1  PILLSBURY WINTHROP SHAW PITTMAN LLP
   REYNOLD L. SIEMENS  #177956
2  Email:  reynold.siemens@pillsburylaw.com
   725 South Figueroa Street, Suite 2800
3  Los Angeles, CA 90017-5406
   Telephone:  (213) 488-7100
4  Facsimile:  (213) 629-1033

5  PILLSBURY WINTHROP SHAW PITTMAN LLP
   BRUCE A. ERICSON  #76342
6  Email:  bruce.ericson@pillsburylaw.com
   GEORGE ALLEN BRANDT  #264935
7  Email:  allen.brandt@pillsburylaw.com
   50 Fremont Street
8  Post Office Box 7880
   San Francisco, CA  94120-7880
9  Telephone: (415) 983-1000
   Facsimile: (415) 983-1200

10
   Attorneys for Defendants ROBERT JOHN BURRELL, WILLIAM CHENEY,
11 GORDON DAMES, ROBERT H. HARVEY, JR., JAMES JORDAN,
   TIMOTHY M. KRAMER, ROBIN LENTZ, JOHN M. MERLO, WARREN
12 NAKAMURA, BRIAN OSBERG, DAVID RHAMY and SHARON UPDIKE

13                 UNITED STATES DISTRICT COURT

14                 CENTRAL DISTRICT OF CALIFORNIA

15                      WESTERN DIVISION

16                                        No. CV 10-01597 GW (MANx)

17 NATIONAL CREDIT UNION
   ADMINISTRATION BOARD AS            **MEMORANDUM IN SUPPORT OF**
   CONSERVATOR FOR WESTERN            **DEFENDANTS' MOTION TO**
18 CORPORATE FEDERAL CREDIT           **DISMISS PLAINTIFF'S FIRST**
   UNION,                             **AMENDED COMPLAINT**
19
                        Plaintiff,     Honorable George H. Wu
20                                     Courtroom 10
        vs.                           312 North Spring Street
21
   ROBERT A. SIRAVO, et al.,          Date:      December 20, 2010
22                                     Time:      8:30 a.m.
                        Defendants.    Courtroom: Los Angeles, 10
23

24

25

26

27

28

# Table of Contents

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT. ...................................................... 1

II.   STATEMENT OF THE CASE. ............................................................ 2

    A.   The parties. ....................................................... 2

    B.   Procedural history. ..................................................... 2

    C.   The FAC's allegations about the Investment Claims. ................... 3

III.  ARGUMENT. .......................................................... 6

    A.   The FAC's First Claim does not state a claim for negligent breach of fiduciary duties because it fails to allege facts sufficient to overcome California's Business Judgment Rule. ..................................... 6

        1.   California's Business Judgment Rule governs the First Claim. ......................................... 6

        2.   The FAC does not allege facts sufficient to overcome California's Business Judgment Rule. ................................................ 10

            a.   The FAC does not allege that the content of Defendants' business decisions was irrational or gross overreaching. ...........................11

            b.   The FAC does not allege fraud, bad faith or conflicts of interest. ....................12

            c.   The FAC's process allegations not do overcome the Business Judgment Rule..................13

            d.   The FAC fails to allege facts particular to Burrell.....................................17

    B.   The FAC's Second Claim does not state a claim for gross negligence because California law does not recognize a general claim for gross negligence and because the FAC does not allege facts amounting to gross negligence. ......................................... 18

        1.   The federal statutory floor does not apply in California. ...................................... 18

        2.   California law does not recognize a general claim for gross negligence. ............................... 18

1

3. The FAC does not allege facts amounting to gross negligence.................................................................... 19

2

3

C. The FAC's First and Second Claims are time-barred as against Cheney, Updike and Rhamy....................................... 21

4

D. Dismissal should be without leave to amend............................ 24

5

IV. CONCLUSION. ...................................................................... 24

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**Table of Authorities**

2

**Page**

3

**Cases**

4   *Archie v. City of Racine*,
        847 F.2d 1211 (7th Cir. 1988)................................................................23

5
    *Ashcroft v. Iqbal*,
6       129 S. Ct. 1937 (2009) ..................................................................3, 6

7   *Atherton v. FDIC*,
        519 U.S. 213, 117 S. Ct. 666 (1997) .................................. 6, 18, 19

8
    *Barnes v. State Farm Mut. Auto. Ins. Co.*,
9       16 Cal. App. 4th 365, 20 Cal. Rptr. 2d 87 (1993)...................9

10  *Bell Atlantic Corp. v. Twombly*,
        550 U.S. 544, 127 S. Ct. 1955 (2007) ................................. 3, 17

11
    *Berg & Berg Enters., LLC v. Boyle*,
12      178 Cal. App. 4th 1020, 100 Cal. Rptr. 3d 875 (2009).................. 7, 8, 9

13  *Briano v. Rubio*,
        46 Cal. App. 4th 1167, 54 Cal. Rptr. 2d 408 (1996)..............................24

14
    *Bridgeport Holdings, Inc. Liquidating Trust v. Boyer*,
15      388 B.R. 548 (Bankr. D. Del. 2008) .........................................................17

16  *Burt v. Irvine Co.*,
        237 Cal. App. 2d 828, 47 Cal. Rptr. 392 (1965) ...................................22

17
    *City of Santa Barbara v. Superior Court*,
18      41 Cal. 4th 747, 62 Cal. Rptr. 3d 527 (2007)................................. 19, 21

19  *Continental Ins. Co. v. Am. Prot. Indus.*,
        197 Cal. App. 3d 322, 242 Cal. Rptr. 784 (1987) ........................ 19, 23

20
    *Devito v. California*,
21      202 Cal. App. 3d 264, 248 Cal. Rptr. 330 (1988) .................................19

22  *Eastburn v. Regional Fire Protection Authority*,
        31 Cal. 4th 1175, 7 Cal. Rptr. 3d 552 (2003).......................................19

23
    *Eminence Capital, LLC v. Aspeon Inc.*,
24      316 F.3d 1048 (9th Cir. 2003).................................................................24

25  *Estate of Detwiler v. Offenbecher*,
        728 F. Supp. 103 (S.D.N.Y. 1989).........................................................16

26
    *Fairchild v. Bank of Am. Nat. Trust & Sav. Asso.*,
27      192 Cal. App. 2d 252, 13 Cal. Rptr. 491 (1961) .....................................9

28

- iii -

*FDIC v. Castetter,*
    184 F.3d 1040 (9th Cir. 1999)...................................................... 7, 11, 16, 18

*FDIC v. McSweeney,*
    976 F.2d 532 (9th Cir. 1992)..................................................... 21, 22, 23

*Findley v. Garrett,*
    109 Cal. App. 2d 166, 240 P.2d 421 (1952) ...................................9

*Gantler v. Stephens,*
    965 A.2d 695 (Del. 2009)........................................................17

*Gully v. NCUA,*
    341 F.3d 155 (2d Cir. 2003) ....................................................6

*In re Caremark Int'l Inc. Derivative Litig.,*
    698 A.2d 959 (Del. Ch. 1996)..................................................10

*In re Citigroup Inc. Shareholder Derivative Litig.,*
    964 A.2d 106 (Del. 2009)................................................ 9, 11, 12

*In re Consumers Power Co. Derivative Litig.,*
    132 F.R.D. 455 (E.D. Mich. 1990)............................................16

*In re Countrywide Fin. Corp. Sec. Litig.,*
    588 F. Supp. 2d 1132 (C.D. Cal. 2008).......................................4

*In re Hansen Natural Corp. Sec. Litig.,*
    527 F. Supp. 2d 1142 (C.D. Cal. 2007).......................................24

*In re Sec. Capital Assur. Secs. Litig.,*
    No. 07 Civ. 11086 (DAB), 2010 U.S. Dist. LEXIS 33954
    (S.D.N.Y. Mar. 10, 2010)........................................................4

*In re Walt Disney Co. Deriv. Litig.,*
    907 A.2d 693 (Del. Ch. 2005).................................................20

*Lee v. Interinsurance Exchange,*
    50 Cal. App. 4th 694, 57 Cal. Rptr. 2d 798 (1996)............... 9, 13, 15, 16

*Lehman v. Superior Court,*
    145 Cal. App. 4th 109, 51 Cal. Rptr. 3d 411 (2006)...........................24

*Martinez v. United States,*
    No. EDCV 09-0375-SVW(RC), 2010 U.S. Dist. LEXIS
    105763 (C.D. Cal. Mar. 25, 2010) ................................. 19, 21

*McMichael v. United States Filter Corp.,*
    No. EDCV 99-182 VAP (MCx), 2001 U.S. Dist. LEXIS
    3918 (C.D. Cal. Feb. 23, 2001) ......................................... 9, 17

*Merrill Lynch Int'l v. XL Capital Assur. Inc.,*
    564 F. Supp. 2d 298 (S.D.N.Y. 2008).......................................4

*Moss v. U.S. Secret Service,*
   572 F.3d 962 (9th Cir. 2009) ................................................ 6, 17

*Ritter & Ritter Pension & Profit Sharing Plan v. Churchill
Condo. Ass'n,*
   166 Cal. App. 4th 103, 82 Cal. Rptr. 3d 389 (2008) ...................... 7, 11

*Rodriguez de Quijas v. Shearson/American Express, Inc.,*
   490 U.S. 477, 109 S. Ct. 1917 (1989) .....................................22

*RTC v. Blasdell,*
   930 F. Supp. 417 (D. Ariz. 1994) .........................................20

*Saenz v. Whitewater Voyages, Inc.,*
   226 Cal. App. 3d 758, 276 Cal. Rptr. 672 (1991) .........................19

*Smith v. Superior Court,*
   217 Cal. App. 3d 950, 266 Cal. Rptr. 253 (1990) .........................24

*Southern Counties Thrift Co. v. Rairdon,*
   47 Cal. App. 2d 770, 118 P.2d 828 (1941) ................................22

*Trenwick Am. Litig. Trust v. Ernst & Young LLP,*
   906 A.2d 168 (Del. Ch. 2006) ............................................21

*United States v. Zuniga,*
   579 F.3d 845 (8th Cir. 2009) ............................................22

*Wilson v. Brett,*
   [1843] 11 M. & W. 113, 152 Eng. Rep. 737 ...............................23

**Statutes and Codes**

California Business & Professions Code
   Section 2533 ............................................................19
   Section 2563 ............................................................19
   Section 3137 ............................................................19
   Section 3401 ............................................................19

California Code of Civil Procedure
   Section 339 .............................................................22
   Section 343 .............................................................22
   Section 359 ...........................................................23, 24

California Corporations Code
   Section 309 ........................................................ passim
   Section 7231 ..........................................................7, 11

United States Code

Title 12, section 1752a(a) ...................................................................2
Title 12, section 1757(15)(B) ..................................................... 4, 12
Title 12, section 1757(7)(E) ...............................................................4
Title 12, section 1761(a) ...................................................................12
Title 12, section 1761(c) ...................................................................12
Title 12, section 1766(a) ...................................................................14
Title 12, section 1786(h)(1) ................................................................2
Title 12, section 1787(b)(14) ...........................................................21
Title 12, section 1787(h) ....................................... 6, 18, 23, 24
Title 12, section 1821(k) .....................................................................6

## Rules and Regulations

Code of Federal Regulations

Title 12, Part 704, Appx. B ........................................ 4, 12, 14, 15
Title 12, section 700-797 ...................................................................12
Title 12, section 703.14(d) ...............................................................14
Title 12, section 703.2 .......................................................................14
Title 12, section 703.3(f) ...................................................................14
Title 12, section 703.7 .......................................................................14
Title 12, section 704.10 ............................................................. 12, 14
Title 12, section 704.5 ................................................................ 4, 12
Title 12, section 704.6 ............................................................... 12, 14
Title 12, section 704.6(d) .......................................................... 14, 15
Title 12, section 704.8 .......................................................................12
Title 12, sections 703.16(d)-(f) ........................................................14
Title 12, sections 703.1-703.19 ........................................................12
Title 12, sections 704.5(c), (h) .........................................................14

## Other Authorities

3 B.E. Witkin, *California Procedure*, Actions § 650 (5th ed. 2008) ..............................................................................................22

75 Fed. Reg. 64851 (Oct. 20, 2010) ................................................15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.    INTRODUCTION AND SUMMARY OF ARGUMENT.

This motion to dismiss, brought by 11 former unpaid volunteer directors and one former officer, attacks the legal sufficiency of the First and Second Claims in the First Amended Complaint, Doc. 84 ("FAC"), filed by the National Credit Union Administration Board ("NCUA"); these 12 defendants (the "Defendants") are not parties to the Third through Sixth Claims.

The First Claim, for negligent breach of fiduciary duty, attacks investment decisions made by Western Federal Corporate Credit Union ("WesCorp").  It focuses almost exclusively on the *content* and *result* of those decisions, and only incidentally on the *process* by which those decisions were made.  In so doing, this claim fails to plead – as it must – an exception to California's Business Judgment Rule, which insulates the content and result of business decisions – even risky decisions – from judicial review so long as the process was rational.  Here, the FAC alleges nothing that undermines the rationality of Defendants' processes.  Nor does the First Claim allege any fraud, bad faith or conflicts of interest, much less the "gross overreaching" needed to overcome the Business Judgment Rule.  Indeed, the FAC candidly admits the careful processes by which Defendants made their decisions, and fails even to suggest that these processes fell short of the detailed legal requirements set by the NCUA's statutes and regulations, which expressly allow investments of the sort made here and expressly set forth how directors were to approach their investment decisions.

The Second Claim attacks the same investments, this time labeling them grossly negligent, but with nothing more by way of factual allegations to support that theory.  This claim has other legal infirmities as well.  The statute under which the NCUA brings this claim sets a federal floor:  it applies only if state law limits liability to levels of culpability more serious than gross negligence, and then it looks to state law for the contours of gross negligence.  That federal floor has no application in California.  But if it did, the NCUA still would have

1   no claim, because its factual allegations do not come anywhere near the showing

2   of "want of even scant care," "extreme departure from the ordinary standard of

3   conduct," "reckless indifference," "deliberate disregard" or conduct "without the

4   bounds of reason" required to state a claim of gross negligence against directors.

5        Both claims also fail to satisfy the statute of limitations as to three

6   Defendants (Cheney, Rhamy and Updike) because all left WesCorp's Board

7   early in 2006, before the beginning of the applicable limitations periods.

8   **II.    STATEMENT OF THE CASE.**

9   **A.    The parties.**

10        The NCUA is an independent federal agency created pursuant to 12 U.S.C.

11   § 1752a(a).  The NCUA alleges that on March 19, 2009 it placed WesCorp into a

12   conservatorship pursuant to 12 U.S.C. § 1786(h)(1) and succeeded to the rights

13   of WesCorp and its members, including the right to bring this case against

14   WesCorp's former directors and officers.  FAC ¶ 1.

15        The 16 named defendants are some but not all of the former unpaid

16   volunteer directors and officers of WesCorp.  FAC ¶¶ 6-21.  The movants here

17   are 11 former directors and one former officer (Robert Burrell).  *Id.*  What these

18   12 defendants have in common is that all are named in the First and Second

19   Claims (the "Investment Claims"), but not in the Third through Sixth Claims (the

20   "SERP Claims").

21   **B.    Procedural history.**

22        The NCUA took over WesCorp and placed it into a conservatorship on

23   March 19, 2009.  FAC ¶ 1.  Unlike the usual private plaintiff, who must prepare

24   a complaint with little or no access to the defendants' records, the NCUA had

25   daily access to WesCorp's books and records – and to its employees – for a year

26   and a half before it filed the FAC.  It has had plenty of time and opportunity to

27   investigate and develop its claims, and no reason not to file a detailed and

28   specific complaint satisfying *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,

1  127 S. Ct. 1955 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).

2      The seven original plaintiffs filed this case in Superior Court in November

3  2009.  The NCUA intervened and then removed the case to this Court.  Doc. 1.

4  The NCUA and the original plaintiffs fought over who owned the claims and

5  should control the litigation (Doc. 31, 40-43); the Court ruled largely in favor of

6  the NCUA (Doc. 66).  After further disagreements between the NCUA and the

7  original plaintiffs, and a status conference (Doc. 80-81), the NCUA filed the

8  FAC and the original plaintiffs withdrew from the case (Doc. 84-85).

9  **C.     The FAC's allegations about the Investment Claims.**

10     The FAC asserts two claims against Defendants: negligent breach of

11  fiduciary duty and gross negligence.  FAC ¶¶ 114, 121.  Both claims principally

12  attack the *content and result* of Defendants' decisions, as opposed to the *process*

13  by which Defendants made those decisions.  As discussed below, the law treats

14  the *process* of decision-making differently from the *content* and *results* of those

15  decisions, hence this memorandum distinguishes between them.

16     *The FAC's allegations about the content of Defendants' business*

17  *decisions:*  The FAC alleges that WesCorp changed its business model starting in

18  2002, abandoning its "traditional business model" in favor of growth in assets,

19  borrowing and interest income from investments.  FAC ¶¶ 25-30, 44-53.

20  WesCorp sought higher yields on its investments and therefore bought

21  proportionately more mortgage-backed securities ("MBS") issued by "the

22  world's leading investment banks" (which the FAC calls "private-label MBS")

23  and proportionately less MBS issued by the Federal National Mortgage

24  Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation

25  ("Freddie Mac"), the two government-sponsored enterprises that the federal

26  government put into conservatorship in September 2008.  FAC ¶¶ 32, 55.

27     In addition to buying more MBS underwritten by "leading investment

28  banks" and less issued by Fannie Mae and Freddie Mac, Defendants also

1    temporarily increased the concentration of AA-rated (as opposed to AAA-rated)

2    MBS until 2005 but then decreased the concentration of AA (in favor of AAA)

3    until 2007, when WesCorp ceased buying MBS altogether.  FAC ¶¶ 62-64.  The

4    FAC admits that all private-label MBS that WesCorp purchased were rated AAA

5    or AA (the highest two ratings) by Moody's or S&P.  FAC ¶ 32.  The FAC does

6    not suggest that WesCorp ever bought lower-rated or lower tranche MBS.[1]

7         The FAC does not question the legality of these investments.  Nor could it,

8    for the Federal Credit Union Act expressly contemplates and authorizes such

9    investments.  12 U.S.C. § 1757(7)(E) (permitting investments in MBS issued by

10   Fannie and Freddie), § 1757(15)(B) (permitting investments in other MBS).  So

11   too do the NCUA's regulations.  *See* 12 C.F.R. § 704.5(c) (Mar. 19, 1997) and

12   Part 704, Appx. B (Oct. 25, 2002).  The FAC's main "content" allegation is that

13   Defendants bought too much "Option ARM" MBS.[2]  FAC ¶¶ 30-31, 113, 121.

14   The FAC admits that WesCorp adopted policies specifying concentration limits

15   for various types of securities and periodically amended the limits.  FAC ¶ 69.

16   The FAC also admits that WesCorp stayed within those limits.  FAC ¶¶ 69, 73.

17   _____

18   [1]  The FAC does not explain this point, but the case law does.  Typically an
19   offering of MBS consists of as many as a dozen classes, or "tranches."
     Investors purchasing the least risky or "senior" tranches receive lower
20   interest; investors purchasing the junior tranches receive more interest to
     compensate them for bearing more risk.  The ratings agencies (such as
21   Moody's and S&P) issue separate ratings for each tranche.  Thus, a senior
     tranche could be AAA, whereas a junior tranche could be BB or even unrated
22   "equity."  *Merrill Lynch Int'l v. XL Capital Assur. Inc.*, 564 F. Supp. 2d 298,
23   300 (S.D.N.Y. 2008); *In re Sec. Capital Assur. Secs. Litig.*, No. 07 Civ. 11086
     (DAB), 2010 U.S. Dist. LEXIS 33954, *10-11 (S.D.N.Y. Mar. 10, 2010).
24   The FAC alleges that WesCorp bought only AAA- and AA-rated MBS, and
     started moving out of AA after 2005.  FAC ¶¶ 62-64.
25
     [2]  The FAC does not define this term either.  Option ARMs are adjustable rate
26   mortgages ("ARMs") in which the borrower is given some latitude (hence the
     "Option") to say how much he or she will pay each month.  *See In re*
27   *Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1150 (C.D. Cal.
28   2008).

1    The FAC faults WesCorp for not adopting a concentration limit specifically for

2    Option ARM MBS, but does not allege facts showing the need for a limit was

3    apparent when WesCorp was buying Option ARMs – in other words, that "red

4    flags" were flying which Defendants should have spotted.  FAC ¶ 70.  (WesCorp

5    ceased buying MBS altogether by mid 2007.  FAC ¶ 64.)

6         *The FAC's allegations about the process by which Defendants made their*

7    *business decisions:*  The FAC's allegations about process are few and far

8    between, and far less specific than the FAC's admissions about what WesCorp

9    did right.  Significantly, the FAC does *not* allege that WesCorp ever violated any

10   of the NCUA's detailed regulations or other directives prescribing how to

11   analyze and monitor investments (about which more below).

12        The FAC admits that Defendants received detailed information about

13   WesCorp's investment portfolio, set appropriate concentration limits and lived

14   within those limits, bought only high-rated investments (mostly AAA),

15   monitored trends, lowered their exposure to riskier investments (nothing below

16   AA) when risks emerged and got out of the market altogether long before most

17   on Wall Street.  *E.g.,* FAC ¶¶ 32, 63-66, 69-70, 74-77.  The FAC also admits that

18   WesCorp classified and tracked MBS investments by rating (AAA and AA) and

19   FICO score (prime, alt-A, and subprime), and used the bond rating of

20   investments to track tranche positions.  FAC ¶¶ 71-72.

21        The FAC admits that each year Defendants adopted a budget that

22   contained detailed information about projected expenses and projected fee

23   income, including monthly projections of investment income, investment

24   expense and net interest income.  FAC ¶ 65.  The FAC admits that Defendants

25   regularly attended meetings of WesCorp's Board of Directors and its Asset and

26   Liability Committee ("ALCO"), and thus regularly received information about

27   the state of the economy, the investment climate and WesCorp's investment

28   strategy.  FAC ¶ 74.  The FAC also admits that Defendants received and

1    considered presentations on Option ARM MBS and took affirmative steps to

2    adjust WesCorp's investment strategy based on the information received at

3    ALCO meetings (*e.g.*, starting to get out of AA in 2005).  FAC ¶¶ 62-64, 75-77.

4         These admissions aside, the FAC's allegations about process are either

5    completely conclusory (FAC ¶ 113) and therefore to be disregarded, *see Iqbal*,

6    129 S. Ct. at 1949; *Moss v. U.S. Secret Service*, 572 F.3d 962, 969 (9th Cir.

7    2009), or else nit-pick the format of the reports that the Board received from

8    management.  FAC ¶ 71-72, 114(e) (reports focused on rating agencies' rating

9    rather than tranche level or whether underlying loans were Option ARMs).

10        *The FAC's allegations about the results of the business decisions:*  The

11   FAC alleges that WesCorp failed because it "was required to record losses of

12   $6.8 billion in its investment portfolio" (FAC ¶ 33) and that Defendants caused

13   losses "not fully ascertained but in excess of $1 billion" (FAC ¶¶ 117, 123).  The

14   FAC does not allege whether the MBS currently are delinquent on payments, or

15   whether any MBS actually have been sold at a loss.

16   **III.   ARGUMENT.**

17   **A.    The FAC's First Claim does not state a claim for negligent breach of**

18   **fiduciary duties because it fails to allege facts sufficient to overcome**

19   **California's Business Judgment Rule.**

20   **1.    California's Business Judgment Rule governs the First Claim.**

21        A federal statute, 12 U.S.C. § 1787(h), defines the liability of directors and

22   officers of a credit union.  That statute permits the NCUA to look to state law, so

23   long as state law requires no more culpability than gross negligence.  *See Gully v.*

24   *NCUA*, 341 F.3d 155, 165 (2d Cir. 2003) (applying New York's corporate

25   fiduciary duty statute and common law to an officer's breach of fiduciary duty);

26   *cf. Atherton v. FDIC*, 519 U.S. 213, 215-16, 117 S. Ct. 666, 669-70 (1997)

27   (construing 12 U.S.C. § 1821(k), which is the FDIC's analogue to § 1787(h)).

28   California law meets this statutory standard.  *FDIC v. Castetter*, 184 F.3d 1040,

1    1043-44 (9th Cir. 1999).  Thus, the Court should look to California law in

2    determining whether the First Claim states a claim.

3         California follows (and indeed has codified, Cal. Corp. Code §§ 309,

4    7231) the Business Judgment Rule.  That Rule insulates directors from liability

5    for simple negligence (which is what the First Claim alleges, FAC ¶¶ 35, 114) so

6    long as the directors acted in good faith, without conflicts of interest, and did

7    what they believed to be in the best interest of the corporation.  *Castetter*,

8    184 F.3d at 1044.  The Rule "protect[s] well-meaning directors who are

9    misinformed, misguided, and honestly mistaken" from judicial second-guessing.

10   *Id.* at 1046.  Or, as California courts express it, "The business judgment rule 'sets

11   up a presumption that directors' decisions are based on sound business judgment.

12   This presumption can be rebutted only by a factual showing of fraud, bad faith or

13   gross overreaching.'"  *Ritter & Ritter Pension & Profit Sharing Plan v. Churchill*

14   *Condo. Ass'n*, 166 Cal. App. 4th 103, 123, 82 Cal. Rptr. 3d 389, 403 (2008)

15   (citations omitted).

16        *Berg & Berg Enters., LLC v. Boyle,* 178 Cal. App. 4th 1020, 1045, 100

17   Cal. Rptr. 3d 875, 897 (2009) explains California's Business Judgment Rule:

18        [T]he common law rule "has two components – one which

19        immunizes directors from personal liability if they act in accordance

20        with its requirements, and another which insulates from court

21        intervention those management decisions which are made by

22        directors in good faith in what the directors believe is the

23        organization's best interest.  Only the first component is embodied

24        in Corporations Code section 309."  The broader rule is "'"a judicial

25        policy of deference to the business judgment of corporate directors

26        in the exercise of their broad discretion in making corporate

27        decisions."'  [It] is based on the premise that those to whom the

28        management of a business organization has been entrusted, and not

1    the courts, are best able to judge whether a particular act or

2    transaction is helpful to the conduct of the organization's affairs or

3    expedient for the attainment of its purposes.  The rule establishes a

4    presumption that directors' decisions are based on sound business

5    judgment, and it prohibits courts from interfering in business

6    decisions made by the directors in good faith and in the absence of a

7    conflict of interest.  "'**A hallmark of the business judgment rule is**

8    **that a court will not substitute its judgment for that of the board**

9    **if the latter's decision can be "attributed to any rational**

10   **business purpose**."'"

11   *Id.* at 1045 (emphasis added) (citations omitted).

12          To be sure, a proper complaint can allege facts sufficient to overcome the

13   Business Judgment Rule.  But the standard is high, because the presumption

14   favors and protects the defendants' business judgment.  As the *Berg & Berg*

15   court explained, a plaintiff must allege facts – not conclusions – sufficient to

16   establish an exception to the Business Judgment Rule.  And to do so:

17          [M]ore is needed than "conclusory allegations of improper motives

18          and conflict of interest.  Neither is it sufficient to generally allege

19          the failure to conduct an active investigation, in the absence of (1)

20          allegations of facts which would reasonably call for such an

21          investigation, or (2) allegations of facts which would have been

22          discovered by a reasonable investigation and would have been

23          material to the questioned exercise of business judgment."  In most

24          cases, "the presumption created by the business judgment rule can

25          be rebutted only by affirmative allegations of facts which, if proven,

26          would establish fraud, bad faith, overreaching or an unreasonable

27          failure to investigate material facts.  **Interference with the**

28          **discretion of directors is not warranted in doubtful cases**."

1    … **the failure to sufficiently plead facts to rebut the**

2        **business judgment rule or establish its exceptions may be raised**

3        **on demurrer, as whether sufficient facts have been so pleaded is**

4        **a question of law**.

5    *Id.* at 1045-46 (emphasis added) (citations omitted).  Other courts also have

6    dismissed complaints on the ground that they do not allege facts sufficient to

7    rebut the Business Judgment Rule.  *McMichael v. United States Filter Corp.,*

8    No. EDCV 99-182 VAP (MCx), 2001 U.S. Dist. LEXIS 3918, at *40-*43 (C.D.

9    Cal. Feb. 23, 2001); *Lee v. Interinsurance Exchange*, 50 Cal. App. 4th 694, 711-

10   17, 57 Cal. Rptr. 2d 798, 808-13 (1996); *Barnes v. State Farm Mut. Auto. Ins.*

11   *Co.,* 16 Cal. App. 4th 365, 378-79, 20 Cal. Rptr. 2d 87, 94-96 (1993); *Fairchild*

12   *v. Bank of Am. Nat. Trust & Sav. Asso.*, 192 Cal. App. 2d 252, 256-58, 13 Cal.

13   Rptr. 491, 492-94 (1961); *Findley v. Garrett*, 109 Cal. App. 2d 166, 177-79, 240

14   P.2d 421, 427-30 (1952).

15       Before turning to the FAC's allegations, one other aspect of the Business

16   Judgment Rule merits mention.  The Rule focuses mainly on the *process* by

17   which directors make business judgments, and not the *content* or *results* of those

18   decisions themselves.  *See* Cal. Corp. Code § 309.  California cases such as *Berg*

19   *& Berg* draw this distinction, but it is perhaps most trenchantly stated in a recent

20   Delaware decision involving (as here) a financial institution's decision to invest

21   in billions of dollars of MBS.

22       *In re Citigroup Inc. Shareholder Derivative Litig.,* 964 A.2d 106 (Del. Ch.

23   2009) dismissed a shareholder derivative action alleging that Citigroup directors

24   breached their fiduciary duties by exposing Citigroup to $55 billion worth of

25   MBS.  In dismissing the action, the Chancery Court focused entirely on the

26   *process* by which the directors had made their investment decision, and not on

27   the *content* of that decision, explaining:

28

1   What should be understood, but may not widely be understood by

2   courts or commentators who are not often required to face such

3   questions, is that compliance with a director's duty of care can never

4   appropriately be judicially determined by reference to the content of

5   the board decision that leads to a corporate loss, apart from

6   consideration of the good faith or rationality of the process

7   employed.  That is, whether a judge or jury considering the matter

8   after the fact, believes a decision substantively wrong, or degrees of

9   wrong extending through "stupid" to "egregious" or "irrational",

10  provides no ground for director liability, so long as the court

11  determines that the process employed was either rational or

12  employed in a good faith effort to advance corporate interests.  To

13  employ a different rule – one that permitted an "objective"

14  evaluation of the decision – would expose directors to substantive

15  second guessing by ill-equipped judges or juries, which would, in

16  the long-run, be injurious to investor interests.  Thus, the business

17  judgment rule is process oriented and informed by a deep respect for

18  all good faith board decisions.

19  *Id.* at 127 (quoting *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959,

20  967-68 (Del. Ch. 1996) (emphasis omitted)).

21  **2.      The FAC does not allege facts sufficient to overcome California's**

22          **Business Judgment Rule.**

23          The FAC does not allege facts sufficient to meet the standards outlined

24  above.  Indeed, it scarcely tries.  It focuses almost entirely on the *content* of the

25  directors' decisions (to approve the purchase of mortgage-backed securities, *see*

26  FAC ¶¶ 25-30, 45-53) and says almost nothing about the *process* of making

27  those decisions, beyond admitting that Defendants received detailed information,

28  set appropriate limits and lived within those limits, bought only high-rated

1　investments (mostly AAA), monitored trends, lowered their exposure to riskier

2　investments when risks emerged and got out of the market altogether long before

3　most on Wall Street.  *E.g.,* FAC ¶¶ 32, 63-66, 69-70, 74-77.

4　**a.　The FAC does not allege that the content of Defendants' business**

5　　　**decisions was irrational or gross overreaching.**

6　　　The case law (summarized above) and the statutes (Cal. Corp. Code

7　§§ 309, 7231) provide no basis to second-guess the content of Defendants'

8　business decisions.  The FAC does not allege that Defendants did not do what

9　they "believe[d] to be in the best interest of the corporation" (*Castetter*, 184 F.3d

10　at 1044) or engaged in "gross overreaching" (*Ritter & Ritter*, 166 Cal. App. 4th

11　at 123).  The FAC alleges nothing to suggest the directors sought to harm

12　WesCorp, did not believe in what they were doing (after all, their own

13　institutions invested with WesCorp) or were grossly overreaching.  What it does

14　allege is a disagreement about the risk-reward tradeoff in business:  how much

15　risk to bear and how much reward to seek.  FAC ¶¶ 25-30, 45-53.  That is exactly

16　what the Business Judgment Rule protects.  The "core protections" of the Rule

17　are "protections designed to allow corporate managers and directors to pursue

18　risky transactions without the specter of being held personally liable if those

19　decisions turn out poorly."  *Citigroup*, 964 A. 2d at 125.

20　　　The NCUA does not like WesCorp's departure from its "traditional

21　business model," its decision to borrow money (hardly a unique idea for a

22　financial institution) or its search for higher yields (again, hardly a unique idea).

23　With the full benefit of 20/20 hindsight, the NCUA claims these decisions led to

24　large losses, although the allegations of loss are remarkably lacking in detail.

25　　　The FAC insinuates that because credit unions are non-profits, WesCorp

26　should not have taken risks or sought higher yields.  FAC ¶¶ 24-27.  (One

27　supposes a financial institution could avoid all risk if it did not lend money or

28　invest money.)  But the FAC does not allege that WesCorp's strategy was a

1   secret,[3] that WesCorp violated any NCUA statute (they specifically authorize

2   investments in private-label MBS, *see* 12 U.S.C. § 1757(15)(B)) or any NCUA

3   regulation (of which there are hundreds, *see* 12 C.F.R. Parts 700-797, including

4   many regulating investments, *see* 12 C.F.R. § 704.5 (Oct. 25, 2002), 704.6 (Oct.

5   25, 2002), 704.8 (Oct. 25, 2002), 704.10 (Mar. 19, 1997) & Part 704, Appx. B

6   (Oct. 25, 2002); *see also* 12 C.F.R. §§ 703.1-703.19 (Jan. 3, 2003)), or that

7   offering higher yields to natural person credit unions that wanted higher yields

8   was somehow unlawful.

9       The whole tenor of the FAC is that the NCUA would rather WesCorp have

10  been more traditional and more risk-adverse (lower leverage, lower yield).  But

11  as explained in *Citigroup*, that is exactly that sort of hindsight-fueled second-

12  guessing that courts should avoid.  The NCUA is not entitled to seek billions of

13  dollars from well-meaning individuals merely because the NCUA now suggests

14  it would have made different choices had government bureaucrats run WesCorp.

15  **b.    The FAC does not allege fraud, bad faith or conflicts of interest.**

16      The FAC makes, with respect to these defendants, no allegations of fraud,

17  bad faith or conflicts of interest.  Nor could it.  These defendants (except Burrell,

18  who is discussed below) were unpaid volunteers (*see* 12 U.S.C. § 1761(c)),

19  CEOs or CFOs of natural person credit unions chosen by member credit unions

20  to serve on WesCorp's Board (*see* 12 U.S.C. § 1761(a)).  There is not even a

21  whiff of self-dealing or self-interest around them.  They are simply good citizens

22  who tried their best to oversee the management of the money their own credit

23  unions had entrusted to WesCorp.  They had "skin in the game" and no ulterior

24  motives, and the FAC does not allege otherwise.

25  _____

26  [3]    At all times, the NCUA had at least two examiners resident at WesCorp, and
    it conducted periodic regulatory examinations of WesCorp.  The FAC does
27  not allege either that it criticized WesCorp when WesCorp was buying MBS
    (before the summer of 2007) or that WesCorp failed to respond to whatever
28  suggestions the NCUA offered in its reports of examination.

c.      **The FAC's process allegations not do overcome the Business Judgment Rule.**

To the very limited extent that the FAC actually does address process, the FAC fails to allege lack of a reasonable inquiry.  As explained in *Lee*, it is not enough to allege a failure to conduct an active investigation without also alleging (1) facts which would reasonably call for such an investigation or (2) facts which would have been discovered by a reasonable investigation and would have been material to the questioned exercise of business judgment.  *Lee*, 50 Cal. App. 4th at 715.  The FAC alleges no such facts.  Instead, and as in *Lee*, what the FAC offers is merely the conclusion that there "was not a reasonable inquiry because the defendants reached a conclusion with which the plaintiffs disagree." *Id.* at 716.  That kind of wishful thinking does not suffice, said *Lee,* in upholding the sustaining of a demurrer.  The same is true here.

Before turning to the FAC's criticisms of Defendants' processes, it is useful to recall what the FAC concedes.  It *admits* that:

- Defendants received detailed information about WesCorp's investment portfolio, set, monitored and followed appropriate concentration limits, monitored trends and reacted to trends (lowering their exposure to AA-rated securities after 2005 and ceasing MBS purchases altogether long before most on Wall Street).  *E.g.,* FAC ¶¶ 32, 62-66, 69-70, 74-77.

- WesCorp classified and tracked MBS investments by rating (AAA and AA) and FICO score (prime, alt-A and subprime), and used the bond rating of investments to track tranche positions.  FAC ¶¶ 71-72.

- Each year, Defendants adopted a budget that contained detailed information about projected expenses and projected fee income, including monthly projections of investment income, investment expense and net interest income.  FAC ¶ 65.

- Defendants regularly attended meetings of WesCorp's Board of Directors and

1   ALCO, and regularly received information about the state of the economy, the

2   investment climate and WesCorp's investment strategy.  FAC ¶ 74.

3   • Defendants received and considered presentations on Option ARM MBS and

4      took affirmative steps to adjust WesCorp's investment strategy based on the

5      information received at ALCO meetings (*e.g.*, starting to get out of AA in

6      2005).  FAC ¶¶ 62-64, 75-77.

7   This is not the portrait of a Board run amok.

8      As telling as what the FAC admits is what it omits:  It does not allege any

9   violation of the myriad NCUA regulations promulgated under 12 U.S.C.

10  § 1766(a) detailing how a credit union should analyze, limit and monitor its

11  investments.  *See* 12 C.F.R. Part 704; *see also id.* Part 703.  Consider this:

12  • The NCUA's regulations expressly contemplate and authorize investments in

13     private-label MBS.  12 C.F.R. § 704.5(c), (h) (Oct. 25, 2002) (specifying

14     kinds of MBS allowed, and not allowed) & Part 704, Appx. B (Oct. 25,

15     2002); *see also id.* § 703.2 (June 3, 2003) (definition of "Mortgage related

16     security"), § 703.14(d) (June 3, 2003) (CDOs), § 703.16(d)-(f) (June 3, 2003)

17     (specifying kinds of MBS that are not allowed).

18  • The NCUA's regulations set concentration limits (*id.* § 704.6(c) (Oct. 25,

19     2002)) and discuss how to analyze concentration risk (*see id.* § 703.3(f) (June

20     3, 2003)).

21  • The NCUA's regulations also require prompt reporting to the NCUA of any

22     investment that falls out of compliance or has its rating downgraded below

23     the approved level (*id.* § 704.10 (Oct. 25, 2002); *see also id.* § 703.7 (June 3,

24     2003)).

25  • Until 2002, the NCUA's regulations only permitted investments rated "AAA"

26     and up (*see* 12 C.F.R. § 704.6(d) (Mar. 19, 1997)).

27  • In 2002 – the year the FAC accuses WesCorp of becoming more "aggressive"

28     (FAC ¶¶ 25, 45) – the NCUA lowered its rating requirement to "AA minus"

- 14 -

1     for all corporate credit unions (*id.* § 704.6(d)(2) (Oct. 25, 2002)) and "BBB"

2     for credit unions (such as WesCorp) given expanded investment authority

3     under Appendix B to Part 704 (*id.* Part 704, Appx. B (Oct. 25, 2002)).

4   •  The NCUA withdrew permission for qualifying corporate credit unions to

5     invest in BBB-rated securities only 12 days ago, on October 20, 2010, and the

6     new rules do not go into effect until January 2011.  *See* 75 Fed. Reg. 64851

7     (Oct. 20, 2010).

8   •  The FAC does not mention that at all relevant times, the NCUA gave

9     WesCorp the highest level of expanded investment authority, including

10     permission to buy securities rated as low as BBB, and that the NCUA

11     therefore subjected WesCorp to the very highest level of regulatory scrutiny,

12     including on-site NCUA examiners who had real-time access to all ALCO

13     and Board reports, and daily access to WesCorp personnel.

14   •  But the FAC does allege that "the lowest tranche MBS purchased were rated

15     AA" (not BBB, as the NCUA permitted until 12 days ago) and admits that

16     WesCorp acted to reduce its holdings of AA after 2005.  FAC ¶¶ 62-64.

17 The FAC does not allege that Defendants violated any of these or the myriad

18 other regulations and directives detailing how Defendants were to do their jobs.

19     With all these admissions and omissions, what does the FAC criticize?

20     The FAC concedes that WesCorp's annual budget contains detailed

21 information about projected expenses and fee income, as well as projected

22 monthly investment income, investment expense and net interest income, but the

23 FAC criticizes the budget for not being more detailed about how changes in the

24 composition of investments might affect these monthly projections.  FAC ¶ 65.

25 Such nit-picking cannot satisfy the standard set by *Lee*:  the allegations do not

26 specify what red flags warranted such additional analysis, or how such additional

27 analysis would have affected an investment decision.  *See Lee*, 50 Cal. App. 4th

28 at 715.

1    Similarly, the FAC admits that WesCorp tracked and periodically

2  reviewed the ratings and other characteristics of its investments, but argues that

3  Option ARMs and lower-tranche MBS should have been tracked separately.

4  FAC ¶¶ 71-72, 113, 114(e).  Again, these allegations fail to satisfy *Lee*:  the FAC

5  alleges no facts showing that, *at the time,* such additional tracking was called for

6  or that such additional tracking would have uncovered something material.  *Lee*,

7  50 Cal. App. 4th at 715-16.

8    Especially in hindsight, any management report could be improved.  After

9  all, given all the time and money in the world, there always is something more

10  that could done, or done a little differently.  But failing to find and analyze every

11  single piece of information that could possibly be uncovered by additional

12  inquiry is not the standard by which directors' acts must be judged.  The

13  Business Judgment Rule does not require that directors conduct "the ideal or

14  perfect investigation – one that can anticipate all suggestions and withstand any

15  criticism . . . of future court review.  What is required is that the corporation

16  makes a *reasonable* effort to reach an informed business decision."  *In re*

17  *Consumers Power Co. Derivative Litig.*, 132 F.R.D. 455, 483 (E.D. Mich. 1990)

18  (emphasis in original).  Indeed, "in the world of business (as elsewhere), persons

19  are often (or always) required to act on less than perfect information"  *Estate of*

20  *Detwiler v. Offenbecher,* 728 F. Supp. 103, 152 (S.D.N.Y. 1989) (citation

21  omitted).  The FAC's nit-picking cannot overcome the Business Judgment Rule.

22    The same is true of the FAC's conclusory and fact-bare suggestion that

23  Defendants did not understand what they were doing.  FAC ¶ 113.  In *Castetter*,

24  the FDIC attempted to show that a failed bank's directors did not comprehend

25  the information that they received, failed to understand their core business, and

26  accordingly failed to adopt proper policies concerning loans, capital adequacy,

27  collections and internal controls.  *Castetter*, 184 F.3d at 1045.  The Ninth Circuit

28  held that such evidence did not establish a claim because it bears on the

1   soundness of the directors' actions, not on the process of making an adequate

2   inquiry.  *Id.*  So too here.  Condescension about Defendants' understanding is no

3   substitute for an adequate complaint.

4         Because Defendants were disinterested and made good-faith decisions

5   based on a reasonable inquiry, the Business Judgment Rule insulates them from a

6   claim for ordinary negligence and breach of the duty of care.  The NCUA has not

7   pleaded facts adequate to show that it is "plausible" (within the meaning of

8   *Twombly*, 550 U.S. at 555-56; *see also Moss*, 572 F.3d at 969) that it will

9   succeed on the First Claim.  Therefore, the First Claim should be dismissed.

10  **d.      The FAC fails to allege facts particular to Burrell.**

11        Robert Burrell was an officer and not a director.  Courts have held that

12  both directors and officers are fiduciaries (*Gantler v. Stephens*, 965 A.2d 695,

13  708-09 (Del. 2009)) and both also enjoy the protection of the Business Judgment

14  Rule (*McMichael*, 2001 U.S. Dist. LEXIS 3918, *31 (holding that "the business

15  judgment rule attaches to protect corporate officers and directors and the

16  decisions they make, and courts hesitate to second-guess such decisions")).

17        But that does not mean fiduciary duty claims against officers can just

18  piggyback on claims against directors.  Instead, a claim against an officer must

19  "allege facts demonstrating that (1) he took part in the challenged conduct and

20  (2) failed to demonstrate the due care attendant to his particular office in doing

21  so."  *Bridgeport Holdings, Inc. Liquidating Trust v. Boyer*, 388 B.R. 548, 573

22  (Bankr. D. Del. 2008).  The reasoning is practical: "Different corporate offices

23  obviously hold different responsibilities.  For example, the responsibilities of

24  [VP] of Marketing are not the same as those of a General Counsel."  *Id.*  To

25  overcome a motion to dismiss, a complaint must describe "which office and

26  which responsibilities each defendant allegedly held," because otherwise "it is

27  not possible to discern what a particular defendant did or failed to do in the

28  exercise of due care in his capacity as holder of that office."  *Id.*

1    The FAC fails this test.  It does not describe the roles of any officer; it

2    does not allege which decisions they made; it says very little about them beyond

3    their job titles.  For example, it fails to allege that Burrell had any specific duties

4    or responsibilities subjecting him to a different or higher standard of fiduciary

5    duty.  It also does not allege any acts by Burrell that breached any duties.

6    Indeed, he is mentioned by name only in the paragraphs identifying him as a

7    party and mentioning his responsibility for meeting earnings goals.  FAC ¶¶ 8,

8    67.  By failing to allege a duty or its breach, the FAC states no negligence claim

9    at all against Burrell, much less one that overcomes the Business Judgment Rule.

10   **B.   The FAC's Second Claim does not state a claim for gross negligence**

11        **because California law does not recognize a general claim for gross**

12        **negligence and because the FAC does not allege facts amounting to**

13        **gross negligence.**

14   **1.   The federal statutory floor does not apply in California.**

15   Under federal statutes such as 12 U.S.C. § 1787(h), "state law sets the

16   standard of conduct as long as the state standard (such as simple negligence) is

17   stricter than that of the federal statute.  The federal statute nonetheless sets a

18   'gross negligence' floor, which applies as a substitute for state standards that are

19   more relaxed."  *Atherton*, 519 U.S. at 215.  Here, California law is stricter than

20   gross negligence.  *Castetter*, 184 F.3d at 1043-44.  Thus, under *Atherton* there is

21   no need or occasion to resort to the federal floor.  This without more defeats the

22   Second Claim, which purports to invoke section 1787(h).  FAC ¶ 119.

23   **2.   California law does not recognize a general claim for gross negligence.**

24   If there were occasion to resort to section 1787(h), then the NCUA would

25   face another obstacle.  Section 1787(h) says "gross negligence" is "defined and

26   determined under applicable State law."  Here, that is California law.  FAC

27   ¶ 112.  But California does not recognize any general claim of "gross

28   negligence."  *Martinez v. United States*, No. EDCV 09-0375-SVW(RC),

1   2010 U.S. Dist. LEXIS 105763, *20-*21 (C.D. Cal. Mar. 25, 2010); *Saenz v.*

2   *Whitewater Voyages, Inc.*, 226 Cal. App. 3d 758, 766 n.9, 276 Cal. Rptr. 672,

3   677 n.9 (1991); *Continental Ins. Co. v. Am. Prot. Indus.*, 197 Cal. App. 3d 322,

4   330, 242 Cal. Rptr. 784, 789-90 (1987).

5       Thus, there is no need to resort to a gross negligence claim under *Atherton*,

6   and no gross negligence claim to resort to under California law.  For either

7   reason, or both reasons, the Second Claim fails as a matter of law.

8   **3.     The FAC does not allege facts amounting to gross negligence.**

9       Even if there were not these two legal bars to alleging a claim for gross

10  negligence, the FAC simply does not allege facts amounting to gross negligence

11  under any recognized definition – California, Delaware or otherwise.

12      California courts have not defined gross negligence in the director context,

13  presumably because California does not recognize such a claim.  But various

14  California statutes do use the term in other contexts,[4] and California courts have

15  had occasion to define "gross negligence" as a "want of even scant care" or "an

16  extreme departure from the ordinary standard of conduct."  *City of Santa*

17  *Barbara v. Superior Court*, 41 Cal. 4th 747, 754, 62 Cal. Rptr. 3d 527, 532

18  (2007) (quotations omitted).[5]

19      Delaware courts define gross negligence in the corporate context as "a

20  reckless indifference to or a deliberate disregard of the whole body of

21  stockholders or actions which are without the bounds of reason."  *In re Walt*

22  _____

23  [4]   *E.g.*, Cal. Bus. & Prof. Code §§ 2533 (speech-language pathologists and
      audiologists), 2563 (contact lens dispensers), 3401 (hearing aid dispensers),
24    3137 (optometrists).

25  [5]   California courts also recognize the propriety of dismissing on motion a
      complaint that fails to allege facts demonstrating an extreme departure from
26    the ordinary standard of conduct.  *Devito v. California*, 202 Cal. App. 3d 264,
      272, 248 Cal. Rptr. 330, 335 (1988); *see also Eastburn v. Regional Fire*
27    *Protection Authority*, 31 Cal. 4th 1175, 1185-86, 7 Cal. Rptr. 3d 552, 661-62
      (2003).

28

1    *Disney Co. Deriv. Litig.*, 907 A.2d 693, 750 (Del. Ch. 2005) (holding that nine-

2    figure severance payment to fired executive was not actionable as gross

3    negligence) (citation omitted).  The FAC cannot conceivably be read to allege

4    anything that comes close to being "want of even scant care," an "extreme

5    departure from the ordinary standard of conduct," "reckless indifference,"

6    "deliberate disregard" or "without the bounds of reason."

7         *RTC v. Blasdell*, 930 F. Supp. 417 (D. Ariz. 1994) also is instructive.

8    There the RTC alleged that the directors of a failed bank had failed to adopt

9    adequate lending policies and procedures, but evidence showed that the directors

10   had enacted some policies and procedures, had adjusted those policies and

11   procedures to address the concerns of regulators, had attended board meetings at

12   which they reviewed and considered relevant and sufficient materials when

13   making decisions, but nonetheless made some arguably improvident loans.  *Id.* at

14   426-27.  The court held that the evidence simply did not support allegations that

15   directors abdicated their responsibilities or were grossly negligent.  *Id.*

16        Under any of these definitions, the FAC's allegations do not amount to

17   gross negligence.  The FAC admits that Defendants adopted a yearly budget that

18   contained detailed information about projected expenses and projected fee

19   income.  FAC ¶ 65.  The FAC admits that Defendants adopted policies

20   specifying concentration limits for its investment securities and periodically

21   amended the policies to change limits or impose new limits.  FAC ¶ 69.  The

22   FAC admits that Defendants tracked and reported investments by rating (AAA or

23   AA) and by FICO score (prime, alt-A, and subprime).  FAC ¶ 71.  The FAC

24   admits that Defendants adopted concentration limits for the investments at issue,

25   and did not exceed them.  FAC ¶¶ 69, 73.  The FAC admits that Defendants

26   attended ALCO meetings, where they received presentations about the state of

27   the economy generally and WesCorp's investment strategy specifically.  FAC

28   ¶ 74.  And the FAC admits that Defendants adjusted WesCorp's investment

1  strategy based on the information presented at the ALCO meetings, first

2  decreasing investments in AA-rated securities and then stopping investments in

3  MBS altogether.  FAC ¶¶ 62-64, 75-77.[6]  As shown in part III.A.2.c above, the

4  FAC's only allegations of process deficiencies are either wholly conclusory or

5  else are nit-picking that cannot rise even to the level of ordinary negligence, let

6  alone a "want of even scant care" or "an extreme departure from the ordinary

7  standard of conduct."  *City of Santa Barbara*, 41 Cal. 4th at 754.

8  Because the FAC does not allege facts to show that it is "plausible" that

9  Defendants were grossly negligent, the FAC's Second Claim must be dismissed.

10  As with the fiduciary duty claim, the FAC does not describe the duties of

11  each officer sufficient to state a claim for gross negligence.  To plead negligence,

12  a complaint must actually allege a duty.  *Martinez*, 2010 U.S. Dist. LEXIS

13  105763, at *20-*21.  The FAC does not do so.

14  **C.     The FAC's First and Second Claims are time-barred as against**

15  **Cheney, Updike and Rhamy.**

16  The NCUA has three years from the date of the conservatorship

17  (March 19, 2009, *see* FAC ¶ 1) to bring claims against directors and officers.

18  12 U.S.C. § 1787(b)(14).  But it can only assert claims that were not time-barred

19  as of the date of the conservatorship; section 1787(b)(14) does not resurrect from

20  the dead claims that were time-barred as of that date.  *FDIC v. McSweeney*,

21  976 F.2d 532, 534 (9th Cir. 1992).  The question is thus whether the NCUA's

22  claims were time-barred under state law as of March 19, 2009, bearing in mind

23  _____

24  [6]  As noted, the FAC alleges that WesCorp departed from its traditional
     business model.  FAC ¶ 25.  Merely departing from a traditional business
25   model is not gross negligence.  *See Trenwick Am. Litig. Trust v. Ernst &*
     *Young LLP*, 906 A.2d 168, 194 (Del. Ch. 2006).  That is especially true
26   where, as here, WesCorp's brief foray into AA-rated investments occurred
     only after the NCUA changed its regulations to permit investments rated as
27   low as BBB.  See part III.A.2.c above.

28

1   that the FAC alleges that Cheney left the WesCorp Board in February 2006

2   (three years and one month before March 2009), and Rhamy and Updike left the

3   WesCorp Board in April 2006 (two years and eleven months before March

4   2009).  FAC ¶¶ 17, 20-21.

5       The FAC is highly ambiguous as to who allegedly did what, or when.

6   Given this ambiguity, one cannot tell whether Cheney, Rhamy and Updike are

7   accused of any actionable acts or omissions within any limitations period.  But if

8   the applicable statute of limitations is three years or less (in the case of Cheney)

9   or two years or less (in the case of Rhamy and Updike), then the limitations

10   period begins *after* they left WesCorp's Board.  If so, they cannot possibly be

11   liable to the NCUA for anything.

12       ***First Claim:***  The limitations period for the First Claim should be two

13   years; California authority – on this point of California law – holds that the

14   proper limitations period for a breach of fiduciary duty claim against a corporate

15   director is two years, under Code of Civil Procedure section 339.  *Burt v. Irvine*

16   *Co.*, 237 Cal. App. 2d 828, 865-67, 47 Cal. Rptr. 392, 415-17 (1965); *Southern*

17   *Counties Thrift Co. v. Rairdon*, 47 Cal. App. 2d 770, 771, 118 P.2d 828, 829

18   (1941); 3 B.E. Witkin, *California Procedure*, Actions § 650, at 858 (5th ed.

19   2008).  But *McSweeney* (which did not discuss either *Burt* or *Southern Counties*)

20   holds that the statute of limitations is four years under California's catchall

21   statute of limitations, Code of Civil Procedure section 343.  *McSweeney*,

22   976 F.3d at 534-36.  Defendants Cheney, Rhamy and Updike recognize that this

23   Court is constrained to follow *McSweeney* as binding precedent and therefore

24   must rule against them on this point.  *Id.*  They make this argument simply to

25   preserve it for appellate purposes.  *See United States v. Zuniga,* 579 F.3d 845,

26   847-48 (8th Cir. 2009); *cf. Rodriguez de Quijas v. Shearson/American Express,*

27   *Inc.,* 490 U.S. 477, 484, 109 S. Ct. 1917, 1920-21 (1989).

28       ***Second Claim:***  The limitations period for the Second Claim is either two

1    years or three years, which means that the Second Claim must be dismissed

2    against Cheney, Rhamy and Updike (if two years) or Cheney only (if three

3    years).  California law does not have a limitations period for a claim of gross

4    negligence because California does not recognize a separate tort of gross

5    negligence.  *See* authorities cited in part III.B.1 above.  Hence the lack of

6    certainty as between two years and three years.

7         *Two years:*  Although gross negligence is not a separate tort in California,

8    it is akin to simple negligence, being the more egregious form of the same thing.

9    *Continental Ins. Co.*, 197 Cal. App. 3d at 330.[7]  California's statute of limitations

10   for claims of simple negligence in the context of a directors' duties is two years.

11   *See McSweeney*, 976 F.2d at 534.  Thus, if a claim for gross negligence should be

12   recognized at all (and it should not, for the reasons stated in part III.B.1 above),

13   the statute of limitations for a claim of gross negligence also should be two years.

14        *Three years:*  Alternatively, and if, despite the arguments above, the Court

15   were to hold that a claim for gross negligence exists under 12 U.S.C. § 1787(h)

16   even though it does not exist under California common law, then that claim must

17   be a creation of section 1787(h).  If so, Code of Civil Procedure section 359's

18   three-year statute of limitations would apply.  That statute applies to "actions

19   against directors … to enforce a liability created by law … ."  Civ. Proc. Code

20   § 359.  California courts construe the words "liability created by law" to mean a

21   statutory liability first authorized by a statute or the Constitution, as opposed to

22   one that existed at common law and was merely codified by statute; but

23   California courts have split over section 359's applicability to Corporations Code

24   section 309.  *Compare Smith v. Superior Court*, 217 Cal. App. 3d 950, 953-54,

25

26   7    As an English judge once famously put it, gross negligence is simply ordinary
         negligence "with the addition of a vituperative epithet."  *Wilson v. Brett*,
27       [1843] 11 M. & W. 113, 116, 152 Eng. Rep. 737 (Rolfe, B.) (quoted in *Archie
         v. City of Racine*, 847 F.2d 1211, 1219 (7th Cir. 1988)).
28

1    266 Cal. Rptr. 253, 254-55 (1990) *with Lehman v. Superior Court*, 145 Cal. App.

2    4th 109, 114-22, 51 Cal. Rptr. 3d 411, 413-20 (2006) and *Briano v. Rubio,*

3    46 Cal. App. 4th 1167, 1173-80, 54 Cal. Rptr. 2d 408, 411-15 (1996).  While

4    these three opinions disagree as to whether section 359 applies to section 309, all

5    three opinions agree that section 359 would apply to a statutory standard of

6    director liability without common-law roots.  Because Section 1787(h) would not

7    simply be a codification of a common-law principle, section 359 would apply to

8    a claim based on section 1787(h).

9         If the limitations period is two years, the Second Claim must be dismissed

10   as to Cheney, Updike and Rhamy.  If, however, the limitations period is three

11   years, the Second Claim must be dismissed as to Cheney.

12   **D.    Dismissal should be without leave to amend.**

13        Defendants recognize the policy of liberality when it comes to granting

14   leave to amend.  But that policy has its limits.  It is one thing to treat liberally a

15   private plaintiff who has been forced to plead a claim against corporations or

16   their directors without any access to the corporation's records.  *Cf. Eminence*

17   *Capital, LLC v. Aspeon Inc.,* 316 F.3d 1048 (9th Cir. 2003).  But it is another

18   thing to extend the same liberality to a government agency that has had the run of

19   WesCorp for the last year and a half, with complete access to all its books and

20   records, and the untrammeled ability to interrogate its employees without anyone

21   representing Defendants in the room.  Where there is no reason to think

22   amendment would cure the defects, there is no reason to grant leave to amend,

23   even the first time around.  *Cf. In re Hansen Natural Corp. Sec. Litig.*, 527 F.

24   Supp. 2d 1142, 1163 (C.D. Cal. 2007).  This is such a case.

25   **IV.   CONCLUSION.**

26        When big losses occur, there is an all-too-human desire to find scapegoats.

27   Doubtlessly WesCorp made some investment decisions that, with 20/20

28   hindsight and full knowledge of the credit crisis of 2008-09, one might wish it

1   had not made.  But it is one thing to regret an investment and quite another to ask

2   a group of unpaid volunteer directors to ante up $6.8 *billion* in damages for

3   having made, in perfect good faith, some investment decisions that did not work

4   out as one might have hoped.  The NCUA knew then what Defendants were

5   doing and how they were doing it.  It therefore has no business suing them now

6   for billions of dollars on account of business decisions that the NCUA's statutes

7   and regulations and its examiners permitted – and indeed applauded – at the time.

8         For each of the foregoing reasons, the FAC should be dismissed without

9   leave to amend.

10        Dated:  November 1, 2010.

11                          PILLSBURY WINTHROP SHAW PITTMAN LLP
                          REYNOLD L. SIEMENS  #177956
12                         Email:  reynold.siemens@pillsburylaw.com
                          725 South Figueroa Street, Suite 2800
13                         Los Angeles, CA 90017-5406
                          Telephone:  (213) 488-7100
14                         Facsimile:  (213) 629-1033

15                          PILLSBURY WINTHROP SHAW PITTMAN LLP
                          BRUCE A. ERICSON  #76342
16                         Email:  bruce.ericson@pillsburylaw.com
                          GEORGE ALLEN BRANDT  #264935
17                         Email:  allen.brandt@pillsburylaw.com
                          50 Fremont Street
18                         Post Office Box 7880
                          San Francisco, CA  94120-7880
19                         Telephone: (415) 983 1000
                          Facsimile: (415) 983 1200

20

21
                          By _____ */s/ Bruce A. Ericson*_____
22                               Bruce A. Ericson

23                          Attorneys for Defendants Robert John Burrell, William
                          Cheney, Gordon Dames, Robert H. Harvey, Jr., James
24                         Jordan, Timothy M. Kramer, Robin Lentz, John M. Merlo,
                          Warren Nakamura, Brian Osberg, David Rhamy and
25                         Sharon Updike

26

27

28