



1  Michael H. Bierman, State Bar No. 89156
2  Michael E. Pappas, State Bar No. 130400
   LUCE, FORWARD, HAMILTON & SCRIPPS LLP
3  601 S. Figueroa, Suite 3900
   Los Angeles, California 90017
4  Telephone: 213.892.4992
   Facsimile:  213.892.7731
5  E-Mail:  mbierman@luce.com
6          mpappas@luce.com

7  Attorneys for Plaintiff and Intervenor, National Credit Union Administration Board
   As Liquidating Agent For Western Corporate Federal Credit Union
8

9              UNITED STATES DISTRICT COURT

10             CENTRAL DISTRICT OF CALIFORNIA

11  NATIONAL CREDIT UNION              Case No.: CV10-01597 GW (MANx)
    ADMINISTRATION BOARD AS
12  LIQUIDATING AGENT FOR              **SECOND AMENDED**
    WESTERN CORPORATE FEDERAL          **COMPLAINT FOR DAMAGES**
13  CREDIT UNION,                      **FOR  BREACH OF FIDUCIARY**
                                       **DUTIES, FRAUD AND UNJUST**
14          Plaintiff,                 **ENRICHMENT**

15  v.
                                       **DEMAND FOR JURY TRIAL**
16  ROBERT A. SIRAVO, TODD M. LANE,
    ROBERT J. BURRELL, THOMAS E.
17  SWEDBERG, TIMOTHY T. SIDLEY,
    ROBERT H. HARVEY, JR., WILLIAM
18  CHENEY, GORDON DAMES, JAMES
    P. JORDAN, TIMOTHY KRAMER,
19  ROBIN J. LENTZ, JOHN M. MERLO,
    WARREN NAKAMURA, BRIAN
20  OSBERG, DAVID RHAMY and
    SHARON UPDIKE,
21
22          Defendants.

23

24          Plaintiff, the National Credit Union Administration Board as Liquidating Agent

25  of Western Corporate Federal Credit Union (the "NCUA") alleges:

26                    **JURISDICTION AND VENUE**

27          1.     Western Corporate Federal Credit Union ("WesCorp") was a credit

28  union chartered under the Federal Credit Union Act, 12 U.S.C. § 1751, et seq., with

1   its principal place of business in San Dimas, California.  On March 19, 2009,

2   WesCorp was placed into conservatorship by the National Credit Union

3   Administration Board, which appointed itself Conservator pursuant to 12 U.S.C.

4   § 1786(h)(1).  On October 1, 2010, the NCUA Board placed WesCorp into

5   involuntary liquidation pursuant to 12 U.S.C. § 1766(a) and 12 U.S.C.

6   § 1787(a)(1)(A) and appointed itself Liquidating Agent.  Pursuant to 12 U.S.C.

7   § 1787(b)(2)(A), the Liquidating Agent has succeeded to all rights, titles, powers,

8   and privileges of WesCorp and of any member, accountholder, officer or director of

9   WesCorp, with respect to WesCorp and its assets, including the right to bring the

10   claims asserted by it in this action.

11        2.     The NCUA Board as Liquidating Agent has retained, for the benefit of

12   the liquidation estate of WesCorp, the sole right to pursue claims arising from pre-

13   liquidation losses and to negotiate, settle and recover any and all losses incurred by

14   WesCorp prior to liquidation.

15        3.     This action arises under the laws of the United States of America,

16   including 12 U.S.C. § 1789(a)(2), and this Court is vested with subject matter

17   jurisdiction pursuant to 28 U.S.C. § 1331.

18        4.     This Court has personal jurisdiction over the defendants because

19   several of them are residents of California and the actions and omissions by

20   defendants complained of in this Complaint occurred in California.

21        5.     Venue is proper is this judicial district under 28 U.S.C. § 1391(b)

22   because a substantial number of the actions and omissions giving rise to the claims

23   asserted herein occurred within the Central District of California and most

24   defendants reside here.

### PARTIES

26        6.     Plaintiff is the liquidating agent for WesCorp.

27        7.     Defendant Robert A. Siravo ("Siravo") was the President and CEO of

28   WesCorp from May 22, 2002 through March 20, 2009, when he was terminated.

1  The NCUA is informed and believes and on that basis alleges that Siravo is a
2  resident of California.

3        8.     Defendant Todd M. Lane ("Lane") was the Chief Financial Officer of
4  WesCorp from March 9, 1998 to April 18, 2008.  The NCUA is informed and
5  believes and on that basis alleges that Lane is a resident of California.

6        9.     Defendant Robert J. Burrell ("Burrell") was an Executive Vice
7  President from January 31, 2003 to March 20, 2009, and the Chief Investment
8  Officer for WesCorp from 2000 to March 20, 2009, when he was terminated.  The
9  NCUA is informed and believes and on that basis alleges that Burrell is a resident of
10  California.

11        10.    Defendant Timothy T. Sidley ("Sidley") was the Vice President for
12  Risk Assessment and Chief Risk Officer in charge of investment credit services
13  from June 18, 1998 to April 2, 2010.  The NCUA is informed and believes and on
14  that basis alleges that Sidley is a resident of California.  Siravo, Lane, Burrell, and
15  Sidley are referred to collectively as the "Officer Defendants."

16        11.    Defendant Thomas E. Swedberg ("Swedberg") was Vice President of
17  Human Resources for WesCorp from April 6, 1999 to July 24, 2006, at which time
18  he became Vice President of Strategic Planning and Organizational Development.
19  He served in that capacity until approximately December 31, 2008.  He retired from
20  his formal position and worked with WesCorp on a consulting basis until July 22,
21  2009.  The NCUA is informed and believes and on that basis alleges that Swedberg
22  is a resident of California.

23        12.    Defendant Robert H. Harvey, Jr. ("Harvey") was a director from May
24  2001 to March 20, 2009 and was the Chairman of the WesCorp board of directors
25  from May 21, 2007 to March 20, 2009.  Harvey was also the CEO of Seattle
26  Metropolitan Credit Union, a WesCorp member reporting assets of $515,340,270 as
27  of December 31, 2008.  The NCUA is informed and believes and on that basis
28  alleges that Harvey is a resident of Washington State.

1       13.    Defendant James P. Jordan ("Jordan") was a member of the WesCorp

2  board of directors from May 2002 to March 20, 2009 and was the Vice Chairman of

3  the WesCorp board from May 21, 2007 to March 20, 2009.  Jordan was also the

4  President and CEO of Schools Financial Credit Union, a WesCorp member

5  reporting assets of $1,185,798,114 as of December 31, 2008.  The NCUA is

6  informed and believes and on that basis alleges that Jordan is a resident of

7  California.

8       14.    Defendant Timothy Kramer ("Kramer") was a member of the WesCorp

9  board of directors from April 2004 to March 20, 2009 and was the former Secretary

10 and Treasurer of the WesCorp board from May 21, 2007 to March 20, 2009.

11 Kramer was also the President and CEO of Keypoint Credit Union, a WesCorp

12 member reporting assets of $837,333,890 as of December 31, 2008.  The NCUA is

13 informed and believes and on that basis alleges that Kramer is a resident of

14 California.

15      15.    Defendant Robin J. Lentz ("Lentz") was a member of the WesCorp

16 board of directors from April 2000 to March 2009.  Lentz was also the President and

17 CEO of Cabrillo Credit Union, a WesCorp member reporting assets of $166,961,144

18 as of December 31, 2008.  The NCUA is informed and believes and on that basis

19 alleges that Lentz is a resident of California.

20      16.    Defendant John M. Merlo ("Merlo") was a member of the WesCorp

21 board of directors from April 2002 to March 2009, and was the Chairman of the

22 WesCorp board of directors from July 2005 to May 2007.  Merlo was also the

23 President and CEO of Premier America Credit Union, a WesCorp member reporting

24 assets of $1,454,100,568 as of December 31, 2008.  The NCUA is informed and

25 believes and on that basis alleges that Merlo is a resident of California.

26      17.    Defendant Gordon Dames ("Dames") was a member of the WesCorp

27 board of directors from May 1999 to May 2008.  Dames was also the President and

28 CEO of Mountain America Credit Union, a WesCorp member reporting assets of

1   $2,301,878,401 as of December 31, 2007.  The NCUA is informed and believes and

2   on that basis alleges that Dames is a resident of Utah.

3          18.    Defendant William Cheney ("Cheney") was a member of the WesCorp

4   board of directors from May 2002 to February 2006.  Cheney was also the President

5   and CEO of Xerox Federal Credit Union, a WesCorp member reporting assets of

6   $798,759,704 as of December 31, 2005.  The NCUA is informed and believes and

7   on that basis alleges that Cheney resides in the Washington D.C. area.

8          19.    Defendant Warren Nakamura ("Nakamura") was a member of the

9   WesCorp board of directors from November 2003 to March 2009.  Nakamura was

10  also the President and CEO of Honolulu Federal Credit Union, a WesCorp member

11  reporting assets of $215,376,162 as of December 31, 2008.  The NCUA is informed

12  and believes and on that basis alleges that Nakamura is a resident of Hawaii.

13         20.    Defendant Brian Osberg ("Osberg") was a member of the WesCorp

14  board of directors from May 2005 to March 2009.  Osberg was also the President

15  and CEO of Potelco United Credit Union, a WesCorp member reporting assets of

16  $56,245,444 as of December 31, 2008.  The NCUA is informed and believes and on

17  that basis alleges that Osberg is a resident of Idaho.

18         21.    Defendant David Rhamy ("Rhamy") was a member of the WesCorp

19  board of directors from April 1995 to April 2006.  Rhamy was also the President

20  and CEO of Silver State Schools Credit Union, a WesCorp member reporting assets

21  of $791,013,858 as of December 31, 2005.  The NCUA is informed and believes

22  and on that basis alleges that Rhamy is a resident of Nevada.

23         22.    Defendant Sharon Updike ("Updike") was a member of the WesCorp

24  board of directors from April 2004 to April 2006.  Updike was also the President

25  and CEO of Eagle Community Credit Union, a WesCorp member reporting assets of

26  $210,527,024 as of December 31, 2005.  The NCUA is informed and believes and

27  on that basis alleges that Updike is a resident of California.

28

Case No. CV10-01597 GW (MANx)
SECOND AMENDED COMPLAINT

23.     Defendants Harvey, Merlo, Dames, Jordan, Kramer, Cheney, Lentz, Nakamura, Osberg, Rhamy and Updike are referred to collectively as the "Director Defendants." Several of the Director Defendants were members of WesCorp's Asset and Liability Committee ("ALCO"), budget committee, compensation committee and other committees charged with supervising various aspects of WesCorp's operations and reporting to the board as a whole as to changes in policies, among other things.

24.     WesCorp's corporate policies provided that all WesCorp's investments were to provide earnings consistent with maintaining safety and soundness and that a primary purpose of WesCorp's Asset/Liability Management policy was to ensure that investment of funds would be accomplished in a safe and secure manner, particularly with respect to limiting WesCorp's exposure to market and operational risks. Those policies delegated the responsibility for the oversight of the asset liability management process, including investments, to the ALCO.

25.     The ALCO provided overall management direction for WesCorp's investment strategy and the types and level of risk WesCorp's investments exposed it to. Its duties included the review and recommendation of proposed changes to WesCorp's asset and liability policies and strategies, the review of and recommendations for existing and proposed concentration limits, and the review of and recommendations for investment security purchases and sales.

26.     The following board members served as members of the ALCO from 2005 through 2007: Jordan and Nakamura from January 2005 through December 2007; Cheney and Rhamy from January through May 2005; Kramer from June 2005 through June 2007; Lentz from June 2005 through May 2006; and Osberg from June 2006 through December 2007. In addition, many of the other board members attended ALCO meetings, and all board members received ALCO materials along with their monthly board packages.

27.   WesCorp's annual budget was reviewed by the budget committee of the board, which recommended it before it was approved by the board.  The budget committee was chaired by Rhamy for the 2006 budget and by Updike for the 2007 budget.  Its members included Dames, Osberg and Updike for the 2006 budget and Longson and Harvey for the 2007 budget.

28.   The NCUA is informed and believes and based thereon alleges that defendants were at all relevant times acting as actual agents, conspirators, ostensible agents, partners or joint venturers and employees of all other defendants, and that all acts alleged herein occurred within the course and scope of said agency, employment, partnership, and joint venture, conspiracy or enterprise, and with the express and/or implied permission, knowledge, consent, authorization and ratification of their co-defendants; however, these allegations are deemed "alternative" theories whenever not doing so would be in contradiction to other allegations.

29.   Whenever this complaint makes reference to any act of defendants, the allegations shall be deemed to mean the act of those defendants named in the particular claim for relief, and each of them, acting individually, jointly and severally, unless otherwise alleged.

## SUMMARY OF CLAIMS

30.   WesCorp was a non-profit corporate credit union run for the benefit of its members, who were themselves credit unions.  Its functions were to provide its members with banking services on an economical basis, to provide a source of liquidity, and to hold and prudently invest its members' excess funds.

31.   Over many years WesCorp became a leading corporate federal credit union through thrifty management, providing efficient banking services and relatively conservative investment of its members' funds.  At about the time that Siravo became President and CEO of WesCorp in 2002, however, WesCorp

7

departed from its traditional business model and began an aggressive campaign to increase the size of the organization.

32.    WesCorp fueled its growth largely by borrowing funds which it then invested, along with its members' funds, primarily in securities that had relatively high yields but that were not guaranteed by the United States or its agencies. WesCorp invested heavily in private label mortgage backed securities ("MBS").

33.    By the end of 2007, WesCorp's assets had grown from their 2002 levels by more than 50% to over $32.5 billion, and its borrowings had increased by more than 2000% to more than $10 billion – over 30% of its total assets.

34.    WesCorp used the income from its investments to expand its operations, subsidize the other banking services it provided and increase the compensation paid to its top executives.  By 2008, WesCorp's operating expenses had grown by more than 110% from 2002 levels.  The compensation paid to its top executives had increased on average by about 88%, and Siravo's compensation had increased by about 325%.

35.    WesCorp's strategy of growing through borrowed funds made it increasingly dependent on income from its investment portfolio.  To maintain that income, it was necessary for WesCorp to obtain a relatively large investment spread – the difference between what it earned on its investments and its cost of funds.

36.    To generate the investment income it needed, WesCorp increased the concentration of relatively higher-yielding private label MBS in its portfolio.  In particular, between 2005 and 2007 it invested heavily in private label MBS based on "reduced documentation" Option ARM loans.

37.    Neither the Officer Defendants nor the Director Defendants recommended or imposed any meaningful concentration limits on most of WesCorp's MBS.  They did not recommend or impose any concentration limits at all on MBS based on Option ARM loans.

38.     Consequently, by the end of 2007, the concentration of private label MBS in WesCorp's portfolio increased to more than $22 billion, or about 95% of WesCorp's total investment portfolio.  The Option ARM MBS in WesCorp's portfolio increased to $8.9 billion, or about 37% of the total portfolio.  The vast majority of these MBS were based on reduced documentation Option ARM loans.

39.     Although the private label MBS that WesCorp purchased for investment were rated AAA or at least AA by Moody's and S&P, or both, and were underwritten by the world's leading investment banks, the overwhelming concentration of private label MBS in WesCorp's investment portfolio was not prudent.

40.     In 2009, WesCorp was required to record losses of $6.8 billion in its investment portfolio, effectively rendering it insolvent.  Virtually all of these losses were recorded on private label MBS.  About $4.7 billion of the losses were recorded on Option ARM MBS.  WesCorp had invested more heavily in risky MBS than other corporate credit unions and suffered disproportionally greater losses as a result of the current mortgage crisis.

41.     If WesCorp's officers and directors had imposed prudent concentration limits on its private label MBS, including its Option ARM MBS, almost all of this loss would have been avoided.

42.     In addition to the significant increases in their salaries and bonuses, three WesCorp officers, including the two most powerful, manipulated WesCorp's Supplemental Executive Retention Plans ("SERPs") to further increase the money WesCorp paid them.  Siravo and Swedberg engineered amendments to the SERPs, increasing the payouts to each by falsely characterizing the amendments as administrative changes necessary to correct errors in the plans.  Siravo received more than $2.3 million in additional SERP payments and Swedberg more than $650,000 as a result of the amendments.  Under an agreement with Siravo, Lane was paid an additional $1.325 million in 2006 and an additional $75,000 in each of 2007

1    and 2008 in lieu of SERP payments.  The NCUA is informed and believes and on

2    that basis alleges that there was no *bona fide* business reason for these payments.

3        43.    The Officer Defendants and the Director Defendants were negligent

4    and grossly negligent and they breached their fiduciary duties to WesCorp by

5    allowing WesCorp to develop a large concentration of risky private label MBS in its

6    investment portfolio, and in particular MBS based on reduced documentation

7    Option ARM loans, without taking steps to monitor or control the risk created by

8    these securities.  Siravo and Swedberg breached their fiduciary duties and defrauded

9    WesCorp with regard to the SERP amendments and increased SERP payments.

10   Lane was unjustly enriched by the payments he received in lieu of SERP payments.

11                          **FACTUAL ALLEGATIONS**

12                     **The Federal Credit Union System**

13       44.    The federal credit union system is a three-tier system consisting of (1)

14   one wholesale corporate credit union (U.S. Central Federal Credit Union); (2)

15   during the relevant time period, between 28 and 31 retail corporate credit unions;

16   and (3) nearly 8,000 "natural person" credit unions.  The wholesale corporate credit

17   union, "U.S. Central," provides services to the retail corporate credit unions, while

18   the retail corporate credit unions provide services to both federally-chartered and

19   state-chartered natural person credit unions.  The natural person credit unions, in

20   turn, serve the financial needs of more than 87 million members.

21       45.    For a number of years, WesCorp had been the largest of the retail

22   corporate credit unions.  At the end of 2002, more than 30% of all of the assets held

23   by retail corporate credit unions were held by WesCorp.

24       46.    Like natural person credit unions, the corporate credit unions are not-

25   for-profit institutions owned by their members.  In the case of the retail corporate

26   credit unions, the members are primarily natural person credit unions.

27       47.    Retail corporate credit unions provide essential support to their natural

28   person credit union members by offering services that would be largely unavailable

                                          10              Case No. CV10-01597 GW (MANx)
                                                          SECOND AMENDED COMPLAINT

or more expensive for natural person credit unions to obtain on their own because of their smaller size.  First, retail corporate credit unions offer a variety of banking products and services to their members – primarily settlement of transactions such as checks, ATM and credit card transactions and wire transfers.  Second, they provide a ready source of liquidity to their members, allowing them to borrow as necessary.  Finally, retail corporate credit unions such as WesCorp provide an avenue for their members to invest their excess funds safely.

48.    Profit maximization is not the mission of a corporate credit union.  Rather, the credit union structure is designed to maximize member service over the profit motive.  "Profits" are relatively small and are either returned to members in the form of benefits (either lower costs or higher returns) or they are invested upstream to provide a source of liquidity and risk management should the financial markets suffer a decline.  According to WesCorp:

> Profit is not the driving force at credit unions; rather, they exist solely for the benefit of their member/owners – a pivotal difference from other financial service providers . . .

> The corporate credit union network was organized to provide liquidity resources for credit unions as part of the credit union system.  The idea was to have within the credit union movement a mechanism enabling credit unions to function independently of the banking system and to provide credit unions with a full range of financial, investment and back offices services.

http://www.wescorp.org/about_us/aboutus_faq.asp?catid=60, downloaded August 31, 2010.

49.    WesCorp's bylaws provide that WesCorp's purpose is to "foster and promote the economic well-being, growth and development of its members through effective funds management, and services which may be of benefit to its members and are authorized by the Federal Credit Union Act and/or rules and regulations."

50.    Corporate credit unions have traditionally been conservative financial institutions pooling the assets of their natural person credit union members to

Case No. CV10-01597 GW (MANx)
SECOND AMENDED COMPLAINT

1   provide banking services, safeguard their members' investments, provide a source of

2   liquidity and pay moderate returns for invested funds.

3       51.    Over the years, most credit unions in California became members of

4   WesCorp.  WesCorp provided a vital service to its many small credit union

5   members which depended on it for services, liquidity and investment of excess

6   funds.  WesCorp's directors were themselves all Chief Executive Officers of credit

7   unions.

8               **The Officer Defendants' Responsibilities and Duties**

9       52.    WesCorp's bylaws required WesCorp's board to adopt corporate

10   policies to govern the institution and its investment strategies, among other things,

11   to ensure that WesCorp was being operated in a safe and sound manner.  WesCorp's

12   policies provided that WesCorp's "mission" was to "improve the financial well-

13   being of credit unions while maintaining a sustainable business entity."  Under those

14   corporate policies, WesCorp's officers were responsible for ensuring that the

15   board's policies were effectively implemented.

16       53.    As President and CEO, Siravo was responsible for ensuring that

17   WesCorp developed, implemented and maintained sound policies and systems,

18   developing a competent staff, providing leadership, monitoring and setting direction

19   for the staff, ensuring that WesCorp's assets were managed in a profitable and

20   secure manner, and reviewing, evaluating and recommending changes in corporate

21   policies as needed, among other things.

22       54.    As President and CEO, Siravo had a duty to be candid and forthright

23   with the WesCorp board of directors and WesCorp members and to disclose changes

24   in the profitability, risk profile and dangers in WesCorp's investment portfolio.  As

25   executive officers of WesCorp, the other Officer Defendants had the same duty.

26       55.    As Chief Financial Officer, Lane was responsible for WesCorp's

27   financial affairs, including its financial statements and financial operations.  Lane

28   had a duty to ensure that WesCorp followed sound financial practices.  Lane had

1   primary responsibility for creating WesCorp's annual budgets, and he had a duty to

2   understand the risks in the proposed budgets and to communicate those risks to the

3   budget committee and the board.  Lane functioned as "second in command" at

4   WesCorp and therefore had general supervisory responsibility over WesCorp.

5       56.   As Chief Investment Officer, Burrell was responsible for the

6   development and implementation of all balance sheet management strategies, which

7   included WesCorp's investment strategies.  Burrell was the primary manager of the

8   balance sheet, including the investment portfolio, and was responsible for ensuring

9   the safety and soundness of that portfolio and that all investments would provide

10   appropriate levels of safety in terms of credit quality, liquidity and interest rate risk.

11   Burrell was also responsible for supervising the Investment Department and

12   ensuring that it complied with all WesCorp investment policies applicable to it.

13       57.   In addition to these individual responsibilities, the NCUA is informed

14   and believes and on that basis alleges that Siravo, Lane, and Burrell managed

15   WesCorp collaboratively and together determined and implemented its overall

16   business strategies, including its strategies of significantly increasing investment

17   income by investing in higher-yielding securities and by substantial borrowing.

18       58.   Under WesCorp's investment credit policy, Sidley, as Vice President-

19   Risk Assessment, and the Director of Investment Credit Services, who reported to

20   him, were responsible for the implementation of WesCorp's investment credit

21   policies and procedures.  Sidley was also responsible for the investment risk

22   monitoring processes, systems, and procedures.

23       59.   On or about October 22, 2006, WesCorp created an Asset/Liability

24   Staff Committee ("ALSC"), to provide a forum to coordinate the issues that most

25   directly impacted effective management of WesCorp's balance sheet.  The ALSC

26   assumed much of the work that was previously required of the ALCO, with the

27   ALCO retaining the responsibility to approve ALSC recommendations.  The ALSC

28

Case No. CV10-01597 GW (MANx)
SECOND AMENDED COMPLAINT

1  was responsible for review of investment security purchases and sales and the

2  prevailing investment strategies and potential changes thereto.

3      60.    At all relevant times, Siravo, Lane and Burrell were voting members of

4  the ALCO and the ALSC.  Sidley was a non-voting member of the ALSC and a staff

5  liaison to the ALCO.  As members of the ALCO and the ALSC, Siravo, Lane and

6  Burrell were responsible for supervising WesCorp's investments and recommending

7  policies and investment strategies and for ensuring the safety and soundness of

8  WesCorp's asset and liability activities, including its investment activities.

9  **WesCorp's Era of Growth**

10      61.    From the early 1990's until about 2002, WesCorp strove to ensure that

11  its operating expenses were less than its income on capital plus fee income.

12  WesCorp considered this "self-sufficiency ratio" to be a hallmark of its strength and

13  ability to endure adverse economic and business conditions.

14      62.    Notwithstanding its size, WesCorp embarked on an aggressive plan to

15  grow at about the time Siravo became President and CEO in 2002.  WesCorp

16  abandoned the self-sufficiency ratio, and its budgets for 2003 to 2008 projected

17  substantial increases in assets, net interest income and operating expenses:

| Budget Year | Budgeted Net Interest Income | Budgeted Operating Expense | Budgeted Average Earning Assets (in millions) |
|---|---|---|---|
| 2002 | $69,460,191 | $55,024,622 | $17,354 |
| 2003 | $79,934,973 | $56,587,747 | $20,754 |
| 2004 | $75,672,982 | $60,552,896 | $23,468 |
| 2005 | $86,116,515 | $67,351,993 | $23,824 |
| 2006 | $97,715,355 | $72,041,978 | $24,681 |
| 2007 | $100,621,962 | $76,924,300 | $27,274 |
| 2008 | $108,419,718 | $85,400,509 | $33,573 |

63.   From 2002 through 2007, WesCorp grew significantly in terms of total assets, net interest income and operating expenses:

| Year | Net Interest Income | Operating Expense | Total Assets (in millions) |
|------|---------------------|-------------------|----------------------------|
| 2002 | $68,234,458 | $53,373,634 | $21,117 |
| 2003 | $60,478,556 | $57,033,281 | $24,995 |
| 2004 | $90,286,905 | $67,864,155 | $25,629 |
| 2005 | $102,682,904 | $68,631,486 | $26,501 |
| 2006 | $89,958,173 | $71,978,632 | $30,046 |
| 2007 | $137,201,776 | $81,901,701 | $32,517 |

64.   WesCorp's membership and deposit base grew only moderately between January 2002 and November 2008. The total number of WesCorp members increased about 11% from 1040 to 1156. The average of WesCorp's total shares and deposits increased 17% between 2002 to 2008 from $17.3 billion to $20 billion.

65.   The disparity between institution growth and membership and deposit growth was particularly pronounced between 2004 and 2007. During that time, WesCorp's total assets grew 30%, its net interest income grew 52% and its total operating expenses grew 21%. During the same period, the number of WesCorp members increased by only 17 and the average of WesCorp's total shares and deposits increased about 12%.

66.   Without a significant increase in its deposit base, WesCorp funded its growth by borrowing money to invest in its portfolio. Between January 2002 and January 2004, WesCorp's borrowings (reported total notes payable) increased from $420 million to $1.28 billion. From January 2004 to November 2008, WesCorp's borrowings increased 472% to $7.3 billion.

67.   In addition to borrowing more money to invest, WesCorp sought to increase the yield on its portfolio by investing an ever larger proportion in private label MBS, which were typically higher-yielding than MBS issued by government

Case No. CV10-01597 GW (MANx)
SECOND AMENDED COMPLAINT

1  agencies.  The increase in borrowed funds and in the yield (and risk) in WesCorp's

2  investment portfolio dramatically increased WesCorp's investment income.

3  WesCorp's net interest income nearly doubled between 2002 and 2007, from $68

4  million to $137 million, before declining in 2008 to $110 million.  Between 2004

5  and 2007, WesCorp's annual gross investment income nearly tripled from $563

6  million to $1.64 billion.

7       68.    WesCorp's corporate policies required that WesCorp's management

8  recommend and its board establish capital goals sufficient to support WesCorp's

9  credit, liquidity, market, fiduciary, operational, and similar types of risk.

10  Nonetheless, WesCorp did not increase its capital goals or its capital base to

11  compensate for the increase in risk in its investment portfolio.  To the contrary,

12  between 2002 and 2007, WesCorp's capital ratios – the ratios of capital to assets –

13  declined.  By 2007, all but two retail corporate credit unions had higher retained

14  earnings ratios than WesCorp and all but four had higher total capital ratios.

15       69.    WesCorp used the money it earned from its portfolio to increase both

16  its operating expenses and its subsidy of its member services business.  Between

17  2002 and 2008, operating expenses increased 62%, from $53.4 million in 2002 to

18  $86.6 million in 2008.  Between 2002 and 2007, the subsidy of member services

19  expenses increased from about 35% to about 45%, and the amount of investment

20  income used to subsidize member services almost doubled, from about $14 million

21  to about $27 million.

22       70.    The growth of WesCorp as an institution and the growth of its net

23  interest income was used to justify increased compensation for WesCorp's top

24  executives.  Siravo's salary and bonus compensation increased from $350,000

25  (annualized) in 2002 to almost $992,000 in 2008.  Lane's salary and bonus

26  increased 121%, from $176,000 in 2002 to almost $390,000 in 2007, his last full

27  year.  Other top WesCorp executives also received significant compensation

28  increases.  The average salary and bonus WesCorp paid to its "leadership team"

1   increased by an average of approximately 88% between 2002 and 2008, an average

2   annual increase of approximately 14%.

3   **WesCorp's Increasing Concentration of Private Label MBS Investments**

4       71.    WesCorp's business model made WesCorp increasingly dependent on

5   growth in its investment income.  Because deposit balances were increasing

6   modestly, if at all, growth in investment income required both increased borrowing

7   and the maximum yield possible on WesCorp's investment portfolio.

8       72.    At the same time WesCorp was seeking increased yields from its

9   investments, the yields available on MBS were generally decreasing.  To increase

10   the aggregate yield on its investments, WesCorp lowered the concentration of lower

11   yielding U.S. government agency MBS in its portfolio.  Such MBS were less risky

12   because they were guaranteed by the agency issuing them.  From December 2002 to

13   December 2007, the concentration of U.S. agency MBS in WesCorp's investment

14   portfolio dropped from 17% to 4%.  During the same period, the concentration of

15   higher-yielding private label MBS in WesCorp's securities portfolio increased from

16   72% to almost 95%.

17       73.    WesCorp invested in AAA rated and AA rated private label MBS.

18   NCUA regulations require a credit union purchasing a security for investment to

19   conduct and document a credit analysis on the security prior to purchase, regardless

20   of rating, except for investments issued or fully guaranteed as to principal and

21   interest by the U.S. government or its agencies.  WesCorp's investment policies also

22   required that WesCorp conduct due diligence for each prospective purchase of a

23   private label MBS, regardless of rating.

24       74.    Between 2004 and 2007, WesCorp invested increasing amounts in new

25   forms of AAA rated private label MBS, including Collateralized Debt Obligations

26   ("CDOs") and Option ARM MBS.

27       75.    CDOs are "second level" MBS.  Typically, MBS are shares in a pool of

28   mortgages.  CDOs are shares in a pool of MBS.  They can be risky because the

1  MBS in the pools were themselves more risky than the single family home loans
2  that made up the pools in most MBS.

3       76.    WesCorp began purchasing CDOs in 2004.  By the end of 2007, CDOs
4  comprised just under 2.5% of WesCorp's investment portfolio.

5       77.    Option ARM MBS are shares in pools of Option ARM mortgage loans.
6  Option ARM loans allow the borrower to make substantially below-market monthly
7  payments for the first years of the loan, after which the monthly payments "reset"
8  and increase drastically, frequently more than doubling.  The loans have a negative
9  amortization feature which allows the principal balance to increase over time as
10 unpaid interest is added to principal.

11      78.    Many Option ARM loans were made without verifying the borrower's
12 income or ability to make the required payments.  These "reduced documentation"
13 loans (whether or not they were also Option ARM loans) were routinely referred to
14 in the industry as "liar loans."  Many Option ARM loans were made to borrowers
15 who could not afford the regular monthly payment due after their loans reset.  Many
16 such borrowers entered into the loans on the hope that rising real estate prices would
17 allow them to refinance before the monthly payments would reset.

18      79.    MBS based on reduced documentation Option ARM loans were
19 inherently risky because (1) they were made without the normal investigation of
20 whether the borrower could afford the loan and (2) they were essentially bets that
21 residential real estate markets would continue to rise, allowing the borrowers to
22 refinance before their loans reset and they were required to make substantially
23 higher monthly payments.

24      80.    WesCorp began purchasing substantial quantities of Option ARM MBS
25 in 2005.  The vast majority of Option ARM MBS WesCorp purchased were based
26 on reduced documentation Option ARM loans.

27      81.    In addition to purchasing Option ARM MBS, WesCorp also increased
28 the yield and risk in its investment portfolio by purchasing MBS from lower

tranches. Typically, a particular MBS was sold in several tranches, or levels. Lower tranches would absorb any losses in the mortgage pools before the higher tranches. Lower tranches therefore had a higher risk and paid a higher yield.

82. The lowest tranche MBS WesCorp purchased prior to 2006 were rated AA rather than AAA. The concentration of AA rated MBS in WesCorp's portfolio increased from less than .5% in 2002 to over 22% in 2005, after which it declined.

83. Conversely, in 2002 more than 95% of the MBS WesCorp purchased were from a "senior" or higher tranche. By 2007, the percentage had dropped to less than 50%.

84. WesCorp did not typically purchase the highest tranche of those securities. Rather, most of the Option ARM MBS WesCorp purchased were from the lowest AAA rated tranches – those most likely to suffer losses if the borrowers defaulted on the loans backing them.

### WesCorp's Budgets

85. Near the end of each year, WesCorp's management proposed and WesCorp's board adopted a budget for WesCorp for the following year. Lane, as Chief Financial Officer, along with Siravo, were responsible for preparing the budget and proposing the budget. Burrell was responsible for the portions of the budget projecting investment income, investment expense, and net interest income. The proposed budget was first considered by the budget committee, which then recommended it to the board.

86. As the officers in charge of the budgeting process, Lane and Siravo had a duty to understand and consider how WesCorp would achieve the investment income and net interest income recommended in the proposed budget and to explain to the budget committee and, if necessary, the board as a whole, the credit and financial risks that the budget contained. Burrell had a duty to provide that information to Siravo and Lane.

87.     As members of the budget committee, defendants Rhamy, Updike, Dames, Osberg, Longson and Harvey (the "Budget Committee Members") were responsible for reviewing the proposed budgets and recommending them to the board for approval.  They had a duty to inform themselves about the budget projections, and in particular the basis for and potential risks to WesCorp of budgeting increases in investment income and net interest income.  They also had a duty to inform themselves as to how WesCorp's management anticipated achieving the investment income and net interest income mandated in the budget they were recommending and what additional risks were entailed in doing so.

88.     The budget contained detailed information about the proposed projected expenses and projected fee income, but very little information about the proposed projected investment income, investment expense and net interest income, except the monthly projected totals.  The Director Defendants were not provided any information about the composition of WesCorp's investment portfolio necessary to achieve the net interest income projected in the budgets.  The executive summary narrative for the budgets was also silent on that subject.

89.     The amount of investment income (denominated interest income) and net interest income earned by WesCorp was based on the return WesCorp earned on its investment portfolio, which in turn depended on the relative risk of the securities being purchased.  By recommending and approving an annual budget mandating particular levels of investment income and net interest income, Siravo, Lane, Burrell, the budget committee and the board were effectively dictating the level of risk in WesCorp's investment portfolio.  The budget committee and the board did so without consulting with the ALCO or any others with expertise on WesCorp's investment portfolio.

90.     WesCorp's 2007 budget mandated investment income of $1.470 billion and net interest income of $101 million.  These amounts were 67% higher and 17% higher, respectively, than the amounts mandated in the 2005 budget, which were

Case No. CV10-01597 GW (MANx)
SECOND AMENDED COMPLAINT

$880 million for investment income and $86 million for net interest income. Lane and Siravo proposed these increases, in consultation with Burrell, based on prior year forecasts.

91.   Burrell and WesCorp's Investment Department were responsible for ensuring that WesCorp's investments earned the returns required to meet WesCorp's budget for investment income and net interest income.

92.   The investment credit spread for WesCorp's private label MBS – the difference between the yield on the security and the 30 day LIBOR interest rate – represented the yield premium of the security, based on its particular level of risk. When investment credit spreads tightened, in 2005 and the years following, the yield premiums on the securities became smaller. WesCorp was therefore required to increase the relative level of risk of its securities in order to earn the same yield premium and the same net interest income. It was required to increase the risk level further to earn the net interest income mandated in its budgets.

93.   In order for WesCorp to obtain these increases in investment income and net interest income, it was required to increase the risk in its investment portfolio materially and to increase the amount of its borrowing by more than 67%, $6.1 billion at year end 2005 to more than $10.2 billion at year end 2007.

94.   WesCorp's budgets reflect that WesCorp actively planned both to increase its borrowings to fund investments and through 2006 to increase the spread required in its investment portfolio. In the following table, the investment credit spread is expressed in basis points above the one-month LIBOR rate.

///
///
///
///
///
///

| Year | Projected Average Borrowings ($ billions) | Projected Spread (bp) |
|------|-------------------------------------------|------------------------|
| 2004 | 1.17 | 27 |
| 2005 | 2.41 | 28 |
| 2006 | 2.54 | 31 |
| 2007 | 7.72 | 18 |
| 2008 | 7.81 | 23 |

95.   The materials that Siravo, Lane and Burrell supplied the budget committee about the budgets contained no information about what changes to WesCorp's investment portfolio would be required for WesCorp to earn the investment income and net interest income mandated by the budgets and no information about or discussion of the additional investment risk that would be required to do so.

96.   Beginning as early as March 2005, Defendants Rhamy, Dames, Updike and Osberg, along with a number of the other Director Defendants, attended ALCO meetings at which tightening investment credit spreads and lower yields were discussed.  By that time, Siravo, Lane and Burrell were aware that the investment credit spreads for private label MBS had been generally shrinking.

97.   A document entitled "Investment & ALM Strategies" in the April 2006 information package for the ALCO, sent to all directors, including defendants Rhamy, Dames, Updike and Osberg, warned:

> It increasingly gets more difficult to find appropriate securities at 30 or above in any sector other than AA's which are trading around spreads of 31 to 36.  There has been a steady overseas bid for MBS and ABS and this is keeping the balance of supply and demand in check, but it doesn't augur well for spreads to the domestic investor. *It seems as if the foreign investors are not considering any of the inherent risks in these securities.*  Absent some unforeseen event, there is nothing in the foreseeable future to suggest spreads will widen. (*Emphasis added*).

98.   By June 2006, Siravo, Lane and Burrell were aware that the investment credit spreads for certain private label MBS were continuing to shrink while the

1    investment credit spreads required for WesCorp to meet its budgeted income targets

2    had been increasing.

3        99.    In June 2006, the Director Defendants were presented with a chart

4    showing that the investment credit spreads for private label MBS had been generally

5    shrinking while the investment credit spreads required for WesCorp to meet its

6    budgeted income targets had been increasing.

7        100.    The information about shrinking investment credit spreads and the risks

8    inherent in the MBS WesCorp was purchasing was a "red flag" that required Siravo,

9    Lane and Burrell to consider the consequences of substantially increasing

10   investment income and net interest income through investment in such securities.

11   Siravo, Lane and Burrell were obligated to explain to the budget committee and the

12   board how adoption of the 2006 and 2007 budgets would materially affect the risk in

13   WesCorp's investment portfolio.  They did not do so.

14       101.    The information about investment credit spreads and the risks inherent

15   in the MBS WesCorp was purchasing was also a "red flag" to the budget committee

16   members and the board, requiring them to make reasonable inquiry and to consider

17   whether, and to what extent, their approval of the 2006 and 2007 budgets would

18   materially increase the risk in WesCorp's investment portfolio.

19       102.    Neither the budget committee nor the board made any such inquiry or

20   investigation, and neither considered the effect of the increase in investment risk and

21   borrowing required for WesCorp to materially increase its investment income and

22   net interest income.  Neither sought that information from the ALCO or the ALSC,

23   the two bodies charged with overseeing WesCorp's investment activities.  In light of

24   the information (and lack of information) they had been provided, the failure of the

25   budget committee and the board to consider the increase in investment risk and

26   borrowing required by the budgets they were recommending and adopting was

27   clearly unreasonable.

28

103.   The failure of Siravo, Lane and Burrell to discuss the increase in investment risk entailed in the proposed budgets with the budget committee and the board was below the standard of care that these officers owed to WesCorp.

104.   The NCUA is informed and believes and on that basis alleges that Siravo, Lane and Burrell actively advocated for the budgets adopted by WesCorp mandating increasing investment income, and did not highlight the increased risks inherent in those budgets, in part to further their own personal agendas of ever-increasing salaries, bonuses and retirement plans, all of which were funded from the increasing net interest income mandated by the budgets.

## WesCorp's Failure to Control MBS Concentration Risk

105.   NCUA regulations required the Director Defendants to set reasonable and supportable concentration limits for limited liquidity investments in relation to capital and to implement a credit risk management policy commensurate with the investment risks and activities WesCorp was undertaking.

106.   The fundamental purpose of investment concentration limits is to limit the harm to an investor if a particular type of investment suffers significant losses. The risk of loss from investments, however "safe" they appear, is usually unforeseen and is frequently unforeseeable.  Investment concentration limits, by requiring diversification, can reduce exposure to losses for particular types of securities caused by unforeseen changes in economic conditions and other unforeseen changes.

107.   Concentration limits for private label MBS are particularly important for corporate credit unions such as WesCorp, whose fundamental purpose is not to make a profit but to provide services to its members, including the safe investment of their excess funds.  The funds corporate credit unions invest are not primarily their retained earnings and excess capital which they can risk in hopes of achieving a profitable return.  Rather, corporate credit unions chiefly invest the funds of their members, entrusted to them primarily for safekeeping.

108.   Under WesCorp's corporate policies, the Director Defendants were solely responsible for setting investment policies.  WesCorp's investment policies required the board to establish, among other things, concentration limits to ensure that the investment of funds was accomplished in a safe and secure manner.  The policies also required the board to review WesCorp's investment policies annually.

109.   The ALCO was responsible for supervising WesCorp's investments and recommending policies to ensure a safe and sound investment strategy.  The ALCO's responsibilities included recommending concentration limits that met regulatory requirements, to ensure that WesCorp's portfolio was properly diversified to minimize investment risk.  The ALCO was required to review WesCorp's investment policies annually and recommend any appropriate or necessary changes to the board.

110.   WesCorp's Risk Management Department, headed by Sidley, and its Investment Department, headed by Burrell, were responsible for proposing investment concentration limits for its investment portfolio, to ensure that the portfolio was properly diversified to minimize investment risk.  The other Officer Defendants, by virtue of their offices and their membership on the ALCO and ALSC were also responsible for recommending investment concentration limits.

111.   WesCorp's board adopted policies specifying concentration limits for its investment securities and from time to time amended the policies to change limits or impose new limits.  In 2002, these policies allowed WesCorp to invest 950% of WesCorp's capital in private label (non-government agency) MBS.  The limit was raised to 1700% of capital in 2003 and to 2150% of capital in 2005.  It eventually reached 2300% in December 2007.  During the period from 2004 on, WesCorp's entire investment portfolio was less than these investment limits.  WesCorp's concentration limit policy therefore allowed WesCorp to invest its entire portfolio in private label MBS.

112.   Siravo and Burrell routinely proposed, and the Director Defendants routinely adopted, amendments raising the concentration limits for the MBS in WesCorp's portfolio so that WesCorp could achieve the portfolio yields required by WesCorp's budget.  For example, in 2004 WesCorp more than doubled the concentration limit for AA rated MBS from 100% of capital to 250% of capital.  In November 2005, it raised the limit again to 350% of capital.  The limit for commercial real estate MBS was 100% of capital until November 2005, after which it was raised to 250% of capital in April and 350% of capital in November 2006.

113.   The concentration limit that had been adopted by the board for AAA rated private label MBS permitted WesCorp's investment in those securities to be up to 1500% of its capital.  Since this concentration limit permitted WesCorp to invest its entire portfolio in AAA rated private label MBS, it was unreasonable and unsupportable.

114.   Although WesCorp was investing increasingly in AAA rated private label MBS from 2005 through 2007, neither the ALCO nor the board considered WesCorp's concentration limit for AAA rated private label MBS during that time. Neither determined that that concentration limit was reasonable or supportable, and neither considered changing that limit or imposing a reasonable and supportable concentration limit on AAA rated private label MBS.  In light of the regulatory requirement of reasonable and supportable concentration limits, the failure of the ALCO and the board to impose a meaningful concentration limit on AAA rated private label MBS, WesCorp's predominant investment, was clearly unreasonable.

## The Failure to Control the Risks of Option ARM MBS

115.   WesCorp's corporate policies required WesCorp's Investment Credit Services Department to review the credit risk implications of new security types, including securities backed by a type of collateral not previously approved by WesCorp.  They required the new security type to be presented to the ALCO and to

1   the board for approval, and they prohibited the purchase of new security types prior

2   to such approvals.

3       116.   WesCorp began purchasing Option ARM MBS in significant amounts

4   in 2005.  However, the Investment Credit Services Department did not perform and

5   present to the ALCO or the board a review of the credit implications of WesCorp's

6   purchase of that type of MBS, either before or after 2005.

7       117.   None of the Officer Defendants enforced the policy requiring review of

8   credit risk implications for new security types with respect to Option ARM MBS

9   either before or after 2005.  Nor did they seek approval from the ALCO or the board

10   for the purchase of Option ARM MBS as a new security type.

11       118.   Neither the ALCO nor the board approved the purchase of Option

12   ARM MBS as a new type of security, either before or after 2005.

13       119.   After members of the ALCO and the board became aware that

14   WesCorp had begun purchasing material quantities of Option ARM MBS, neither

15   the ALCO nor the board required WesCorp to comply with the policy requiring a

16   review of credit implications for new security types with respect to Option ARM

17   MBS.  The failure of the ALCO and the board to enforce WesCorp's policy

18   governing new security types for Option ARM MBS under these circumstances was

19   clearly unreasonable.

20       120.   By the Summer of 2005, the Officer Defendants and, on information

21   and belief, the Director Defendants were aware that (1) the "reset shock"

22   experienced by Option ARM loans increases their credit risk; (2) the credit quality

23   of the Option ARM MBS loan pools was deteriorating; (3) a drop in housing

24   demand could result in a decrease in real estate values and credit losses on existing

25   Option ARM loans because the borrowers would be unable to refinance.  The

26   NCUA is informed and believes and on that basis alleges that the Officer

27   Defendants and the Director Defendants also knew at that time that the credit risk on

28   reduced documentation loans was significantly higher than the credit risk on loans

1  made after verifying the borrowers income and ability to made the payments

2  required by the loan.

3    121.   Nonetheless, from 2005 through 2007, the Option ARM MBS became

4  WesCorp's predominant MBS investment.  By 2006, 49% of its investment

5  portfolio purchases were Option ARM MBS.  At the end of 2006, WesCorp had

6  over $6 billion invested in Option ARM MBS, and that single type of security

7  comprised nearly 28% of WesCorp's investment portfolio.

8    122.   In 2007, more than 70% of the securities WesCorp purchased for its

9  portfolio, over $4.627 billion, were Option ARM MBS.  By the end of 2007,

10  WesCorp had nearly $9 billion invested in Option ARM MBS, comprising over

11  37% of WesCorp's investment portfolio.

12    123.   Without providing specific numbers, the Investment Department

13  reported at the ALCO meetings, attended by the Director Defendants, that WesCorp

14  was purchasing significant quantities of Option ARM MBS.

15    124.   Although the Officer Defendants by virtue of their offices and as

16  members of the ALCO were required to recommend concentration limits by

17  investment types, including those backed by different types of collateral, they did

18  not recommend any concentration limits for Option ARM MBS.

19    125.   Although the ALCO was required to recommend concentration limits

20  by investment types, including those backed by different types of collateral, it did

21  not recommend any concentration limits for Option ARM MBS, and the board never

22  considered or adopted any such limits.

23    126.   By contrast, WesCorp's board adopted meaningful concentration limits

24  for other AAA rated private label MBS based on different collateral types.  For

25  example, it adopted a concentration limit of 100% of capital for CDOs, another form

26  of risky AAA rated private label MBS WesCorp was purchasing at the time.

27    127.   In light of the heavy investment WesCorp was making in Option ARM

28  MBS, the failure of the ALCO and the board to recommend and adopt a

Case No. CV10-01597 GW (MANx)
SECOND AMENDED COMPLAINT

1   concentration limit for Option ARM MBS under these circumstances was clearly

2   unreasonable.

3       128.   For reporting purposes, WesCorp classified its private label MBS

4   (other than CMBS and CDOs) in only two ways: by rating (AAA and AA) and by

5   FICO score (prime, alt-A, and subprime).  The Officer Defendants never proposed,

6   the ALCO never considered or recommended and the Director Defendants never

7   adopted policies requiring tracking or reporting of the concentration of Option ARM

8   MBS in WesCorp's portfolio.  Consequently, neither the Officer Defendants, nor the

9   ALCO or the other Director Defendants monitored those concentrations.

10       129.   The Officer Defendants never proposed, the ALCO never considered or

11   recommended, and the Director Defendants never adopted policies limiting or

12   requiring reporting of concentration of AAA rated private label MBS by tranche

13   position.  Consequently, neither the Officer Defendants nor the ALCO or the other

14   Director Defendants monitored the increasing concentration of lower tranche AAA

15   private label MBS in WesCorp's investment portfolio.

16       130.   Without tracking and reporting, WesCorp, the ALCO and the board

17   were unaware of the concentrations of Option ARM MBS and lower tranche AAA

18   private label MBS in WesCorp's portfolio. In light of the heavy investment

19   WesCorp was making in Option ARM MBS, the failure of the ALCO and the board

20   to inform themselves of the concentration of Option ARM MBS and lower tranche

21   AAA MBS under these circumstances was clearly unreasonable.

22       131.   Even though the Option ARM MBS, particularly from lower AAA

23   tranches, were WesCorp's predominant investment in 2006 and 2007, and the

24   Officer Defendants and, on information and belief, the Director Defendants were

25   aware of the risks created by those investments, neither the ALCO nor the board

26   took any actions to inquire about, investigate or consider the risk posed by the

27   increasing concentration of Option ARM MBS.

28

Case No. CV10-01597 GW (MANx)
SECOND AMENDED COMPLAINT

1    132.   Burrell as the officer in charge of the Investment Department and Chief

2   Investment Officer and the members of his staff and Sidley as the officer in charge

3   of the Investment Credit Services Department and Chief Risk Officer and the

4   members of his staff had the duty to ensure a thorough review of each proposed

5   security purchase for credit risk.  However, the credit risk reviews by both

6   departments were perfunctory, performed in a matter of hours on limited

7   information.  Typically, the purchase justification which WesCorp's investment

8   policies required the Investment Credit Services Department to provide to the

9   ALCO and the board was a rote statement with no analysis.

10    133.   The Officer Defendants and, on information and belief, the Director

11   Defendants knew that WesCorp did not perform a thorough review of the credit risk

12   of private label MBS purchases, and the ALCO was not provided sufficient

13   information to itself evaluate the credit risk entailed in WesCorp's purchase of

14   private label MBS.  The failure of the ALCO and the board to require a thorough

15   review of the credit risk of WesCorp's private label MBS purchases under these

16   circumstances was clearly unreasonable.

### The Warnings of Risks in WesCorp's Portfolio

18    134.   By the Summer of 2005, WesCorp was warning its member credit

19   unions that the loans being originated and sold into the secondary market for MBS

20   were deteriorating in credit quality; that a drop in housing demand could result in a

21   decrease in real estate values and credit losses on existing Option ARM loans

22   because the borrowers will be unable to refinance; that credit unions that hold

23   significant balances in negative amortization loans, such as Option ARM loans, may

24   have significant credit risk exposure; that the "housing bubble" might be

25   dangerously close to bursting; and that if the housing bubble burst, California and a

26   few other states would suffer the worst of the damage.   The Officer Defendants

27   were aware of these warnings.  The NCUA is informed and believes and on that

28   basis alleges that the Director Defendants were also aware of these warnings.

135.   The Officer Defendants and the Director Defendants generally attended the ALCO meetings.  At those meetings, the attendees received presentations about the state of the economy generally and, from the Investment Department, about the investment climate and WesCorp's investment strategy specifically.

136.   Beginning as early as March 2005 and continuing through 2006, the Investment Department reported at the ALCO meetings that investment credit spreads were tightening significantly.  It also reported that "good" investments were becoming increasingly harder to find.

137.   The Officer Defendants and the Director Defendants were kept informed at the ALCO meetings both of interest rates and of the status of the housing market, and they were therefore aware of interest rates beginning to rise significantly in 2005.  In addition, the ALCO was told on several occasions as early as late 2005 that housing activity was slowing.

138.   In early 2006, the ALCO and the board were informed that the rise in real estate prices was slowing and by mid-2006 they had been informed that residential real estate prices were flat and declining.  The September 19, 2006 "Economic and Market Conditions" report noted:

> It's getting difficult to pick up a newspaper without being confronted with a depressing story on the housing slowdown.  The stories generally center on homeowners who didn't 'realize' how much their payments could increase or on homeowners who need to sell and can't find a buyer at any price.

139.   The October 31, 2006 "Economic and Market Conditions" report in the ALCO package warned: "We think the housing story and ramifications of poor lending practices will grow in importance, bringing along with them all of the negative implications for the economy."  The December 19, 2006 report was even more negative on housing and "the mortgages underneath the housing market."  The report noted escalating delinquencies and the inability of borrowers to refinance, "unless some benevolent lender decides to forego the appraisal."

Case No. CV10-01597 GW (MANx)
SECOND AMENDED COMPLAINT

1    140.   By the end of 2006, WesCorp was warning its members that it believed

2    the housing market to be in the most precarious position ever seen in the United

3    States, and that it would be easy to envision a meltdown in housing that would drive

4    the economy into a recession.

5    141.   The "Economic and Market Conditions" report in the January 23, 2007

6    ALCO package noted:

7       Our biggest concerns stem from what we see in the performance
        characteristics of recent vintage mortgages, and from what we are hearing
8       from mortgage servicers.  These . . . statistics tell us that the surge in
        delinquency notices and foreclosures we've seen recently is only the first
9       warning of a larger wave to come.

10   142.   The "Economic and Market Conditions" report in the February 2007

11   ALCO package discussed the "meltdown" of the subprime market and the restricted

12   availability of Option ARM loans.  The report in the March 2007 ALCO package

13   noted the doubling of delinquency rates for prime borrowers in adjustable rate

14   mortgages and the inability of borrowers to roll over balances and refinance.

15   143.   While WesCorp curtailed its purchases of AA rated MBS in 2005, it

16   took no other steps to address the effect these trends might have on WesCorp's

17   heavy concentration of private label MBS.  To the contrary, notwithstanding its

18   understanding of the ongoing collapse of the housing market, the likelihood that that

19   collapse would lead to both increased delinquencies and declining home prices, and

20   the particular vulnerability of reduced documentation Option ARM MBS to both,

21   WesCorp continued to make such MBS its predominant investment in 2007.

22   144.   The information that the Officer Defendants were receiving about the

23   residential real estate market was a "red flag" requiring them to reconsider and

24   adjust WesCorp's investment strategy and budgets.  However, the Officer

25   Defendants failed to inform the ALCO or the board of the need to revise their

26   investment strategy or budgets, failed to inform the board of the risks posed by

27   WesCorp's increasing concentration of Option ARM MBS, and failed to take any

28   action to limit that concentration.  As a result, the Officer Defendants continued to

1    cause WesCorp to increase the concentration of Option ARM MBS in its investment

2    portfolio until it stopped purchasing private label MBS altogether in July 2007,

3    when the securities essentially became unavailable and the market for them froze.

4         145.   The information that the ALCO members and board members were

5    receiving about the residential real estate market was also a "red flag" to them,

6    which required them to make reasonable inquiry about, investigate and to inform

7    themselves about the growing risks to WesCorp created by WesCorp's increasing

8    concentration of Option ARM MBS in its portfolio in light of the changing

9    economic conditions and to consider actions to mitigate those risks.

10        146.   Neither the ALCO nor the board made reasonable inquiry about,

11   investigated or informed themselves about the risks posed by WesCorp's increasing

12   concentration of Option ARM MBS and neither took any action to limit that

13   concentration.  As a result, WesCorp continued to increase the concentration of

14   Option ARM MBS in its investment portfolio until it stopped purchasing private

15   label MBS altogether in July 2007, when the securities essentially became

16   unavailable and the market for them froze.  The failure of the ALCO and the board

17   to consider the risks posed by WesCorp's increasing concentration of Option ARM

18   MBS in light of what they knew about the deterioration of the housing market was

19   clearly unreasonable.

20        147.   NCUA regulations required the directors to ensure the maintenance of

21   sufficient capital to support the risk exposures arising from current and projected

22   activities.  Although WesCorp's risk exposures were increasing because of

23   WesCorp's increased borrowing and substantial concentration of Option ARM

24   MBS, the Director Defendants did not inquire about, consider or require WesCorp to

25   increase its capital to protect against that risk exposure.  To the contrary, they

26   allowed WesCorp's core capital ratio and total capital ratio to decline in 2006 and

27   2007.  In light of WesCorp's heavy investment in private label MBS, and

28   particularly Option ARM MBS, and the board's awareness of the decline in the

1 | housing market and the rise in interest rates, the failure of the board to inquire about

2 | increasing WesCorp's capital and its decision to allow WesCorp's capital ratios to

3 | decline were clearly unreasonable.

4 | **WesCorp's Collapse**

5 | 148.   At the end of 2007, WesCorp's investment portfolio held the following

6 | concentrations of relatively risky MBS securities.

7 |

| MBS Type | % of Portfolio |
|---|---|
| Option ARM | 37.1% |
| AA rated Subprime | 14.5% |
| CDO | 2.4% |

11 | 149.   The Officer Defendants' and the Director Defendants' failure to control

12 | WesCorp's concentration of Option ARM loans proved fatal.  WesCorp was

13 | required to recognize losses of $6.872 billion in its investment portfolio as of

14 | December 31, 2008.  Of these losses, more than $4.683 billion, or 68%, resulted

15 | from Option ARM MBS WesCorp purchased in 2006 and 2007.  $2.5 billion of the

16 | losses resulted from the Option ARM MBS it purchased in 2007 alone and after the

17 | Officer Defendants and the Director Defendants ignored the repeated warnings

18 | alleged above.  The Option ARM MBS purchased by WesCorp in 2007 were

19 | responsible for more than 35% of the $6.872 billion in losses WesCorp was required

20 | to recognize.

21 | 150.   By contrast, WesCorp lost 83% of the value of its CDO securities.

22 | However, because of the prudent concentration limit imposed on its CDO securities

23 | – 100% of capital – WesCorp's losses on its CDO securities were only $457 million.

24 | 151.   Had WesCorp imposed the same concentration limit on its Option

25 | ARM MBS as it did on its CDO MBS, its losses on those securities would have

26 | been limited to less than $200 million.

27 | 152.   WesCorp had invested more heavily in private label MBS than other

28 | corporate credit unions.  In addition, because it invested in riskier MBS, its losses

1  were disproportionately greater.  While WesCorp invested only slightly more in

2  MBS than U.S. Central, a much larger credit union, its losses were more than twice

3  as large as U.S. Central's.  WesCorp's losses were more than 10 times larger than

4  those of the other retail corporate credit unions that had significant investments in

5  private label MBS.

| Corporate Credit Union | Investment in MBS as of December 2007 (including Home Equity MBS) | | Losses as of January 31, 2010 | |
|---|---|---|---|---|
| | $ | % of Total Investments | $ | % of MBS Investments |
| WesCorp | $21.588 billion | 74% | $6.8 billion | 31% |
| U.S. Central | $20.287 billion | 49% | $3.2 billion | 16% |
| Members United | $4.024 billion | 31% | $462 million | 11% |
| Southwest | $4.477 billion | 40% | $455 million | 10% |
| Constitution | $917 million | 57% | $104 million | 11% |

14      153.   The investment losses at WesCorp and at U.S. Central threatened the

15  national credit union system, creating the likelihood of cascading failures of

16  thousands of natural person credit unions throughout the country, including many of

17  the credit unions that were members of WesCorp.  To prevent this massive systemic

18  failure, emergency legislation was required, and credit unions throughout the

19  country have been required to pay substantially increased insurance assessments

20  costing, in the aggregate, billions of dollars.

21                              **The Improper SERP Payments**

22      154.   WesCorp's board authorized a SERP for certain high-level WesCorp

23  executives in November 2001 (the "Executive SERP").  Swedberg was a participant

24  in the Executive SERP program.

25      155.   The purpose of the Executive SERP was to encourage its participants to

26  remain employed at WesCorp.  Among other benefits, the Executive SERP provided

27  its participants a lump sum payment at their expected retirement dates, provided that

28

(1) they remained employees of WesCorp at the time, (2) had been WesCorp employees for ten years, and (3) had been a participant in the SERP for five years.

156.   When Siravo became President and CEO of WesCorp in March 2002, he negotiated a SERP plan for himself (the "Siravo SERP") that provided a similar lump sum payment at his expected retirement date, which was May 1, 2008.

157.   In both  SERPs, the amount of the lump sum benefit was determined by a formula based on "Final Compensation."  Final Compensation was defined as the "monthly base-period salary paid most recently while a person was a participant in the program, multiplied by twelve (12)."  The lump sum payment formula for both SERPs also included a 40% gross-up for taxes.

158.   In the fall of 2007, Siravo and Swedberg decided to increase the amount of the SERP retirement lump sum payment that they and the other participants in the Executive SERP and Siravo SERP would receive at their expected retirement dates.  They decided to propose amendments to the SERP plans that would (1) change the definition of "Final Compensation" to include all compensation, not just monthly base salary; and (2) increase the gross-up for taxes from 40% to 67%.

159.   Siravo decided that the Siravo SERP should be amended by the board first.  Siravo told Swedberg that he would propose identical amendments for the Executive SERP after the Siravo SERP was amended.  Because Swedberg appeared "disinterested" with respect to the proposed amendments to the Siravo SERP, Siravo told Swedberg that he should make the presentation to the board requesting amendments of the Siravo SERP.  Although Swedberg was no longer responsible for WesCorp's human resources function, he prepared the materials requesting the amendments to the SERPs and communicated with the board regarding the proposed amendment to the Siravo SERP.

160.   Rather than disclosing to the board that the amendments to the Siravo SERP were simply intended to increase the size of the lump sum payment to Siravo,

1   Swedberg, with Siravo's knowledge and acquiescence, concealed this fact and

2   instead represented to the board that the amendments were necessary to correct

3   errors in the Siravo SERP.

4       161.   Swedberg developed the proposal to amend the Siravo SERP in

5   conjunction with Siravo, Merlo (the Chairman of the board's compensation

6   committee), and Harvey (the Chairman of the board).

7       162.   Swedberg initially prepared a PowerPoint presentation for WesCorp's

8   board, which he sent to Siravo on October 19, 2007. The presentation stated that the

9   Siravo SERP required modification because (1) its formula currently produces a

10  28% shortfall and (2) new plans provide for a 67% gross-up, which "produces a

11  more equitable result."

12      163.   Both of these statements were false and misleading. The formula in the

13  Siravo SERP in fact produced a lump sum payment significantly higher than the

14  payment contemplated by the parties at the time the SERP was negotiated, and the

15  amount of the gross-up had been set at that time in arms-length negotiations.

16      164.   On October 22, 2007, Swedberg showed the PowerPoint presentation

17  to Merlo, who suggested replacing it with a short memo. Swedberg then prepared a

18  one page memo for Merlo's review that "recommended" an "administrative change"

19  to "increase benefits sufficiently to achieve 48 percent of earnings inclusive of off-

20  sets" and requested consideration of a change in the tax multiplier to 1.67 percent.

21  Subsequent drafts of the memo stated that "the SERP currently produces 37% of

22  ending earnings versus the agreed-to 48%."

23      165.   The representations that the proposed change was "administrative" and

24  that there had been an "agreed-to 48%" of ending earnings were false. The change

25  was substantive, and Siravo and WesCorp had never agreed that his lump sum SERP

26  payment would be based on 48% of "ending earnings."

27      166.   On October 28, 2007, Swedberg met with Merlo and Harvey. After

28  that meeting, Swedberg wrote a revised memorandum dated November 2, 2007,

which he sent to Harvey on November 5, 2007, with Siravo's concurrence.  The memorandum, provided to the board's executive committee (and possibly the board as a whole), was entitled "Administrative Change" to the CEO's SERP.  A true and correct copy of the November 2, 2007 memorandum is attached hereto as Exhibit 1.

167.  The characterization of the proposed amendments as "administrative" was false and misleading.  The proposed changes to the Siravo SERP were not "administrative" at all.  They were substantive changes intended to nearly double the SERP benefit.  In addition, the memorandum falsely stated:

a.   that there were two "administrative errors in the current 457(f) [SERP] plan document that are not consistent with the intent of the program when it was initially developed."

b.   that "[o]ur CEO's current 457(f) Plan utilized an old template that dated back to Dick Johnson's tenure as President when no bonuses or incentive pay plans existed at WesCorp and the concept of tax gross-up was not broadly utilized in 457(f) Plans."

c.   that the changes are necessary to provide the "agreed upon 48 percent of compensation rate" and that the tax gross-up change is required to provide the "correct tax gross-up amount."

168.  Each of these statements was false and misleading, and the NCUA is informed and believes and on that basis alleges that Swedberg and Siravo knew the statements were false at the time they were made or had no reasonable ground to believe that they were true.

169.  The true facts were that the Siravo SERP was fully consistent with the intent of the parties at the time the plan was negotiated.  Siravo's employment agreement provided for an incentive bonus, and the concept of gross-up rates was broadly utilized in SERP plans at the time, a fact Swedberg knew or should have known.  At the time the terms of the Siravo SERP were being negotiated, Siravo and WesCorp never agreed or contemplated that the amount of the lump sum payment

would be 48% of total compensation. Rather, the parties contemplated and agreed that the amount of Siravo's lump sum payment was to be calculated as a percentage of base salary, not total compensation. Finally, the gross-up percentage in the Siravo SERP formula was the same as the percentage in the Executive SERP, and the NCUA is informed and believes and on that basis alleges that neither party intended to change it at the time the Siravo SERP was negotiated.

170. After Harvey approved the proposal outlined in the November 2 memorandum, he submitted it to Kramer and Jordan, the other members of the WesCorp board's executive committee, each of whom approved the proposal prior to the board meeting.

171. At the November 27, 2007 meeting of the WesCorp board, Harvey requested that the board approve the executive committee's approval of the changes to the Siravo SERP and adopt a resolution to that effect. The board did so.

172. The resolution adopted by the WesCorp board authorized the following changes to the Siravo SERP:

> 1. "Include salary *plus* bonus and incentive pay in the SERP benefit calculation to make it consistent with the compensation used in WesCorp's Defined Benefit plan benefits calculation." (Emphasis in original).

> 2. "Calculate the tax gross-up using the divisor (.60) *versus* the multiplier (1.4)." (Emphasis in original).

173. On January 24, 2008, Harvey, as chairman of WesCorp's board, executed an amended Siravo SERP document that the NCUA is informed and believes and on that basis alleges had been prepared by Swedberg and approved by Siravo. The amended Siravo SERP provided Siravo a larger lump sum payment than the board's resolution authorized.

174. As senior officers of WesCorp, both Siravo and Swedberg had a duty to ensure that the amendments to the Siravo SERP conformed to the board resolution and that they had a duty to inform the board of any variance, or otherwise take

action to correct any mistake once it was recognized. The NCUA is informed and believes and on that basis alleges that both Siravo and Swedberg knew or should have known of the variance, but neither of them informed either Harvey or other members of WesCorp's board that the amended Siravo SERP document provided for a larger lump sum payment than the board had approved.

175.   Although Siravo extended his employment at WesCorp to April 30, 2009, his expected retirement date remained May 1, 2008. On May 13, 2008, WesCorp paid Siravo a lump sum SERP payment of $6,881,401. Under the original Siravo SERP, Siravo's lump sum payment would have been $4,494,351.62.

176.   After the Siravo SERP changes were approved, Swedberg began work on amendments to the Executive SERP, in which he was a participant. These amendments were identical to the amendments to the Siravo SERP proposed by Swedberg and approved by WesCorp's board.

177.   WesCorp's board approved the amendments to the Executive SERP at its June 24, 2008 meeting. The only WesCorp employee present was Siravo. The board resolution adopting the amendments to the Executive SERP is identical to the resolution adopting the amendments to the Siravo SERP, except for the identification of the SERP program involved.

178.   Swedberg retired at the end of 2008. On January 6, 2009, he was paid a lump sum SERP payment of $1,223,962. Under the original Executive SERP, his lump sum SERP payment would have been $534,971.35.

179.   Lane was a participant in the Executive SERP. His SERP expected retirement date was in 2015. The NCUA is informed and believes and on that basis alleges that by late 2005, Lane had decided to leave WesCorp in the next few years, well prior to his expected retirement date.

180.   In a December 7, 2005 memo to Lane, Siravo proposed an alternative to the Executive SERP for Lane under which Lane would exchange his participation in the Executive SERP for a payment of $1,325,000 by February 28,

2006 and a further payment of $75,000 on January 15 of each year thereafter that he was employed at WesCorp.  Lane accepted the proposal by executing an Early Payout Agreement with Siravo containing those terms.

181.   The NCUA is informed and believes and based thereon alleges that the board was either unaware of the Early Payout Agreement and never approved it or that the board's approval, if any was given, was given without an informed decision making process.  The early payout in lieu of a lump sum payment upon expected retirement date is inconsistent with the SERP rationale of retaining key executives until their retirement date.  The NCUA is informed and believes and based thereon alleges that the payment to Lane served no *bona fide* business purpose and therefore constituted a wasting of corporate assets.

182.   Pursuant to the Early Payout Agreement, Lane received a payment of $1.325 million in 2006 and of $75,000 in each of 2007 and 2008.  For all three years he also received base compensation and a substantial "regular" bonus.  On April 8, 2008, Lane left his employment with WesCorp.

## FIRST CLAIM FOR RELIEF

### (Breach of Fiduciary Duties – Against the Officer Defendants)

183.   The NCUA incorporates by reference paragraphs 1 through 153, inclusive, of this complaint as though fully set forth.

184.   The Officer Defendants had a duty to exercise the same care as a reasonably prudent officer of a $30 billion financial institution would exercise in managing the institution's affairs, including managing WesCorp's assets and liabilities and investment activities in a safe and sound manner.

185.   As senior officers of a corporate credit union, the Officer Defendants also occupied a position of trust with respect to WesCorp as defined under California law.  As such, they owed WesCorp duties of loyalty and good faith and were required to perform their duties in a manner each of them believed to be in the

best interests of WesCorp, at the expense of each of their own personal interests or compensation.

186.   The Officer Defendants also had a duty to keep both themselves and the board fully informed of the risks arising from WesCorp's business strategy, its annual budget and its investing activities.

187.   Siravo, as President and CEO, had a duty to supervise all aspects of the institution, including WesCorp's investing activities and portfolio, its budgeting process and the credit risks WesCorp was exposed to.  He had a duty to ensure that the policies, budgets and other board actions necessary for WesCorp's safe and sound operation were recommended and explained to the board.  Siravo had a duty to ensure that WesCorp's policies, including those relating to its investing activities and portfolio, were observed and enforced.

188.   As a member of the ALCO and the ALSC, Siravo also had a duty to ensure that WesCorp's investing activities were conducted in a prudent manner.

189.   Lane, as Chief Financial Officer, had a duty to control the financial affairs of the credit union and to provide full information about any increase in risk WesCorp would be exposed to by adopting the budgets he recommended.  In addition, as a member of WesCorp's Executive Team actively managing and directing the business strategy and affairs of WesCorp, and as the second in command at WesCorp, Lane had the responsibility to supervise WesCorp's investing activities and portfolio, its budgeting process and the credit risks WesCorp was exposed to and to ensure that the policies, budgets and other board actions necessary for WesCorp's safe and sound operation were recommended and explained to the board.  As a member of the ALCO and the ALSC, Lane also had a duty to ensure that WesCorp's investing activities were conducted in a prudent manner.

190.   Burrell, as Chief Investment Officer, had a duty to manage WesCorp's investment portfolio and its investing activities in a safe and sound manner; to avoid

over-concentrations of credit risk in WesCorp's investment portfolio; to ensure that WesCorp's investment activities were conducted in accordance with all WesCorp investment policies; to recommend reasonable and supportable concentration limits to the board; to ensure that the board, the ALCO and the ALSC were fully informed of the risks of WesCorp's concentrations of Option ARM MBS and lower tranche AAA private label MBS; to monitor and to provide information to the board, the ALCO and the ALSC about the concentrations of Option ARM MBS and lower tranche AAA private label MBS in WesCorp's portfolio and WesCorp's purchases of those securities; and to otherwise safeguard the investment portfolio. Burrell had a duty to ensure that WesCorp's policies relating to its investing activities and portfolio were observed and enforced. As a member of the ALCO and the ALSC, Burrell also had a duty to ensure that WesCorp's investing activities were conducted in a prudent manner.

191.   In addition, by actively managing and directing the business strategy and affairs of WesCorp together, Siravo, Lane and Burrell collectively had responsibility for WesCorp's budgeting process and to ensure that the policies, budgets and other board actions necessary for WesCorp's safe and sound operation were recommended and explained to the board.

192.   Siravo, Lane and Burrell breached their duties of care by, among other things:

a.    Recommending budgets that materially increased the risks in WesCorp's investment portfolio without recognizing those risks, informing the board of them or recommending or taking steps to mitigate them;

b.    Not recommending the review and correction of the unreasonable and unsupportable concentration limit for AAA private label MBS;

c.    Not requiring compliance with WesCorp's investment policies as to new security types prior to WesCorp's purchases of material amounts of Option ARM MBS;

1          d.      Not considering and recommending a concentration limit for

2   Option ARM MBS before the concentration of those securities in WesCorp's

3   portfolio became material;

4          e.      Causing WesCorp to develop a dangerous concentration of

5   Option ARM MBS in its investment portfolio;

6          f.      Causing WesCorp to develop a heavy concentration of lower

7   tranche AAA private label MBS;

8          g.      Not advising the ALCO or the board of the concentrations of

9   Option ARM MBS and lower tranche AAA private label MBS in WesCorp's

10  investment portfolio;

11         h.      Not enforcing WesCorp's policies requiring a thorough credit

12  review prior to WesCorp's purchase of private label MBS;

13         i.      Ignoring the potential effect of the deterioration of the housing

14  market and rising interest rates on WesCorp's continuing investment strategy of

15  purchasing Option ARM MBS as its predominant investment and taking no action to

16  adjust WesCorp's budget or investing activities in light of these changes;

17         j.      Causing WesCorp to borrow ever-increasing sums of money to

18  make up for diminishing investment returns and thereby increase the risk and

19  severity of a liquidity or capital crisis; and

20         k.      Not considering or recommending to the board that WesCorp

21  increase its capital to adjust for the greater risks it was exposed to by its heavy

22  investment in Option ARM MBS and by the simultaneous deterioration of the

23  housing market and rising interest rates.

24         193.   In addition, Siravo, Lane and Burrell breached their duties of care and

25  loyalty by, among other things, causing WesCorp to depart from the traditional

26  corporate credit union business model and instead follow a strategy of maximizing

27  investment income to maximize net interest income and thereby materially increase

28  their own compensation.  The strategy advocated and pursued by Siravo, Lane and

Burrell caused WesCorp to develop a dangerous concentration of private label MBS, particularly Option ARM MBS, and to borrow ever-increasing sums of money to make up for diminishing investment yields. In doing so, they failed to adequately identify or control the risks inherent in their business strategy and they failed to advise the ALCO and the board of the risks.

194.   Sidley, as Chief Risk Officer and Vice President of Credit Services, had a duty to ensure that an appropriate credit review was performed of each security purchased by WesCorp and that the collateral underlying the security was appropriately considered, to recommend appropriate concentration limits, and to advise the ALCO and the board of increased credit risk to WesCorp from the concentration of Option ARM MBS and lower tranche AAA private label MBS in its portfolio.

195.   Sidley breached his duties of care by, among other things:

  a.   Not complying with WesCorp's investment policies as to new security types prior to WesCorp's purchases of material amounts of Option ARM MBS;

  b.   Not recommending the review and correction of the unreasonable and unsupportable concentration limit for AAA private label MBS;

  c.   Not considering and recommending a concentration limit for Option ARM MBS before the concentration of those securities in WesCorp's portfolio became material;

  d.   Not advising the ALCO and the board of the dangerous concentrations of Option ARM  and lower tranche AAA private label MBS in WesCorp's investment portfolio; and

  e.   Not considering or recommending to the board that WesCorp increase its capital to adjust for the greater risks it was exposed to by its heavy investment in Option ARM MBS and by the simultaneous deterioration of the housing market and rising interest rates.

196.   For each of these acts and omissions, the Officer Defendants failed to perform their duties with such care as an ordinarily prudent person in a like position would use as an executive officer for a $30 billion financial institution.

197.   In addition, the NCUA is informed and believes and based thereon alleges that Siravo breached his duty of care by not devoting sufficient time and effort to his duties as President and CEO of WesCorp.

198.   As a result of the foregoing breaches of the duty of care, among others, WesCorp suffered massive losses in its investment portfolio, which losses were a substantial factor in WesCorp's failure and the NCUA has suffered damages not fully ascertained but in excess of $1 billion.

## SECOND CLAIM FOR RELIEF

### (Breach of Fiduciary Duties – Against Defendants Rhamy, Updike, Dames, Osberg, Longson and Harvey)

199.   The NCUA incorporates by reference paragraphs 1 through 153, inclusive, of this complaint as though fully set forth.

200.   As members of the budget committee of WesCorp's board recommending that the board approve WesCorp's budgets, the Budget Committee Members, defendants Rhamy, Updike, Dames, Osberg, Longson and Harvey, were required to perform their duties in a manner they believed to be in the best interests of WesCorp and with such care, including reasonable inquiry, as an ordinarily prudent person would use acting as a budget committee member for a $30 billion institution.

201.   The Budget Committee Members had a duty to make reasonable inquiry and to inform themselves about the budgets they were recommending to the board, and in particular about the basis for the levels of investment income and net interest income being mandated in those budgets; what, generally, WesCorp would do to earn the investment income and net interest income levels set in the budgets; and what potential risks WesCorp would assume by doing so.

Case No. CV10-01597 GW (MANx)
SECOND AMENDED COMPLAINT

1    202.   The Budget Committee Members breached this duty by failing to

2    exercise oversight over the budgeting process, and in particular failing to make

3    reasonable inquiry about, inform themselves about, obtain advice about or consider:

4              a.    The level of investment income and net interest income

5    mandated in the budgets they were recommending and the investment risks required

6    to obtain that level of investment income and net interest income;

7              b.    The additional risks that WesCorp would be exposed to from the

8    purchase of the securities necessary for WesCorp to earn the budgeted levels of

9    investment income and net interest income;

10             c.    The risks involved in and the effects of substantially increasing

11   WesCorp's borrowing to obtain the investment income and the net interest income

12   levels mandated by the budgets; and

13             d.    Whether WesCorp's capital plan should be modified to require

14   additional capital in light of the increased risk exposure required for WesCorp to

15   earn the investment income and net interest income mandated by WesCorp's

16   budgets.

17    203.   The defendant Budget Committee Members further breached their duty

18   of care by ignoring the "red flags" of tightening investment credit spreads for

19   private label MBS and the changes in the housing market and economy.  In

20   particular, the Budget Committee Members did not make reasonable inquiry about,

21   inform themselves about, obtain advice about or consider the risks created for

22   WesCorp by budgeting investment income and net interest income levels that were

23   dependent on heavy investment in private label MBS, and particularly Option ARM

24   MBS, during a time of tightening investment credit spreads for private label MBS, a

25   deteriorating housing market and rising interest rates.

26    204.   In these acts and omissions, the defendant Budget Committee Members

27   abdicated their responsibilities as budget committee members, acted clearly

28   unreasonably in light of the circumstances known to them at the time, and failed to

1  perform their duties with such care, including reasonable inquiry, as an ordinarily

2  prudent person in a like position would use as a budget committee member for a $30

3  billion corporate credit union.

4      205.  As a result of the foregoing breaches of the duty of care, among others,

5  WesCorp suffered massive losses in its securities portfolio, which losses were a

6  substantial factor in WesCorp's failure and the NCUA has suffered damages not

7  fully ascertained but in excess of $1 billion.

8  **THIRD CLAIM FOR RELIEF**

9  **(Breach of Fiduciary Duties – Against Defendants Jordan, Nakamura, Cheney,**

10  **Rhamy, Kramer, Lentz, and Osberg)**

11      206.  The NCUA incorporates by reference paragraphs 1 through 153,

12  inclusive, of this complaint as though fully set forth.

13      207.  As members of WesCorp's ALCO, Jordan, Nakamura, Cheney,

14  Rhamy, Kramer, Lentz, and Osberg ("ALCO Members") were required to perform

15  their duties in a manner they believed to be in the best interests of WesCorp and

16  with such care, including reasonable inquiry, as an ordinarily prudent person would

17  use acting as an ALCO member for a $30 billion institution.

18      208.  The defendant ALCO Members had a duty to oversee WesCorp's asset

19  and liability management, including its investment activities, to ensure the safe and

20  sound operation of the credit union.  They had a duty to inform themselves about

21  and to understand WesCorp's asset and liability management strategy, WesCorp's

22  investment activities and the composition of WesCorp's investment portfolio.

23      209.  This duty required the ALCO Members:

24          a.  To make reasonable inquiry about, inform themselves of and

25  consider the risks of WesCorp's strategy of borrowing and investing heavily in

26  private label MBS and Option ARM MBS and whether WesCorp should increase its

27  capital in light of the increased risk exposure created by this strategy;

28

b.      To make reasonable inquiry about, inform themselves about, understand and recommend to the board reasonable and supportable concentration limits for AAA rated private label MBS;

c.      To make reasonable inquiry about, inform themselves about, understand and recommend to the board concentration limits for new investment types such Option ARM MBS;

d.      To monitor compliance with, enforce, review annually and recommend changes to WesCorp's investment policies;

e.      To make reasonable inquiry about, inform themselves about and understand the significant concentrations of private label MBS, particularly Option ARM MBS and lower tranche AAA private label MBS in WesCorp's investment portfolio;

f.      To require WesCorp to monitor the significant concentrations of private label MBS, particularly Option ARM MBS and lower tranche AAA private label MBS in WesCorp's investment portfolio;

g.      To make reasonable inquiry about, inform themselves about, and consider the effects of changing investment and economic conditions on WesCorp's investment strategy and portfolio, and in particular any possible risks changing conditions might create for the portfolio, and to consider possible changes to WesCorp's strategy and portfolio in light of the changing conditions.

210.   The defendant ALCO members breached these duties by:

a.      Failing to make inquiry about or consider the risks of WesCorp's strategy of borrowing and investing heavily in private label MBS and Option ARM MBS and failing to consider whether WesCorp should increase its capital in light of the increased risk exposure created by this strategy;

b.      Failing to require compliance with WesCorp's investment policies after being on notice that the policies were not being followed, particularly

1  those requiring an analysis of the credit implications of securities based on a new

2  form of collateral and a thorough credit analysis of securities being purchased;

3      c.      Failing to review, consider or recommend correction of

4  WesCorp's unreasonable and unsupportable concentration limit for AAA private

5  label MBS despite the requirement to review concentration limits annually;

6      d.      Failing to consider or recommend a concentration limit for

7  reduced documentation Option ARM MBS despite the fact that that form of security

8  was the predominant investment being made by WesCorp in 2006 and 2007;

9      e.      Failing to inquire about, inform themselves about, monitor or

10  control the concentration of Option ARM and lower tranche AAA private label

11  MBS in WesCorp's portfolio and failing to require that WesCorp even monitor

12  those concentrations; and

13      f.      Failing to inquire about, inform themselves about or consider the

14  potential effect of tightening investment credit spreads and the deterioration of the

15  housing market and rising interest rates on WesCorp's continuing investment

16  strategy of purchasing Option ARM MBS as its predominant investment.

17      211.  For each of these acts and omissions, the defendant ALCO members

18  abdicated their responsibilities as ALCO members, and their failures to act were

19  clearly unreasonable in light of the circumstances known to them at the time.  They

20  failed to perform their duties with such care, including reasonable inquiry, as an

21  ordinarily prudent person in a like position would use as an ALCO member for a

22  $30 billion corporate credit union.

23      212.  As a result of the foregoing breaches of the duty of care, among others,

24  WesCorp suffered massive losses in its securities portfolio, which losses were a

25  substantial factor in WesCorp's failure and the NCUA has suffered damages not

26  fully ascertained but in excess of $1 billion.

27  **FOURTH CLAIM FOR RELIEF**

28  **(Breach of Fiduciary Duties – Against All Director Defendants)**

213.   The NCUA incorporates by reference paragraphs 1 through 153, inclusive, of this complaint as though fully set forth.

214.   As directors of WesCorp, the Director Defendants had a duty to ensure the safe and sound operation of the credit union.  They were required to perform their duties as directors in a manner they believed to be in the best interests of WesCorp and with such care, including reasonable inquiry, as an ordinarily prudent person would use acting as a director for a $30 billion institution.

215.   As directors of a corporate credit union, the Director Defendants occupied a position of trust with respect to WesCorp as defined under California law.  As such, they owed WesCorp duties of loyalty and were required to perform their duties in a manner each of them believed to be in the best interests of WesCorp, at the expense of each of their own personal interests or the interests of the natural person credit unions they ran.  The Director Defendants had a duty to keep themselves informed, not to engage in acts or omissions amounting to an unexcused pattern of inattention, not to abdicate their duties as directors and not to engage in acts from which they derived an improper personal benefit.

216.   As directors of a corporate credit union, the Director Defendants had a duty to make reasonable inquiry sufficient to obtain a basic understanding of, and to consider:

a.   The risks and benefits of WesCorp's strategy of massive borrowing and investing heavily in private label MBS and particularly Option ARM MBS and whether WesCorp should increase its capital in light of the increased risk exposure created by this strategy;

b.   The basic composition of WesCorp's investment portfolio;

c.   Whether the budgets the board approved, including increased investment income, borrowing and net interest income, created material additional investment risk for WesCorp; and

1          d.     The effects that changing investment and economic conditions

2    might have on the basic safety and soundness of WesCorp and particularly its

3    investment strategy and investment portfolio.

4        217.   The Director Defendants had further duties to:

5          a.     Periodically review and reassess WesCorp's capital position in

6    light of changes in the risk exposures arising from WesCorp's activities;

7          b.     Consider changes to WesCorp's investment policies annually:

8          c.     Adopt reasonable and meaningful investment concentration

9    limits; and

10         d.     Ensure that WesCorp's investment policies were being enforced.

11       218.   The Director Defendants breached these duties by:

12         a.     Failing to inquire about or consider the risks of WesCorp's

13   strategy of borrowing and investing heavily in private label MBS and particularly

14   Option ARM MBS;

15         b.     Failing to inquire about or consider whether WesCorp should

16   increase its capital in light of the increased risk exposure created by its investment

17   strategy and by the deteriorating housing market and rising interest rates;

18         c.     Approving budgets based on desired yield without inquiring

19   about, informing themselves of, obtaining advice about or considering whether such

20   budgets materially increased the credit risk WesCorp was exposed to in its

21   investment portfolio and as a result of the substantial borrowing required;

22         d.     Failing to review, consider or correct WesCorp's unreasonable

23   and unsupportable concentration limit for AAA private label MBS;

24         e.     Failing to consider or recommend a concentration limit for

25   Option ARM MBS though they knew or should have known that that form of

26   security was the predominant investment being made by WesCorp in 2006 and

27   2007;

28

Case No. CV10-01597 GW (MANx)
SECOND AMENDED COMPLAINT

1          f.      Failing to require compliance with WesCorp's investment

2  policies, particularly those requiring a thorough credit analysis of securities being

3  purchased and an analysis of the credit implications of securities based on a new

4  form of underlying collateral;

5          g.      Failing to inquire about, inform themselves about, monitor or

6  control the concentration of Option ARM and lower tranche AAA private label

7  MBS in WesCorp's portfolio, and allowing WesCorp to develop a large and

8  dangerous concentration of those MBS; and

9          h.      Failing to inquire about, inform themselves about or consider the

10  potential effects of changes in investment and economic conditions on WesCorp's

11  continuing investment strategy of purchasing Option ARM MBS as its predominant

12  investment and to reevaluate WesCorp's strategy in light of these changes.

13      219.   For each of these acts and omissions, the Director Defendants abdicated

14  their responsibilities as directors, and their actions and failures to act were clearly

15  unreasonable in light of the circumstances known to them at the time.  The Director

16  Defendants failed to perform their duties with such care, including reasonable

17  inquiry, as an ordinarily prudent person in a like position would use as a director of

18  a $30 billion corporate credit union.

19      220.   As a result of the foregoing breaches of the duty of care, among others,

20  WesCorp suffered massive losses in its securities portfolio, which losses were a

21  substantial factor in WesCorp's failure, and the NCUA has suffered damages not

22  fully ascertained but in excess of $1 billion.

23              **FIFTH CLAIM FOR RELIEF**

24      **(Breach of Fiduciary Duty – Against Siravo and Swedberg)**

25      221.   The NCUA incorporates by reference paragraphs 1 through 23 and 154

26  through 178, inclusive, of this complaint as though fully set forth.

27      222.   As officers of WesCorp, defendants Siravo and Swedberg (collectively

28  the "SERP Defendants") occupied a position of trust with respect to WesCorp as

defined under California law.  As such, they owed WesCorp duties of loyalty and were required to perform their duties in good faith and in a manner each of them believed to be in the best interests of WesCorp, at the expense of their own personal interests and to provide candid and truthful information to the board of directors in matters affecting compensation and employment issues.

223.   The SERP Defendants breached their fiduciary duties by, among other things, misleading the board about the intent of the original SERPs, the necessity for the changes and the true nature of the SERP amendments as described above.

224.   Moreover, Swedberg, as the head of human resources and the officer in charge of executive compensation, had a duty to disclose the real purpose for the proposed amendments to the Siravo SERP.  Similarly, Siravo, as President and CEO, had a fiduciary duty to provide full information as to those proposed amendments.  When Siravo made a similar presentation to the board a few months later to approve the proposed amendments to the Executive SERP, he had a duty to disclose their true nature.  In addition, by virtue of their positions, both of the SERP Defendants had a duty to calculate Siravo's SERP payment correctly and advise the board of any error in the amendment.

225.   As a result of the SERP Defendants' breaches of their fiduciary duties, the WesCorp board approved the SERP amendments and permitted the increased SERP payments to Siravo and Swedberg without full knowledge of the facts.

226.   As a result of the SERP Defendants' conduct in this regard, the NCUA has incurred damages in the form of overpayment to Siravo and Swedberg in the approximate sum of $3,076,039.80.

## SIXTH CLAIM FOR RELIEF

### (Fraud – Against Siravo and Swedberg)

227.   The NCUA incorporates by reference paragraphs 1 through 23, 154 through 178 and 222 through 226, inclusive, of this complaint as though fully set forth.

228.   As officers of WesCorp, the SERP Defendants had a duty to provide candid and truthful information to the board of directors in matters affecting compensation and employment issues and had a further duty not to conceal material facts related to compensation and employment issues.

229.   On or about November 2, 2007, the SERP Defendants made the representations described above with regard to the changes to the Siravo SERP, and on or about June 24, 2008, they made similar representations with regard to the Executive SERP.  The SERP Defendants also incorrectly calculated and failed to correct errors that they were aware of in the amendments to the SERPs.

230.   The representations described above made with regard to the Siravo SERP and the Executive SERP were false when made, and the NCUA is informed and believes and on that basis alleges that the SERP Defendants knew them to be false or had no reasonable basis for believing that they were true and that they made these representations and concealed material facts with the intent to defraud and to induce the WesCorp board of directors to approve the amendments to the SERP plans and to have WesCorp make the increased payments to them described above.

231.   In reliance on the aforesaid false representations and the failure of the SERP Defendants to disclose material facts, the WesCorp board of directors approved the amendments to the SERPs and permitted the increased SERP payments to Siravo and Swedberg.

232.   The board of directors' reliance on the representations was justified given the positions of trust occupied by the SERP Defendants.

233.   As a result of the SERP Defendants' conduct in this regard, the NCUA has incurred damages in excess of $3,076,039.80.

234.   The conduct of the SERP Defendants was willful, malicious and fraudulent and the NCUA is entitled to recover punitive and exemplary damages.

///

///

Case No. CV10-01597 GW (MANx)
SECOND AMENDED COMPLAINT

## SEVENTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty – Against Siravo)

235.   The NCUA incorporates by reference paragraphs 1 through 23 and 154 through 182, inclusive, of this complaint as though fully set forth.

236.   As the President and CEO of WesCorp, Siravo occupied a position of trust with respect to WesCorp as defined under California law.  As such, he owed WesCorp a duty of loyalty and was required to perform his job responsibilities in good faith and in a manner he believed to be in the best interests of WesCorp, at the expense of his own personal interests and to provide candid and truthful information to the board of directors in matters affecting compensation and employment issues.

237.   Siravo had a further duty to preserve WesCorp assets and not to commit waste.

238.   The NCUA is informed and believes and on that basis alleges that Siravo breached his fiduciary duties by causing WesCorp to pay defendant Lane in excess of $1.4 million in compensation to which he was not entitled under the Executive SERP, failing to disclose to the board the nature of the payment, and failing to obtain appropriate board approval.

239.   As a result of Siravo's breach of fiduciary duties, the NCUA has been damaged in an amount in excess of $1.4 million, according to proof.

## EIGHTH CLAIM FOR RELIEF

### (Unjust Enrichment – Against Lane)

240.   The NCUA incorporates by reference paragraphs 1 through 23, 154 through 182 and 236 through 239, inclusive, of this complaint as though fully set forth.

241.   As an executive of WesCorp, Lane was entitled to participate in the Executive SERP but only if he fulfilled the terms of the SERP, which required him to remain employed at WesCorp until his expected retirement date.

242.   The NCUA is informed and believes and on that basis alleges that the Early Payout Agreement under which Lane received in excess of $1.4 million was not authorized by the WesCorp board of directors and was beyond Siravo's authority to offer, and Lane knew or should have known, as Chief Financial Officer, that the transaction was unauthorized and improper.

243.   Pursuant to the Early Payout Agreement, Lane received a payment of $1.325 million in 2006 and of $75,000 in each of 2007 and 2008. For all three years he also received base compensation and a substantial "regular" bonus. On April 8, 2008, Lane left his employment with WesCorp before reaching his retirement age.

244.   Lane was not entitled to the payments he received and was unjustly enriched and the NCUA has been damaged in an amount according to proof.

## PRAYER FOR RELIEF

Wherefore the NCUA prays for damages as follows:

1.     Compensatory damages according to proof;

2.     Exemplary and punitive damages;

3.     Costs of suit; and

4.     Such other and further relief as this Court deems appropriate.

DATED: February  22, 2011      LUCE, FORWARD, HAMILTON & SCRIPPS LLP
                               MICHAEL H. BIERMAN
                               MICHAEL E. PAPPAS


                               By:  _____
                                    Michael H. Bierman
                                    Attorneys For The National Credit Union
                                    Administration Board As Liquidating Agent
                                    For Western Corporate Federal Union

Case No. CV10-01597 GW (MANx)
SECOND AMENDED COMPLAINT

1

## DEMAND FOR JURY TRIAL

2   The NCUA demands a jury trial.

3

4   DATED:  February 22, 2011    LUCE, FORWARD, HAMILTON & SCRIPPS LLP

5   MICHAEL H. BIERMAN
MICHAEL E. PAPPAS

6

7

8   By:  _____

Michael H. Bierman

9   Attorneys For The National Credit Union
Administration Board As Liquidating Agent
For Western Corporate Federal Union

10

11

12

13

14   201091817.10

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1



**Memorandum**

Date:        November 2, 2007

To:          Robert Harvey, Board Chairman

From:        Tom Swedberg, Vice President

Subject:     Administrative Changes to CEO's Supplemental Executive Retirement Plan - 457(f)

Attachment:  President/CEO Retention Program Agreement for your review.

Per our discussions in Nashville, Tennessee, attached is the information you requested regarding two suggested changes to the CEO Supplemental Executive Retirement Program.

In preparing for the May 2008 SERP distribution to Bob Siravo, we noticed there were two administrative errors in the current 457(f) plan document that are not consistent with the intent of the program when it was initially developed.

Our CEO's current 457(f) Plan utilized an old template that dated back to Dick Johnson's tenure as President when no bonuses or incentive pay plans existed at WesCorp and the concept of tax gross-up was not broadly utilized in 457(f) Plans.

As a result we recommend that the Board approve the following administrative changes:

1) The CEO's bonus and incentive pay be included in the benefit calculation. Without this change the benefit payments under the SERP Program effectively provide for only a 37 percent replacement rate instead of the agreed upon 48 percent of compensation rate.

2) Change the tax gross-up calculation to utilize the divisor of (.60%) versus the current multiplier of (1.40%). This change results in the correct tax gross-up amount.

Without these two changes, the existing plan will pay the CEO $4.863 million which represents a replacement rate of 37 percent and is not properly grossed-up. With the inclusion of the two changes the CEO would receive the intended 48 percent of replacement rate payment that is properly grossed-up and receive an amount of $7.412 million.

Attached is a copy of the current SERP plan document. The suggested changes are highlighted. Also attached is the appropriate Board Resolution.

Respectfully,

Tom Swedberg

**EXHIBIT __/__ PAGE __/__**

## PROOF OF SERVICE

**National Credit Union Administration, v. Siravo, et al.**

**Case No. CV10-01597 GW (MANx)**

At the time of service, I was over 18 years of age and **not a party to this action**.  I am employed in the County of Los Angeles, State of California.  My business address is 601 S. Figueroa, Suite 3900, Los Angeles, California 90017.

On February 22, 2011, I served true copies of the following document described as:

## SECOND AMENDED COMPLAINT FOR DAMAGES FOR  BREACH OF FIDUCIARY DUTIES, FRAUD AND UNJUST ENRICHMENT

on the interested parties in this action as follows:

### SEE ATTACHED SERVICE LIST

☒      **BY MAIL:**     I enclosed the document in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with Luce, Forward, Hamilton & Scripps LLP's practice for collecting and processing correspondence for mailing.  On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on February 22, 2011, at Los Angeles, California.

*Tracey L. Waters*

Tracey L. Waters

(undated  7/14/10)

1

## SERVICE LIST

2

3   Scott A. Kamber, Esq.                    David C. Parisi, Esq.
    KAMBER LAW, LLC                          Suzanne Havens Beckman, Esq.
    11 Broadway, 22nd Fl.               Azita Moradmand
4   New York, NY 10004                       PARISI & HAVENS LLP
    Tel.: (646) 964-9600                     15233 Valleyheart Drive
5   Fax: (212) 202-6364                      Sherman Oaks, CA 91403
    *Attorneys for Plaintiffs*               Tel.: (818) 990-1299
6                                            Fax: (818) 501-7852
                                             *Attorneys for Plaintiffs*
7

8   Bruce A. Ericson, Esq.                   Randy Moore
    Pillsbury Winthrop Shaw Pittman LLP      Duane Tyler
    50 Freemont Street                       Moore, Brewer, Jones, Tyler & North
9   San Francisco, CA 94105-2228            4180 La Jolla Village Drive, Suite 540
    Tel.: (415)-983-1560                     La Jolla, CA 92037
10  Fax:  (415) 983-1200                     858-626-2883
    *Attorneys for Defendants Robert John*   858-626-2899 (fax)
11  *Burrell, Gordon Dames, Adam Denbo,*     *Attorneys for Defendants*
    *Diana R. Dykstra, Robert H. Harvey, Jr.,* *(Substituted out 7/13/10)*
12  *Wayne Hope, James P. Jordan, Timothy*
    *Kramer, Robin J. Lentz, Susanne*
13  *Longson, John M. Merlo, Warren*
    *Nakamura, Brian Osberg, David*
14  *Roughton, Robert Siravo, Darren*
    *Williams*
15

16  Kyle A. Ostergard, Esq.                  Edwin V. Woodsome, Jr., Esq.
    Alston & Bird LLP                        Orrick, Herrington & Sutcliffe LLP
    333 S. Hope Street, 16th Floor           777 South Figueroa Street, Suite 3200
17  Los Angeles, CA  90071                   Los Angeles, California  90017-5855
    DD (213) 576-1036                        Tel:  213-629-2020
18  Fax (213) 576-1100                       Fax: 213-612-2499
    *Attorneys for Defendant RiskSpan, Inc.* *Attorneys for Defendants Jeremy Calva,*
19                                           *Laura Cloherty, Jeff Hamilton, James*
                                             *Hayes, Dwight Johnston, Timothy*
20                                           *Sidley, David Trinder*

21

22  Janlynn R. Fleener, Esq.                 Bruce A. Ericson, Esq.
    DOWNEY BRAND                             Reynold Lloyd Siemens, Esq.
23  621 Capitol Mall, 18th Floor             Pillsbury, Winthrop, Shaw Pittman LLP
    Sacramento, California  95814            50 Freemont Street
24  Tel.: (916) 444-1000                     Post Office Box 7880
    Fax:  (916) 444-2100                     San Francisco, CA 94120-7880
25  jfleener@downeybrand.com                 Tel: (415) 983-1000
    *Attorneys for Defendant Donna Bland*    Fax: (415) 983-1200
26                                           Bruce.ericson@pillsburylaw.com
                                             *Attorneys for Defendant William*
27                                           *Cheney*

28

1   Richard E. Drooyan, Esq.            Curtis G. Carll, Esq.
    Munger, Tolles & Olson, LLP         Chapin, Fitzgerald Sullivan, LLP
2   355 S. Grand Avenue                 550 W. C. Street
    Suite 3500                          Suite 2000
3   Los Angeles, CA  90071              San Diego, CA  92101

4

5
    201054285.2
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(updated  7/14/10)