CHAPIN FITZGERALD SULLIVAN LLP
　　Kenneth M. Fitzgerald, Esq. (SBN: 142505)
　　kfitzgerald@cfslawfirm.com
　　Curtis G. Carll, Esq. (SBN: 248470)
　　ccarll@cfslawfirm.com
550 West "C" Street, Suite 2000
San Diego, California 92101
Tel: (619) 241-4810
Fax: (619) 955-5318

Attorneys for Defendant
Todd M. Lane

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **National Credit Union Administration Board**, *as Liquidating Agent for Western Corporate Federal Credit Union*,<br><br>　　　　　　Plaintiff,<br><br>　　vs.<br><br>**Robert A. Siravo**, *et al.*,<br><br>　　　　　　Defendants. | Case No.: CV10-01597 GW (MANx)<br><br>**Defendant Todd M. Lane's Memorandum of Points and Authorities in Support of Motion to Dismiss Plaintiff's Second Amended Complaint**<br><br>Date: June 9, 2011<br>Time: 8:30 a.m.<br>Courtroom: Los Angeles, 10<br><br>The Honorable George H. Wu |

# TABLE OF CONTENTS

I. Introduction ................................................................................................. 1

II. Facts ............................................................................................................ 2

    A. Procedural Background .................................................................. 2

    B. The Cause of WesCorp's Losses .................................................. 2

    C. The Division of Roles and Responsibilities at WesCorp ................. 3

        1. The Investment Department ................................................. 3

        2. The Credit Risk Department ................................................. 4

        3. The Board ............................................................................ 5

        4. Todd Lane's Role Within WesCorp ..................................... 6

        5. The ALCO Books Illustrate WesCorp's Division
           of Responsibility ................................................................. 6

III. Legal Standard ........................................................................................... 10

IV. Argument ................................................................................................... 11

    A. The Complaint Fails *Iqbal's* Standard Under Rule 8 ...................... 11

        1. The Complaint Impermissibly Lumps Allegations
           Against Lane with Ones Against the Other
           Officers ................................................................................ 11

        2. The Complaint's Allegations Against Lane Are
           Implausible ......................................................................... 13

    B. Lane Did Not Breach His Fiduciary Duties to WesCorp ............... 16

V. Conclusion ................................................................................................ 17

# TABLE OF AUTHORITIES

Page(s)

## FEDERAL CASES

Ashcroft v. Iqbal,
129 S. Ct. 1937 (2009) .......................................................1, 2, 10, 11, 12, 14, 16

Bell Atlantic Corp. v. Twombly,
550 U.S. 544 (2007) ........................................................... 1, 2, 10, 11

Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.,
896 F.2d 1542 (9th Cir. 1989)........................................................... 8

## STATE CASES

Frances T. v. Village Green Owners Ass'n.,
42 Cal. 3d 490 (1986)........................................................................2

Tarasoff v. Regents of Univ. of Cal.,
17 Cal. 3d 425 (1976) ...................................................................... 11

## STATUTES AND RULES

Fed. R. Civ. P. 8.............................................................................. 1, 11

# I.  Introduction

In March, 2009, the mortgage meltdown took down WesCorp, like it did homeowners, pension funds, banks, investment banks, independent mortgage brokers, real estate developers, AIG, and retail credit unions.  It also surprised the NCUA, WesCorp's in-house regulator and overseer, which had been monitoring and signing off on WesCorp's investments.  Yet, with the luxury of hindsight, the NCUA sued WesCorp's directors and officers in an attempt to hold them exclusively responsible for the paper losses to WesCorp stemming from this unprecedented, systemic financial collapse.[1]

In their motion to dismiss, the directors explain why the business judgment rule shields them from liability.  In their own motion, the officers explain why, even taking all of the NCUA's allegations as true, they did not breach their fiduciary duties.  Defendant Todd Lane joins and supports in full the officer defendants' motion.  Those motions detail how all the directors and officers acted with the care and diligence required of them and fulfilled their duties to WesCorp.

Lane also moves separately to explain two additional reasons why the NCUA's claim for breach of fiduciary duty against him cannot survive.  First, the Complaint violates Rule 8 and *Twombly*/*Iqbal* by merely lumping allegations against Lane with those against other defendants.  Second, the Complaint does not allege facts sufficient to state a claim that Lane was responsibile for the investment decisions that alleged caused WesCorp's losses.  This is even more apparent when considering the documents referred to in the Complaint, which reflect that Lane had no role in the investment decisions or concentration limits on investments at WesCorp.  In sum, the Complaint does not state a claim for

---

[1]  The Plaintiff in this case is the National Credit Union Administration Board, or the "NCUA."  The NCUA has adopted WesCorp's claims and is now on its Second Amended Complaint, or "Complaint," which this brief references by paragraph (¶) throughout.

breach of fiduciary duty against Lane, and the First Claim for Relief must therefore be dismissed.

# II. Facts

## A.  Procedural Background

Lane moved to dismiss the NCUA's first complaint against him on the grounds that the NCUA had not described Lane's role at WesCorp, or his responsibility for the decisions that allegedly led to is collapse.  The Court granted Lane's motion, with leave to amend, holding that "the factual allegations demonstrating <u>Lane's</u> **role and participation** must be improved in order to state a plausible claim for relief" for breach of fiduciary duties.  Tentative Ruling, Dec. 20, 2010, at 18 ("Dec. 20 Ruling") (underlining in original, bolding added).

The Court relied on *Iqbal*, as well as the California Supreme Court's analysis of corporate duties in *Frances T.*, to hold that "the plausibility requirement enunciated in *Twombly* is to be applied on a defendant-by-defendant basis."  *Id.*  (citing *Ashcroft v. Iqbal*, 129 S. Ct 1937,  1942–43, 1949 (2009); *Frances T. v. Village Green Owners Ass'n*, 42 Cal. 3d 490, 508(1986)).  The Court found that the NCUA's first amended complaint improperly "lumps together individual defendants with admittedly differentiated roles and responsibilities." *Id.*  The Court's final order noted that WesCorp had divided responsibility for management among people and committees, and that to hold one group responsible for another's area was doubtful: "the Court would seemingly also have to question why a *budget* committee should be held responsible for the effect of *investment* decisions."  Order, Jan. 31, 2011, at 2 ("Jan. 31 Order") (emphasis in original).  Even with its amendments, the Complaint does not—because it cannot—remedy these shortcomings.

## B.  The Cause of WesCorp's Losses.

The Complaint explicitly and repeatedly blames WesCorp's (paper) losses

1   on one thing: the over-concentration of investments in private-label mortgage-

2   based securities, particularly option adjustable-rate mortgages.  All of the alleged

3   damages stem from that single act.  *See, e.g.* ¶¶ 33–40; 121–131; 152.  If

4   WesCorp had diversified its portfolio away from private-label mortgage-backed

5   securities, the Complaint argues, we wouldn't be here today.  ¶ 41 ("If

6   [defendants] had imposed prudent concentration limits on its private label MBS .

7   . . almost all of this loss would have been avoided.").  Similarly, the alleged

8   breaches of duties by WesCorp's directors and officers derive *solely* from this

9   alleged over-concentration in MBS investments.  *See, e.g.*, ¶ 124 (officers "did not

10   recommend any concentration limits for Option ARM MBS"); ¶ 133 (officers

11   "did not perform a thorough review of the credit risk of private label MBS

12   purchases").[2]

13   **C.   The Division of Roles and Responsibilities at WesCorp.**

14   **1.   The Investment Department.**

15   Lane was not directly responsible for investment decisions or concentration

16   limits on investments.  Instead, according to the Complaint, WesCorp had an

17   Investment Department that was headed and supervised by Robert Burrell, the

18   company's Chief Investment Officer from 2000 to March 2009.  ¶¶ 9, 56.  The

19   Complaint specifically alleges that Burrell "was responsible for the development

20   and implementation of **all** balance sheet management strategies, which included

21   WesCorp's **investment strategies**."  ¶ 56 (emphasis added).  He was the "primary

22   manager" of the investment portfolio, and he "was responsible for the safety and

[2] Tangentially, the Complaint alleges that the proposed budgets and the alleged failure to review new security types were also linked to WesCorp's losses.  The officers' motion to dismiss thoroughly explains why those actions, even if true, were not fiduciary breaches.  Part V(C).  Because those alleged breaches simply *allowed* the over-concentration to take place, they do not state separate grounds for WesCorp's losses apart from overconcentration.  *See, e.g.* ¶¶ 88–89 (budgeting issues linked to concentration risk); ¶¶ 124–131 (lack of review of new securities linked to concentration limits).

soundness of that portfolio." *Id.* He had responsibility to ensure that "all investments would provide appropriate levels of safety" (¶ 56) and returns. ¶ 91. He also had "a duty to manage WesCorp's investment portfolio and its investing activities in a safe and sound manner." ¶ 190. If WesCorp had any policies related to investments, Burrell was responsible for ensuring their compliance. *Id.* This made Burrell "responsible for proposing investment concentration limits for its investment portfolio, to ensure that the portfolio was properly diversified to minimize risk" (¶ 110) and "to avoid over-concentrations of credit risk in WesCorp's investment portfolio." ¶ 190. In carrying out this duty, Burrell, with Chief Executive Officer Robert Siravo, "routinely proposed . . . amendments raising the concentration limits for the MBS." ¶ 112. Burrell also "had the duty to ensure a thorough review of each proposed security purchase for credit risk." ¶ 132.

The Complaint also specifically alleges that Burrell assisted Lane and Siravo in the budgeting process. ¶ 86. While those two, according to the Complaint, had to understand how WesCorp would achieve the investment income laid out in the budget, it was Burrell's "duty to provide . . . to Siravo and Lane" "the credit and financial risks that the budget contained." *Id.*

**2. The Credit Risk Department.**

According to the Complaint, WesCorp also had an executive in charge of investment risk: Timothy Sidley, who was the Vice President for Risk Assessment and Chief Risk Officer in charge of investment credit services from Jun 1998 until April 2011. ¶ 10. The Complaint specifically alleges that Sidley was "responsible for the implementation of WesCorp's investment credit policies and procedures." He was also "responsible for the investment risk monitoring process, systems, and procedures." ¶ 58. With Burrell, Sidley was responsible for "proposing investment concentration limits for [WesCorp's] investment portfolio, to ensure that the portfolio was properly diversified to minimize investment risk"

(¶ 110), as well as the duty to "ensure a thorough review of each proposed security purchase for credit risk."  ¶¶ 132, 194 (Sidley had "a duty to ensure that . . . the collateral underlying the security was appropriately considered, . . . and to advise the ALCO and the board of increased credit risk to WesCorp from the concentration of Option ARM MBS and lower tranche AAA private label MRS in its portfolio.").

### 3.  The Board.

According to the Complaint, WesCorp's Board had complete decision-making authority on WesCorp's investments and credit policies.  WesCorp's bylaws required the Board of Directors to adopt policies regarding WesCorp's "investment strategies" to ensure that "WesCorp was being operated in a safe and sound manner."  ¶ 52.  The Board was "responsible for setting investment policies" (¶ 108), approving WesCorp's budgets (¶ 87), setting "reasonable and supportable concentration limits for limited liquidity investments" (¶ 105), and implementing "a credit risk management policy commensurate with the investment risks and activities WesCorp was undertaking."  ¶ 105.

The Board also had an Asset and Liability Committee ("ALCO") made up of directors.  ¶ 23.  A "primary purpose" of ALCO was to "ensure that investment of funds would be accomplished in a safe and secure manner, particularly with respect to limiting WesCorp's exposure to market and operational risks."  ¶ 24.  ALCO "provided overall management direction for WesCorp's investment strategy and the types and levels of risk WesCorp's investments exposed [WesCorp] to."  ¶ 25.  This committee was responsible for "the review and recommendation of proposed changes to WesCorp's asset and liability policies and strategies, the review of and recommendations for existing and proposed concentration limits, and the review of and recommendations for investment security purchases and sales."  ¶ 25.  The WesCorp policies that its "investments were to provide earnings consistent with maintaining safety and

soundness" were the responsibility of ALCO.  ¶ 24.  All members of the Board, whether on ALCO or not, received the monthly ALCO materials.  ¶ 26.

WesCorp also had a budget committee made up of directors.  This committee reviewed WesCorp's annual budget, and "recommended it before it was approved by the board."  ¶¶ 27, 85.  The members of the budget committee had a "duty to inform themselves about the budget projections, and in particular the basis for and potential risks to WesCorp of budgeting increases in investment income and net interest income."  ¶ 87.

### 4.  Todd Lane's Role Within WesCorp.

According to the Complaint, Lane was WesCorp's Chief Financial Officer from March 1998 to April 2008 (nearly a year before WesCorp was conserved by the NCUA).  ¶ 8.  As CFO, the Complaint describes two specific duties that Lane had.  He handled WesCorp's "financial statements and financial operations."  ¶ 55.  He also had a large role in the budgeting process, bearing "primary responsibility" for drafting annual budgets for the Board's review.  ¶¶ 55, 85, 86, 189.

Outside of those two duties—neither of which involved deciding types or concentration levels of investments, or credit risk—the Complaint only offers vague allegations that Lane had "general supervisory responsibility at WesCorp" (¶ 55) and certain general duties "as a member of WesCorp's Executive Team actively managing and directing the business strategy and affairs of WesCorp."  ¶ 189.

### 5.  The ALCO Books Illustrate WesCorp's Division of Responsibility.

The ALCO meetings, as described in the minutes in the accompanying ALCO packages, reveal the division of roles and responsibilities at WesCorp.  According to the Complaint, ALCO played a central role in WesCorp's alleged collapse because it was responsible for "the review of and recommendations for existing and proposed concentration limits."  ¶ 25.

Two things are clear from the minutes of seven ALCO meetings from March 2006 to February 2007 (all of which were relied on in the Complaint). First, Todd Lane was not involved with economic forecasting, investment decision-making, credit-risk evaluation, or setting concentration limits. Those tasks fell onto the shoulders of other officers. For example, in each meeting, Sidley talked about interest-rate risk (reflecting his role as Chief Risk Officer) while Burrell discussed economic and interest rate forecasts (reflecting his role as Chief Investment Officer). When he said anything at all, Lane talked about membership totals and once noted that the capital ratio at WesCorp had reached its internal policy limit (reflecting his role as Chief Financial Officer). On two occasions Lane submitted requests that were the committee voted on and approved to then go to the Board for its approval.

The second thing that is clear is that the officers and staff of WesCorp provided as much information as possible to the Board. They thoroughly analyzed the available data and made their best *recommendations* to the committee and the Board based on that data. The Board—the only entity with decision-making authority—then made fully informed decisions.[3] What follows are brief descriptions of these ALCO meetings:

- *March 28, 2006.* Burrell laid out economic and market conditions, noting the "weakening housing market" but stating that "the economy remains strong." Lane's RJN at 4 [Directors' RJN at 11].[4] Burrell also spoke regarding new

---

[3] A crippling, uncontested fact for the NCUA is that the officers only had the power to inform the Board and recommend certain actions—they had no actual power to do anything. *See, e.g.*, ¶ 27 (budget approved by Board); ¶ 105 (concentration limits and credit-risk management policies set by Board). As the Directors' judicially noticed documents show, the officers provided all the information available for the Board to make informed, prudent decisions *at the time*. The entire Complaint against the officers amounts to holding them responsible for decisions they had no authority to make.

[4] Lane both joins the Directors' Request for Judicial Notice and submits his own ("Lane's RJN"). These documents are limited to the minutes of the ALCO meetings referenced in

strategies for the portfolio's target balance and sales of securities, noting that "we may be asking to increase the limit on 'AAA rated' CMBS from 200% to 250% of Total Capital to provide the flexibility in managing this area." *Id.* at 5 [12]. Sidley delivered a review of interest-rate risk and explained that in the previous month "a prepayment shock test was conducted" "to measure the impact of changing prepayment speeds on the [Net Economic Value]." *Id.* at 4 [11]. Although Lane was present at the meeting, he didn't speak. *Id.*

- *August 22, 2006.* Burrell spoke regarding the economic and interest rate forecast, and Sidley spoke about interest-rate risk. Lane's RJN at 9 [Directors' RJN at 143]. The VP Portfolio Manager discussed "Strategies" and said "our strategy is to leverage the balance sheet as much as possible." *Id.* at 10 [144]. The VP Balance Sheet Management led the "Business & Liquidity Forecast." *Id.* Lane was again present, and again he didn't speak.

- *September 19, 2006.* Sidley delivered another review of interest-rate risks. Lane's RJN at 14 [Directors' RJN at 245]. Burrell delivered an economic and interest rate outlook. *Id.* The VP Treasury & Funding delivered a business and liquidity forecast, stating that "we have plenty of room for growth as capital is at a 6% level." *Id.* at 15 [246]. The VP Portfolio Manager spoke about strategies laid out in the 2006 business plan in light of current market conditions, and reiterated that the strategy was to continue to leverage the balance sheet as much as possible. *Id.* Lane spoke only regarding membership totals by state. *Id.* at 14 [245].

- *November 28, 2006.* Sidley discussed items in the Investment Credit Review and discussed a credit spread shock test. Lane's RJN at 19, 20 [Directors' RJN at 358, 359]. Burrell delivered an economic and interest-rate forecast, and

---

the Complaint and therefore may be considered by the Court. *See Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.,* 896 F.2d 1542, 1555 n. 19 (9th Cir. 1989).

1  "discussed the request to add new collateral types and the requested policy
2  amendments[.]"  *Id.* at 19, 20 [358, 359].  The VP Balance Sheet Management
3  said that Net Interest Income was below the plan due to actual interest rates
4  being substantially higher than the plan.  *Id.* at 20 [358].  The VP Treasury &
5  Funding said that the net short-term liquidity position had increased due to
6  increasing member balances, and the VP Portfolio Manager stated that the
7  strategy was still to continue to leverage the balance sheet as much as possible.  *Id.*
8  Lane spoke only regarding membership totals by state.  *Id.*

9  • *December 19, 2006.*  Sidley delivered a risk assessment that did not show
10  immediate cause for concern.  Lane's RJN at 24 [Directors' RJN at 457]
11  ("WesCorp is most sensitive in the 2 to 5 year segment.  If interest rates move up
12  10 basis points, NEV declines by $1 million at the 3 year point on the curve.
13  This represents low risk to changes in rate and the structure of the yield curve.").
14  The SVP Business Development & Marketing, and the VP Treasury & Funding
15  spoke about liquidity as affected by declining loan demand.  *Id.* at 25 [458]
16  ("increasing liquidity is mainly coming from declining loan demand rather than
17  share growth").  The VP Portfolio Manager and VP Balance Sheet Management
18  spoke regarding new securities purchases and interest-rate swaps.  *Id.*  As usual,
19  Burrell discussed an economic and interest rate forecast, and spoke regarding
20  investment spreads.  *Id.* at 24, 25 [457, 458].  Lane spoke only to request and
21  receive approval for the sale and purchase of CU Business Partners, LLC shares.
22  *Id.* at 25 [458].

23  • *January 23, 2007.*  At this ALCO meeting, like all the others, Sidley and
24  Burrell delivered a risk assessment.  Lane's RJN at 29 [Directors' RJN at 556].
25  Burrell also delivered an economic and interest rate forecast, and spoke regarding
26  the 1-month LIBOR and overnight funds rates.  *Id.* at 29, 30 [556, 557].  The
27  S.VP Business Development & Marketing and the VP Treasury & Funding
28  discussed member business activity and the continuing decline of member loan

1    balances.  *Id.* at 30 [557].  The VP Balance Sheet Management spoke about Net

2    Interest Income projections; the VP Treasury & Funding discussed a decrease in

3    the net short-term liquidity position, and the VP Portfolio Manager spoke again

4    about securities purchases and interest rate swaps.  *Id.*  Burrell requested that the

5    Net Interest Income limit on the +300 basis point be temporarily increased

6    through April 2007, and this was voted on and recommended to the Board.  *Id.* at

7    [556, 557].  Addressing the Business Forecast part of the meeting, Lane

8    "indicated that the capital ratio was below the 6% internal policy limit, and

9    requested waiver for the capital ratio to decline below the internal 6% policy limit

10   from December 2006 to May 2007."  *Id.* at 30 [557].  ALCO voted on this

11   waiver and recommended it to the Board.  *Id.*

12   • *February 25, 2007*.  Sidley gave a review of interest rate risk and Burrell

13   gave an economic and interest-rate forecast.  Lane's RJN at 34 [Directors' RJN at

14   659].  Burrell also discussed member business activity, Net Interest Income

15   forecasts, WesCorp's liquidity, and investment strategy.  *Id.* at 35 [660] ("The

16   strategy is to continue to leverage the balance sheet as much as possible").  Lane

17   was present at the meeting, but didn't speak.  *Id.* at 34 [659].

18       In sum, the facts alleged and the documents cited by the NCUA in its second

19   amended complaint make clear that Lane was not responsible for, nor involved in,

20   investment decisions or investment concentration limits at WesCorp.  The

21   NCUA has not alleged facts to state a viable claim against him for breach of

22   fiduciary duty, and the NCUA cannot do so.

## III.  Legal Standard

24       A motion to dismiss should be granted if the plaintiff fails to plead

25   "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.*

26   *v. Twombly*, 550 U.S. 544, 570 (2007).  "Where a complaint pleads facts that are

27   merely consistent with a defendant's liability, it stops short of [demonstrating an]

28   . . . entitlement to relief." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal

1   citations and quotations omitted).  The Court is not required to accept legal

2   conclusions as true.  *Ashcroft v. Iqbal*, 129 S. Ct. at 1949.  Allegations of duties are

3   legal conclusions and, therefore, the Court need not accept them as true.  *See*

4   *Tarasoff v. Regents of Univ. of Cal.*, 17 Cal. 3d 425, 434 (1976) ("[L]egal duties

5   are not discoverable facts of nature, but merely conclusory expressions that, in

6   cases of a particular type, liability should be imposed for damage done.").

## IV.   Argument

### A.   The Complaint Fails *Iqbal*'s Standard Under Rule 8.

9        The Complaint does not meet the *Twombly-Iqbal* pleading standard for

10  two reasons.  First, it impermissibly lumps Lane with two other defendants.  *See*

11  *Iqbal*, 129 S. Ct, at 1949 (plaintiff must plead "factual content that allows the

12  court to draw the reasonable inference that the defendant is liable for the

13  misconduct alleged").  Second, the Complaint's allegations against Lane are

14  implausible.  *See* at 1950 ("factual content" in complaint must lead to a "plausible"

15  claim, leaving the Court with "a content-specific task that requires the reviewing

16  court to draw on its judicial experience and common sense.").  Considering the

17  very documents the NCUA relies on to support them, the Complaint's allegations

18  about Lane's supposed responsibility for investments—specifically, types of

19  investments and concentration limits—are meritless.

### 1.   The Complaint Impermissibly Lumps Allegations Against Lane with Ones Against the Other Officers.

22       As for the "lumping," the Court granted Lane's initial motion to dismiss

23  because the NCUA had not demonstrated "<u>Lane's</u> role and participation" in the

24  alleged fiduciary breaches.  Dec. 20 Ruling, at 18 (emphasis in original).  The

25  Court cautioned that the NCUA must plead defendant-specific allegations

26  against Lane to survive *Iqbal*.  *Id.*  The new Complaint does not do this, and the

27  First Claim for Relief therefore must be dismissed.

28

The Complaint actually flouts the specificity requirements of *Iqbal*. After enumerating the specific duties of each officer (¶¶ 53–56), the Complaint drops this all-inclusive bomb:

> In addition to these individual responsibilities, the NCUA is informed and believes that Siravo, Lane, and Burrell managed WesCorp collaboratively and together determined and implemented its overall business strategies, including its strategies of significantly increasing investment income by investing in higher-yielding securities and by substantial borrowing.

¶ 57.[5] *See also* ¶ 191 (three officers "collectively had responsibility . . ."); ¶ 110 ("The other Officer Defendants, by virtue of their offices and their membership on the ALCO and ALSC, were also responsible for recommending investment concentration limits.").

The Complaint then goes on to allege that these three officers were jointly responsible for everything that transpired at WesCorp—despite, as described above, the rigid, specific, and key divisions of roles and responsibilities at WesCorp. *See, e.g.*, ¶ 60 (the three "were responsible for supervising WesCorp's investments and recommending policies and investment strategies and for ensuring the safety and soundness of WesCorp's asset and liability activities, including its investment activities"); ¶ 96 ("Siravo, Lane and Burrell were aware that the investment credit spreads for private label MBS had been generally shrinking"); ¶ 103 ("The failure of Siravo, Lane and Burrell to discuss the increase in investment risk entailed in the proposed budgets with the budget

---

[5] The NCUA possesses all of WesCorp's documents and still employs many of its people. It is unfathomable that the NCUA would need to rely on "information and belief" for any allegation. It is especially disturbing with respect to this one, as it reflects a blatant attempt to circumvent the Court's earlier ruling. Surely if the NCUA had *any* documents or *any* facts to support allegations that Lane was responsible for investment decisions, credit risk, or concentration limits, it would set forth the factual basis for such an allegation, rather than base it on what the "NCUA is informed and believes." But even with this allegation, the Complaint still does not (because it cannot) connect a strategy for growth with participation in actual decisions and decision-making authority for concentration limits or investment type.

1    committee and the board was below the standard of care that these officers owed

2    to WesCorp.").  The First Claim for Relief even lumps their alleged duties of care

3    together.  ¶ 192.

4         As the Court already recognized, this type of pleading is impermissible.

5    Dec. 20 Ruling at 18.  Lane's liability to WesCorp is premised on allegations that

6    are not specific to him, and therefore the First Claim for Relief should be

7    dismissed.

8         **2.  The Complaint's Allegations Against Lane Are Implausible.**

9         The Complaint's allegations as to Lane are also implausible.  The

10   Complaint states that Lane had two specific duties at WesCorp: (1) to handle the

11   financial statements and financial operations and (2) to craft a budget to submit

12   to the budget committee for approval.  ¶¶ 55, 85, 86, 189.  To successfully plead

13   a fiduciary breach against Lane, the Complaint must link those actual duties to

14   the cause of the losses that WesCorp suffered, i.e., not having *sufficient*

15   concentration limits on private-label mortgaged-backed securities.

16        The Complaint doesn't even try to link the WesCorp's financial statements

17   and financial operations to its investment losses.  As for the budget, the Court has

18   already pointed out the implausibility of holding the budgeting process

19   responsible for investment decisions.  Jan. 31 Order, at 2.  This has not deterred

20   the NCUA from still hanging much of its argument for Lane's liability on the

21   allegation that the he did not tell the Board that expenses would have to be

22   matched with investment income.  ¶¶ 87–89.  According to the NCUA, the

23   budgeting tail wagged the investment selection dog.  Leaving aside for a moment

24   the factually wrong idea that the company's total budget determined its

25   investment income—as opposed to its investment income dictating the total

26   budget, as was the case—the NCUA is effectively accusing the Board of being

27   devoid of all sense (business or otherwise).  The Complaint admits that

28   WesCorp's expenses were covered by investment income.  ¶ 87.  If that's true,

then any information on expenses necessarily relates to investments. The NCUA alleges the opposite—that the Budget Committee and Board saw expense figures and had no clue that income would have to match. *See* ¶ 95 ("The materials that Siravo, Lane and Burrell supplied the budget committee about the budgets contained no information about what changes to WesCorp's investment portfolio would be required . . . ."); ¶ 100 ("Siravo, Lane and Burrell were obligated to explain to the budget committee and the board how adoption of the 2006 and 2007 budgets would materially affect the risk in WesCorp's portfolio."); ¶ 103. Even within the context of the Complaint itself, these are implausible, and insufficient, allegations.

Moving from the *specific* allegations against Lane to the *lumped* ones, it is also implausible that Lane had actual responsibility for both the financial operations of WesCorp and, essentially, everything else. Yet, the Complaint effectively alleges that Lane wasn't just the CFO—he was also the Chief Executive Officer, the Chief Investment Officer, and the Chief Risk Officer, because Lane allegedly "had the responsibility to:"

- "supervise WesCorp's investing activities and portfolio" [Chief Investment Officer, *see* ¶¶ 56, 91, 110, 112, 132];
- "supervise . . . the credit risks WesCorp was exposed to" [Chief Risk Officer, *see* ¶¶ 58, 110, 132, 194];
- "to ensure that the policies, budgets and other board actions necessary for WesCorp's safe and sound operation were recommended and explained to the board" [all three].

¶ 189. Plaintiff's specific allegations about the roles of Burrell, Sidley and Siravo and basic common sense show that these general allegations about Lane are implausible. *See Iqbal*, 129 S. Ct. at 1950. It is farcical to suggest that Lane had actual responsibility for financial operations *and* investments and concentration risk—when the NCUA had an Investment Department and a Risk Assessment Department, employing different executives and staff to carry out separate those

1    functions.[6]

2    　　　WesCorp was a massive corporate credit union with, for example, $68.5

3    million in operating expenses in 2005, to go with $26.5 *billion* in total assets.  ¶

4    63.  As the Complaint belabors, WesCorp grew substantially from 2002 onward.

5    ¶¶ 31–36.  Although the Complaint conveniently doesn't delve into exactly what

6    WesCorp was doing to grow, it offers a few hints.  WesCorp "used the income

7    from its investments to **expand operations** [and] **subsidize the other banking**

8    **services it provided** . . . ."  ¶ 34 (emphasis added).  WesCorp, it seems, was

9    getting bigger and using that growth of scale to improve the services it

10   provided—essentially, doing exactly what any successful company does.  Lane, as

11   the Complaint and the ALCO minutes show, was involved in the operations side

12   of this growth, but he had nothing to do with the investment and credit risk side.

13   Although unstated in the Complaint, the ALCO minutes suggest that Lane—in

14   addition to his responsibilities for the internal operations of WesCorp—was in

15   charge of the additional retail credit unions that were added to WesCorp's

16   membership base, which "grew only modestly between January 2002 and

17   November 2008," increasing by 116, from 1040 to 1156.  ¶ 64.  Lane's

18   involvement in the budgeting process dovetails with this role, as Lane would be

19   very familiar with the actual operations of WesCorp.  ¶¶ 55, 85, 86, 189.

20   　　　Handing the operations of the country's largest retail corporate credit union

21   is a big task, which is why that was the only task Lane had.  The NCUA asks the

22   Court to find the Complaint "plausible" by accepting two paradoxical premises:

23   (1) that WesCorp had departments and executives whose sole responsibility was

24   to handle investments and credit risk, and who actively participated in those

---

26   [6] A quick glace at the ALCO meetings minutes reveals as much.  Here is the list of some of the

27   titles of the staff at the November 2006 ALCO meeting: Chief Technical Officer; VP-Balance Sheet Management; VP-Portfolio Manager; VP-Operational Integrity; VP-Treasury and Funding; VP/Controller; Director-Internal Audit; VP-Risk Assessment; Liquidity

28   Consultant; and VP-Correspondent services.  Lane's RJN at 19 [Directors' RJN at 358].

areas, and (2) that Lane—who was not involved in either department, and had his own set of *independent* responsibilities as CFO—also had responsibility to handle investments and credit risk, and actively participated in those areas.  If the first premise is true, the second cannot be.  Holding Lane responsible for investments and credit risk (or, more specific to the allegations, concentration limits) would be as implausible as holding Burrell and Sidley responsible for the math computations underling WesCorp's accounting.

The Complaint's implausible allegations are eerily similar to those the Supreme Court rejected in *Iqbal*.  There, the Court rejected allegations that two high-ranking officials (in the midst of "various other defendants") had violated the plaintiff's constitutional rights, despite one being accused of being the "'principal architect' of this invidious policy" and the other of being "'instrumental' in adopting and executing it."  *Iqbal*, 129 S. Ct. at 1944, 1952. The Court found that "given more likely explanations," the allegations "do not plausibly establish" a claim.  *Id.* at 1951; *see also id.* at 1950 ("where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct" it should be dismissed).

**B.   Lane Did Not Breach His Fiduciary Duties to WesCorp.**

Lane adopts the arguments made in Part V of the officers' motion to dismiss, which explains why the Complaint does not state a claim for relief against any officer defendant, including Lane, for breach of fiduciary duty.

///

///

///

///

1

# V. Conclusion

2      For these reasons, the First Claim for Relief in the Second Amended

3  Complaint should be dismissed without leave to amend.

4

5  DATED:   April 18, 2011              CHAPIN FITZGERALD SULLIVAN LLP

6

7

8                                By:      /s/ Curtis G. Carll

9                                       Kenneth M. Fitzgerald, Esq.
                                        Curtis G. Carll, Esq.
10                                      Attorneys for Defendant
                                        Todd M. Lane
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28