1  PILLSBURY WINTHROP SHAW PITTMAN LLP
   REYNOLD L. SIEMENS  #177956
2  Email:  reynold.siemens@pillsburylaw.com
   725 South Figueroa Street, Suite 2800
3  Los Angeles, CA 90017-5406
   Telephone:  (213) 488-7100
4  Facsimile:  (213) 629-1033

5  PILLSBURY WINTHROP SHAW PITTMAN LLP
   BRUCE A. ERICSON  #76342
6  Email:  bruce.ericson@pillsburylaw.com
   GEORGE ALLEN BRANDT  #264935
7  Email:  allen.brandt@pillsburylaw.com
   50 Fremont Street
8  Post Office Box 7880
   San Francisco, CA  94120-7880
9  Telephone: (415) 983-1000
   Facsimile: (415) 983-1200

10

11 Attorneys for Defendants ROBERT JOHN BURRELL, WILLIAM CHENEY,
   GORDON DAMES, ROBERT H. HARVEY, JR., JAMES JORDAN,
   TIMOTHY M. KRAMER, ROBIN LENTZ, JOHN M. MERLO, WARREN
12 NAKAMURA, BRIAN OSBERG, DAVID RHAMY and SHARON UPDIKE

13              UNITED STATES DISTRICT COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15              WESTERN DIVISION

16 | NATIONAL CREDIT UNION | No. CV 10-01597 GW (MANx)
17 | ADMINISTRATION BOARD AS |
   | CONSERVATOR FOR WESTERN | **MEMORANDUM IN SUPPORT OF**
18 | CORPORATE FEDERAL CREDIT | **DIRECTOR DEFENDANTS' MOTION**
   | UNION, | **TO DISMISS PLAINTIFF'S SECOND**
19 | | **AMENDED COMPLAINT (DOC. 116)**
   |                     Plaintiff, |
20 | | Honorable George H. Wu
   | vs. | Courtroom 10
21 | | 312 North Spring Street
   | ROBERT A. SIRAVO, et al., |
22 | | Date:        June 9, 2011
   |                     Defendants. | Time:        8:30 a.m.
23 | | Courtroom:  Los Angeles, 10

24   Filed herewith:
     1.  Notice of Motion and Motion
25   2.  Request for Judicial Notice

26

27

28

1

## TABLE OF CONTENTS

2                                                                                                  **Page**

3    I.      INTRODUCTION. ................................................................. 1

4    II.     STATEMENT OF THE CASE. .......................................... 3

5          A.    The parties. ...................................................... 3

6          B.    Procedural history. .......................................... 3

7          C.    The SAC's allegations about the Investment Claims. ................. 4

8    III.    ARGUMENT. ................................................................ 5

9          A.    The NCUA must meet an extremely high standard to overcome the Business Judgment Rule. .......................................... 5

10, 11          B.    The NCUA's admissions defeat its Investment Claims. ................................................ 7

12, 13          C.    The SAC's "new" allegations do not plead an exception to the Business Judgment Rule and do not cure the problems the Court identified with the FAC. ............... 11

14, 15, 16                1.    The SAC's allegations about the Budget Committee fail to overcome the Business Judgment Rule because they do not show the Committee failed unreasonably to investigate matters within its purview. ................................. 12

17, 18, 19                2.    The SAC's allegations about Option ARMs fail to overcome the Business Judgment Rule because the SAC does not allege that the Directors knew of but disregarded problems with these securities. ................................. 14

20, 21, 22, 23                3.    The SAC's allegations about reports on the economy and housing market fail to overcome the Business Judgment Rule because they attack content, not process. ................................. 17

               4.    The SAC's other "new" allegations simply rehash the inadequate allegations of the FAC. ................. 20

24          D.    Further leave to amend would be futile. ..................... 24

25    IV.    CONCLUSION. ................................................... 24

26

27

28

# TABLE OF AUTHORITIES

Page

## Cases

*Anchor Sav. Bank, FSB v. United States,*
  81 Fed. Cl. 1 (2008),
  *aff'd and remanded,* 597 F.3d 1356 (Fed. Cir. 2010) ............................16

*Ashcroft v. Iqbal,*
  129 S. Ct. 1937 (2009) .........................................................................4, 9

*Bader v. Anderson,*
  179 Cal. App. 4th 775, 101 Cal. Rptr. 3d 821 (2009) ............................6

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544, 127 S. Ct. 1955 (2007) .................................................4, 9

*Berg & Berg Enters., LLC v. Boyle,*
  178 Cal. App. 4th 1020, 100 Cal. Rptr. 3d 875 (2009) ..........................6

*Dreiling v. American Exp. Co.,*
  458 F.3d 942 (9th Cir. 2006) ................................................................19

*FDIC v. Castetter,*
  184 F.3d 1040 (9th Cir. 1999) ............................................ 6, 11, 14, 19

*In re Citigroup Inc. S'holder Deriv. Litig.,*
  964 A.2d 106 (Del. Ch. 2009) ................................................................6

*In re Stac Elec. Sec. Litig.,*
  89 F.3d 1399 (9th Cir. 1996) ................................................................19

*Johnson v. Riverside Healthcare Sys., LP,*
  534 F.3d 1116 (9th Cir. 2008) ................................................................5

*Kendall v. Visa U.S.A., Inc.,*
  518 F.3d 1042 (9th Cir. 2008) ..............................................................24

*Lee v. Interinsurance Exchange,*
  50 Cal. App. 4th 694, 57 Cal. Rptr. 2d 798 (1996) ....................... passim

*Parrino v. FHP, Inc.,*
  146 F.3d 699 (9th Cir. 1998) ................................................................19

*Swartz v. KPMG LLP,*
  476 F.3d 756 (9th Cir. 2007) ................................................................19

## Statutes and Codes

California Corporations Code
  Section 309 ......................................................................................5, 14
  Section 7231 ....................................................................................5, 14

Credit Rating Agency Reform Act of 2006,
    Pub. L. No. 109-291, 120 Stat. 1327........................................................9

Garn-St. Germain Depository Institutions Act of 1982,
    Pub. L. No. 97-320, 96 Stat. 1469.........................................................17

Secondary Mortgage Market Enhancement Act of 1984,
    Pub. L. No. 98-440, 98 Stat. 1689.........................................................17

United States Code
    Title 12, section 1757 ........................................................................17
    Title 12, section 3801 ........................................................................17
    Title 12, section 3801(a)(2) ...............................................................17

**Rules and Regulations**

Code of Federal Regulations
    Title 12, Part 704 ..........................................................................7, 8
    Title 12, Part 704, Appx. B ...............................................................7
    Title 12, section 704.6(d)(2)...............................................................7
    Title 17, section 240.17g-1.................................................................9

Federal Rules of Civil Procedure
    Rule 25(c) ..........................................................................................3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

I. **INTRODUCTION.**

The Court has given the NCUA ample guidance on how to plead facts establishing an exception to the Business Judgment Rule. The Second Amended Complaint, Doc. 116 ("SAC") demonstrates that the NCUA either can't or won't follow that guidance. While offering more verbiage, the SAC still relies mainly on hindsight-fueled allegations about the *content* of the Directors' investments decisions. And, on the relatively few occasions where the SAC discusses the Directors' *process*, it fails to meet the standards delineated by the Court and by *Lee v. Interinsurance Exchange*, 50 Cal. App. 4th 694, 715, 717, 57 Cal. Rptr. 2d 798, 811-13 (1996).

The SAC's content-based allegations boil down to the unremarkable proposition that, in hindsight, WesCorp would have fared better had it bought fewer private-label mortgage-backed securities ("MBS") or unloaded them sooner. Hindsight is, as the cliché goes, 20/20. But hindsight cannot overcome the Business Judgment Rule. And in this case, the NCUA's own admissions undercut whatever minimal effect hindsight might otherwise have. For the NCUA, in its own words, has admitted that *at the time* everyone – the NCUA included – 'knew' private-label MBS to be a low-risk investment permitted by the NCUA's enabling statute and rules, and just as safe as the MBS issued by government sponsored enterprises such as Fannie and Freddie.

The SAC alleges that WesCorp's Budget Committee paid too little attention to the risk said to be inherent in the level of income it budgeted. But nothing in the SAC shows that risk-assessment fell within the Budget Committee's purview. The Court pointedly asked for allegations showing that the Budget Committee had jurisdiction over risk-assessment; the SAC provides exactly nothing. Instead, the SAC alleges that another committee – the Asset & Liability Committee ("ALCO") – assessed risk, and met regularly with the Budget Committee. The SAC alleges nothing – and certainly nothing satisfying

1    *Lee* – to suggest that the Budget Committee should have duplicated the ALCO's

2    work, or would have discovered anything material had it done so.

3        The SAC alleges that WesCorp's Option ARM MBS performed poorly –

4    in hindsight – and had deficiencies.  But once again the SAC fails to connect this

5    to anything that the Directors knew at the time, or could have discovered by

6    more investigation.  Instead, the SAC offers the conclusory allegation that

7    Option ARMs were "new" – a claim that legal authorities show to be

8    demonstrably wrong – and suggests that their "newness" called for further

9    investigation.  Again these allegations come nowhere near satisfying *Lee*.

10        The SAC also alleges that the Directors did enough investigation to see

11    storm clouds on the economic horizon, but failed to unload WesCorp's MBS fast

12    enough to avoid the storm.  Here, in one set of allegations, we have both an

13    admission of adequate process (you investigated enough to see the storm clouds)

14    and a legally irrelevant attack on content (in hindsight, you did not dump your

15    MBS fast enough).  And that is not all that is wrong with what the SAC alleges.

16    The SAC finds recognition of these storm clouds in books prepared each month

17    for the ALCO.  But having expressly mentioned these books – thus making them

18    fair game for judicial notice – the SAC ignores 90% of what they say.  The books

19    reveal a detailed monthly process, examining concentration limits, risk, capital,

20    delinquency rates, losses and credit support, among many other things.  The

21    books also reveal timely changes in investment strategy in response to changes in

22    economic climate and risk.  Yet the SAC mentions none of this – citing the

23    books repeatedly but conveniently ignoring what they say.

24        Most of all, the SAC consists of retreads – old allegations made fatter but

25    in no material way made better.  That is true of the allegations about capital; that

26    is true of the allegations about buying lower tranches of AAA-rated investments.

27    And that also is true of the allegations about concentration limits, credit spreads

28    and losses.  There is not a hint of real novelty in any of this.

1    In short, the SAC, like the First Amended Complaint, Doc. 84 ("FAC"),

2    fails to allege an exception to the Business Judgment Rule.  Back in the day, the

3    NCUA had two examiners on site at WesCorp, with real-time access to

4    WesCorp's investment decision-making.  Since 2009, the NCUA has controlled

5    all of WesCorp's books and records.  Yet today the NCUA is no closer to stating

6    a claim than when it started this crusade against unpaid, uninsured volunteer

7    directors – directors who never took a dime out of WesCorp for themselves;

8    directors who entrusted WesCorp with millions of dollars of their own credit

9    unions' money.  Enough is enough.  The claims against the directors should be

10   dismissed without further leave to amend.

11   **II.     STATEMENT OF THE CASE.**

12   **A.     The parties.**

13   *Plaintiff:*  We have a new plaintiff, albeit not one that has complied with

14   Fed. R. Civ. P. 25(c) (that noncompliance is the subject of a separate motion).

15   The National Credit Union Administration Board as *Conservator* of WesCorp

16   filed the FAC.  But the National Credit Union Administration Board as

17   *Liquidating Agent* of WesCorp filed the SAC.  While the two plaintiffs are not

18   the same, for purposes of this motion we shall call them both the "NCUA."

19   *Defendants:*  The 16 named defendants are some but not all of the former

20   directors and officers of WesCorp.  SAC ¶¶ 7-22.  The movants here are 11

21   former unpaid uninsured volunteer directors (the "Directors").  *Id.*  The Directors

22   are named only in the Second, Third and Fourth Claims (the "Investment

23   Claims"), which this motion seeks to dismiss.  The five officers are filing

24   separate motions to dismiss the claims asserted against them.

25   **B.     Procedural history.**

26   In March 2009, the NCUA took over WesCorp and placed it into a

27   conservatorship; in October 2010, it began an involuntary liquidation.  SAC ¶ 1.

28   The seven original plaintiffs filed this case in superior court in November 2009.

1    The NCUA intervened and removed the case to this Court. Doc. 1. The NCUA

2    and the original plaintiffs disputed who owned the claims and should control the

3    litigation (Doc. 31, 40-43); the Court ruled largely in favor of the NCUA (Doc.

4    66). After further proceedings (Doc. 80-81), the NCUA filed the FAC and the

5    original plaintiffs withdrew from the case (Doc. 84-85). Defendants filed

6    motions to dismiss the FAC on November 1, 2010. The Court said it was

7    inclined to grant the Directors' motion to dismiss without leave to amend but let

8    the NCUA submit an offer of additional allegations (Doc. 110). After additional

9    briefing, the Court stated that granting leave to amend was "a close call" but

10   allowed the NCUA to amend (Doc. 115). Hence the SAC.

11         Unlike the usual private plaintiff, who must prepare a complaint with little

12   or no access to the defendants' records, the NCUA had daily access to

13   WesCorp's books and records – and to its employees – for a year and a half

14   before it filed the First Amended Complaint ("FAC") and six more months

15   before it filed the SAC. The NCUA thus has had two opportunities to allege

16   facts establishing an exception to the Business Judgment Rule. Having had

17   ample time and opportunity to investigate its claims, the NCUA has no excuse

18   for not filing a detailed and specific complaint satisfying *Bell Atlantic Corp. v.*

19   *Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct.

20   1937 (2009). But the SAC does not satisfy *Twombly* and *Iqbal*.

21   **C.    The SAC's allegations about the Investment Claims.**

22         The FAC's Investment Claims failed because they did not establish an

23   exception to the Business Judgment Rule. The FAC offered almost exclusively

24   hindsight disagreements with the *content* of the Directors' decisions. *See* Doc.

25   110 ("12/20 Order") at 7 ("Plaintiff essentially concedes that most of its

26   allegations deal with content instead of process."). The FAC conceded so much

27   about what the Directors did right that its few allegations not based on hindsight

28   bias could not overcome the Business Judgment Rule. *Id.* at 9.

1      The SAC fares no better.  Its "new" allegations fall into three categories:

2   allegations that WesCorp's Budget Committee did not monitor investment risk;

3   allegations that WesCorp imprudently approved investing in Option ARMs; and

4   allegations about the reports on economic and market conditions prepared by

5   WesCorp's staff and reviewed each month by WesCorp's ALCO.  *See* Doc. 115

6   ("1/31 Order") at 2.  These "new" allegations do not give the Court what it asked

7   for: *factual* allegations demonstrating a failure to conduct an active investigation

8   in circumstances where facts known to the Directors reasonably called for an

9   investigation or where an investigation would have revealed facts material to the

10   questioned exercise of business judgment.  12/20 Order at 7.  Indeed, the SAC

11   suffers from the same fundamental problem as the FAC:  it also mainly uses

12   hindsight to attack the content of the Directors' decisions while making

13   numerous admissions about what the Directors did right.

14   **III.   ARGUMENT.**

15      Dismissal is appropriate wherever a plaintiff has failed to plead facts to

16   state a claim for relief that is "plausible."  12/20 Order at 2 (quoting *Johnson v.*

17   *Riverside Healthcare Sys., LP,* 534 F.3d 1116, 1121-22 (9th Cir. 2008)).  Like

18   the FAC, the SAC fails to state "plausible" Investment Claims because it does

19   not plead facts establishing an exception to the Business Judgment Rule.

20   **A.     The NCUA must meet an extremely high standard to overcome the**

21   **Business Judgment Rule.**

22      Claims 2, 3 and 4 purport to allege breaches of  fiduciary duty, namely, the

23   duty of care.  California law applies to such claims.  12/20 Order at 4.

24      California's Business Judgment Rule, codified in part at sections 309 and

25   7231 of the California Corporations Code, "recognizes that where decisions are

26   without fraud or breach of trust, 'management of the corporation is best left to

27   those to whom it has been entrusted, not to the courts.'"  12/20 Order at 5

28   (quoting *Bader v. Anderson*, 179 Cal. App. 4th 775, 787, 101 Cal. Rptr. 3d 821,

1    830 (2009)).  Absent one of its limited exceptions, "the rule . . . protect[s] well-

2    meaning directors who are misinformed, misguided, and honestly mistaken." *Id.*

3    (quoting *FDIC v. Castetter*, 184 F.3d 1040, 1046 (9th Cir. 1999)).  The Rule

4    prohibits courts from interfering in business decisions made by directors in good

5    faith and in the absence of a conflict of interest.  *Id.* (citing *Berg & Berg Enters.,*

6    *LLC v. Boyle*, 178 Cal. App. 4th 1020, 1045, 100 Cal. Rptr. 3d 875, 897 (2009)).

7    "[D]oubtful cases" do not call for "[i]nterference with the discretion of

8    directors." *Id.* at 5-6 (quoting *Berg & Berg*, 178 Cal. App. 4th at 1046; *Lee*,

9    50 Cal. App. 4th at 715).

10        The exceptions to the Business Judgment Rule are limited.  To plead an

11   exception, a plaintiff must plead facts establishing a conflict of interest, fraud,

12   oppression, corruption or a complete abdication of corporate responsibility.

13   12/20 Order at 6 (citing *Castetter*, 184 F.3d at 1046).  "[T]o establish such

14   exceptions, conclusory allegations of improper motives or conflict of interest are

15   insufficient, as are general allegations of a failure to conduct an 'active

16   investigation, in the absence of (1) allegations of facts which would reasonably

17   call for such an investigation, or (2) allegations of facts which would have been

18   discovered by a reasonable investigation and would have been material to the

19   questioned exercise of business judgment.'" *Id.* (quoting *Lee*, 50 Cal. App. 4th

20   at 715).  Because of the distorting effects of hindsight bias, the Business

21   Judgment Rule permits courts and juries to examine only the process by which

22   directors made decisions, and not the content of the decisions.  *See id.* at 7; *see*

23   *also In re Citigroup Inc. S'holder Deriv. Litig.,* 964 A.2d 106, 127 (Del. Ch.

24   2009).  "To rebut the presumption afforded by the business judgment rule, most

25   of the time only affirmative allegations demonstrating fraud, bad faith,

26   overreaching or an unreasonable failure to investigate material facts will do."

27   12/20 Order at 6 (citing *Berg & Berg*, 178 Cal. App. 4th at 1046; *Lee*, 50 Cal.

28   App. 4th at 715).

1    Here, the SAC alleges no facts calling into question the Directors' motives

2    or honesty.  Just as "[f]raud, breach of trust, conflict of interest, bad faith,

3    oppression, corruption, complete abdication of responsibility, willful ignorance

4    and gross overreaching are fairly glaringly absent from the allegations" in the

5    FAC (*id.* at 8), so too are they "fairly glaringly absent" from the SAC.

6    Absent such allegations, the SAC must allege an unreasonable failure to

7    investigate material facts, within the meaning of *Lee*.  Yet the SAC's allegations

8    do not meet this standard, particularly viewed in light of the NCUA's admissions

9    about the Directors' decisions and decision-making processes.

10   **B.    The NCUA's admissions defeat its Investment Claims.**

11   The NCUA admits that WesCorp only purchased securities that Moody's

12   or Standard & Poor ("S&P") rated AAA or AA, the two highest ratings available.

13   12/20 Order at 8; SAC ¶ 82.  The NCUA also admits that WesCorp bought

14   mainly AAA-rated securities and began to decrease its holdings of AA-rated

15   securities in 2005, well before the market collapse.  12/20 Order at 8; SAC ¶¶ 73,

16   82.  The NCUA gave corporate credit unions the power to invest in securities

17   rated "AA-"(12 C.F.R. § 704.6(d)(2) (Oct. 25, 2002)) and gave WesCorp

18   expanded authority to invest in securities rated as low as "BBB" (12 C.F.R. Part

19   704, Appx. B (Oct. 25, 2002)).  On S&P's ratings scale, BBB is six levels below

20   AA (the levels in between are AA-, A+, A, A- and BBB+).  Yet despite the

21   NCUA's invitation, WesCorp never bought these lower-rated securities, never

22   held less than 78% AAA-rated securities, ceased buying subprime late in 2006

23   and ceased buying private-label MBS altogether in July 2007.  SAC ¶ 146.

24   The Court recognizes that the fact that WesCorp purchased only the

25   highest rated assets presents "a seemingly gigantic problem with Plaintiff's case

26   . . . ."  1/31 Order at 2.  Indeed it does.  WesCorp's AAA-rated assets received

27   the top rating because independent ratings agencies deemed them the highest

28   quality assets available to investors, and among the safest.  This is not just what

1    the Director and the ratings agencies thought, it is what the NCUA publicly

2    stated as late as a month or two before it filed the FAC.  In a video about

3    corporate credit unions – including WesCorp – publicly distributed to credit

4    unions last summer and still available on the Internet in both video and

5    transcribed form, the NCUA made these statements, among many others:

6    • "Historically mortgage-backed securities experienced no significant losses

7       . . . ." [1]

8    • "Historically, mortgage-backed securities fit well into the corporate credit

9       unions' business function as a liquidity provider because there was an active

10      market for mortgage-backed securities and they could be used as collateral for

11      borrowing."  NCUA Transcript at 7, RJN Ex. 10, at 0765.

12   • "When corporate credit unions had excess funds on deposit from consumer

13      credit unions who were their members, some purchased private-label

14      mortgage-backed securities with those funds.  **The securities offered a better**

15      **return and were historically just as safe as many other investment**

16      **products.**"  *Id.* (emphasis added).

17   • "When the investment requirements for Part 704 [that is, 12 C.F.R. Part 704,

18      the NCUA's regulations for corporate credit unions, none of which WesCorp

19      is alleged to have violated] were implemented, a thorough review was

20      performed on the history of credit ratings and their success in evaluating the

21      financial strength of marketable securities.  **The loss history of securities**

22      **with an initial rating of triple-A or double-A was less than one half of one**

23

24      [1]   NCUA, Transcript of Corporate System Resolution Presentation, Track 2,
25      http://event.on24.com/event/22/07/64/rt/1/documents/player_docanchr_1/tran
        scriptforchapter2.pdf (last visited Jan. 23, 2011), at 6, Request for Judicial
26      Notice, filed herewith ("RJN"), Ex. 10, at 0764.  A video version of the
        NCUA's presentation may be found on its website at
27      http://www.ncua.gov/Resources/CorporateCU/CSR/Presentations.aspx (last
        visited Jan. 19, 2011).
28

1   **percent.  The loss history of securities issued by government-sponsored**

2   **entities and the loss history of private label securities was virtually the**

3   **same**." *Id.* (emphasis added).

4   • "While corporate credit unions were not allowed to rely only on credit ratings,

5       the track record of credit ratings in evaluating the future performance of

6       securities was historically strong.  Credit ratings have been an investment

7       decision-making tool in financial markets for decades." *Id.*

8   • "All of the mortgage-backed securities that were purchased by corporate

9       credit unions were permissible at the time they were acquired and accordingly

10      met the rating requirements." *Id.*

11  • "**Based on historic performance, there appeared to be very little risk with**

12      **the private label mortgage backed securities purchased by the**

13      **corporates.**" *Id.* at 0766 (emphasis added).

14  • "Finally, many of the securities paid interest based on a floating rate rather

15      than a fixed rate.  This helped corporate credit unions in the overall

16      management of their investment and share portfolios, and mitigated the risk

17      of changing interest rates." *Id.*

18      These admissions render the SAC's allegations about the *content* of the

19  Directors' investment decisions implausible under *Twombly* and *Iqbal*, to put it

20  mildly.  But the NCUA's admissions do not stop there:  they also undercut the

21  SAC's allegations about *process*.  Thus, whatever the wisdom of making

22  investment decisions solely on the basis of ratings obtained from a "Nationally

23  Recognized Statistical Rating Organization" (*see* Credit Rating Agency Reform

24  Act of 2006, Pub. L. No. 109-291, 120 Stat. 1327, and 17 C.F.R. § 240.17g-1 et

25  seq. (June 18, 2007)) such as S&P or Moody's, it is clear that the Directors did

26  not rely solely on credit ratings and did much more investigation.  The original

27  complaint alleges that WesCorp hired an independent third-party consulting and

28  valuation firm called RiskSpan Inc. to evaluate each of WesCorp's investments

1   *monthly*.  Doc. 1, Orig. Compl. ¶¶ 4-5, 16.[2]  The SAC expressly mentions the

2   books that ALCO members received each month before the monthly ALCO

3   meeting.  *E.g.,* SAC ¶¶ 97, 99, 138-42.  But the SAC is exceedingly selective in

4   what it says about these books.  The SAC notes, for example, that the books

5   typically survey economic and market conditions.  *See, e.g.,* SAC ¶ 97, referring

6   to part II of the ALCO book for April 2006, *see* RJN Ex. 1, at 0022-33.  But the

7   SAC conveniently omits to mention that the ALCO books also contain a consent

8   agenda listing each proposed new investment, with individualized concentration

9   limits as to each (*id.* at 0013-20), a detailed discussion of risk assessment and

10  risk exposure (*id.* at 0035-48), a detailed discussion of fluctuations in member

11  balances and loans (*id.* at 0050-55), a detailed forecast of borrowings, liquidity

12  and capital (*id.* at 0057-67), a discussion of investment strategies, including a list

13  of all transactions in the previous month (*id.* at 0069-73), and supporting

14  documentation that includes pages upon pages of detail on derivatives,

15  concentration limits, watch lists, counterparty transaction limits, delinquencies,

16  losses, credit support and stress tests analyzing various risk scenarios (*id.* at

17  0075-0107).  All of these sections are supported by pages of raw data.  *Id.*  And

18  this is just one month's book.  All the other books cited by the SAC contain this

19  much detail or more.  *See* RJN Ex. 1, 4-9.  These books – cited by the SAC and

20  thus fair game for judicial notice – belie the SAC's conclusory claim that the

21  Directors ignored risks and stinted on process.

22        But that is not all.  The NCUA also admits that:  All of WesCorp's

23  investments were underwritten "by the world's leading investment banks."  SAC

24  ¶ 39.  WesCorp's budgets contained "detailed information" including proposed

25  ———————————

26  [2]   The original plaintiffs alleged that RiskSpan performed that work negligently, but the NCUA chose not to pursue such allegations and dropped RiskSpan from the case.  Thus, we are left with the allegation that WesCorp hired and relied in part on risk assessments performed by an independent expert. Directors may rely on independent expertise.  12/20 Order at 4-5.

1   projected expenses, projected fee income, and monthly projected totals for

2   projected investment income.  SAC ¶ 88.  WesCorp classified and tracked MBS

3   investments by rating (AAA and AA) and FICO score (prime, alt-A and

4   subprime).  SAC ¶ 128.  And the Directors "generally" attended ALCO meetings

5   and received presentations about the state of the economy, the investment climate

6   and WesCorp's investment strategy.  SAC ¶¶ 96, 97, 99, 135.

7        These admissions have not significantly changed from the admissions in

8   the FAC.  And, as in the FAC, "[t]he affirmatively-alleged facts about what the

9   Director Defendants *did do* in their roles with WesCorp are not meaningfully

10  different from those the Ninth Circuit considered in *Castetter* and concluded

11  called for application of the business judgment rule."  12/20 Order at 9 (citing

12  *Castetter*, 184 F.3d at 1045).

13       Given the NCUA's many admissions about what the Directors did right,

14  the NCUA needs substantial factual allegations about what the Directors did

15  wrong – within the meaning of *Lee* – to plead an exception to the Business

16  Judgment Rule.  As shown below, the SAC offers no such allegations.

17  **C.    The SAC's "new" allegations do not plead an exception to the**

18  **        Business Judgment Rule and do not cure the problems the Court**

19  **        identified with the FAC.**

20       The "new" allegations that the NCUA pleads in the SAC fall into three

21  categories:  allegations about the Budget Committee; allegations about approval

22  of Option ARM investments; and allegations about surveys of  economic and

23  market conditions in the ALCO books.  None differs significantly from the

24  allegations of the FAC and none pleads an exception to the Business Judgment

25  Rule.  *See* 1/31 Order at 2 (most of the new allegations in the NCUA's Offer of

26  Additional Allegations, Doc. 111, "are not significantly different than what were

27  already included in the FAC.").

28

1. **The SAC's allegations about the Budget Committee fail to overcome the Business Judgment Rule because they do not show the Committee failed unreasonably to investigate matters within its purview.**

The SAC alleges that the Directors who served on the Budget Committee failed to monitor the risk in WesCorp's portfolio. *See* SAC ¶¶ 85-104. (These allegations form the basis for the Second Claim against the Directors who served on the Budget Committee. SAC ¶¶ 199-205.) The SAC claims that the Budget Committee adopted budgets that mandated a particular level of investment income without adequately investigating how much risk WesCorp would have to run to achieve that level of investment income. *See, e.g.,* SAC ¶ 89.

But the SAC offers no facts that explain why a *Budget Committee* should be held responsible for analyzing investment decisions, particularly when that task fell to others – *e.g.,* the ALCO. SAC ¶ 25. This is an enormous hurdle for these allegations, because "the Court would seemingly also have to question why a *budget* committee should be held responsible for the effect of *investment* decisions." 1/31 Order at 2 (emphasis in original). The Court asked this question; the SAC offers no allegations that answer this question. All it offers are conclusory allegations in support of a dubious syllogism: the budgets set a level of investment income; that level of income required a certain level of risk; and in hindsight the particular risks that the Directors decided to take did not work out. Even without the Business Judgment Rule, the SAC's allegations about the Budget Committee are too conclusory and tenuous to form the basis of a claim for breach of the duty of care, because they do not begin to show that risk assessment fell to the Budget Committee.

Even if the SAC could task the Budget Committee with risk assessment, it fails to overcome the Business Judgment Rule because it does not allege facts showing an unreasonable inquiry. As the Court noted, *Lee* sets forth the common sense requirement that conclusory allegations of an inadequate inquiry

1    are insufficient in the absence of "'(1) allegations of facts which would

2    reasonably call for such an investigation, or (2) allegations of facts which would

3    have been discovered by a reasonable investigation and would have been

4    material to the questioned exercise of business judgment.'"  1/31 Order at 1

5    (quoting *Lee*, 50 Cal. App. 4th at 715).  The SAC alleges no material facts that

6    additional investigation would have revealed, nor could it:  these were AAA-

7    rated investments that even the NCUA ranked among the most conservative and

8    safe at the time.  RJN Ex. 10, at 0765-0766.  Indeed, had the Budget Committee

9    been given the task of risk assessment, it likely would have duplicated the efforts

10   of the ALCO and the independent expert, RiskSpan: reviewing copious amounts

11   of background data and reaching the same reasonable conclusions.

12        The SAC does allege that the Budget Committee members knew that

13   investment spreads for MBS securities were tightening and that this fact

14   warranted additional investigation.  SAC ¶ 101.  But the SAC alleges no facts

15   that connect this piece of information to the process of adopting the budget.

16   Even if Budget Committee members knew it was becoming more difficult to find

17   individual MBS investments that offered, say, a spread of X basis points over

18   MBS issued by Fannie or Freddie, that fact has no connection to the Budget

19   Committee's decision to set WesCorp's overall investment income goal.  At

20   most it might militate for or against a particular investment offering a particular

21   spread, but the SAC makes no allegations about any particular investment, much

22   less allege that the Budget Committee ever decided which specific investments to

23   make, or not to make.  Indeed, SAC ¶ 94 alleges that WesCorp *reduced* its

24   spreads after 2006 to levels lower than in 2004, 2005 or 2006.

25        The SAC's Budget Committee allegations also fail to overcome the

26   Business Judgment Rule because they are content-based and allege nothing about

27   the process of adopting the budget.  Instead, the allegations take issue with the

28   decisions the Directors made:  the level of investment income in the budget and

1    (with a few unsupportable inferential leaps) the risk implicit in that level of

2    income.  As the Court has noted, the Directors "'[i]n performing the duties of a

3    director,' are permitted to 'rely on information, opinions, reports or statements,

4    including financial statements and other financial data' when prepared by various

5    other individuals 'so long as . . . the directors act in good faith, after reasonable

6    inquiry when the need therefore is indicated by the circumstances and without

7    knowledge that would cause such reliance to be unwarranted.'"  1/31 Order at 2-

8    3 (quoting Cal. Corp. Code §§ 309(b), 7231(b); *Castetter*, 184 F.3d at 1043-44).

9    This law should focus the Court's inquiry on how the Directors made the

10   decision, what they relied on, and whether such reliance was reasonable:  How

11   did the Directors adopt the budget?  What did they rely on?  What steps should

12   they have taken instead?  What would additional inquiry have revealed – not in

13   hindsight, but at the time?  The SAC answers none of these questions.  It does

14   offer conclusory allegations that the Budget Committee members failed to

15   consult the ALCO or the ALSC (SAC ¶ 102), but then cancels that allegation by

16   alleging that all Directors also "generally attended the ALCO meetings" (SAC

17   ¶ 135) and received presentations on risk (SAC ¶¶ 96, 97, 99).  Lacking any

18   allegations of fact demonstrating inadequate processes, the NCUA's new

19   allegations about the Budget Committee are not even minimally plausible.  They

20   certainly do not overcome the Business Judgment Rule.

21   **2.     The SAC's allegations about Option ARMs fail to overcome the**

22   **        Business Judgment Rule because the SAC does not allege that the**

23   **        Directors knew of but disregarded problems with these securities.**

24          The SAC alleges that the Directors authorized investing in Option ARMs

25   without treating them as a "new" kind of investment and therefore inadequately

26   investigated the risks of Option ARMs.  SAC ¶¶ 115-126.  These allegations fail

27   to overcome the Business Judgment Rule because the SAC does not plead facts

28   showing that the Directors should have dug deeper given the facts they knew *at*

1   *the time*.  *See* 12/20 Order at 5-6 (citing *Lee,* 50 Cal. App. 4th at 715).  The Court

2   told the NCUA to provide more, stating that these allegations were "irrelevant

3   given the business judgment rule because there are no allegations that the

4   director defendants were aware at the time any investment decisions were made

5   of the *details* underlying the incredibly weak foundation for those securities at

6   the time, or that such information was readily available to them."  1/31 Order at 3

7   (emphasis in original).  In response to this prompting, the NCUA offers only

8   vague allegations that the Directors knew "(1) the 'reset shock' experienced by

9   Option ARM loans increases their credit risk; (2) the credit quality of the Option

10  ARM MBS loan pools was deteriorating; and (3) a drop in housing demand

11  could result in a decrease in real estate values and credit losses on existing

12  Option ARM loans . . . ."  SAC ¶ 120.  (None of the three is specific to Option

13  ARMs, and only the first is specific to all ARMs, be they Option ARMs or not.)

14  These allegations suggest, at most, that the Directors knew Option ARMs

15  entailed certain risks.  SAC ¶ 131.  This is a far cry from the Directors being

16  aware of the "details" of the "incredibly weak foundation" of those securities.

17  The SAC faults the Directors for being no more prescient about the future of

18  Option ARMs than the independent rating agencies, the investment banks and

19  the NCUA itself.  Such allegations do not meet the test that the Court set out in

20  its 12/20 Order or establish an exception to the Business Judgment Rule.

21      The SAC also fails to allege that Option ARM MBS comprised an

22  inappropriately large proportion of WesCorp's portfolio.  The Court told the

23  NCUA that the allegations related to Option ARM concentration would be

24  relevant only if Option ARM based MBS comprised a large proportion of

25  WesCorp's overall investment portfolio, and even then likely relevant only as to

26  members of the ALCO.  1/31 Order at 3.  Yet the SAC alleges that Option ARMs

27  ranged from only 28% to 37% of WesCorp's overall investment portfolio.  SAC

28  ¶¶ 121-22.  The NCUA alleges no facts to contextualize these numbers as a

- 15 -

1    "large proportion of not only WesCorp's mortgage-backed securities

2    investments, but also its overall investment portfolio."  1/31 Order at 3.  Without

3    such context, the NCUA has not shown that the Directors' investigation was

4    unreasonable under *Lee* given the facts known to them at the time.

5         Unable to allege that the Directors knew Option ARMs to be unusually

6    weak, or that Option ARMs were a disproportionate part of WesCorp's overall

7    portfolio, the SAC falls back on allegations that the Directors violated some

8    unspecified policy by not treating them as a "new" asset type, from which

9    alleged fact the SAC draws the dubious inference that whatever investigation the

10   Directors did was therefore inadequate, never mind what it was.  SAC ¶¶ 115,

11   119.  These vague allegations fly in the face of the ALCO books cited by the

12   SAC.  The ALCO books show that each and every investment WesCorp made

13   was first reviewed by the investment staff, then reviewed and approved by the

14   ALCO, then recommended to the Board of Directors and, if approved, monitored

15   periodically thereafter with detailed attention to concentration limits and risk.

16   *See, e.g.,* RJN Ex. 1, at 0013-0020, 0035-0048.  The SAC does not even suggest

17   why this method of approval was procedurally inadequate, or how it differed

18   from what WesCorp's policies allegedly required.

19        The SAC also alleges no facts showing that Option ARM MBS really were

20   "new" within the meaning of the alleged policy.  The SAC concedes that

21   WesCorp had purchased MBS since 2002.  SAC ¶ 72.  A number of institutions

22   offered Option ARMs successfully for decades before they became so popular in

23   the middle of the last decade.  Adjustable rate mortgages, and private-label MBS

24   containing ARMs, have been around for decades, received the blessing of

25   Congress and long were viewed as essential to reducing what was deemed the

26   main risks facing financial institutions – interest rate risk and liquidity risk.  *See*

27   *Anchor Sav. Bank, FSB v. United States,* 81 Fed. Cl. 1, 11-20 (2008), *aff'd and*

28   *remanded,* 597 F.3d 1356 (Fed. Cir. 2010) (explaining how and why Congress

1   legalized ARMs early in the 1980's and then encouraged the growth of private-

2   label MBS); *see also* Garn-St. Germain Depository Institutions Act of 1982, Pub.

3   L. No. 97-320, 96 Stat. 1469 (authorizing ARMs).[3]  In hindsight, they may have

4   been abused, or overused, but Option ARMs were not novel or new.

5       The NCUA's allegations about Option ARMs are nothing more than a

6   slightly different spin on the same old allegations about inadequate investigation,

7   and fail for the same reasons as the other allegations of the FAC and SAC:  they

8   are vague and conclusory, and they fail to allege facts that would have been

9   discovered by additional investigation or unreasonable risks known to the

10  Directors at the time, as required by *Lee*.

11  **3.    The SAC's allegations about reports on the economy and housing**

12          **market fail to overcome the Business Judgment Rule because they**

13          **attack content, not process.**

14      The SAC alleges that, beginning in late 2006, the Directors learned of

15  problems in the housing market by reading discussions of economic and market

16  conditions in the ALCO books.  *See* SAC ¶¶ 138-147.  The SAC then claims that

17  the Directors acted unreasonably in light of these warnings and did not

18  investigate them adequately.  *Id.*

19      The discussions that the SAC highlights can be summarized as follows:

20  housing is experiencing a slowdown (2006) (SAC ¶ 138); the housing slowdown

21  might cause the economy as a whole to suffer (Q4 2006) (SAC ¶ 139); the

22  _____

23  [3]  Title VIII of Garn-St. Germain, the "Alternative Mortgage Transaction Parity

24  Act of 1982," authorized ARMs; it is codified at 12 U.S.C. § 3801 *et seq.*
    Section 3801(a)(2) contains Congress's finding that ARMs "are essential to

25  the provision of an adequate supply of credit secured by residential property
    necessary to meet the demand expected during the 1980's . . . ."  *See also*

26  Secondary Mortgage Market Enhancement Act of 1984, Pub. L. No. 98-440,
    98 Stat. 1689, which encouraged private-label MBS.  Section 105 of the Act

27  amended the Federal Credit Union Act, 12 U.S.C. § 1757, by adding

28  subsection (15), allowing credit unions to invest in MBS.

1   housing situation is precarious (end of 2006) (SAC ¶ 140); mortgage

2   delinquencies and foreclosures are rising (Q1 2007) (SAC ¶¶ 141, 142); and

3   subprime is experiencing a "meltdown" (Feb. 2007) (SAC ¶ 142).  These

4   statements say nothing about the investments that WesCorp actually made –

5   bearing in mind that WesCorp had started to lighten up on AA (which peaked at

6   22% of WesCorp's portfolio) back in 2005 and had stopped buying subprime by

7   December 2006.  SAC ¶¶ 82, 148.

8          These allegations also fail for several other reasons:

9          *First*, the warnings the SAC cites (usually in part II of the ALCO books)

10   are general discussions about the economy and the housing market that say

11   nothing about the specific investments that the Directors approved.  The SAC's

12   so-called "red flags" are nothing more than selectively quoted statements about

13   the economy in general.  The SAC makes no attempt, much less a plausible

14   attempt, to connect the ALCO books' high-level discussion of the economy with

15   any specific decision that the Directors made.  Such a tactic is understandable;

16   had the NCUA alleged facts about the specific investment decisions that the

17   Directors made, the specific information that the Directors consulted, and the

18   reasons that the Directors made those decisions, it would quickly become

19   apparent that the Directors made reasonable investment decisions based on the

20   best information available at the time.  While these decisions did not turn out as

21   hoped, nevertheless, they are precisely the type of decision that the Business

22   Judgment Rule protects

23          *Second*, the ALCO books show that the *process* by which the Directors

24   made decisions was much more than adequate.  The ALCO books show that the

25   Directors consulted staff about the state of the economy, reviewed each

26   investment individually, and studied hundreds of pages of material each month.

27   *See* RJN Exhibits 1, 4-9.  The SAC does not allege that these reports were

28   deficient in any way; it merely quarrels with the decisions made on the basis of

1  these reports – in short, with content, not process.  Like the defendants in

2  *Castetter*, the Directors properly relied upon information prepared by others with

3  expertise (the staff, and RiskSpan).  Once again, "[t]he affirmatively-alleged

4  facts about what the Director Defendants *did do* in their roles with WesCorp are

5  not meaningfully different from those the Ninth Circuit considered in *Castetter*

6  and concluded called for application of the business judgment rule."  12/20 Order

7  at 9 (citing *Castetter*, 184 F.3d at 1045).  Once again, the SAC does not fault the

8  Directors for the fact that they received information (process) but complains

9  instead about what they did with the information (content).[4]  Making such

10  complaints with the benefit of 20/20 hindsight is precisely the kind of second-

11  guessing the Business Judgment Rule is designed to prevent.

12      The SAC focuses only on the general discussion in part II of the ALCO

13  books.  But the Court need not limit its review of these books to the few pages

14  that the SAC chooses to cite.  The Court may properly consider the full text of

15  documents mentioned in a complaint and is not bound by a plaintiff's

16  interpretation of them.[5]  Viewed in this light, the ALCO books reflect the

17  collection and use of  information about the economy at large when considering

18  specific investment decisions.  For example, the ALCO book for December 2006

19  _____

20  [4]  Even that quarrel is more about timing than substance.  The SAC admits that
     WesCorp lightened up on AA, ceased buying subprime and then ceased
21  buying private-label MBS altogether.  It merely wishes that WesCorp had
     done so sooner than it did.  In hindsight, of course.
22

23  [5]  *See In re Stac Elec. Sec. Litig.*, 89 F.3d 1399, 1405-09 (9th Cir. 1996).
     Indeed, "in order to '[p]revent[] plaintiffs from surviving a Rule 12(b)(6)
24  motion by deliberately omitting . . . documents upon which their claims are
     based,' a court may consider a writing referenced in a complaint but not
25  explicitly incorporated therein if the complaint relies on the document and its
     authenticity is unquestioned."  *Swartz v. KPMG LLP,* 476 F.3d 756, 763 (9th
26  Cir. 2007) (quoting *Parrino v. FHP, Inc.,* 146 F.3d 699, 706 (9th Cir. 1998));
     *Dreiling v. American Exp. Co.,* 458 F.3d 942, 946 n.2 (9th Cir. 2006) (holding
27  that courts, on a motion to dismiss, "may consider documents referred to in
     the complaint or any matter subject to judicial notice, such as SEC filings.").
28

1   outlined WesCorp's response to deterioration in the housing market: "[L]enders

2   have relaxed underwriting standards to maintain volumes, and credit issues in

3   sub-prime deals, mainly the 2006 originations, are beginning to show in the form

4   of higher delinquency levels.  Fortunately our purchase of sub-prime mortgages

5   in 2006 have been minimal compared to prior years.  A significant portion of our

6   2006 purchases have been in Option Arms that have prime or near prime

7   borrowers.  Despite the negative press surrounding negative amortization loans

8   their credit performance has been good throughout the year, especially compared

9   to the amount of credit enhancement the rating agencies require."  RJN Ex. 6, at

10  0414.  Similarly, the ALCO book for February 2007 stated that "[p]ersistently

11  high delinquencies and losses should result in downgrades of lower rated bonds

12  with slim levels of credit enhancement.  Hence, our decision to purchase Triple-

13  A rated structures with higher FICO Alt-A and prime collateral should benefit us

14  in a market with declining credit quality."  RJN Ex. 8, at 0618.  Far from

15  ignoring the economic trends that the NCUA highlights, the Directors

16  incorporated information about these trends into their investment plans and into

17  their monthly portfolio review.  The NCUA can quarrel in hindsight with the

18  content or timing of the decisions the Directors made based on the information

19  they received, but such content-based arguments do not establish an exception to

20  the Business Judgment Rule, within the meaning of *Lee*.

21  **4.      The SAC's other "new" allegations simply rehash the inadequate**

22  **allegations of the FAC.**

23  In addition to the three categories of "new" allegations discussed above,

24  the NCUA offers some additional detail that does nothing more than rehash

25  allegations in the FAC that the Court deemed inadequate.  The new details

26  provide yet more hindsight but do not begin to establish any exception to the

27  Business Judgment Rule.  These new details fall into three categories:

28  *Lower-tranche AAA investments and capital:*  The SAC alleges that some

1    of WesCorp's AAA-rated investments were not from the top tranche.  SAC ¶ 84.

2    It also alleges that, while WesCorp increased its capital, it failed to increase its

3    capital enough.  SAC ¶ 147.[6]  These allegations amount to nothing more than

4    hindsight-fueled disagreement with the content of decisions.  The allegations do

5    not describe how and why the Directors made the decision to purchase lower

6    tranche AAA-rated securities, or how those processes were deficient.  The

7    allegations offer nothing about how and why the Directors chose a certain level

8    of capital.  (The ALCO books reflect monthly consideration of capital levels.

9    *See, e.g.,* RJN Ex. 1, at 0057-0067.)  As such, like the other tweaks to the SAC,

10   "these allegations are not significantly different than what were already included

11   in the FAC."  1/31 Order at 2.  The SAC does not even allege that higher tranche

12   investments or additional capital would have resulted in fewer losses or avoided

13   insolvency.  Hindsight-based arguments such as "AAA-rated was good, but

14   higher tranche AAA-rated would have been better" and "the actual capital

15   increase was good, but even higher increase would have been better" are

16   precisely what the Business Judgment Rule is designed to preclude.

17          *Concentration limits:*  The NCUA adds some detail about various

18   concentration limits that the Directors either did or did not adopt, but for several

19   reasons the additional detail adds nothing of substance:

20   •   The SAC deems WesCorp's concentration limits too high, but never alleges

21       that WesCorp's investments came near these limits, let alone exceeded them.

22       SAC ¶¶ 111-14.  This omission is no accident; WesCorp's MBS typically ran

23       well below the limits.  *E.g.,* RJN Ex. 1, at 0039, Ex. 9, at 0689.

24   •   The new allegations completely ignore the ALCO books' detailed tracking of

25       compliance with WesCorp's concentration limits.  *E.g.,* RJN Ex. 1, at 0075-

26   _____

27   [6]    The SAC fails to allege that WesCorp's capital fell below the regulatory
        minimum set by the NCUA to be well capitalized.  Nor could it; at no time
28      did WesCorp's capital fall below the regulatory standard.

1   0107.  For example, the SAC alleges that the Directors should have tracked

2   both Option ARM MBS and lower tranche AAA rated securities and adopted

3   special concentration limits for them.  SAC ¶ 130.  These allegations ignore

4   the fact that WesCorp tracked concentration at an even more granular level –

5   by originator, by issuer group, by shelf registration, by servicers, by bond

6   insurer and by state.  *E.g.,* RJN Ex. 1, at 039, 0077-0078.

7   • In substance the new allegations are almost identical to the concentration limit

8   allegations of the FAC, which the Court held "do not satisfy the requirements

9   set forth in *Lee,* 50 Cal. App. 4th at 715."  12/20 Order at 8.  *Lee* requires

10   allegations that demonstrate what *at the time* should have alerted the Directors

11   to the need to consider concentration limits for Option ARM MBS or lower

12   tranche AAA-rated MBS.  The SAC offers none of this.  Nor could it; at the

13   time these top-rated securities appeared as safe as any other highly rated

14   security – and the NCUA has admitted as much.  RJN Ex. 10, at 0765-0766.

15   The SAC also fails to allege material facts the Directors would have

16   discovered had they conducted additional investigation into Option ARMs or

17   lower tranche AAA-rated MBS.  In hindsight, the NCUA would prefer lower

18   concentration limits.  But the SAC offers nothing that made it unreasonable

19   not to have adopted lower concentration limits at the time.

20   *Credit spreads:*  The SAC adds some detail about the tightening of credit

21   spreads, but the added detail does nothing to establish an exception to the

22   Business Judgment Rule.  The SAC alleges that the investment credit spread for

23   WesCorp's MBS tightened, and WesCorp accordingly increased the relative

24   level of risk in its portfolio to earn the same income.  SAC ¶¶ 92-93.  Even

25   assuming that this is correct as a matter of economics (a heroic assumption, *see*

26   Doc. 113, at 4-7), and is not torpedoed by the allegation that WesCorp actually

27   reduced spreads after 2006, thus decreasing risk (SAC ¶ 94), such allegations:

28   merely describe the risks that WesCorp decided to take; say nothing about the

1  procedures the Directors used to choose that level of risk; and, accordingly,

2  provide yet another example of content-based hindsight.  The SAC does claim

3  that tightening spreads were a "red flag" requiring additional investigation.  SAC

4  ¶ 101.  But this allegation is wholly conclusory:  there is no explanation why a

5  certain level of risk – even a level that changes over time – requires any more

6  investigation than the Directors normally conducted, and no explanation why a

7  shift of a few basis points (hundreds of a percent) was material to anything.  The

8  factual allegations about spreads also do not explain what additional facts about

9  the investments additional investigation would have uncovered.[7]  Thus, the

10  allegations about spreads fail to satisfy *Lee*.  *See* 1/31 Order at 1 (quoting *Lee*,

11  50 Cal. App. 4th at 715).

12      *Losses:*  Finally, the SAC adds some detail about WesCorp's alleged

13  losses.  It alleges that WesCorp "invested more heavily in private label MBS

14  than other corporate credit unions" and that its failure "threatened the national

15  credit union system."  SAC ¶¶ 152, 153.  These allegations do nothing to

16  establish breaches by the Directors.  They are representative of the improper

17  focus of both the FAC and the SAC:  instead of properly alleging facts that might

18  satisfy *Lee*, the NCUA tries to overwhelm the reader with the shock of large

19  losses.  Allegations about the size of WesCorp's alleged losses do nothing to

20  establish the Investment Claims.

21

22

_____

23  [7]  The NCUA's "red flags" did not arise until well after some defendants had
    left WesCorp.  Bill Cheney left WesCorp in February 2006 (SAC ¶ 18); Dave
24  Rhamy and Sharon Updike left WesCorp in April 2006 (SAC ¶¶ 21-22).  All
    three left WesCorp before the alleged spreads tightened and the other "red
25  flags" emerged.  Indeed, all three left WesCorp before most of the events
    alleged in the SAC's few substantive allegations that are specific about time.
26  *See, e.g.,* SAC ¶¶ 33-34, 38, 40, 59, 76, 83, 90, 94, 97-102, 122, 131, 138-
    144, 146, 148-149.  Thus, the case against these three Directors must be
27  evaluated without the benefit of any of these allegations.

28

1   **D.    Further leave to amend would be futile.**

2        "Dismissal without leave to amend is proper if it is clear that the complaint

3   could not be saved by amendment."  12/20 Order at 2-3 (quoting *Kendall v. Visa*

4   *U.S.A., Inc.,* 518 F.3d 1042, 1051 (9th Cir. 2008)).  Here, it is clear that further

5   amendment cannot save the SAC.  The NCUA has had two chances to plead

6   facts that establish an exception to the Business Judgment Rule but has failed to

7   do so.  The NCUA had full-time examiners on site during the years when

8   WesCorp was making these investments, and since taking over WesCorp has had

9   two years more to investigate the facts, and open access to all of the relevant

10  evidence.  It is not surprising that the NCUA's investigation has come up short;

11  the numerous and detailed admissions about what the Directors did right show

12  that the Directors did not do anything that might establish an exception to the

13  Business Judgment Rule.

14       Whether or not to grant leave to amend was a "close call" before (1/31

15  Order at 3), but now it is clear:  the NCUA has no facts that would establish an

16  exception to the Business Judgment Rule.  The Directors' motion to dismiss the

17  Investment Claims should be granted with prejudice because further amendment

18  would be futile.

19  **IV.   CONCLUSION.**

20       The "new" allegations of the SAC rehash the failed allegations of the FAC

21  and ignore the ALCO books the SAC cites.  Like the FAC, the SAC concedes the

22  Directors did many things right.  And having conceded this much, the SAC

23  offers nothing more than the hindsight-fueled conclusion that the Directors

24  should have done more, or done it sooner.  But as this Court has held, where

25  allegations establish that the Directors acted reasonably under the circumstances

26  known to them and the Business Judgment Rule applies, "California courts have

27  clearly indicated that courts (juries included) should not interfere."  12/20 Order

28  at 9.

1    Because the SAC repeats the mistakes and deficiencies of the FAC, it

2   should be dismissed.  And because the NCUA knew of WesCorp's investment

3   decisions as they were made, and has possessed all of WesCorp's books and

4   records for the last two years, this time the dismissal should be without leave to

5   amend.  The Directors – unpaid, uninsured volunteers who never took a dime out

6   of WesCorp for themselves – have suffered enough already from this ill-

7   considered and heavy-handed attempt by a government agency to find a

8   convenient scapegoat, never mind the dubious economics of this litigation or its

9   human cost.

10       Dated:  April 18, 2011.

11                            PILLSBURY WINTHROP SHAW PITTMAN LLP
                             REYNOLD L. SIEMENS  #177956
12                            Email:  reynold.siemens@pillsburylaw.com
                             725 South Figueroa Street, Suite 2800
13                            Los Angeles, CA 90017-5406
                             Telephone:  (213) 488-7100
14                            Facsimile:  (213) 629-1033

15                            PILLSBURY WINTHROP SHAW PITTMAN LLP
                             BRUCE A. ERICSON  #76342
16                            Email:  bruce.ericson@pillsburylaw.com
                             GEORGE ALLEN BRANDT  #264935
17                            Email:  allen.brandt@pillsburylaw.com
                             50 Fremont Street
18                            Post Office Box 7880
                             San Francisco, CA  94120-7880
19                            Telephone: (415) 983-1000
                             Facsimile: (415) 983-1200

20

21
                             By _____/s/ Bruce A. Ericson_____
22                                        Bruce A. Ericson

23                            Attorneys for Defendants Robert John Burrell, William
                             Cheney, Gordon Dames, Robert H. Harvey, Jr., James
24                            Jordan, Timothy M. Kramer, Robin Lentz, John M. Merlo,
                             Warren Nakamura, Brian Osberg, David Rhamy and
25                            Sharon Updike

26

27

28