1  Michael H. Bierman, State Bar No. 89156
2  Michael E. Pappas, State Bar No. 130400
   LUCE, FORWARD, HAMILTON & SCRIPPS LLP
3  601 S. Figueroa, Suite 3900
   Los Angeles, California 90017
4  Telephone: 213.892.4992
   Facsimile: 213.892.7731
5  E-Mail: mbierman@luce.com
              mpappas@luce.com
6
7  Attorneys for Plaintiff National Credit Union Administration Board
   As Liquidating Agent For Western Corporate Federal Credit Union
8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 11  NATIONAL CREDIT UNION ADMINISTRATION BOARD AS LIQUIDATING AGENT FOR WESTERN CORPORATE FEDERAL CREDIT UNION, <br><br> 14    Plaintiff, <br><br> 15  v. <br><br> 16  ROBERT A. SIRAVO, TODD M. LANE, ROBERT J. BURRELL, THOMAS E. SWEDBERG, TIMOTHY T. SIDLEY, ROBERT H. HARVEY, JR., WILLIAM CHENEY, GORDON DAMES, JAMES P. JORDAN, TIMOTHY KRAMER, ROBIN J. LENTZ, JOHN M. MERLO, WARREN NAKAMURA, BRIAN OSBERG, DAVID RHAMY and SHARON UPDIKE, <br><br> 22    Defendants. | Case No.: CV10-01597 GW (MANx) <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFF NATIONAL CREDIT UNION ADMINISTRATION BOARD AS LIQUIDATING AGENT FOR WESTERN CORPORATE FEDERAL CREDIT UNION IN OPPOSITION TO DIRECTOR DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT [DOCKET 122]** <br><br> Date:      June 9, 2011 <br> Time:     8:30 a.m. <br> Courtroom: 10 |

1

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................. 1

THE ALLEGATIONS OF THE SECOND AMENDED COMPLAINT .................. 3

    A.    WesCorp's Purpose.................................................................. 3

    B.    WesCorp's Risky Investments and Failure............................. 4

    C.    The Directors' Responsibility for WesCorp's Failure ......................... 6

LEGAL STANDARD.............................................................................11

LEGAL ARGUMENT............................................................................12

I.     THE SAC ALLEGES FACTS THAT PLAUSIBLY OVERCOME
THE CALIFORNIA BUSINESS JUDGMENT RULE. ...............................12

    A.    Section 7231 Defines the Personal Liability of Directors....................12

    B.    The Business Judgment Rule Requires Only Notice Pleading............14

    C.    The Factual Allegations of the SAC Permit a Reasonable
Inference of Liability. ..........................................................15

    D.    The Motion to Dismiss Should be Denied Because of the
Inherently Factual Nature of the Inquiry. ...............................16

II.    THE DIRECTORS' ARGUMENTS DO NOT DEFEAT THE
ALLEGATIONS OF THE SAC.......................................................12

    A.    The Directors May Not Rely on the ALCO Materials and the
Matz Presentation for this Motion to Dismiss. ...................................18

    B.    The Allegations are Not Based on Hindsight or Content.....................20

    C.    The Directors' Arguments do Not Establish that the NCUA's
Claims are Implausible. ..........................................................22

CONCLUSION .....................................................................................25

Case No. CV10-01597 GW (MANx)
NCUA'S OPPOSITION TO DIRECTORS'
MOTION TO DISMISS SAC

201109866.8

## TABLE OF AUTHORITIES

**Page**

### CASES

*Ashcroft v. Iqbal*
__ U.S. __, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ........................ 12, 14, 16

*Bader v. Anderson*
179 Cal. App. 4th 775 (2009).................................................................17

*Balistreri v. Pacifica Police Dep't*
901 F.2d 696 (9th Cir. 1988).................................................................11

*Barber v. Chang*
151 Cal. App. 4th 1456 (2007)...............................................................16

*Batlan v. WT Consulting, Inc.*
2009 WL 936664 (Bkrtcy. D. Or. Jan. 26, 2009) .............................18

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544 (2007)...............................................................................14

*Branch v. Tunnell*
14 F.3d 449 (9th Cir. 1994)...................................................................19

*Brummett v. County of Sacramento*
21 Cal. 3d 880 (1978) ...........................................................................16

*Coto Settlement v. Eisenberg*
593 F.3d 1031 (9th Cir. 2010)...............................................................20

*Court Appointed Receiver of Lancer Offshore, Inc. v. Citco Group Ltd.*
2008 WL 926509 (S.D. Fla. Mar. 31, 2008)........................................18

*Del Puerto Water Dist. v. U.S. Bureau of Reclamation*
271 F. Supp. 2d 1224 (E.D. Cal. 2003) ...............................................19

*Desaigondar v. Meyercord*
108 Cal. App. 4th 173 (2003).................................................................17

*Edie v. Baca*
2009 WL 3417844 (C.D. Cal. Oct. 19, 2009)......................................19

*FDIC v. Castetter*
184 F.3d 1040 (9th Cir. 1999)..........................................................13, 22

*Frances T. v. Village Green Owners Ass'n*
42 Cal. 3d 490 (1986) ......................................................................13, 17

*Franklin v. Dudley*
2009 WL 3073930 (E.D. Cal. Sept. 22, 2009).....................................20

ii

201109866.8

1

## TABLE OF AUTHORITIES
### (cont'd)

2

**Page**

3

*FSLIC v. Musacchio*
   695 F. Supp. 1053 (N.D. Cal. 1988)................................................................17

4

*Gaillard v. Natomas*
   208 Cal. App. 3d 1250 (1989)................................................................13, 21

5

6

*Galbraith v. County of Santa Clara*,
   307 F.3d 1119 (9th Cir. 2002).................................................................19

7

*Gilbert v. Bagley*,
   492 F. Supp. 714 (M.D.N.C. 1980)...............................................................18

8

9

*Guzell v. Hiller*,
   223 F.3d 518 (7th Cir. 2000)..................................................................20

10

*Harrison v. Institutional Gang of Investigations*
   2009 WL 1277749 (N.D. Cal. May 6, 2009) .................................................20

11

12

*Hishon v. King & Spalding*
   467 U.S. 69 (1984)................................................................................16

13

*In re Citigroup Inc. Shareholder Derivative Litig.*
   964 A. 2d 106 (Del. Ch. 2009)...................................................................17

14

*In re 1st Rochdale Co-op Group, Ltd.*
   2008 WL 170410 (S.D.N.Y. Jan. 17, 2008) .................................................14

15

16

*Katz v. Chevron Corp.*
   22 Cal. App. 4th 1352 (1994)...................................................................17

17

*Kautz v. Sugarman*
   2011 WL 1330676 (S.D.N.Y. Mar. 31, 2011) ............................................14

18

19

*Lamden v. La Jolla Shores Clubdominium Homeowners Ass'n*
   21 Cal. 4th 249 (1999) ....................................................................12, 13, 17

20

*Lee v. City of Los Angeles*
   250 F.3d 668 (9th Cir. 2001)...................................................................18

21

22

*Lee v. Interinsurance Exchange*
   50 Cal. App. 4th 694 (1996)................................................................12, 13

23

*McMichael v. U.S. Filter Corp.*
   2001 WL 418981 (C.D. Cal. Apr. 17, 2001) .................................................17

24

25

*O'Campo v. Chico Mall, LP*
   2010 WL 3220141 (E.D. Cal. Aug. 13, 2010)................................................14

26

*Official Committee of Administrative Claimants v. Bricker*
   2010 WL 3781662 (N.D. Ohio Sept. 22, 2010).............................................14

27

28

iii

1

## TABLE OF AUTHORITIES
### (cont'd)

2

**Page**

3

*Parrino v. FHP, Inc.*,
146 F.3d 699 (9th Cir. 1998)...............................................................19

4

*Resolution Trust Corp. v. Fiala*
870 F. Supp. 962 (E.D. Mo. 1994) .....................................................18

5

6

*Rivera v. Hamlet*
2003 WL 22846114 (N.D. Cal. Nov. 25, 2003) ................................20

7

*Rojas v. Loza*
2008 WL 5056525 (N.D. Cal. Nov. 24, 2008) .................................20

8

9

*Seidel v. Byron*
405 B.R. 277 (N.D. Ill. 2009) .............................................................14

10

*Sprewell v. Golden State Warriors*
266 F.3d 979,
*amended on other grounds*, 275 F.3d 1187 (9th Cir. 2001) ..............12

11

12

*Swartz v. KPMG LLP*
476 F.3d 756 (9th Cir. 2007)...............................................................19

13

14

*U.S. v. Southern California Edison Co.*
300 F. Supp. 2d 964 (E.D. Cal. 2004) ...............................................19

15

*Wilson v. Grannis*
2008 WL 4415268 (N.D. Cal. Sept. 26, 2008) .................................20

16

17

## STATUTES

18

Cal. Corp. Code § 309................................................................ 12, 13, 17

19

Cal. Corp. Code § 309(a) .................................................................22

20

Cal. Corp. Code § 309(b) .................................................................22

21

Cal. Corp. Code § 7231.............................................. 2, 12, 13, 16, 17

22

Cal. Corp. Code § 7231(a) ...............................................................13

23

Cal. Corp. Code § 7231(b) ...............................................................13

24

Cal. Corp. Code § 7231(c) ...............................................................13

25

## RULES

26

Fed. R. Civ. P. 8(a)(2).......................................................................14

27

Fed. R. Civ. P. 12(b)(6)........................................................ 11, 14, 18

28

Fed. R. Evid. 201 ..............................................................................19

iv

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF AUTHORITIES</u>
### (cont'd)

**<u>Page</u>**

### <u>MISCELLANEOUS</u>

1 W. Schwarzer, A. Tashima & J. Wagstaffe, *California Practice Guide: Federal Civil Procedure Before Trial*, §§ 8:1550, 8:1553 (2011).....................23

W. Fletcher, *Fletcher Cyclopedia of the Law of Corporations*, § 1042.10 (2011).............................................................................................17

Case No. CV10-01597 GW (MANx)
NCUA'S OPPOSITION TO DIRECTORS'
MOTION TO DISMISS SAC

201109866.8

**INTRODUCTION**

In its Second Amended Complaint ("SAC"), the National Credit Union Administration Board ("NCUA") as Liquidating Agent for Western Corporate Federal Credit Union ("WesCorp") alleges that WesCorp, a non-profit credit union, adopted a business strategy of growing its income by investing its members' funds in increasingly large concentrations of increasingly risky investments, particularly private label Mortgage Backed Securities ("MBS") based on reduced documentation Option ARM loans. This strategy, championed by its CEO and his lieutenants, permitted WesCorp's executives to increase their compensation significantly. WesCorp's substantial investments in Option ARM MBS were unprecedented among corporate credit unions. When the investments collapsed, WesCorp's investment portfolio lost approximately $6.8 billion dollars, dwarfing by a factor of more than 10 the losses of the other retail corporate credit unions that had significant investments in private label MBS. WesCorp's failure cost billions of dollars and threatened the viability of the national credit union system.

The SAC alleges that the defendant directors (the "Directors") are legally responsible for this debacle because they did not comply with or enforce regulations and WesCorp policies that could have prevented it, because they permitted and unwittingly encouraged WesCorp to develop the excessive concentration of risky Option ARM MBS and because they did not consider changing WesCorp's investment strategy even in the face of information that the investments were risky and getting riskier. The question raised by the Directors' motion to dismiss is whether California's business judgment rule prevents any further litigation of the NCUA's claims.

The factual allegations against the Directors are specific. Although the investment income levels mandated by WesCorp's annual budgets had the effect of materially increasing the risk in WesCorp's investment portfolio, the Directors approved those income levels blindly, without considering that risk. Although

regulation and WesCorp policy required the Directors to set meaningful concentration limits for WesCorp's investments, the concentration limit for WesCorp's primary investment, private label MBS, was meaningless – permitting WesCorp to invest its entire portfolio in that one type of security.  Although WesCorp policies required them to approve and set concentration limits for new security types, the Directors permitted WesCorp to purchase Option ARM MBS, a particularly risky new form of security, without either.  Although regulation and WesCorp policy required them to do so, the Directors failed to consider augmenting WesCorp's capital in light of the increased risk created in WesCorp's investment portfolio.  Finally, although they had received information that WesCorp's investments in Option ARM MBS were becoming increasingly risky, the Directors did not consider changing WesCorp's investment strategy, allowing it to continue investing heavily in these MBS until the market for them froze in 2007.

To be legally sufficient, the SAC must allege facts permitting a reasonable inference of liability.  The business judgment rule of Cal. Corp. Code § 7231 shields a director from liability if, *inter alia*, he or she acted "with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances."  *Id.*  The SAC's allegations permit a reasonable inference that the Directors did not do so and that their actions and failures to act were clearly unreasonable in light of the circumstances known to them at the time.  Because the reasonableness of directors' actions is intensely factual, federal courts frequently conclude that it cannot be definitively resolved on a motion to dismiss.

The Directors do not analyze the SAC's allegations as a whole, except to repeatedly and incorrectly assert that they are based on "hindsight."  Instead, they recite their own version of what happened, based on their interpretations of selective and sometimes mischaracterized allegations from the SAC, extraneous materials,

2

201109866.8

1    and, occasionally, on unsupported representations of counsel.[1]  They assert that

2    these materials "show" that the Directors' decision-making process was generally

3    sufficient and that investment in private label MBS generally was considered safe.

4    Neither the extraneous materials the Directors rely on nor the SAC allegations they

5    quote nullify the SAC's specific factual allegations.

6          The Directors request judicial notice of the extraneous materials and assert

7    that the SAC's limited quotations from and references to certain documents render

8    the materials as a whole "fair game."  However, the contents of the materials and the

9    inferences the Directors seek to draw from them are not properly subject to judicial

10   notice, and the SAC's limited use of the materials does not permit their

11   consideration as a whole on a motion to dismiss.  Nothing in the materials

12   contradicts or otherwise calls into question the references relied on by the SAC.

13         The SAC's factual allegations, construed as they must be on a motion to

14   dismiss, are plausible.  If they are proven, imposing liability on the Directors for

15   their role in WesCorp' failure would not be unreasonable.  The NCUA respectfully

16   submits that the Directors' motion to dismiss should be denied, and it should be

17   permitted to prove the allegations of the SAC.

18   **THE ALLEGATIONS OF THE SECOND AMENDED COMPLAINT**

19         **A.    WesCorp's Purpose**

20         WesCorp was the largest non-profit "retail" corporate credit union.  SAC

21   ¶¶ 30, 45.  Its purpose was to provide its members, themselves credit unions, with a

22   place to invest their excess funds prudently, a ready source of liquidity, and a variety

23   of "back office" banking services.  SAC ¶¶ 46-49.  WesCorp's members, especially

24   its many small credit union members, depended on WesCorp for services, liquidity

25   and safe investment of excess funds.  SAC ¶ 51.

26   _____

27   [1]    These include the allegation that the Directors are "uninsured volunteers."
     While the Directors were not paid by WesCorp for being board members, they were
28   well paid as CEOs of their credit unions, and the WesCorp board positions were
     coveted.

**B.**   **WesCorp's Risky Investments and Failure**

In 2002, after Robert Siravo became CEO, WesCorp began to aggressively increase its net interest income by increasing the yield in its investment portfolio, purchasing an increasing amount of private label MBS, rather than less risky U.S. agency securities, and by increasing its borrowing.  SAC ¶¶ 62-63, 66-67, 72.

From December 2002 to December 2007, the concentration of U.S. agency MBS in WesCorp's MBS investment portfolio dropped from 17% to 4%, while the concentration of higher-yielding private label MBS increased from 72% to almost 95%.  SAC ¶ 72.  In contrast, the other corporate credit unions with significant investments in private label MBS had lower concentrations of those securities, ranging from 31% to 57%.  *Id.*  Between January 2004 and November 2008, WesCorp increased its borrowing 472% to $7.3 billion.  SAC ¶ 66.

Between 2002 and 2007, WesCorp's net interest income nearly doubled, from $68 million to $137 million, and between 2004 and 2007, its annual gross investment income nearly tripled from $563 million to $1.64 billion.  SAC ¶ 67. This increase allowed WesCorp's senior officers to increase their compensation substantially – Siravo's compensation increased by about 325% and Lane's compensation more than doubled.  SAC ¶¶ 34, 70.

In 2005, WesCorp began purchasing large quantities of MBS based on reduced documentation Option ARM loans.  SAC ¶¶ 36, 80.  These loans allowed the borrower to make substantially below-market monthly payments for the first years of the loan, after which the monthly payments "reset" and increased drastically, frequently more than doubling.  SAC ¶ 77.  The reduced documentation loans were made without verifying the borrower's ability to make the required monthly payments and were commonly referred to in the industry as "liar loans." SAC ¶ 78.  Many were made to borrowers who could afford the initial below-market monthly payments but not the regular monthly payment due after the loan reset.  *Id.* The loans, and the MBS based on them, were inherently risky because they were

Case No. CV10-01597 GW (MANx)
NCUA'S OPPOSITION TO DIRECTORS'
MOTION TO DISMISS SAC

1  made without the normal investigation of whether the borrower could afford the
2  loan; they were essentially bets that residential real estate markets would continue to
3  rise, allowing the borrowers to refinance before their loans reset and they were
4  required to make substantially higher monthly payments.  SAC ¶ 79.

5      From 2005 through 2007, Option ARM MBS were WesCorp's predominant
6  MBS investment, and WesCorp continued purchasing large quantities of Option
7  ARM MBS through July 2007, when the market for private label MBS froze and
8  WesCorp stopped purchasing them altogether.  SAC ¶¶ 121, 146.  In 2007, more
9  than 70% of WesCorp's investments, over $4.627 billion, were Option ARM MBS.
10  SAC ¶ 122.  By the end of 2007, WesCorp had nearly $9 billion invested in Option
11  ARM MBS, comprising over 37% of WesCorp's investment portfolio. *Id.*

12      To increase yields further, WesCorp also increased the risk in its portfolio by
13  purchasing MBS from lower tranches, which would absorb any losses in the
14  mortgage pools before the higher tranches.  SAC ¶ 81.  The percentage of "senior"
15  or higher tranche private label MBS purchased dropped from more than 95% to less
16  than 50% between 2002 and 2007.  SAC ¶ 83.  Most of the Option ARM MBS
17  purchased by WesCorp were from the lowest AAA rated tranches – those most
18  likely to suffer losses if the loan borrowers defaulted.  SAC ¶ 84.

19      WesCorp was required to recognize investment losses of $6.872 billion as of
20  December 31, 2008.  SAC ¶ 149.  More than $4.683 billion of the losses were on
21  Option ARM MBS WesCorp purchased in 2006 and 2007.  *Id.*  Had WesCorp
22  imposed the same concentration limit on its Option ARM MBS as it did on another
23  form of risky private label MBS, its losses would have been limited to less than
24  $200 million.  SAC ¶¶ 126, 151.  WesCorp's disproportionately heavy investments
25  in Option ARM MBS caused its losses to be more than 10 times greater and
26  proportionally much more severe than those of the other retail corporate credit
27  unions with significant investments in private label MBS.  SAC ¶¶ 40, 152.  These
28  losses, and the smaller losses of the wholesale corporate credit union, threatened the

5

national credit union system, required emergency legislation, and resulted in increased insurance assessments costing, in total, billions of dollars. SAC ¶ 153.

### C. The Directors' Responsibility for WesCorp's Failure

**WesCorp's Budgets.** Each year, WesCorp's management proposed and WesCorp's board adopted a budget for WesCorp which mandated, among other things, the amount of investment income and net interest income WesCorp was to earn. SAC ¶¶ 85, 90. Since the amount of WesCorp's investment income depended on the relative risk of the securities it was purchasing, the board effectively dictated the level of risk in WesCorp's portfolio by setting investment income levels. Robert Burrell, WesCorp's Chief Investment Officer, and the Investment Department were responsible for ensuring that the budgeted figures were met. SAC ¶¶ 89, 91. Between 2005 and 2007, the investment income mandated in WesCorp's budgets increased by 67% and the net interest income by 17%. SAC ¶ 90. Siravo, Lane and Burrell actively advocated for WesCorp's budgets in part because higher net interest income would tend to increase their own compensation. SAC ¶ 104.

The proposed budgets were first considered by WesCorp's budget committee, which included board members Rhamy, Updike, Dames, Osberg, Longson and Harvey. SAC ¶¶ 85, 87. The budget committee and the board had a duty to inform themselves about the budget projections before recommending them and, in particular, about the basis for and potential risks to WesCorp of budgeting increases in investment income and net interest income and how WesCorp's management anticipated that WesCorp would achieve the increases. SAC ¶ 87.

Neither the budget committee nor the board informed themselves sufficiently to prudently consider and adopt the investment income and net interest income levels specified in the budgets. SAC ¶¶ 88-89. While the budget committee received detailed information about projected expenses and fee income, allowing it to evaluate the recommended budget figures in those categories, it received very

6

201109866.8

little information with which to evaluate the recommended investment income figures. SAC ¶¶ 88, 95. In particular, it did not receive any information about the changes in WesCorp's investment portfolio necessary to achieve the recommended investment income, and the budget committee therefore could not and did not evaluate the level of investment risk recommended in the budgets. *Id.* That evaluation was also not delegated to WesCorp's Asset and Liability Committee ("ALCO"), or performed by the board. SAC ¶¶ 89, 102.

A number of budget committee members and board members were on notice that WesCorp's budgets might be materially increasing the risk in WesCorp's investment portfolio. SAC ¶¶ 96-97, 99, 101. From as early as March 2005, they were aware that investment credit spreads were tightening and the yields on investments were declining. SAC ¶¶ 96-97, 99. The tightening spreads required WesCorp to increase the relative level of risk of its securities in order to earn the same amount of investment income. SAC ¶ 92. Nonetheless, the budget committee continued to recommend, and the Board continued to adopt, budgets proposed by the officers that (1) increased WesCorp's investment income and net interest income, (2) required larger investment credit spreads (except for 2007) and (3) required greater borrowing. SAC ¶¶ 90, 93-94.

The SAC alleges that: (1) it was clearly unreasonable under the circumstances for the budget committee to recommend and for the board to adopt budgets that had the effect of mandating increased risk in WesCorp's investment portfolio without any evaluation of that risk; and (2) the information the budget committee and board received required them to make reasonable inquiry about whether, and to what extent, their approval of WesCorp's 2006 and 2007 budgets would materially increase the risk in WesCorp's investment portfolio. SAC ¶¶ 101-02, 202-03.

**Failure to Control MBS Concentration Risk.** The risk of loss from investments, however "safe" they appear, is usually unforeseen and frequently unforeseeable. SAC ¶ 106. Investment concentration limits force diversification

201109866.8

1  and thereby limit the harm to an investor if a particular type of investment suffers

2  significant losses.  *Id.*  Concentration limits are particularly important for corporate

3  credit unions such as WesCorp, whose purpose is not to make a profit but to safely

4  invest its members' excess funds until they need them.  SAC ¶ 107.

5      NCUA regulations required the Directors to set reasonable and supportable

6  concentration limits for private label MBS and to implement a credit risk

7  management policy commensurate with the investment risks and activities WesCorp

8  was undertaking.  SAC ¶ 105.  WesCorp's investment policies required the board to

9  establish concentration limits to ensure that the funds of WesCorp's members were

10  invested in a safe and secure manner.  SAC ¶ 108.  They also required the ALCO

11  and the board to review the investment policies annually.  SAC ¶¶ 108-09.

12      WesCorp's investment policies required the ALCO to provide overall

13  management direction for WesCorp's investment strategy, to review and

14  recommend proposed changes to WesCorp's asset and liability policies and

15  strategies, to review and recommend existing and proposed concentration limits, and

16  to review and recommend investment security purchases and sales.  SAC ¶ 25.

17  Defendants Jordan, Nakamura, Cheney, Rhamy, Kramer, Lentz, and Osberg were all

18  members of the ALCO during the relevant time period.  SAC ¶ 26.

19      WesCorp's board and the ALCO violated NCUA regulations and WesCorp's

20  investment policies from 2004 on by failing to consider or impose meaningful

21  concentration limits on AAA rated private label MBS, even though WesCorp was

22  investing increasingly in those securities from 2005 through 2007.  SAC ¶ 114.  The

23  limits imposed by the board on those securities were meaningless – allowing

24  WesCorp to invest its entire portfolio in that one form of security.  SAC ¶¶ 111-13.

25  The board compounded this failure by failing to consider, recommend or impose

26  requirements that WesCorp track the principal risk factors in WesCorp's huge

27  concentration of AAA rated private label MBS – particularly the concentration of

28  Option ARM MBS and lower tranche MBS in WesCorp's investment portfolio.

1  SAC ¶¶ 128-29. Without such tracking and reporting, WesCorp, the ALCO and the

2  Directors were unable to monitor or control these risks. SAC ¶¶ 114, 128-30. The

3  board and the ALCO failed to monitor or control these risks despite being aware that

4  they were likely increasing as of 2005. SAC ¶¶ 96, 97, 101.

5  The SAC alleges that in light of the requirements imposed by NCUA

6  regulations and WesCorp's investment policies, the failures of the ALCO and the

7  board to consider or impose a meaningful concentration limit on AAA rated private

8  label MBS were clearly unreasonable under the facts known to the directors at the

9  time. SAC ¶¶ 113-14, 210. It also alleges that the failures of the Directors and the

10  ALCO to consider or require tracking and reporting of the principal risk factors in

11  WesCorp's portfolio of AAA rated private label MBS – the concentrations of

12  Option ARM and lower tranche MBS – were clearly unreasonable based on what

13  the Directors and the ALCO knew at the time. SAC ¶¶ 114, 130-31, 210, 218.

14  **Failure to Control Risks of Option ARM MBS.** For new security types,

15  including securities backed by a type of collateral not previously approved by

16  WesCorp, WesCorp's investment policies: (1) required WesCorp to review the

17  credit implications of the security type; (2) required the ALCO to recommend and

18  the board to approve that security type; and (3) prohibited the purchase of the

19  security type prior to approval. SAC ¶ 115. NCUA regulations and WesCorp's

20  investment policies also required that WesCorp conduct a credit analysis on

21  securities for investment prior to purchase, regardless of rating, except for securities

22  guaranteed by the United States or its agencies. SAC ¶ 73.

23  WesCorp began purchasing Option ARM MBS in significant amounts in

24  2005 without any review of the credit implications and without the approval of the

25  ALCO or the board. SAC ¶¶ 116, 118. After the ALCO and the Board learned of

26  these purchases, neither required WesCorp to comply with its investment policies

27  with respect to Option ARM MBS. SAC ¶ 119. WesCorp's policies required the

28  ALCO to recommend concentration limits by investment type, including

9

1  investments backed by new types of collateral.  SAC ¶ 125.  Nonetheless, the ALCO

2  members did not propose, and the Directors never considered or adopted, any

3  concentration limits for Option ARM MBS.  *Id.*

4     By summer 2005, the Directors, including the ALCO members, were aware

5  of the reasons that Option ARM MBS were materially more risky than other private

6  label MBS, particularly that: (1) the "reset shock" of Option ARM loans increases

7  their credit risk; (2) reduced documentation loans significantly increase the credit

8  risk; (3) the quality of the Option ARM loans was deteriorating; (4) a drop in

9  housing demand could result in credit losses on the loans and therefore the

10  securities; (5) the "housing bubble" might be dangerously close to bursting; and (6)

11  if it did, California would be one of the states whose housing market would suffer

12  the most damage.  SAC ¶¶ 120, 134.  By early 2006, the ALCO and the board had

13  also been informed that the rise in real estate prices was slowing, and by mid 2006,

14  that residential real estate prices were flat and declining.  SAC ¶ 138.

15     The SAC alleges that the failure of the ALCO members and the board to

16  comply with and enforce WesCorp's investment policies by approving Option ARM

17  MBS as a new security type and imposing a concentration limit and their failure to

18  consider or require tracking of the concentrations of Option ARM MBS and lower

19  tranche MBS were clearly unreasonable under the circumstances known to the

20  Directors at the time.  SAC ¶¶ 119, 145-46, 210, 218.

21     **The Failure to Raise Capital Ratios.**  NCUA regulations required the

22  Directors to ensure that WesCorp maintained sufficient capital to support the risk

23  exposures arising from current and projected activities; WesCorp's corporate

24  policies required the board to establish capital goals sufficient to support the credit

25  and other risks WesCorp was being exposed to.  SAC ¶¶ 68, 147.  Although (1) the

26  budgets adopted by the board mandated increased investment risk in WesCorp's

27  portfolio, (2) WesCorp's increasingly heavy investments in Option ARM MBS and

28  lower tranche MBS materially increased the risk in WesCorp's portfolio, and (3) the

1  Directors were aware that the slowing and subsequent decline in the housing market

2  were making both WesCorp's investment portfolio and its investment strategy

3  increasingly risky, the Directors never considered increasing WesCorp's capital

4  goals or its capital base to compensate for the increased risk. SAC ¶¶ 68, 105, 147,

5  202, 218. To the contrary, between 2002 and 2007, WesCorp's capital ratios – the

6  ratios of capital to assets – declined. *Id.* The SAC alleges that the failure of the

7  Directors to consider and to increase WesCorp's capital in light of the increased risk

8  in its investment portfolio was clearly unreasonable under the circumstances known

9  to the Directors at the time. SAC ¶¶ 68, 105, 147, 202, 210, 218.

10  **The Warnings Ignored.** Beginning by March 2005 and continuing through

11  2006, the Directors were informed that: (1) investment credit spreads were

12  tightening significantly, SAC ¶¶ 96-97, 99, 136; (2) "good" investments were

13  becoming increasingly hard to find, SAC ¶ 136; (3) interest rates were beginning to

14  rise, SAC ¶ 137; and (4) the "housing bubble" might be dangerously close to

15  bursting, SAC ¶ 134. By summer 2005, the Directors were also aware of the factors

16  that made investments in Option ARM MBS particularly risky. SAC ¶¶ 120, 134-

17  43. The SAC alleges that this information was a warning that WesCorp's

18  investment strategy was becoming increasingly risky and that the failure of the

19  Directors and the ALCO to further investigate, consider or reevaluate that strategy

20  after receiving this information was clearly unreasonable under the circumstances

21  known to the Directors at the time. SAC ¶¶ 145-46, 203, 210, 218.

22  ## LEGAL STANDARD

23  Dismissal under Fed. R. Civ. P. 12(b)(6) for failure to state a claim is

24  warranted only where the complaint does not allege a claim supported by a

25  cognizable legal theory or if the complaint does not allege sufficient facts in support

26  of a cognizable legal theory. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696,

27  699 (9th Cir. 1988). When considering a motion to dismiss under Rule 12(b)(6), the

28  Court must accept as true all of the factual allegations set out in plaintiff's complaint

201109866.8

1   and draw inferences from those allegations in the light most favorable to plaintiff.

2   *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988, *amended on other*

3   *grounds*, 275 F.3d 1187 (9th Cir. 2001). If a complaint "pleads factual content that

4   allows the court to draw the reasonable inference that the defendant is liable for the

5   misconduct alleged," the complaint survives a motion to dismiss. *Ashcroft v. Iqbal*,

6   __ U.S. __, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

## LEGAL ARGUMENT

**I.    THE SAC ALLEGES FACTS THAT PLAUSIBLY OVERCOME THE CALIFORNIA BUSINESS JUDGMENT RULE.**

### A.    Section 7231 Defines the Personal Liability of Directors.

In *Lamden v. La Jolla Shores Clubdominium Homeowners Ass'n*, 21 Cal. 4th

249, 257 (1999), the California Supreme Court recognized that the liability of

corporate directors for the breach of their duties as directors is defined by Cal. Corp.

Code §§ 7231 (non-profit corporations) and 309 (for-profit corporations), and not by

the common law business judgment rule discussed in *Lee v. Interinsurance*

*Exchange,* 50 Cal. App. 4th 694 (1996). As the court stated in *Lamden*:

> The common law business judgment rule has two components—one which immunizes [corporate] [directors] from personal liability if they act in accordance with its requirements, and another which insulates from court intervention those management decisions which are made by directors in good faith in what the directors believe is the organization's best interest." (*Lee v. Inter Insurance Exchange*, 50 Cal. 4th 694, 714 (1996). . . . *[I]n California the component of the rule relating to directors' personal liability is defined by statute*. (*see* Corp. Code §§ 309 [profit corporations], 7231 [non-profit corporations]). [Emphasis added.]

*Lee* itself recognizes this distinction. *See Lee*, 50 Cal. App. 4th at 714 (business

judgment rule has two components: Section 309, which immunizes directors from

personal liability, and a common law component which precludes court intervention

into those management decisions made by directors in good faith in what the

directors believe is in the organization's best interest).

The Directors have argued on policy grounds that the Court should apply the

second component of the business judgment rule to protect directors from personal

liability because "judicial second-guessing" is as harmful in determining personal

12

201109866.8

1    liability as it is in considering ongoing corporate action.  This argument ignores the

2    rulings in *Lamden* and *Lee* that directors are immunized from liability only if they

3    act in accordance with the applicable statute.  Thus, in *FDIC v. Castetter*, 184 F.3d

4    1040, 1044-46 (9th Cir. 1999), the court looked to Section 309 for the applicable

5    standard, not referring to the common law business judgment rule.  *See id.*

6          Section 7231 defines the standard of care a director owes to his non-profit

7    mutual benefit corporation.  Subdivision (a) imposes a duty to act "with such care,

8    including reasonable inquiry, as an ordinarily prudent person in a like position

9    would use under similar circumstances."  Cal. Corp. Code § 7231(a).  Subdivision

10   (b) entitles a director to rely on certain information furnished by others specified in

11   the statute, provided reliance is warranted.  Cal. Corp. Code § 7231(b).  Finally,

12   subdivision (c) insulates from liability any person "who performs the duties of a

13   director in accordance with subdivisions (a) and (b)."  Cal. Corp. Code § 7231(c).

14         The business judgment rule, as codified in Section 7231, "incorporates the

15   concept of a director's immunity from liability for an honest mistake of business

16   judgment with the concept of a director's obligation of reasonable diligence in the

17   performance of his or her duties."  *Gaillard v. Natomas*, 208 Cal. App. 3d 1250,

18   1264 (1989).  It protects disinterested directors against liability for carefully made

19   decisions that turn out badly.  It does not eliminate liability for breach of the duty of

20   care or failures to exercise judgment.  As the Court recognized, the business

21   judgment rule does not protect directors who had acted "clearly unreasonably under

22   the circumstances known to them at the time."  Docket 115 at 2 (citing *Frances T. v.*

23   *Village Green Owners Ass'n,* 42 Cal. 3d 490, 509 (1986)).[2]

24

25

26   _____

27   [2]    The Directors steadfastly ignore this portion of the Court's January 31, 2011 Order, instead relying exclusively on statements made in the Court's December 20, 2010 tentative ruling.  *See, e.g.,* Docket 122-1 at 5:6-10, 5:15-6:28, 7:2-5, 7:11-16,

28   10 at fn. 2, 11:7-12, 14:26-15:1, 15:12-20, 19:3-7, 22:7-9, 24:2-4, 24:24-28.

201109866.8

1

**B.      The Business Judgment Rule Requires Only Notice Pleading.**

2       The Directors suggest, without authority, that the business judgment rule

3 requires the NCUA to meet "an extremely high" pleading standard for its claims for

4 damages against the Directors.  Docket 122-1 at 5:20-7:9.  However, the pleading

5 standards are defined by Fed. R. Civ. P. 8(a)(2), requiring a short and plain

6 statement of the claim, and *Iqbal*, 129 S. Ct. at 1949, and *Bell Atlantic Corp. v.*

7 *Twombly*, 550 U.S. 544, 555-56 (2007), requiring further that sufficient factual

8 matter be pled to state a claim for relief that is plausible on its face.[3]

9       "'Plausibility,' as it is used in *Twombly* and *Iqbal,* does not refer to the

10 likelihood that a pleader will succeed in proving the allegations."  *O'Campo v.*

11 *Chico Mall, LP*, 2010 WL 3220141, at *3 (E.D. Cal. Aug. 13, 2010).  Rather, "it

12 refers to whether the nonconclusory factual allegations, when assumed to be true,

13 'allow[] the court to draw the reasonable inference that the defendant is liable for the

14 misconduct alleged.'"  *Id.* (quoting *Iqbal,* 129 S. Ct. at 1949).  "The plausibility

15 standard is not akin to a 'probability requirement,' but it asks for more than a sheer

16 possibility that a defendant has acted unlawfully."  *Iqbal*, 129 S. Ct. at 1949

17 (quoting *Twombly,* 550 U.S. at 557).  Assessing plausibility, federal courts have

18 routinely denied Rule 12(b)(6) motions seeking to adjudicate the business judgment

19 rule.[4]

20 _____

21 [3]      The Directors rely almost entirely on California state court cases that do not apply either Rule 8(a)(2) or the plausibility analysis required by *Iqbal* and *Twombly*.

22 [4]      *See, e.g.*, *Kautz v. Sugarman*, 2011 WL 1330676, at *7 (S.D.N.Y. Mar. 31,

23 2011) (court cannot decide the reasonableness of investigation or the application of the business judgment rule at this stage of the litigation); *In re 1st Rochdale Co-op*

24 *Group, Ltd.*, 2008 WL 170410, at *2 (S.D.N.Y. Jan. 17, 2008) (allegations that "the officers and directors of Rochdale ignored or failed to consider material information,

25 failed to exercise due care and reasonable diligence, failed to conduct a reasonable investigation, and made decisions that were not reasonably informed" were

26 sufficient "to render plausible [Trustee's] argument that the Movants are not entitled to the protection of the business judgment rule with respect to their decisions that

27 resulted in millions of dollars of alleged losses," even though there were no allegations of fraud, bad faith or self-dealing); *see also Official Committee of*

28 *Administrative Claimants v. Bricker*, 2010 WL 3781662, at *14 (N.D. Ohio Sept. 22, 2010); *Seidel v. Byron*, 405 B.R. 277, 290 (N.D. Ill. 2009).

201109866.8

Case No. CV10-01597 GW (MANx)
NCUA'S OPPOSITION TO DIRECTORS'
MOTION TO DISMISS SAC

### C.   The Factual Allegations of the SAC Permit a Reasonable Inference of Liability.

The facts alleged in the SAC plead plausible claims for breach of fiduciary duty by the Directors.  Among other things they permit a reasonable inference that the Directors did not meet the standard of care prescribed in Section 7231 and that they acted clearly unreasonably under the circumstances known to them at the time.

The SAC alleges that: (1) WesCorp was a non-profit custodian of the excess funds of its members – its role was fiduciary more than entrepreneurial; (2) it abandoned its traditional, conservative business model and began to seek substantial increases in investment portfolio income and net interest income by increasing the risk in WesCorp's investments; (3) those increases permitted WesCorp's executives to increase their compensation substantially; and (4) the Directors failed to take basic steps to control that risk, notwithstanding the requirements of various NCUA regulations and WesCorp policies.

The SAC highlights five specific situations in which the Directors were required to consider the increasing risk being created for WesCorp by its increasingly risky investments: (1) when approving WesCorp's annual budgets, the Directors did not consider the increased risk entailed in the investment income and net interest income levels they were mandating; (2) the Directors failed to consider and set a meaningful concentration limit for AAA rated private label MBS, investments comprising most of WesCorp's investment portfolio; (3) although required to approve new security types, including those backed by a new form of collateral, the Directors permitted WesCorp to purchase Option ARM MBS, a particularly risky form of security, without consideration or approval by the ALCO or the Directors and without setting concentration limits or even requiring WesCorp to monitor concentrations; (4) although required to do so, the Directors failed to consider increasing WesCorp's capital in light of the increased risk in its investment portfolio and instead let WesCorp's capital levels decline; and (5) although they had

1   been informed both that deterioration of the housing market would significantly

2   increase the risk of losses in Option ARM MBS and that the housing market was

3   deteriorating, the Directors failed to investigate or consider WesCorp's strategy of

4   investing heavily in lower tranche Option ARM MBS.

5          Nothing in the SAC establishes conclusively that these failures by the

6   Directors to inform themselves, to deliberate and to set meaningful concentration

7   limits were merely poor outcomes from otherwise prudently made business

8   judgments.  Nothing establishes that they were the result of a diligent decision-

9   making process or that the Directors had made reasonable inquiry.

10         While they sometimes quibble with the specificity of the SAC's factual

11   allegations, the Directors do not seriously claim that they are not well-pleaded.  The

12   allegations must therefore be accepted as true for the purposes of determine whether

13   the NCUA has stated plausible claims.  *See Iqbal*, 129 S. Ct. at 1949.  The

14   allegations permit the reasonable inference that, in the enumerated failures to act,

15   each of the Directors breached his or her fiduciary duties to WesCorp by failing to

16   act as a reasonably prudent person would under like circumstances and by acting

17   clearly unreasonably under the circumstances known to them at the time.

18
19            **D.     The Motion to Dismiss Should be Denied Because of the Inherently Factual Nature of the Inquiry.**

20         When ruling on a motion to dismiss, all ambiguities or doubts concerning

21   sufficiency of the claim must be resolved in favor of the pleader.  *See Hishon v.*

22   *King & Spalding*, 467 U.S. 69, 73 (1984).  Under California law, determining what

23   constitutes due care and whether a breach of a duty of due care has occurred, is a

24   question of fact for the jury, which must view the conduct as a whole in the light of

25   all the circumstances.  *See Brummett v. County of Sacramento,* 21 Cal. 3d 880, 887

26   (1978); *Barber v. Chang*, 151 Cal. App. 4th 1456, 1463 (2007).

27         Virtually no case law discusses the specific duties imposed by Section 7231

28   outside of the homeowners association context.  This is not a case, such as most of

16

1   those relied on by the Directors, in which the duties of the Directors in the

2   circumstances alleged have already been adjudicated.[5]  What is "reasonable" for the

3   director of a nonprofit mutual benefit corporation under Section 7231 can differ

4   significantly from what is "reasonable" for the director of a for-profit corporation

5   under Section 309.  The essence of business judgment for directors of for-profit

6   corporations is deciding how a company will evaluate the trade-off between risk and

7   return, and their ability to earn returns for investors by taking business risks would

8   be crippled by imposing liability on directors for making a "wrong" decision.  *See In*

9   *re Citigroup Inc. Shareholder Derivative Litig.,* 964 A.2d 106, 126 (Del. Ch. 2009);

10  *Lamden*, 21 Cal. 4th at 259; *Frances T. v. Village Green Owners Ass'n*, 42 Cal. 3d

11  490, 507 at n.14 (1986).

12       By contrast, WesCorp's members were not investors voluntarily buying

13  shares in WesCorp in hopes that they could profit from its business risks.  They

14  were generally small credit unions looking for banking services, a borrowing source

15  and a safe place to keep their excess funds.  What is reasonable for the director of a

16  for-profit company may be completely unreasonable for the director of a non-profit

17  charged with safeguarding the assets of its members.  *See* W. Fletcher, *Fletcher*

18  *Cyclopedia of the Law of Corporations*, § 1042.10 (2011) ("[a] court may require

19  greater diligence from bank directors than they do from business corporation

20  directors in protecting the assets in their charge").

21       No case law applies the business judgment rule in the context of a non-profit

22  corporation entrusted with the funds of its members.  Under the SAC's allegations,

23  application of the business judgment rule presents a question of fact, requiring

24  denial of this motion.  *See FSLIC v. Musacchio*, 695 F. Supp. 1053, 1064 (N.D. Cal.

25

26  _____

27  [5]     *See, e.g.*, *McMichael v. U.S. Filter Corp.*, 2001 WL 418981 (C.D. Cal. Apr. 17,
    2001); *Bader v. Anderson*, 179 Cal. App. 4th 775, 787-88 (2009); *Desaigondar v.*
    *Meyercord*, 108 Cal. App. 4th 173, 183 (2003); *Katz v. Chevron Corp.*, 22 Cal. App.

28  4th 1352, 1366-67 (1994).

Case No. CV10-01597 GW (MANx)
NCUA'S OPPOSITION TO DIRECTORS'
MOTION TO DISMISS SAC

201109866.8

1  1988) ("a ruling on the applicability of the business judgment rule is peculiarly a

2  question of fact, wholly inappropriate for consideration on a motion to dismiss").[6]

3  ## II.   THE DIRECTORS' ARGUMENTS DO NOT DEFEAT THE ALLEGATIONS OF THE SAC.

4

5  ### A.   The Directors May Not Rely on the ALCO Materials and the Matz Presentation for this Motion to Dismiss.

6          Generally, a district court may not consider any material beyond the pleadings

7  in ruling on a motion to dismiss for failure to state a claim.  *See Lee v. City of Los*

8  *Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).  Here, the Directors rely heavily on

9  extrinsic evidence – packages of ALCO materials and a presentation by the Chair of

10  the NCUA, Debbie Matz.  They ask the Court to consider these extraneous materials

11  under two exceptions to the general rule, neither of which applies.

12          The Directors argue that portions of the ALCO materials disprove the SAC's

13  allegations by demonstrating that the Directors were acting within the standard of

14  care, and "show that the *process* by which the Directors made decisions was more

15  than adequate."  Docket 122-1 at 10:1-21, 18:23-24.[7]  They argue that the Matz

16  presentation is an admission by the NCUA that investment in private label MBS was

17  considered "safe."  *Id.* at 7:28 – 9:20.

18          First, the Directors seek judicial notice of the extraneous materials.  As is set

19  forth in more detail in the NCUA's Objections to Requests for Judicial Notice filed

20  herewith, this request is improper.  Courts may only take judicial notice of facts that

21  ---

[6]    *See also Batlan v. WT Consulting, Inc.*, 2009 WL 936664, at *3 (Bkrtcy. D. Or. Jan. 26, 2009) (same); *Court Appointed Receiver of Lancer Offshore, Inc. v. Citco Group Ltd.*, 2008 WL 926509, at *5 (S.D. Fla. Mar. 31, 2008) (it is "unwise to evaluate conduct and determine whether or not it is protected by the business judgment rule at the motion to dismiss stage"); *Resolution Trust Corp. v. Fiala*, 870 F. Supp. 962, 971 (E.D. Mo. 1994) (business judgment rule is a fact-bound affirmative defense not providing a basis for dismissal under Rule 12(b)(6)); *Gilbert v. Bagley*, 492 F. Supp. 714, 738 (M.D.N.C. 1980) ("[a]pplication of the business judgment rule defense necessarily depends upon the facts as developed at trial and is thus an inappropriate ground for dismissal at this stage").

[7]    The Directors mischaracterize the documents in various ways.  For example the "detailed discussion of risk assessment and risk exposure," Docket 122-1 at 10:9-10, is limited to interest rate risk and bears no relationship to the credit risk at issue here.

18

1    are not subject to reasonable dispute.  *See* Fed. R. Evid. 201.  While courts may

2    sometimes take judicial notice of the existence of documents, they may not take

3    judicial notice of their contents, if those contents are subject to reasonable dispute.

4    *See Edie v. Baca*, 2009 WL 3417844, at *3 (C.D. Cal. Oct. 19, 2009); *Del Puerto*

5    *Water Dist. v. U.S. Bureau of Reclamation,* 271 F. Supp. 2d 1224, 1234 (E.D. Cal.

6    2003).  Furthermore, "documents are judicially noticeable only for the purpose of

7    determining what statements are contained therein, not to prove the truth of the

8    contents or ***any party's assertion of what the contents mean***."  *U.S. v. Southern*

9    *California Edison Co*., 300 F. Supp. 2d 964, 975 (E.D. Cal. 2004) (emphasis added).

10          Here, the Directors are asking the Court to review the contents of the ALCO

11   materials and the Matz presentation and to take judicial notice that: (1) the Directors

12   received the ALCO materials and read, analyzed and acted diligently on them; and

13   (2) their characterization of the snippets of the Matz presentation they have selected

14   is correct.  Judicial notice is not proper for either.

15          Second, the Directors argue that all of the ALCO materials can be considered

16   on this motion because the SAC quoted or referred to small portions of some

17   documents in the materials.  As the authority cited by the Directors states, a court on

18   a motion to dismiss may consider a document on which the complaint "necessarily

19   relies" if: (1) the complaint refers to the document; (2) the document is central to the

20   plaintiff's claim; and (3) no party questions the document's authenticity.  *See*

21   *Branch v. Tunnell,* 14 F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds*,

22   *Galbraith v. County of Santa Clara,* 307 F.3d 1119 (9th Cir. 2002).  The purpose of

23   this rule is to prevent the plaintiff from surviving a motion to dismiss by deliberately

24   omitting documents on which its claims are based.  *See Swartz v. KPMG LLP*, 476

25   F.3d 756, 763 (9th Cir. 2007) (citing *Parrino v. FHP, Inc.,* 146 F.3d 699, 706 (9th

26   Cir. 1998)).   The rule does not permit consideration of the entire body of ALCO

27   materials on this motion.

28

201109866.8

1   The SAC uses portions of documents from the ALCO materials for the

2   limited purpose of supporting its allegations that the Directors were on notice of

3   certain facts.[8] Nothing that the Directors ask the Court to consider disproves or is

4   even relevant to the notice allegations, and the quotes and references are in no way

5   "central" to the NCUA's claims. *See Coto Settlement v. Eisenberg*, 593 F.3d 1031,

6   1038 (9th Cir. 2010) ("the mere mention of the existence of a document is

7   insufficient to incorporate the contents of a document").

8   Here, the Directors are asking the Court to consider the contents not of the

9   documents used but of other documents in the ALCO materials. *See Docket 122-1*

10  at 10:6-21, 16:11-16, 18:23-27, 19:16 – 20:14, 21:8-9, 21:22 – 22:6, 22:12-14. The

11  ALCO materials were neither incorporated by reference nor attached to the SAC.

12  Even if they had been attached, however, documents written by others cannot be

13  attributed wholesale to the plaintiff on a motion to dismiss where the plaintiff has

14  not adopted the entirety of the documents. *See Rivera v. Hamlet*, 2003 WL

15  22846114 at *5 (N.D. Cal. Nov. 25, 2003).[9] Nor can the Court draw disputed

16  inferences from the contents of such documents.

17  **B.   The Allegations are Not Based on Hindsight or Content.**

18  The Directors repeatedly mischaracterize the SAC's allegations as being

19  based on "hindsight" and as questioning the "content" of the Directors' decisions.

20  _____

21  [8]   The SAC quotes or cites the "Investment & ALM Strategies" document from one package of ALCO materials and the "Economic and Market Conditions"

22  document from five others. SAC ¶¶ 97, 139, 141-42.

    [9]   *See also Harrison v. Institutional Gang of Investigations*, 2009 WL 1277749, at

23  *2-3 (N.D. Cal. May 6, 2009) (holding that defendants' reliance on the content of administrative appeals attached as exhibits to the complaint to show that the

24  complaint fails to state a claim upon which relief can be granted and that they are entitled to qualified immunity "reflects a basic misunderstanding of the rules at the

25  pleading stage as it attempts to put their words into plaintiff's mouth"); *Rojas v. Loza*, 2008 WL 5056525, at *8 (N.D. Cal. Nov. 24, 2008) (rejecting defendants'

26  argument that exhibits attached to complaint showed that they did not use excessive force and noting that plaintiffs did not adopt as true full contents of documents

27  attached to complaint); *Franklin v. Dudley*, 2009 WL 3073930, at *3 (E.D. Cal. Sept. 22, 2009); *Wilson v. Grannis*, 2008 WL 4415268, at *2 (N.D. Cal. Sept. 26,

28  2008) (citing *Guzell v. Hiller*, 223 F.3d 518, 519 (7th Cir. 2000)).

201109866.8

1  Neither is the case.  The "hindsight" accusation is essentially a contention that the

2  alleged duty of care stems only from the fact of damage.  In this case, many of the

3  Directors' alleged acts and omissions were contrary to NCUA regulations and

4  WesCorp policies, and all are explicitly alleged to be clearly unreasonable based on

5  the circumstances the Directors were aware of at the time. The fact that ensuing

6  events have made the harm caused by the Directors painfully clear does not mean

7  that the NCUA's allegations are based on hindsight.

8         Likewise, despite the Directors' contention that the NCUA is focused on the

9  "content" of their decisions, *see*, *e.g.*, Docket 122-1 at 18:23 – 19:1, the SAC does

10  not challenge the results of the Directors' deliberations, but rather their failure to

11  deliberate and act at all on the issues alleged.

12         The Directors in essence argue that their failure to act when on notice is itself

13  a "decision" challenged by the NCUA.  However, the failure to deliberate is not

14  protected by the business judgment rule.  *See Gaillard*, 208 Cal. App. 3d at 1263-64

15  ("the [business judgment] rule does not immunize a director from liability in the

16  case of his or her abdication of corporate responsibilities: '. . . when courts say that

17  they will not interfere in matters of business judgment, it is presupposed that

18  judgment – reasonable diligence – has in fact been exercised'").

19         In any event, the ALCO materials do not show the Directors considered any

20  information, let alone made affirmative determinations that the risk levels mandated

21  by the budget were appropriate, the concentration limit for private label MBS was

22  meaningful, Option ARM MBS were appropriate as a new security type, tracking

23  and reporting of Option ARM MBS and lower tranche MBS was unnecessary or

24  reversing the decline in WesCorp's capital ratios was unwarranted.[10]

25

26

27  ───────────────
   [10]   Contrary to the Directors' contention, the materials do not show that they

28  reviewed any investment individually, and there is no allegation that they considered
   the materials at all.

                                  21                    Case No. CV10-01597 GW (MANx)
NCUA'S OPPOSITION TO DIRECTORS'
                                                       MOTION TO DISMISS SAC

1

### C. The Directors' Arguments do Not Establish that the NCUA's Claims are Implausible.

2

3      The Directors argue that the NCUA's "admissions" about what the Directors

4 "did right" with investments defeat its claims against them. Docket 122-1 at 4:26 –

5 5:13. They argue in essence that what the Directors did right nullifies the SAC's

6 other allegations, so that recovery by the NCUA would be implausible, even if all of

7 the SAC's factual allegations were proven. The "admissions" the Directors rely on

8 are the extraneous materials – the Matz presentation and the ALCO materials – and

9 certain allegations in the SAC.[11] The Directors argue that the claims against them

10 must be dismissed because these admissions "are not meaningfully different from

11 those the Ninth Circuit considered in *Castetter* and concluded called for application

12 of the business judgment rule." Docket 122-1 at 11:8-12. Whether or not the

13 "admissions" are similar to the conduct considered in *Castetter*, the SAC also

14 includes allegations of conduct not considered in *Castetter*. *Castetter*, therefore,

15 does not suggest that the SAC's allegations are insufficient.[12]

16      **WesCorp's Purchase of AAA and AA MBS**. The Directors assert the

17 SAC's allegations relating to investments cannot be plausible because the SAC also

18 alleges that WesCorp only purchased AAA or AA rated MBS that were

19 underwritten by leading banks and it decreased its holdings of AA rated MBS after

20

21

22 [11]    The allegations are that WesCorp purchased only AAA or AA rated securities underwritten by leading banks; the budget committee received detailed information about aspects of the budget other than investment income; and WesCorp tracked its

23 private label MBS securities investments by rating and FICO score. *See* Docket 122-1 at 7:11-28, 10:22-23, 10:24-11:6.

24

25 [12]    In *Castetter*, unlike the current case, the directors had little background in banking. The evidence did not establish that the directors violated regulations or

26 bank policies, but that the directors understood that their bank was having problems and sought and followed expert advice in attempting to remedy them. *See Castetter*,

27 184 F.3d at 1045**.** The Ninth Circuit did not hold that the alleged acts and omissions met the standard of care required by Section 309(a), but that the evidence ***after trial***

28 established that the defendants were entitled to the reliance safe harbor established by Section 309(b). *See id.*

Case No. CV10-01597 GW (MANx)
NCUA'S OPPOSITION TO DIRECTORS'
MOTION TO DISMISS SAC

201109866.8

1   2005 and the Matz presentation states that private label MBS were safe.[13] *See*

2   Docket 122-1 at 7:10 – 9:26. These allegations do not nullify the SAC's other

3   allegations relating to investments – the failure to set a meaningful concentration

4   limit, to consider and approve the purchase of Option ARM MBS as a new security

5   type, to set concentration limits or even to require tracking for Option ARM MBS or

6   lower tranche MBS, or to consider the wisdom of WesCorp continuing to invest

7   heavily in Option ARM MBS in light of the information that they were becoming

8   increasingly risky. Even if private label MBS were generally "safe," the Option

9   ARM MBS WesCorp invested in were not, and meaningful concentration limits

10  were required, regardless of "safety."

11        The Directors also contend that "it is clear" that the Directors "did much more

12  investigation," than simply relying on credit ratings. *Id.* at 9:25-26. However, their

13  "evidence" is: (1) an allegation made by the original plaintiffs in this case about

14  RiskSpan;[14] and (2) their characterization of some of the ALCO materials.[15] Neither

15  can properly be considered on a motion to dismiss or establishes any investigation

16  by the Directors.

17        **The Budget Committee.** The Directors argue that the allegations directed at

18  the budget committee are implausible because they do not show that the committee

19  ─────────────────

20  [13]   The statements in the Matz presentation about private label MBS referred to the category generally and not to the particularly risky lower tranche Option ARM MBS that WesCorp purchased.

21  [14]   The original plaintiffs in this action made certain allegations about RiskSpan

22  that the NCUA did not adopt, because RiskSpan performed no pre-purchase analysis of any MBS. In any event the allegations of the prior plaintiffs in a prior complaint

23  may not be used against the NCUA with respect to this complaint. *See* 1 W. Schwarzer, A. Tashima & J. Wagstaffe, *California Practice Guide: Federal Civil*

24  *Procedure Before Trial*, §§ 8:1550, 8:1553 (2011) ("[t]he amended complaint supersedes the original complaint and renders it of no legal effect," although a "prior

25  pleading may be admissible in evidence against the pleader").

    [15]   While the ALCO materials contain information about many aspects of

26  WesCorp's assets and liabilities, they contain virtually no mention of credit risk or investment class concentration limits. The ALCO materials in fact suggest that the

27  ALCO members simply ignored the credit risk inherent in the WesCorp investments that were listed for them and in the increasing concentration of Option ARM MBS

28  that WesCorp used to fuel its investment income growth.

201109866.8

1   failed unreasonably to investigate matters within its purview. *See* Docket 122-1 at

2   12:1 – 14:20. The SAC alleges that approval of income levels was squarely within

3   the purview of the budget committee and the board. If they did not have the

4   expertise to evaluate the risk they were mandating, it was their duty to delegate the

5   evaluation to another body. They did not do so. The budget committee's assertion

6   that it was "not my problem" means only that the budget committee recommended

7   and the board set the income levels recommended by the officers without any

8   consideration by any directors of the risk created by those levels.[16]

9       **Option ARM MBS.** The SAC does not allege that the Directors failed to

10  "unload WesCorp's MBS fast enough to avoid the storm." *Id*. at 2:10-12. It alleges

11  that the Directors allowed WesCorp to continue investing heavily in Option ARM

12  MBS even though they were aware of the storm. SAC ¶¶ 143, 149, 218. The

13  Directors argue that the NCUA "does not plead facts showing that the Directors

14  should have dug deeper given the facts they knew *at the time*" about Option ARM

15  MBS. Docket 122-1 at 14:27 – 15:1. Those facts are alleged in paragraph 120,

16  which explicitly sets forth the Directors' awareness of the details of the weak

17  foundation for Option ARM MBS.[17] In making this argument the Directors deftly

18  confuse conventional MBS based on conventional Adjustable Rate Mortgages

19  ("ARMs") with the Option ARM MBS at issue in this case.[18]

20  _____

21  [16]    The Directors' other arguments about the budget committee allegations are also flawed. The NCUA is not complaining that "in hindsight the particular risks that the

22  Directors decided to take" did not work out. Docket 122-1 at 12:18-21. Rather, the SAC alleges that the Directors never decided to take the particular risks. Despite the

23  Directors' argument that they had no duty of inquiry because "these were AAA rated investments that even the NCUA ranked among the most conservative and safe

24  at the time," *id*. at 13:6-8, the SAC alleges that WesCorp was materially increasing the risk in its investment portfolio. Paragraph 92 of the SAC specifically connects

25  the tightening of investment spreads with the consideration of the budget. Finally, the allegations of paragraphs 88, 92-93, 95, and 102 of the SAC respond to the

26  questions the Directors suggest to the Court. *See* Docket 122-1 at 14:9-13.

    [17]    Notwithstanding the Directors' contention to the contrary, each of the three

27  points listed by the Directors applies specifically to Option ARM MBS.

    [18]    Notwithstanding the Directors' assertions to the contrary, paragraphs 38, 121

28  and 122 allege that Option ARM MBS comprised an inappropriately large

1   **The Directors' Other Arguments.**  The Directors make a number of other

2   incorrect arguments about some of the NCUA's new allegations.  The SAC does not

3   describe "how and why the Directors made the decision" to have WesCorp purchase

4   lower tranche AAA rated securities or evaluate its capital levels, *id.* at 21:4-8,

5   because it alleges that they did neither, SAC ¶¶ 68, 129-31, 147.  WesCorp's

6   specific concentration limits by originator, issuer group and similar subsets cannot

7   substitute for concentration limits by investment type, even if characterized as

8   "more granular."  Docket 122-1 at 22:3-6.  Finally, nothing cited by the Directors

9   suggests that Option ARM MBS or lower tranche AAA-rated MBS are "top-rated

10  securities [that] appeared to be as safe as any other highly rated security."  *Id.* at

11  22:12-14.  The SAC alleges otherwise.  SAC ¶¶ 77-80, 120.

12                          **CONCLUSION**

13          For the reasons set forth above, the NCUA respectfully requests that the

14  Directors' motion to dismiss the SAC be denied.

15  DATED:  May 12, 2011          LUCE, FORWARD, HAMILTON & SCRIPPS LLP

16                                              MICHAEL H. BIERMAN
                                                MICHAEL E. PAPPAS

17

18                                  By:   /s/ Michael H. Bierman

19                                        Michael H. Bierman
                                          Attorneys For The National Credit Union
20                                        Administration Board As Liquidating Agent
                                          For Western Corporate Federal Union

21

22

23

24

25

26

27

28  proportion of WesCorp's portfolio, and no additional details are required to allege
    that Option ARM MBS were a new security type under WesCorp's policies.

201109866.8