CHAPIN FITZGERALD SULLIVAN & BOTTINI LLP
   Kenneth M. Fitzgerald, Esq. (SBN: 142505)
   kfitzgerald@cfsblaw.com
   Curtis G. Carll, Esq. (SBN: 248470)
   ccarll@cfsblaw.com
550 West "C" Street, Suite 2000
San Diego, California 92101
Tel: (619) 241-4810
Fax: (619) 955-5318

Attorneys for Defendant
Todd M. Lane

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **National Credit Union Administration Board**, *as Liquidating Agent for Western Corporate Federal Credit Union,*<br><br>            Plaintiff,<br>  vs.<br>**Robert A. Siravo**, *et al.,*<br><br>            Defendants. | Case No.: CV10-01597 GW (MANx)<br><br>**Defendant Todd M. Lane's Reply in Support of Motion to Dismiss Plaintiff's Second Amended Complaint**<br><br>Date: June 9, 2011<br>Time: 8:30 a.m.<br>Courtroom: Los Angeles, 10<br><br>The Honorable George H. Wu |

# Table of Contents

I.   Introduction..................................................................................................1

II.  Facts ............................................................................................................2

    A.   WesCorp's Losses Were Caused by Over-concentration of Investments, Not Budgets or Capital Ratios.................................2

    B.   The NCUA's Characterizations of Roles at WesCorp .....................4

        1.   The NCUA's Characterizations of Officers' Roles Shows a Clear Division of Responsibility Between Investments and Operations ...................................4

        2.   The NCUA's Characterizations of Todd Lane's Role Show No Responsibility for Risk, Investments, or Concentration Limits  .............................5

III. Argument .....................................................................................................7

    A.   The NCUA Does Not Satisfy *Iqbal* ......................................................7

    B.   The NCUA Impermissibly Lumps Lane With Other Officers ................................................................................... 10

    C.   The NCUA Mischaracterizes Causation .........................................11

    D.   Lane's Motion is Procedurally Proper ..............................................12

        1.   Lane's Motion Does Not Violate Federal Rule 12(g) Because It Does Not Delay This Action, and Does Not Prejudice Plaintiff ..............................................12

IV.  Conclusion................................................................................................14

# Table of Authorities

**page(s)**

## Federal Cases

Ashcroft v. Iqbal,
   129 S. Ct. 1937 (2009) ...............................................................7, 8, 9, 10, 12

Adams v. Coveney,
   162 F. 4d 23 (1st Cir. 1998) ...............................................................................10

Godfrey v. United States,
   748 F. 2d 1568 (Fed. Cir. 1984)........................................................................10

O'Connor v. United States,
   956 F. 2d 48 (4th Cir. 1992) ..............................................................................10

Phillips v. Baker
   121 F.2d 752 (9th Cir. 1941) .............................................................................13

Sunrise Toyota, Ltd. v. Toyota Motor Co.,
   55 F.R.D. 519 (S.D.N.Y. 1972)........................................................................13

## State Cases

Frances T. v. Village Green Owners Association,
   42 Cal. 3d 490 (1986)........................................................................................10

Osborn v. Irwin Memorial Blood Bank,
   5 Cal. App. 4th 234 (1992) ...............................................................................12

## Statutes and Rules

Fed. R. Civ. P. 12 ....................................................................................................12

## Other Authorities

6 B. Witkin, Summary of California Law: Torts,
   (10th ed. 2005 & supp. 20) ...............................................................................13

W. Schwarzer, A. Tashima, J. Wagstaffe, Federal Civil Procedure Before
   Trial, The Rutter Group 9:16 (2011) ................................................................13

# I. Introduction

*"Lane certainly was in a position to take action to prevent the harm that eventually befell WesCorp."* [1]

With that sentence, the NCUA admits that it believes that everyone in management at WesCorp should be personally liable for WesCorp's investment losses, regardless of their individual duties. The NCUA's opposition cites no law supporting this sweeping, all-inclusive theory of "management-group strict liability," and this Court should not create such a far-reaching precedent here. Doing so would ignore the reality that WesCorp had specific individuals with distinct responsibilities for investment decisions and investment-risk management. It would also contravene case law requiring a claim for breach of fiduciary duty to be based on an individual's violations of his specific duties. Finally, it would be unjust and unfair.

Every individual in management—and every individual who ever attended an ALCO meeting (and there were many)—was exposed to the same information as Lane and was, therefore, "in a position to take action." With perfect hindsight, individuals at WesCorp (and around the world) undoubtedly wish they had been more prescient in predicting the burst of the real estate bubble, and the collapse of values in mortgage-backed securities. But a corporate officer's duties do not include the duty to correctly predict unprecedented economic upheavals. The duties of a CFO do not include policing and commandeering the job of the Chief Investment Officer and other professionals in the investment function, who have direct and specific responsibility for investment decisions and investment risk management.

---

[1] Doc. 127, at 15:18-19 (NCUA Opposition to Lane's Motion to Dismiss). The "Complaint" and paragraph (¶) refer to the Second Amended Complaint.

Should every individual who was "in a position to take action" be dragged through this lawsuit? The NCUA's position is that even though Lane's role, duties, and responsibilities did not involve investment selection or investment-risk management, and even though WesCorp had other executives and departments responsible for choosing investments and managing their allocation, and even though WesCorp's losses stemmed from over-concentration of investments, Lane should still be responsible—merely because he sat on committees that received and approved investment recommendations, and because he was responsible for the budgeting process. That position is fundamentally untenable. The NCUA has not stated and cannot state a legally viable claim for breach of fiduciary duty against Lane.

## II. Facts

### A. WesCorp's Alleged Losses Were Caused By Over-concentration of Investments, Not Budgets or Capital Ratios.

The NCUA faces a real challenge when trying to plead liability against Lane. On the one hand, the NCUA repeatedly and emphatically blames over-concentration of investments as the cause of WesCorp's losses. *See, e.g.*, Doc. 127, at 13:26–14:2 ("WesCorp's failure was caused by a business strategy of making risky investments in private label Option ARM MBS without sufficient controls to address the risk presented by the extremely high concentrations of such investments that WesCorp accumulated.").[2] On the other, "investments" and "concentrations," and the risks associated with each, were not Lane's

---

[2] The NCUA alleges that a fiduciary breach by Lane and the other Officer Defendants was the purchase of "reduced-documentation" Option-ARM MBS, or "liar loans"— or, to be exact, fraudulently procured loans. Doc 127, at 4:9-22; see also ¶¶ 74–79. Missing from the Complaint, however, is an allegation that anyone at WesCorp knew, or should have known, this *entire body of loans* was fraudulent.

responsibility.  *See, e.g.*, Doc. 128, at 6:21–7:2 (describing Lane's role with no mention of investment or concentration responsibility).

The NCUA tries to get around this problem by inventing creative and implausible alternative theories for WesCorp's MBS-driven downfall.  Thus, while emphasizing the Officers' "failure to control risks" (*see* Doc. 128, at 10:12–14:17), the NCUA also targets budgets and capital ratios as responsible for the losses.  *See, e.g.*, Doc. 127, at 5:12-20 (budgeting); 6:21–7:3 (capital ratios).  This attempt to expand liability to Lane, because of his alleged responsibility for budgets and capital ratios, is unavailing, for several reasons.

First, the NCUA itself repeatedly admits the investment risks controlled everything:  budgets and capital ratios were affected by the risks inherent in investment decisions and concentration limits.  *See, e.g.*, Doc. 127, at 6:18-21 ("NCUA regulations required WesCorp to maintain sufficient capital **to support its risk exposures**, and WesCorp's corporate policies required management to recommend **capital goals sufficient to support WesCorp's risk**.") (emphasis added); *id.* at 5:24–6:2 (budgets were problematic because they did not highlight the investment risks).  Thus, according to plaintiff, allegedly imprudent investment decisions in high concentrations of MBS created the supposed problems with the budgets, and the allegedly inadequate capital ratios.

Second, while Lane was responsible for preparing the budget, there is no basis for making him responsible for the investment decisions and projected investment returns reflected in those budgets.  As with all organizations, there were individuals within WesCorp who had specific responsibility for each of the areas whose performance was projected in WesCorp's budgets.  Managers had to generate revenue that was projected in the budgets.  Controllers had to be sure WesCorp did not overspend on computers and furniture and equipment, to meet projected expenses.  And investment officers chose investments and projected the returns on those investments which were included in the budgets.

There is no legal authority, and it defies common sense and basic corporate organizational behavior, that a financial officer who aggregates all of those individual components into one budget—based on the recommendations of each of the people who has specific responsibility for each of those components—somehow becomes liable in tort or otherwise legally responsible for every missed estimate.  *See* Doc. 115, at 2 (Jan. 31 Order) (questioning why a budget committee would be responsible for the effect of investment decisions).  It is neither just nor fair to allow a CFO to be left as a defendant in a lawsuit fundamentally based on the alleged failure of others to do their jobs.  Taking all of the NCUA's factual allegations as true, it is clear that Lane cannot be liable for breaching any of his duties in a way that caused WesCorp to suffer its losses on MBS investments.

## B.  The NCUA's Characterizations of Roles at WesCorp.

Plaintiff's allegations, and its characterizations of those allegations in its opposition briefs, confirm (1) that WesCorp had a clear division of responsibility; and (2) that Todd Lane did not have responsibility for the acts that caused WesCorp's alleged losses.[3]

### 1. The NCUA's Characterizations of Officers' Roles Shows a Clear Division of Responsibility Between Investments and Operations.

*Robert Burrell*:  Burrell was "Chief Investment Officer," which made him responsible for "the development and implementation of all balance sheet management strategies." Doc. 128, at 7:9-11.  Burrell, in this capacity, was responsible for "WesCorp's investment strategies."  *Id.*  Burrell was "the primary manager of the balance sheet, including the investment portfolio."  *Id.* at 7:11-13.  Overall, Burrell and his department were responsible for "ensuring the safety and

---

[3] The NCUA has challenged Lane's judicial noticed documents.  Lane joins the Officer Defendants' reply on judicial notice.

soundness of [the investment] portfolio and that all investments would provide appropriate levels of safety in terms of credit quality, liquidity and interest rate risk." *Id.* at 7:13-15.  Those responsibilities included reviewing and recommending concentration limits and investments.  *Id.* at 10:21-23; *see also* ¶ 112 (Siravo and Burrell "routinely" proposed "amendments raising the concentration limits in WesCorp's portfolio[.]").

Linked to his duties with investments, Burrell had a role in the budgeting process:  He was responsible for "the portions of the budget projecting investment income, investment expense, and net interest income." Doc. 128, at 9:7-8 (citing ¶ 85); *see also* ¶ 86 (Burrell "had a duty" to provide credit and investment risks to Lane and Siravo); ¶ 90 (Lane and Siravo consulted with Burrell on net interest income before proposing the budget).

*Timothy Sidley*:  Sidley was WesCorp's Vice President of Risk Assessment. Doc. 128, at 7:19.  WesCorp had investment credit policies and procedures; it was Sidley's responsibility to implement them.  *Id.* at 7:20-22.  WesCorp also had processes and procedures for monitoring investment risk; again, Sidley was responsible for these areas.  *Id.* at 7:22-23.  With Burrell, Sidley also had the specific responsibility for setting concentration limits, "to ensure that the portfolio was properly diversified to minimize investment risk." *Id.* at 10:20-23.  Together, they also "had the duty to ensure a thorough review of each proposed security purchase for credit risk."  And they did, in fact, engage in a "credit risk review," and **then they gave a "purchase justification" for each security to the "ALCO and the board."**  ¶ 132 (emphasis added).

### 2.  The NCUA's Characterizations of Todd Lane's Role Show No Responsibility for Risk, Investments, or Concentration Limits.

In contrast to the specific investment and risk responsibilities of Burrell and Sidley, the NCUA describes Lane's role in a number of ways, all of which have an

 #:2050

amorphous, attenuated link, if any, to investment selection and investment concentration risk management. Lane, allegedly, had these duties and roles:

- "general supervisory responsibility;" Doc. 127, at 1:19, 12:14-15;
- "integral part of WesCorp's senior management team;" *id.* at 1:26-27;
- setting "strategic direction and business goals;" *id.* at 3:1;
- "responsibility for the overall financial health of WesCorp;" *id.* 127, at 15:15;
- "*one* of the voting members of . . . bodies responsible for WesCorp's investment portfolio;" *id.* at 3:1-3, 12:18-20 (emphasis added);
- "responsible for ensuring that **WesCorp's board was making decisions** in approving the budget and in particular **determining the levels of investment income and net interest income that WesCorp's management should be charged with achieving**;" *id.* at 14:27–15:2 (emphasis added).

Lane had no actual duties or responsibilities for investments. In fact, in its Opposition to the Officers' Motion, the NCUA says that Sidley and Burrell "were responsible for proposing investment concentration limits for WesCorp's investment portfolio, to ensure that the portfolio was properly diversified to minimize investment risk." Doc. 128, at 10:20-23. The NCUA admits that those two individuals and their departments had the exclusive role, responsibility, and authority regarding investment risk. But the NCUA also understands that this fact undermines its claims against Lane and Siravo, so in the very next sentence does its best to make everyone vicariously responsible, by alleging that the "other Officer Defendants, by virtue of their offices and their membership on the ALCO and the ALSC, were also responsible for recommending investment concentration limits." *Id.* at 10:23-26.

The NCUA knows that its other allegations against Lane regarding budgeting and capital ratios are inadequate. It knows that unless it can pin Lane

Lane's Reply i/s/o Motion to Dismiss 2nd A. Complaint

to investment decisions and concentration limits, it has no case.  So, to do that, it invents—implausibly, and without *specific facts* to support it—the idea that Lane had control over investment decisions just because his title was "CFO."

## III.  Argument

### A.  The NCUA Does Not Satisfy *Iqbal*.

The NCUA effectively concedes that the Complaint fails *Iqbal* when it states:

> [I]f the NCUA proves the allegations in the SAC, it is certainly **plausible, given Lane's title, role and vote on the committees that created the strategy** and made the decisions that caused WesCorp's failure, that **he may be liable** for that failure along with the other Officer Defendants[.]

Doc. 127, at 15:31-24 (emphasis added).  The Complaint is premising liability on Lane's title and participation on committees, and not his legal duty or his actions breaching his duties.  The First Claim should be dismissed under *Iqbal*.

In *Iqbal*, the plaintiff was detained at a detention center, and alleged that he had been mistreated while there.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1943 (2009).  He sued the jailors who were directly responsible for his treatment, as well as high-ranking government officials.  *Id.* at 1944.  He alleged that the high-ranking officials (1) had unconstitutionally designated him based on a suspect classification; (2) had approved "the policy of holding post-September-11th detainees in highly restrictive conditions;" and (3) "each knew of, condoned, and willfully and maliciously agreed to subject [plaintiff] to harsh conditions of confinement as a matter of policy." *Id.* (citations and quotations omitted).  In this alleged scheme, one official was the "principal architect" and another was "instrumental in its adoption, promulgation, and implementation." *Id.*

The Court found that all these allegations were "bare assertions" that "amount to nothing more than a formulaic recitation of the elements" of the claim.  *Id.* at 1951.  They were not, therefore, "entitled to be assumed true."  *Id.* The Court's decision was based on "the conclusory nature of the … allegations,

rather than their extravagantly fanciful nature." *Id.*; *see also id.* at 1960 (Souter, J., dissenting) (arguing that these same allegations are not conclusory).

Plaintiff's claims against the high-ranking officials rested "solely on their ostensible policy of holding post-September-11th detainees in the [detention center] once they were categorized as of high interest." *Id.* at 1952 (quotations omitted). The Supreme Court emphasized that on Plaintiff's theory, "the complaint must contain facts plausibly showing that petitioners *purposefully adopted a policy* of classifying post-September-11 detainees as of high interest because of their race, religion, or national origin." *Id.* at 1952 (quotations omitted) (emphasis added).

The Supreme Court—*even if* accepting that allegation as true (which it did not)—found that the complaint should be dismissed because it didn't "show" or "intimate" that the high-ranking officials "purposefully housed detainees in [the detention center]" due to a suspect classification. *Id.* at 1952. The allegations only showed that the high-ranking officials "sought to keep suspected terrorists in the most secure conditions available until the suspects could be cleared of terrorist activity." *Id.*

Here, the NCUA's allegations against Lane should be rejected based on the same reasoning applied in *Iqbal*. Because Lane had nothing to do with WesCorp's investment or risk-management policies, the NCUA had to allege another hook for Lane's liability. It therefore asserts that Lane "managed WesCorp collaboratively with Siravo and Burrell, and together they determined and implemented WesCorp's overall business strategies, including its strategy of significantly increasing investment income by investing in higher yielding securities and by substantial borrowing." Doc. 127, at 4:6-10; *see also id.* at 12:15-18; 13:26–14:2 (repeating the "strategy" theory). But this allegation is exactly the type rejected in *Iqbal*, where the Court found that allegations of policies to engage in unconstitutional activity were conclusory, and, even if

accepted as true, implausible. The fact that the WesCorp Officers may have established a strategy for growth is not an allegation of misconduct—that they "purposefully adopted" a strategy (*Iqbal*, at 1952) to make high-risk investments and imprudently put WesCorp into danger of collapse. In light of the NCUA's own admissions that WesCorp's investments were blessed by rating agencies, typically with AAA ratings (¶¶ 73, 74, 84, 114), this leap becomes completely implausible.

There are no facts backing up the NCUA's theory against Lane. There are no alleged meetings where the allegedly illegal "strategy" was hatched; there are no formal policies in place; there are no votes, no e-mails, no documents. There are no allegations of any specific facts or *actual actions* by Lane (or the other Officer Defendants) to adopt the "strategy" that rests as the keystone to the NCUA's case.

On the budget, there are no allegations that Burrell—who was responsible for identifying investment risks in the budget (¶¶ 86, 90)—actually warned Siravo or Lane that the budgets assumed a level of investment income that could only be achieved through investment in high-risk securities. The theory that budgeting drove investment choices, or that people involved in budgeting assumed the responsibility for investment outcomes, defies common sense. *See* Doc. 115, at 2 (Jan. 31 Order) (questioning why a budget committee would be responsible for the effect of investment decisions). In addition, the NCUA's story is that Lane and Siravo were "obligated to explain to the budget committee and the board how adoption of the 2006 and 2007 budgets would materially affect the risk in WesCorp's portfolio." ¶ 100. But portfolio risk was a matter within the purview of other professionals. It is implausible and defies common sense that Lane would be "obligated" to educate the board on something outside his role and responsibility. It is also inconsistent with the reams of documents by which the board was fully informed of the nature and character of the

investments being made under the direction of the Chief Investment Officer and with the guidance of the risk managers.  Finally, courts have recognized the separation of authority at corporations.  *See Adams v. Coveney,* 162 F. 3d 23, 27 (1st Cir. 1998) ("[t]he separation of authority within a business enterprise, and *the limitation on authority held by officers* is a practical reality which is acknowledged and given effect by the courts.")  (emphasis added) (quoting *O'Connor v. United States*, 956 F. 2d 48, 51 (4th Cir. 1992); *see also Godfrey v. United States*, 748 F. 2d 1568, 1576 (Fed. Cir. 1984) ("the courts recognize the normal division of and limitations on authority exercised by various representatives of a particular business").

**B.  The NCUA Impermissibly Lumps Lane With Other Officers.**

The NCUA again lumps allegations against Lane together with the other Officer Defendants, but argues that there's no authority that this type of pleading is improper.  This Court already found that there is: "Plaintiff argues that the FAC states a sufficient claim against Lane in light of its allegations referring to the 'Officer Defendants.' . . . This sort of "lumping" . . . . [w]hile that is perhaps a common pleading tactic, it is not necessarily clear that it survives *Iqbal*, at least where a defendant has challenged its use and the plaintiff lumps together individual defendants with admittedly differentiated roles and responsibilities."  Doc. 110, at 18 (Dec. 20 Tentative Ruling) (citing *Frances T. v. Village Green Owners Ass'n*, 42 Cal. 3d 490, 508 (1986)).

Even if the NCUA's collective pleading (*see, e.g.* ¶¶ 53–57, 60, 96, 103 110; Doc. 128, at 7:26–9:2) were permissible, it still fails *Iqbal* as insufficiently pleading misconduct by Lane.  Under *Iqbal*, the Court must dismiss a complaint where one cannot "infer more than the mere possibility of misconduct." 127 S. Ct. at 1950.  That is the case here.

### C. The NCUA Mischaracterizes Causation.

To survive a motion to dismiss, the NCUA must plead specific facts showing that Lane's actions (i.e., his alleged fiduciary duty breaches) caused WesCorp's losses. *See* Doc. 120-1, at 13:12-15. The NCUA recognizes this fundamental problem with its Complaint. Doc. 127, at 13:18-21. To avoid it, the NCUA argues that as long as it alleges that Lane was "a cause" of WesCorp's losses it can survive a 12(b)(6) motion. *Id.* (citing 6 B. Witkin, Summary of California Law: Torts, § 1193, at 568 (10th ed. 2005 & supp. 2010) ("Witkin").

Witkin does state that a "defendant's negligent act need not be the *sole* cause of the injury; it is enough that it be *a cause.*" *Id.* (emphasis in original). But NCUA should have kept reading. The very next line explains that this principle is irrelevant here because it is a theory of liability that applies to concurring or multiple **independent** causes of injury (so that multiple parties may not avoid liability simply because another party also caused the harm): "When the *separate and distinct* negligent acts of two persons are in substantially *simultaneous operation*, and contribute to cause the injury, 'each is and both are the proximate cause,' and the plaintiff may recover in full from either of the parties, or both." *Id.* (emphasis added) (citing, among other things, CACI No. 431 "Causation: Multiple Causes"). The NCUA's cite is useful in showing that it recognizes that Lane's alleged breaches could not have caused WesCorp's losses, but not useful in salvaging the NCUA's insufficient claim against Lane.

Nowhere does the NCUA attempt to allege that Lane's fiduciary breaches were "but-for" causes of WesCorp's losses, nor that the losses would not have occurred if Lane had fulfilled his duties as the NCUA claims he should have. Nor can it. As described above, and clear from the Complaint, the only things that could have stopped WesCorp's losses (as alleged by the NCUA) were less risky investments, and less concentration in those investments. But Lane had no responsibility for, role in, or authority over either. His alleged breaches were

proposing budgets that did not properly call out **investment risks**, and not proposing adjustments to capital ratios to account for **investment risk**—but identifying investment risks were specific roles of other individuals at WesCorp.[4] The NCUA has not alleged that Lane's alleged breaches were substantial factors in WesCorp's losses, similar to their failure to plausibly state liability under *Iqbal*. *Compare Osborn v. Irwin Mem'l Blood Bank*, 5 Cal. App. 4th 234, 253 (1992) ("However the test is phrased, causation in fact is ultimately a matter of probability and common sense.") with *Iqbal*, 129 S. Ct. at 1950 ("factual content" in complaint must lead to a "plausible" claim, leaving the Court with "a content-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

Not every officer of every bank and every credit union in every other commercial institution which was burned by the mortgage crisis mortgage meltdown is liable—nor should they be. Todd Lane is not liable here. There is no precedent for the claims against him; there are no facts specific to him that are sufficient to state a legally viable claim against him; and the court should not burden him with the expense of defending a case that is fundamentally directed at the decisions and failures of others.

**D. Lane's Motion is Procedurally Proper.**

  **1. Lane's Motion Does Not Violate Federal Rule 12(g) Because It Does Not Delay This Action, and Does Not Prejudice Plaintiff.**

Lane joined the Officers in their Motion to Dismiss (Doc. 121) and moved individually on grounds not raised in that motion. Plaintiff claims that Lane's separate motion violates Federal Rule of Civil Procedure 12(g)(2). Doc. 127, at 8:4–9:6. That isn't the case.

---

[4] The Directors' Reply in support of their Motion to Dismiss explains that WesCorp's capital ratios were appropriate based on what WesCorp's management knew at the time and in line with the NCUA's regulations on the subject. *See* Part II(B)(2)(d).

Rule 12(g)(2) is a rule of timing, with the purpose of requiring a party to bring all waivable defenses *at the same time* rather than in successive pleadings. This meaning is obvious on the face of the Rule:

> [A] party that makes a motion under this rule must not make *another motion* under this rule raising a defense or objection that was available to the party but omitted from its *earlier motion*.

F.R.C.P. 12(g)(2) (emphasis added). The Rule prohibits a party from making one 12(b)(6) motion on an issue, then, afterward, bringing another 12(b)(6) motion on another issue. W. Schwarzer, A. Tashima, J. Wagstaffe, *Federal Civil Procedure Before Trial*, The Rutter Group 9:16 (2011) ("[Rule 12(g)(2)] prevents defendant from **first** moving to dismiss for lack of personal jurisdiction; **then, if unsuccessful**, moving to dismiss for improper service; **then if unsuccessful**, challenging venue, etc.") (emphasis added). Rule 12(h) makes this explicit by stating that a "party waives any defense listed in Rule 12(b)(2)-(5) by: omitting it from a motion in the circumstances described in Rule (12)(g)." Even the case cited by Plaintiff states the same. Doc 127, at 9:3-6; *Phillips v. Baker*, 121 F.2d 752, 754 (9th Cir. 1941) ("Subdivision (g) . . . *for the obvious purpose of avoiding forced delays,* prohibits bringing by separate motion any of the omitted defenses which were theretofore available.") (emphasis added).

In addition to not violating Rule 12(g)(2), Lane's motion also imposes no prejudice on Plaintiff, nor delays the litigation, and therefore should stand. *Sunrise Toyota, Ltd. v. Toyota Motor Co.*, 55 F.R.D. 519, 528 n.4 (S.D.N.Y. 1972) (rejecting a challenge to two motions under 12(g) and finding "[s]ince both motions were argued together and are jointly submitted to the court, there is no issue of dilatory motion practice or unfairness to plaintiff, and the policy of Rule 12(g) is in no way frustrated."). It is telling that Plaintiff did not raise this same argument in response to the motion to dismiss filed by Defendants Swedberg and

Siravo (Doc. 119), even though Siravo also filed two motions, rather than, as Plaintiff claims to be necessary, raising "all objections and defenses in a *single* Rule 12 motion[.]" Doc. 127, at 8:24-26.

Plaintiff also accuses Lane of exceeding the 25-page page limit in Local Rule 11-6 by effectively filing a 41-page brief. Doc. 127, at 9:7-12. But Lane's motion, in fact, was slightly less than 16 pages of text, and it joined (Doc. 120-1, at 16:19-21) Part V of the Officers' memorandum (Doc. 121, at 12:4–22:28), which was about 11 pages of text. Regardless, and equally applicable to Plaintiff's Rule 12(g)(2) argument, Lane would have been free to join (rather than sign) the Officers' motion, and then file separate papers, without objection—which is exactly what Lane did in the motions to dismiss the First Amended Complaint, without objection. *See* Doc. 99 (Lane's Joinder); Doc. 104 (Lane's separate Reply). Substantively, there is no difference between these procedures. Each results in no loss of judicial economy, no delay, and no prejudice on Plaintiff. Therefore, the Court should consider Lane's separate arguments relating to the First Claim for Relief, arguments that are unique to Lane and explicitly distinct from those raised in the Officers' Motion to Dismiss.

## IV.   Conclusion

For these reasons, the First Claim for Relief in the Second Amended Complaint should be dismissed without leave to amend.

DATED: May 26, 2011                                CHAPIN FITZGERALD SULLIVAN & BOTTINI LLP

                                                     By:    /s/ *Kenneth M. Fitzgerald*
                                                            Kenneth M. Fitzgerald, Esq.
                                                            Curtis G. Carll, Esq.
                                                            Attorneys for Defendant
                                                            Todd M. Lane