# Exhibit 11

EXHIBIT 11
8

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 1 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 2 of 190   Page ID
#:2085

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent of U.S. Central Federal Credit Union Western Corporate Federal Credit Union, Members United Corporate Federal Credit Union, and Southwest Corporate Federal Credit Union, | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| J.P. MORGAN SECURITIES LLC., J.P. MORGAN ACCEPTANCE CORPORATION  I, AMERICAN HOME MORTGAGE ASSETS LLC, INDYMAC MBS, INC., and BOND SECURITIZATION, LLC, | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

Case No. 11-cv-2341 EFM/JPO

JURY TRIAL DEMANDED

## COMPLAINT

EXHIBIT 11

9

Case 2:11-cv-02341-EFM-JPO   Document 1   Filed 06/20/11   Page 2 of 186
Case 2:10-cv-01597-GW-MAN   Document 140-1   Filed 06/23/11   Page 3 of 190   Page ID
#:2086

# TABLE OF CONTENTS

I.     NATURE OF THE ACTION ................................................................. 1

     Table 1 ....................................................................................... 3

     Table 2 ....................................................................................... 7

II.    PARTIES AND RELEVANT NON-PARTIES .................................... 7

III.   JURISDICTION AND VENUE .......................................................... 11

IV.   MORTGAGE ORIGINATION AND SECURITIZATION PROCESS........... 11

     Figure 1 ..................................................................................... 14

V.    RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT ................... 14

     Table 3 ..................................................................................... 15

VI.   THE CREDIT UNIONS' PURCHASES.............................................. 17

     Table 4 ..................................................................................... 18

VII.  THE ORIGINATORS SYSTEMATICALLY DISREGARDED THE UNDERWRITING GUIDELINES STATED IN THE OFFERING DOCUMENTS ..................................... 20

        A.    The Surge in Mortgage Delinquency and Defaults Shortly After the Offerings and the High OTD Practices of the Originators Demonstrates Systematic Disregard of Underwriting Standards ................................... 21

              Table 5 ............................................................................ 23

              Table 6 ............................................................................ 31

        B.    The Surge in Actual Versus Expected Cumulative Losses is Evidence of the Originators' Systematic Disregard of Underwriting Standards........ 32

              Figure 2 ........................................................................... 36

        C.    The Collapse of the Certificates' Credit Ratings is Evidence of Systematic Disregard of Underwriting Guidelines ................................. 44

EXHIBIT 11
10

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 3 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 4 of 190   Page ID
#:2087

D.    Revelations Subsequent to the Offerings Show That the Originators
      Systematically Disregarded Underwriting Standards.............................. 45

      1.    The Systematic Disregard of Underwriting Standards Was
            Pervasive as Revealed After the Collapse ...........................................45

      2.    American Home's Systematic Disregard of Underwriting
            Standards ...............................................................................................50

      3.    Ameriquest's Systematic Disregard of Underwriting Standards ..53

      4.    The Chase Originators' Systematic Disregard of Underwriting
            Standards ...............................................................................................56

      5.    Countrywide's Systematic Disregard of Underwriting Standards58

      6.    GreenPoint's Systematic Disregard of Underwriting Standards...67

      7.    IndyMac's Systematic Disregard of Underwriting Standards .......68

      8.    New Century's Systematic Disregard of Underwriting Standards
            ................................................................................................................73

      9.    NovaStar's Systematic Disregard of Underwriting Standards.......82

      10.   Option One's Systematic Disregard of Underwriting Standards ..85

VIII.   THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF
        MATERIAL FACT........................................................................................ 87

        A.    Untrue Statements Concerning Evaluation of the Borrower's Capacity and
              Likelihood to Repay the Mortgage Loan ........................................................ 90

        B.    Untrue Statements Concerning Reduced Documentation Programs..................... 110

        C.    Untrue Statements Concerning Loan-to-Value Ratios ................................. 113

        D.    Untrue Statements Concerning Credit Enhancement ................................. 115

IX.     THE CLAIMS ARE TIMELY.................................................................... 117

        *Table 7* ................................................................................................. 120

ii

EXHIBIT 11
11

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 4 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 5 of 190   Page ID
#:2088

X.    CLAIMS FOR RELIEF ................................................................................. 126

COUNT ONE (Section 11 of the Securities Act of 1933).............................................. 126
(American Home Mortgage Assets Trust 2007-3)

COUNT TWO (Section 11 of the Securities Act of 1933).............................................. 127
(C-BASS 2006-CB7 Trust)

COUNT THREE (Section 11 of the Securities Act of 1933) ......................................... 128
(IndyMac INDX Mortgage Loan Trust 2006-AR29)

COUNT FOUR (Section 11 of the Securities Act of 1933) ........................................... 130
(J.P. Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2006-
A3, J.P. Morgan Alternative Loan Trust 2006-A6, J.P. Morgan Alternative Loan Trust
2006-A7, J.P. Morgan Alternative Loan Trust 2007-A1, J.P. Morgan Alternative Loan
Trust 2007-A2, J.P. Morgan Mortgage Acquisition Trust 2006-WMC3, J.P. Morgan
Mortgage Acquisition Corp. 2007-HE1, J.P. Morgan Mortgage Acquisition Trust 2007-
CH3, J.P. Morgan Mortgage Acquisition Trust 2007-CH4)

COUNT FIVE (Section 11 of the Securities Act of 1933)............................................. 132
(J.P. Morgan Alternative Loan Trust 2006-A2,
J.P. Morgan Alternative Loan Trust 2006-A7)

COUNT SIX (Section 11 of the Securities Act of 1933)................................................ 133
(J.P. Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2007-
A2, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, J.P. Morgan Mortgage
Acquisition Trust 2007-CH5, J.P. Morgan Alternative Loan Trust 2006-A3)

COUNT SEVEN (Section 11 of the Securities Act of 1933) ......................................... 134
(J.P. Morgan Alternative Loan Trust 2007-S1, J.P. Morgan Mortgage Acquisition Trust
2007-CH3, J.P. Morgan Mortgage Acquisition Trust 2007-CH4)

COUNT EIGHT (Section 12(a)(2) of the Securities Act of 1933)................................. 136
(C-BASS 2006-CB7 Trust , IndyMac INDX Mortgage Loan Trust 2006-AR29, J.P.
Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2006-A3,
J.P. Morgan Alternative Loan Trust 2006-A6, J.P. Morgan Alternative Loan Trust 2006-
A7, J.P. Morgan Alternative Loan Trust 2007-A1, J.P. Morgan Alternative Loan Trust
2007-A2, J.P. Morgan Mortgage Acquisition Corp. 2007-HE1, J.P. Morgan Mortgage
Acquisition Trust 2007-CH3, J.P. Morgan Mortgage Acquisition Trust 2007-CH4)

EXHIBIT 11
12

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 5 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 6 of 190   Page ID
#:2089

COUNT NINE (Section 12(a)(2) of the Securities Act of 1933) ................................... 138
(J.P. Morgan Alternative Loan Trust 2006-A2,
J.P. Morgan Alternative Loan Trust 2006-A7)

COUNT TEN (Section 12(a)(2) of the Securities Act of 1933) .................................... 140
(J.P. Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2007-
A2, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, J.P. Morgan Mortgage
Acquisition Trust 2007-CH5)

COUNT ELEVEN (Section 12(a)(2) of the Securities Act of 1933) ............................ 142
(J.P. Morgan Alternative Loan Trust 2007-S1, J.P. Morgan Mortgage Acquisition Trust
2007-CH3, J.P. Morgan Mortgage Acquisition Trust 2007-CH4)

COUNT TWELVE (Violation of the California Corporate Securities Law of 1968).... 143
(Cal. Corp. Code §§ 25401 and 25501)
(J.P. Morgan Alternative Loan Trust 2006-A2,
J.P. Morgan Alternative Loan Trust 2006-A7)

COUNT THIRTEEN (Violation of the Kansas Uniform Securities Act) ..................... 144
(Kan. Stat. Ann. § 17-12a509)
(C-BASS 2006-CB7 Trust, IndyMac INDX Mortgage Loan Trust 2006-AR29, J.P.
Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2006-A3,
J.P. Morgan Alternative Loan Trust 2006-A6, J.P. Morgan Alternative Loan Trust 2006-
A7, J.P. Morgan Alternative Loan Trust 2007-A1, J.P. Morgan Alternative Loan Trust
2007-A2, J.P. Morgan Mortgage Acquisition Corp. 2006-HE1, J.P. Morgan Mortgage
Acquisition Trust 2007-HE1, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, J.P.
Morgan Mortgage Acquisition Trust 2007-CH4)

COUNT FOURTEEN (Violation of the Illinois Securities Law of 1953) .................... 146
(815 Ill. Comp. Stat. Ann. 5/12)
(J.P. Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2007-
A2, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, J.P. Morgan Mortgage
Acquisition Trust 2007-CH5)

COUNT FIFTEEN (Violation of the Texas Securities Act).......................................... 148
(Tex. Rev. Civ. Stat. Ann. art. 581, § 33)
(J.P. Morgan Alternative Loan Trust 2007-S1, J.P. Morgan Mortgage Acquisition Trust
2007-CH3, J.P. Morgan Mortgage Acquisition Trust 2007-CH4)

JURY DEMAND ......................................................................................................... 149

EXHIBIT 11
13

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 6 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1    Filed 06/23/11   Page 7 of 190   Page ID
#:2090

APPENDIX A ..................................................................................................... 152

APPENDIX B ..................................................................................................... 172

EXHIBIT 11
14

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 7 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1    Filed 06/23/11   Page 8 of 190   Page ID
#:2091

Plaintiff, the National Credit Union Administration Board ("NCUA Board"), brings this action in its capacity as Liquidating Agent of U.S. Central Federal Credit Union ("U.S. Central"), Western Corporate Federal Credit Union ("WesCorp"), Members United Corporate Federal Credit Union ("Members United"), and Southwest Corporate Federal Credit Union ("Southwest") (collectively, the "Credit Unions") against J.P. Morgan Securities LLC ("J.P. Morgan") (f/k/a J.P. Morgan Securities, Inc.) as underwriter and seller, and against J.P. Morgan Acceptance Corporation I, American Home Mortgage Assets LLC, IndyMac MBS, Inc., and Bond Securitization, LLC (collectively, the "Issuer Defendants") as issuers, of certain residential mortgage-backed securities ("RMBS") purchased by the Credit Unions, and alleges as follows:

## I.      NATURE OF THE ACTION

1.      This action arises out of the sale of RMBS to the Credit Unions where J.P. Morgan acted as underwriter and/or seller of the RMBS.

2.      Virtually all of the RMBS sold to the Credit Unions were rated as triple-A (the same rating as U.S. Treasury bonds) at the time of issuance.

3.      The Issuer Defendants issued and J.P. Morgan underwrote and sold the RMBS pursuant to registration statements, prospectuses, and/or prospectus supplements (collectively, the "Offering Documents").  These Offering Documents contained untrue statements of material fact or omitted to state material facts in violation of Sections 11 and 12(a)(2) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2) ("Section 11" and "Section 12(a)(2)," respectively), and the Kansas, California, Illinois, and Texas Blue Sky laws.

4.      The NCUA Board expressly disclaims and disavows any allegation in this Complaint that could be construed as alleging fraud.

EXHIBIT 11
15

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 8 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 9 of 190   Page ID
#:2092

5.     The Offering Documents described, among other things, the mortgage underwriting standards of the originators (the "Originators") who made the mortgages that were pooled and served as the collateral for the RMBS purchased by the Credit Unions.

6.     The Offering Documents represented that the Originators adhered to the underwriting guidelines set out in the Offering Documents for the mortgages in the pools collateralizing the RMBS.   In fact, the Originators had systematically abandoned the stated underwriting guidelines in the offering documents.   Because the mortgages in the pools collateralizing the RMBS were largely underwritten without adherence to the underwriting standards in the Offering Documents, the RMBS were significantly riskier than represented in the Offering Documents.   Indeed, a material percentage of the borrowers whose mortgages comprised the RMBS were all but certain to become delinquent or default shortly after origination.   As a result, the RMBS were destined from inception to perform poorly.

7.     These untrue statements and omissions were material because the value of RMBS is largely a function of the cash flow from the principal and interest payments on the mortgage loans collateralizing the RMBS.   Thus, the performance of the RMBS is tied to the borrower's ability to repay the loan.

8.     The Credit Unions purchased the RMBS listed in Table 1 (infra) through initial offerings directly from J.P. Morgan by means of prospectuses or oral communications.   Thus, J.P. Morgan is liable for material untrue statements and omissions of fact under Section 11, Section 12(a)(2), the California Corporate Securities Law of 1968, Cal. Corp. Code §§ 25401 and 25501, the Kansas Uniform Securities Act, Kan. Stat. Ann. § 17-12a509, the Illinois Securities Law of 1953, 815 Ill. Comp. Stat. Ann. 5/12, and/or the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. art. 581, § 33, for the RMBS listed in Table 1.

EXHIBIT 11
16

Case 2:11-cv-02341-EFM -JPO    Document 1    Filed 06/20/11    Page 9 of 186
Case 2:10-cv-01597-GW -MAN    Document 140-1    Filed 06/23/11    Page 10 of 190    Page ID
#:2093

**Table 1**

| CUSIP | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 12479DAE8 | C-BASS 2006-CB7 Trust | Bond Securitization, LCC | U.S. Central | 10/2/06 | $31,618,000 |
| 45662DAD7 | IndyMac INDX Mortgage Loan Trust 2006-AR29 | IndyMac MBS, Inc. | U.S. Central | 9/26/06 | $20,000,000 |
| 46628GAA7 | J.P. Morgan Alternative Loan Trust 2006-A2 | J.P. Morgan Acceptance Corporation I | U.S. Central | 4/6/06 | $158,097,000 |
| 46628GAD1 | J.P. Morgan Alternative Loan Trust 2006-A2 | J.P. Morgan Acceptance Corporation I | U.S. Central | 4/6/06 | $19,007,000 |
| 46628GAK5 | J.P. Morgan Alternative Loan Trust 2006-A2 | J.P. Morgan Acceptance Corporation I | WesCorp | 4/6/06 | $12,612,616 |
| 46628GAA7 | J.P. Morgan Alternative Loan Trust 2006-A2 | J.P. Morgan Acceptance Corporation I | Members United | 4/5/06 | $47,787,000 |
| 46628UAD0 | J.P. Morgan Alternative Loan Trust 2006-A3 | J.P. Morgan Acceptance Corporation I | U.S. Central | 6/14/06 | $36,406,000 |
| 46628UAE8 | J.P. Morgan Alternative Loan Trust 2006-A3 | J.P. Morgan Acceptance Corporation I | U.S. Central | 6/14/06 | $35,990,000 |
| 466285AA1 | J.P. Morgan Alternative Loan Trust 2006-A6 | J.P. Morgan Acceptance Corporation I | U.S. Central | 10/23/06 | $75,000,000 |

EXHIBIT 11
17

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 10 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 11 of 190   Page ID
#:2094

| CUSIP | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|-------|----------------|-----------|-------|------------|------------|
| 466285AC7 | J.P. Morgan Alternative Loan Trust 2006-A6 | J.P. Morgan Acceptance Corporation I | U.S. Central | 10/23/06 | $49,431,000 |
| 466285AD5 | J.P. Morgan Alternative Loan Trust 2006-A6 | J.P. Morgan Acceptance Corporation I | U.S. Central | 10/23/06 | $30,297,000 |
| 466285AE3 | J.P. Morgan Alternative Loan Trust 2006-A6 | J.P. Morgan Acceptance Corporation I | U.S. Central | 10/23/06 | $25,017,000 |
| 466286AA9 | J.P. Morgan Alternative Loan Trust 2006-A7 | J.P. Morgan Acceptance Corporation I | U.S. Central | 11/9/06 | $125,000,000 |
| 466286AC5 | J.P. Morgan Alternative Loan Trust 2006-A7 | J.P. Morgan Acceptance Corporation I | U.S. Central | 11/9/06 | $50,000,000 |
| 466286AD3 | J.P. Morgan Alternative Loan Trust 2006-A7 | J.P. Morgan Acceptance Corporation I | U.S. Central | 11/9/06 | $46,515,000 |
| 466286AE1 | J.P. Morgan Alternative Loan Trust 2006-A7 | J.P. Morgan Acceptance Corporation I | WesCorp | 11/9/06 | $27,138,168 |
| 466287AA7 | J.P. Morgan Alternative Loan Trust 2007-A1 | J.P. Morgan Acceptance Corporation I | U.S. Central | 2/15/07 | $135,000,000 |

4

EXHIBIT 11
18

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 11 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 12 of 190   Page ID
#:2095

| CUSIP | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|-------|----------------|-----------|-------|------------|------------|
| 466278AC2 | J.P. Morgan Alternative Loan Trust 2007-A2 | J.P. Morgan Acceptance Corporation I | U.S. Central | 5/27/07 | $50,000,000 |
| 466278AC2 | J.P. Morgan Alternative Loan Trust 2007-A2 | J.P. Morgan Acceptance Corporation I | Members United | 5/30/07 | $20,000,000 |
| 466275AB0 | J.P. Morgan Alternative Loan Trust 2007-S1 | J.P. Morgan Acceptance Corporation I | Southwest | 5/15/07 | $10,010,000 |
| 46626LGF1 | J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | J.P. Morgan Acceptance Corporation I | U.S. Central | 2/24/06 | $18,000,000 |
| 46630XAF5 | J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | J.P. Morgan Acceptance Corporation I | U.S. Central | 5/3/07 | $25,870,000 |
| 46630XAD0 | J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | J.P. Morgan Acceptance Corporation I | Members United | 5/1/07 | $10,000,000 |
| 46630XAE8 | J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | J.P. Morgan Acceptance Corporation I | Southwest | 5/3/07 | $5,000,000 |
| 46630CAE4 | J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | J.P. Morgan Acceptance Corporation I | U.S. Central | 6/7/07 | $46,299,000 |

EXHIBIT 11
19

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 12 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 13 of 190   Page ID
#:2096

| CUSIP | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 46630CAF1 | J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | J.P. Morgan Acceptance Corporation I | U.S. Central | 6/7/07 | $10,000,000 |
| 46630CAD6 | J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | J.P. Morgan Acceptance Corporation I | Southwest | 6/707 | $8,000,000 |
| 46630KAU0 | J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | J.P. Morgan Acceptance Corporation I | U.S. Central | 6/12/07 | $28,434,000 |
| 46631KAD7 | J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | J.P. Morgan Acceptance Corporation I | Members United | 6/28/07 | $25,000,000 |

9.      The Credit Unions purchased each RMBS listed in Table 2 (*infra*) pursuant to and traceable to registration statements containing untrue statements of material fact or that omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading.  J.P. Morgan was an underwriter for each of the securities listed in Table 2 and is therefore liable under Section 11.

EXHIBIT 11
20

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 13 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 14 of 190   Page ID
#:2097

**Table 2**

| CUSIP | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 026935AD8 | American Home Mortgage Assets Trust 2007-3 | American Home Mortgage Assets LLC | WesCorp | 6/1/07 | $30,339,000 |
| 45662DAA3 | IndyMac INDX Mortgage Loan Trust 2006-AR29 | IndyMac MBS, Inc. | U.S. Central | 10/31/06 | $74,361,204 |
| 466286AE1 | J.P. Morgan Alternative Loan Trust 2006-A7 | J.P. Morgan Acceptance Corporation I | U.S. Central | 5/16/07 | $24,405,712 |
| 46629KAE9 | J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | J.P. Morgan Acceptance Corporation I | U.S. Central | 10/19/06 | $60,274,241 |
| 46628UAD0 | J.P. Morgan Alternative Loan Trust 2006-A3 | J.P. Morgan Acceptance Corporation I | Members United | 7/24/07 | $23,491,172 |

10.    The RMBS the Credit Unions purchased suffered a significant drop in market value.  The Credit Unions have suffered significant losses from those RMBS purchased despite the NCUA Board's mitigation efforts.

## II.    PARTIES AND RELEVANT NON-PARTIES

11.    The National Credit Union Administration ("NCUA") is an independent agency of the Executive Branch of the United States Government that, among other things, charters and regulates federal credit unions, and operates and manages the National Credit Union Share Insurance Fund ("NCUSIF") and the Temporary Corporate Credit Union Stabilization Fund ("TCCUSF").  The NCUSIF insures the deposits of account holders in all federal credit unions and the majority of state-chartered credit unions.  The NCUA has regulatory authority over state-chartered credit unions that have their deposits insured by the NCUSIF.  The NCUA is under the management of the NCUA Board.  *See* Federal Credit Union Act, 12 U.S.C. §§ 1751, 1752a(a) ("FCU Act").

7

EXHIBIT 11
21

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 14 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 15 of 190   Page ID
#:2098

12.     U.S. Central was a federally-chartered corporate credit union with its offices and principal place of business in Lenexa, Kansas.  As a corporate credit union, U.S. Central provided investment and financial services to other corporate credit unions.

13.     WesCorp was a federally-chartered corporate credit union with its offices and principal place of business in San Dimas, California.  As a corporate credit union, WesCorp provided investment and financial services to other credit unions.

14.     Members United was a federally-chartered corporate credit union with its offices and principal place of business in Warrenville, Illinois.  Members United was created in mid-2006 by the merger of Empire and Mid-States Corporate Federal Credit Unions.  As a corporate credit union, Members United provided investment and financial services to other credit unions.

15.     Southwest was a federally-chartered corporate credit union with its offices and principal place of business in Plano, Texas.  As a corporate credit union, Southwest provided investment and financial services to other credit unions.

16.     The NCUA Board placed U.S. Central and WesCorp into conservatorship on March 20, 2009, pursuant to its authority under the FCU Act, 12 U.S.C. § 1786(h).  On September 24, 2010, the NCUA Board placed Members United and Southwest into conservatorship pursuant to the FCU Act, 12 U.S.C. § 1786(h).  On October 1, 2010, the NCUA Board placed U.S. Central and WesCorp into involuntary liquidation pursuant to 12 U.S.C. §§ 1766(a), 1787(a)(1)(A) and appointed itself Liquidating Agent.  On October 31, 2010, the NCUA Board placed Members United and Southwest into involuntary liquidation, appointing itself Liquidating Agent.

17.     Pursuant to 12 U.S.C. § 1787(b)(2)(A), the NCUA Board as Liquidating Agent has succeeded to all rights, titles, powers, and privileges of the Credit Unions and of any

EXHIBIT 11
22

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 15 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 16 of 190   Page ID
#:2099

member, account holder, officer or director of the Credit Unions, with respect to the Credit Unions and their assets, including the right to bring the claims asserted by them in this action. As Liquidating Agent, the NCUA Board has all the powers of the members, directors, officers, and committees, of the Credit Unions, *see* 12 U.S.C. § 1786(h)(8), and succeeds to all rights, titles, powers, and privileges of the Credit Unions, *see* 12 U.S.C.  § 1787(b)(2)(A).  The NCUA Board may also sue on the Credit Unions' behalf.  *See* 12 U.S.C. §§ 1766(b)(3)(A), 1787(b)(2), 1789(a)(2).

18.     Prior to being placed into conservatorship and involuntary liquidation, U.S. Central, WesCorp, Members United and Southwest were four of the largest corporate credit unions in the United States.

19.     Any recoveries from this legal action will reduce the total losses resulting from the failure of U.S. Central.  Losses from the Credit Unions' failures must be paid from the NCUSIF or the TCCUSF.  Expenditures from these funds must be repaid through assessments against all federally-insured credit unions.  Because of the expenditures resulting from the Credit Unions' failures federally-insured credit unions will experience larger assessments, thereby reducing federally-insured credit unions' net worth.  Reductions in net worth can adversely affect the dividends that individual members of credit unions receive for the savings on deposit at their credit union.  Reductions in net worth can also make loans for home mortgages and automobile purchases more expensive and difficult to obtain.  Any recoveries from this action will help to reduce the amount of any future assessments on federally-insured credit unions throughout the system, reducing the negative impact on federally-insured credit unions' net worth.  Recoveries from this action will benefit credit unions and their individual members by increasing net worth resulting in more efficient and lower-cost lending practices.

EXHIBIT 11
23

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 16 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 17 of 190   Page ID
#:2100

20.     Defendant J.P. Morgan is a United States Securities and Exchange Commission ("SEC") registered broker-dealer.  J.P. Morgan acted as an underwriter of all the RMBS that are the subject of this Complaint and that are listed in Tables 1 and 2 (*supra*).  J.P. Morgan is a Delaware corporation with its principal place of business in New York.

21.     American Home Mortgage Assets, LLC is the depositor and issuer of the American Home Mortgage Assets Trust 2007-3 offering.  American Home Mortgage Assets, LLC is a Delaware corporation with its principal place of business in New York.

22.     Bond Securitization, LLC is the depositor and issuer of the C-BASS 2006-CB7 Trust offering.  Bond Securitization, LLC is a Delaware corporation with its principal place of business in New York.

23.     IndyMac MBS, Inc. is the depositor and issuer of the IndyMac INDX Mortgage Loan Trust 2006-AR29 offering.  IndyMac MBS, Inc. is a Delaware corporation with its principal place of business in California.

24.     J.P. Morgan Acceptance Corporation I is the depositor and issuer of the J.P. Morgan Alternative Loan Trust 2007-A2, J.P. Morgan Alternative Loan Trust 2007-A1, J.P. Morgan Alternative Loan Trust 2006-A7, J.P. Morgan Alternative Loan Trust 2006-A6, J.P. Morgan Alternative Loan Trust 2006-A3, J.P. Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Acquisition Trust 2007-HE1, J.P. Morgan Acquisition Trust 2007-CH5, J.P. Morgan Acquisition Trust 2007-CH4, J.P. Morgan Acquisition Trust 2007-CH3, J.P. Morgan Acquisition Corp. 2006-HE1, and J.P. Morgan Alternative Loan Trust 2007-S1 offerings.  J.P. Morgan Acceptance Corporation I is a Delaware corporation with its principal place of business in New York.

EXHIBIT 11
24

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 17 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 18 of 190   Page ID
#:2101

## III.    JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction pursuant to:  (a) 12 U.S.C. § 1789(a)(2),

which provides that "[a]ll suits of a civil nature at common law or in equity to which the [NCUA

Board] shall be a party shall be deemed to arise under the laws of the United States, and the

United States district courts shall have original jurisdiction thereof, without regard to the amount

in controversy"; and (b) 28 U.S.C. § 1345, which provides that "the district courts shall have

original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or

by any agency or officer thereof expressly authorized to sue by Act of Congress."

26.    Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C.

§ 77v(a), because many of the transactions at issue occurred in Lenexa, Kansas, the headquarters

of U.S. Central.   This Court has personal jurisdiction over each Defendant because they

offered/sold the RMBS at issue in this Complaint to U.S. Central in this District;

prepared/disseminated the Offering Documents containing untrue statements or omissions of

material fact as alleged herein to U.S. Central in this District; and/or are residents of/conduct

business in this District.

## IV.    MORTGAGE ORIGINATION AND SECURITIZATION PROCESS

27.    RMBS are asset-backed securities.  A pool or pools of residential mortgages are

the assets that back or collateralize the RMBS certificates purchased by investors.

28.    Because residential mortgages are the assets collateralizing RMBS, the

origination of the mortgages commences the process that leads to the creation of RMBS.

Originators decide whether to loan potential borrowers money to purchase residential real estate

through a process called mortgage underwriting.   The originator applies its underwriting

standards or guidelines to determine whether a particular borrower is qualified to receive a

mortgage for a particular property.  The underwriting guidelines consist of a variety of metrics,

EXHIBIT 11
25

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 18 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 19 of 190   Page ID
#:2102

including:  the borrower's debt, income, savings, credit history and credit score; whether the property will be owner-occupied; and the amount of the loan compared to the value of the property at issue (the "loan-to-value" or "LTV" ratio), among other things.  Underwriting guidelines are designed to ensure that:  (1) the borrower has the means to repay the loan, (2) the borrower will likely repay the loan, and (3) the loan is secured by sufficient collateral in the event of default.

29.     Historically, most originators made mortgage loans to borrowers and held the loans on their own books for the duration of the loan.  Originators profited as they collected monthly principal and interest payments directly from the borrower.  Originators also retained the risk that the borrower would default on the loan.

30.     This changed in the 1970s when the Government National Mortgage Association ("Ginnie Mae"), the Federal National Mortgage Association ("Fannie Mae"), and the Federal Home Loan Mortgage Corporation ("Freddie Mac") have purchased "conforming loans" (loans underwritten in accordance with Fannie Mae and Freddie Mac underwriting guidelines) from originators and "securitized" them for resale to investors as RMBS.

31.     More recently, originators, usually working with investment banks, began securitizing "non-conforming loans."  Non-conforming loans (loans not written in compliance with Fannie Mae or Freddie Mac guidelines) are also known as "nonprime" or "private label" loans and include "Alt-A" and "subprime" loans.  Despite the non-conforming nature of the underlying mortgages, the securitizers of such RMBS were able to obtain triple-A credit ratings by using "credit enhancement" (explained *infra*) when they securitized the non-conforming loans.

EXHIBIT 11
26

Case 2:11-cv-02341-EFM -JPO  Document 1   Filed 06/20/11   Page 19 of 186
Case 2:10-cv-01597-GW -MAN  Document 140-1   Filed 06/23/11   Page 20 of 190   Page ID
#:2103

32.     On information and belief, all of the loans collateralizing the RMBS at issue in this Complaint are non-conforming mortgage loans.

33.     The issuance of RMBS collateralized by non-conforming loans peaked in 2006. The securitization process shifted the originators' focus from ensuring the ability of borrowers to repay their mortgages, to ensuring that the originator could process (and obtain fees from) an ever-larger loan volume for distribution as RMBS.  This practice is known as "originate-to-distribute" ("OTD").

34.     Securitization begins with a "sponsor" who purchases loans in bulk from one or more originators.  The sponsor transfers title of the loans to an entity called the "depositor."

35.     The depositor transfers the loans to a trust called the "issuing entity."

36.     The issuing entity issues "notes" and/or "certificates" representing an ownership interest in the cash flow from the mortgage pool underlying the securities (*i.e.*, the principal and interest generated as borrowers make monthly payments on the mortgages in the pool).

37.     The depositor files required documents (such as registration statements and prospectuses) with the SEC so that the certificates can be offered to the public.

38.     One or more "underwriters"—like J.P. Morgan—then sell the notes or certificates to investors.

39.     A loan "servicer" collects payments from borrowers on individual mortgages as part of a pool of mortgages, and the issuing entity allocates and distributes the income stream generated from the mortgage loan payments to the RMBS investors.

40.     Figure 1 (*infra*) depicts a typical securitization process.

EXHIBIT 11
27

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 20 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 21 of 190   Page ID
#:2104

**Figure 1**



41.     Because securitization, as a practical matter, shifts the risk of default on the mortgage loans from the originator of the loan to the RMBS investor, the originator's adherence to mortgage underwriting guidelines as represented in the offering documents with respect to the underlying mortgage loans is critical to the investors' ability to evaluate the expected performance of the RMBS.

## V.      RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT

42.     RMBS offerings are generally divided into slices or "tranches," each of which represents a different level of risk.  RMBS certificates denote the particular tranches of the security purchased by the investor.  Each tranche represents a different level of risk.

EXHIBIT 11
28

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 21 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 22 of 190   Page ID
#:2105

43.     The credit rating for an RMBS reflects an assessment of the creditworthiness of that RMBS and indicates the level of risk associated with that RMBS.  Standard & Poor's ("S&P") and Moody's Investors Service, Inc. ("Moody's") are the credit ratings agencies that assigned credit ratings to the RMBS in this case.

44.     The credit rating agencies use letter-grade rating systems as shown in Table 3 (*infra*).

**Table 3**

*Credit Ratings*

| Moody's | S&P | Definitions | Grade Type |
|---------|-----|-------------|------------|
| Aaa | AAA | **Prime (Maximum Safety)** | |
| Aa1<br>Aa2<br>Aa3 | AA+<br>AA<br>AA- | **High Grade, High Quality** | **INVESTMENT GRADE** |
| A1<br>A2<br>A3 | A+<br>A<br>A- | **Upper Medium Grade** | |
| Baa1<br>Baa2<br>Baa3 | BBB+<br>BBB<br>BBB- | **Medium Grade** | |
| Ba2<br>Ba3 | BB<br>BB- | **Non-Investment Grade, or Speculative** | |
| B1<br>B2<br>B3 | B+<br>B<br>B- | **Highly Speculative, or Substantial Risk** | **SPECULATIVE GRADE** |
| Caa2<br>Caa3 | CCC+ | **In Poor Standing** | |
| Ca | CCC<br>CCC- | **Extremely Speculative** | |
| C | - | **May be in Default** | |
| - | D | **Default** | |

45.     Moody's purportedly awards the coveted "Aaa" rating to structured finance products that are "of the highest quality, with minimal credit risk."  Moody's Investors Services, Inc., *Moody's Rating Symbols & Definitions* at 8 (June 2009), *available at* http://v2.moodys.com/cust/content/Content.ashx?source=StaticContent/Free%20Pages/Products %20and%20Services/Downloadable%20Files/Rating_Symbols_Definitions.pdf.  Likewise, S&P

EXHIBIT 11
29

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 22 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 23 of 190   Page ID
#:2106

rates a product "AAA" when the "obligor's capacity to meet its financial commitment on the obligation is extremely strong."   Standard & Poor's, *Ratings Definitions*, *available at* http://www.standardandpoors.com/ratings/articles/en/us/?assetID=1245303711350.

46.    In fact, RMBS could not be sold unless they received one of the highest "investment grade" ratings on most tranches from one or more credit rating agencies because the primary market for RMBS is institutional investors, such as the Credit Unions, which are generally limited to buying only securities with the highest credit ratings.  *See*, *e.g.*, NCUA Credit Risk Management Rule, 12 C.F.R. § 704.6(d)(2) (2010) (prohibiting corporate credit unions from investing in securities rated below AA-); *but see*, *e.g.*, Removing References to Credit Ratings in Regulations; Proposing Alternatives to the Use of Credit Ratings, 76 Fed. Reg. 11,164 (proposed Mar. 1, 2011) (to be codified at 12 C.F.R. pts. 703, 704, 709, and 742) (the NCUA's proposed rule eliminating the use of credit ratings for guidance in investment decisions by credit unions).

47.    While the pool of mortgages underlying the RMBS may not have been sufficient to warrant a triple-A credit rating, the use of various forms of "credit enhancement" were used to obtain a triple-A rating on the higher tranches of RMBS.

48.    One form of credit enhancement is "structural subordination."  The tranches, and their risk characteristics relative to each other, are often analogized to a waterfall.  Investors in the higher or "senior" tranches are the first to be paid as income is generated when borrowers make their monthly payments.  After investors in the most senior tranche are paid, investors in the next subordinate or "junior" tranche are paid, and so on down to the most subordinate or lowest tranche.

EXHIBIT 11
30

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 23 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 24 of 190   Page ID
#:2107

49.     In the event mortgages in the pool default, the resulting loss is absorbed by the subordinate tranches first.

50.     Accordingly, senior tranches are deemed less risky than subordinate tranches and therefore receive higher credit ratings.

51.     Another form of credit enhancement is overcollateralization. Overcollateralization is the inclusion of a higher dollar amount of mortgages in the pool than the par value of the security.  The spread between the value of the pool and the par value of the security acts as a cushion in the event of a shortfall in expected cash flow.

52.     Other forms of credit enhancement include "excess spread," monoline insurance, obtaining a letter of credit, and "cross-collateralization."  "Excess spread" involves increasing the interest rate paid to the purchasers of the RMBS relative to the interest rate received on the cash flow from the underlying mortgages.  Monoline insurance, also known as "wrapping" the deal, involves purchasing insurance to cover losses from any defaults.  Finally, some RMBS are "cross-collateralized," *i.e.,* when a tranche in an RMBS experiences rapid prepayments or disproportionately high realized losses, principal and interest collected from another tranche is applied to pay principal or interest, or both, to the senior certificates in the loan group experiencing rapid prepayment or disproportionate losses.

## VI.     THE CREDIT UNIONS' PURCHASES

53.     The Credit Unions purchased only the highest-rated tranches of RMBS.  All but one were rated triple-A at the time of issuance.  These securities have since been downgraded below investment grade just a few years after they were sold (*see infra* Table 4).

EXHIBIT 11
31

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 24 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 25 of 190   Page ID
#:2108

**Table 4**

| | CREDIT RATINGS OF RMBS PURCHASES ORIGINAL/RECENT | | | | | |
|---|---|---|---|---|---|---|
| **CUSIP** | **ISSUER NAME** | **BUYER** | **ORIGINAL RATING S&P** | **ORIGINAL RATING MOODY'S** | **RECENT RATING S&P** | **RECENT RATING MOODY'S** |
| 026935AD8 | American Home Mortgage Assets Trust 2007-3 | WesCorp | AAA 6/14/2007 | Aaa 6/14/2007 | D 2/24/2010 | C 2/2/2009 |
| 12479DAE8 | C-BASS 2006-CB7 Trust | U.S. Central | AAA 10/11/2006 | Aaa 10/24/2006 | CCC 8/4/2009 | C 4/12/2010 |
| 45662DAA3 | IndyMac INDX Mortgage Loan Trust 2006-AR29 | U.S. Central | AAA 10/3/2006 | Aaa 10/9/2006 | D 10/22/2010 | Caa3 1/29/2009 |
| 45662DAD7 | IndyMac INDX Mortgage Loan Trust 2006-AR29 | U.S. Central | AAA 10/3/2006 | Aaa 10/9/2006 | D 10/22/2010 | Caa3 1/29/2009 |
| 46628GAA7 | J.P. Morgan Alternative Loan Trust 2006-A2 | U.S. Central | AAA 5/2/2006 | Aaa 5/8/2006 | CCC 7/24/2009 | Caa3 9/17/2010 |
| 46628GAA7 | J.P. Morgan Alternative Loan Trust 2006-A2 | Members United | AAA 5-2-2006 | Aaa 5/8/2006 | CCC 7/24/2009 | Caa3 9/17/2010 |
| 46628GAD1 | J.P. Morgan Alternative Loan Trust 2006-A2 | U.S. Central | AAA 5/2/2006 | Aaa 5/8/2006 | CCC 7/24/2009 | Ca 9/17/2010 |
| 46628GAK5 | J.P. Morgan Alternative Loan Trust 2006-A2 | WesCorp | AAA 5/2/2006 | NR | D 12/17/2010 | NR |
| 46628UAD0 | J.P. Morgan Alternative Loan Trust 2006-A3 | U.S. Central | AAA 7/6/2006 | Aaa 7/18/2006 | CCC 7/24/2009 | Ca 9/17/2010 |
| 46628UAD0 | J.P. Morgan Alternative Loan Trust 2006-A3 | Members United | AAA 7/6/2006 | Aaa 7/18/2006 | CCC 7/24/2009 | Ca 9/17/2010 |
| 46628UAE8 | J.P. Morgan Alternative Loan Trust 2006-A3 | U.S. Central | AAA 7/6/2006 | Aaa 7/18/2006 | CCC 7/24/2009 | C 9/17/2010 |
| 466285AA1 | J.P. Morgan Alternative Loan Trust 2006-A6 | U.S. Central | AAA 11/1/2006 | Aaa 10/31/2006 | CCC 9/2/2009 | Ca 9/17/2010 |
| 466285AC7 | J.P. Morgan Alternative Loan Trust 2006-A6 | U.S. Central | AAA 11/1/2006 | Aaa 10/31/2006 | CCC 9/2/2009 | Caa2 9/17/2010 |
| 466285AD5 | J.P. Morgan Alternative Loan Trust 2006-A6 | U.S. Central | AAA 11/1/2006 | Aaa 10/31/2006 | CCC 9/2/2009 | C 9/17/2010 |

EXHIBIT 11
32

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 25 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 26 of 190   Page ID
#:2109

| CREDIT RATINGS OF RMBS PURCHASES ORIGINAL/RECENT | | | | | | |
|---|---|---|---|---|---|---|
| CUSIP | ISSUER NAME | BUYER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
| 466285AE3 | J.P. Morgan Alternative Loan Trust 2006-A6 | U.S. Central | AAA 11/1/2006 | Aaa 10/31/2006 | CC 2/16/2010 | C 9/17/2010 |
| 466286AA9 | J.P. Morgan Alternative Loan Trust 2006-A7 | U.S. Central | AAA 12/4/2006 | Aaa 1/3/2007 | CCC 6/25/2009 | Caa3 9/17/2010 |
| 466286AC5 | J.P. Morgan Alternative Loan Trust 2006-A7 | U.S. Central | AAA 12/4/2006 | Aaa 1/3/2007 | CCC 6/25/2009 | Caa2 9/17/2010 |
| 466286AD3 | J.P. Morgan Alternative Loan Trust 2006-A7 | U.S. Central | AAA 12/4/2006 | Aaa 1/3/2007 | CCC 6/25/2009 | Ca 9/17/2010 |
| 466286AE1 | J.P. Morgan Alternative Loan Trust 2006-A7 | WesCorp | AAA 12/4/2006 | Aaa 1/3/2007 | D 3/18/2010 | C 9/17/2010 |
| 466286AE1 | J.P. Morgan Alternative Loan Trust 2006-A7 | U.S. Central | AAA 12/4/2006 | Aaa 1/3/2007 | D 3/18/2010 | C 9/17/2010 |
| 466287AA7 | J.P. Morgan Alternative Loan Trust 2007-A1 | U.S. Central | AAA 3/1/2007 | Aaa 3/14/2007 | D 11/24/2010 | Ca 9/17/2010 |
| 466278AC2 | J.P. Morgan Alternative Loan Trust 2007-A2 | U.S. Central | AAA 6/3/2007 | Aaa 6/11/2007 | CCC 9/1/2009 | Ca 9/17/2010 |
| 466278AC2 | J.P. Morgan Alternative Loan Trust 2007-A2 | Members United | AAA 6/3/2007 | Aaa 6/11/2007 | CCC 9/1/2009 | Ca 9/17/2010 |
| 466275AB0 | J.P. Morgan Alternative Loan Trust 2007-S1 | Southwest | AAA | Aaa 6/11/2007 | CCC 3/1/2010 | C 9/17/2010 |
| 46626LGF1 | J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | U.S. Central | AAA 3/3/2006 | Aaa 3/10/2006 | CCC 8/4/2009 | Ca 12/28/2010 |
| 46629KAE9 | J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | U.S. Central | AAA 9/27/2006 | Aaa 10/2/2006 | CCC 10/6/2009 | Ca 3/24/2009 |
| 46630XAF5 | J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | U.S. Central | AAA 6/1/2007 | Aaa 5/15/2007 | CCC 8/4/2009 | Caa3 12/28/2010 |
| 46630XAD0 | J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | Members United | AAA | Aaa 5/31/2007 | CCC 3/2/2010 | Caa1 12/29/2010 |

19

EXHIBIT 11
33

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 26 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 27 of 190   Page ID
#:2110

| CREDIT RATINGS OF RMBS PURCHASES ORIGINAL/RECENT | | | | | | |
|---|---|---|---|---|---|---|
| CUSIP | ISSUER NAME | BUYER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
| 46630XAE8 | J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | Southwest | AAA | Aaa 5/31/2007 | CCC 8/4/2009 | Caa3 12/29/2010 |
| 46630CAE4 | J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | U.S. Central | AAA 6/19/2007 | Aaa 6/15/2007 | CCC 8/4/2009 | Ca 7/14/2010 |
| 46630CAF1 | J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | U.S. Central | AA+ 6/19/2007 | Aa1 6/15/2007 | CCC 8/4/2009 | C 7/14/2010 |
| 46630CAD6 | J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | Southwest | AAA | Aaa 6/8/2007 | CCC 8/4/2009 | Caa2 12/29/2010 |
| 46631KAD7 | J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | Members United | AAA | Aaa 7/9/2007 | CCC 8/4/2009 | B3 12/29/2010 |
| 46630KAU0 | J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | U.S. Central | AAA 6/21/2007 | Aaa 6/29/2007 | CCC 8/4/2009 | Ca 7/14/2010 |

54.   At the time of purchase, the Credit Unions were not aware of the untrue statements or omissions of material facts in the Offering Documents of the RMBS.  If the Credit Unions had known about the Originators' pervasive disregard of underwriting standards—contrary to the representations in the Offering Documents—the Credit Unions would not have purchased the certificates.

55.   The securities' substantial loss of market value has injured the Credit Unions and the NCUA Board.

## VII.   THE ORIGINATORS SYSTEMATICALLY DISREGARDED THE UNDERWRITING GUIDELINES STATED IN THE OFFERING DOCUMENTS

56.   The performance and value of RMBS are largely contingent upon borrowers repaying their mortgages.  The loan underwriting guidelines ensure that the borrower has the

EXHIBIT 11
34

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 27 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 28 of 190   Page ID
#:2111

means to repay the mortgage and that the RMBS is secured by sufficient collateral in the event of reasonably anticipated defaults on underlying mortgage loans.

57.    With respect to RMBS collateralized by loans written by originators who systematically disregarded their stated underwriting standards, the following pattern is present:

a.    a surge in borrower delinquencies and defaults on the mortgages in the pools (*see infra* Section VII.A and Table 5);

b.    actual losses to the underlying mortgage pools within the first 12 months after the offerings exceeded expected losses (*see infra* Section VII.B and Figure 2); and,

c.    a high percentage of the underlying mortgage loans were originated for distribution, as explained below (*see infra* Table 6 and accompanying allegations).

58.    These factors support a finding that the Originators failed to originate the mortgages in accordance with the underwriting standards stated in the Offering Documents.

59.    This conclusion is further corroborated by reports that the Originators who contributed mortgage loans to the RMBS at issue in this Complaint abandoned the underwriting standards described in the RMBS Offering Documents (*see infra* Section VII.D).

A.    **The Surge in Mortgage Delinquency and Defaults Shortly After the Offerings and the High OTD Practices of the Originators Demonstrates Systematic Disregard of Underwriting Standards**

60.    Residential mortgages are generally considered delinquent if no payment has been received for more than 30 days after payment is due.  Residential mortgages where no payment has been received for more than 90 days (or three payment cycles) are generally considered to be in default.

EXHIBIT 11
35

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 28 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 29 of 190   Page ID
#:2112

61.     The surge of delinquencies and defaults following the offerings evidences the systematic flaws in the Originators' underwriting process (*see infra* Table 5).

62.     The Offering Documents reported zero or near zero delinquencies and defaults at the time of the offerings (*see infra* Table 5).

63.     The pools of mortgages collateralizing the RMBS experienced delinquency and default rates up to 9.64% within the first three months, up to 23.04% at six months, and up to 43.78% at one year (*see infra* Table 5).

64.     As of May 2011, approximately half (49.67%) of the mortgage collateral across all of the RMBS that the Credit Unions purchased was in delinquency, bankruptcy, foreclosure, or was real estate owned ("REO"), which means that a bank or lending institution owns the property after a failed sale at a foreclosure auction (*see infra* Table 5).

65.     Table 5 (*infra*) reflects the delinquency, foreclosure, bankruptcy, and REO rates on the RMBS as to which claims are asserted in this Complaint.  The data presented in the last five columns are from the trustee reports (dates and page references as indicated in the parentheticals).  The shadowed rows reflect the group of mortgages in the pool underlying the specific tranches purchased by the Credit Unions; however, some trustee reports include only the aggregate data.  For RMBS with multiple groups, aggregate information on all the groups is included because the tranches are cross-collateralized.

EXHIBIT 11
36

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 29 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 30 of 190   Page ID
#:2113

**Table 5**

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | American Home Mortgage Assets Trust 2007-3: Aggregate (P.S. dated June 5, 2007) | Zero (S-40) | 0% (June, p.10) | 4.99% (Aug., p.10) | 13.9% (Nov., p.10) | 27.47% (May, p.10) | 46.49% (May 2011, p.11) |
| | American Home Mortgage Assets Trust 2007-3: Group 1-1 | Zero (S-40) | 0% (June, p.12) | 2.62% (Aug., p.12) | 8.63% (Nov., p.12) | 23.58% (May, p.12) | 52.52% (May 2011, p.12) |
| 026935AD8 | American Home Mortgage Assets Trust 2007-3: Group 1-2 *Class I-2A-2 in Group I-2 (S-12) | Zero (S-40) | 0% (June, p.12) | 9.63% (Aug., p.12) | 23.04% (Nov., p.12) | 43.78% (May, p.12) | 62.39% (May 2011, p.12) |
| | American Home Mortgage Assets Trust 2007-3: Group 2-1 | Zero (S-40) | 0% (June, p.13) | 2.04% (Aug., p.13) | 5.74% (Nov., p.13) | 15.73% (May, p.13) | 42.32% (May 2011, p.13) |
| | American Home Mortgage Assets Trust 2007-3: Group 2-2 | Zero (S-40) | 0% (June, p.13) | 3.72% (Aug., p.13) | 12.44% (Nov., p.13) | 25.55% (May, p.13) | 42.85% (May 2011, p.13) |
| | American Home Mortgage Assets Trust 2007-3: Group 3 | Zero (S-40) | 0% (June, p.14) | 5.16% (Aug., p.14) | 16.35% (Nov., p.14) | 18.05% (May, p.14) | 13.85% (May 2011, p.14) |
| | C-BASS 2006-CB7 Trust: Aggregate (P.S. dated October 2, 2006) | Zero ("Delinquency Status" table) | .77% (Oct., p.14) | 4.71% (Dec., p.14) | 9.9% (Mar., p.15) | 19.53% (Sept., p.16) | 48.74% (May 2011, p.18) |
| | C-BASS 2006-CB7 Trust:  Group 1 Total | Zero ("Delinquency Status" table) | .94% (Oct., p.15) | 4.02% (Dec., p.15) | 9.11% (Mar., p.16) | 18.75% (Sept., p.17) | 49.06% (May 2011, p.19) |
| 12479DAE8 | C-BASS 2006-CB7 Trust:  Group 2 Total *Class A-5 in Group 2 ("The Mortgage Loans" section) | Zero ("Delinquency Status" table) | .57% (Oct., p.18) | 5.53% (Dec., p.18) | 10.84% (Mar., p.19) | 18.76% (Sept., p.20) | 48.36% (May 2011, p.22) |
| 45662DAA3 45662DAD7 | IndyMac INDX Mortgage Loan Trust 2006-AR29 (P.S. dated September 28, 2006) | Zero (S-32) | 1.42% (Oct., p.10) | 3.47% (Dec., p.10) | 5.94% (Mar., p.10) | 11.07% (Sept., p.10) | 41.36% (May 2011, p.10) |
| | J.P. Morgan Alternative Loan Trust 2006-A2: Aggregate | | 1.53% (May, p.13) | 3% (July, p.13) | 4.21% (Oct., p.13) | 7.73% (Apr., p.12) | 42.27% (May 2011, p.12) |

23

EXHIBIT 11
37

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 30 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 31 of 190   Page ID
#:2114

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 46628GAA7 46628GAD1 | J.P. Morgan Alternative Loan Trust 2006-A2: Group 1 *Classes 1-A-1, 1-A-4 , and 1-A-5 in Group 1 (S-1) | Zero (S-22) | 2.15% (May, p.14) | 3.93% (July, p.14) | 6.02% (Oct., p.14) | 10.68% (Apr., p.13) | 45.61% (May 2011, p.13) |
| 46628GAK5 | J.P. Morgan Alternative Loan Trust 2006-A2: Group 2 *Class 2-A-5 in Group 2 (S-1) | Zero (S-22) | 1.2% (May, p.14) | 2.16% (July, p.14) | 2.54% (Oct., p.14) | 5.01% (Apr., p.13) | 36.67% (May 2011, p.13) |
| | J.P. Morgan Alternative Loan Trust 2006-A2: Group 4 | Zero (S-22) | .95% (May, p.15) | 2.39% (July, p.15) | 5.4% (Oct., p.15) | 7.52% (Apr., p.14) | 42.39% (May 2011, p.14) |
| | J.P. Morgan Alternative Loan Trust 2006-A2: Group 5 | Zero (S-22) | 1.28% (May, p.16) | 1.8% (July, p.16) | 2.31% (Oct., p.16) | 5.44% (Apr., p.15) | 45.89% (May 2011, p.15) |
| | J.P. Morgan Alternative Loan Trust 2006-A3: Aggregate (P.S. dated June 28, 2006) | Zero (S-20) | 1.42% (July, p.13) | 2.92% (Sept., p.13) | 4.59% (Dec., p.12) | 7.56% (June, p.12) | 46.87% (May 2011, p.12) |
| 46628UAD0 46628UAE8 | J.P. Morgan Alternative Loan Trust 2006-A3: Group 1 *Class 1-A-4 and 1-A-5 in Group 1 (S-4) | Zero (S-20) | 1.34% (July, p.14) | 3.21% (Sept., p.14) | 5.83% (Dec., p.13) | 9.13% (June, p.13) | 45.71% (May 2011, p.13) |
| | J.P. Morgan Alternative Loan Trust 2006-A3: Group 2 | Zero (S-20) | .56% (July, p.14) | 2.45% (Sept., p.14) | 2.93% (Dec., p.13) | 4.7% (June, p.13) | 48.75% (May 2011, p.14) |
| | J.P. Morgan Alternative Loan Trust 2006-A3: Group 3 | Zero (S-20) | 3.12% (July, p.15) | 2.43% (Sept., p.15) | 2.32% (Dec., p.14) | 6.23% (June, p.14) | 47.60% (May 2011, p.14) |
| | J.P. Morgan Alternative Loan Trust 2006-A6: Aggregate (P.S. dated October 27, 2006) | | 1.34% (Nov., p.11) | 3.56% (Jan., p.10) | 4.25% (Apr., p.10) | 9.49% (Oct., p.10) | 49.61% (May 2011, p.10) |
| 466285AA1 466285AC7 466285AD5 466285AE3 | J.P. Morgan Alternative Loan Trust 2006-A6: Group 1 *Class 1-A-1, 1-A-3, 1-A-4, and 1-A-5 in Group 1 (S-109) | Zero (S-19) | 1.8% (Nov., p.12) | 4.25% (Jan., p.11) | 5.18% (Apr., p.11) | 11.58% (Oct., p.11) | 55.18% (May 2011, p.11) |

EXHIBIT 11
38

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 31 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 32 of 190   Page ID
#:2115

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | J.P. Morgan Alternative Loan Trust 2006-A6: Group 2 | Zero (S-20) | .28% (Nov., p.12) | 1.97% (Jan., p.11) | 2.08% (Apr., p.11) | 4.56% (Oct., p.11) | 36.57% (May 2011, p.11) |
| | J.P. Morgan Alternative Loan Trust 2006-A7: Aggregate (P.S. dated November 28, 2006) | | 2.9% (Dec., p.14) | 3.82% (Feb., p.15) | 5.25% (May, p.14) | 12.55% (Nov., p.14) | 48.79% (May 2011, p.13) |
| 466286AA9 466286AC5 466286AD3 466286AE1 | J.P. Morgan Alternative Loan Trust 2006-A7: Group 1 *Class 1-A-1, 1-A-3, 1-A-4, and 1-A-5 in Group 1 (S-112) | Zero (S-19) | 3.38% (Dec., p.14) | 4.4% (Feb., p.15) | 5.8% (May, p.14) | 13.37% (Nov., p.14) | 49.14% (May 2011, p.13) |
| | J.P. Morgan Alternative Loan Trust 2006-A7: Group 2 | Zero (S-20) | 1.55% (Dec., p.15) | 2.15% (Feb., p.16) | 3.74% (May, p.15) | 10.29% (Nov., p.15) | 47.72% (May 2011, p.14) |
| | J.P. Morgan Alternative Loan Trust 2007-A1: Aggregate (P.S. dated February 26, 2007) | | 5.13% (Mar., p.16) | 5.11% (May, p.16) | 8.05% (Aug. p.17) | 21.02% (Feb., p.17) | 54.49% (May 2011, p.16) |
| 466287AA7 | J.P. Morgan Alternative Loan Trust 2007-A1: Group 1A *Class 1-A-1A in Pool 1 Senior Certificates ("Description of the Certificates" section) | Zero ("Description of the Mortgage Pool" section) | 5.64% (Mar., p.16) | 6.56% (May, p.16) | 10.91% (Aug., p.17) | 25.94% (Feb., p.17) | 59.47% (May 2011, p.16) |
| 466287AA7 | J.P. Morgan Alternative Loan Trust 2007-A1: Group 1B *Class 1-A-1A in Pool 1 Senior Certificates ("Description of the Certificates" section) | Zero ("Description of the Mortgage Pool" section) | 5.62% (Mar., p.17) | 4.24% (May, p.17) | 5.95% (Aug., p.18) | 19.75% (Feb., p.18) | 48.80% (May 2011, p.17) |
| | J.P. Morgan Alternative Loan Trust 2007-A1: Group 2 | Zero ("Description of the Mortgage Pool" section) | 4.71% (Mar., p.17) | 2.12% (May, p.17) | 3.29% (Aug., p.18) | 12.43% (Feb., p.18) | 54.49% (May 2011, p.17) |
| | J.P. Morgan Alternative Loan Trust 2007-A1: Group 3 | Zero ("Description of the Mortgage Pool" section) | 2.67% (Mar., p.18) | 3.03% (May, p.18) | 3.62% (Aug., p.19) | 11.82% (Feb., p.19) | 43.84% (May 2011, p.19) |

EXHIBIT 11
39

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 32 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 33 of 190   Page ID
#:2116

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | J.P. Morgan Alternative Loan Trust 2007-A2: Aggregate (P.S. dated May 31, 2007) | Zero ("Description of the Mortgage Pool" section) | 3.15% (June, p.16) | 7.91% (Aug., p.16) | 13.89% (Nov., p.16) | 25.61% (May, p.16) | 55.48% (May 2011, p.16) |
| 466278AC2 | J.P. Morgan Alternative Loan Trust 2007-A2: Group 1 *Class 1-2-A1 in Pool 1 Senior Certificates ("Description of the Certificates" section) | Zero ("Description of the Mortgage Pool" section) | 3.61% (June, p.17) | 7.2% (Aug., p.17) | 12.47% (Nov., p.17) | 24.69% (May, p.17) | |
| 466278AC2 | J.P. Morgan Alternative Loan Trust 2007-A2: Group 1A *Class 1-2-A1 in Pool 1 Senior Certificates ("Description of the Certificates" section) | Zero ("Description of the Mortgage Pool" section) | Trustee report does not have % for a Group 1A | Trustee report does not have % for a Group 1A | Trustee report does not have % for a Group 1A | Trustee report does not have % for a Group 1A | 55.50% (May 2011, p.17) |
| 466278AC2 | J.P. Morgan Alternative Loan Trust 2007-A2: Group 1B *Class 1-2-A1 in Pool 1 Senior Certificates ("Description of the Certificates" section) | Zero ("Description of the Mortgage Pool" section) | Trustee report does not have % for a Group 1B | Trustee report does not have % for a Group 1B | Trustee report does not have % for a Group 1B | Trustee report does not have % for a Group 1B | 61.32% (May 2011, p.17) |
| | J.P. Morgan Alternative Loan Trust 2007-A2: Group 2 | Zero ("Description of the Mortgage Pool" section) | 3.27% (June, p.17) | 9.64% (Aug., p.17) | 17.03% (Nov., p.17) | 31.45% (May, p.17) | 48.40% (May 2011, p.18) |
| | J.P. Morgan Alternative Loan Trust 2007-A2: Group 3 | Zero ("Description of the Mortgage Pool" section) | 2.97% (June, p.18) | 4.08% (Aug., p.18) | 5.2% (Nov., p.18) | 10.4% (May, p.18) | 39.38% (May 2011, p.18) |
| | J.P. Morgan Alternative Loan Trust 2007-A2: Group 4 | Zero ("Description of the Mortgage Pool" section) | 2.51% (June, p.18) | 4.95% (Aug., p.18) | 7.41% (Nov., p.18) | 8.58% (May, p.18) | 31.40% (May 2011, p.19) |
| | J.P. Morgan Alternative Loan Trust 2007-A2: Group 5 | Zero ("Description of the Mortgage Pool" section) | 0% (June, p.19) | .68% (Aug., p.19) | 4.77% (Nov., p.19) | 1.85% (May, p.19) | Trustee report does not have % for a Group 5 |
| 466275AB0 | J.P. Morgan Alternative Loan Trust 2007-S1 (Class A-2) | Zero ("Description of the Mortgage Pool" section) | 1.17% (June, p.9) | 3.51% (Aug., p.9) | 7.53% (Nov., p.9) | 13.76% (May, p.9) | 42.01% (May 2011, p.9) |

EXHIBIT 11
40

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 33 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 34 of 190   Page ID
#:2117

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | J.P. Morgan Mortgage Acquisition Corp. 2006-HE1:  Group 1 | 0.48% of the Group 1 mortgage loans were 30 to 59 days delinquent. (S-11) | .42% (Mar., pp.8-11) | 1.62% (May, pp.9-13) | 5.19% (Aug., pp.9-13) | 12% (Feb., pp.10-14) | 46.02% (May 2011, S-13) |
| 46626LGF1 | J.P. Morgan Mortgage Acquisition Corp. 2006-HE1:  Group 2 *Class A-4 in Group 2 (S-3) | 0.63% of the Group 2 mortgage loans were 30 to 59 days delinquent. (S-11) | .88% (Mar., pp.8-11) | 3.25% (May, pp.9-13) | 6.06% (Aug., pp.9-13) | 17.39% (Feb., pp.10-14) | 50.85% (May 2011, S-14) |
| | J.P. Morgan Mortgage Acquisition Trust 2006-WMC3: Aggregate (P.S. dated August 22, 2006) | Approximately 0.55%, 1.11% and 0.95% of the mortgage loans in group 1, group 2 and the aggregate pool, respectively as of the cut-off date, were 30 to 59 days delinquent. (S-19) | | | | 19.36% (July, p.9) | 51.48% (May 2011, S-11) |
| | J.P. Morgan Mortgage Acquisition Trust 2006-WMC3: Group 1 | Approximately 0.55%, 1.11% and 0.95% of the mortgage loans in group 1, group 2 and the aggregate pool, respectively as of the cut-off date, were 30 to 59 days delinquent. (S-19) | | | | 14.45% (July, p.11) | 50.38% (May 2011, S-13) |
| 46629KAE9 | J.P. Morgan Mortgage Acquisition Trust 2006-WMC3: Group 2 *Class A-4 in Group 2 (S-9) | Approximately 0.55%, 1.11% and 0.95% of the mortgage loans in group 1, group 2 and the aggregate pool, respectively as of the cut-off date, were 30 to 59 days delinquent. (S-19) | | | | 21.31% (July, p.11) | 52.02% (May 2011, S-14) |

27

EXHIBIT 11

41

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 34 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 35 of 190   Page ID
#:2118

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | J.P. Morgan Mortgage Acquisition Trust 2007-CH3: Aggregate (P.S. dated May 3, 2007) | Approximately 0.13%, 0.13% and 0.14% of the Mortgage Loans in the Aggregate Pool, Group 1 and Group 2, respectively, were 30 to 59 days delinquent; however, as of April 24, 2007, all of the Mortgage Loans were current. ("The Mortgage Loans" section) | 1.48% (May, p.10) | 3.9% (July, p.10) | 7.12% (Oct., p.10) | 18.47% (Apr., p.10) | 48.69% (May 2011, p.10) |
| | J.P. Morgan Mortgage Acquisition Trust 2007-CH3: Group 1 | Approximately 0.13%, 0.13% and 0.14% of the Mortgage Loans in the Aggregate Pool, Group 1 and Group 2, respectively, were 30 to 59 days delinquent; however, as of April 24, 2007, all of the Mortgage Loans were current. ("The Mortgage Loans" section) | 1.15% (May, p.11) | 2.91% (July, p.11) | 5.69% (Oct., p.11) | 15.6% (Apr., p.12) | 47.69% (May 2011, p.15) |
| 46630XAF5 46630XAD0 46630XAE8 | J.P. Morgan Mortgage Acquisition Trust 2007-CH3:  Group 2 *Classes A-5 in Group 2. ("Designations" section) | Approximately 0.13%, 0.13% and 0.14% of the Mortgage Loans in the Aggregate Pool, Group 1 and Group 2, respectively, were 30 to 59 days delinquent; however, as of April 24, 2007, all of the Mortgage Loans were current. ("The Mortgage Loans" section) | 1.74% (May, p.12) | 4.68% (July, p.12) | 8.26% (Oct., p.12) | 20.75% (Apr., p.14) | 49.50% (May 2011, p.20) |

28

EXHIBIT 11
42

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 35 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 36 of 190   Page ID
#:2119

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 46630CAF1 46630CAD6 | J.P. Morgan Mortgage Acquisition Trust 2007-CH4: Aggregate (P.S. dated June 7, 2007) *Class M-1 in Subordinate Certificates ("Designations" section) | Zero ("Description of the Mortgage Pool" section) | .84% (June, p.10) | 3.2% (Aug., p.10) | 7.89% (Nov., p.10) | 19.04% (May, p.10) | 47.83% (May 2011, p.10) |
| | J.P. Morgan Mortgage Acquisition Trust 2007-CH4: Group 1 | Zero ("Description of the Mortgage Pool" section) | .54% (June, p.11) | 2.69% (Aug., p.11) | 6.25% (Nov., p.11) | 15.54% (May, p.12) | 45.92% (May 2011, p.15) |
| 46630CAE4 | J.P. Morgan Mortgage Acquisition Trust 2007-CH4: Group 2 *Class A-5 in Group 2 ("Designations" section) | Zero ("Description of the Mortgage Pool" section) | 1.14% (June, p.12) | 3.71% (Aug., p.12) | 9.5% (Nov., p.12) | 22.47% (May, p.14) | 49.77% (May 2011, p.18) |
| | J.P. Morgan Mortgage Acquisition Trust 2007-HE1: Aggregate (P.S. dated June 14, 2007) | Zero ("Description of the Mortgage Pool") | 2.45% (June, p.12) | 7.6% (Aug. p.12) | 15.21% (Nov., p.12) | 27.41% (May, p.12) | 46.69% (May 2011, p.14) |
| | J.P. Morgan Mortgage Acquisition Trust 2007-HE1: Group 1 | Zero ("Description of the Mortgage Pool") | .43% (June, p.13) | 2.15% (Aug., p.13) | 6.31% (Nov., p.13) | 14.68% (May, p.15) | 42.77% (May 2011, p.19) |
| 46630KAU0 | J.P. Morgan Mortgage Acquisition Trust 2007-HE1: Group 2 *Class AV-4 in Group 2 ("Designations" section) | Zero ("Description of the Mortgage Pool") | 3.04% (June, p.14) | 9.2% (Aug., p.14) | 17.85% (Nov., p.14) | 31.33% (May, p.17) | 48.32% (May 2011, p.24) |
| 46631KAD7 | J.P. Morgan Mortgage Acquisition Trust 2007-CH5 (Class A-4) | Zero ("Description of the Mortgage Pool") | 1.48% (July, p.10) | 5.14% (Sept., 10) | 9.02% (Dec., p.10) | 20.64% (June, p.10) | 51.07% (May 2011, p.10) |

66.     This early spike in delinquencies and defaults, which occurred almost immediately after these RMBS were purchased by the Credit Unions, was later discovered to be indicative of the Originators' systematic disregard of their stated underwriting guidelines.

EXHIBIT 11
43

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 36 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 37 of 190   Page ID
#:2120

67.     The phenomenon of borrower default shortly after origination of the loans is known as "Early Payment Default."   Early Payment Default evidences borrower misrepresentations and other misinformation in the origination process, resulting from the systematic failure of the Originators to apply the underwriting guidelines described in the Offering Documents.

68.     A November 2008 Federal Reserve Board study attributed the rise in defaults, in part, to "[d]eteriorating lending standards" and posits that "the surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to investors."  Christopher J. Mayer *et al.*, *The Rise in Mortgage Defaults* at 15-16 (Fed. Reserve Bd. Fin. & Econ. Discussion Series, Paper No. 2008-59).

69.     In January 2011, the Financial Stability Oversight Council, chaired by United States Treasury Secretary Timothy Geithner, issued a report analyzing the effects of risk retention requirements in mortgage lending on the broader economy.  *See* FIN. STABILITY OVERSIGHT COUNCIL, MACROECONOMIC EFFECTS OF RISK RETENTION REQUIREMENTS (2011) ("FSOC Risk Retention Report").  The FSOC Risk Retention Report focused on stabilizing the mortgage lending industry through larger risk retention requirements in the industry that can "incent better lending decisions" and "help to mitigate some of the pro-cyclical effects securitization may have on the economy."  *Id.* at 2.

70.     The FSOC Risk Retention Report observed that the securitization process often incentivizes poor underwriting by shifting the risk of default from the originators to the investors, while obscuring critical information concerning the actual nature of the risk.   The report stated:

> The securitization process involves multiple parties with varying incentives and information, thereby breaking down the traditional direct relationship between

EXHIBIT 11
44

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 37 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 38 of 190   Page ID
#:2121

borrower and lender.  The party setting underwriting standards and making lending decisions (the originator) and the party making structuring decisions (the securitizer) are often exposed to minimal or no credit risk.  By contrast, the party that is most exposed to credit risk (the investor) often has less influence over underwriting standards and may have less information about the borrower.  As a result, originators and securitizers that do not retain risk can, at least in the short run, maximize their own returns by lowering loan underwriting standards in ways that investors may have difficulty detecting.  The originate-to-distribute model, as it was conducted, exacerbated this weakness by compensating originators and securitizers based on volume, rather than on quality.

*Id.* at 3.

71.     Indeed, originators that wrote a high percentage of their loans for distribution were more likely to disregard underwriting standards, resulting in poorly performing mortgages, in contrast to originators that originated and then held most of their loans.

72.     High OTD originators profited from mortgage origination fees without bearing the risks of borrower default or insufficient collateral in the event of default.  Divorced from these risks, high OTD originators were incentivized to push loan quantity over quality.

73.     Table 6 (*infra*) shows the percentage of loans originated for distribution relative to all the loans made by the Originators for the years 2005, 2006 and 2007, for those Originators in this Complaint with high OTD percentages.  The data was obtained from the Home Mortgage Disclosure Act database.

**Table 6**

| Originator | OTD % 2005 | OTD% 2006 | OTD % 2007 |
|---|---|---|---|
| American Home Mortgage Corp. | 91.9 | 62.4 | |
| American Mortgage Network, Inc. | | 90.3 | 71.9 |
| Ameriquest Mortgage Company | 91.4 | 95.8 | 96.7 |
| Argent Mortgage Company, L.L.C. | 80.6 | 87.4 | 89.4 |
| Countrywide Home Loans, Inc. | 98.5 | 96.5 | 98.4 |

EXHIBIT 11
45

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 38 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 39 of 190   Page ID
#:2122

| Originator | OTD % 2005 | OTD% 2006 | OTD % 2007 |
|---|---|---|---|
| Flagstar Bank, FSB | 61 | 59.8 | 82.1 |
| GreenPoint Mortgage Funding, Inc. | 89.0 | 87.0 | 95.6 |
| IndyMac Bank, F.S.B. | 81.1 | 87.7 | 82.8 |
| JPMorgan Chase Bank, N.A. | 83.0 | 77.9 | 85.4 |
| M & T Mortgage Corporation | 73.1 | 70.7 | |
| New Century Mortgage Corporation | 92.4 | 84.2 | |
| NovaStar Mortgage, Inc. | 89.3 | 80.0 | 98.5 |
| Option One Mortgage Corporation | 92.2 | 72.7 | 58.2 |
| PHH Mortgage Corporation | 96.3 | 92.9 | 85.6 |
| Quicken Loans, Inc. | 89.5 | 86.7 | 91.3 |
| WMC Mortgage Corp. | 100 | 100 | 100 |

B.   **The Surge in Actual Versus Expected Cumulative Losses is Evidence of the Originators' Systematic Disregard of Underwriting Standards**

74.   The actual losses to the mortgage pools underlying the RMBS the Credit Unions purchased have exceeded expected losses so quickly and by so wide a margin (*see infra* Figure 2) that a significant portion of the mortgages could not have been underwritten as represented in the Offering Documents.

75.   "Loss" is different than and should be distinguished from default and delinquency rates.  Loss either attempts to predict ("expected loss") or reflects ("actual loss") losses to the collateral pool by reason of borrower default, less any amounts recovered by the mortgage holder on a defaulted loan by sale of the subject property after foreclosure (which amounts may be less than 100% of the balance of the outstanding mortgage if the property is sold for less than the balance).

EXHIBIT 11
46

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 39 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 40 of 190   Page ID
#:2123

76.     While the short term price of a security may be influenced by broader market or liquidity forces, actual versus expected loss is a gauge of the health or the performance of an RMBS based on factors particular to that security.

77.     Expected loss is a statistical estimate of the total cumulative shortfall in principal payments on a mortgage pool over its 30-year life, expressed as a percentage of the original principal balance of the pool.  Expected loss is based on historical data for similar mortgage pools.

78.     The amount of expected loss is used to determine the amount of credit enhancement needed to achieve a desired credit rating.  Each credit rating has a "rating factor," which can be expressed in multiples of the amount of credit enhancement over expected loss (in equation form:  CE/EL = RF).  Thus, the rating factor expresses how many times the expected loss is covered by credit enhancement.  A triple-A rated security would have a rating factor of "5," so it would require credit enhancement of five times the amount of the expected loss.  A "double-A rating" would have a rating factor of "4," and thus would require credit enhancement equaling four times the expected loss.  A "single-A" rating would have a rating factor of "3" and would require credit enhancement of three times the expected loss.  A "Baa" rating would require credit enhancement of 2—1.5 times expected loss, and a "Ba" rating or lower requires some amount of credit enhancement less than 1.5 times expected loss.

79.     Again, credit enhancement over expected loss equals the rating factor.  So, by way of example, if cumulative expected losses on an asset pool are calculated to be $1 million, and the desired rating is triple-A (rating factor 5), the amount of credit enhancement provided will have to equal $5 million, or $1 million multiplied by five.

EXHIBIT 11
47

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 40 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 41 of 190   Page ID
#:2124

80.     Accordingly, if the analysis of expected loss is flawed, so too, is the calculation of the amount of credit enhancement.  For instance, on a triple-A rated security, if actual cumulative losses exceed five times expected losses, the credit enhancement will be insufficient, and the principal of the senior tranche will be impaired.  This is because, again, the amount of credit enhancement was determined based on the assumed amount of expected loss.

81.     The following hypothetical illustrates how, working backwards, expected loss can be inferred in an already-issued offering.  Assume there is a $100 million offering backed by $100 million of assets, with a triple-A rated senior tranche with a principal balance of $75 million.  This means the non-senior (subordinate) tranches, in aggregate, have a principal balance of $25 million.  The $25 million amount of the non-senior or subordinated tranches in this hypothetical offering serves as the credit enhancement for the senior tranche.  Therefore, on our hypothetical $100 million offering, the expected loss would be $5 million, or the amount of the credit enhancement on the triple-A rated senior tranche—$25 million—divided by the rating factor for triple-A rated securities—5.  The following equation illustrates:  $25,000,000/5 = $5,000,000.

82.     "Actual losses" are the economic losses that were, in fact, suffered by the mortgage pools due to defaults and resulting foreclosures and any related inability of the mortgage holder or servicer to recoup the full principal amount of the mortgages.  The actual loss data in Figure 2 (*infra*) is from ABSNET, a provider of asset-backed securities related data.

83.     The path of cumulative losses can be plotted on a line graph representing loss (either expected or actual) from origination to maturity, as shown in Figure 2 (*infra*).

84.     For the RMBS the Credit Unions purchased, Figure 2 (*infra*) depicts a series of graphs illustrating the losses the RMBS actually experienced in the first 12 months after issuance

EXHIBIT 11
48

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 41 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 42 of 190   Page ID
#:2125

in comparison to the losses the RMBS were expected to experience during the same time period.

As the graphs show, the actual losses (the "Series 1" or solid line) far exceeded the expected

losses (the "Series 2" or dotted line) for the period analyzed.

EXHIBIT 11
49

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 42 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1    Filed 06/23/11   Page 43 of 190   Page ID
#:2126

## Figure 2

| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| American Home Mortgage Assets Trust 2007-3 | 41708 | 1 | $ - | $ 2,232,609 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 2 | $ 20,399,980 | $ 2,438,567 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 3 | $ 49,464,549 | $ 2,663,093 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 4 | $ 76,378,883 | $ 2,907,778 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 5 | $ 103,617,642 | $ 3,174,333 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 6 | $ 130,873,934 | $ 3,464,595 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 7 | $ 140,742,932 | $ 3,780,536 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 8 | $ 163,847,101 | $ 4,124,262 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 9 | $ 187,001,069 | $ 4,498,024 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 10 | $ 185,965,334 | $ 4,904,215 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 11 | $ 206,785,530 | $ 5,345,381 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 12 | $ 226,605,691 | $ 5,824,213 |



| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| C-Bass 2006-CB7 Trust | 39209 | 1 | $ - | $ 4,864,380 |
| C-Bass 2006-CB7 Trust | 39209 | 2 | $ 157,854 | $ 5,313,120 |
| C-Bass 2006-CB7 Trust | 39209 | 3 | $ 1,438,864 | $ 5,802,314 |
| C-Bass 2006-CB7 Trust | 39209 | 4 | $ 5,295,712 | $ 6,335,430 |
| C-Bass 2006-CB7 Trust | 39209 | 5 | $ 12,191,277 | $ 6,916,196 |
| C-Bass 2006-CB7 Trust | 39209 | 6 | $ 20,453,074 | $ 7,548,616 |
| C-Bass 2006-CB7 Trust | 39209 | 7 | $ 25,330,485 | $ 8,236,984 |
| C-Bass 2006-CB7 Trust | 39209 | 8 | $ 36,994,887 | $ 8,985,890 |
| C-Bass 2006-CB7 Trust | 39209 | 9 | $ 41,639,864 | $ 9,800,237 |
| C-Bass 2006-CB7 Trust | 39209 | 10 | $ 43,328,104 | $ 10,685,243 |
| C-Bass 2006-CB7 Trust | 39209 | 11 | $ 45,885,742 | $ 11,646,449 |
| C-Bass 2006-CB7 Trust | 39209 | 12 | $ 58,154,837 | $ 12,689,722 |



36

EXHIBIT 11
50

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 43 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1    Filed 06/23/11   Page 44 of 190   Page ID
#:2127

| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 1 | $        - | $   1,157,891 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 2 | $        - | $   1,264,706 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 3 | $        - | $   1,381,151 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 4 | $     183,945 | $   1,508,051 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 5 | $   4,809,404 | $   1,646,294 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 6 | $   7,319,041 | $   1,796,831 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 7 | $  12,634,590 | $   1,960,687 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 8 | $  13,756,491 | $   2,138,952 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 9 | $  16,926,173 | $   2,332,795 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 10 | $  19,661,215 | $   2,543,457 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 11 | $  17,447,693 | $   2,772,257 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 12 | $  21,651,100 | $   3,020,592 |



| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 1 | $        - | $   1,837,349 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 2 | $     176,100 | $   2,006,844 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 3 | $     176,100 | $   2,191,620 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 4 | $   1,882,009 | $   2,392,986 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 5 | $   5,645,115 | $   2,612,350 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 6 | $   8,240,930 | $   2,851,224 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 7 | $  10,828,807 | $   3,111,231 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 8 | $  11,657,617 | $   3,394,104 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 9 | $  13,046,327 | $   3,701,695 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 10 | $  13,889,919 | $   4,035,975 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 11 | $  13,966,410 | $   4,399,037 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 12 | $  14,709,284 | $   4,793,096 |

EXHIBIT 11
51

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 44 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 45 of 190   Page ID
#:2128

| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 1 | $ - | $ 938,438 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 2 | $ - | $ 1,025,009 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 3 | $ - | $ 1,119,384 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 4 | $ 436,000 | $ 1,222,233 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 5 | $ 2,085,800 | $ 1,334,274 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 6 | $ 5,078,487 | $ 1,456,281 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 7 | $ 6,278,298 | $ 1,589,081 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 8 | $ 10,232,056 | $ 1,733,560 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 9 | $ 11,152,254 | $ 1,890,664 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 10 | $ 10,206,033 | $ 2,061,400 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 11 | $ 10,294,486 | $ 2,246,836 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 12 | $ 8,774,840 | $ 2,448,105 |



| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 1 | $ - | $ 1,094,900 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 2 | $ - | $ 1,195,904 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 3 | $ - | $ 1,306,015 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 4 | $ 3,236,864 | $ 1,426,011 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 5 | $ 5,353,713 | $ 1,556,733 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 6 | $ 9,486,872 | $ 1,699,081 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 7 | $ 10,732,752 | $ 1,854,022 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 8 | $ 12,429,553 | $ 2,022,590 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 9 | $ 14,767,018 | $ 2,205,887 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 10 | $ 16,860,421 | $ 2,405,089 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 11 | $ 20,792,706 | $ 2,621,442 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 12 | $ 19,943,097 | $ 2,856,267 |



38

EXHIBIT 11
52

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 45 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 46 of 190   Page ID
#:2129

| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 1 | $ - | $ 1,509,477 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 2 | $ - | $ 1,648,727 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 3 | $ - | $ 1,800,530 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 4 | $ 2,828,633 | $ 1,965,962 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 5 | $ 5,855,085 | $ 2,146,181 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 6 | $ 6,458,278 | $ 2,342,429 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 7 | $ 6,047,569 | $ 2,556,038 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 8 | $ 14,381,198 | $ 2,788,433 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 9 | $ 20,665,842 | $ 3,041,135 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 10 | $ 28,076,471 | $ 3,315,763 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 11 | $ 30,698,876 | $ 3,614,037 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 12 | $ 38,143,801 | $ 3,937,778 |



| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 1 | $ - | $ 4,281,276 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 2 | $ 742,614 | $ 4,676,224 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 3 | $ 20,532,961 | $ 5,106,778 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 4 | $ 31,152,908 | $ 5,575,988 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 5 | $ 21,132,777 | $ 6,087,136 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 6 | $ 36,418,595 | $ 6,643,746 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 7 | $ 46,784,338 | $ 7,249,598 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 8 | $ 57,438,097 | $ 7,908,731 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 9 | $ 67,487,068 | $ 8,625,460 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 10 | $ 75,157,240 | $ 9,404,378 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 11 | $ 81,333,966 | $ 10,250,363 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 12 | $ 93,496,458 | $ 11,168,576 |



EXHIBIT 11
53

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 46 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 47 of 190   Page ID
#:2130

| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 1 | $ - | $ 410,953 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 2 | $ - | $ 448,864 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 3 | $ - | $ 490,192 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 4 | $ 624,000 | $ 535,231 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 5 | $ 10,080,662 | $ 584,295 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 6 | $ 18,806,077 | $ 637,723 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 7 | $ 33,916,733 | $ 695,878 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 8 | $ 39,279,758 | $ 759,147 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 9 | $ 41,855,791 | $ 827,945 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 10 | $ 40,461,103 | $ 902,712 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 11 | $ 53,729,616 | $ 983,917 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 12 | $ 51,706,996 | $ 1,072,055 |



| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 1 | $ - | $ 797,869.72 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 2 | $ 877,350.00 | $ 871,473.28 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 3 | $ 2,701,050.00 | $ 951,712.38 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 4 | $ 24,812,177.86 | $ 1,039,155.58 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 5 | $ 23,847,597.01 | $ 1,134,414.48 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 6 | $ 56,668,113.07 | $ 1,238,145.90 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 7 | $ 69,671,811.57 | $ 1,351,053.91 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 8 | $ 93,015,433.02 | $ 1,473,891.70 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 9 | $ 95,421,023.57 | $ 1,607,463.21 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 10 | $ 107,609,382.83 | $ 1,752,624.44 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 11 | $ 154,197,189.34 | $ 1,910,284.29 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 12 | $ 166,153,037.14 | $ 2,081,404.89 |



EXHIBIT 11
54

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 47 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 48 of 190   Page ID
#:2131

| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 1 | $ 102,646 | $ 788,280 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 2 | $ 102,646 | $ 860,999 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 3 | $ 64,665 | $ 940,274 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 4 | $ 2,534,448 | $ 1,026,666 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 5 | $ 3,046,760 | $ 1,120,780 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 6 | $ 2,298,597 | $ 1,223,265 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 7 | $ 9,260,993 | $ 1,334,816 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 8 | $ 9,260,879 | $ 1,456,177 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 9 | $ 9,355,814 | $ 1,588,143 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 10 | $ 8,438,051 | $ 1,731,560 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 11 | $ 8,092,595 | $ 1,887,324 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 12 | $ 34,688,542 | $ 2,056,388 |



| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 1 | $ 133,927 | $ 3,143,882 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 2 | $ 847,632 | $ 3,433,905 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 3 | $ 1,476,714 | $ 3,750,075 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 4 | $ 4,886,555 | $ 4,094,631 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 5 | $ 7,534,711 | $ 4,469,984 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 6 | $ 11,554,439 | $ 4,878,722 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 7 | $ 16,132,788 | $ 5,323,618 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 8 | $ 20,648,434 | $ 5,807,642 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 9 | $ 22,135,172 | $ 6,333,959 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 10 | $ 25,650,302 | $ 6,905,945 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 11 | $ 31,246,799 | $ 7,527,179 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 12 | $ 36,044,045 | $ 8,201,453 |



41

EXHIBIT 11
55

| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 1 | $ 419,989 | $ 4,870,631 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 2 | $ 499,987 | $ 5,319,948 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 3 | $ 9,129,384 | $ 5,809,771 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 4 | $ 7,543,059 | $ 6,343,572 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 5 | $ 14,369,392 | $ 6,925,084 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 6 | $ 21,127,603 | $ 7,558,317 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 7 | $ 34,569,959 | $ 8,247,569 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 8 | $ 46,387,317 | $ 8,997,438 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 9 | $ 65,543,969 | $ 9,812,831 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 10 | $ 79,103,448 | $ 10,698,974 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 11 | $ 92,545,292 | $ 11,661,416 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 12 | $ 107,215,715 | $ 12,706,029 |



| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 1 | $ - | $ 5,150,476 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 2 | $ 622,257 | $ 5,625,608 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 3 | $ 6,293,652 | $ 6,143,574 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 4 | $ 14,490,054 | $ 6,708,045 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 5 | $ 24,518,310 | $ 7,322,968 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 6 | $ 33,402,099 | $ 7,992,584 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 7 | $ 43,866,860 | $ 8,721,437 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 8 | $ 59,290,433 | $ 9,514,390 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 9 | $ 69,562,994 | $ 10,376,632 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 10 | $ 83,867,036 | $ 11,313,689 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 11 | $ 92,504,511 | $ 12,331,428 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 12 | $ 106,184,655 | $ 13,436,060 |



EXHIBIT 11
56

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 49 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 50 of 190   Page ID
#:2133

| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 1 | $                     - | $        6,224,765 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 2 | $         1,863,699 | $        6,799,000 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 3 | $       13,681,618 | $        7,425,004 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 4 | $       25,684,470 | $        8,107,212 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 5 | $       16,447,504 | $        8,850,396 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 6 | $       33,011,572 | $        9,659,681 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 7 | $       54,500,563 | $      10,540,559 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 8 | $       69,681,554 | $      11,498,906 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 9 | $       86,428,125 | $      12,540,995 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 10 | $     100,411,688 | $      13,673,504 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 11 | $     110,528,495 | $      14,903,523 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 12 | $     125,377,886 | $      16,238,560 |



| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 1 | 542,655 | $        2,866,753 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 2 | $                     - | $        3,131,211 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 3 | $         7,922,743 | $        3,419,511 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 4 | $       20,129,145 | $        3,733,695 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 5 | $       31,403,557 | $        4,075,961 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 6 | $       43,238,857 | $        4,448,669 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 7 | $       56,337,997 | $        4,854,349 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 8 | $       65,897,112 | $        5,295,706 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 9 | $       76,400,420 | $        5,775,630 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 10 | $       85,314,823 | $        6,297,195 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 11 | $       89,730,712 | $        6,863,668 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 12 | $       94,300,781 | $        7,478,506 |

EXHIBIT 11
57

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 50 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 51 of 190   Page ID
#:2134

85.     As clearly shown in Figure 2 (*supra*), actual losses spiked almost immediately after issuance of the RMBS.  Borrowers defaulted on the underlying mortgages soon after loan origination, rapidly eliminating the RMBS' credit enhancement.   For example, in the J.P. Morgan Alternative Loan Trust 2007-A2 offering (shown in Figure 2, *supra*), actual losses at month 12 exceeded $166 million, or 80 times the expected losses of approximately $2.08 million.

86.     This immediate increase in actual losses—at a rate far greater than expected losses—is strong evidence that the Originators systematically disregarded the underwriting standards in the Offering Documents.

87.     Because credit enhancement is designed to ensure triple-A performance of triple-A rated RMBS, the evidence that credit enhancement failed (*i.e.*, actual losses swiftly surged past expected losses shortly after the offering) substantiates that a critical number of mortgages in the pool were not written in accordance with the underwriting guidelines stated in the offering documents.

C.     **The Collapse of the Certificates' Credit Ratings is Evidence of Systematic Disregard of Underwriting Guidelines**

88.     Virtually all of the RMBS the Credit Unions purchased were rated triple-A at issuance.

89.     Moody's and S&P have since downgraded the RMBS the Credit Unions purchased to well below investment grade (*see supra* Table 4).

90.     A rating downgrade is material.   The total collapse in the credit ratings of the RMBS the Credit Unions purchased, typically from triple-A to non-investment speculative grade, is evidence of the Originators' systematic disregard of underwriting guidelines, amplifying that these securities were impaired from the outset.

44

EXHIBIT 11
58

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 51 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 52 of 190   Page ID
#:2135

D.     **Revelations Subsequent to the Offerings Show That the Originators Systematically Disregarded Underwriting Standards**

91.     Public disclosures subsequent to the issuance of the RMBS reinforce the allegation that the Originators systematically abandoned their stated underwriting guidelines.

1.     **The Systematic Disregard of Underwriting Standards Was Pervasive as Revealed After the Collapse**

92.     Mortgage originators experienced unprecedented success during the mortgage boom.  Yet, their success was illusory.  As the loans they originated began to significantly underperform, the demand for their products subsided.  It became evident that originators had systematically disregarded their underwriting standards.

93.     The Office of the Comptroller of the Currency (the "OCC"), an office within the United States Department of the Treasury, published a report in November 2008 listing the "Worst Ten" metropolitan areas with the highest rates of foreclosures and the "Worst Ten" originators with the largest numbers of foreclosures in those areas ("2008 'Worst Ten in the Worst Ten' Report").  In this report the OCC emphasized the importance of adherence to underwriting standards in mortgage loan origination:

> The quality of the underwriting process—that is, determining through analysis of the borrower and market conditions that a borrower is highly likely to be able to repay the loan as promised—is a major determinant of subsequent loan performance.  The quality of underwriting varies across lenders, a factor that is evident through comparisons of rates of delinquency, foreclosure, or other loan performance measures across loan originators.

94.     Recently government reports and investigations, and newspaper reports have uncovered the extent of the pervasive abandonment of underwriting standards.  The Permanent Subcommittee on Investigations in the United States Senate ("PSI") recently released its report detailing the causes of the financial crisis.  Using Washington Mutual Bank ("WaMu") as a case study, the PSI concluded through its investigation:

EXHIBIT 11
59

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 52 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 53 of 190   Page ID
#:2136

> Washington Mutual was far from the only lender that sold poor quality mortgages
> and mortgage backed securities that undermined U.S. financial markets. The
> Subcommittee investigation indicates that Washington Mutual was emblematic of
> a host of financial institutions that knowingly originated, sold, and securitized
> billions of dollars in high risk, poor quality home loans. These lenders were not
> the victims of the financial crisis; the high risk loans they issued became the fuel
> that ignited the financial crisis.

STAFF OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS, 112TH CONG., WALL STREET AND THE

FINANCIAL CRISIS: ANATOMY OF A FINANCIAL COLLAPSE 50 (Subcomm. Print 2011) ("PSI Wall

Street Report").

95.    Indeed, the Financial Crisis Inquiry Commission ("FCIC") issued its final report

in January 2011 that detailed, among other things, the collapse of mortgage underwriting

standards and subsequent collapse of the mortgage market and wider economy. *See* FIN. CRISIS

INQUIRY COMM'N, FINAL REPORT OF THE NATIONAL COMMISSION ON THE CAUSES OF THE

FINANCIAL AND ECONOMIC CRISIS IN THE UNITED STATES (2011) ("FCIC Report").

96.    The FCIC Report concluded that there was a "systemic breakdown in

accountability and ethics" during the housing and financial crisis. "Unfortunately—as has been

the case in past speculative booms and busts—we witnessed an erosion of standards of

responsibility and ethics that exacerbated the financial crisis." *Id.* at xxii.  The FCIC found that

the current economic crisis had its genesis in the housing boom:

> [I]t was the collapse of the housing bubble—fueled by low interest rates, easy and
> available credit, scant regulation, and toxic mortgages—that was the spark that
> ignited a string of events, which led to a full-blown crises in the fall of 2008.
> Trillions of dollars in risky mortgages had become embedded throughout the
> financial system, as mortgage-related securities were packaged, repackaged, and
> sold to investors around the world.

*Id.* at xvi.

97.    During the housing boom, mortgage lenders focused on quantity rather than

quality, originating loans for borrowers who had no realistic capacity to repay the loan.  The

EXHIBIT 11
60

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 53 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 54 of 190   Page ID
#:2137

FCIC Report found "that the percentage of borrowers who defaulted on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id.* at xxii.  Early Payment Default is a significant indicator of pervasive disregard for underwriting standards.   The FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards." *Id.*

98.     In this lax lending environment, mortgage lenders went unchecked, originating mortgages for borrowers in spite of underwriting standards:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop.

*Id.*

99.     Lenders and borrowers took advantage of this climate, with borrowers willing to take on loans and lenders anxious to get those borrowers into the loans, ignoring even loosened underwriting standards.  The FCIC Report observed: "Many mortgage lenders set the bar so low that lenders simply took eager borrowers' qualifications on faith, often with a willful disregard for a borrower's ability to pay." *Id.* at xxiii.

100.    In an interview with the FCIC, Alphonso Jackson, the Secretary of the Department of Housing and Urban Affairs ("HUD") from 2004 to 2008, related that HUD had heard about mortgage lenders "running wild, taking applications over the Internet, not verifying people's income or their ability to have a job." *Id.* at 13 (internal quotation marks omitted).

101.    Chairman of the Federal Reserve Board, Benjamin Bernanke, spoke to the decline of underwriting standards in this speech before the World Affairs Council of Greater Richmond on April 10, 2008:

47

EXHIBIT 11
61

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 54 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 55 of 190   Page ID
#:2138

> First, at the point of origination, underwriting standards became increasingly compromised. The best-known and most serious case is that of subprime mortgages, mortgages extended to borrowers with weaker credit histories. To a degree that increased over time, these mortgages were often poorly documented and extended with insufficient attention to the borrower's ability to repay. In retrospect, the breakdown in underwriting can be linked to the incentives that the originate-to-distribute model, as implemented in this case, created for the originators. Notably, the incentive structures sometimes often tied originator revenue to loan volume, rather than to the quality of the loans being passed up the chain. Investors normally have the right to put loans that default quickly back to the originator, which should tend to apply some discipline to the underwriting process. However, in the recent episode, some originators had little capital at stake, reducing their exposure to the risk that the loans would perform poorly.

Benjamin Bernanke, Chairman, Federal Reserve Board, Speech to the World Affairs Council of Greater Richmond, *Addressing Weaknesses in the Global Financial Markets: The Report of the President's Working Group on Financial Markets*, Apr. 10, 2008.

102.    Investment banks securitized loans that were not originated in accordance with underwriting guidelines, and failed to disclose this fact in RMBS offering documents. As the FCIC Report noted:

> The Commission concludes that firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

103.    The lack of disclosure regarding the true underwriting practices of the Originators in the Offering Documents at issue in this Complaint put the Credit Unions at a severe disadvantage. The FSOC explained that the origination and securitization process contains inherent "information asymmetries" that put investors at a disadvantage regarding critical information concerning the quality and performance of RMBS. The FSOC Risk Retention Report described the information disadvantage for investors of RMBS:

EXHIBIT 11
62

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 55 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 56 of 190   Page ID
#:2139

One important informational friction highlighted during the recent financial crisis has aspects of a "lemons" problem that exists between the issuer and investor. An originator has more information about the ability of a borrower to repay than an investor, because the originator is the party making the loan. Because the investor is several steps removed from the borrower, the investor may receive less robust loan performance information. Additionally, the large number of assets and the disclosures provided to investors may not include sufficient information on the quality of the underlying financial assets for investors to undertake full due diligence on each asset that backs the security.

FSOC Risk Retention Report at 9 (footnote omitted).

104.     Because investors had limited or no access to information concerning the actual quality of loans underlying the RMBS, the "originate-to-distribute" model created a situation where the origination of low quality mortgages through poor underwriting thrived.  The FSOC found:

In the originate-to-distribute model, originators receive significant compensation upfront without retaining a material ongoing economic interest in the performance of the loan.  This reduces the economic incentive of originators and securitizers to evaluate the credit quality of the underlying loans carefully.  Some research indicates that securitization was associated with lower quality loans in the financial crisis.  For instance, one study found that subprime borrowers with credit scores just above a threshold commonly used by securitizers to determine which loans to purchase defaulted at significantly higher rates than those with credit scores below the threshold.  By lowering underwriting standards, securitization may have increased the amount of credit extended, resulting in riskier and unsustainable loans that otherwise may not have been originated.

*Id.* at 11 (footnote omitted).

105.     The FSOC reported that as the "originate-to-distribute" model became more pervasive in the mortgage industry, underwriting practices weakened across the industry.  The FSOC Risk Retention Report found "[t]his deterioration was particularly prevalent with respect to the verification of the borrower's income, assets, and employment for residential real estate loans."  *Id.*

106.     In sum, the disregard of underwriting standards was pervasive across originators. The failure to adhere to underwriting standards directly contributed to the sharp decline in the

EXHIBIT 11
63

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 56 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 57 of 190   Page ID
#:2140

quality of mortgages that became part of mortgage pools collateralizing RMBS.  The lack of adherence to underwriting standards for the loans underlying RMBS was not disclosed to investors in the offering materials.  The nature of the securitization process, with the investor several steps removed from the origination of the mortgages underlying the RMBS, made it difficult for investors to ascertain how the RMBS would perform.

107.   As discussed below, facts have recently come to light that show many of the Originators who contributed to the loan pools underlying the RMBS at issue in this Complaint engaged in these underwriting practices.

### 2.   **American Home's Systematic Disregard of Underwriting Standards**

108.   American Home Mortgage Investment Corp. was a real estate investment trust that invested in RMBS consisting of loans originated and serviced by its subsidiaries. It was the parent of American Home Mortgage Holdings, Inc., which in turn was the parent of American Home Mortgage Corp., a retail lender of mortgage loans.  Collectively, these entities are referred to herein as "American Home."  American Home originated or contributed a critical number of loans to the mortgage pools underlying the American Home Mortgage Assets Trust 2007-3, J.P. Morgan Alternative Loan Trust 2006-A3, J.P. Morgan Alternative Loan Trust 2007-A2, and J.P. Morgan Alternative Loan Trust 2007-S1 offerings.

109.   Edmund Andrews, an economics reporter for the New York Times, recounted his own experience using American Home as a lender.  According to Andrews, he was looking to purchase a home in 2004, and his real estate agent referred him to a loan officer at American Home.  The American Home loan officer began the ordeal by asking Andrews how large of a loan he needed.  Andrews, who had a monthly take home pay of $2,777, advised the loan officer that he had hefty child support and alimony payments to an ex-wife.  Andrews would be relying

EXHIBIT 11
64

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 57 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 58 of 190   Page ID
#:2141

on his then-unemployed fiancée to earn enough money to meet his monthly obligations—

including the mortgage.  Andrews reported:

> As I quickly found out, American Home Mortgage had become one of the fastest-growing mortgage lenders in the country.  One of its specialties was serving people just like me:  borrowers with good credit scores who wanted to stretch their finances far beyond what our incomes could justify.  In industry jargon, we were "Alt-A" customers, and we usually paid slightly higher rates for the privilege of concealing our financial weaknesses.
>
> I thought I knew a lot about go-go mortgages.  I had already written several articles about the explosive growth of liar's loans, no-money-down loans, interest-only loans and other even more exotic mortgages.  I had interviewed people with very modest incomes who had taken out big loans.  Yet for all that, I was stunned at how much money people were willing to throw at me.
>
> [The American Home loan officer] called back the next morning.  "Your credit scores are almost perfect," he said happily.  "Based on your income, you can qualify for a mortgage of about $500,000."
>
> What about my alimony and child-support obligations?  No need to mention them.  What would happen when they saw the automatic withholdings in my paycheck?  No need to show them.  If I wanted to buy a house, [the American Home loan officer] figured, it was my job to decide whether I could afford it.  His job was to make it happen.
>
> "I am here to enable dreams," he explained to me long afterward.  [The American Home loan officer]'s view was that if I'd been unemployed for seven years and didn't have a dime to my name but I wanted a house, he wouldn't question my prudence.  "Who am I to tell you that you shouldn't do what you want to do?  I am here to sell money and to help you do what you want to do.  At the end of the day, it's your signature on the mortgage — not mine."

Edmund L. Andrews, *My Personal Credit Crisis*, N.Y. TIMES, May 17, 2009, at MM46.

110.    The American Home loan officer steered Andrews to a stated-income loan so that

he would not have to produce paychecks or tax returns that would reveal his alimony and child

support obligations.  The loan officer wanted to limit disclosure of Andrews's alimony and child

support payments when an existing mortgage showed up under Andrews's name.  Although his

ex-wife was solely responsible for that mortgage under the terms of the couple's separation

EXHIBIT 11
65

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 58 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 59 of 190   Page ID
#:2142

agreement, the only way Andrews could explain that fact would be to produce the agreement,

which would also reveal his alimony and child support obligations.  According to Andrews:

> [The American Home loan officer] didn't get flustered.  If Plan A didn't work, he
> would simply move down another step on the ladder of credibility.  Instead of
> "stating" my income without documenting it, I would take out a "no ratio"
> mortgage and not state my income at all.  For the price of a slightly higher interest
> rate, American Home would verify my assets, but that was it.  Because I wasn't
> stating my income, I couldn't have a debt-to-income ratio, and therefore, I
> couldn't have too much debt.  I could have had four other mortgages, and it
> wouldn't have mattered.  American Home was practically begging me to take the
> money.

*Id.*

111.   American Home ultimately approved Andrews's application.  Not surprisingly,

Andrews was unable to afford his monthly mortgage payments.

112.   American Home's lack of adherence to underwriting guidelines was set forth in

detail in a 165-page amended class action complaint filed June 4, 2008, in *In re American Home*

*Mortgage Sec. Litig.*, No. 07-md-1898 (TCP) (E.D.N.Y.).   Investors in American Home

common/preferred stock alleged that the company misrepresented itself as a conservative lender,

when, based on statements from over 33 confidential witnesses and internal company documents,

American Home in reality was a high risk lender, promoting quantity of loans over quality by

targeting borrowers with poor credit, violating company underwriting guidelines, and providing

incentives for employees to sell risky loans, regardless of the borrowers' creditworthiness.  *See*

Amended Class Action Complaint, *In re American Home Mortgage Sec. Litig.*, No. 07-md-1898,

Doc. 17 (E.D.N.Y. filed June 4, 2008) ("American Home ACC").

113.   According to the American Home ACC, former American Home employees

recounted underwriters consistently bullied by sales staff when underwriters challenged

questionable loans, while exceptions to American Home's underwriting guidelines were

routinely applied.  *See id.* at 43.

EXHIBIT 11
66

Case 2:11-cv-02341-EFM -JPO  Document 1  Filed 06/20/11  Page 59 of 186
Case 2:10-cv-01597-GW -MAN  Document 140-1  Filed 06/23/11  Page 60 of 190  Page ID
#:2143

114.    The American Home ACC cited to witnesses who were former American Home employees.  These witnesses reported that American Home management told underwriters to not decline a loan, regardless of whether the loan application included fraud.  *See id.*

115.    Another former American Home employee stated that American Home routinely made exceptions to its underwriting guidelines to be able to close loans.  When American Home mortgage underwriters raised concerns to the sales department about the pervasive use of exceptions to American Home's mortgage underwriting practices, the sales department contacted American Home headquarters to get approval for the use of exceptions for loan approval. Indeed, it was commonplace to overrule mortgage underwriters' objections to approving a loan to facilitate loan approval.  *See id.* at 44.

116.    A former American Home auditor confirmed this account that American Home mortgage underwriters were regularly overruled when the objected to loan originations.  *See id.*

117.    The parties settled the litigation on January 14, 2010 for $37.25 million.

118.    American Home's lax lending practices landed it in the 2008 "Worst Ten in the Worst Ten" Report.  American Home came in 8th in Las Vegas, Nevada and 9th in both Detroit, Michigan and Miami, Florida.  *See* 2008 "Worst Ten in the Worst Ten" Report.  When the OCC issued the 2009 "Worst Ten in the Worst Ten" Report, American Home again featured prominently, appearing in the top ten in six of the ten worst metropolitan areas (4th in both Fort Pierce-Port St. Lucie, Florida and Fort Myers-Cape Coral, Florida; 7th in Vallejo-Fairfield-Napa, California; 8th in Las Vegas, Nevada, 9th in Stockton-Lodi, California; and 10th in Bakersfield, California).  *See* 2009 "Worst Ten in the Worst Ten" Report.

### 3.    Ameriquest's Systematic Disregard of Underwriting Standards

119.    ACC Capital Holdings ("ACC Capital"), based in Orange, California, was the nation's largest privately-owned subprime lender.    Ameriquest Mortgage Company

EXHIBIT 11
67

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 60 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 61 of 190   Page ID
#:2144

("Ameriquest") was ACC Capital's retail mortgage lending unit. Argent Mortgage Company ("Argent") was ACC Capital's wholly-owned wholesale lending unit, which made loans through independent brokers.  ACC Capital was one of the first subprime lenders to start showing problems stemming largely from problems with loan quality.  On September 1, 2007, Citigroup purchased Argent from the troubled ACC Capital, and Ameriquest announced that it was shutting down lending operations.  Ameriquest and Argent originated or contributed a critical portion of the loans in the mortgage pool underlying the C-BASS 2006-CB7 Trust offering.

120.    Both Ameriquest and Argent appeared in OCC's 2008 "Worst Ten in the Worst Ten" Report.  Argent was ranked as the "worst" lender in Cleveland, Ohio, and Detroit, Michigan; the 2nd worst in Las Vegas, Nevada, and Miami, Florida; the 3rd worst in Denver, Colorado; the 4th worst in Stockton, California; the 5th worst in Bakersfield, California; the 6th worst in Riverside and Sacramento, California; and the 8th worst in Memphis, Tennessee. Ameriquest ranked 7th in Cleveland, Ohio, and Memphis, Tennessee, 8th in Denver, Colorado, and Miami, Florida, 9th in Bakersfield, California, and 10th in Stockton, California.

121.    In the 2009 Report, Argent was 4th in Las Vegas, Nevada, 6th in Fort Pierce-Port St. Lucie, Florida and Reno, Nevada, 7th in Bakersfield, California and Stockton-Lodi, California, 8th in Riverside-San Bernardino, California, 9th in Merced, California, Modesto, California and Fort Myers-Cape Coral, Florida and 10th in Vallejo-Fairfield-Napa, California. Ameriquest was 10th in Fort Pierce-St. Lucie, Florida.

122.    According to a May 11, 2008, Cleveland Plain Dealer article titled *The Subprime House of Cards*, Jacquelyn Fishwick, who worked for more than two years at an Argent loan processing center near Chicago as an underwriter and account manager, reported that "some Argent employees played fast and loose with the rules" and stated: "I personally saw some stuff I

EXHIBIT 11
68

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 61 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 62 of 190   Page ID
#:2145

didn't agree with."  Ms. Fishwick "saw [Argent] account managers remove documents from files

and create documents by cutting and pasting them."

123.    According to a January 29, 2009, article in the Miami Herald, Orson Benn, a

former vice president of Argent who was convicted and sentenced to prison for racketeering

relating to mortgage fraud, spent three years during the height of the housing boom teaching

brokers "how to doctor credit reports, coached them to inflate [borrower] income on loan

applications, and helped them invent phantom jobs for borrowers" so that loans could be

approved.  Jack Dolan *et al.*, *Home Loan Racket Flourished In Florida*, MIAMI HERALD, Jan. 29,

2009,  *available  at*  http://www.miamiherald.com/2008/12/07/v-fullstory/878194/home-loan-

racket-flourished-in.html.

124.    According to Mr. Benn himself, "the accuracy of loan applications was not a

priority." *Id.*  The article reports: "The simplest way for a bank to confirm someone's income is

to call the employer.  But in at least two dozen cases, the applications show bogus telephone

numbers for work references."  *Id.*  The article notes that one Argent broker generated at least

100 loans worth $22 million in Miami and nearly all of them were based on false and misleading

financial information.  *Id.*  For instance, "one borrower claimed to work for a company that

didn't exist—and got a $170,000 loan.  Another borrower claimed to work a job that didn't

exist—and got enough money to buy four houses."  *Id.*  The *Miami Herald* obtained applications

for 129 loans funded by Argent and found that "103 contained red flags: non-existent employers,

grossly inflated salaries and sudden, drastic increases in the borrower's net worth."  *Id.*

125.    The New York Times reported that Ameriquest refused to sign up for a tax

verification service for verifying the reported taxes of borrowers as part of its underwriting

EXHIBIT 11
69

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 62 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1    Filed 06/23/11   Page 63 of 190   Page ID
#:2146

process.  *See* Gretchen Mortgenson, *A Road Not Taken By Lenders*, N.Y. TIMES, Apr. 6, 2010,

*available at* http://www.nytimes.com/2008/04/06/business/06gret.html.

126.    Richard Bowen was Citibank's Business Chief Underwriter for correspondent

lending and was involved in the due diligence prior to Citibank's acquisition of Argent.  In his

April 7, 2010 appearance before the FCIC, Mr. Bowen testified that he advised against the

acquisition because "we sampled loans that were originated by Argent, and we found large

numbers that did not – that were not underwritten according to the representations that were

there."   *Hearing on Subprime Lending and Securitization and Government Sponsored*

*Enterprises Before the Fin. Crisis Inquiry Comm'n* at 239 (Apr. 7, 2010) (statement of Richard

M. Bowen, III).

### 4.    The Chase Originators' Systematic Disregard of Underwriting Standards

127.    Chase Home Finance, Chase Home Mortgage, and J.P. Morgan Chase Bank, N.A.

(the "Chase Originators") compose the mortgage-lending arm of JP Morgan Chase.  The Chase

Originators originated or contributed a critical portion of loans in the mortgage pool underlying

the J.P. Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2006-A3,

J.P. Morgan Alternative Loan Trust 2006-A6, J.P. Morgan Alternative Loan Trust 2006-A7, J.P.

Morgan Alternative Loan Trust 2007-A1, J.P. Morgan Alternative Loan Trust 2007-A2, J.P.

Morgan Mortgage Acquisition Trust 2007-CH3, J.P. Morgan Mortgage Acquisition Trust 2007-

CH4, J.P. Morgan Mortgage Acquisition Trust 2007-CH5, and J.P. Morgan Alternative Loan

Trust 2007-S1 offerings.

128.    Chase employees circulated a memo instructing mortgage associates how to

tweak data they entered into the automated underwriting program ("ZiPPY") to get loans

approved by the automated underwriting program.  *See* Memorandum from Chase on ZiPPY

Cheats & Tricks (on file with Plaintiff) (Chase ZiPPY Memo") (reported in Mark Friesen, *Chase*

EXHIBIT 11
70

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 63 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 64 of 190   Page ID
#:2147

*mortgage memo pushes 'Cheats & Tricks'*, OREGONIAN, March 28, 2008, *available at*
http://www.oregonlive.com/business/index.ssf/2008/03/chase_mortgage_memo_pushes_che.htm
l).

129.    The Chase ZiPPY Memo listed a few steps that mortgage associates could use to
manipulate the date entered into the ZiPPY automated underwriting program to recommend a
using the "Stated Income/Stated Asset" underwriting guidelines for borrowers.  *See* Chase
ZiPPY Memo.

130.    Strikingly, "Step 3" stated: "If you do not get Stated/Stated, try resubmitting with
slightly higher income.  Inch it up $500 to see if you can get the findings you want.  Do the same
for assets." *Id.*

131.    In other words, the Chase ZiPPY Memo instructed mortgage associates to inflate
borrower income to "trick" ZiPPY into recommending the use of Stated Income/Stated Asset
underwriting guidelines.

132.    In addition, the Chase ZiPPY Memo told mortgage associates not to report gift
funds, but to include gift funds in the borrower's bank account.

133.    The Oregonian characterized the memo in the following excerpt from a March 28,
2008 article:.  In particular, the Oregonian article highlighted the "tricks" employed to get
mortgage loans approved under the automated underwriting program:

> A newly surfaced memo from banking giant JPMorgan Chase provides a rare
> glimpse into the mentality that fueled the mortgage crisis.

> The memo's title says it all: "Zippy Cheats & Tricks."

> It is a primer on how to get risky mortgage loans approved by Zippy, Chase's in-
> house automated loan underwriting system.  The secret to approval?  Inflate the
> borrowers' income or otherwise falsify their loan application.

EXHIBIT 11
71

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 64 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 65 of 190   Page ID
#:2148

The document, a copy of which was obtained by The Oregonian, bears a Chase corporate logo.  But it's unclear how widely it was circulated or used within Chase.

. . .

Chase, the nation's second-largest bank, originates mortgage loans itself but also operates a wholesale arm that underwrites and funds loans brought to them by a network of mortgage brokers.  The "Cheats & Tricks" memo was instructing those brokers how to get difficult loans approved by Zippy.

"Never fear," the memo states. "Zippy can be adjusted (just ever so slightly.)"

The Chase memo deals specifically with so-called stated-income asset loans, one of the most dangerous of the mortgage industry's innovations of recent years. Known as "liar loans" in some circles because lenders made little effort to verify information in the borrowers' loan application, they have defaulted in large number since the housing bust began in 2007.

Mark Friesen, *Chase mortgage memo pushes 'Cheats & Tricks'*, Oregonian, Mar. 28, 2008,

*available at* http://www.oregonlive.com/business/index.ssf/2008/03/

chase_mortgage_memo_pushes_che.html.

### 5.     Countrywide's Systematic Disregard of Underwriting Standards

134.    Countrywide was one of the largest originators of residential mortgages in the United States during the period at issue in this Complaint.   Countrywide originated or contributed a critical portion of the loans in the mortgage pool underlying the J.P. Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2006-A6, J.P. Morgan Alternative Loan Trust 2006-A7, J.P. Morgan Alternative Loan Trust 2007-A1, and J.P. Morgan Alternative Loan Trust 2007-A2 offerings.

135.    In October 2009, the House Committee on Oversight and Government Reform launched an investigation into the entire subprime mortgage industry, including Countrywide, focusing on "whether mortgage companies employed deceptive and predatory lending practices, or improper tactics to thwart regulation, and the impact of those activities on the current crisis." Press Release, Comm. on Oversight & Government Reform, Statement of Chairman Towns on

EXHIBIT 11
72

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 65 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 66 of 190   Page ID
#:2149

Committee Investigation Into Mortgage Crisis at 1 (Oct. 23, 2009) (internal quotation marks omitted).

136.    On May 9, 2008, the New York Times noted that minimal documentation and stated income loans—Countrywide's No Income/No Assets Program and Stated Income/Stated Assets Program—have "bec[o]me known [within the mortgage industry] as 'liars' loans' because many [of the] borrowers falsified their income."  Floyd Norris, *A Little Pity, Please, for Lenders*, N.Y. Times, May 9, 2008 at C1.

137.    In a television special titled, If You Had a Pulse, We Gave You a Loan, Dateline NBC reported on March 27, 2009:

> To highlight just how simple it could be to borrow money, Countrywide marketed one of its stated-income products as the "Fast and Easy loan."

> As manager of Countrywide's office in Alaska, Kourosh Partow pushed Fast and Easy loans and became one of the company's top producers.

> He said the loans were "an invitation to lie" because there was so little scrutiny of lenders.  "We told them the income that you are giving us will not be verified.  The asset that you are stating will not be verified."

> He said they joked about it:  "If you had a pulse, we gave you a loan.  If you fog the mirror, give you a loan."

> But it turned out to be no laughing matter for Partow.  Countrywide fired him for processing so-called "liar loans" and federal prosecutors charged him with crimes.  On April 20, 2007, he pleaded guilty to two counts of wire fraud involving loans to a real estate speculator; he spent 18 months in prison.

> In an interview shortly after he completed his sentence, Partow said that the practice of pushing through loans with false information was common and was known by top company officials.  "It's impossible they didn't know."

> . . .

> During the criminal proceedings in federal court, Countrywide executives portrayed Partow as a rogue who violated company standards.

> But former senior account executive Bob Feinberg, who was with the company for 12 years, said the problem was not isolated.  "I don't buy the rogue.  I think it was infested."

EXHIBIT 11
73

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 66 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 67 of 190   Page ID
#:2150

He lamented the decline of what he saw as a great place to work, suggesting a push to be number one in the business led Countrywide astray. He blamed Angelo Mozilo, a man he long admired, for taking the company down the wrong path. It was not just the matter of stated income loans, said Feinberg. Countrywide also became a purveyor of loans that many consumer experts contend were a bad deal for borrowers, with low introductory interest rates that later could skyrocket.

In many instances, Feinberg said, that meant borrowers were getting loans that were "guaranteed to fail."

138.    On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide executives, alleging securities fraud. Specifically, the SEC alleged that Mozilo and the others misled investors about the credit risks that Countrywide created with its mortgage origination business, telling investors that Countrywide was primarily involved in prime mortgage lending, when it was actually heavily involved in risky sub-prime loans with expanded underwriting guidelines. *See SEC v. Mozilo*, No. CV 09-3994-JFW (C.D. Cal. filed June 4, 2009) (the "SEC Complaint"). The SEC defeated a motion to dismiss in that case. Mozilo and the other executives settled the charges with the SEC for $73 million on October 15, 2010. *See* Walter Hamilton & E. Scott Reckard, *Angelo Mozilo, Other Former Countrywide Execs Settle Fraud Charges*, L.A. Times, Oct. 16, 2010, at A1.

139.    Internal Countrywide e-mails the SEC released in connection with its lawsuit show the extent to which Countrywide systematically deviated from its underwriting guidelines. For instance, in an April 13, 2006 e-mail from Mozilo, to other top Countrywide executives, Mozilo stated that Countrywide was originating home mortgage loans with "serious disregard for process, compliance with guidelines and irresponsible behavior relative to meeting timelines." E-mail from Angelo Mozilo to Eric Sieracki and other Countrywide Executives (Apr. 13, 2006 7:42 PM PDT). Mozilo wrote that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the

EXHIBIT 11
74

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 67 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 68 of 190   Page ID
#:2151

quality of loans originated versus the pricing of those loan[s]."   *Id* (internal quotation marks omitted).

140.    Indeed, in September 2004, Mozilo had voiced his concern over the "clear deterioration in the credit quality of loans being originated," observing that "the trend is getting worse" because of competition in the non-conforming loans market.  With this in mind, Mozilo argued that Countrywide should "seriously consider securitizing and selling ([Net Interest Margin Securities]) a substantial portion of [Countrywide's] current and future sub prime [sic] residuals."  E-mail from Angelo Mozilo to Stan Kurland & Keith McLaughlin, Managing Directors, Countrywide (Sept. 1, 2004 8:17 PM PDT).

141.    To protect themselves against poorly underwritten loans, parties who purchase loans from an originator frequently require the originator to repurchase any loans that suffer Early Payment Default.

142.    In the first quarter of 2006, HSBC Holdings plc ("HSBC"), a purchaser of Countrywide's 80/20 subprime loans, began to force Countrywide to repurchase certain loans that HSBC contended were defective under the parties' contract.  In an e-mail sent on April 17, 2006, Mozilo asked, "[w]here were the breakdowns in our system that caused the HSBC debacle including the creation of the contract all the way through the massive disregard for guidelines set forth by both the contract and corporate."  E-mail from Angelo Mozilo to Dave Sambol, former Executive Managing Director and Chief of Mortgage Banking and Capital Markets at Countrywide Financial (Apr. 17, 2006 5:55 PM PST).  Mozilo continued:

> In all my years in the business I have never seen a more toxic prduct. [sic]  It's not only subordinated to the first, but the first is subprime.  In addition, the [FICOs] are below 600, below 500 and some below 400 . . .  With real estate values coming down. . .the product will become increasingly worse.  There has [sic] to be major changes in this program, including substantial increases in the minimum [FICO].

EXHIBIT 11
75

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 68 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 69 of 190   Page ID
#:2152

*Id.*

143.    Countrywide sold a product called the "Pay Option ARM."  This loan was a 30-year adjustable rate mortgage that allowed the borrower to choose between various monthly payment options, including a set minimum payment.  In a June 1, 2006 e-mail, Mozilo noted that most of Countrywide's Pay Option ARMs were based on stated income and admitted that "[t]here is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records."  E-mail from Angelo Mozilo to Carlos Garcia, former CFO of Countrywide Financial and Jim Furash, former President of Countrywide Bank (June 1, 2006 10:38 PM PST).

144.    An internal quality control report e-mailed on June 2, 2006, showed that for Stated Income loans, 50.3% of loans indicated a variance of 10% or more from the stated income in the loan application.  *See* E-mail from Clifford Rossi, Chief Risk Officer, Countrywide, to Jim Furash, Executive, CEO, Countrywide Bank, N.A., among others (June 2, 2006 12:28 PM PDT).

145.    Countrywide, apparently, was "flying blind" on how one of its popular loan products, the Pay Option ARM loan, would perform, and admittedly, had "no way, with any reasonable certainty, to assess the real risk of holding these loans on [its] balance sheet."  E-mail from Angelo Mozilo to Dave Sambol, Managing Director Countrywide (Sept. 26, 2006 10:15 AM PDT).  Yet, such loans were securitized and passed on to unsuspecting investors such as U.S. Central.

146.    With growing concern over the performance of Pay Option ARM loans in the waning months of 2007, Mozilo advised that he "d[id]n't want any more Pay Options originated for the Bank."  E-mail from Angelo Mozilo Countrywide to Carlos Garcia, former Managing Director, Countrywide (Nov. 3, 2007 5:33 PM PST).  In other words, if Countrywide was to

EXHIBIT 11
76

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 69 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 70 of 190   Page ID
#:2153

continue to originate Pay Option ARM loans, it was not to hold onto the loans.  Mozilo's

concerns about Pay Option ARM loans were rooted in "[Countrywide's] inability to underwrite

[Pay Option ARM loans] combined with the fact that these loans [we]re inherently unsound

unless they are full doc, no more than 75% LTV and no piggys."  *Id.*

147.   In a March 27, 2006 e-mail, Mozilo reaffirmed the need to "oversee all of the

corrective processes that will be put into effect to permanently avoid the errors of both

judgement [sic] and protocol that have led to the issues that we face today" and that "the people

responsible for the origination process understand the necessity for adhering to the guidelines for

100% LTV sub-prime product.  This is the most dangerous product in existence and there can be

nothing more toxic and therefore requires that no deviation from guidelines be permitted

irrespective of the circumstances."  E-mail from Angelo Mozilo, former Chairman and CEO of

Countrywide Financial, to the former Countrywide Managing Directors (Mar. 27, 2006 8:53 PM

PST).

148.   Yet, Countrywide routinely found exceptions to its underwriting guidelines

without sufficient compensating factors.  In an April 14, 2005 e-mail, Frank Aguilera, a

Countrywide managing director, explained that the "spirit" of Countrywide's exception policy

was not being followed.  He noted a "significant concentration of similar exceptions" that

"denote[d] a divisional or branch exception policy that is out side [sic] the spirit of the policy."

Aguilera continued: "The continued concentration in these same categories indicates either a)

inadequate controls in place to mange [sic] rogue production units or b) general disregard for

corporate program policies and guidelines." Aguilera observed that pervasive use of the

exceptions policy was an industry-wide practice:

It appears that [Countrywide Home Loans]' loan exception policy is more loosely
interpreted at [Specialty Lending Group] than at the other divisions.  I understand

EXHIBIT 11
77

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 70 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 71 of 190   Page ID
#:2154

> that [Correspondent Lending Division] has decided to proceed with a similar
> strategy to appease their complaint customers. . . . [Specialty Lending Group] has
> clearly made a market in this unauthorized product by employing a strategy that
> Blackwell has suggested is prevalent in the industry.

E-mail from Frank Aguilera, Managing Director, Countrywide to John McMurray, Managing

Director, Countrywide (Apr. 14, 2005 12:14 PM PDT).

149.    Internal reports months after an initial push to rein in the excessive use of

exceptions with a "zero tolerance" policy showed the use of exceptions remained excessive.

E-mail from Frank Aguilera, Managing Director, Countrywide to Brian Kuelbs, Managing

Director, Countrywide, among others (June 12, 2006 10:13 AM PDT).

150.    In February 2007, nearly a year after pressing for a reduction in the overuse of

exceptions and as Countrywide claimed to be tightening lending standards, Countrywide

executives found that exceptions continued to be used at an unacceptably high rate.  Frank

Aguilera stated that any "[g]uideline tightening should be considered purely optics with little

change in overall execution unless these exceptions can be contained."  E-mail from Frank

Aguilera, Managing Director, Countrywide to Mark Elbuam, Managing Director, Countrywide,

among others (Feb. 21, 2007 4:58 PM PST).

151.    John McMurray, a former Countrywide managing director, expressed his opinion

that "the exception process has never worked properly" in a September 2007 e-mail.  E-mail

from John McMurray, Managing Director, to Jess Lederman, Managing Director, Countrywide

(Sept. 7, 2007 10:12 AM PDT).

152.    Countrywide conceded that the poor performance of loans it originated was, in

many cases, due to poor underwriting.  In April 2007, Countrywide noticed that its high

combined loan-to-value ratio ("CLTV") stated income loans were performing worse than those

of its competitors.  After reviewing many of the loans that went bad, a Countrywide executive

EXHIBIT 11
78

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 71 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 72 of 190   Page ID
#:2155

stated that "in most cases [poor performance was] due to poor underwriting related to reserves and verification of assets to support reasonable income." E-mail from Russ Smith, Countrywide to Andrew Gissinger, Managing Director, Countrywide (Apr. 11, 2007 7:58 AM PDT).

153.    On October 6, 2008, 39 states announced that Countrywide agreed to pay up to $8 billion in relief to homeowners nationwide to settle lawsuits and investigations regarding Countrywide's deceptive lending practices.

154.    Like loan purchasers, insurers of RMBS also typically require the insured party to repurchase loans suffering Early Payment Default in order to protect themselves against fraud and poor underwriting.

155.    On September 30, 2008, MBIA Insurance Corp. ("MBIA"), an insurer of certain RMBS backed by pools of loans originated by Countrywide, filed a complaint against Countrywide alleging, in part, that Countrywide misrepresented the quality of its underwriting process. *See* Complaint, *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 08/602825 (N.Y. Sup. Ct. filed Sept. 30, 2008). After several motions to dismiss and an amended complaint, the court allowed MBIA's claims of fraud and breach of covenant of fair dealing against Countrywide to proceed.

156.    On July 1, 2008, NBC Nightly News aired the story of a former Countrywide regional Vice President, Mark Zachary, who sued Countrywide after he was fired for questioning his supervisors about Countrywide's poor underwriting practices.

157.    According to Zachary, Countrywide pressured employees to approve unqualified borrowers. Countrywide's mentality, he said, was "what do we do to get one more deal done. It doesn't matter how you get there [i.e., how the employee closes the deal]. . . ." NBC Nightly News, Countrywide Whistleblower Reports "Liar Loans" (July 1, 2008) ("July 1, 2008 NBC

EXHIBIT 11
79

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 72 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 73 of 190   Page ID
#:2156

Nightly News").  Zachary also stated that the practices were not the work of a few bad apples, but rather:  "It comes down, I think from the very top that you get a loan done at any cost."  *Id.*

158.    Zachary also told of a pattern of:  1) inflating home appraisals so buyers could borrow enough to cover closing costs, but leaving the borrower owing more than the house was truly worth; 2) employees steering borrowers who did not qualify for a conventional loan into riskier mortgages requiring little or no documentation, knowing they could not afford it; and 3) employees coaching borrowers to overstate their income in order to qualify for loans.

159.    NBC News interviewed six other former Countrywide employees from different parts of the country, who confirmed Zachary's description of Countrywide's corrupt culture and practices.   Some said that Countrywide employees falsified documents intended to verify borrowers' debt and income to clear loans.  NBC News quoted a former loan officer:  "'I've seen supervisors stand over employees' shoulders and watch them . . . change incomes and things like that to make the loan work.'"  July 1, 2008 NBC Nightly News.

160.    Not surprisingly, Countrywide's default rates reflected its approach to underwriting.  *See* 2008 "Worst Ten in the Worst Ten" Report.  Countrywide appeared on the top ten list in six of the ten markets: 4th in Las Vegas, Nevada; 8th in Sacramento, California; 9th in Stockton, California and Riverside, California; and 10th in Bakersfield, California and Miami, Florida.   When the OCC issued its updated 2009 "Worst Ten in the Worst Ten" Report, Countrywide appeared on the top ten list in every market, holding 1st place in Las Vegas, Nevada; 2nd in Reno, Nevada; 3rd in Merced, California; 6th in Fort Myers-Cape Coral, Florida, Modesto, California, and Stockton-Lodi, California; 7th in Riverside-San Bernardino, California and Fort Pierce-Port St. Lucie, Florida; 8th in Vallejo-Fairfield-Napa, California; and 9th in Bakersfield, California.  2009 "Worst Ten in the Worst Ten" Report.

EXHIBIT 11
80

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 73 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 74 of 190   Page ID
#:2157

6.      **GreenPoint's Systematic Disregard of Underwriting Standards**

161.    GreenPoint was a primary originator of the loans underlying the J.P. Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2007-A1, and J.P. Morgan Alternative Loan Trust 2007-A2 offerings.

162.    GreenPoint, based in Novato, California, was the wholesale mortgage banking unit of Capital One Financial Corp. ("Capital One").  Capital One acquired GreenPoint when it purchased GreenPoint's holding company, North Fork Bancorp, in December 2006.  Capital One shut down GreenPoint's operations less than one year later on August 21, 2007.

163.    According to a press release issued by Capital One on August 20, 2007, GreenPoint had an "originate and sell" (*i.e.*, OTD) business model with a focus on "prime non-conforming and near-prime markets, especially the Alt-A mortgage sector."  Capital One eventually liquidated GreenPoint in December 2008, taking an $850 million write-down due to mortgage-related losses associated with GreenPoint's origination business.

164.    When originating stated income loans, GreenPoint often inflated the borrowers' income by as much as 5%.  A September 12, 2008, article on Bloomberg reports on GreenPoint's underwriting practices:

> Many Alt-A loans go to borrowers with credit scores higher than subprime and lower than prime, and carried lower interest rates than subprime mortgages.
>
> So-called no-doc or stated-income loans, for which borrowers didn't have to furnish pay stubs or tax returns to document their earnings, were offered by lenders such as GreenPoint Mortgage and Citigroup Inc. to small business owners who might have found it difficult to verify their salaries.
> . . .
>
> "To grow, the market had to embrace more borrowers, and the obvious way to do that was to move down the credit scale," said Guy Cecala, publisher of Inside Mortgage Finance.  "Once the door was opened, it was abused."
> . . .

EXHIBIT 11
81

Case 2:11-cv-02341-EFM -JPO  Document 1  Filed 06/20/11  Page 74 of 186
Case 2:10-cv-01597-GW -MAN  Document 140-1  Filed 06/23/11  Page 75 of 190  Page ID
#:2158

> Almost all stated-income loans exaggerated the borrower's actual income by 5 percent or more, and more than half increased the amount by more than 50 percent, according to a study cited by Mortgage Asset Research Institute in its 2006 report to the Washington-based Mortgage Bankers Association.

Dan Levy & Bob Ivry, *Alt-A Mortgages Next Risk for Housing Market as Defaults Surge*, BLOOMBERG, Sept. 12, 2008, *available at* http://www.bloomberg.com/apps/news? pid=newsarchive&sid=arb3xM3SHBVk (last visited Oct. 28, 2010).

165. GreenPoint is the defendant in private litigation regarding its origination practices. The allegations concern GreenPoint's adherence to its underwriting guidelines in the mortgage loan origination process, and the plaintiff seeks to have GreenPoint repurchase 30,000 loans it issued that allegedly were not in compliance with GreenPoint's own underwriting guidelines. *See U.S. Bank Nat'l Ass'n v. GreenPoint Mortgage Funding, Inc.*, No. 09-600352 (N.Y. Sup. Ct. filed Apr. 22, 2009). On March 3, 2010, the court denied GreenPoint's motion to dismiss this claim, holding that discovery would be required to determine whether GreenPoint would be required under the parties' contract to repurchase all 30,000 loans based on the deficiencies in individual loans identified by U.S. Bank.

166. GreenPoint's pervasive disregard of underwriting standards resulted in its inclusion among the worst ten originators in the 2008 "Worst Ten in the Worst Ten" Report. GreenPoint was identified 7th worst in Stockton, California, and 9th worst in both Sacramento, California, and Las Vegas, Nevada. In the 2009 "Worst Ten in the Worst Ten" Report, GreenPoint was listed as 3rd worst in Modesto, California; 4th worst in Stockton, Merced, and Vallejo-Fairfield-Napa, California; 6th worst in Las Vegas, Nevada; and 9th in Reno, Nevada.

### 7. IndyMac's Systematic Disregard of Underwriting Standards

167. IndyMac Bank F.S.B. ("IndyMac") was a principal originator of the loans underlying IndyMac INDX Mortgage Loan Trust 2006-AR29 offering.

EXHIBIT 11
82

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 75 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 76 of 190   Page ID
#:2159

168.     On July 11, 2008, just four months after IndyMac filed its 2007 Annual Report, federal regulators seized IndyMac in what was among the largest bank failures in U.S. history. IndyMac filed for bankruptcy on July 31, 2008.

169.     On March 4, 2009, the Office of the Inspector General of the United States Department of the Treasury ("Treasury OIG") issued Audit Report No. OIG-09-032, titled "Safety and Soundness:  Material Loss Review of IndyMac Bank, FSB" (the "IndyMac OIG Report") reporting the results of Treasury OIG's review of the failure of IndyMac.  The IndyMac OIG Report portrays IndyMac as a company determined to originate as many loans as possible, as quickly as possible, without regard for the quality of the loans, the creditworthiness of the borrowers, or the value of the underlying collateral.

170.     According to the IndyMac OIG Report, "[t]he primary causes of IndyMac's failure were . . . associated with its" "aggressive growth strategy" of "originating and securitizing Alt-A loans on a large scale."  IndyMac OIG Report at 2.  The report found, "IndyMac often made loans without verification of the borrower's income or assets, and to borrowers with poor credit histories.   Appraisals obtained by IndyMac on underlying collateral were often questionable as well." *Id.*

171.     IndyMac "encouraged the use of nontraditional loans," engaged in "unsound underwriting practices" and "did not perform adequate underwriting," in an effort to "produce as many loans as possible and sell them in the secondary market." *Id.* at 11, 21.  The OIG Report reviewed a sampling of loans in default and found "little, if any, review of borrower qualifications, including income, assets, and employment." *Id.* at 11.

EXHIBIT 11
83

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 76 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1    Filed 06/23/11   Page 77 of 190   Page ID
#:2160

172.     IndyMac was not concerned by the poor quality of the loans or the fact that borrowers simply "could not afford to make their payments" because, "as long as it was able to sell those loans in the secondary mortgage market," IndyMac could remain profitable.  *Id.* at 2-3.

173.     IndyMac's "risk from its loan products. . .was not sufficiently offset by other underwriting parameters, primarily higher FICO scores and lower LTV ratios." *Id.* at 31.

174.     Unprepared for the downturn in the mortgage market and the sharp decrease in demand for poorly underwritten loans, IndyMac found itself "hold[ing] $10.7 billion of loans it could not sell in the secondary market." *Id.* at 3.  This proved to be a weight it could not bear, and IndyMac ultimately failed.  *See id.*

175.     In June 2008, the Center for Responsible Lending ("CRL") published a report entitled *IndyMac:  What Went Wrong?  How an 'Alt-A' Leader Fueled its Growth with Unsound and Abusive Mortgage Lending* (June 30, 2008) ("CRL Report"), *available at* http://www.responsiblelending.org/mortgage-lending/research-analysis/indymac_what_went_wrong.pdf.  The CRL Report detailed the results of the CRL's investigation into IndyMac's lending practices.  CRL based its report on interviews with former IndyMac employees and reviewed numerous lawsuits filed against IndyMac.  The CRL Report summarized the results of its investigation as follows:

> IndyMac's story offers a body of evidence that discredits the notion that the mortgage crisis was caused by rogue brokers or by borrowers who lied to bankroll the purchase of bigger homes or investment properties.  CRL's investigation indicates many of the problems at IndyMac were spawned by top-down pressures that valued short-term growth over protecting borrowers and shareholders' interests over the long haul.

CRL Report at 1.

EXHIBIT 11
84

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 77 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 78 of 190   Page ID
#:2161

176.    CRL reported that its investigation "uncovered substantial evidence that [IndyMac] engaged in unsound and abusive lending during the mortgage boom, routinely making loans without regard to borrowers' ability to repay [the mortgage loans]." *Id.* at 2.

177.    The CRL Report stated that "IndyMac pushed through loans with fudged or falsified information or simply lowered standards so dramatically that shaky loans were easy to approve." *Id.*

178.    The CRL Report noted that "[a]s IndyMac lowered standards and pushed for more volume," "the quality of [IndyMac's] loans became a running joke among its employees." *Id.* at 3.

179.    Former IndyMac mortgage underwriters explained that "loans that required no documentation of the borrowers' wages" were "[a] big problem" because "these loans allowed outside mortgage brokers and in-house sales staffers to inflate applicants' [financial information] . . . and make them look like better credit risks." *Id.* at 8.  These "shoddily documented loans were known inside the company as 'Disneyland loans' – in honor of a mortgage issued to a Disneyland cashier whose loan application claimed an income of $90,000 a year." *Id.* at 3.

180.    The CRL also found evidence that:  (1) managers pressured underwriters to approve shaky loans in disregard of IndyMac's underwriting guidelines; and (2) managers overruled underwriters' decisions to deny loans that were based upon falsified paperwork and inflated appraisals.  For instance, Wesley E. Miller, who worked as a mortgage underwriter for IndyMac in California from 2005 to 2007, told the CRL:

> [W]hen he rejected a loan, sales managers screamed at him and then went up the line to a senior vice president and got it okayed.  "There's a lot of pressure when you're doing a deal and you know it's wrong from the get-go – that the guy can't afford it," Miller told CRL.  "And then they pressure you to approve it."
>
> The refrain from managers, Miller recalls, was simple:  "Find a way to make this work."

EXHIBIT 11
85

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 78 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 79 of 190   Page ID
#:2162

*Id.* at 9 (footnote omitted).

181.    Likewise, Audrey Streater, a former IndyMac mortgage underwriting team leader, stated:

> I would reject a loan and the insanity would begin.   It would go to upper management and the next thing you know it's going to closing.

*Id.* at 1, 3.   Streater also said the "prevailing attitude" at IndyMac was that underwriting was "window dressing—a procedural annoyance that was tolerated because loans needed an underwriter's stamp of approval if they were going to be sold to investors."  *Id.* at 8.

182.    Scott Montilla, who was an IndyMac mortgage loan underwriter in Arizona during the same time period, told the CRL that IndyMac management would override his decision to reject loans about 50% of the time.  *See id.* at 9.  According to Montilla:

> "I would tell them:  'If you want to approve this, let another underwriter do it, I won't touch it – I'm not putting my name on it,'" Montilla says.  "There were some loans that were just blatantly overstated. . . .   Some of these loans are very questionable.  They're not going to perform."

*Id.* at 10.

183.    Montilla and another IndyMac mortgage underwriter told the CRL that borrowers did not know their stated incomes were being inflated as part of the application process.  *See id.* at 14.

184.    On July 2, 2010, the FDIC sued certain former officers of IndyMac's Homebuilder Division ("HBD"), alleging that IndyMac disregarded its underwriting practices, among other things, and approved loans to borrowers who were not creditworthy or for projects with insufficient collateral.  *See* Complaint, *FDIC v. Van Dellen*, No. 2:10-cv-04915-DSF, ¶ 6 (C.D. Cal. filed July 2, 2010).  This case is set for trial in September 2012.

185.    IndyMac currently faces a class action lawsuit alleging disregard of underwriting standards that adversely affected the value of the purchased RMBS.  *See In re IndyMac*

EXHIBIT 11
86

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 79 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 80 of 190   Page ID
#:2163

*Mortgage-Backed Sec. Litig.*, No. 09-4583 (S.D.N.Y. filed May 14, 2009).  On June 21, 2010,

the class action suit survived a motion to dismiss.

186.    MBIA filed a breach of contract claim against IndyMac (with the FDIC

representing IndyMac as conservator and receiver) in May 2009, claiming that IndyMac made

contractual misrepresentations concerning its adherence to its underwriting standards in

processing mortgage loan applications.  *See MBIA Ins. Corp. v. IndyMac Bank, FSB*, No. 1:09-

cv-01011-CKK (D.D.C. filed May 29, 2009).  A motion to dismiss is pending.

187.    IndyMac's failure to abide by its underwriting standards left investors holding

severely downgraded junk securities.  As a result of IndyMac's systematic disregard of its

underwriting standards, the OCC included IndyMac in the OCC's 2008 "Worst Ten in the Worst

Ten" Report.  IndyMac ranked 10th in Las Vegas, Nevada in both 2008 and 2009, while coming

in at 10th in Merced, California, Riverside-San Bernardino, California, and Modesto, California

in 2009.  *See* 2008 "Worst Ten in the Worst Ten" Report; 2009 "Worst Ten in the Worst Ten"

Report.

### 8.    New Century's Systematic Disregard of Underwriting Standards

188.    New Century Capital Corporation and New Century Mortgage Corporation were

subsidiaries of New Century Financial Corp. ("New Century").  New Century was founded in

1995 in Irvine, California, and grew to be one of the nation's largest subprime lenders—

originating $60 billion in loans in 2006 alone.  New Century supplied the loans underlying the C-

BASS 2006-CB7 Trust Offering.

189.    New Century failed dramatically in April 2007 amid a wave of loan defaults,

revelations that its prior year's books contained numerous accounting errors, government

investigations and a liquidity crisis when its Wall Street backers pulled the financial plug on loan

funding.  The circumstances leading to its collapse tell the story of a company— like so many

EXHIBIT 11
87

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 80 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 81 of 190   Page ID
#:2164

other lenders of the time—that was far more concerned with originating mortgages to fuel the

securitization machine than in the quality of those mortgages.

190.    A June 2, 2008 article in the Columbus Dispatch summarized New Century's

reputation in the industry:

> The California-based mortgage company catered to the riskiest borrowers, even
> those with credit scores as low as 500. Its brokers cut deals by asking few
> questions and reviewing even fewer documents, investigators say.
>
> Homeowners struggling to pay their existing mortgages signed up for what they
> believed to be redemption: a new loan. They were unaware of the warnings from
> lending and legal experts that New Century loaned money with a devil-may-care-
> attitude.
>
> New Century typified the book-'em-at-any-cost mentality that fueled the national
> mania for high-rate mortgages, commonly called subprime.

Jill Riepenhoff & Doug Haddix, *Risky Refinancings Deepen Financial Hole*, COLUMBUS

DISPATCH, June 2, 2008, at 1A.

191.    The article continued:

> Lending experts and consumer advocates say New Century was the poster child
> for the subprime tsunami—a company that relaxed lending standards so much that
> even borrowers with fresh bankruptcies and foreclosures could get a mortgage.

*Id.*

192.    New Century's foreclosure rates reflected its inattention to underwriting

standards.  Indeed, New Century appeared in the OCC's 2008 "Worst Ten in the Worst Ten"

Report in every housing market highlighted.

193.    Incredibly, New Century appeared in the top five in every market—1st in Las

Vegas, Nevada and Riverside, California; 2nd in Cleveland, Ohio, Denver, Colorado,

Sacramento, California and Stockton, California; 3rd in Bakersfield, California and Detroit,

Michigan; and 5th in Miami, Florida and Memphis, Tennessee.

74

EXHIBIT 11
88

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 81 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 82 of 190   Page ID
#:2165

194.    When the OCC issued its updated 2009 "Worst Ten in the Worst Ten" Report,

New Century rose to the top three in every one of the ten worst markets, holding 1st place in—

Reno, Nevada, Bakersfield, California, Riverside-San Bernardino, California and Fort Myers-

Cape Coral, Florida; 2nd place in Modesto, California, Las Vegas, Nevada, Merced, California,

Stockton-Lodi, California; and 3rd place in Fort Pierce-Port St. Lucie, Florida and Vallejo-

Fairfield-Napa, California.

195.    The U.S. Bankruptcy Court of the District of Delaware presiding over the case

appointed Michael J. Missal (the "Examiner") to examine "any and all accounting and financial

statement irregularities, errors and misstatements" in connection with New Century's practices

and procedures.  The Examiner engaged a law firm, forensic accountants and financial advisors

to assist in his investigation and reporting.  His final report to the Bankruptcy Court dated

February 29, 2008 (the "Examiner's Report") was unsealed and publicly released on March 26,

2008.

196.    The Examiner concluded that New Century "engaged in a number of significant

improper and imprudent practices related to its loan originations, operations, accounting and

financial reporting processes."   Examiner's Report, at 2.   The Examiner summarized the

findings:

A.      "New Century had a brazen obsession with increasing loan originations,
without due regard to the risks associated with that business strategy.  Loan
originations rose dramatically in recent years, from approximately $14 billion in
2002 to approximately $60 billion in 2006.  The Loan Production Department was
the dominant force within the Company and trained mortgage brokers to originate
New Century loans in the aptly named 'CloseMore University.' Although a
primary goal of any mortgage banking company is to make more loans, New
Century did so in an aggressive manner that elevated the risks to dangerous and
ultimately fatal levels."  Examiner's Report, at 3.

B.      "The increasingly risky nature of New Century's loan originations created
a ticking time bomb that detonated in 2007.  Subprime loans can be appropriate
for a large number of borrowers. New Century, however, layered the risks of loan

EXHIBIT 11
89

Case 2:11-cv-02341-EFM-JPO   Document 1   Filed 06/20/11   Page 82 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 83 of 190   Page ID
#:2166

products upon the risks of loose underwriting standards in its loan originations to high risk borrowers." *Id.*

C. "More than 40% of the loans originated by New Century were underwritten on a stated income basis. These loans are sometimes referred to as 'liars' loans' because borrowers are not required to provide verification of claimed income, leading a New Century employee to tell certain members of Senior Management in 2004 that 'we are unable to actually determine the borrowers' ability to afford a loan.'" *Id.*

D. "New Century also made frequent exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan. A Senior Officer of New Century warned in 2004 that the 'number one issue is exceptions to guidelines.' Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies." *Id.* at 3-4.

E. "Senior Management turned a blind eye to the increasing risks of New Century's loan originations and did not take appropriate steps to manage those risks. New Century's former Chief Credit Officer noted in 2004 that the Company had "no standard for loan quality. Instead of focusing on whether borrowers could meet their obligations under the terms of the mortgages, a number of members of the Board of Directors and Senior Management told the Examiner that their predominant standard for loan quality was whether the loans New Century originated could be initially sold or securitized in the secondary market." *Id.* at 4.

F. "Senior Management was aware of an alarming and steady increase in early payment defaults ('EPD') on loans originated by New Century, beginning no later than mid-2004. The surge in real estate prices slowed and then began to decrease, and interest rates started to rise. The changing market conditions exacerbated the risks embedded in New Century's products, yet Senior Management continued to feed eagerly the wave of investor demands without anticipating the inevitable requirement to repurchase an increasing number of bad loans. Unfortunately, this wave turned into a tsunami of impaired and defaulted mortgages. New Century was not able to survive and investor suffered mammoth losses. *Id.*

197.     The Examiner's Report also stated that New Century's underwriting and appraisal systems were antiquated. Rather than undertaking sophisticated risk assessments, New Century relied on outdated manual systems that, according to a member of New Century management interviewed by the Examiner, allowed New Century to "finagle anything." *Id.* at 54.

198.     Brad Morrice, New Century's CEO beginning in 2006, acknowledged that "bad appraisals were a frustrating source of concern and the main cause of loan 'kickouts,'" i.e., a

EXHIBIT 11
90

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 83 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 84 of 190   Page ID
#:2167

rejection of certain loans by investors, and that "improper appraisals were the biggest contributors to losses when loans went bad." *Id.* at 61-62.

199.    From 2003 to 2006, New Century began peddling riskier and riskier products, yet failed to employ underwriting safeguards that might have mitigated the inherent risk associated with such products.  For instance, from March 2003 to June 2005, the percentage of interest-only loans New Century originated leapt from 0% to 38.49%.  And from 2004 to 2005, the percentage of interest-only ARMs rose from 19.3% to 29.6% of the total volume of New Century's originations and purchases.  Despite the riskiness of those products, New Century qualified borrowers based on their ability to pay the initial interest rate rather than the interest plus principal amortization, which was added after the first several years.  *Id.* at 57, 125-26.

200.    Likewise, from 2004 through 2006, New Century increasingly sold "stated income" loans – with such loans representing at least 42% of New Century's total loan volume.  (Table, Missal 57).  "Stated income" loans involve no documentation regarding a borrower's income; instead, the loan is made based on the borrower's statement as to the amount of his or her income.  Stated income loans are often referred to in the industry as "liars' loans," because of the ease with which unscrupulous borrowers or mortgage brokers can overstate income.  (Examiner's Report, at 58).  Despite the risks already inherent in such products, New Century actively discouraged its employees from even seeking to verify whether a prospective borrower's stated income was reasonable.  *Id.* at 127 n.314.

201.    The Examiner identified several "red flags" that were indicative of the poor quality of New Century's loans and the fact that New Century was not adhering to its underwriting guidelines.  Specifically, the Examiner noted that "defective appraisals, incorrect credit reports and missing documentation" had led to a high number of kick-outs by investors, all

EXHIBIT 11
91

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 84 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 85 of 190   Page ID
#:2168

of which "suggested that New Century's loan origination processes were not consistently

producing loans that met New Century's underwriting standards and investor guidelines." *Id.* at

109.

> 202.    The Examiner found:
>
> New Century's Senior Management recognized that the Company had serious
> loan quality issues beginning as early as 2004.  For example, in April 2004, New
> Century's Chief Credit Officer reported that 'the QA [quality assurance] results
> [pertaining to the loan origination processes] are still at unacceptable levels' and
> that 'Investor Rejects [kickouts] are at an incline as well.'  Two months later, in
> June 2004, the head of Secondary Marketing remarked in an e-mail that 'we have
> so many issues pertaining to quality and process!'"

*Id.* at 110.

203.    In 2005, New Century began internal audits of its loan origination and production

processes.  An audit of the Sacramento wholesale fulfillment center revealed a number of "high

risk" problems, including the fact that 45% of the loans reviewed had improper RESPA

disclosures, 42% did not have approval stipulations fully satisfied, 39% had noted exceptions

with respect to the calculation or verification of income, and 23% had appraisal exceptions or

problems.  *See id.* at 152.

204.    Further adding to the problem was the fact that exceptions were frequently

granted to underwriting guidelines, but "New Century had no formal exceptions policy."  *Id.* at

174.

205.    With no policy in place, the granting of exceptions was arbitrary.  Despite upper

management's awareness of the tremendous problems regarding loan quality, the Examiner

concluded that "New Century continued to focus on generating greater quantities of ever riskier

loans, devoting little effort to such basic issues as making sure that the Company's loan

origination and underwriting policies and procedures were followed to avoid kickouts of loans

offered for sale."  *Id.* at 111.

EXHIBIT 11
92

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 85 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 86 of 190   Page ID
#:2169

206.    The Examiner reported:

New Century's loan origination*s* grew at an enormous rate from 2000 through 2006, becoming the second largest subprime lender by the end of 2004 and remaining one of the largest in 2005.  The Production Department was highly motivated and effective in originating such loans and apparently resisted changes that might have limited loan production volume.   While both the Quality Assurance and Internal Audit Departments identified loan quality problems, and kick-out and EPD rates confirmed many of these problems, the Production Department devoted its resources to generating high volumes of loans, with relatively little attention to loan quality.

*Id.* at 113.

207.    New Century consistently prioritized the origination of new loans over virtually all other concerns, including loan quality.  Despite after-the-fact assertions by some company spokespeople that such disregard was anomalous, New Century leaders articulated priorities demonstrating that the disregard was, in fact, systematic.  For example, Patrick Flanagan, who until 2006 was New Century's Head of Loan Production and Secondary Marketing, "emphasized maintaining New Century's loan production even when field audits revealed loan quality problems."  Even after Flanagan left the company, New Century's prioritization of volume, rather than quality, continued.  *Id.* at 89.

208.    The Examiner noted that New Century's Quality Assurance Department would run audit reports after loans were funded to determine if the loan file evidenced compliance with New Century's underwriting guidelines.  "The Quality Assurance audit results tended to identify the same sorts of problems as identified in the kickout reports, such as faulty appraisals, undocumented exceptions to underwriting guidelines and missing documentation from loan files."  Despite this fact, "since such post-funding audits did not directly affect profitability, some in Management discounted their importance."  *Id.* at 137.

209.    The Examiner's Report contained pages of findings that management ignored the loan quality issue and resisted efforts to implement strategies that would improve the quality of

79

EXHIBIT 11
93

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 86 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 87 of 190   Page ID
#:2170

loans.  For instance, the Examiner reported that management had determined a way to identify

underwriters whose actions led to a high number of defective loans in October 2005, but failed to

implement the effort until much later.  *Id.* at 169 n.337.

210.    The Examiner's Report found that loan quality trends "worsened dramatically" at

New Century in 2006 and early 2007.  Although New Century made a belated effort to improve

loan quality late in 2006, it was "too little too late" and even as late as December 2006, "the

same sorts of problems, including defective appraisals and missing documentation continued to

be the main reasons for investors kicking out increasing quantities of New Century loans." *Id.* at

157-58.

211.    The Examiner concluded, "New Century knew from multiple data sources that its

loan quality was problematic, starting no later than 2004.  Yet . . . the Board of Directors and

Senior Management before 2006 took few steps to address the troubling loan quality trends." *Id.*

at 175.

212.    On April 7, 2010, Patricia Lindsay, former Vice President of Corporate Risk at

New Century, who worked for the company from 1997 through December 2007, corroborated

the Examiner's findings in her testimony before the Financial Crisis Inquiry Commission.  She

testified that at New Century, risk managers were often viewed as a roadblock rather than a

resource and that:

> Account executives, who were New Century employees who brought loans in
> from brokers, were primarily compensated on commission of closed loans that
> they brought in. . . .  Many of the sales managers and account executives lacked
> any real estate or mortgage experience. They were missing the depth of
> experience necessary to make an informed lending decision. These same sales
> mangers had the ability to make exceptions to guidelines on loans, which would
> result in loans closing with these exceptions, at times over the objections of
> seasoned appraisers, underwriters or risk personnel. Some of the best sales
> managers had underwriting backgrounds and were more closely aligned with risk

EXHIBIT 11
94

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 87 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 88 of 190   Page ID
#:2171

management and better at understanding potential problems, but this was the exception and not the rule.

*Section 2:   Subprime Origination and Securitization Before the Fin. Crisis. Inquiry Comm'n*

(Apr. 7, 2010) (testimony of Patricia Lindsay, former Vice President of Corporate Risk, New

Century).

213.    She also testified as to systematic problems in the appraisal process:

> In my experience at New Century, fee appraisers hired to go to the properties were often times pressured into coming in "at value", fearing if they didn't, they would lose future business and their livelihoods.  They would charge the same fees as usual, but would find properties that would help support the needed value rather than finding the best comparables to come up with the most accurate value.

*Id.*

214.    Ms. Lindsay noted that at the end, New Century's approach to lending lacked

"common sense"—that the business became "volume driven and automated" with a broker being

able to get a loan pre-approved in "12 seconds or less."  *See id.*

215.    New Century's collapse has led to numerous civil and criminal investigations and

lawsuits.  For instance, in early 2007, the Ohio Attorney General filed a civil suit against New

Century.  The Attorney General obtained a temporary restraining order prohibiting New Century

from initiating any new loans or pursuing any foreclosure actions in Ohio.  The injunction acted

as a moratorium on New Century foreclosures in Ohio, thus giving the Attorney General's Office

an opportunity to review the loans for evidence of predatory practices.  After the investigation,

the local newspaper reported:

> New Century's underwriting standards were so low "that they would have sold a loan to a dog," said Ohio Assistant Attorney General Robert M. Hart.

> "Most people believe their broker has a duty to get them the best deal," Hart said. But New Century's brokers had incentives "to do the worst deal for borrowers."

> They earned more money when they made high-rate loans and tacked on fees or prepayment penalties.

EXHIBIT 11
95

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 88 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 89 of 190   Page ID
#:2172

Jill Riepenhoff & Doug Haddix, *Risky Refinancings Deepen Financial Hole*, COLUMBUS DISPATCH, June 2, 2008, at 1A.

216.    In December 2009, the SEC filed a complaint charging three former New Century executives with securities fraud.  *See SEC v. Morrice*, No. SACV09-01426 JVS (C.D. Cal. Dec. 7, 2009).  The SEC's complaint alleges that the New Century executives misled investors as to the deterioration of New Century's loan portfolio, including dramatic increases in early default rates and loan repurchases/repurchase requests.   On July 30, 2010, the SEC announced it had accepted offers to settle the case, subject to court approval, with defendants agreeing to (1) pay over $1.5 million in disgorgement and civil penalties; (2) be permanently enjoined from further securities law violations; and (3) a five-year ban on  serving as an officer or director of a public company.

9.    **NovaStar's Systematic Disregard of Underwriting Standards**

217.    NovaStar Mortgage, Inc. ("NovaStar"), a former Missouri subprime lender with offices in several states, originated numerous subprime loans that later defaulted.  NovaStar routinely and systematically disregarded its own underwriting standards and guidelines in order to generate more loan origination business, from which it reaped enormous profits. NovaStar originated or contributed a critical portion of loans in the mortgage pool underlying the J.P. Morgan Mortgage Acquisition Trust 2007-HE1 Offering.

218.    NovaStar regularly originated loans for borrowers who did not have a realistic capacity to repay the loans, as illustrated in this report from the New York Times:

> The Jordans are fighting a foreclosure on their home of 25 years that they say was a result of an abusive and predatory loan made by NovaStar Mortgage Inc.  A lender that had been cited by the Department of Housing and Urban Development for improprieties, like widely hiring outside contractors as loan officers, NovaStar ran out of cash in 2007 and is no longer making loans.
> . . .

EXHIBIT 11
96

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 89 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 90 of 190   Page ID
#:2173

The facts surrounding the Jordans' case are depressingly familiar.  In 2004, interested in refinancing their adjustable-rate mortgage as a fixed-rate loan, they said they were promised by NovaStar that they would receive one.  In actuality, their lawsuit says, they received a $124,000 loan with an initial interest rate of 10.45 percent that could rise as high as 17.45 percent over the life of the loan.

Mrs. Jordan, 66, said that she and her husband, who is disabled, provided NovaStar with full documentation of their pension, annuity and Social Security statements showing that their net monthly income was $2,697.  That meant that the initial mortgage payment on the new loan—$1,215—amounted to 45 percent of the Jordans' monthly net income.

The Jordans were charged $5,934 when they took on the mortgage, almost 5 percent of the loan amount. The loan proceeds paid off the previous mortgage, $11,000 in debts and provided them with $9,616 in cash.

Neither of the Jordans knew the loan was adjustable until two years after the closing, according to the lawsuit.  That was when they began getting notices of an interest-rate increase from Nova- Star. The monthly payment is now $1,385.

"I got duped," Mrs. Jordan said. "They knew how much money we got each month. Next thing I know I couldn't buy anything to eat and I couldn't pay my other bills."

Gretchen Morgenson, *Looking for The Lenders' Little Helpers*, N.Y. TIMES, July 12, 2009.

219.    Investor Michael Burry studied NovaStar's underwriting practices, as reported by

The Pitch in this May 13, 2010 article:

One of the subprime-loan originators that Burry studied was NovaStar, a company that started in Westwood and later moved into an office building off Ward Parkway.  NovaStar specialized in making home loans to people with shaky credit.

Burry noticed when NovaStar began issuing loans of increasingly crappy quality. From early 2004 to late 2005, the number of NovaStar borrowers taking out interest-only loans - no money down! - nearly quintupled.

The charade lasted until home prices stopped growing at an unprecedented clip and sketchy borrowers began to default on their tricked-out loans.
. . .

NovaStar, a company that the New York Times labeled "Exhibit A" for anyone interested in the goofy lending practices which precipitated the housing collapse, was eventually delisted from the New York Stock Exchange.

EXHIBIT 11
97

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 90 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 91 of 190   Page ID
#:2174

David Martin, *Hailed as a Rebel Reformer, KC Fed Chief Tom Hoenig is Really Neither* THE
PITCH, May 13, 2010, *available at* http://www.pitch.com/2010-05-13/news/kc-fed-chief-tom-
hoenig-is-no-rebel/.

220.    NovaStar faces a class action suit that alleges NovaStar systematically
disregarded its underwriting guidelines when originating mortgages in 2006 and 2007 that were
subsequently securitized into RMBS.   *See* Second Amended Class Action Complaint, *N.J.
Carpenters Health Fund v. NovaStar Mortgage, Inc.*, No. 08-cv-5310, Doc. 117 (S.D.N.Y. filed
May 18, 2011) ("N.J. Carpenters SAC").

221.    The N.J. Carpenters SAC includes statements concerning NovaStar's systematic
disregard of its underwriting guidelines from former NovaStar employees who worked in the
NovaStar mortgage origination business.   These former employees include a former Vice
President of Operations, Quality Control Auditors and Supervisors, Senior Underwriters,
Account Managers, and Account Executives. *See id.* ¶ 57.

222.    Former Account Managers, Underwriters, and Quality Control Auditors reported
that the pressure to increase the volume of loan production led to the systematic disregard of
NovaStar's underwriting guidelines in mortgage loan origination. *See id.* ¶ 70.

223.    When NovaStar Underwriters and Quality Control Auditors alerted supervisors
about loans that were initially rejected because of suspicious or fraudulent documentation,
NovaStar management would routinely override these initial loan rejections and approve the
loans. *See id.*

224.    For Full Documentation loans, NovaStar Underwriters would reject loan
applications where employment could not be adequately verified.   In many cases, NovaStar

EXHIBIT 11
98

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 91 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 92 of 190   Page ID
#:2175

management overrode the initial rejection, disregarding the questionable verification of employment in order to approve the loan application. *See id.* ¶ 75.

225.   The N.J. Carpenters SAC noted that Full Documentation loan applications regularly included unreasonably inflated income.  For instance, many loan application files reported income for several housekeepers in South Florida upwards of $200,000 a year. *See id.* ¶ 77.

226.   For Stated Income loans, inflated income was commonplace.  Reported income in Stated Income loans was apparently far from reasonable in relation to the applicant's employment. *See id.* ¶ 80.  When underwriters denied loan applications because of unreasonable stated income, NovaStar management disregarded the initial rejection and subsequently approved the loans in spite of the unreasonable reported income. *See id.* ¶ 81.

10.   **Option One's Systematic Disregard of Underwriting Standards**

227.   Option One Mortgage Corporation ("Option One") was a California corporation headquartered in Irvine, California.  Option One originated, serviced, acquired, and sold non-prime residential mortgages.  The company was founded in 1992 and, from June 1997 until April 2008, was a subsidiary of Block Financial Corporation.  In April 2008, Option One's assets were sold to American Home Mortgage Servicing, Inc.

228.   Option One originated or contributed loans in the mortgage pool underlying the J.P. Morgan Mortgage Acquisition Trust 2007-HE1 offering.

229.   Option One disregarded its underwriting practices while focusing on selling the loans it originated to Wall Street banks for securitization, according to the complaint in *Cambridge Place Inv. Mgmt. v. Morgan Stanley & Co.*, No. 1:10-cv-11376-NMG (D. Mass. filed Aug. 13, 2010); *see also* Tom Hals, *Fund Sues Banks for $1.2 Billion Loss Tied to Subprime,*

EXHIBIT 11
99

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 92 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 93 of 190   Page ID
#:2176

REUTERS, July 12, 2010, *available at* http://www.reuters.com/article/2010/07/12/us-cambridgeplace-subprime-lawsuit-idUSTRE66B61220100712.

230.   The Massachusetts Attorney General sued Option One, alleging, among other things, that Option One failed to follow its own underwriting standards in processing mortgage loan applications.  *See Massachusetts v. H&R Block, Inc.*, No. 08-2474-BLS (Mass. Super. Ct. filed June 3, 2008); *see also* Tim McLaughlin, *Caturano Being Acquired by RSM McGladrey*, BOSTON BUS. J., June 24, 2010.  Trial is set for 2011.

231.   Option One faces a suit that alleges Option One systematically disregarded its underwriting guidelines when originating mortgages that were subsequently securitized into RMBS.  *See* Complaint, *Federal Home Loan Bank of Chicago v. Banc of Am.*, No. 10-ch-45003 (Ill. Cir. Ct.) ("FHLB Chicago Complaint").

232.   Statements from confidential witnesses in the FHLB Chicago Complaint represented that Option One originated mortgage loans in violation of its stated underwriting standards.

233.   According to one confidential witness in the complaint, Option One "watered down" the appraisal process, allowing loans with inflated appraisals to be approved.  *See id.* ¶ 298.

234.   The same confidential witness explained how Option One told its employees to "be more aggressive"; it was made clear that the main objective of the company was to generate loans— "[a]s long as they could sell it, that's what mattered." *See id.* ¶ 296.

235.   Another confidential witness stated that one particular broker who worked with Option One "was given preferential treatment and his loans were always pushed through"

EXHIBIT 11
100

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 93 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 94 of 190   Page ID
#:2177

because he provided the company with "lots and lots of loans"; loans that this confidential witness said were often absent the necessary documentation. *See id.* ¶ 297.

## VIII.   THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACT

236.   The offering documents included material untrue statements or omitted facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

237.   For purposes of Section 11 liability, the Prospectus Supplements are part of and included in the registration statements of the offerings pursuant to 17 C.F.R. §§ 230.158, 230.430B (2008); *see also* Securities Offering Reform, 70 Fed. Reg. 44,722-01, 44,768-69 (Aug. 3, 2005).

238.   Statements in the offering documents concerning the following subjects were material and untrue at the time they were made: (1) the Originators' evaluation of the borrower's likelihood and capacity to repay the loan through application of the stated underwriting standards, including the calculation and use of an accurate "debt-to-income" ratio and the frequency and use of exceptions to those standards; (2) adherence to stated underwriting standards for reduced documentation programs; (3) the accurate calculation of the "loan-to-value" ratio for the mortgaged property and the accuracy of appraisals; and (4) the existence of credit enhancement to minimize the risk of loss.

239.   American Home Mortgage was the sole originator of loans in the American Home Mortgage Assets Trust 2007-3 offerings.  *See* American Home Mortgage Assets Trust 2007-3 Prospectus Supplement, June 5, 2007, at S-5.

240.   Ameriquest Mortgage Corp. and Argent Mortgage Company originated approximately 28.84% of the loans in the C-BASS 2006-CB7 Trust offering.  *See* C-BASS 2006-

EXHIBIT 11
101

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 94 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 95 of 190   Page ID
#:2178

CB7 Prospectus Supplement, October 2, 2006, at S-63.  New Century Mortgage Corp, originated

approximately 25.61% of the loans in the C-BASS 2006-CB7 Trust offering.  *Id.* at 19.

241.    IndyMac originated all of the loans in the IndyMac INDX 2006-AR29 offering.

*See* IndyMac INDX Mortgage Loan Trust 2006-AR29 Prospectus Supplement, September 28,

2006, at S-44.

242.    Chase Home Finance LLC and JPMorgan Chase, N.A. (the "Chase Originators"),

PHH Mortgage, Countrywide Home Loans, Inc., GreenPoint Mortgage Funding, Inc., and M&T

Mortgage Corp. were the primary originators of the mortgages underlying the J.P. Morgan

Alternative Loan Trust 2006-A2 offering.  *See* J.P. Morgan Alternative Loan Trust 2006-A2

Prospectus Supplement, April 27, 2006, at S-29.

243.    Option One Mortgage Corp., NovaStar Mortgage, Inc., and ResMAE Mortgage

Corp. were the primary originators of loans underlying the J.P. Morgan Mortgage Acquisition

Trust 2007-HE1 offering.  *See* J.P. Morgan Mortgage Acquisition Trust 2007-HE1 Prospectus

Supplement, June 14, 2007, at S-5.

244.    J.P. Morgan Chase Bank, N.A., Chase Home Mortgage or another J.P. Morgan

Chase affiliate ("Chase Originators") were the sole originators for the J.P. Morgan Mortgage

Acquisition Trust 2007-CH5, J.P. Morgan Mortgage Acquisition Trust 2007-CH4, and J.P.

Morgan Mortgage Acquisition Trust 2007-CH3 offerings. *See* J.P. Morgan Mortgage Acquisition

Trust 2007-CH5 Prospectus Supplement, June 28, 2007, at "The Originator" section; J.P.

Morgan Mortgage Acquisition Trust 2007-CH4 Prospectus Supplement, June 7, 2007, at S-67;

and J.P. Morgan Mortgage Acquisition Trust 2007-CH3 Prospectus Supplement, May 3, 2007, at

S-66.

EXHIBIT 11
102

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 95 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 96 of 190   Page ID
#:2179

245.    ResMAE Mortgage Corp. and Accredited Home Lenders, Inc. were the primary originators for the loans underlying the J.P. Morgan Mortgage Acquisition Trust 2006-HE1 offering.   *See* J.P. Morgan Mortgage Acquisition Trust 2006-HE1 Prospectus Supplement, February 24, 2006, at S-3.

246.    Chase Home Finance, LLC, J.P. Morgan Chase Bank, N.A. and American Home Mortgage Corp. were the primary originators of loans underlying the J.P. Morgan Alternative Loan Trust 2006-A3 offering.   *See* J.P. Morgan Alternative Loan Trust 2006-A3 Prospectus Supplement, June 28, 2006, at S-4.

247.    PHH Mortgage, the Chase Originators, and Countrywide Home Loans were the primary originators of the loans underlying the J.P. Morgan Alternative Loan Trust 2006-A6 offering.   *See* J.P. Morgan Alternative Loan Trust 2006-A6 Prospectus Supplement, October 27, 2006, at S-23.

248.    Flagstar, Countrywide Home Loans, the Chase Originators, and PHH Mortgage were the primary originators of the loans underlying the J.P. Morgan Alternative Loan Trust 2006-A7 offering.   *See* J.P. Morgan Alternative Loan Trust 2006-A7 Prospectus Supplement, dated November 28, 2006, at S-23-24.

249.    The Chase Originators, GreenPoint Mortgage, and Countrywide Home Loans were the primary originators of loans underlying the J.P. Morgan Alternative Loan Trust 2007-A1 offering.   *See* J.P. Morgan Alternative Loan Trust 2007-A1 Prospectus Supplement, February 26, 2007, at S-35.

250.    The Chase Originators, American Home Mortgage Corp., GreenPoint Mortgage Funding, Inc., Quicken Loans, Inc., American Mortgage Network, Inc., and Countrywide Home Loans were the primary originators in the J.P. Morgan Alternative Loan Trust 2007-A2 offering.

EXHIBIT 11
103

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 96 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 97 of 190   Page ID
#:2180

*See* J.P. Morgan Alternative Loan Trust 2007-A2 Prospectus Supplement, May 31, 2007, at S-38.

251.    The Chase Originators and American Home Mortgage Corp. were the primary originators of loans collateralizing the J.P. Morgan Alternative Loan Trust 2007-S1 offering.  *See* J.P. Morgan Alternative Loan Trust 2007-S1 Prospectus Supplement, May 30, 2007, at "The Originators" Section.

252.    WMC Mortgage Corporation was the sole originator of loans in the J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 offering.  *See* J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 Prospectus Supplement, August 22, 2006, at S-3.

253.    Examples of material untrue statements and/or omissions of fact in the Offering Documents of the RMBS listed above follow.

**A.    Untrue Statements Concerning Evaluation of the Borrower's Capacity and Likelihood to Repay the Mortgage Loan**

254.    With respect to American Home's underwriting guidelines, the American Home Mortgage Assets Trust 2007-3 Prospectus Supplement represented:

> The Originator's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt.  Because each loan is different, the Originator expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.

American Home Mortgage Assets Trust 2007-3 Prospectus Supplement at S-51-52; J.P. Morgan Alternative Loan Trust 2006-A3 Prospectus Supplement at S-30; J.P. Morgan Alternative Loan Trust 2007-A2 Prospectus Supplement at S-43; *see* American Home Mortgage Assets Trust 2007-3 Free Writing Prospectus, May 31, 2007, at "Underwriting Guidelines"; J.P. Morgan Alternative Loan Trust 2007-A2 Free Writing Prospectus, May 23, 2007, at "American Home Mortgage Corp."

EXHIBIT 11
104

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 97 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 98 of 190   Page ID
#:2181

255.    The American Home Mortgage Assets Trust 2007-3 Prospectus Supplement

continued:

> The Originator underwrites a borrower's creditworthiness based solely on
> information that the Originator believes is indicative of the applicant's willingness
> and ability to pay the debt they would be incurring.

American Home Mortgage Assets Trust 2007-3 Prospectus Supplement at S-52; J.P. Morgan

Alternative Loan Trust 2006-A3 Prospectus Supplement at S-30; J.P. Morgan Alternative Loan

Trust 2007-A2 Prospectus Supplement at S-43; *see* J.P. Morgan Alternative Loan Trust 2006-A3

Registration Statement, Dec. 7, 2005, at "Underwriting Standards"; American Home Mortgage

Assets Trust 2007-3 Free Writing Prospectus, May 31, 2007, at "Underwriting Guidelines"; J.P.

Morgan Alternative Loan Trust 2007-A2 Free Writing Prospectus, May 23, 2007, at "American

Home Mortgage Corp."

256.    The American Home Mortgage Assets Trust 2007-3 Prospectus Supplement

represented:

> The Originator obtains a credit report that summarizes each borrower's credit
> history.   The credit report contains information from the three major credit
> repositories, Equifax, Experian, and TransUnion.   These companies have
> developed scoring models to identify the comparative risk of delinquency among
> applicants based on characteristics within the applicant's credit report.   A
> borrower's credit score represents a comprehensive view of the borrower's credit
> history risk factors and is indicative of whether a borrower is likely to default on a
> loan.   Some of the factors used to calculate credit scores are a borrower's
> incidents of previous delinquency, the number of credit accounts a borrower has,
> the amount of available credit that a borrower has utilized, the source of a
> borrower's existing credit, and recent attempts by a borrower to obtain additional
> credit.   Applicants who have higher credit scores will, as a group, have fewer
> defaults than those who have lower credit scores.   The minimum credit score
> allowed by the Originator loan guidelines for non-conforming loans is 620 and the
> average is typically over 700.   For American Home Alt-A, the minimum credit
> score is generally 580.  If the borrowers do not have a credit score they must have
> an alternative credit history showing at least three trade lines with no payments
> over 60 days past due in the last 12 months.
>
> In addition to reviewing the borrower's credit history and credit score, the
> Originator underwriters closely review the borrower's housing payment history.

EXHIBIT 11
105

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 98 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 99 of 190   Page ID
#:2182

> In general, for non-conforming loans the borrower should not have made any
> mortgage payments over thirty days after the due date for the most recent twelve
> months.  In general, for Alt-A loans the borrower may have no more than one
> payment that was made over thirty days after the due date for the most recent
> twelve months.

American Home Mortgage Assets Trust 2007-3 Prospectus Supplement at S-52; J.P. Morgan

Alternative Loan Trust 2006-A3 Prospectus Supplement at S-30; J.P. Morgan Alternative Loan

Trust 2007-A2 Prospectus Supplement at S-43-44; *see* American Home Mortgage Assets Trust

2007-3 Free Writing Prospectus, May 31, 2007, at "Underwriting Guidelines"; J.P. Morgan

Alternative Loan Trust 2007-A2 Free Writing Prospectus, May 23, 2007, at "American Home

Mortgage Corp."

     257.    The American Home Mortgage Assets Trust 2007-3 Prospectus Supplement also

represented:

> For manually underwritten loans, the underwriter must ensure that the borrower's
> income will support the total housing expense on an ongoing basis.  Underwriters
> may give consideration to borrowers who have demonstrated an ability to carry a
> similar or greater housing expense for an extended period.  In addition to the
> monthly expense the underwriter must evaluate the borrower's ability to manage
> all recurring payments on all debts, including monthly housing expense.  When
> evaluating the ratio of all monthly debt payments to the borrower's monthly
> income (debt-to-income ratio), the underwriter should be aware of the degree and
> frequency of credit usage and its impact on the borrower's ability to repay the
> loan.  For example, borrowers who lower their total obligations should receive
> favorable consideration and borrowers with a history of heavy usage and a pattern
> of slow or late payments should receive less flexibility.

American Home Mortgage Assets Trust 2007-3 Prospectus Supplement at S-52-53; J.P. Morgan

Alternative Loan Trust 2006-A3 Prospectus Supplement at S-29-30; J.P. Morgan Alternative

Loan Trust 2007-A2 Prospectus Supplement at S-44; *see* American Home Mortgage Assets Trust

2007-3 Free Writing Prospectus, May 31, 2007, at "Underwriting Guidelines"; J.P. Morgan

Alternative Loan Trust 2007-A2 Free Writing Prospectus, May 23, 2007, at "American Home

Mortgage Corp."

EXHIBIT 11
106

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 99 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 100 of 190   Page
ID #:2183

258.   With respect to exceptions to American Home's underwriting guidelines, the

American Home Mortgage Assets Trust 2007-3 Prospectus Supplement stated:

> The Originator realizes that there may be some acceptable quality loans that fall
> outside published guidelines and encourages "common sense" underwriting.
> Because a multitude of factors are involved in a loan transaction, no set of
> guidelines can contemplate every potential situation.   Therefore, each case is
> weighed individually on its own merits and exceptions to the Originator's
> underwriting guidelines are allowed if sufficient compensating factors exist to
> offset any additional risk due to the exception.

American Home Mortgage Assets Trust 2007-3 Prospectus Supplement at S-53; J.P. Morgan

Alternative Loan Trust 2006-A3 Prospectus Supplement at S-31; J.P. Morgan Alternative Loan

Trust 2007-A2 Prospectus Supplement at S-44-45; *see* American Home Mortgage Assets Trust

2007-3 Free Writing Prospectus, May 31, 2007, at "Underwriting Guidelines"; J.P. Morgan

Alternative Loan Trust 2007-A2 Free Writing Prospectus, May 23, 2007, at "American Home

Mortgage Corp."

259.   The C-BASS 2006-CB7 Prospectus Supplement represented:

> The Mortgage Loans originated by the Ameriquest Loan Sellers were originated
> generally in accordance with guidelines (the "Ameriquest Underwriting
> Guidelines") established by the Ameriquest Loan Sellers with one of the
> following income documentation types: "Full Documentation", "Limited
> Documentation" or "Stated Income."

C-BASS 2006-CB7 Prospectus Supplement at S-63.

260.   The C-BASS 2006-CB7 Prospectus Supplement represented:

> All of the Mortgage Loans were originated or acquired by New Century in
> accordance with the New Century Underwriting Guidelines.

C-BASS 2006-CB7 Prospectus Supplement at S-68.

261.   The C-BASS 2006-CB7 Prospectus Supplement stated:

> The sponsor or a loan reviewer has reviewed a majority of the files related to the
> mortgage loans in connection with the acquisition of the mortgage loans by the
> sponsor for credit and compliance considerations.   These files may include the
> documentation pursuant to which the mortgage loan was originally underwritten,

EXHIBIT 11
107

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 100 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 101 of 190   Page
ID #:2184

as well as the mortgagor's payment history on the mortgage loan.  In its review, the sponsor evaluates the mortgagor's credit standing, repayment ability and willingness to repay debt.  A mortgagor's ability and willingness to repay the debts (including the mortgage loans) in a timely fashion is determined by the sponsor by reviewing the quality, quantity and durability of income history, history of debt management, history debt repayment and net worth accumulation of the mortgagor to the extent such information is available.  In addition, the sponsor may also obtain and review a current credit report for the mortgagor.

C-BASS 2006-CB7 Trust Prospectus Supplement at S-62.

262.    The C-BASS 2006-CB7 Prospectus Supplement stated:

The Ameriquest Underwriting Guidelines are primarily intended to evaluate: (1) the applicant's credit standing and repayment ability and (2) the value and adequacy of the mortgaged property as collateral.

C-BASS 2006-CB7 Trust Prospectus Supplement at S-63.

263.    The C-BASS 2006-CB7 Prospectus Supplement stated:

The New Century Underwriting Guidelines are primarily intended to assess the borrower's ability to repay the related Mortgage Loan, to assess the value of the mortgaged property and to evaluate the adequacy of the property as collateral for the Mortgage Loan.  All of the Mortgage Loans were also underwritten with a view toward the resale of the Mortgage Loans in the secondary market.  While New Century's primary consideration in underwriting a mortgage loan is the value of the mortgaged property, New Century also considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the type and use of the mortgaged property.

C-BASS 2006-CB7 Trust Prospectus Supplement at S-68.

264.    The C-BASS 2006-CB7 Prospectus Supplement represented:

On a case-by-case basis, the Ameriquest Loan Sellers may determine that, based upon compensating factors, a loan applicant, not strictly qualifying under one of the risk categories below, warrants an exception to the requirements set forth in the Ameriquest Underwriting Guidelines.

C-BASS 2006-CB7 Prospectus Supplement at S-63.

265.    The C-BASS 2006-CB7 Prospectus Supplement represented:

On a case-by-case basis, exceptions to the New Century Underwriting Guidelines are made where compensating factors exist. It is expected that a substantial portion of the Mortgage Loans will represent these exceptions.

EXHIBIT 11
108

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 101 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 102 of 190   Page
ID #:2185

C-BASS 2006-CB7 Prospectus Supplement at S-68.

266.   The C-BASS 2006-CB7 Prospectus Supplement stated:

The Stated Income residential loan program requires the applicant's employment
and income sources to be stated on the application.  The applicant's income as
stated must be reasonable for the related occupation in the loan underwriter's
discretion.

C-BASS 2006-CB7 Trust Prospectus Supplement at S-64.

267.   With respect to Indymac's guidelines, the IndyMac INDX Mortgage Loan Trust

2006-AR29 Prospectus Supplement stated:

Mortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac
Bank according to IndyMac Bank's underwriting guidelines, which also accept
mortgage loans meeting Fannie Mae or Freddie Mac guidelines regardless of
whether such mortgage loans would otherwise meet IndyMac Bank's guidelines,
or pursuant to an exception to those guidelines based on IndyMac Bank's
procedures for approving such exceptions.

IndyMac INDX Mortgage Loan Trust 2006-AR29 Prospectus Supplement at S-45; *see* IndyMac

INDX Mortgage Loan Trust 2006-AR29 Registration Statement, Feb. 24, 2006, at S-28.

268.   The IndyMac INDX Mortgage Loan Trust 2006-AR29 Prospectus Supplement

continued:

IndyMac Bank's underwriting criteria for traditionally underwritten mortgage
loans includes an analysis of the borrower's credit history, ability to repay the
mortgage loan and the adequacy of the mortgaged property as collateral.
Traditional underwriting decisions are made by individuals authorized to consider
compensating factors that would allow mortgage loans not otherwise meeting
IndyMac Bank's guidelines.

IndyMac INDX Mortgage Loan Trust 2006-AR29 Prospectus Supplement at S-45; *see* IndyMac

INDX Mortgage Loan Trust 2006-AR29 Registration Statement, Feb. 24, 2006, at S-28.

269.   The IndyMac INDX Mortgage Loan Trust 2006-AR29 Prospectus Supplement

also stated:

Underwriting procedures vary by channel of origination.  Generally, mortgage
loans originated through the mortgage professional channel will be submitted to

EXHIBIT 11
109

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 102 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 103 of 190   Page
ID #:2186

e-MITS for assessment and subjected to a full credit review and analysis. Mortgage loans that do not meet IndyMac Bank's guidelines may be manually re-underwritten and approved under an exception to those underwriting guidelines. Mortgage loans originated through the consumer direct channel are subjected to essentially the same procedures, modified as necessary to reflect the fact that no third-party contributes to the preparation of the credit file.

IndyMac INDX Mortgage Loan Trust 2006-AR29 Prospectus Supplement at S-47; *see* IndyMac

INDX Mortgage Loan Trust 2006-AR29 Registration Statement, Feb. 24, 2006, at S-30.

270.    With respect to exceptions to IndyMac's guidelines, the IndyMac INDX

Mortgage Loan Trust 2006-AR29 Prospectus Supplement represented:

Exceptions to underwriting standards are permitted in situations in which compensating factors exist.  Examples of these factors are significant financial reserves, a low loan-to-value ratio, significant decrease in the borrower's monthly payment and long-term employment with the same employer.

IndyMac INDX Mortgage Loan Trust 2006-AR29 Prospectus Supplement at S-47;  *see* IndyMac

INDX Mortgage Loan Trust 2006-AR29 Registration Statement, Feb. 24, 2006, at S-31.

271.    On the issue of the Chase Originators' guidelines, the J.P. Morgan Alternative

Loan Trust 2007-A2 Prospectus Supplement states:

The Chase Originators have represented to the Seller that, except for approximately 74.27% of these Chase Originator Mortgage Loans, such Chase Originator Mortgage Loans were originated generally in accordance with such policies.  The depositor believes that such Mortgage Loans subject to the exception in the previous sentence were originated generally in accordance with the underwriting guidelines set forth under the heading "The Originators— General Underwriting Guidelines" in this prospectus supplement.  References to Mortgage Loans in this section refer to the Chase Originator Mortgage Loans originated or acquired by the Chase Originators in accordance with the underwriting guidelines described below.

J.P. Morgan Alternative Loan Trust 2007-A2 Prospectus Supplement at S-40-41; J.P. Morgan

Alternative Loan Trust 2007-A1 Prospectus Supplement at S-37-38; J.P. Morgan Alternative

Loan Trust 2007-S1 Prospectus Supplement at "The Originators"; J.P. Morgan Alternative Loan

Trust 2006-A7 Prospectus Supplement at S-32; J.P. Morgan Alternative Loan Trust 2006-A6

EXHIBIT 11
110

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 103 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 104 of 190   Page
ID #:2187

Prospectus Supplement at S-32; J.P. Morgan Alternative Loan Trust 2006-A3 Prospectus

Supplement at S-27; J.P. Morgan Alternative Loan Trust 2006-A2 Prospectus Supplement at

S-37; J.P. Morgan Alternative Loan Trust 2007-A1 Free Writing Prospectus, Feb. 9, 2007 at

"The Chase Originators"; J.P. Morgan Alternative Loan Trust 2006-A7 Free Writing Prospectus,

Nov. 1, 2006, at "The Chase Originators"; J.P. Morgan Alternative Loan Trust 2006-A6 Free

Writing Prospectus, Oct. 18, 2006, at "The Chase Originators"; J.P. Morgan Alternative Loan

Trust 2006-A3 Free Writing Prospectus, June 8, 2006, at "The Chase Originators"; J.P. Morgan

Alternative Loan Trust 2006-A2 Free Writing Prospectus, April 5, 2006, at "The Chase

Originators."

272.    With respect to exceptions to the Chase Originators' guidelines, the J.P. Morgan

Alternative Loan Trust 2007-A2 Prospectus Supplement stated:

> From time to time, exceptions and/or variances to Alternative A Underwriting
> Policies may be made.  Such exceptions and/or variances may be made only if
> specifically approved on a loan-by-loan basis by certain credit personnel who
> have the authority to make such exceptions and/or variances.  Exceptions and/or
> variances may be made only after careful consideration of certain mitigating
> factors such as borrower capacity, liquidity, employment and residential stability
> and local economic conditions.

J.P. Morgan Alternative Loan Trust 2007-A2 Prospectus Supplement, May 31, 2007, at S-42;

J.P. Morgan Alternative Loan Trust 2007-A1 Prospectus Supplement at S-39; J.P. Morgan

Alternative Loan Trust 2007-S1 Prospectus Supplement at "The Originators" section; J.P.

Morgan Alternative Loan Trust 2006-A7 Prospectus Supplement at S-33; J.P. Morgan

Alternative Loan Trust 2006-A6 Prospectus Supplement at S-33; J.P. Morgan Alternative Loan

Trust 2006-A3 Prospectus Supplement at S-28-29; J.P. Morgan Alternative Loan Trust 2006-A2

Prospectus Supplement at S-38; *see* J.P. Morgan Alternative Loan Trust 2007-S1 Free Writing

Prospectus, May 10, 2007, at "The Chase Originators"; J.P. Morgan Alternative Loan Trust

2007-A1 Free Writing Prospectus, Feb. 9, 2007 at "The Chase Originators"; J.P. Morgan

EXHIBIT 11
111

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 104 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 105 of 190   Page
ID #:2188

Alternative Loan Trust 2006-A7 Free Writing Prospectus, Nov. 1, 2006, at "The Chase
Originators"; J.P. Morgan Alternative Loan Trust 2006-A6 Free Writing Prospectus, Oct. 18,
2006, at "The Chase Originators"; J.P. Morgan Alternative Loan Trust 2006-A3 Free Writing
Prospectus, June 8, 2006, at "The Chase Originators"; J.P. Morgan Alternative Loan Trust 2006-
A2 Free Writing Prospectus, Apr. 5, 2006, at "The Chase Originators."

273.    Flagstar Bank's underwriting guidelines were described as follows in the J.P.
Morgan Alternative Loan Trust 2006-A7 Prospectus Supplement:

> As an integral part of the underwriting review, the underwriter will evaluate the
> intent and willingness of an applicant to repay the mortgage loan in a timely
> manner, again assisted by Fannie Mae's Desktop Underwriter or Freddie Mac's
> LP system for loans with an original principal balance of up to $650,000. In
> general, the intent is evaluated based on the applicant's past credit performance.
> Flagstar Bank utilizes credit scoring provided by credit reporting agencies to
> assist in the analysis of an applicant's credit history. Flagstar Bank may also
> consider a mortgage/rent payment history, in addition to the applicant's credit
> history and credit scoring as maintained at credit reporting agencies.

J.P. Morgan Alternative Loan Trust 2006-A7 Prospectus Supplement at S-34; *see* J.P. Morgan
Alternative Loan Trust 2006-A7 Free Writing Prospectus, Nov. 1, 2006, at "Underwriting
Standards."

274.    The J.P. Morgan Alternative Loan Trust 2006-A7 Prospectus Supplement
continued:

> Flagstar Bank requires that the applicant's sources of income have the probability
> of continuing and are adequate to support the loan terms requested. The
> underwriter, assisted by Fannie Mae's Desktop Underwriter or Freddie Macs LP
> system for loans with an original principal balance of up to $650,000, will review
> the applicant's history of receiving stable income from employment or other
> verifiable sources, as well as evaluating the likelihood that the income will
> continue to be received in the foreseeable future.  Emphasis is on the continuity of
> stable income, and an applicant who has changed jobs frequently, and has been
> able to earn consistent and predictable income may also be acceptable for
> underwriting approval.

EXHIBIT 11
112

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 105 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1    Filed 06/23/11   Page 106 of 190   Page
ID #:2189

> The underwriter will further review the application to evaluate whether the
> applicant has sufficient liquid assets available for down payment, closing costs
> and cash reserves, if required.

J.P. Morgan Alternative Loan Trust 2006-A7 Prospectus Supplement at S-34; *see* J.P. Morgan

Alternative Loan Trust 2006-A7 Free Writing Prospectus, Nov. 1, 2006, at "Underwriting

Standards."

275.    The J.P. Morgan Alternative Loan Trust 2006-A7 Prospectus Supplement finally

stated:

> Flagstar Bank's use of standardized underwriting guidelines does not imply that
> each specific criterion was satisfied individually.  Flagstar Bank will consider a
> mortgage loan to be originated in accordance with a given set of guidelines if,
> based on an overall qualitative evaluation, the loan is in substantial compliance
> with the Flagstar Bank Underwriting Guidelines. Even if one or more specific
> criteria included in the Flagstar Bank Underwriting Guidelines were not satisfied,
> if other factors compensated for the standards that were not satisfied, the
> mortgage loan may be considered to be in substantial compliance with the
> Flagstar Bank Underwriting Guidelines.

J.P. Morgan Alternative Loan Trust 2006-A7 Prospectus Supplement at S-34; *see* J.P. Morgan

Alternative Loan Trust 2006-A7 Free Writing Prospectus, Nov. 1, 2006, at "Underwriting

Standards."

276.    The J.P. Morgan Alternative Loan Trust 2006-A6 Prospectus Supplement stated

the following about PHH Mortgage's underwriting standards:

> PHH Mortgage's underwriting standards have been established based upon its
> knowledge of the primary and secondary residential mortgage markets.  They are
> intended to originate investment-quality mortgage loans that are salable in the
> secondary mortgage market. They are applied in originating or purchasing loans
> for its own account, and in originating loans for, or purchasing loans from, other
> lenders under various "private-label" programs. The application of the
> underwriting standards represent a balancing of several factors that may affect
> that may affect the ultimate recovery of the loan amount, including but not limited
> to, the applicant's credit standing and ability to repay the loan, as well as the
> value and adequacy of the mortgaged property as collateral.  PHH Mortgage may
> adapt its underwriting guidelines based upon the nature of a specific private-label
> relationship.

EXHIBIT 11
113

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 106 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 107 of 190   Page
ID #:2190

J.P. Morgan Alternative Loan Trust 2006-A6 Prospectus Supplement at S-35-36; J.P. Morgan Alternative Loan Trust 2006-A2 Prospectus Supplement at S-33; J.P. Morgan Alternative Loan Trust 2006-A7 Prospectus Supplement at S-38; *see* J.P. Morgan Alternative Loan Trust 2006-A6 Free Writing Prospectus, Oct. 18, 2006, at "Underwriting Standards"; J.P. Morgan Alternative Loan Trust 2006-A2 Free Writing Prospectus, Apr. 5, 2006, at "PHH Mortgage Corporation"; J.P. Morgan Alternative Loan Trust 2006-A7 Free Writing Prospectus, Nov. 1, 2006, at "Underwriting Standards."

277.    In addition, the J.P. Morgan Alternative Loan Trust 2006-A6 Prospectus Supplement stated:

> PHH Mortgage's underwriting guidelines are applied to evaluate an applicant's credit standing, financial condition, and repayment ability, as well as the value and adequacy of the mortgaged property as collateral for any loan made. As part of the loan application process, the applicant is required to provide information concerning his or her assets, liabilities, income and expenses (except as described below), along with an authorization to obtain any necessary third party verifications, including a credit report summarizing the applicant's credit history.

J.P. Morgan Alternative Loan Trust 2006-A6 Prospectus Supplement at S-36; J.P. Morgan Alternative Loan Trust 2006-A2 Prospectus Supplement at S-33; J.P. Morgan Alternative Loan Trust 2006-A7 Prospectus Supplement at S-38; *see* J.P. Morgan Alternative Loan Trust 2006-A6 Free Writing Prospectus, Oct. 18, 2006, at "Underwriting Standards"; J.P. Morgan Alternative Loan Trust 2006-A2 Free Writing Prospectus, Apr. 5, 2006, at "PHH Mortgage Corporation"; J.P. Morgan Alternative Loan Trust 2006-A7 Free Writing Prospectus, Nov. 1, 2006, at "Underwriting Standards."

278.    Finally, the J.P. Morgan Alternative Loan Trust 2006-A6 Prospectus Supplement stated:

> In evaluating the applicant's ability and willingness to repay the proposed loan, PHH Mortgage reviews the applicant's credit history and outstanding debts, as reported on the credit report. If an existing mortgage or other significant debt

EXHIBIT 11
114

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 107 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 108 of 190   Page
ID #:2191

> listed on the loan application is not adequately reported on the credit report, PHH Mortgage may request a written or oral verification of the balance and payment history of such debt from the servicer of such debt.
>
> Except as described below, PHH Mortgage verifies the applicant's liquid assets to ensure that the client has adequate liquid assets to apply toward any required down payment, closing costs, prepaid interest, and a specified amount of cash reserves after the closing of the related mortgage. Additional liquid assets may not be verified.

J.P. Morgan Alternative Loan Trust 2006-A6 Prospectus Supplement at S-36; J.P. Morgan Alternative Loan Trust 2006-A2 Prospectus Supplement at S-33; J.P. Morgan Alternative Loan Trust 2006-A7 Prospectus Supplement at S-38; *see* J.P. Morgan Alternative Loan Trust 2006-A6 Free Writing Prospectus, Oct. 18, 2006, at "Underwriting Standards"; *see* J.P. Morgan Alternative Loan Trust 2006-A2 Free Writing Prospectus, Apr. 5, 2006, at "PHH Mortgage Corporation"; J.P. Morgan Alternative Loan Trust 2006-A7 Free Writing Prospectus, Nov. 1, 2006, at "Underwriting Standards."

279.    The J.P. Morgan Alternative Loan Trust 2007-A2 Prospectus Supplement represented the following concerning American Home's underwriting guidelines:

> The following information generally describes American Home's underwriting guidelines with respect to mortgage loans originated pursuant to its "conforming" or "prime" underwriting guidelines and its Alt-A underwriting guidelines.

J.P. Morgan Alternative Loan Trust 2007-A2 Prospectus Supplement at S-43; J.P. Morgan Alternative Loan Trust 2006-A3 Prospectus Supplement at S-29; American Home Mortgage Assets Trust 2007-3 Prospectus Supplement at S-51; *see* J.P. Morgan Alternative Loan Trust 2007-A2 Free Writing Prospectus, May 23, 2007, at "American Home Mortgage Corp"; American Home Mortgage Assets Trust 2007-3 Free Writing Prospectus, May 31, 2007, at "Underwriting Guidelines."

280.    The J.P. Morgan Alternative Loan Trust 2007-A2 Prospectus Supplement represented J.P. Morgan's "general underwriting standards" to require:

EXHIBIT 11
115

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 108 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 109 of 190   Page
ID #:2192

> Underwriting standards are applied by or on behalf of a lender to evaluate a borrower's credit standing and repayment ability, and the value and adequacy of the related Mortgaged Property as collateral. In general, a prospective borrower applying for a loan is required to fill out a detailed application designed to provide to the underwriting officer pertinent credit information.  As part of the description of the borrower's financial condition, the borrower generally is required to provide a current list of assets and liabilities and a statement of income and expenses, as well as an authorization to apply for a credit report which summarizes the borrower's credit history with local merchants and lenders and any record of bankruptcy. In most cases, an employment verification is obtained from an independent source (typically the borrower's employer), which verification repots, among other things, the length of employment with that organization, the current salary, and whether it is expected that the borrower will continue such employment in the future. If a prospective borrower is self employed, the borrower may be required to submit copies of signed tax returns.

J.P. Morgan Alternative Loan Trust 2007-A2 Prospectus Supplement at S-39; J.P. Morgan Alternative Loan Trust 2007-A1 Prospectus Supplement at S-35-36; J.P. Morgan Alternative Loan Trust 2006-A7 Prospectus Supplement at S-24; J.P. Morgan Alternative Loan Trust 2006-A6 Prospectus Supplement at S-24; J.P. Morgan Alternative Loan Trust 2006-A3 Prospectus Supplement at S-26; J.P. Morgan Alternative Loan Trust 2006-A2 Prospectus Supplement at S-29-30; *see* J.P. Morgan Alternative Loan Trust 2007-A2 Registration Statement, Mar. 27, 2006, at "Underwriting Standards"; J.P. Morgan Alternative Loan Trust 2007-A1 Registration Statement, Dec. 7, 2005, at "Underwriting Standards"; J.P. Morgan Alternative Loan Trust 2006-A7 Registration Statement, Dec. 7, 2005, at "Underwriting Standards"; J.P. Morgan Alternative Loan Trust 2006-A6 Registration Statement, Dec. 7, 2005, at "Underwriting Standards"; J.P. Morgan Alternative Loan Trust 2006-A3 Registration Statement, Dec. 7, 2005, at "Underwriting Standards"; J.P. Morgan Alternative Loan Trust 2006-A2 Registration Statement, Dec. 7, 2005, at "Underwriting Standards."

281.     On GreenPoint's underwriting guidelines, the J.P. Morgan Alternative Loan Trust 2007-A1 Prospectus Supplement stated:

EXHIBIT 11
116

Case 2:11-cv-02341-EFM -JPO  Document 1  Filed 06/20/11  Page 109 of 186
Case 2:10-cv-01597-GW -MAN  Document 140-1  Filed 06/23/11  Page 110 of 190  Page
ID #:2193

> Generally, the GreenPoint underwriting guidelines are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral.

J.P. Morgan Alternative Loan Trust 2007-A1 Prospectus Supplement at S-40; J.P. Morgan Alternative Loan Trust 2006-A2 Prospectus Supplement at S-39; *see* J.P. Morgan Alternative Loan Trust 2007-A1 Free Writing Prospectus, Feb. 9, 2007, at "GreenPoint Mortgage Funding, Inc."; J.P. Morgan Alternative Loan Trust 2006-A2 Free Writing Prospectus, Apr. 5, 2006, at "GreenPoint Mortgage Funding, Inc."

282.    The J.P. Morgan Alternative Loan Trust 2007-A1 Prospectus Supplement continued:

> Periodically, the data used by GreenPoint to underwrite mortgage loans may be obtained by an approved loan correspondent. In those instances, the initial determination as to whether a mortgage loan complies with GreenPoint's underwriting guidelines may be made by such loan correspondent. In addition, GreenPoint may acquire mortgage loans from approved correspondent lenders under a program pursuant to which GreenPoint delegates to the correspondent the obligation to underwrite the mortgage loans to GreenPoint's standards. Under these circumstances, the underwriting of a mortgage loan may not have been reviewed by GreenPoint before acquisition of the mortgage loan, and the correspondent represents to GreenPoint that its underwriting standards have been met. After purchasing mortgage loans under those circumstances, GreenPoint conducts a quality control review of a sample of the mortgage loans. The number of loans reviewed in the quality control process varies based on a variety of factors, including GreenPoint's prior experience with the correspondent lender and the results of the quality control review process itself.

J.P. Morgan Alternative Loan Trust 2007-A1 Prospectus Supplement at S-41; J.P. Morgan Alternative Loan Trust 2006-A2 Prospectus Supplement, dated April 24, 2006, at S-40; *see* J.P. Morgan Alternative Loan Trust 2007-A1 Free Writing Prospectus, Feb. 9, 2007, at "GreenPoint Mortgage Funding, Inc." ; J.P. Morgan Alternative Loan Trust 2006-A2 Free Writing Prospectus, Apr. 5, 2006, at "GreenPoint Mortgage Funding, Inc."

283.    On the issue of exceptions to GreenPoint's guidelines, the J.P. Morgan Alternative Loan Trust 2007-A1 Prospectus Supplement represented:

EXHIBIT 11
117

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 110 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 111 of 190   Page
ID #:2194

> Exceptions to the guidelines are permitted where compensating factors are
> present. The GreenPoint underwriting guidelines are generally not as strict as
> Fannie Mae or Freddie Mac guidelines. GreenPoint's underwriting guidelines are
> applied in accordance with applicable state laws and regulations.

J.P. Morgan Alternative Loan Trust 2007-A1 Prospectus Supplement at S-40; J.P. Morgan

Alternative Loan Trust 2006-A2 Prospectus Supplement at S-39; *see* J.P. Morgan Alternative

Loan Trust 2007-A1 Free Writing Prospectus, Feb. 9, 2007, at "GreenPoint Mortgage Funding,

Inc."; J.P. Morgan Alternative Loan Trust 2006-A2 Free Writing Prospectus, Apr. 5, 2006, at

"GreenPoint Mortgage Funding, Inc."

284. The J.P. Morgan Alternative Loan Trust 2006-A7 Prospectus Supplement

described Countrywide's underwriting guidelines as follows:

> Countrywide Home Loans' underwriting standards are applied by or on behalf of
> Countrywide Home Loans to evaluate the prospective borrower's credit standing
> and repayment ability and the value and adequacy of the mortgaged property as
> collateral. Under those standards, a prospective borrower must generally
> demonstrate that the ratio of the borrower's monthly housing expenses (including
> principal and interest on the proposed mortgage loan and, as applicable, the
> related monthly portion of property taxes, hazard insurance and mortgage
> insurance) to the borrower's monthly gross income and ratio of total monthly debt
> to the monthly gross income (the "debt-to-income" ratios) are within acceptable
> limits.

J.P. Morgan Alternative Loan Trust 2006-A7 Prospectus Supplement at S-27; J.P. Morgan

Alternative Loan Trust 2006-A6 Prospectus Supplement at S-27; *see* J.P. Morgan Alternative

Loan Trust 2006-A7 Free Writing Prospectus, Nov. 1, 2006, at "Underwriting Standards"; J.P.

Morgan Alternative Loan Trust 2006-A6 Free Writing Prospectus, Oct. 18, 2006, at

"Underwriting Standards."

285. The J.P. Morgan Alternative Loan Trust 2006-A7 Prospectus Supplement

continued:

> For all mortgage loans originated or acquired by Countrywide Home Loans,
> Countrywide Home Loans obtains a credit report relating to the applicant from a
> credit reporting company. The credit report typically contains information

EXHIBIT 11
118

Case 2:11-cv-02341-EFM-JPO  Document 1  Filed 06/20/11  Page 111 of 186
Case 2:10-cv-01597-GW-MAN  Document 140-1  Filed 06/23/11  Page 112 of 190  Page
ID #:2195

relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcy, dispossession, suits or judgments. All adverse information in the credit report is required to be explained by the prospective borrower to the satisfaction of the lending officer.

J.P. Morgan Alternative Loan Trust 2006-A7 Prospectus Supplement at S-28; J.P. Morgan Alternative Loan Trust 2006-A6 Prospectus Supplement at S-28; *see* J.P. Morgan Alternative Loan Trust 2006-A7 Free Writing Prospectus, Nov. 1, 2006, at "Underwriting Standards"; J.P. Morgan Alternative Loan Trust 2006-A6 Free Writing Prospectus, Oct. 18, 2006, at "Underwriting Standards."

286.    The J.P. Morgan Alternative Loan Trust 2006-A7 Prospectus Supplement also stated:

Under its Standard Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 33% and a debt-to-income ratio based on the borrower's total monthly debt of up to 38%.
. . .

Under its Expanded Underwriting Guidelines, Countrywide Home Loans generally permits a debt-to-income ratio based on the borrower's monthly housing expenses of up to 36% and a debt-to-income ratio based on the borrower's total monthly debt of up to 40%; provided, however, that if the Loan-to-Value Ratio exceeds 80%, the maximum permitted debt-to-income ratios are 33% and 38%, respectively.

J.P. Morgan Alternative Loan Trust 2006-A7 Prospectus Supplement at S-29-30; J.P. Morgan Alternative Loan Trust 2006-A6 Prospectus Supplement at S-29-30; *see* J.P. Morgan Alternative Loan Trust 2006-A7 Free Writing Prospectus, Nov. 1, 2006, at "Standard Underwriting Guidelines"; J.P. Morgan Alternative Loan Trust 2006-A6 Free Writing Prospectus, Oct. 18, 2006, at "Standard Underwriting Guidelines."

287.    The J.P. Morgan Alternative Loan Trust 2006-A7 Prospectus Supplement represented: "Exceptions to Countrywide Home Loans' underwriting guidelines may be made if

EXHIBIT 11
119

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 112 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 113 of 190   Page
ID #:2196

compensating factors are demonstrated by a prospective borrower." J.P. Morgan Alternative

Loan Trust 2006-A7 Prospectus Supplement at S-27; J.P. Morgan Alternative Loan Trust 2006-

A6 Prospectus Supplement at S-27; *see* J.P. Morgan Alternative Loan Trust 2006-A7 Free

Writing Prospectus, Nov. 1, 2006, at "Underwriting Standards"; J.P. Morgan Alternative Loan

Trust 2006-A6 Free Writing Prospectus, Oct. 18, 2006, at "Underwriting Standards."

288.    The J.P. Morgan Mortgage Acquisition Trust 2007-CH4 Prospectus Supplement

stated:

> The Mortgage Loans were originated and underwritten in accordance with either
> the Chase Home Mortgage Call Center Underwriting Guidelines described below
> (the "CHM Call Center Underwriting Guidelines" or the Chase Home Mortgage
> Wholesale/Retail Underwriting Guidelines described below (the "CHM
> Wholesale/Retail Underwriting Guidelines").

J.P. Morgan Mortgage Acquisition Trust 2007-CH4 Prospectus Supplement at S-68; *see* J.P.

Morgan Mortgage Acquisition Trust 2007-CH3 Prospectus Supplement at S-67; and J.P. Morgan

Mortgage Acquisition Trust 2007-CH5 Prospectus Supplement at "The Originator."

289.    The J.P. Morgan Mortgage Acquisition Trust 2007-CH4 Prospectus Supplement

stated:

> The CHM HLD Underwriting Guidelines utilize various credit grade categories to
> grade the likelihood that the mortgagor will satisfy the repayment conditions of
> the mortgage loan. These credit grade categories establish the maximum
> permitted loan-to-value ratio, debt-to-income ratio and loan amount, given the
> borrower's credit history considered in a manner generally consistent with non-
> prime mortgage industry practice, the occupancy status of the mortgaged
> property, the type of mortgage property and documentation type.

J.P. Morgan Mortgage Acquisition Trust 2007-CH4 Prospectus Supplement at S-69; J.P. Morgan

Mortgage Acquisition Trust 2007-CH3 Prospectus Supplement at S-68; J.P. Morgan Mortgage

Acquisition Trust 2007-CH5 Prospectus Supplement at "The Originator."

290.    The J.P. Morgan Mortgage Acquisition Trust 2007-CH4 Prospectus Supplement

stated:

EXHIBIT 11
120

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 113 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 114 of 190   Page
ID #:2197

> The CHM HLD Underwriting Guidelines consider the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan, but also take into consideration the credit standing and repayment ability of the prospective borrower. On a case by case basis, CHM HLD underwriters may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception.

J.P. Morgan Mortgage Acquisition Trust 2007-CH4 Prospectus Supplement at S-68; J.P. Morgan Mortgage Acquisition Trust 2007-CH3 Prospectus Supplement at S-67; J.P. Morgan Mortgage Acquisition Trust 2007-CH5 Prospectus Supplement at "The Originator."

291.    The J.P. Morgan Mortgage Acquisition Trust 2007-CH4 Prospectus Supplement stated:

> The Chase Home Mortgage Wholesale/Retail Underwriting Guidelines consider the value and adequacy of the mortgaged property as collateral for the proposed mortgage loan, but also take into consideration the borrower's credit standing and repayment ability. On a case by case basis, Chase Home Mortgage may determine that, based upon compensating factors, a prospective borrower not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception.

J.P. Morgan Mortgage Acquisition Trust 2007-CH4 Prospectus Supplement at S-74; J.P. Morgan Mortgage Acquisition Trust 2007-CH3 Prospectus Supplement at S-73; J.P. Morgan Mortgage Acquisition Trust 2007-CH5 Prospectus Supplement at "The Originator."

292.    The J.P. Morgan Mortgage Acquisition Trust 2007-HE1 Prospectus Supplement stated that the Option One Underwriting Guidelines were "primarily intended to assess the value of the mortgaged property, to evaluate the adequacy of such property as collateral for the mortgage loan and to assess the applicant's ability to repay the mortgage loan." J.P. Morgan Mortgage Acquisition Trust 2007-HE1 Prospectus Supplement at S-56.

293.    The J.P. Morgan Mortgage Acquisition Trust 2007-HE1 Prospectus Supplement stated:

EXHIBIT 11
121

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 114 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 115 of 190   Page
ID #:2198

Option One Underwriting Guidelines require a reasonable determination of an applicant's ability to repay the loan. Such determination is based on a review of the applicant's source of income, calculation of a debt service-to-income ratio based on the amount of income from sources indicated on the loan application or similar documentation, a review of the applicant's credit history and the type and intended use of the property being financed.

J.P. Morgan Mortgage Acquisition Trust 2007-HE1 Prospectus Supplement at S-57.

294.   The J.P. Morgan Mortgage Acquisition Trust 2007-HE1 Prospectus Supplement stated: "On a case-by-case basis, exceptions to the Option One Underwriting Guidelines are made where compensating factors exist." J.P. Morgan Mortgage Acquisition Trust 2007-HE1 Prospectus Supplement at S-56.

295.   The J.P. Morgan Mortgage Acquisition Trust 2007-HE1 Prospectus Supplement stated:

The underwriting standards of ResMAE are primarily intended to assess the ability and willingness of the borrower to repay the debt and to evaluate the adequacy of the mortgaged property as collateral for the mortgage loan. ResMAE considers, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio (referred to herein as Debt Ratio), as well as the value, type and use of the mortgaged property.

J.P. Morgan Mortgage Acquisition Trust 2007-HE1 Prospectus Supplement at S-63; J.P. Morgan Mortgage Acquisition Trust 2006-HE1 Prospectus Supplement at S-60.

296.   Lastly, the J.P. Morgan Mortgage Acquisition Trust 2007-HE1 Prospectus Supplement stated the following concerning NovaStar's underwriting standards:

The underwriting guidelines of NovaStar are intended to evaluate the credit history of the potential borrower, the capacity and willingness of the borrower to repay the loan and the adequacy of the collateral securing the loan. Each loan applicant completes an application that includes information with respect to the applicant's income, liabilities and employment history. Prior to issuing an approval on the loan, the loan underwriter runs an independent credit report or pulls a reissue of the clients credit through an independent 3rd party vendor, which provides detailed information concerning the payment history of the borrower on all of their debts to verify that the information submitted by the broker is still accurate and up to date.

EXHIBIT 11
122

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 115 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 116 of 190   Page
ID #:2199

J.P. Morgan Mortgage Acquisition Trust 2007-HE1 Prospectus Supplement at S-59-60.

297.   With respect to WMC Mortgage Corporation's underwriting guidelines, The J.P.

Morgan Mortgage Acquisition Trust 2006-WMC3 Prospectus Supplement stated:

> The originator's underwriting standards are primarily intended to assess the value
> of the mortgaged property and to evaluate the adequacy of that property as
> collateral for the mortgage loan and the applicant's credit standing and ability to
> repay.
>
> …
>
> While the primary consideration in underwriting a mortgage loan is the value and
> adequacy of the mortgaged property as collateral, the originator also considers,
> among other things, a mortgagor's credit history, repayment ability and debt
> service-to-income ratio, as well as the type and use of the mortgaged property.

J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 Prospectus Supplement at S-11; *see* J.P.

Morgan Mortgage Acquisition Trust 2006-WMC3 Registration Statement, Dec. 7, 2005, at

"Underwriting Standards."

298.   The J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 also represented:

> On a case-by-case basis WMC may determine that, based upon compensating
> factors, a prospective mortgagor not strictly qualifying under the underwriting
> risk category or other guidelines described below warrants an underwriting
> exception.

J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 Prospectus Supplement at S-52-53; J.P.

Morgan Mortgage Acquisition Trust 2006-WMC3 Registration Statement, Dec. 7, 2005, at

"Underwriting Standards."

299.   UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding

statements were material at the time they were made, because the quality of the loans in the

mortgage pool directly affects the riskiness of the RMBS investment, and the quality of the loans

is dependent upon the underwriting process employed.  The preceding statements were untrue at

the time they were made because, as alleged herein, the Originators did not adhere to the stated

EXHIBIT 11
123

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 116 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 117 of 190   Page
ID #:2200

underwriting guidelines, did not effectively evaluate the borrowers' ability or likelihood to repay

the loans, did not properly evaluate whether the borrower's debt-to-income ratio supported a

conclusion that the borrower had the means to meet his/her monthly obligations, and did not

ensure that adequate compensating factors justified the granting of exceptions to guidelines.

Rather, as alleged herein, the Originators systematically disregarded the stated underwriting

guidelines in order to increase the volume of mortgages originated.  *See supra* Section VII.D.

Further evidence of this fact is found in, among other things, the surge in delinquencies and

defaults shortly after the offering (*see supra* Table 5), the rate at which actual losses outpaced

expected losses within the first year after the offering (*see supra* Figure 2), the collapse of the

credit ratings (*see supra* Table 4), and the fact that the Originators were engaged in high OTD

lending (*see supra* Table 6).

### B.   Untrue Statements Concerning Reduced Documentation Programs

300.   On American Home's documentation programs, the American Home Mortgage

Assets Trust 2007-3 Prospectus Supplement represented:

> Certain non-conforming stated income or stated asset products allow for less
> verification documentation than Fannie Mae or Freddie Mac require.  Certain
> non-conforming Alt-A products also allow for less verification documentation
> than Fannie Mae or Freddie Mac require.  For these Alt-A products the borrower
> may not be required to verify employment income, assets required to close or
> both.  For some other Alt-A products, the borrower is not required to provide any
> information regarding employment income, assets required to close or both.  Alt-
> A products with less verification documentation generally have other
> compensating factors such as higher credit score or lower loan-to-value
> requirements.

American Home Mortgage Assets Trust 2007-3 Prospectus Supplement at S-52; J.P. Morgan

Alternative Loan Trust 2006-A3 Prospectus Supplement at S-30; J.P. Morgan Alternative Loan

Trust 2007-A2 Prospectus Supplement at S-43; *see* American Home Mortgage Assets Trust

2007-3 Free Writing Prospectus, May 31, 2007, at "Underwriting Guidelines"; J.P. Morgan

EXHIBIT 11
124

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 117 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 118 of 190   Page
ID #:2201

Alternative Loan Trust 2007-A2 Free Writing Prospectus, May 23, 2007, at "American Home

Mortgage Corp."

301.    The C-BASS 2006-CB7 Trust Prospectus Supplement described New Century's

documentation programs as follows:

> The Mortgage Loans were originated consistent with and generally conform to the
> New Century Underwriting Guidelines' full documentation, limited
> documentation and stated income documentation residential loan programs.
> Under each of the programs, New Century reviews the applicant's source of
> income, calculates the amount of income from sources indicated on the loan
> application or similar documentation, reviews the credit history of the applicant,
> calculates the debt service-to-income ratio to determine the applicant's ability to
> repay the loan, reviews the type and use of the property being financed, and
> reviews the property.

C-BASS 2006-CB7 Trust Prospectus Supplement at S-69.

302.    The IndyMac INDX Mortgage Loan Trust 2006-AR29 Prospectus Supplement

stated the following on the issue of IndyMac's documentation programs:

> IndyMac Bank purchases loans that have been originated under one of seven
> documentation programs: Full/Alternate, FastForward, Limited, Stated Income,
> No Ratio, No Income/No Asset and No Doc. In general, documentation types that
> provide for less than full documentation of employment, income and liquid assets
> require higher credit quality and have lower loan-to-value ratios and loan amount
> limits.
> . . .
>
> The Stated Income Documentation Program requires prospective borrowers to
> provide information regarding their assets and income.  Information regarding a
> borrower's assets, if applicable, is verified through written communications.
> Information regarding income is not verified and employment verification may
> not be written.

IndyMac INDX Mortgage Loan Trust 2006-AR29 Prospectus Supplement at S-46; *see* IndyMac

INDX Mortgage Loan Trust 2006-AR29 Registration Statement, Feb. 24, 2006, at S-37.

303.    With respect to the Chase Originators' documentation programs, the J.P. Morgan

Alternative Loan Trust 2007-A2 Prospectus Supplement stated:

EXHIBIT 11
125

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 118 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 119 of 190   Page
ID #:2202

> For ChaseFlex Stated program Mortgage Loans (also known as Proactive "SISA" program Mortgage Loans or Stated Income/Stated Asset program Mortgage Loans), verification of the income and assets, as stated on the application is not required.  The underwriting for such mortgage loans requires AUS approval and is based entirely on stronger credit profile and lower loan-to-value requirements.

J.P. Morgan Alternative Loan Trust 2007-A2 Prospectus Supplement at S-41; *see* J.P. Morgan Alternative Loan Trust 2007-A2 Free Writing Prospectus, May 23, 2007, at "The Chase Originators."

304.    The J.P. Morgan Alternative Loan Trust 2006-A7 Prospectus Supplement stated the following concerning Countrywide's documentation programs:

> The same documentation and verification requirements apply to mortgage loans documented under the Alternative Documentation Program regardless of whether the loan has been underwritten under the Expanded Underwriting Guidelines or the Standard Underwriting Guidelines. However, under the Alternative Documentation Program, mortgage loans that have been underwritten pursuant to the Expanded Underwriting Guidelines may have higher loan balances and Loan-to-Value Ratios than those permitted under the Standard Underwriting Guidelines.

J.P. Morgan Alternative Loan Trust 2006-A7 Prospectus Supplement at S-31; *see* J.P. Morgan Alternative Loan Trust 2006-A7 Free Writing Prospectus, Nov. 1, 2006, at "Expanded Underwriting Guidelines."

305.    J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 Prospectus Supplement stated:

> In the case of mortgage loans originated under the Stated Income Documentation and Stated Income/Verified Assets (Streamlined) Documentation categories, the Underwriting Guidelines require (1) that income be stated on the application, accompanied by proof of self employment in the case of self-employed individuals, (2) that a WMC pre-funding auditor conduct telephonic verification of employment, or in the case of self-employed individuals, telephonic verification of business line and (3) that stated income be consistent with type of work listed on the application.

J.P. Morgan Acquisition Trust 2006-WMC3 Prospectus Supplement at S-54.

EXHIBIT 11
126

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 119 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 120 of 190   Page
ID #:2203

306.   UNTRUE STATEMENTS AND OMITTED INFORMATION:   The preceding statements were material at the time they were made, because the quality of the loans in the mortgage pool directly affects the riskiness of the RMBS investment, and the quality of the loans is dependent upon the underwriting process employed.   The preceding statements were untrue at the time they were made, because regardless of the documentation program purportedly employed, the Originators systematically disregarded their underwriting guidelines in order to increase the volume of mortgages originated, emphasizing quantity of loans rather than the quality of those loans.   *See supra* Section VII.D.   Further evidence of this fact is found in, among other things, the surge in delinquencies and defaults shortly after the offering (*see supra* Table 5), the huge discrepancy between expected and actual losses (*see supra* Figure 2), the collapse of the credit ratings (*see supra* Table 4), and the fact that the Originators were engaged in high OTD lending (*see supra* Table 6).

### C.   Untrue Statements Concerning Loan-to-Value Ratios

307.   The American Home Mortgage Assets Trust 2007-3 Prospectus Supplement represented the following regarding American Home's guidelines:

> The Originator sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan.   In general, the Originator requires lower loan-to-value ratios for those loans that are perceived to have a higher risk, such as high loan amounts, loans in which additional cash is being taken out on a refinance transaction or loans on second homes.   A lower loan-to-value ratio requires a borrower to have more equity in the property which is a significant additional incentive to the borrower to avoid default on the loan.

American Home Mortgage Assets Trust 2007-3 Prospectus Supplement at S-53; J.P. Morgan Alternative Loan Trust 2006-A3 Prospectus Supplement at S-31; J.P. Morgan Alternative Loan Trust 2007-A2 Prospectus Supplement at S-44; *see* American Home Mortgage Assets Trust 2007-3 Free Writing Prospectus, May 31, 2007, at "Underwriting Guidelines."; J.P. Morgan

EXHIBIT 11
127

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 120 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 121 of 190   Page
ID #:2204

Alternative Loan Trust 2007-A2 Free Writing Prospectus, May 23, 2007 at "American Home

Mortgage Corp."

308.    IndyMac's loan-to-value guidelines were described in the IndyMac INDX

Mortgage Loan Trust 2006-AR29 Prospectus Supplement as follows:

> Maximum loan-to-value and combined loan-to-value ratios and loan amounts are
> established according to the occupancy type, loan purpose, property type, FICO
> Credit Score, number of previous late mortgage payments, and the age of any
> bankruptcy or foreclosure actions.

IndyMac INDX Mortgage Loan Trust 2006-AR29 Prospectus Supplement at S-46; *see* IndyMac

INDX Mortgage Loan Trust 2006-AR29 Free Writing Prospectus, Feb. 24, 2006, at S-30.

309.    The J.P. Morgan Alternative Loan Trust 2007-A1 Prospectus Supplement stated

the following with respect to GreenPoint's loan-to-value guidelines:

> In determining whether a prospective borrower has sufficient monthly income
> available to meet the borrower's monthly obligation on the proposed mortgage
> loan and monthly housing expenses and other financial obligations, GreenPoint
> generally considers the ratio of those amounts to the proposed borrower's
> monthly gross income. These ratios vary depending on a number of underwriting
> criteria, including loan-to-value ratios ("LTV"), and are determined on a loan-by-
> loan basis. The ratios generally are limited to 40% but may be extended to 50%
> with adequate compensating factors, such as disposable income, reserves, higher
> FICO credit score, or lower LTVs. Each mortgage loan has a required amount of
> reserves, with the minimum being three months of principal, interest, taxes and
> insurance for full documentation loans. Depending on the LTV and occupancy
> types, these reserve requirements may be increased to compensate for the
> additional risk.

J.P. Morgan Alternative Loan Trust 2007-A1 Prospectus Supplement at S-40; *see* J.P. Morgan

Alternative Loan Trust 2007-A1 Free Writing Prospectus, Feb. 9, 2007, at "GreenPoint

Mortgage Funding, Inc."

310.    The J.P. Morgan Mortgage Acquisition Trust 2007-HE1 Prospectus Supplement

stated the following concerning ResMAE's guidelines:

> The underwriting guidelines establish the maximum permitted loan-to-value ratio
> for each loan type based upon these and other risk factors.

EXHIBIT 11
128

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 121 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 122 of 190   Page
ID #:2205

J.P. Morgan Mortgage Acquisition Trust 2007-HE1 Prospectus Supplement at S-63; J.P. Morgan

Mortgage Acquisition Trust 2006-HE1 Prospectus Supplement at S-60.

311.    J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 Prospectus Supplement

stated:

> In general, loans with greater documentation standards are eligible for higher
> LTV and CLTV limits across all risk categories.

J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 Prospectus Supplement at S-53.

312.    UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding

statements were material at the time they were made because the riskiness of the RMBS

investment is directly dependent on the quality of the underwriting process and adequate

assessment and limits on loan-to-value ratios (in addition to accurate appraisals) is key to that

process.   The preceding statements were untrue at the time they were made because the

Originators did not adhere to the maximum loan-to-value ratios as represented in the offering

document, encouraged inflated appraisals and frequently granted loans with high loan-to-value

ratios with no meaningful assessment of the borrower's ability to repay the loan based on the

borrower's credit profile.  *See supra* Section VII.D.  Further evidence of this fact is found in,

among other things, the surge in delinquencies and defaults shortly after the offering (*see supra*

Table 5), the huge discrepancy between expected and actual losses (*see supra* Figure 2), the

collapse of the credit ratings (*see supra* Table 4), and the fact that the Originators were engaged

in high OTD lending (*see supra* Table 6).

### D.    Untrue Statements Concerning Credit Enhancement

313.    The American Home Mortgage Assets Trust 2007-3 Prospectus Supplement

states: "Any decrease in the value of the mortgage properties related to the mortgage loans may

EXHIBIT 11
129

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 122 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 123 of 190   Page
ID #:2206

result in the allocation of losses which are not covered by credit enhancement to the certificates."

American Home Mortgage Assets Trust 2007-3 Prospectus Supplement at S-24.

314.    The C-BASS 2006-CB7 Prospectus Supplement stated:

The credit enhancement features described in the summary are intended to
enhance the likelihood that holders of the offered certificates will receive regular
payments of interest and principal.

C-BASS 2006-CB7 Trust Prospectus Supplement at S-14; *see* C-BASS 2006-CB7 Trust

Registration Statement, Aug. 18, 2006, at "Risk Factors."

315.    The IndyMac INDX Mortgage Loan Trust 2006-AR29 Prospectus Supplement

represented:

Subordination is designed to provide the holders of certificates with a higher
distribution priority with protection against most losses realized when the
remaining unpaid principal balance of a mortgage loan exceeds the amount of
proceeds recovered upon the liquidation of that mortgage loan.

IndyMac INDX Mortgage Loan Trust 2006-AR29 Prospectus Supplement at S-16.

316.    The J.P. Morgan Alternative Loan Trust 2007-A2 Prospectus Supplement states:

The credit enhancement features described in this prospectus supplement for pool
1 are intended to enhance the likelihood that holders of the pool 1 senior and pool
1 mezzanine certificates will receive regular payments of interest and principal.
However, we cannot assure you that the credit enhancement will adequately cover
any shortfalls in cash available to pay your certificates as a result of delinquencies
or defaults on the pool 1 mortgage loans. If delinquencies or defaults occur on the
pool 1 mortgage loans, neither the servicer nor any other entity will advance
scheduled monthly payments of interest and principal on delinquent or defaulted
mortgage loans if such advances are not likely to be recovered.

J.P. Morgan Alternative Loan Trust 2007-A2 Prospectus Supplement at S-22; *see* J.P. Morgan

Alternative Loan Trust 2007-A2 Free Writing Prospectus, May 23, 2007, at "Risk Factors."

317.    J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 Prospectus Supplement

represented:

EXHIBIT 11
130

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 123 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 124 of 190   Page
ID #:2207

> Subordination is intended to enhance the likelihood of regular distributions of interest and principal on the more senior certificates and to afford those certificates protection against realized losses on the mortgage loans.

J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 Prospectus Supplement at S-6.

318.   UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding statements were material at the time they were made, because the Credit Unions nearly always purchased the highest-rated tranches of the RMBS, and those highly-rated tranches relied on the credit enhancement, which purportedly afforded protection against financial loss. The preceding statements were untrue at the time they were made, because, due to the Originators' systematic disregard of underwriting standards, the mortgages in the pools were fatally impaired at the outset and destined to fail.  This rendered the protection allegedly afforded by the credit enhancement in the highest tranches illusory.  *See supra* Section VII.D.  Further evidence of the Originators' pervasive disregard of underwriting standards is found in the surge in delinquencies and defaults shortly after the offering (*see supra* Table 5); the huge discrepancy between expected and actual losses (*see supra* Figure 2); the collapse of the credit ratings (*see supra* Table 4); and the Originators' high OTD lending (*see supra* Table 6).

## IX.   THE CLAIMS ARE TIMELY

319.   For actions brought by the NCUA Board as Liquidating Agent, the FCU Act extends the statute of limitations for at least three years from the date of the appointment of the NCUA Board as Conservator or Liquidating Agent.  *See* 12 U.S.C. § 1787(b)(14)(B)(i).

320.   The NCUA Board placed U.S. Central and WesCorp into conservatorship and appointed itself as conservator on March 20, 2009.  On September 24, 2010, the NCUA Board placed Members United and Southwest into conservatorship and appointed itself conservator. On October 1, 2010, the NCUA Board placed U.S. Central and WesCorp into liquidation and

EXHIBIT 11
131

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 124 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 125 of 190   Page
ID #:2208

appointed itself as Liquidating Agent.  On October 31, 2010, the NCUA Board placed Members

United and Southwest into liquidation and appointed itself Liquidating Agent.

321.    Actions brought under Sections 11 and 12 of the Securities Act must be:

> brought within one year after the discovery of the untrue statement or the
> omission, or after such discovery should have been made by the exercise of
> reasonable diligence. . . .  In no event shall any such action be brought to enforce
> a liability created under section 77k or 77*l*(a)(1) of this title more than three years
> after the security was bona fide offered to the public, or under section 77*l*(a)(2) of
> this title more than three years after the sale.

15 U.S.C. § 77m.

322.    Actions brought under section 17-12a509 of the Kansas Uniform Securities Act,

must be brought within "the earlier of two years after discovery of the facts constituting the

violation or five years after the violation."  Kan. Stat. Ann. § 17-12a509(j).

323.    Actions brought under section 25501 of the California Corporate Securities Law

of 1968, must be brought within "five years after the act or transaction constituting the violation

of the expiration of two years after the discovery by the plaintiff of the facts constituting the

violation, whichever shall first expire."  Cal. Corp. Code § 25506(b).

324.    Actions brought under section 581-33 of the Texas Securities Act must be brought

no "(a) more than three years after discovery of the untruth or omission, or after discovery

should have been made by the exercise of reasonable diligence; or (b) more than five years after

the sale."  Tex. Rev. Civ. Stat. Ann. art 581, § 33(H)(2).

325.    Actions brought under section 13 of the Illinois Securities Law of 1953 must be

brought within

> 3 years from the date of sale; provided, that if the party bringing the action neither
> knew nor in the exercise of reasonable diligence should have known of any
> alleged violation of subsection E, F, G, H, I or J of Section 12 of this Act which is
> the basis for the action, the 3 year period provided shall begin to run upon the
> earlier of:

EXHIBIT 11
132

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 125 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 126 of 190   Page
ID #:2209

(1) the date upon which the party bringing the action has actual knowledge of the alleged violation of this Act; or

(2) the date upon which the party bringing the action has notice of facts which in the exercise of reasonable diligence would lead to actual knowledge of the alleged violation of this Act; but in no event shall the period of limitation so extended be more than 2 years beyond the expiration of the 3 year period otherwise applicable.

815 Ill. Comp. Stat. Ann. 5/13(D).

326.    As the Federal Reserve Board noted in November 2008, the "deteriorating lending standards" and "the surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to investors." Christopher Mayer *et al.*, *The Rise in Mortgage Defaults* at 15-16; *see also* FSOC Risk Retention Report at 9.

327.    Accordingly, the Credit Unions did not discover and could not have discovered the material untrue statements and/or misleading omissions in the Offering Documents more than one year prior to March 20, 2009, the date on which the NCUA Board placed U.S. Central and WesCorp into conservatorship.

328.    In addition, the Credit Unions and/or the NCUA Board as the Liquidating Agent are or were members of putative classes in the cases listed below.  Therefore, the NCUA Board's claims are subject to legal tolling of the statute of limitations and statute of repose under the doctrine announced in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) ("American Pipe doctrine"), and its progeny.

EXHIBIT 11
133

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 126 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 127 of 190   Page
ID #:2210

**Table 7**

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | American Pipe Tolling Commencement Date | American Pipe Tolling Most Recent Action |
|---|---|---|---|---|---|
| 45662DAD7 | IndyMac INDX Mortgage Loan Trust 2006-AR29 | U.S. Central | 9/26/06 | *IBEW Local 103 v. IndyMac*, BC405843 (Cal. Super. Ct. L.A. County) Complaint **Filed: January 20, 2009**, consolidated into *In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-4583 (S.D.N.Y.) **Filed: May 14, 2009** | *In re Indymac Mortgage-Backed Sec. Litig.*, No. 09-cv-4583 (S.D.N.Y.) Motion for Class Certification **PENDING: December 10, 2010** |
| 45662DAA3 | IndyMac INDX Mortgage Loan Trust 2006-AR29 | U.S. Central | 10/31/06 | *IBEW Local 103 v. IndyMac*, BC405843 (Cal. Super. Ct. L.A. County) Complaint **Filed: January 20, 2009**, consolidated into *In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-4583 (S.D.N.Y.) **Filed: May 14, 2009** | *In re Indymac Mortgage-Backed Sec. Litig.*, No. 09-cv-4583 (S.D.N.Y.) Motion for Class Certification **PENDING: December 10, 2010** |
| 46628GAK5 | J.P. Morgan Alternative Loan Trust 2006-A2 | WesCorp | 4/6/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed: March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)) | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending: May 7, 2010** |
| 46628GAA7 | J.P. Morgan Alternative Loan Trust 2006-A2 | U.S. Central | 4/6/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed: March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)) | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending: May 7, 2010** |
| 46628GAD1 | J.P. Morgan Alternative Loan Trust 2006-A2 | U.S. Central | 4/6/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed: March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)) | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending: May 7, 2010** |

EXHIBIT 11
134

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 127 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 128 of 190   Page
ID #:2211

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | American Pipe Tolling Commencement Date | American Pipe Tolling Most Recent Action |
|---|---|---|---|---|---|
| 46628GAA7 | J.P. Morgan Alternative Loan Trust 2006-A2 | Members United | 4/5/2006 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed: March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)) | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending: May 7, 2010** |
| 46628UAD0 | J.P. Morgan Alternative Loan Trust 2006-A3 | U.S. Central | 6/14/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed: March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)) | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending: May 7, 2010** |
| 46628UAE8 | J.P. Morgan Alternative Loan Trust 2006-A3 | U.S. Central | 6/14/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed: March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)) | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending: May 7, 2010** |
| 466285AA1 | J.P. Morgan Alternative Loan Trust 2006-A6 | U.S. Central | 10/23/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed: March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)); *Public Employees' Ret. Sys. of Miss. v. Moodys*, No. 09-3209 (E.D.N.Y.) **Filed: July 24, 2009** Consolidated No. 08-1713 (E.D.N.Y.), **Oct. 21, 2009** | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No.08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending: May 7, 2010** |
| 466285AC7 | J.P. Morgan Alternative Loan Trust 2006-A6 | U.S. Central | 10/23/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed: March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)); *Public Employees' Ret Sys. v. Moodys*, No. 09-3209 (E.D.N.Y.) Complaint **July 24, 2009** Consolidated into No. 08-1713 (E.D.N.Y.), **Oct. 21, 2009** | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending: May 7, 2010** |

EXHIBIT 11
135

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 128 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 129 of 190   Page
ID #:2212

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | American Pipe Tolling Commencement Date | American Pipe Tolling Most Recent Action |
|-------|----------------|-------|------------|------------------------------------------|------------------------------------------|
| 466285AD5 | J.P. Morgan Alternative Loan Trust 2006-A6 | U.S. Central | 10/23/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed: March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)); *Public Employees' Ret. Sys. of Miss. v. Moodys*, No. 09-3209 (E.D.N.Y.) Complaint **July 24, 2009** Consolidated into No. 08-1713 (E.D.N.Y.), **Oct. 21, 2009** | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending: May 7, 2010** |
| 466285AE3 | J.P. Morgan Alternative Loan Trust 2006-A6 | U.S. Central | 10/23/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed: March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)); *Public Employees' Ret. Sys. of Miss. v. Moodys*, No. 09-3209 (E.D.N.Y.) Complaint **July 24, 2009** Consolidated into No. 08-1713 (E.D.N.Y.), **Oct. 21, 2009** | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending: May 7, 2010** |
| 466286AE1 | J.P. Morgan Alternative Loan Trust 2006-A7 | WesCorp | 11/9/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed: March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)); *Public Employees' Ret. Sys. of Miss. v. Moodys*, No. 09-3209 (E.D.N.Y.) Complaint **July 24, 2009** Consolidated into No. 08-1713 (E.D.N.Y.), **Oct. 21, 2009** | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending: May 7, 2010** |

EXHIBIT 11
136

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 129 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 130 of 190   Page
ID #:2213

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | American Pipe Tolling Commencement Date | American Pipe Tolling Most Recent Action |
|-------|----------------|-------|------------|------------------------------------------|-------------------------------------------|
| 466286AA9 | J.P. Morgan Alternative Loan Trust 2006-A7 | U.S. Central | 11/9/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed: March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)); *Public Employees' Ret. Sys. of Miss. v. Moodys*, No. 09-3209 (E.D.N.Y.) Complaint **July 24, 2009** Consolidated into No. 08-1713 (E.D.N.Y.), **Oct. 21, 2009** | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending: May 7, 2010** |
| 466286AC5 | J.P. Morgan Alternative Loan Trust 2006-A7 | U.S. Central | 11/9/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed: March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)); *Public Employees' Ret. Sys. of Miss. v. Moodys*, No. 09-3209 (E.D.N.Y.) Complaint **July 24, 2009** Consolidated into No. 08-1713 (E.D.N.Y.), **Oct. 21, 2009** | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending: May 7, 2010** |
| 466286AD3 | J.P. Morgan Alternative Loan Trust 2006-A7 | U.S. Central | 11/9/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed:  March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)); *Public Employees' Ret. Sys. of Miss. v. Moodys*, No. 09-3209 (E.D.N.Y.) Complaint **July 24, 2009** Consolidated into No. 08-1713 (E.D.N.Y.), **Oct. 21, 2009** | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No.08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending: May 7, 2010** |

EXHIBIT 11
137

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 130 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 131 of 190   Page
ID #:2214

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | American Pipe Tolling Commencement Date | American Pipe Tolling Most Recent Action |
|---|---|---|---|---|---|
| 466286AE1 | J.P. Morgan Alternative Loan Trust 2006-A7 | U.S. Central | 5/16/07 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed: March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)); *Public Employees' Ret. Sys. of Miss. v. Moodys*, No. 09-3209 (E.D.N.Y.) Complaint **July 24, 2009** Consolidated into No. 08-1713 (E.D.N.Y.), **Oct. 21, 2009** | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No.08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending: May 7, 2010** |
| 46629KAE9 | J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | U.S. Central | 10/19/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed:  March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)); *Public Employees' Ret. Sys. of Miss. v. Moodys*, No. 09-3209 (E.D.N.Y.) Complaint **July 24, 2009** Consolidated into No. 08-1713 (E.D.N.Y.), **Oct. 21, 2009** | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending:  May 7, 2010** |
| 466278AC2 | J.P. Morgan Alternative Loan Trust 2007-A2 | U.S. Central | 5/27/07 | *Fort Worth Employees' v.  J.P. Morgan*, No. 600767-2009 (N.Y. Sup. Ct.) Complaint **March 12, 2009, Voluntary Dismissal  May 7, 2010**  (Removed to No. 09-3701 (S.D.N.Y.)); *Fort Worth Employees' v. J.P. Morgan*, No. 09-3701 (S.D.N.Y.) Second Amended Complaint **July 8, 2010    Pending** | *Employees' Ret. Sys. of the Virgin Islands v. J.P. Morgan Chase & Co.*, No. 09-3701 (S.D.N.Y.) Order on Motion To Dismiss **Filed:  May 10, 2011** |
| 46630XAF5 | J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | U.S. Central | 5/3/07 | *Fort Worth Employees' v.  J.P. Morgan*, No. 600767-2009 (N.Y. Sup. Ct.) Complaint **March 12, 2009, Voluntary Dismissal  May 7, 2010**  (Removed to No. 09-3701 (S.D.N.Y.)); *Fort Worth Employees' v. J.P. Morgan*, No. 09-3701 (S.D.N.Y.) Second Amended Complaint **July 8, 2010    Pending** | *Employees' Ret. Sys. of the Virgin Islands v. J.P. Morgan Chase & Co.*, No. 09-3701 (S.D.N.Y.) Order on Motion To Dismiss **Filed:  May 10, 2011** |

EXHIBIT 11

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 131 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 132 of 190   Page
ID #:2215

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | American Pipe Tolling Commencement Date | American Pipe Tolling Most Recent Action |
|---|---|---|---|---|---|
| 46630CAE4 | J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | U.S. Central | 6/7/07 | *Fort Worth Employees' v. J.P. Morgan*, No. 600767-2009 (N.Y. Sup. Ct.) Complaint **March 12, 2009, Voluntary Dismissal  May 7, 2010** (Removed to No. 09-3701 (S.D.N.Y.)); *Fort Worth Employees' v. J.P. Morgan*, No. 09-3701 (S.D.N.Y.) Second Amended Complaint **July 8, 2010    Pending** | *Employees' Ret. Sys. of the Virgin Islands v. J.P. Morgan Chase & Co.*, No. 09-3701 (S.D.N.Y.) Order on Motion To Dismiss **Filed:  May 10, 2011** |
| 46630CAF1 | J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | U.S. Central | 6/7/07 | *Fort Worth Employees' v. J.P. Morgan*, No. 600767-2009 (N.Y. Sup. Ct.) Complaint **March 12, 2009, Voluntary Dismissal  May 7, 2010** (Removed to No. 09-3701 (S.D.N.Y.)); *Fort Worth Employees' v. J.P. Morgan*, No. 09-3701 (S.D.N.Y.) Second Amended Complaint **July 8, 2010    Pending** | *Employees' Ret. Sys. of the Virgin Islands v. J.P. Morgan Chase & Co.*, No. 09-3701 (S.D.N.Y.) Order on Motion To Dismiss **Filed:  May 10, 2011** |
| 466278AC2 | J.P. Morgan Alternative Loan Trust 2007-A2 | Members United | 5/30/2007 | *Fort Worth Employees' v. J.P. Morgan*, No. 600767-2009 (N.Y. Sup. Ct.) Complaint **March 12, 2009, Voluntary Dismissal  May 7, 2010** (Removed to No. 09-3701 (S.D.N.Y.)); *Fort Worth Employees' v. J.P. Morgan*, No. 09-3701 (S.D.N.Y.) Second Amended Complaint **July 8, 2010    Pending** | *Employees' Ret. Sys. of the Virgin Islands v. J.P. Morgan Chase & Co.*, No. 09-3701 (S.D.N.Y.) Order on Motion To Dismiss **Filed:  May 10, 2011** |

329.    With respect to those RMBS purchases for which the NCUA Board asserts claims under Section 11 of the Securities Act (Counts 1-7), the earliest date they were bona fide offered to the public was April 27, 2006, or not more than three years prior to March 20, 2009. Accordingly, the NCUA Board's Section 11 claims are not time-barred.

330.    With respect to those RMBS purchases for which the NCUA Board asserts claims under Section 12(a)(2) (Counts 8-11), the earliest sale was April 5, 2006, or not more than three years prior to March 20, 2009. Accordingly, the NCUA Board's Section 12(a)(2) claims are not time-barred.

EXHIBIT 11
139

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 132 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1    Filed 06/23/11   Page 133 of 190   Page
ID #:2216

331.    With respect to those RMBS purchases for which the NCUA Board asserts claims under state law (Counts 12-15), the earliest purchase date/offering date with respect to those claims was February 2, 2006, or not more than five years prior to March 20, 2009. Accordingly, the NCUA Board's state law claims are not time-barred.

## X.    CLAIMS FOR RELIEF

### COUNT ONE
### Section 11 of the Securities Act of 1933
### (American Home Mortgage Assets Trust 2007-3)

332.    The NCUA Board realleges paragraphs 1 through 331 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than American Home Mortgage Assets, LLC, or specific to offerings other than the American Home Mortgage Assets Trust 2007-3 Offering.

333.    The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act of 1933, with respect to WesCorp's purchase of the American Home Mortgage Assets Trust 2007-3 certificates against Defendant J.P. Morgan, as the underwriter, and against Defendant American Home Mortgage Assets, LLC, as the issuer.

334.    The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

335.    At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

336.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the Certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

EXHIBIT 11
140

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 133 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 134 of 190   Page
ID #:2217

337.     WesCorp purchased the certificates pursuant to and traceable to the defective Registration Statement, as alleged above.

338.     At the time WesCorp purchased the Certificates, it did not know of the untrue statements and omissions contained in the registration statement.

339.     J.P. Morgan's and American Home Mortgage Assets LLC's conduct as alleged above violated Section 11.

340.     WesCorp and Plaintiff sustained damages as a result of Defendants' violations of Section 11.

341.     WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant J.P. Morgan, and Defendant American Home Mortgage Assets LLC, jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## COUNT TWO
### Section 11 of the Securities Act of 1933
### (C-BASS 2006-CB7 Trust)

342.     The NCUA Board realleges paragraphs 1 through 331 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than Bond Securitization, LLC, or specific to offerings other than the C-BASS 2006-CB7 Trust Offering.

343.     The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act of 1933, with respect to U.S. Central's purchase of the C-BASS 2006-CB7 Trust certificates against Defendant J.P. Morgan, as the underwriter, and against Defendant Bond Securitization, LLC, as the issuer.

344.     The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

EXHIBIT 11
141

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 134 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 135 of 190   Page
ID #:2218

345.    At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

346.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

347.    U.S. Central purchased the certificates pursuant to and traceable to the defective registration statement, as alleged above.

348.    At the time U.S. Central purchased the certificates, it did not know of the untrue statements and omissions contained in the registration statement.

349.    J.P. Morgan's and Bond Securitization, LLC's conduct as alleged above violated Section 11.

350.    U.S. Central and Plaintiff sustained damages as a result of Defendants' violations of Section 11.

351.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant J.P. Morgan, and Defendant Bond Securitization, LLC, jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## COUNT THREE
### Section 11 of the Securities Act of 1933
### (IndyMac INDX Mortgage Loan Trust 2006-AR29)

352.    The NCUA Board realleges paragraphs 1 through 331 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than IndyMac MBS, Inc., or specific to offerings other than the IndyMac INDX Mortgage Loan Trust 2006-AR29 Offering.

EXHIBIT 11
142

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 135 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 136 of 190   Page
ID #:2219

353.    The NCUA Board brings this cause of action pursuant to Section 11 of the
Securities Act of 1933, with respect to U.S. Central's purchase of the IndyMac INDX Mortgage
Loan Trust 2006-AR29 certificates against Defendant J.P. Morgan, as the underwriter, and
against Defendant IndyMac MBS, Inc., as the issuer.

354.    The NCUA Board expressly disclaims and disavows any allegation that could be
construed as alleging fraud.

355.    At the time the registration statement became effective, it (including the
prospectus and any prospectus supplements) contained untrue statements and omitted facts that
were necessary to make the statements made not misleading, as alleged above.

356.    The untrue statements and omitted facts were material because a reasonably
prudent investor deciding whether to purchase the Certificates would have viewed them as
important and as substantially altering the total mix of information available, as alleged above.

357.    U.S. Central purchased the Certificates pursuant to and traceable to the defective
registration statement, as alleged above.

358.    At the time U.S. Central purchased the Certificates, it did not know of the untrue
statements and omissions contained in the registration statement.

359.    J.P. Morgan's and IndyMac MBS, Inc.'s conduct as alleged above violated
Section 11.

360.    U.S. Central and Plaintiff sustained damages as a result of Defendants' violations
of Section 11.

361.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its
favor against Defendant J.P. Morgan, and Defendant IndyMac MBS, Inc., jointly and severally,

EXHIBIT 11
143

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 136 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 137 of 190   Page
ID #:2220

awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court

deems appropriate and just.

## COUNT FOUR
### Section 11 of the Securities Act of 1933
**(J.P. Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2006-A3, J.P. Morgan Alternative Loan Trust 2006-A6, J.P. Morgan Alternative Loan Trust 2006-A7, J.P. Morgan Alternative Loan Trust 2007-A1, J.P. Morgan Alternative Loan Trust 2007-A2, J.P. Morgan Mortgage Acquisition Trust 2006-WMC3, J.P. Morgan Mortgage Acquisition Trust 2006-HE1, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, J.P. Morgan Mortgage Acquisition Trust 2007-CH4)**

362.    The NCUA Board realleges paragraphs 1 through 331 of this Complaint, as

though fully set forth here, except those paragraphs specific to the Issuer Defendants other than

J.P. Morgan Acceptance Corporation I, or specific to offerings other than the J.P. Morgan

Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2006-A3, J.P. Morgan

Alternative Loan Trust 2006-A6, J.P. Morgan Alternative Loan Trust 2006-A7, J.P. Morgan

Alternative Loan Trust 2007-A1, J.P. Morgan Alternative Loan Trust 2007-A2, J.P. Morgan

Mortgage Acquisition Trust 2006-WMC3, J.P. Morgan Mortgage Acquisition Corp. 2007-HE1,

J.P. Morgan Mortgage Acquisition Trust 2007-CH3, and J.P. Morgan Mortgage Acquisition

Trust 2007-CH4 offerings.

363.    The NCUA Board brings this cause of action pursuant to Section 11 of the

Securities Act of 1933, with respect to U.S. Central's purchases of the J.P. Morgan Alternative

Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2006-A3, J.P. Morgan Alternative

Loan Trust 2006-A6, J.P. Morgan Alternative Loan Trust 2006-A7, J.P. Morgan Alternative

Loan Trust 2007-A1, J.P. Morgan Alternative Loan Trust 2007-A2, J.P. Morgan Mortgage

Acquisition Trust 2006-WMC3, J.P. Morgan Mortgage Acquisition Corp. 2007-HE1, J.P.

Morgan Mortgage Acquisition Trust 2007-CH3, and J.P. Morgan Mortgage Acquisition Trust

EXHIBIT 11
144

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 137 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 138 of 190   Page
ID #:2221

2007-CH4 certificates against Defendant J.P. Morgan, as the underwriter, and against Defendant

J.P. Morgan Acceptance Corporation I, as the issuer.

364.    The NCUA Board expressly disclaims and disavows any allegation that could be

construed as alleging fraud.

365.    At the time the registration statement became effective, it (including the

prospectus and any prospectus supplements) contained untrue statements and omitted facts that

were necessary to make the statements made not misleading, as alleged above.

366.    The untrue statements and omitted facts were material because a reasonably

prudent investor deciding whether to purchase the Certificates would have viewed them as

important and as substantially altering the total mix of information available, as alleged above.

367.    U.S. Central purchased the Certificates pursuant to and traceable to the defective

registration statement, as alleged above.

368.    At the time U.S. Central purchased the Certificates, it did not know of the untrue

statements and omissions contained in the registration statement.

369.    J.P. Morgan's and J.P. Morgan Acceptance Corporation I's conduct as alleged

above violated Section 11.

370.    U.S. Central and Plaintiff sustained damages as a result of Defendants' violations

of Section 11.

371.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its

favor against Defendant J.P. Morgan Securities, LLC, and Defendant J.P. Morgan Acceptance

Corporation I, jointly and severally, awarding all damages, in an amount to be proven at trial,

costs, and such other relief as the Court deems appropriate and just.

EXHIBIT 11
145

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 138 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 139 of 190   Page
ID #:2222

## COUNT FIVE
**Section 11 of the Securities Act of 1933**
**(J.P. Morgan Alternative Loan Trust 2006-A2,**
**J.P. Morgan Alternative Loan Trust 2006-A7)**

372.    The NCUA Board realleges paragraphs 1 through 331 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than J.P. Morgan Acceptance Corporation I, or specific to offerings other than the J.P. Morgan Alternative Loan Trust 2006-A2 and J.P. Morgan Alternative Loan Trust 2006-A7 offerings.

373.    The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act of 1933, with respect to WesCorp's purchases of the J.P. Morgan Alternative Loan Trust 2006-A2 and J.P. Morgan Alternative Loan Trust 2006-A7 certificates against Defendant J.P. Morgan, as the underwriter, and against Defendant J.P. Morgan Acceptance Corporation I, as the issuer.

374.    The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

375.    At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

376.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the Certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

377.    WesCorp purchased the Certificates pursuant to and traceable to the defective registration statement, as alleged above.

378.    At the time WesCorp purchased the Certificates, it did not know of the untrue statements and omissions contained in the registration statement.

EXHIBIT 11
146

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 139 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 140 of 190   Page
ID #:2223

379.     J.P. Morgan's and J.P. Morgan Acceptance Corporation I's conduct as alleged above violated Section 11.

380.     WesCorp and Plaintiff sustained damages as a result of Defendants' violations of Section 11.

381.     WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant J.P. Morgan Securities, LLC, and Defendant J.P. Morgan Acceptance Corporation I, jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

### COUNT SIX
**Section 11 of the Securities Act of 1933**
**(J.P. Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2007-A2, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, J.P. Morgan Mortgage Acquisition Trust 2007-CH5, J.P. Morgan Alternative Loan Trust 2006-A3)**

382.     The NCUA Board realleges paragraphs 1 through 331 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than J.P. Morgan Acceptance Corporation I, or specific to offerings other than the J.P. Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2007-A2, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, J.P. Morgan Mortgage Acquisition Trust 2007-CH5, and J.P. Morgan Alternative Loan Trust 2006-A3 offerings.

383.     The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act of 1933, with respect to Members United's purchases of the J.P. Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2007-A2, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, J.P. Morgan Mortgage Acquisition Trust 2007-CH5, and J.P. Morgan Alternative Loan Trust 2006-A3 certificates against Defendant J.P. Morgan, as the underwriter, and against Defendant J.P. Morgan Acceptance Corporation I, as the issuer.

EXHIBIT 11
147

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 140 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 141 of 190   Page
ID #:2224

384.    The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

385.    At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

386.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the Certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

387.    Members United purchased the Certificates pursuant to and traceable to the defective registration statement, as alleged above.

388.    At the time Members United purchased the Certificates, it did not know of the untrue statements and omissions contained in the registration statement.

389.    J.P. Morgan's and J.P. Morgan Acceptance Corporation I's conduct as alleged above violated Section 11.

390.    Members United and Plaintiff sustained damages as a result of Defendants' violations of Section 11.

391.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant J.P. Morgan, and Defendant J.P. Morgan Acceptance Corporation I, jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

**COUNT SEVEN**
**Section 11 of the Securities Act of 1933**
**(J.P. Morgan Alternative Loan Trust 2007-S1, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, J.P. Morgan Mortgage Acquisition Trust 2007-CH4)**

EXHIBIT 11
148

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 141 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 142 of 190   Page
ID #:2225

392.    The NCUA Board realleges paragraphs 1 through 331 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than J.P. Morgan Acceptance Corporation I, or specific to offerings other than the J.P. Morgan Alternative Loan Trust 2007-S1, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, and J.P. Morgan Mortgage Acquisition Trust 2007-CH4 offerings.

393.    The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act of 1933, with respect to Southwest's purchases of the J.P. Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2007-S1, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, and J.P. Morgan Mortgage Acquisition Trust 2007-CH4 certificates against Defendant J.P. Morgan, as the underwriter, and against Defendant J.P. Morgan Acceptance Corporation I, as the issuer.

394.    The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

395.    At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

396.    The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

397.    Southwest purchased the certificates pursuant to and traceable to the defective registration statement, as alleged above.

398.    At the time Southwest purchased the certificates, it did not know of the untrue statements and omissions contained in the registration statement.

EXHIBIT 11
149

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 142 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 143 of 190   Page
ID #:2226

399.     J.P. Morgan's and J.P. Morgan Acceptance Corporation I's conduct as alleged above violated Section 11.

400.     Southwest and Plaintiff sustained damages as a result of Defendants' violations of Section 11.

401.     WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant J.P. Morgan, and Defendant J.P. Morgan Acceptance Corporation I, jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

## COUNT EIGHT
### Section 12(a)(2) of the Securities Act of 1933
**(C-BASS 2006-CB7 Trust , IndyMac INDX Mortgage Loan Trust 2006-AR29, J.P. Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2006-A3, J.P. Morgan Alternative Loan Trust 2006-A6, J.P. Morgan Alternative Loan Trust 2006-A7, J.P. Morgan Alternative Loan Trust 2007-A1, J.P. Morgan Alternative Loan Trust 2007-A2, J.P. Morgan Mortgage Acquisition Corp. 2007-HE1, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, J.P. Morgan Mortgage Acquisition Trust 2007-CH4)**

402.     The NCUA Board realleges paragraphs 1 through 331 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the C-BASS 2006-CB7 Trust, IndyMac INDX Mortgage Loan Trust 2006-AR29,  J.P. Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2006-A3, J.P. Morgan Alternative Loan Trust 2006-A6, J.P. Morgan Alternative Loan Trust 2006-A7, J.P. Morgan Alternative Loan Trust 2007-A1, J.P. Morgan Alternative Loan Trust 2007-A2, J.P. Morgan Mortgage Acquisition Corp. 2007-HE1, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, and J.P. Morgan Mortgage Acquisition Trust 2007-CH4 offerings.

403.     The NCUA Board brings this cause of action pursuant to Section 12(a)(2) of the Securities Act of 1933, with respect to U.S. Central's purchases of the C-BASS 2006-CB7, IndyMac INDX Mortgage Loan Trust 2006-AR29, J.P. Morgan Alternative Loan Trust 2006-A2,

136

EXHIBIT 11
150

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 143 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 144 of 190   Page
ID #:2227

J.P. Morgan Alternative Loan Trust 2006-A3, J.P. Morgan Alternative Loan Trust 2006-A6, J.P.

Morgan Alternative Loan Trust 2006-A7, J.P. Morgan Alternative Loan Trust 2007-A1, J.P.

Morgan Alternative Loan Trust 2007-A2, J.P. Morgan Mortgage Acquisition Corp. 2007-HE1,

J.P. Morgan Mortgage Acquisition Trust 2007-CH3, J.P. Morgan Mortgage Acquisition Trust

2007-CH4 certificates against Defendant J.P. Morgan, as the underwriter and seller of those

certificates.

404.    The NCUA Board expressly disclaims and disavows any allegation that could be

construed as alleging fraud.

405.    Defendant J.P. Morgan offered to sell and sold the securities to U.S. Central

through one or more instrumentalities of interstate commerce (i.e., telephone, faxes, mails, e-

mail, or other means of electronic communication).

406.    Defendant J.P. Morgan offered to sell and sold the securities, for its own financial

gain, to U.S. Central by means of the prospectus and/or prospectus supplements, as alleged

above, and/or oral communications related to the prospectuses and/or prospectus supplements.

407.    The prospectuses and/or prospectus supplements) contained untrue statements and

omitted facts that were necessary to make the statements made not misleading, as alleged above.

408.    The untrue statements and omitted facts were material because a reasonably

prudent investor deciding whether to purchase the certificate would have viewed them as

important and as substantially altering the total mix of information available, as alleged above.

409.    U.S. Central purchased the certificates on the initial offering pursuant to the

prospectus and/or prospectus supplements.

410.    At the time U.S. Central purchased the certificates, it did not know of the untrue

statements and omissions contained in the prospectuses and/or prospectus supplements.

EXHIBIT 11
151

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 144 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 145 of 190   Page
ID #:2228

411.     Defendant's conduct as alleged above violated Section 12(a)(2).

412.     U.S. Central and Plaintiff sustained damages as a result of Defendant's violations of Section 12(a)(2).

413.     Under Section 12(a)(2), the NCUA Board is entitled to rescind and recover the consideration U.S. Central paid for the certificates, minus principal and interest received.

414.     WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant J.P. Morgan, awarding rescission or a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

**COUNT NINE**
**Section 12(a)(2) of the Securities Act of 1933**
**(J.P. Morgan Alternative Loan Trust 2006-A2,**
**J.P. Morgan Alternative Loan Trust 2006-A7)**

415.     The NCUA Board realleges paragraphs 1 through 331 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the J.P. Morgan Alternative Loan Trust 2006-A2 and J.P. Morgan Alternative Loan Trust 2006-A7 offerings.

416.     The NCUA Board brings this cause of action pursuant to Section 12(a)(2) of the Securities Act of 1933, with respect to WesCorp's purchases of the J.P. Morgan Alternative Loan Trust 2006-A2 and J.P. Morgan Alternative Loan Trust 2006-A7 certificates against Defendant J.P. Morgan, as the underwriter and seller of those certificates.

417.     The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

EXHIBIT 11
152

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 145 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 146 of 190   Page
ID #:2229

418.   Defendant J.P. Morgan offered to sell and sold the securities to WesCorp through one or more instrumentalities of interstate commerce (i.e., telephone, faxes, mails, e-mail, or other means of electronic communication).

419.   Defendant J.P. Morgan offered to sell and sold the securities, for its own financial gain, to WesCorp by means of the prospectus and/or prospectus supplements, as alleged above, and/or oral communications related to the prospectuses and/or prospectus supplements.

420.   The prospectuses and/or prospectus supplements contained untrue statements of material fact and omitted facts that were necessary to make the statements made not misleading, as alleged above.

421.   The untrue statements of material fact and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

422.   WesCorp purchased the certificates on the initial offering pursuant to the prospectus and/or prospectus supplements.

423.   At the time WesCorp purchased the certificates, it did not know of the untrue statements and omissions contained in the prospectuses and/or prospectus supplements.

424.   Defendant's conduct as alleged above violated Section 12(a)(2).

425.   WesCorp and Plaintiff sustained damages as a result of Defendant's violations of Section 12(a)(2).

426.   Under Section 12(a)(2), the NCUA Board is entitled to rescind and recover the consideration WesCorp paid for the certificates, minus principal and interest received.

EXHIBIT 11
153

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 146 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 147 of 190   Page
ID #:2230

427.     WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant J.P. Morgan, awarding rescission or a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

**COUNT TEN**
**Section 12(a)(2) of the Securities Act of 1933**
**(J.P. Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2007-A2, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, J.P. Morgan Mortgage Acquisition Trust 2007-CH5)**

428.     The NCUA Board realleges paragraphs 1 through 331 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the J.P. Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2007-A2, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, and J.P. Morgan Mortgage Acquisition Trust 2007-CH5 offerings.

429.     The NCUA Board brings this cause of action pursuant to Section 12(a)(2) of the Securities Act of 1933, with respect to Members United's purchases of the J.P. Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2007-A2, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, J.P. Morgan Mortgage Acquisition Trust 2007-CH5 certificates against Defendant J.P. Morgan, as the underwriter and seller of those certificates.

430.     The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging.

431.     Defendant J.P. Morgan offered to sell and sold the securities to Members United through one or more instrumentalities of interstate commerce (i.e., telephone, faxes, mails, e-mail, or other means of electronic communication).

EXHIBIT 11
154

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 147 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 148 of 190   Page
ID #:2231

432.    Defendant J.P. Morgan offered to sell and sold the securities, for its own financial gain, to Members United by means of the prospectus and/or prospectus supplements, as alleged above, and/or oral communications related to the prospectuses and/or prospectus supplements.

433.    The prospectuses and/or prospectus supplements contained untrue statements of material fact and omitted facts that were necessary to make the statements made not misleading, as alleged above.

434.    The untrue statements of material fact and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

435.    Members United purchased the certificates on the initial offering pursuant to the prospectus and/or prospectus supplements.

436.    At the time Members United purchased the certificates, it did not know of the untrue statements and omissions contained in the prospectuses and/or prospectus supplements.

437.    Defendant J.P. Morgan's conduct as alleged above violated Section 12(a)(2).

438.    Members United and Plaintiff sustained damages as a result of Defendant's violations of Section 12(a)(2).

439.    Under Section 12(a)(2), the NCUA Board is entitled to rescind and recover the consideration Members United paid for the certificates, minus principal and interest received.

440.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant J.P. Morgan, awarding rescission or a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

EXHIBIT 11
155

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 148 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 149 of 190   Page
ID #:2232

## COUNT ELEVEN

### Section 12(a)(2) of the Securities Act of 1933

**(J.P. Morgan Alternative Loan Trust 2007-S1, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, J.P. Morgan Mortgage Acquisition Trust 2007-CH4)**

441.    The NCUA Board realleges paragraphs 1 through 331 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the J.P. Morgan Alternative Loan Trust 2007-S1, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, and J.P. Morgan Mortgage Acquisition Trust 2007-CH4 offerings.

442.    The NCUA Board brings this cause of action pursuant to Section 12(a)(2) of the Securities Act of 1933, with respect to Southwest's purchases of the J.P. Morgan Alternative Loan Trust 2007-S1, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, and J.P. Morgan Mortgage Acquisition Trust 2007-CH4 certificates against Defendant J.P. Morgan, as the underwriter and seller of those certificates.

443.    The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

444.    Defendant J.P. Morgan offered to sell and sold the securities to Southwest through one or more instrumentalities of interstate commerce (i.e., telephone, faxes, mails, e-mail, or other means of electronic communication).

445.    Defendant J.P. Morgan offered to sell and sold the securities, for its own financial gain, to Southwest by means of the prospectus and/or prospectus supplements, as alleged above, and/or oral communications related to the prospectuses and/or prospectus supplements.

446.    The prospectuses and/or prospectus supplements contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

EXHIBIT 11
156

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 149 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 150 of 190   Page
ID #:2233

447.     The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

448.     Southwest purchased the certificates on the initial offering pursuant to the prospectus and/or prospectus supplements.

449.     At the time Southwest purchased the certificates, it did not know of the untrue statements and omissions contained in the prospectuses and/or prospectus supplements.

450.     Defendant J.P. Morgan's conduct as alleged above violated Section 12(a)(2).

451.     Southwest and Plaintiff sustained damages as a result of Defendant's violations of Section 12(a)(2).

452.     Under Section 12(a)(2), the NCUA Board is entitled to rescind and recover the consideration Southwest paid for the certificates, minus principal and interest received.

453.     WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant J.P. Morgan, awarding rescission or a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

## COUNT TWELVE
### Violation of the California Corporate Securities Law of 1968
### Cal. Corp. Code §§ 25401 and 25501
### (J.P. Morgan Alternative Loan Trust 2006-A2,
### J.P. Morgan Alternative Loan Trust 2006-A7)

454.     The NCUA Board realleges paragraphs 1 through 331 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the J.P. Morgan Alternative Loan Trust 2006-A2 and J.P. Morgan Alternative Loan Trust 2006-A7 offerings.

EXHIBIT 11
157

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 150 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 151 of 190   Page
ID #:2234

455.     The NCUA Board brings this cause of action pursuant to Sections 25401 and 25501 of the California Corporate Securities Law of 1968, with respect to WesCorp's purchases of the J.P. Morgan Alternative Loan Trust 2006-A2 and J.P. Morgan Alternative Loan Trust 2006-A7 certificates against Defendant J.P. Morgan, as the seller of those certificates.

456.     Defendant offered to sell and sold the securities to WesCorp by means of written and/or oral communications which included untrue statements of material fact and/or omissions of material facts that were necessary to make the statements made not misleading, as alleged above.

457.     The untrue statements of material fact and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

458.     At the time WesCorp purchased the certificates, it did not know of these untruths or omissions.

459.     Defendant sold the certificates to WesCorp in California.

460.     Defendant's sales of the certificates violated Cal. Corp. Code § 25401.

461.     WesCorp and Plaintiff sustained damages as a result of Defendant's violations of Cal. Corp. Code § 25401.

462.     WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant J.P. Morgan, awarding rescission or a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

**COUNT THIRTEEN**
**Violation of the Kansas Uniform Securities Act**

EXHIBIT 11
158

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 151 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 152 of 190   Page
ID #:2235

**Kan. Stat. Ann. § 17-12a509**
**(C-BASS 2006-CB7 Trust, IndyMac INDX Mortgage Loan Trust 2006-AR29, J.P. Morgan**
**Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2006-A3, J.P.**
**Morgan Alternative Loan Trust 2006-A6, J.P. Morgan Alternative Loan Trust 2006-A7,**
**J.P. Morgan Alternative Loan Trust 2007-A1, J.P. Morgan Alternative Loan Trust 2007-**
**A2, J.P. Morgan Mortgage Acquisition Corp. 2006-HE1, J.P. Morgan Mortgage**
**Acquisition Trust 2007-HE1, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, J.P.**
**Morgan Mortgage Acquisition Trust 2007-CH4)**

463.    The NCUA Board realleges paragraphs 1 through 331 of this Complaint, as
though fully set forth here, except those paragraphs specific to offerings other than the C-BASS
2006-CB7 Trust, IndyMac INDX Mortgage Loan Trust 2006-AR29, J.P. Morgan Alternative
Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2006-A3, J.P. Morgan Alternative
Loan Trust 2006-A6, J.P. Morgan Alternative Loan Trust 2006-A7, J.P. Morgan Alternative
Loan Trust 2007-A1, J.P. Morgan Alternative Loan Trust 2007-A2, J.P. Morgan Mortgage
Acquisition Corp. 2006-HE1, J.P. Morgan Mortgage Acquisition Trust 2007-HE1, J.P. Morgan
Mortgage Acquisition Trust 2007-CH3, and J.P. Morgan Mortgage Acquisition Trust 2007-CH4
offerings.

464.    The NCUA Board brings this cause of action pursuant to Section 17-12a509 of
the Kansas Uniform Securities Act, with respect to U.S. Central's purchases of the C-BASS
2006-CB7 Trust, IndyMac INDX Mortgage Loan Trust 2006-AR29, J.P. Morgan Alternative
Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2006-A3, J.P. Morgan Alternative
Loan Trust 2006-A6, J.P. Morgan Alternative Loan Trust 2006-A7, J.P. Morgan Alternative
Loan Trust 2007-A1, J.P. Morgan Alternative Loan Trust 2007-A2, J.P. Morgan Mortgage
Acquisition Corp. 2006-HE1, J.P. Morgan Mortgage Acquisition Trust 2007-HE1, J.P. Morgan
Mortgage Acquisition Trust 2007-CH3, and J.P. Morgan Mortgage Acquisition Trust 2007-CH4
certificates against Defendant J.P. Morgan, as the seller of those certificates.

EXHIBIT 11
159

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 152 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 153 of 190   Page
ID #:2236

465.     Defendant offered to sell and sold the securities to U.S. Central by means of written and/or oral communications which included untrue statements of material fact and/or omissions of material facts that were necessary to make the statements made not misleading, as alleged above.

466.     The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the Certificates would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

467.     Defendant sold the Certificates to U.S. Central in Kansas.

468.     U.S. Central did not know of these untruths and omissions.

469.     If U.S. Central had known about these untruths and omissions, it would not have purchased the securities from Defendant.

470.     Defendant's sales of the Certificates violated Kan. Stat. Ann. § 17-12a509(b).

471.     U.S. Central and Plaintiff sustained damages as a result of Defendant's violations of Kan. Stat. Ann. § 17-12a509(b).

472.     WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant J.P. Morgan, awarding rescission or a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

### COUNT FOURTEEN
### Violation of the Illinois Securities Law of 1953
### 815 Ill. Comp. Stat. Ann. 5/12
### (J.P. Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2007-A2, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, J.P. Morgan Mortgage Acquisition Trust 2007-CH5)

473.     The NCUA Board realleges paragraphs 1 through 331 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the J.P.

146

EXHIBIT 11
160

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 153 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 154 of 190   Page
ID #:2237

Morgan Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2007-A2, J.P.
Morgan Mortgage Acquisition Trust 2007-CH3, and J.P. Morgan Mortgage Acquisition Trust
2007-CH5 offerings.

474.    The NCUA Board brings this cause of action pursuant to Section 12 of the Illinois
Securities Law of 1953, with respect to Members United's purchases of the J.P. Morgan
Alternative Loan Trust 2006-A2, J.P. Morgan Alternative Loan Trust 2007-A2, J.P. Morgan
Mortgage Acquisition Trust 2007-CH3, and J.P. Morgan Mortgage Acquisition Trust 2007-CH5
certificates against Defendant J.P. Morgan, as the seller of those certificates.

475.    Defendant offered to sell and sold the securities to Members United by means of
written and/or oral communications which included untrue statements of material fact and/or
omissions of material facts that were necessary to make the statements made not misleading, as
alleged above.

476.    The untrue statements of material fact and omitted facts were material because a
reasonably prudent investor deciding whether to purchase the certificates would have viewed
them as important and as substantially altering the total mix of information available, as alleged
above.

477.    Defendant sold the certificates to Members United in Illinois.

478.    At the time Members United purchased the certificates, it did not know of these
untruths and omissions.

479.    If Members United had known about these untruths and omissions, it would not
have purchased the securities from Defendant.

480.    Defendant's sales of the certificates violated 815 Ill. Comp. Stat. Ann. 5/12(G).

EXHIBIT 11
161

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 154 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 155 of 190   Page
ID #:2238

481.     Members United and Plaintiff sustained damages as a result of Defendant's violations of 815 Ill. Comp. Stat. Ann. 5/12(G).

482.     WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant J.P. Morgan, awarding rescission or a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

## COUNT FIFTEEN
### Violation of the Texas Securities Act
### Tex. Rev. Civ. Stat. Ann. art. 581, § 33
**(J.P. Morgan Alternative Loan Trust 2007-S1, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, J.P. Morgan Mortgage Acquisition Trust 2007-CH4)**

483.     The NCUA Board realleges paragraphs 1 through 331 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the J.P. Morgan Alternative Loan Trust 2007-S1, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, J.P. Morgan Mortgage Acquisition Trust 2007-CH4 offerings.

484.     The NCUA Board brings this cause of action pursuant to Section 33 of the Texas Securities Act, with respect to Southwest's purchases of the J.P. Morgan Alternative Loan Trust 2007-S1, J.P. Morgan Mortgage Acquisition Trust 2007-CH3, J.P. Morgan Mortgage Acquisition Trust 2007-CH4 certificates against Defendant J.P. Morgan, as the seller of those certificates.

485.     Defendant offered to sell and sold the securities to Southwest by means of written and/or oral communications which included untrue statements of material fact and/or omissions of material facts that were necessary to make the statements made not misleading, as alleged above.

486.     The untrue statements of material fact and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would have viewed

EXHIBIT 11
162

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 155 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 156 of 190   Page
ID #:2239

them as important and as substantially altering the total mix of information available, as alleged above.

487.    Defendant sold the certificates to Southwest in Texas.

488.    At the time Southwest purchased the certificates, it did not know of these untruths and omissions.

489.    If Southwest had known about these untruths and omissions, it would not have purchased the securities from Defendant.

490.    Defendant's sales of the certificates Tex. Rev. Civ. Stat. Ann. art. 581, § 33(A)(2).

491.    Southwest and Plaintiff sustained damages as a result of Defendant's violations of Tex. Rev. Civ. Stat. Ann. art. 581, § 33(A)(2).

492.    WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant J.P. Morgan, awarding rescission or a rescissory measure of damages, or in the alternative compensatory damages, in an amount to be proven at trial; costs, and such other relief as the Court deems appropriate and just.

### Jury Demand and Designation of Place of Trial

Plaintiff hereby demands a trial by jury of all issues properly triable.  Pursuant to Local Rule 40.2(a), Plaintiff hereby designates Kansas City, Kansas as the place of trial of this action.

EXHIBIT 11
163

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 156 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 157 of 190   Page
ID #:2240

Dated:  June 20, 2011

NATIONAL CREDIT UNION
ADMINISTRATION BOARD,
as Liquidating Agent of
United States Central Federal Credit Union
Western Corporate Federal Credit Union
Members United Corporate Federal Credit Union,
and Southwest Corporate Federal Credit Union

By: _____
Norman E. Siegel (D. Kan. # 70354)
Rachel E. Schwartz (Kan. # 21782)
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel: (816) 714-7100
Fax: (816) 714-7101
siegel@stuevesiegel.com
schwartz@stuevesiegel.com

Mark C. Hansen
David C. Frederick
Wan J. Kim
Joseph S. Hall
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Phone: (202) 326-7900
Fax:  (202) 326-7999
mhansen@khhte.com
dfrederick@khhte.com
wkim@khhte.com
jhall@khhte.com

George A. Zelcs
KOREIN TILLERY, LLC
205 North Michigan Avenue, Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9760
Fax: (312) 641-9751
GZelcs@koreintillery.com

EXHIBIT 11
164

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 157 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 158 of 190   Page
ID #:2241

Stephen M. Tillery
Douglas R. Sprong
Peter H. Rachman
Robert L. King
Diane Moore Heitman
KOREIN TILLERY, LLC
505 North Seventh Street, Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (314) 241-3525
STillery@koreintillery.com
DSprong@koreintillery.com
PRachman@koreintillery.com
RKing@koreintillery.com
DHeitman@koreintillery.com

Of Counsel:

Robert M. Fenner, General Counsel
John K. Ianno, Associate General Counsel
NATIONAL CREDIT UNION ADMINISTRATION
1775 Duke Street
Alexandria, Virginia 22314-3428

EXHIBIT 11
165

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 158 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1    Filed 06/23/11   Page 159 of 190   Page
ID #:2242

# APPENDIX A

## Table 1

| CUSIP | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 12479DAE8 | C-BASS 2006-CB7 Trust | Bond Securitization, LCC | U.S. Central | 10/2/06 | $31,618,000 |
| 45662DAD7 | IndyMac INDX Mortgage Loan Trust 2006-AR29 | IndyMac MBS, Inc. | U.S. Central | 9/26/06 | $20,000,000 |
| 46628GAA7 | J.P. Morgan Alternative Loan Trust 2006-A2 | J.P. Morgan Acceptance Corporation I | U.S. Central | 4/6/06 | $158,097,000 |
| 46628GAD1 | J.P. Morgan Alternative Loan Trust 2006-A2 | J.P. Morgan Acceptance Corporation I | U.S. Central | 4/6/06 | $19,007,000 |
| 46628GAK5 | J.P. Morgan Alternative Loan Trust 2006-A2 | J.P. Morgan Acceptance Corporation I | WesCorp | 4/6/06 | $12,612,616 |
| 46628GAA7 | J.P. Morgan Alternative Loan Trust 2006-A2 | J.P. Morgan Acceptance Corporation I | Members United | 4/5/06 | $47,787,000 |
| 46628UAD0 | J.P. Morgan Alternative Loan Trust 2006-A3 | J.P. Morgan Acceptance Corporation I | U.S. Central | 6/14/06 | $36,406,000 |
| 46628UAE8 | J.P. Morgan Alternative Loan Trust 2006-A3 | J.P. Morgan Acceptance Corporation I | U.S. Central | 6/14/06 | $35,990,000 |

EXHIBIT 11
166

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 159 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 160 of 190   Page
ID #:2243

| CUSIP | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 466285AA1 | J.P. Morgan Alternative Loan Trust 2006-A6 | J.P. Morgan Acceptance Corporation I | U.S. Central | 10/23/06 | $75,000,000 |
| 466285AC7 | J.P. Morgan Alternative Loan Trust 2006-A6 | J.P. Morgan Acceptance Corporation I | U.S. Central | 10/23/06 | $49,431,000 |
| 466285AD5 | J.P. Morgan Alternative Loan Trust 2006-A6 | J.P. Morgan Acceptance Corporation I | U.S. Central | 10/23/06 | $30,297,000 |
| 466285AE3 | J.P. Morgan Alternative Loan Trust 2006-A6 | J.P. Morgan Acceptance Corporation I | U.S. Central | 10/23/06 | $25,017,000 |
| 466286AA9 | J.P. Morgan Alternative Loan Trust 2006-A7 | J.P. Morgan Acceptance Corporation I | U.S. Central | 11/9/06 | $125,000,000 |
| 466286AC5 | J.P. Morgan Alternative Loan Trust 2006-A7 | J.P. Morgan Acceptance Corporation I | U.S. Central | 11/9/06 | $50,000,000 |
| 466286AD3 | J.P. Morgan Alternative Loan Trust 2006-A7 | J.P. Morgan Acceptance Corporation I | U.S. Central | 11/9/06 | $46,515,000 |
| 466286AE1 | J.P. Morgan Alternative Loan Trust 2006-A7 | J.P. Morgan Acceptance Corporation I | WesCorp | 11/9/06 | $27,138,168 |

EXHIBIT 11

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 160 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 161 of 190   Page
ID #:2244

| CUSIP | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 466287AA7 | J.P. Morgan Alternative Loan Trust 2007-A1 | J.P. Morgan Acceptance Corporation I | U.S. Central | 2/15/07 | $135,000,000 |
| 466278AC2 | J.P. Morgan Alternative Loan Trust 2007-A2 | J.P. Morgan Acceptance Corporation I | U.S. Central | 5/27/07 | $50,000,000 |
| 466278AC2 | J.P. Morgan Alternative Loan Trust 2007-A2 | J.P. Morgan Acceptance Corporation I | Members United | 5/30/07 | $20,000,000 |
| 466275AB0 | J.P. Morgan Alternative Loan Trust 2007-S1 | J.P. Morgan Acceptance Corporation I | Southwest | 5/15/07 | $10,010,000 |
| 46626LGF1 | J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | J.P. Morgan Acceptance Corporation I | U.S. Central | 2/24/06 | $18,000,000 |
| 46630XAF5 | J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | J.P. Morgan Acceptance Corporation I | U.S. Central | 5/3/07 | $25,870,000 |
| 46630XAD0 | J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | J.P. Morgan Acceptance Corporation I | Members United | 5/1/07 | $10,000,000 |
| 46630XAE8 | J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | J.P. Morgan Acceptance Corporation I | Southwest | 5/3/07 | $5,000,000 |

EXHIBIT 11

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 161 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 162 of 190   Page
ID #:2245

| CUSIP | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 46630CAE4 | J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | J.P. Morgan Acceptance Corporation I | U.S. Central | 6/7/07 | $46,299,000 |
| 46630CAF1 | J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | J.P. Morgan Acceptance Corporation I | U.S. Central | 6/7/07 | $10,000,000 |
| 46630CAD6 | J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | J.P. Morgan Acceptance Corporation I | Southwest | 6/707 | $8,000,000 |
| 46630KAU0 | J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | J.P. Morgan Acceptance Corporation I | U.S. Central | 6/12/07 | $28,434,000 |
| 46631KAD7 | J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | J.P. Morgan Acceptance Corporation I | Members United | 6/28/07 | $25,000,000 |

**Table 2**

| CUSIP | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 026935AD8 | American Home Mortgage Assets Trust 2007-3 | American Home Mortgage Assets LLC | WesCorp | 6/1/07 | $30,339,000 |
| 45662DAA3 | IndyMac INDX Mortgage Loan Trust 2006-AR29 | IndyMac MBS, Inc. | U.S. Central | 10/31/06 | $74,361,204 |
| 466286AE1 | J.P. Morgan Alternative Loan Trust 2006-A7 | J.P. Morgan Acceptance Corporation I | U.S. Central | 5/16/07 | $24,405,712 |
| 46629KAE9 | J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | J.P. Morgan Acceptance Corporation I | U.S. Central | 10/19/06 | $60,274,241 |
| 46628UAD0 | J.P. Morgan Alternative Loan Trust 2006-A3 | J.P. Morgan Acceptance Corporation I | Members United | 7/24/07 | $23,491,172 |

155

EXHIBIT 11
169

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 162 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1    Filed 06/23/11   Page 163 of 190   Page
ID #:2246

**Table 3**

*Credit Ratings*

| Moody's | S&P | Definitions | Grade Type |
|---------|-----|-------------|------------|
| Aaa | AAA | **Prime (Maximum Safety)** | |
| Aa1<br>Aa2<br>Aa3 | AA+<br>AA<br>AA- | **High Grade, High Quality** | **INVESTMENT GRADE** |
| A1<br>A2<br>A3 | A+<br>A<br>A- | **Upper Medium Grade** | |
| Baa1<br>Baa2<br>Baa3 | BBB+<br>BBB<br>BBB- | **Medium Grade** | |
| Ba2<br>Ba3 | BB<br>BB- | **Non-Investment Grade, or Speculative** | **SPECULATIVE GRADE** |
| B1<br>B2<br>B3 | B+<br>B<br>B- | **Highly Speculative, or Substantial Risk** | |
| Caa2<br>Caa3 | CCC+ | **In Poor Standing** | |
| Ca | CCC<br>CCC- | **Extremely Speculative** | |
| C | - | **May be in Default** | |
| - | D | **Default** | |

EXHIBIT 11
170

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 163 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 164 of 190   Page
ID #:2247

Table 4

| CREDIT RATINGS OF RMBS PURCHASES ORIGINAL/RECENT | | | | | | |
|---|---|---|---|---|---|---|
| CUSIP | ISSUER NAME | BUYER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
| 026935AD8 | American Home Mortgage Assets Trust 2007-3 | WesCorp | AAA 6/14/2007 | Aaa 6/14/2007 | D 2/24/2010 | C 2/2/2009 |
| 12479DAE8 | C-BASS 2006-CB7 Trust | U.S. Central | AAA 10/11/2006 | Aaa 10/24/2006 | CCC 8/4/2009 | C 4/12/2010 |
| 45662DAA3 | IndyMac INDX Mortgage Loan Trust 2006-AR29 | U.S. Central | AAA 10/3/2006 | Aaa 10/9/2006 | D 10/22/2010 | Caa3 1/29/2009 |
| 45662DAD7 | IndyMac INDX Mortgage Loan Trust 2006-AR29 | U.S. Central | AAA 10/3/2006 | Aaa 10/9/2006 | D 10/22/2010 | Caa3 1/29/2009 |
| 46628GAA7 | J.P. Morgan Alternative Loan Trust 2006-A2 | U.S. Central | AAA 5/2/2006 | Aaa 5/8/2006 | CCC 7/24/2009 | Caa3 9/17/2010 |
| 46628GAA7 | J.P. Morgan Alternative Loan Trust 2006-A2 | Members United | AAA 5-2-2006 | Aaa 5/8/2006 | CCC 7/24/2009 | Caa3 9/17/2010 |
| 46628GAD1 | J.P. Morgan Alternative Loan Trust 2006-A2 | U.S. Central | AAA 5/2/2006 | Aaa 5/8/2006 | CCC 7/24/2009 | Ca 9/17/2010 |
| 46628GAK5 | J.P. Morgan Alternative Loan Trust 2006-A2 | WesCorp | AAA 5/2/2006 | NR | D 12/17/2010 | NR |
| 46628UAD0 | J.P. Morgan Alternative Loan Trust 2006-A3 | U.S. Central | AAA 7/6/2006 | Aaa 7/18/2006 | CCC 7/24/2009 | Ca 9/17/2010 |
| 46628UAD0 | J.P. Morgan Alternative Loan Trust 2006-A3 | Members United | AAA 7/6/2006 | Aaa 7/18/2006 | CCC 7/24/2009 | Ca 9/17/2010 |
| 46628UAE8 | J.P. Morgan Alternative Loan Trust 2006-A3 | U.S. Central | AAA 7/6/2006 | Aaa 7/18/2006 | CCC 7/24/2009 | C 9/17/2010 |
| 466285AA1 | J.P. Morgan Alternative Loan Trust 2006-A6 | U.S. Central | AAA 11/1/2006 | Aaa 10/31/2006 | CCC 9/2/2009 | Ca 9/17/2010 |
| 466285AC7 | J.P. Morgan Alternative Loan Trust 2006-A6 | U.S. Central | AAA 11/1/2006 | Aaa 10/31/2006 | CCC 9/2/2009 | Caa2 9/17/2010 |
| 466285AD5 | J.P. Morgan Alternative Loan Trust 2006-A6 | U.S. Central | AAA 11/1/2006 | Aaa 10/31/2006 | CCC 9/2/2009 | C 9/17/2010 |
| 466285AE3 | J.P. Morgan Alternative Loan Trust 2006-A6 | U.S. Central | AAA 11/1/2006 | Aaa 10/31/2006 | CC 2/16/2010 | C 9/17/2010 |
| 466286AA9 | J.P. Morgan Alternative Loan Trust 2006-A7 | U.S. Central | AAA 12/4/2006 | Aaa 1/3/2007 | CCC 6/25/2009 | Caa3 9/17/2010 |
| 466286AC5 | J.P. Morgan Alternative Loan Trust 2006-A7 | U.S. Central | AAA 12/4/2006 | Aaa 1/3/2007 | CCC 6/25/2009 | Caa2 9/17/2010 |
| 466286AD3 | J.P. Morgan Alternative Loan Trust 2006-A7 | U.S. Central | AAA 12/4/2006 | Aaa 1/3/2007 | CCC 6/25/2009 | Ca 9/17/2010 |
| 466286AE1 | J.P. Morgan Alternative Loan Trust 2006-A7 | WesCorp | AAA 12/4/2006 | Aaa 1/3/2007 | D 3/18/2010 | C 9/17/2010 |
| 466286AE1 | J.P. Morgan Alternative Loan Trust 2006-A7 | U.S. Central | AAA 12/4/2006 | Aaa 1/3/2007 | D 3/18/2010 | C 9/17/2010 |
| 466287AA7 | J.P. Morgan Alternative Loan Trust 2007-A1 | U.S. Central | AAA 3/1/2007 | Aaa 3/14/2007 | D 11/24/2010 | Ca 9/17/2010 |
| 466278AC2 | J.P. Morgan Alternative Loan Trust 2007-A2 | U.S. Central | AAA 6/3/2007 | Aaa 6/11/2007 | CCC 9/1/2009 | Ca 9/17/2010 |
| 466278AC2 | J.P. Morgan Alternative Loan Trust 2007-A2 | Members United | AAA 6/3/2007 | Aaa 6/11/2007 | CCC 9/1/2009 | Ca 9/17/2010 |
| 466275AB0 | J.P. Morgan Alternative Loan Trust 2007-S1 | Southwest | AAA | Aaa 6/11/2007 | CCC 3/1/2010 | C 9/17/2010 |

EXHIBIT 11
171

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 164 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 165 of 190   Page
ID #:2248

| CREDIT RATINGS OF RMBS PURCHASES ORIGINAL/RECENT | | | | | | |
|---|---|---|---|---|---|---|
| CUSIP | ISSUER NAME | BUYER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
| 46626LGF1 | J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | U.S. Central | AAA 3/3/2006 | Aaa 3/10/2006 | CCC 8/4/2009 | Ca 12/28/2010 |
| 46629KAE9 | J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | U.S. Central | AAA 9/27/2006 | Aaa 10/2/2006 | CCC 10/6/2009 | Ca 3/24/2009 |
| 46630XAF5 | J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | U.S. Central | AAA 6/1/2007 | Aaa 5/15/2007 | CCC 8/4/2009 | Caa3 12/28/2010 |
| 46630XAD0 | J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | Members United | AAA | Aaa 5/31/2007 | CCC 3/2/2010 | Caa1 12/29/2010 |
| 46630XAE8 | J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | Southwest | AAA | Aaa 5/31/2007 | CCC 8/4/2009 | Caa3 12/29/2010 |
| 46630CAE4 | J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | U.S. Central | AAA 6/19/2007 | Aaa 6/15/2007 | CCC 8/4/2009 | Ca 7/14/2010 |
| 46630CAF1 | J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | U.S. Central | AA+ 6/19/2007 | Aa1 6/15/2007 | CCC 8/4/2009 | C 7/14/2010 |
| 46630CAD6 | J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | Southwest | AAA | Aaa 6/8/2007 | CCC 8/4/2009 | Caa2 12/29/2010 |
| 46631KAD7 | J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | Members United | AAA | Aaa 7/9/2007 | CCC 8/4/2009 | B3 12/29/2010 |
| 46630KAU0 | J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | U.S. Central | AAA 6/21/2007 | Aaa 6/29/2007 | CCC 8/4/2009 | Ca 7/14/2010 |

158

EXHIBIT 11
172

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 165 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 166 of 190   Page
ID #:2249

**Table 5**

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MONTH | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | American Home Mortgage Assets Trust 2007-3: Aggregate (P.S. dated June 5, 2007) | Zero (S-40) | 0% (June, p.10) | 4.99% (Aug., p.10) | 13.9% (Nov., p.10) | 27.47% (May, p.10) | 46.49% (May 2011, p.11) |
| | American Home Mortgage Assets Trust 2007-3: Group 1-1 | Zero (S-40) | 0% (June, p.12) | 2.62% (Aug., p.12) | 8.63% (Nov., p.12) | 23.58% (May, p.12) | 52.52% (May 2011, p.12) |
| 026935AD8 | American Home Mortgage Assets Trust 2007-3: Group 1-2 *Class I-2A-2 in Group I-2 (S-12) | Zero (S-40) | 0% (June, p.12) | 9.63% (Aug., p.12) | 23.04% (Nov., p.12) | 43.78% (May, p.12) | 62.39% (May 2011, p.12) |
| | American Home Mortgage Assets Trust 2007-3: Group 2-1 | Zero (S-40) | 0% (June, p.13) | 2.04% (Aug., p.13) | 5.74% (Nov., p.13) | 15.73% (May, p.13) | 42.32% (May 2011, p.13) |
| | American Home Mortgage Assets Trust 2007-3: Group 2-2 | Zero (S-40) | 0% (June, p.13) | 3.72% (Aug., p.13) | 12.44% (Nov., p.13) | 25.55% (May, p.13) | 42.85% (May 2011, p.13) |
| | American Home Mortgage Assets Trust 2007-3: Group 3 | Zero (S-40) | 0% (June, p.14) | 5.16% (Aug., p.14) | 16.35% (Nov., p.14) | 18.05% (May, p.14) | 13.85% (May 2011, p.14) |
| | C-BASS 2006-CB7 Trust:  Aggregate (P.S. dated October 2, 2006) | Zero ("Delinquency Status" table) | .77% (Oct., p.14) | 4.71% (Dec., p.14) | 9.9% (Mar., p.15) | 19.53% (Sept., p.16) | 48.74% (May 2011, p.18) |
| | C-BASS 2006-CB7 Trust: Group 1 Total | Zero ("Delinquency Status" table) | .94% (Oct., p.15) | 4.02% (Dec., p.15) | 9.11% (Mar., p.16) | 18.75% (Sept., p.17) | 49.06% (May 2011, p.19) |
| 12479DAE8 | C-BASS 2006-CB7 Trust: Group 2 Total *Class A-5 in Group 2 ("The Mortgage Loans" section) | Zero ("Delinquency Status" table) | .57% (Oct., p.18) | 5.53% (Dec., p.18) | 10.84% (Mar., p.19) | 18.76% (Sept., p.20) | 48.36% (May 2011, p.22) |
| 45662DAA3 45662DAD7 | IndyMac INDX Mortgage Loan Trust 2006-AR29 (P.S. dated September 28, 2006) | Zero (S-32) | 1.42% (Oct., p.10) | 3.47% (Dec., p.10) | 5.94% (Mar., p.10) | 11.07% (Sept., p.10) | 41.36% (May 2011, p.10) |
| | J.P. Morgan Alternative Loan Trust 2006-A2: Aggregate | | 1.53% (May, p.13) | 3% (July, p.13) | 4.21% (Oct., p.13) | 7.73% (Apr., p.12) | 42.27% (May 2011, p.12) |
| 46628GAA7 46628GAD1 | J.P. Morgan Alternative Loan Trust 2006-A2: Group 1 *Classes 1-A-1, 1-A-4 , and 1-A-5 in Group 1 (S-1) | Zero (S-22) | 2.15% (May, p.14) | 3.93% (July, p.14) | 6.02% (Oct., p.14) | 10.68% (Apr., p.13) | 45.61% (May 2011, p.13) |
| 46628GAK5 | J.P. Morgan Alternative Loan Trust 2006-A2: Group 2 *Class 2-A-5 in Group 2 (S-1) | Zero (S-22) | 1.2% (May, p.14) | 2.16% (July, p.14) | 2.54% (Oct., p.14) | 5.01% (Apr., p.13) | 36.67% (May 2011, p.13) |
| | J.P. Morgan Alternative Loan Trust 2006-A2: | Zero (S-22) | .95% (May, p.15) | 2.39% (July, | 5.4% (Oct., | 7.52% (Apr., p.14) | 42.39% (May 2011, p.14) |

159

EXHIBIT 11
173

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 166 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 167 of 190   Page
ID #:2250

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MONTH | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | Group 4 | | | p.15) | p.15) | | |
| | J.P. Morgan Alternative Loan Trust 2006-A2: Group 5 | Zero (S-22) | 1.28% (May, p.16) | 1.8% (July, p.16) | 2.31% (Oct., p.16) | 5.44% (Apr., p.15) | 45.89% (May 2011, p.15) |
| | J.P. Morgan Alternative Loan Trust 2006-A3: Aggregate (P.S. dated June 28, 2006) | Zero (S-20) | 1.42% (July, p.13) | 2.92% (Sept., p.13) | 4.59% (Dec., p.12) | 7.56% (June, p.12) | 46.87% (May 2011, p.12) |
| 46628UAD0 46628UAE8 | J.P. Morgan Alternative Loan Trust 2006-A3: Group 1 *Class 1-A-4 and 1-A-5 in Group 1 (S-4) | Zero (S-20) | 1.34% (July, p.14) | 3.21% (Sept., p.14) | 5.83% (Dec., p.13) | 9.13% (June, p.13) | 45.71% (May 2011, p.13) |
| | J.P. Morgan Alternative Loan Trust 2006-A3: Group 2 | Zero (S-20) | .56% (July, p.14) | 2.45% (Sept., p.14) | 2.93% (Dec., p.13) | 4.7% (June, p.13) | 48.75% (May 2011, p.14) |
| | J.P. Morgan Alternative Loan Trust 2006-A3: Group 3 | Zero (S-20) | 3.12% (July, p.15) | 2.43% (Sept., p.15) | 2.32% (Dec., p.14) | 6.23% (June, p.14) | 47.60% (May 2011, p.14) |
| | J.P. Morgan Alternative Loan Trust 2006-A6: Aggregate (P.S. dated October 27, 2006) | | 1.34% (Nov., p.11) | 3.56% (Jan., p.10) | 4.25% (Apr., p.10) | 9.49% (Oct., p.10) | 49.61% (May 2011, p.10) |
| 466285AA1 466285AC7 466285AD5 466285AE3 | J.P. Morgan Alternative Loan Trust 2006-A6: Group 1 *Class 1-A-1, 1-A-3, 1-A-4, and 1-A-5 in Group 1 (S-109) | Zero (S-19) | 1.8% (Nov., p.12) | 4.25% (Jan., p.11) | 5.18% (Apr., p.11) | 11.58% (Oct., p.11) | 55.18% (May 2011, p.11) |
| | J.P. Morgan Alternative Loan Trust 2006-A6: Group 2 | Zero (S-20) | .28% (Nov., p.12) | 1.97% (Jan., p.11) | 2.08% (Apr., p.11) | 4.56% (Oct., p.11) | 36.57% (May 2011, p.11) |
| | J.P. Morgan Alternative Loan Trust 2006-A7: Aggregate (P.S. dated November 28, 2006) | | 2.9% (Dec., p.14) | 3.82% (Feb., p.15) | 5.25% (May, p.14) | 12.55% (Nov., p.14) | 48.79% (May 2011, p.13) |
| 466286AA9 466286AC5 466286AD3 466286AE1 | J.P. Morgan Alternative Loan Trust 2006-A7: Group 1 *Class 1-A-1, 1-A-3, 1-A-4, and 1-A-5 in Group 1 (S-112) | Zero (S-19) | 3.38% (Dec., p.14) | 4.4% (Feb., p.15) | 5.8% (May, p.14) | 13.37% (Nov., p.14) | 49.14% (May 2011, p.13) |
| | J.P. Morgan Alternative Loan Trust 2006-A7: Group 2 | Zero (S-20) | 1.55% (Dec., p.15) | 2.15% (Feb., p.16) | 3.74% (May, p.15) | 10.29% (Nov., p.15) | 47.72% (May 2011, p.14) |
| | J.P. Morgan Alternative Loan Trust 2007-A1: Aggregate (P.S. dated February 26, 2007) | | 5.13% (Mar., p.16) | 5.11% (May, p.16) | 8.05% (Aug. p.17) | 21.02% (Feb., p.17) | 54.49% (May 2011, p.16) |

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 167 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 168 of 190   Page
ID #:2251

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MONTH | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 466287AA7 | J.P. Morgan Alternative Loan Trust 2007-A1: Group 1A **Class 1-A-1A in Pool 1 Senior Certificates ("Description of the Certificates" section)** | Zero ("Description of the Mortgage Pool" section) | 5.64% (Mar., p.16) | 6.56% (May, p.16) | 10.91% (Aug., p.17) | 25.94% (Feb., p.17) | 59.47% (May 2011, p.16) |
| 466287AA7 | J.P. Morgan Alternative Loan Trust 2007-A1: Group 1B **Class 1-A-1A in Pool 1 Senior Certificates ("Description of the Certificates" section)** | Zero ("Description of the Mortgage Pool" section) | 5.62% (Mar., p.17) | 4.24% (May, p.17) | 5.95% (Aug., p.18) | 19.75% (Feb., p.18) | 48.80% (May 2011, p.17) |
| | J.P. Morgan Alternative Loan Trust 2007-A1: Group 2 | Zero ("Description of the Mortgage Pool" section) | 4.71% (Mar., p.17) | 2.12% (May, p.17) | 3.29% (Aug., p.18) | 12.43% (Feb., p.18) | 54.49% (May 2011, p.17) |
| | J.P. Morgan Alternative Loan Trust 2007-A1: Group 3 | Zero ("Description of the Mortgage Pool" section) | 2.67% (Mar., p.18) | 3.03% (May, p.18) | 3.62% (Aug., p.19) | 11.82% (Feb., p.19) | 43.84% (May 2011, p.19) |
| | J.P. Morgan Alternative Loan Trust 2007-A2: Aggregate (P.S. dated May 31, 2007) | Zero ("Description of the Mortgage Pool" section) | 3.15% (June, p.16) | 7.91% (Aug., p.16) | 13.89% (Nov., p.16) | 25.61% (May, p.16) | 55.48% (May 2011, p.16) |
| 466278AC2 | J.P. Morgan Alternative Loan Trust 2007-A2: Group 1 **Class 1-2-A1 in Pool 1 Senior Certificates. ("Description of the Certificates" section)** | Zero ("Description of the Mortgage Pool" section) | 3.61% (June, p.17) | 7.2% (Aug., p.17) | 12.47% (Nov., p.17) | 24.69% (May, p.17) | |
| 466278AC2 | J.P. Morgan Alternative Loan Trust 2007-A2: Group 1A **Class 1-2-A1 in Pool 1 Senior Certificates ("Description of the Certificates" section)** | Zero ("Description of the Mortgage Pool" section) | Trustee report does not have % for a Group 1A | Trustee report does not have % for a Group 1A | Trustee report does not have % for a Group 1A | Trustee report does not have % for a Group 1A | 55.50% (Ma 2011, p.17) |
| 466278AC2 | J.P. Morgan Alternative Loan Trust 2007-A2: Group 1B **Class 1-2-A1 in Pool 1 Senior Certificates ("Description of the Certificates" section)** | Zero ("Description of the Mortgage Pool" section) | Trustee report does not have % for a Group 1B | Trustee report does not have % for a Group 1B | Trustee report does not have % for a Group 1B | Trustee report does not have % for a Group 1B | 61.32% (May 2011, p.17) |
| | J.P. Morgan Alternative Loan Trust 2007-A2: Group 2 | Zero ("Description of the Mortgage Pool" section) | 3.27% (June, p.17) | 9.64% (Aug., p.17) | 17.03% (Nov., p.17) | 31.45% (May, p.17) | 48.40% (May 2011, p.18) |
| | J.P. Morgan Alternative Loan Trust 2007-A2: | Zero ("Description of the Mortgage Pool" section) | 2.97% (June, p.18) | 4.08% (Aug., | 5.2% (Nov., | 10.4% (May, p.18) | 39.38% (May 2011, p.18) |

EXHIBIT 11
175

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 168 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 169 of 190   Page
ID #:2252

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MONTH | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | Group 3 | | | p.18) | p.18) | | |
| | J.P. Morgan Alternative Loan Trust 2007-A2: Group 4 | Zero ("Description of the Mortgage Pool" section) | 2.51% (June, p.18) | 4.95% (Aug., p.18) | 7.41% (Nov., p.18) | 8.58% (May, p.18) | 31.40% (May 2011, p.19) |
| | J.P. Morgan Alternative Loan Trust 2007-A2: Group 5 | Zero ("Description of the Mortgage Pool" section) | 0% (June, p.19) | .68% (Aug., p.19) | 4.77% (Nov., p.19) | 1.85% (May, p.19) | Trustee report does not have % for a Group 5 |
| 466275AB0 | J.P. Morgan Alternative Loan Trust 2007-S1 (Class A-2) | Zero ("Description of the Mortgage Pool" section) | 1.17% (June, p.9) | 3.51% (Aug., p.9) | 7.53% (Nov., p.9) | 13.76% (May, p.9) | 42.01% (May 2011, p.9) |
| | J.P. Morgan Mortgage Acquisition Corp. 2006-HE1:  Group 1 | 0.48% of the Group 1 mortgage loans were 30 to 59 days delinquent (S-11) | .42% (Mar., pp.8-11) | 1.62% (May, pp.9-13) | 5.19% (Aug., pp.9-13) | 12% (Feb., pp.10-14) | 46.02% (May 2011, S-13) |
| 46626LGF1 | J.P. Morgan Mortgage Acquisition Corp. 2006-HE1:  Group 2 *Class A-4 in Group 2 (S-3) | 0.63% of the Group 2 mortgage loans were 30 to 59 days delinquent. (S-11) | .88% (Mar., pp.8-11) | 3.25% (May, pp.9-13) | 6.06% (Aug., pp.9-13) | 17.39% (Feb., pp.10-14) | 50.85% (May 2011, S-14) |
| | J.P. Morgan Mortgage Acquisition Trust 2006-WMC3: Aggregate (P.S. dated August 22, 2006) | Approximately 0.55%, 1.11% and 0.95% of the mortgage loans in group 1, group 2 and the aggregate pool, respectively as of the cut-off date, were 30 to 59 days delinquent (S-19) | | | | 19.36% (July, p.9) | 51.48% (May 2011, S-11) |
| | J.P. Morgan Mortgage Acquisition Trust 2006-WMC3:  Group 1 | Approximately 0.55%, 1.11% and 0.95% of the mortgage loans in group 1, group 2 and the aggregate pool, respectively as of the cut-off date, were 30 to 59 days delinquent (S-19) | | | | 14.45% (July, p.11) | 50.38% (May 2011, S-13) |
| 46629KAE9 | J.P. Morgan Mortgage Acquisition Trust 2006-WMC3:  Group 2 *Class A-4 in Group 2 (S-9) | Approximately 0.55%, 1.11% and 0.95% of the mortgage loans in group 1, group 2 and the aggregate pool, respectively as of the cut-off date, were 30 to 59 days delinquent (S-19) | | | | 21.31% (July, p.11) | 52.02% (May 2011, S-14) |
| | J.P. Morgan Mortgage Acquisition Trust 2007-CH3: Aggregate (P.S. dated May 3, 2007) | Approximately 0.13%, 0.13% and 0.14% of the Mortgage Loans in the Aggregate Pool, Group 1 and Group 2, respectively, were 30 to 59 days delinquent; however, as of April 24, 2007, all of the Mortgage Loans were current. ("The Mortgage Loans" section) | 1.48% (May, p.10) | 3.9% (July, p.10) | 7.12% (Oct., p.10) | 18.47% (Apr., p.10) | 48.69% (May 2011, p.10) |
| | J.P. Morgan | Approximately 0.13%, | 1.15% | 2.91% | 5.69% | 15.6% | 47.69% (May |

EXHIBIT 11
176

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 169 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 170 of 190   Page
ID #:2253

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MONTH | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | Mortgage Acquisition Trust 2007-CH3:  Group 1 | 0.13% and 0.14% of the Mortgage Loans in the Aggregate Pool, Group 1 and Group 2, respectively, were 30 to 59 days delinquent; however, as of April 24, 2007, all of the Mortgage Loans were current. ("The Mortgage Loans" section) | (May, p.11) | (July, p.11) | (Oct., p.11) | (Apr., p.12) | 2011, p.15) |
| 46630XAF5 46630XAD0 46630XAE8 | J.P. Morgan Mortgage Acquisition Trust 2007-CH3:  Group 2 *Classes A-5 in Group 2 ("Designations" section) | Approximately 0.13%, 0.13% and 0.14% of the Mortgage Loans in the Aggregate Pool, Group 1 and Group 2, respectively, were 30 to 59 days delinquent; however, as of April 24, 2007, all of the Mortgage Loans were current ("The Mortgage Loans" section) | 1.74% (May, p.12) | 4.68% (July, p.12) | 8.26% (Oct., p.12) | 20.75% (Apr., p.14) | 49.50% (May 2011, p.20) |
| 46630CAF1 46630CAD6 | J.P. Morgan Mortgage Acquisition Trust 2007-CH4: Aggregate (P.S. dated June 7, 2007) *Class M-1 in Subordinate Certificates ("Designations" section) | Zero ("Description of the Mortgage Pool" section) | .84% (June, p.10) | 3.2% (Aug., p.10) | 7.89% (Nov., p.10) | 19.04% (May, p.10) | 47.83% (May 2011, p.10) |
| | J.P. Morgan Mortgage Acquisition Trust 2007-CH4:  Group 1 | Zero ("Description of the Mortgage Pool" section) | .54% (June, p.11) | 2.69% (Aug., p.11) | 6.25% (Nov., p.11) | 15.54% (May, p.12) | 45.92% (May 2011, p.15) |
| 46630CAE4 | J.P. Morgan Mortgage Acquisition Trust 2007-CH4:  Group 2 *Class A-5 in Group 2 ("Designations" section) | Zero ("Description of the Mortgage Pool" section) | 1.14% (June, p.12) | 3.71% (Aug., p.12) | 9.5% (Nov., p.12) | 22.47% (May, p.14) | 49.77% (May 2011, p.18) |
| | J.P. Morgan Mortgage Acquisition Trust 2007-HE1: Aggregate (P.S. dated June 14, 2007) | Zero ("Description of the Mortgage Pool" section) | 2.45% (June, p.12) | 7.6% (Aug. p.12) | 15.21% (Nov., p.12) | 27.41% (May, p.12) | 46.69% (May 2011, p.14) |
| | J.P. Morgan Mortgage Acquisition Trust 2007-HE1:  Group 1 | Zero ("Description of the Mortgage Pool") | .43% (June, p.13) | 2.15% (Aug., p.13) | 6.31% (Nov., p.13) | 14.68% (May, p.15) | 42.77% (May 2011, p.19) |
| 46630KAU0 | J.P. Morgan Mortgage Acquisition Trust 2007-HE1:  Group 2 *Class AV-4 in Group 2 ("Designations" section) | Zero ("Description of the Mortgage Pool" section) | 3.04% (June, p.14) | 9.2% (Aug., p.14) | 17.85% (Nov., p.14) | 31.33% (May, p.17) | 48.32% (May 2011, p.24) |
| 46631KAD7 | J.P. Morgan Mortgage | Zero ("Description of the Mortgage Pool" | 1.48% | 5.14% (Sept., | 9.02% (Dec., | 20.64% | 51.07% (May |

EXHIBIT 11

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 170 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1    Filed 06/23/11   Page 171 of 190   Page
ID #:2254

| CUSIP | OFFERINGS | RATE AT CUT-OFF DATE FOR OFFERING | 1 MONTH | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | Acquisition Trust 2007-CH5 (Class A-4) | | (July, p.10) | p.10) | p.10) | (June, p.10) | 2011, p.10) |

EXHIBIT 11
178

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 171 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 172 of 190   Page
ID #:2255

**Table 6**

| Originator Name | OTD % 2005 | OTD% 2006 | OTD % 2007 |
|---|---|---|---|
| American Home Mortgage Corp. | 91.9 | 62.4 | |
| American Mortgage Network, Inc. | | 90.3 | 71.9 |
| Ameriquest Mortgage Company | 91.4 | 95.8 | 96.7 |
| Argent Mortgage Company, L.L.C. | 80.6 | 87.4 | 89.4 |
| Countrywide Home Loans, Inc. | 98.5 | 96.5 | 98.4 |
| Flagstar Bank, FSB | 61 | 59.8 | 82.1 |
| GreenPoint Mortgage Funding, Inc. | 89.0 | 87.0 | 95.6 |
| IndyMac Bank, F.S.B. | 81.1 | 87.7 | 82.8 |
| JPMorgan Chase Bank, N.A. | 83.0 | 77.9 | 85.4 |
| M & T Mortgage Corporation | 73.1 | 70.7 | |
| New Century Mortgage Corporation | 92.4 | 84.2 | |
| NovaStar Mortgage, Inc. | 89.3 | 80.0 | 98.5 |
| Option One Mortgage Corporation | 92.2 | 72.7 | 58.2 |
| PHH Mortgage Corporation | 96.3 | 92.9 | 85.6 |
| Quicken Loans, Inc. | 89.5 | 86.7 | 91.3 |
| WMC Mortgage Corp. | 100 | 100 | 100 |

EXHIBIT 11
179

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 172 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 173 of 190   Page
ID #:2256

**Table 7**

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | American Pipe Tolling Commencement Date | American Pipe Tolling Most Recent Action |
|---|---|---|---|---|---|
| 45662DAD7 | IndyMac INDX Mortgage Loan Trust 2006-AR29 | U.S. Central | 9/26/06 | *IBEW Local 103 v. IndyMac*, BC405843 (Cal. Super. Ct. L.A. County) Complaint **Filed:  January 20, 2009**, consolidated into *In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-4583 (S.D.N.Y.) **Filed:  May 14, 2009** | *In re Indymac Mortgage-Backed Sec. Litig.*, No. 09-cv-4583 (S.D.N.Y.) Motion for Class Certification **PENDING:  December 10, 2010** |
| 45662DAA3 | IndyMac INDX Mortgage Loan Trust 2006-AR29 | U.S. Central | 10/31/06 | *IBEW Local 103 v. IndyMac*, BC405843 (Cal. Super. Ct. L.A. County) Complaint **Filed:  January 20, 2009**, consolidated into *In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-4583 (S.D.N.Y.) **Filed:  May 14, 2009** | *In re Indymac Mortgage-Backed Sec. Litig.*, No. 09-cv-4583 (S.D.N.Y.) Motion for Class Certification **PENDING:  December 10, 2010** |
| 46628GAK5 | J.P. Morgan Alternative Loan Trust 2006-A2 | WesCorp | 4/6/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed:  March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)) | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending:  May 7, 2010** |
| 46628GAA7 | J.P. Morgan Alternative Loan Trust 2006-A2 | U.S. Central | 4/6/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed:  March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)) | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending:  May 7, 2010** |
| 46628GAD1 | J.P. Morgan Alternative Loan Trust 2006-A2 | U.S. Central | 4/6/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed:  March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)) | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending:  May 7, 2010** |

EXHIBIT 11

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 173 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 174 of 190   Page
ID #:2257

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | American Pipe Tolling Commencement Date | American Pipe Tolling Most Recent Action |
|---|---|---|---|---|---|
| 46628GAA7 | J.P. Morgan Alternative Loan Trust 2006-A2 | Members United | 4/5/2006 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed:  March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)) | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending:  May 7, 2010** |
| 46628UAD0 | J.P. Morgan Alternative Loan Trust 2006-A3 | U.S. Central | 6/14/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed:  March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)) | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending:  May 7, 2010** |
| 46628UAE8 | J.P. Morgan Alternative Loan Trust 2006-A3 | U.S. Central | 6/14/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed:  March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)) | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending:  May 7, 2010** |
| 466285AA1 | J.P. Morgan Alternative Loan Trust 2006-A6 | U.S. Central | 10/23/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed:  March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)); *Public Employees' Ret. Sys. of Miss. v. Moodys*, No. 09-3209 (E.D.N.Y.) **Filed:  July 24, 2009** Consolidated No. 08-1713 (E.D.N.Y.), **Oct. 21, 2009** | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No.08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending:  May 7, 2010** |
| 466285AC7 | J.P. Morgan Alternative Loan Trust 2006-A6 | U.S. Central | 10/23/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed:  March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)); *Public Employees' Ret Sys. v. Moodys*, No. 09-3209 (E.D.N.Y.) Complaint **July 24, 2009** Consolidated into No. 08-1713 (E.D.N.Y.), **Oct. 21, 2009** | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending:  May 7, 2010** |

EXHIBIT 11

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 174 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 175 of 190   Page
ID #:2258

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | American Pipe Tolling Commencement Date | American Pipe Tolling Most Recent Action |
|---|---|---|---|---|---|
| 466285AD5 | J.P. Morgan Alternative Loan Trust 2006-A6 | U.S. Central | 10/23/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed: March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)); *Public Employees' Ret. Sys. of Miss. v. Moodys*, No. 09-3209 (E.D.N.Y.) Complaint **July 24, 2009** Consolidated into No. 08-1713 (E.D.N.Y.), **Oct. 21, 2009** | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending: May 7, 2010** |
| 466285AE3 | J.P. Morgan Alternative Loan Trust 2006-A6 | U.S. Central | 10/23/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed: March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)); *Public Employees' Ret. Sys. of Miss. v. Moodys*, No. 09-3209 (E.D.N.Y.) Complaint **July 24, 2009** Consolidated into No. 08-1713 (E.D.N.Y.), **Oct. 21, 2009** | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending: May 7, 2010** |
| 466286AE1 | J.P. Morgan Alternative Loan Trust 2006-A7 | WesCorp | 11/9/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed: March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)); *Public Employees' Ret. Sys. of Miss. v. Moodys*, No. 09-3209 (E.D.N.Y.) Complaint **July 24, 2009** Consolidated into No. 08-1713 (E.D.N.Y.), **Oct. 21, 2009** | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending: May 7, 2010** |

EXHIBIT 11
182

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 175 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 176 of 190   Page
ID #:2259

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | American Pipe Tolling Commencement Date | American Pipe Tolling Most Recent Action |
|---|---|---|---|---|---|
| 466286AA9 | J.P. Morgan Alternative Loan Trust 2006-A7 | U.S. Central | 11/9/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed: March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)); *Public Employees' Ret. Sys. of Miss. v. Moodys*, No. 09-3209 (E.D.N.Y.) Complaint **July 24, 2009** Consolidated into No. 08-1713 (E.D.N.Y.), **Oct. 21, 2009** | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending:  May 7, 2010** |
| 466286AC5 | J.P. Morgan Alternative Loan Trust 2006-A7 | U.S. Central | 11/9/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed: March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)); *Public Employees' Ret. Sys. of Miss. v. Moodys*, No. 09-3209 (E.D.N.Y.) Complaint **July 24, 2009** Consolidated into No. 08-1713 (E.D.N.Y.), **Oct. 21, 2009** | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending:  May 7, 2010** |
| 466286AD3 | J.P. Morgan Alternative Loan Trust 2006-A7 | U.S. Central | 11/9/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed:  March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)); *Public Employees' Ret. Sys. of Miss. v. Moodys*, No. 09-3209 (E.D.N.Y.) Complaint **July 24, 2009** Consolidated into No. 08-1713 (E.D.N.Y.), **Oct. 21, 2009** | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No.08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending:  May 7, 2010** |

EXHIBIT 11
183

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 176 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 177 of 190   Page
ID #:2260

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | American Pipe Tolling Commencement Date | American Pipe Tolling Most Recent Action |
|-------|---------------|-------|-----------|----------------------------------------|------------------------------------------|
| 466286AE1 | J.P. Morgan Alternative Loan Trust 2006-A7 | U.S. Central | 5/16/07 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed: March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)); *Public Employees' Ret. Sys. of Miss. v. Moodys*, No. 09-3209 (E.D.N.Y.) Complaint **July 24, 2009** Consolidated into No. 08-1713 (E.D.N.Y.), **Oct. 21, 2009** | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No.08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending: May 7, 2010** |
| 46629KAE9 | J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | U.S. Central | 10/19/06 | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-5675 (N.Y. Sup. Ct.) Complaint **Filed:  March 26, 2008** (Removed to No. 08-1713 (E.D.N.Y.)); *Public Employees' Ret. Sys. of Miss. v. Moodys*, No. 09-3209 (E.D.N.Y.) Complaint **July 24, 2009** Consolidated into No. 08-1713 (E.D.N.Y.), **Oct. 21, 2009** | *Plumbers & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713 (E.D.N.Y.) Motion To Dismiss Consolidated Class Action Complaint **Pending:  May 7, 2010** |
| 466278AC2 | J.P. Morgan Alternative Loan Trust 2007-A2 | U.S. Central | 5/27/07 | *Fort Worth Employees' v.  J.P. Morgan*, No. 600767-2009 (N.Y. Sup. Ct.) Complaint **March 12, 2009, Voluntary Dismissal May 7, 2010**  (Removed to No. 09-3701 (S.D.N.Y.)); *Fort Worth Employees' v. J.P. Morgan*, No. 09-3701 (S.D.N.Y.) Second Amended Complaint **July 8, 2010    Pending** | *Employees' Ret. Sys. of the Virgin Islands v. J.P. Morgan Chase & Co.*, No. 09-3701 (S.D.N.Y.) Order on Motion To Dismiss **Filed:  May 10, 2011** |
| 46630XAF5 | J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | U.S. Central | 5/3/07 | *Fort Worth Employees' v.  J.P. Morgan*, No. 600767-2009 (N.Y. Sup. Ct.) Complaint **March 12, 2009, Voluntary Dismissal May 7, 2010**  (Removed to No. 09-3701 (S.D.N.Y.)); *Fort Worth Employees' v. J.P. Morgan*, No. 09-3701 (S.D.N.Y.) Second Amended Complaint **July 8, 2010    Pending** | *Employees' Ret. Sys. of the Virgin Islands v. J.P. Morgan Chase & Co.*, No. 09-3701 (S.D.N.Y.) Order on Motion To Dismiss **Filed:  May 10, 2011** |

EXHIBIT 11

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 177 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1   Filed 06/23/11   Page 178 of 190   Page
ID #:2261

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | American Pipe Tolling Commencement Date | American Pipe Tolling Most Recent Action |
|---|---|---|---|---|---|
| 46630CAE4 | J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | U.S. Central | 6/7/07 | *Fort Worth Employees' v. J.P. Morgan*, No. 600767-2009 (N.Y. Sup. Ct.) Complaint **March 12, 2009, Voluntary Dismissal May 7, 2010** (Removed to No. 09-3701 (S.D.N.Y.)); *Fort Worth Employees' v. J.P. Morgan*, No. 09-3701 (S.D.N.Y.) Second Amended Complaint **July 8, 2010    Pending** | *Employees' Ret. Sys. of the Virgin Islands v. J.P. Morgan Chase & Co.*, No. 09-3701 (S.D.N.Y.) Order on Motion To Dismiss **Filed:  May 10, 2011** |
| 46630CAF1 | J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | U.S. Central | 6/7/07 | *Fort Worth Employees' v. J.P. Morgan*, No. 600767-2009 (N.Y. Sup. Ct.) Complaint **March 12, 2009, Voluntary Dismissal May 7, 2010** (Removed to No. 09-3701 (S.D.N.Y.)); *Fort Worth Employees' v. J.P. Morgan*, No. 09-3701 (S.D.N.Y.) Second Amended Complaint **July 8, 2010    Pending** | *Employees' Ret. Sys. of the Virgin Islands v. J.P. Morgan Chase & Co.*, No. 09-3701 (S.D.N.Y.) Order on Motion To Dismiss **Filed:  May 10, 2011** |
| 466278AC2 | J.P. Morgan Alternative Loan Trust 2007-A2 | Members United | 5/30/2007 | *Fort Worth Employees' v. J.P. Morgan*, No. 600767-2009 (N.Y. Sup. Ct.) Complaint **March 12, 2009, Voluntary Dismissal May 7, 2010** (Removed to No. 09-3701 (S.D.N.Y.)); *Fort Worth Employees' v. J.P. Morgan*, No. 09-3701 (S.D.N.Y.) Second Amended Complaint **July 8, 2010   Pending** | *Employees' Ret. Sys. of the Virgin Islands v. J.P. Morgan Chase & Co.*, No. 09-3701 (S.D.N.Y.) Order on Motion To Dismiss **Filed:  May 10, 2011** |

EXHIBIT 11

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 178 of 186
Case 2:10-cv-01597-GW  -MAN   Document 140-1    Filed 06/23/11   Page 179 of 190   Page
ID #:2262

## APPENDIX B

## Figure 1



EXHIBIT 11
186

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 179 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 180 of 190   Page
ID #:2263

## Figure 2

| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| American Home Mortgage Assets Trust 2007-3 | 41708 | 1 | $ - | $ 2,232,609 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 2 | $ 20,399,980 | $ 2,438,567 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 3 | $ 49,464,549 | $ 2,663,093 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 4 | $ 76,378,883 | $ 2,907,778 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 5 | $ 103,617,642 | $ 3,174,333 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 6 | $ 130,873,934 | $ 3,464,595 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 7 | $ 140,742,932 | $ 3,780,536 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 8 | $ 163,847,101 | $ 4,124,262 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 9 | $ 187,001,069 | $ 4,498,024 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 10 | $ 185,965,334 | $ 4,904,215 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 11 | $ 206,785,530 | $ 5,345,381 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 12 | $ 226,605,691 | $ 5,824,213 |



| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| C-Bass 2006-CB7 Trust | 39209 | 1 | $ - | $ 4,864,380 |
| C-Bass 2006-CB7 Trust | 39209 | 2 | $ 157,854 | $ 5,313,120 |
| C-Bass 2006-CB7 Trust | 39209 | 3 | $ 1,438,864 | $ 5,802,314 |
| C-Bass 2006-CB7 Trust | 39209 | 4 | $ 5,295,712 | $ 6,335,430 |
| C-Bass 2006-CB7 Trust | 39209 | 5 | $ 12,191,277 | $ 6,916,196 |
| C-Bass 2006-CB7 Trust | 39209 | 6 | $ 20,453,074 | $ 7,548,616 |
| C-Bass 2006-CB7 Trust | 39209 | 7 | $ 25,330,485 | $ 8,236,984 |
| C-Bass 2006-CB7 Trust | 39209 | 8 | $ 36,994,887 | $ 8,985,890 |
| C-Bass 2006-CB7 Trust | 39209 | 9 | $ 41,639,864 | $ 9,800,237 |
| C-Bass 2006-CB7 Trust | 39209 | 10 | $ 43,328,104 | $ 10,685,243 |
| C-Bass 2006-CB7 Trust | 39209 | 11 | $ 45,885,742 | $ 11,646,449 |
| C-Bass 2006-CB7 Trust | 39209 | 12 | $ 58,154,837 | $ 12,689,722 |



EXHIBIT 11
187

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 180 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 181 of 190   Page
ID #:2264

| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 1 | $            - | $      1,157,891 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 2 | $            - | $      1,264,706 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 3 | $            - | $      1,381,151 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 4 | $      183,945 | $      1,508,051 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 5 | $    4,809,404 | $      1,646,294 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 6 | $    7,319,041 | $      1,796,831 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 7 | $   12,634,590 | $      1,960,687 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 8 | $   13,756,491 | $      2,138,952 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 9 | $   16,926,173 | $      2,332,795 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 10 | $   19,661,215 | $      2,543,457 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 11 | $   17,447,693 | $      2,772,257 |
| IndyMac INDX Mortgage Loan Trust 2006-AR29 | 39100 | 12 | $   21,651,100 | $      3,020,592 |



| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 1 | $            - | $      1,837,349 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 2 | $      176,100 | $      2,006,844 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 3 | $      176,100 | $      2,191,620 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 4 | $    1,882,009 | $      2,392,986 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 5 | $    5,645,115 | $      2,612,350 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 6 | $    8,240,930 | $      2,851,224 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 7 | $   10,828,807 | $      3,111,231 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 8 | $   11,657,617 | $      3,394,104 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 9 | $   13,046,327 | $      3,701,695 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 10 | $   13,889,919 | $      4,035,975 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 11 | $   13,966,410 | $      4,399,037 |
| J.P. Morgan Alternative Loan Trust 2006-A2 | 37939 | 12 | $   14,709,284 | $      4,793,096 |



EXHIBIT 11

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 181 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 182 of 190   Page
ID #:2265

| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 1 | $ - | $ 938,438 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 2 | $ - | $ 1,025,009 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 3 | $ - | $ 1,119,384 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 4 | $ 436,000 | $ 1,222,233 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 5 | $ 2,085,800 | $ 1,334,274 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 6 | $ 5,078,487 | $ 1,456,281 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 7 | $ 6,278,298 | $ 1,589,081 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 8 | $ 10,232,056 | $ 1,733,560 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 9 | $ 11,152,254 | $ 1,890,664 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 10 | $ 10,206,033 | $ 2,061,400 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 11 | $ 10,294,486 | $ 2,246,836 |
| J.P. Morgan Alternative Loan Trust 2006-A3 | 38517 | 12 | $ 8,774,840 | $ 2,448,105 |



| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 1 | $ - | $ 1,094,900 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 2 | $ - | $ 1,195,904 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 3 | $ - | $ 1,306,015 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 4 | $ 3,236,864 | $ 1,426,011 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 5 | $ 5,353,713 | $ 1,556,733 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 6 | $ 9,486,872 | $ 1,699,081 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 7 | $ 10,732,752 | $ 1,854,022 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 8 | $ 12,429,553 | $ 2,022,590 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 9 | $ 14,767,018 | $ 2,205,887 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 10 | $ 16,860,421 | $ 2,405,089 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 11 | $ 20,792,706 | $ 2,621,442 |
| J.P. Morgan Alternative Loan Trust 2006-A6 | 39501 | 12 | $ 19,943,097 | $ 2,856,267 |



EXHIBIT 11

Case 2:11-cv-02341-EFM -JPO   Document 1     Filed 06/20/11    Page 182 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1    Filed 06/23/11   Page 183 of 190   Page
ID #:2266

| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 1 | $                           - | $         1,509,477 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 2 | $                           - | $         1,648,727 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 3 | $                           - | $         1,800,530 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 4 | $             2,828,633 | $         1,965,962 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 5 | $             5,855,085 | $         2,146,181 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 6 | $             6,458,278 | $         2,342,429 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 7 | $             6,047,569 | $         2,556,038 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 8 | $           14,381,198 | $         2,788,433 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 9 | $           20,665,842 | $         3,041,135 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 10 | $           28,076,471 | $         3,315,763 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 11 | $           30,698,876 | $         3,614,037 |
| J.P. Morgan Alternative Loan Trust 2006-A7 | 41240 | 12 | $           38,143,801 | $         3,937,778 |



| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 1 | $                           - | $         4,281,276 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 2 | $                 742,614 | $         4,676,224 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 3 | $           20,532,961 | $         5,106,778 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 4 | $           31,152,908 | $         5,575,988 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 5 | $           21,132,777 | $         6,087,136 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 6 | $           36,418,595 | $         6,643,746 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 7 | $           46,784,338 | $         7,249,598 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 8 | $           57,438,097 | $         7,908,731 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 9 | $           67,487,068 | $         8,625,460 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 10 | $           75,157,240 | $         9,404,378 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 11 | $           81,333,966 | $       10,250,363 |
| J.P. Morgan Mortgage Acquisition Trust 2006-WMC3 | 38913 | 12 | $           93,496,458 | $       11,168,576 |



EXHIBIT 11
190

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 183 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 184 of 190   Page
ID #:2267

| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 1 | $ - | $ 410,953 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 2 | $ - | $ 448,864 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 3 | $ - | $ 490,192 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 4 | $ 624,000 | $ 535,231 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 5 | $ 10,080,662 | $ 584,295 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 6 | $ 18,806,077 | $ 637,723 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 7 | $ 33,916,733 | $ 695,878 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 8 | $ 39,279,758 | $ 759,147 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 9 | $ 41,855,791 | $ 827,945 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 10 | $ 40,461,103 | $ 902,712 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 11 | $ 53,729,616 | $ 983,917 |
| J.P. Morgan Alternative Loan Trust 2007-A1 | 40928 | 12 | $ 51,706,996 | $ 1,072,055 |



| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 1 | $ - | $ 797,869.72 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 2 | $ 877,350.00 | $ 871,473.28 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 3 | $ 2,701,050.00 | $ 951,712.38 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 4 | $ 24,812,177.86 | $ 1,039,155.58 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 5 | $ 23,847,597.01 | $ 1,134,414.48 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 6 | $ 56,668,113.07 | $ 1,238,145.90 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 7 | $ 69,671,811.57 | $ 1,351,053.91 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 8 | $ 93,015,433.02 | $ 1,473,891.70 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 9 | $ 95,421,023.57 | $ 1,607,463.21 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 10 | $ 107,609,382.83 | $ 1,752,624.44 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 11 | $ 154,197,189.34 | $ 1,910,284.29 |
| J.P. Morgan Alternative Loan Trust 2007-A2 | 41347 | 12 | $ 166,153,037.14 | $ 2,081,404.89 |



EXHIBIT 11
191

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 184 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 185 of 190   Page
ID #:2268

| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 1 | $ 102,646 | $ 788,280 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 2 | $ 102,646 | $ 860,999 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 3 | $ 64,665 | $ 940,274 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 4 | $ 2,534,448 | $ 1,026,666 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 5 | $ 3,046,760 | $ 1,120,780 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 6 | $ 2,298,597 | $ 1,223,265 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 7 | $ 9,260,993 | $ 1,334,816 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 8 | $ 9,260,879 | $ 1,456,177 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 9 | $ 9,355,814 | $ 1,588,143 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 10 | $ 8,438,051 | $ 1,731,560 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 11 | $ 8,092,595 | $ 1,887,324 |
| J.P. Morgan Alternative Loan Trust 2007-S1 | 41376 | 12 | $ 34,688,542 | $ 2,056,388 |



| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 1 | $ 133,927 | $ 3,143,882 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 2 | $ 847,632 | $ 3,433,905 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 3 | $ 1,476,714 | $ 3,750,075 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 4 | $ 4,886,555 | $ 4,094,631 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 5 | $ 7,534,711 | $ 4,469,984 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 6 | $ 11,554,439 | $ 4,878,722 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 7 | $ 16,132,788 | $ 5,323,618 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 8 | $ 20,648,434 | $ 5,807,642 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 9 | $ 22,135,172 | $ 6,333,959 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 10 | $ 25,650,302 | $ 6,905,945 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 11 | $ 31,246,799 | $ 7,527,179 |
| J.P. Morgan Mortgage Acquisition Corp. 2006-HE1 | 36906 | 12 | $ 36,044,045 | $ 8,201,453 |

EXHIBIT 11
192

Case 2:11-cv-02341-EFM -JPO   Document 1    Filed 06/20/11   Page 185 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 186 of 190   Page
ID #:2269

| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 1 | $ 419,989 | $ 4,870,631 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 2 | $ 499,987 | $ 5,319,948 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 3 | $ 9,129,384 | $ 5,809,771 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 4 | $ 7,543,059 | $ 6,343,572 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 5 | $ 14,369,392 | $ 6,925,084 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 6 | $ 21,127,603 | $ 7,558,317 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 7 | $ 34,569,959 | $ 8,247,569 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 8 | $ 46,387,317 | $ 8,997,438 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 9 | $ 65,543,969 | $ 9,812,831 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 10 | $ 79,103,448 | $ 10,698,974 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 11 | $ 92,545,292 | $ 11,661,416 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH3 | 41483 | 12 | $ 107,215,715 | $ 12,706,029 |



| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 1 | $ - | $ 5,150,476 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 2 | $ 622,257 | $ 5,625,608 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 3 | $ 6,293,652 | $ 6,143,574 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 4 | $ 14,490,054 | $ 6,708,045 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 5 | $ 24,518,310 | $ 7,322,968 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 6 | $ 33,402,099 | $ 7,992,584 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 7 | $ 43,866,860 | $ 8,721,437 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 8 | $ 59,290,433 | $ 9,514,390 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 9 | $ 69,562,994 | $ 10,376,632 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 10 | $ 83,867,036 | $ 11,313,689 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 11 | $ 92,504,511 | $ 12,331,428 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH4 | 41498 | 12 | $ 106,184,655 | $ 13,436,060 |



EXHIBIT 11
193

Case 2:11-cv-02341-EFM -JPO   Document 1   Filed 06/20/11   Page 186 of 186
Case 2:10-cv-01597-GW -MAN   Document 140-1   Filed 06/23/11   Page 187 of 190   Page
ID #:2270

| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 1 | $ - | $ 6,224,765 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 2 | $ 1,863,699 | $ 6,799,000 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 3 | $ 13,681,618 | $ 7,425,004 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 4 | $ 25,684,470 | $ 8,107,212 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 5 | $ 16,447,504 | $ 8,850,396 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 6 | $ 33,011,572 | $ 9,659,681 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 7 | $ 54,500,563 | $ 10,540,559 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 8 | $ 69,681,554 | $ 11,498,906 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 9 | $ 86,428,125 | $ 12,540,995 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 10 | $ 100,411,688 | $ 13,673,504 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 11 | $ 110,528,495 | $ 14,903,523 |
| J.P. Morgan Mortgage Acquisition Trust 2007-CH5 | 42238 | 12 | $ 125,377,886 | $ 16,238,560 |



| Deal Name | ABSNet Deal Id | Period | Actual Cum. Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 1 | 542,655 | $ 2,866,753 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 2 | $ - | $ 3,131,211 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 3 | $ 7,922,743 | $ 3,419,511 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 4 | $ 20,129,145 | $ 3,733,695 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 5 | $ 31,403,557 | $ 4,075,961 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 6 | $ 43,238,857 | $ 4,448,669 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 7 | $ 56,337,997 | $ 4,854,349 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 8 | $ 65,897,112 | $ 5,295,706 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 9 | $ 76,400,420 | $ 5,775,630 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 10 | $ 85,314,823 | $ 6,297,195 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 11 | $ 89,730,712 | $ 6,863,668 |
| J.P. Morgan Mortgage Acquisition Trust 2007-HE1 | 41517 | 12 | $ 94,300,781 | $ 7,478,506 |



180

EXHIBIT 11
194

# Exhibit 12

EXHIBIT 12
195



National Credit Union Administration   Office of Public &
1775 Duke Street   Congressional Affairs
Alexandria, Va. 22134   (703) 518-6336
www.ncua.gov   dsmall@ncua.gov

## *NCUA Media Release*

# NCUA Suing Securities Firms to Recover Billions

## *Recoveries will benefit all federally insured credit unions*

**ALEXANDRIA, Va. (June 20, 2011)** – The National Credit Union Administration filed two suits today against securities firms alleging violations of federal and state securities laws and misrepresentations in the sale of hundreds of securities. Additional law suits may follow in order to recover losses from the purchase of securities that caused the failures of five, large wholesale credit unions.

As liquidating agent for the failed corporate credit unions, NCUA has a statutory duty to seek recoveries from responsible parties in order to minimize the cost of any failure to its insurance funds and the credit union industry. The first two suits were filed today against J.P. Morgan Securities, LLC, and RBS Securities, Inc.

"NCUA has a responsibility to do everything in our power to seek maximum recoveries from those involved in the issuing, underwriting and sale of the faulty securities that resulted in the failures of five of the largest wholesale credit unions," said NCUA Board Chairman Debbie Matz. "NCUA's legal actions are based on ongoing investigations of individuals and entities responsible for selling these securities to the failed institutions.  By these actions we intend to hold responsible parties accountable. The first two actions involve damages in excess of $800 million. We expect to file additional actions and seek a total amount of damages in the billions of dollars. Those who caused the problems in the wholesale credit unions should pay for the losses now being paid by retail credit unions."

NCUA's suits claim the sellers, issuers and underwriters of the questionable securities made numerous material misrepresentations in the offering documents. These misrepresentations caused the corporate credit unions that bought the notes to believe the risk of loss associated with the investment was minimal, when in fact the risk was substantial. The corporate credit unions invested in mortgage-backed securities that experienced dramatic, unprecedented declines in value, effectively rendering the institutions insolvent. These suits are the culmination of lengthy investigations into the circumstances surrounding the purchases of these securities.

NCUA officials are also discussing the losses with a number of other sellers, issuers and underwriters. If NCUA is unable to reach reasonable settlements on behalf of the liquidated credit unions with these additional parties, the agency will likely bring additional lawsuits.

**- MORE -**

*"Protecting credit unions and the consumers who own them through effective regulation"*

EXHIBIT 12
196

*Page 2*
*NCUA Media Release – Continued*
*Lawsuits*



Any recoveries from these legal actions would reduce the total losses resulting from the failure of the five corporate credit unions. Losses from those failures must be paid from the Temporary Corporate Credit Union Stabilization Fund or the National Credit Union Share Insurance Fund. Expenditures from these funds must be repaid through assessments against all federally insured credit unions. Thus, any recoveries would help to reduce the amount of future assessments on credit unions.

In addition to these suits, NCUA has taken a number of actions to mitigate losses to the credit union system from these corporate failures. Among the actions taken:

- After placing these five corporate credit unions into liquidation, NCUA re-securitized the problematic mortgage-backed securities and sold them in the marketplace with a government-backed guarantee. This action garnered approximately $28.3 billion in proceeds.
- NCUA established a temporary share guarantee for shares on deposit at corporate credit unions.
- NCUA established bridge corporate credit unions in conservatorship to ensure the services provided to consumer credit unions continued during the resolution and transition period.
- NCUA is working with members of the bridges to transition services to new entities where possible.

The five wholesale credit unions placed into NCUA conservatorship and now liquidated are: U.S. Central, Western Corporate, Southwest Corporate, Members United Corporate, and Constitution Corporate.

Corporate credit unions are wholesale credit unions that provide various services to retail credit unions, which in turn serve consumers, or "natural persons." Natural person credit unions rely on corporate credit unions to provide them such services as check clearing, electronic payments and investments.

NCUA filed the first two suits in the Federal District Court for the District of Kansas, the former headquarters of U.S. Central. To obtain copies of the complaints, visit the respective courts' websites or the Pacer reporting service. The complaints also will be posted to NCUA's website at the following links: J. P. Morgan Complaint; RBS Complaint.

*NCUA is the independent federal agency created by the U.S. Congress to regulate, charter and supervise federal credit unions. With the backing of the full faith and credit of the U.S. Government, NCUA operates and manages the National Credit Union Share Insurance Fund, insuring the deposits of more than 90 million account holders in all federal credit unions and the overwhelming majority of state-chartered credit unions.*

**- NCUA -**

---

EXHIBIT 12
197