# EXHIBIT 13

EXHIBIT 13

8

1  MARC M. SELTZER (54534)
   mseltzer@susmangodfrey.com
2  BRYAN J.E. CAFORIO (261265)
   bcaforio@susmangodfrey.com
3  SUSMAN GODFREY L.L.P.
   1901 Avenue of the Stars, Suite 950
4  Los Angeles, California 90067-6029
   Telephone: (310) 789-3100
5  Fax: (310) 789-3150

6  GEORGE A. ZELCS
   gzelcs@koreintillery.com
7  KOREIN TILLERY LLC
   205 North Michigan Avenue, Suite 1950
8  Chicago, Illinois 60601
   Telephone: (312) 641-9760
9  Fax: (312) 641-9751

10 Attorneys for Plaintiff National Credit Union
   Administration Board

11
   (See Signature Page for Names and Addresses
12 of Additional Counsel for Plaintiffs)

13              **UNITED STATES DISTRICT COURT**

14              **CENTRAL DISTRICT OF CALIFORNIA**

15                    **WESTERN DIVISION**

16 NATIONAL CREDIT UNION                  **L A C V 1 1 - 5 8 8 7** MMM(RZ)
   ADMINISTRATION BOARD, as
17 Liquidating Agent of Western Corporate   Case No.
18 Federal Credit Union,

19              Plaintiff,
                    vs.
20
   RBS SECURITIES, INC., f/k/a RBS        **COMPLAINT FOR DAMAGES**
21 GREENWICH CAPITAL MARKETS,             **FOR VIOLATION OF THE**
   INC.; GREENWICH CAPITAL                **SECURITIES ACT OF 1933 AND**
22 ACCEPTANCE, INC.; AMERICAN             **THE CALIFORNIA CORPORATE**
   HOME MORTGAGE ASSETS LLC;             **SECURITIES LAW OF 1968**
23 INDYMAC MBS, INC.; LARES ASSET
   SECURITIZATION, INC.; NOMURA
24 ASSET ACCEPTANCE CORP.;               **JURY TRIAL DEMANDED**
   NOMURA HOME EQUITY LOAN,
25 INC.; and WACHOVIA MORTGAGE
   LOAN TRUST, LLC,
26
                    Defendants
27

28

   1616146v1/012661

EXHIBIT 13
9

FILED
CLERK, U.S. DISTRICT COURT

JUL 1 8 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ....................................................................... 1

II.   PARTIES AND RELEVANT NON-PARTIES ........................................... 6

III.  JURISDICTION AND VENUE .................................................................. 9

IV.   MORTGAGE ORIGINATION AND THE SECURITIZATION PROCESS ................................................................................................. 9

V.    RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT ................ 12

VI.   WESCORP'S PURCHASES ..................................................................... 15

VII.  THE ORIGINATORS SYSTEMATICALLY DISREGARDED THE UNDERWRITING GUIDELINES STATED IN THE OFFERING DOCUMENTS ......................................................................................... 17

      A.    The Surge in Mortgage Delinquency and Defaults Shortly After the Offerings and the High OTD Practices of the Originators Demonstrate Systematic Disregard of Underwriting Standards .......... 18

      B.    The Surge in Actual Versus Expected Cumulative Losses Is Evidence of the Originators' Systematic Disregard of Underwriting Standards ........................................................... 29

      C.    The Collapse of the Certificates' Credit Ratings Is Evidence of Systematic Disregard of Underwriting Guidelines ............................ 42

      D.    Revelations Subsequent to the Offerings Show That the Originators Systematically Disregarded Underwriting Standards ....... 42

            1.    The Systematic Disregard of Underwriting Standards Was Pervasive as Revealed After the Collapse ......................................................................... 42

            2.    American Home's Systematic Disregard of Underwriting Standards ................................................. 49

            3.    Countrywide Home Loans, Inc.'s Systematic Disregard of Underwriting Standards ..................... 53

            4.    First National Bank of Nevada's Systematic Disregard of Underwriting Standards ..................... 62

            5.    IndyMac Bank's Systematic Disregard of Underwriting Standards ............................................. 63

EXHIBIT 13
10

6.  Option One Mortgage Corporation's Systematic Disregard of Underwriting Standards ..................................... 68

7.  Silver State Mortgage Company's Systematic Disregard of Underwriting Standards ..................................... 69

8.  WaMu's Systematic Disregard of Underwriting Standards ...................................................................... 71

VIII. THE OFFERING DOCUMENTS CONTAINED UNTRUE STATEMENTS OF MATERIAL FACT ....................................... 83

A.  Untrue Statements Concerning Evaluation of the Borrower's Capacity and Likelihood To Repay the Mortgage Loan ...................... 86

B.  Untrue Statements Concerning Reduced Documentation Programs ...................................................................... 111

C.  Untrue Statements Concerning Loan-to-Value Ratios ...................... 117

D.  Untrue Statements Concerning Credit Enhancement ........................ 120

IX. THE CLAIMS ARE TIMELY ................................................. 123

X.  CLAIMS FOR RELIEF ...................................................... 127

EXHIBIT 13
11

1        Plaintiff, National Credit Union Administration Board ("NCUA Board")

2 brings this action in its capacity as Liquidating Agent of Western Corporate Federal

3 Credit Union ("WesCorp") against RBS Securities, Inc. ("RBS") (f/k/a RBS

4 Greenwich Capital Markets, Inc.) as underwriter and seller, and against Greenwich

5 Capital Acceptance, Inc.; American Home Mortgage Assets LLC; IndyMac MBS,

6 Inc.; Lares Asset Securitization, Inc.; Nomura Asset Acceptance Corp.; Nomura

7 Home Equity Loan, Inc.; and, Wachovia Mortgage Loan Trust, LLC (collectively,

8 the "Issuer Defendants") as issuers, of certain residential mortgage-backed

9 securities ("RMBS") purchased by WesCorp, and alleges as follows:

10 **I.**      **NATURE OF THE ACTION**

11        1.      This action arises out of the sale of RMBS to WesCorp where RBS

12 acted as underwriter and/or seller of the RMBS.

13        2.      Virtually all of the RMBS sold to WesCorp were rated as triple-A (the

14 same rating as United States Treasury Bonds) at the time of issuance.

15        3.      The Issuer Defendants issued and RBS underwrote and sold the RMBS

16 pursuant to registration statements, prospectuses, and/or prospectus supplements

17 (collectively, the "Offering Documents"). These Offering Documents contained

18 untrue statements of material fact or omitted to state material facts in violation of

19 Sections 11 and 12(a)(2) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C.

20 §§ 77k, 77l(a)(2) ("Section 11" and "Section 12(a)(2)," respectively), and the

21 California Corporate Securities Law of 1968, Cal. Corp. Code §§ 25000, *et seq.*

22 ("California Corporate Securities Law").

23        4.      The NCUA Board expressly disclaims and disavows any allegation in

24 this complaint that could be construed as alleging fraud.

25        5.      The Offering Documents described, among other things, the mortgage

26 underwriting standards of the originators (the "Originators") that made the

27 mortgages that were pooled and served as the collateral for the RMBS purchased by

28 WesCorp.

1616146v1/012661                          1

EXHIBIT 13
12

6.     The Offering Documents represented that the Originators adhered to the underwriting guidelines set out in the Offering Documents for the mortgages in the pools collateralizing the RMBS.  In fact, the Originators had systematically abandoned the stated underwriting guidelines described in the Offering Documents. Because the mortgages in the pools collateralizing the RMBS were largely underwritten without adherence to the underwriting standards stated in the Offering Documents, the RMBS were significantly riskier than represented in the Offering Documents.  Indeed, a material percentage of the borrowers whose mortgages comprised the RMBS were all but certain to become delinquent or default shortly after origination.  As a result, the RMBS were destined from inception to perform poorly.

7.     These untrue statements and omissions of fact were material because the value of RMBS is largely a function of the cash flow from the principal and interest payments on the mortgage loans collateralizing the RMBS.  Thus, the performance of the RMBS is tied to the borrower's ability to repay the loan.

8.     WesCorp purchased the RMBS listed in Table 1 (infra) through initial offerings directly from RBS by means of prospectuses or oral communications. Thus, RBS is liable for material untrue statements and omissions of fact under Section 11, Section 12(a)(2), and/or the California Corporate Securities Law for the RMBS listed in Table 1.

1616146v1/012661

2

EXHIBIT 13
13

## Table 1

| CUSIP[1] | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 65538DAB1 | Alternative Loan Trust 2006-AR4 | Nomura Asset Acceptance Corporation | WesCorp | 11/17/06 | $12,778,000 |
| 026935AD8 | American Home Mortgage Assets Trust 2007-3 | American Home Mortgage Assets LLC | WesCorp | 6/1/07 | $30,339,000 |
| 32027NXE6 | First Franklin Mortgage Loan Trust 2005-FFH4 | Financial Asset Securities Corp. | WesCorp | 11/30/05 | $10,000,000 |
| 41162CAD3 | HarborView 2006-10 | Greenwich Capital Acceptance, Inc. | WesCorp | 10/18/06 | $90,000,000 |
| 41162GAB8 | HarborView 2006-11 | Greenwich Capital Acceptance, Inc. | WesCorp | 10/27/06 | $18,934,000 |
| 41162DAG4 | HarborView 2006-12 | Greenwich Capital Acceptance, Inc. | WesCorp | 10/19/06 | $80,000,000 |
| 41162DAH2 | HarborView 2006-12 | Greenwich Capital Acceptance, Inc. | WesCorp | 11/29/06 | $120,000,000 |
| 41162NAD9 | HarborView 2006-14 | Greenwich Capital Acceptance, Inc. | WesCorp | 12/5/06 | $60,000,000 |
| 41162NAH0 | HarborView 2006-14 | Greenwich Capital Acceptance, Inc. | WesCorp | 12/5/06 | $99,827,000 |
| 41161GAE3 | HarborView 2006-8 | Greenwich Capital Acceptance, Inc. | WesCorp | 8/1/06 | $105,693,000 |
| 41161XAM8 | HarborView 2006-9 | Greenwich Capital Acceptance, Inc. | WesCorp | 8/18/06 | $100,000,000 |

[1] "CUSIP" stands for "Committee on Uniform Securities Identification Procedures." A CUSIP number is used to identify most securities, including certificates of RMBS. See CUSIP Number, http://www.sec.gov/answers/cusip.htm.

EXHIBIT 13
14

| CUSIP[1] | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 41164MAF4 | HarborView 2007-1 | Greenwich Capital Acceptance, Inc. | WesCorp | 2/14/07 | $48,602,000 |
| 41164MAP2 | HarborView 2007-1 | Greenwich Capital Acceptance, Inc. | WesCorp | 2/16/07 | $56,000,000 |
| 41164LAC3 | HarborView 2007-2 | Greenwich Capital Acceptance, Inc. | WesCorp | 3/1/07 | $55,000,000 |
| 41164YAD3 | HarborView 2007-4 | Greenwich Capital Acceptance, Inc. | WesCorp | 5/30/07 | $98,667,000 |
| 41165AAC6 | HarborView 2007-5 | Greenwich Capital Acceptance, Inc. | WesCorp | 6/26/07 | $55,000,000 |
| 41165AAD4 | HarborView 2007-5 | Greenwich Capital Acceptance, Inc. | WesCorp | 6/26/07 | $71,000,000 |
| 45667SAN7 | IndyMac INDX Mortgage Loan Trust 2006-AR35 | IndyMac MBS, Inc. | WesCorp | 11/28/06 | $180,000,000 |
| 45667SAP2 | IndyMac INDX Mortgage Loan Trust 2006-AR35 | IndyMac MBS, Inc. | WesCorp | 11/28/06 | $20,000,000 |
| 55028CAA3 | Luminent Mortgage Trust 2007-1 | Lares Asset Securitization, Inc. | WesCorp | 1/23/07 | $35,000,000 |
| 55028CAB1 | Luminent Mortgage Trust 2007-1 | Lares Asset Securitization, Inc. | WesCorp | 1/23/07 | $20,400,000 |
| 61915RCL8 | MortgageIT Mortgage Loan Trust 2006-1 | Greenwich Capital Acceptance, Inc. | WesCorp | 2/17/06 | $35,710,500 |

EXHIBIT 13

15

| CUSIP[1] | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 65537KAB6 | Nomura Home Equity Loan, Inc., Home Equity Loan Trust, Series 2007-1 | Nomura Home Equity Loan, Inc. | WesCorp | 1/23/07 | $40,000,000 |
| 65537KAC4 | Nomura Home Equity Loan, Inc., Home Equity Loan Trust, Series 2007-1 | Nomura Home Equity Loan, Inc. | WesCorp | 1/23/07 | $30,000,000 |
| 83611MJM1 | Soundview Home Loan Trust 2005-OPT4 | Financial Asset Securities Corp. | WesCorp | 11/22/05 | $18,037,000 |

9.     WesCorp purchased each RMBS listed in Table 2 (infra) pursuant to and traceable to a registration statement containing an untrue statement of a material fact or that omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.  RBS was an underwriter for each of the securities listed in Table 2 and is therefore liable under Section 11.

### Table 2

| CUSIP | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 41161XAN6 | HarborView 2006-9 | Greenwich Capital Acceptance, Inc. | WesCorp | 3/8/07 | $22,810,706 |
| 41164MAP2 | HarborView 2007-1 | Greenwich Capital Acceptance, Inc. | WesCorp | 3/12/07 | $6,921,395 |
| 55028CAE5 | Luminent Mortgage Trust 2007-1 | Lares Asset Securitization, Inc. | WesCorp | 3/1/07 | $25,074,560 |
| 92978GAC3 | Wachovia Mortgage Loan Trust, Series 2006-ALT1 | Wachovia Mortgage Loan Trust, LLC | WesCorp | 11/30/06 | $44,376,000 |

EXHIBIT 13
16

10.    The RMBS WesCorp purchased suffered a significant drop in market value.    WesCorp has suffered significant losses from those RMBS purchased despite the NCUA Board's mitigation efforts.

II.    **PARTIES AND RELEVANT NON-PARTIES**

11.    The National Credit Union Administration ("NCUA") is an independent agency of the Executive Branch of the United States Government that, among other things, charters and regulates federal credit unions, and operates and manages the National Credit Union Share Insurance Fund ("NCUSIF") and the Temporary Corporate Credit Union Stabilization Fund ("TCCUSF").  The NCUSIF insures the deposits of account holders in all federal credit unions and the majority of state-chartered credit unions.  The TCCUSF was created in 2009 to allow the NCUA to borrow funds from the United States Department of the Treasury ("Treasury Department") for the purposes of stabilizing corporate credit unions under conservatorship or liquidation, or corporate credit unions threatened with conservatorship or liquidation.  The NCUA must repay all monies borrowed from the Treasury Department for the purposes of the TCCUSF by 2021.  The NCUA has regulatory authority over state-chartered credit unions that have their deposits insured by the NCUSIF.  The NCUA is under the management of the NCUA Board. See Federal Credit Union Act, 12 U.S.C. §§ 1751, 1752a(a) ("FCU Act").

12.    WesCorp was a federally chartered corporate credit union with its offices and principal place of business in San Dimas, California.  As a corporate credit union, WesCorp provided investment and financial services to other credit unions.

13.    The NCUA Board placed WesCorp into conservatorship on March 20, 2009, pursuant to its authority under the FCU Act, 12 U.S.C. § 1786(h).  On October 1, 2010, the NCUA Board placed WesCorp into involuntary liquidation pursuant to 12 U.S.C. §§ 1766(a), 1787(a)(1)(A), and appointed itself Liquidating Agent.  Pursuant to 12 U.S.C. § 1787(b)(2)(A), the NCUA Board as Liquidating

EXHIBIT 13
17

1   Agent has succeeded to all rights, titles, powers, and privileges of WesCorp and of

2   any member, account holder, officer, or director of WesCorp, with respect to

3   WesCorp and its assets, including the right to bring the claims asserted by them in

4   this action.   As Liquidating Agent, the NCUA Board has all the powers of the

5   members, directors, officers, and committees of WesCorp, see 12 U.S.C. §

6   1786(h)(8), and succeeds to all rights, titles, powers, and privileges of WesCorp,

7   see 12 U.S.C. § 1787(b)(2)(A).   The NCUA Board may also sue on WesCorp's

8   behalf. *See* 12 U.S.C. §§ 1766(b)(3)(A), 1787(b)(2), 1789(a)(2).

9       14.     Prior to being placed into conservatorship and involuntary liquidation,

10   WesCorp was the second largest corporate credit union in the United States.

11      15.     Any recoveries from this legal action will reduce the total losses

12   resulting from the failure of WesCorp.   Losses from WesCorp's failure must be

13   paid from the NCUSIF or the TCCUSF.   Expenditures from these funds must be

14   repaid through assessments against all federally insured credit unions.   Because of

15   the expenditures resulting from WesCorp's failure, federally insured credit unions

16   will experience larger assessments, thereby reducing federally insured credit

17   unions' net worth.   Reductions in net worth can adversely affect the dividends that

18   individual members of credit unions receive for the savings on deposit at their

19   credit union.   Reductions in net worth can also make loans for home mortgages and

20   automobile purchases more expensive and difficult to obtain.   Any recoveries from

21   this action will help to reduce the amount of any future assessments on federally

22   insured credit unions throughout the system, reducing the negative impact on

23   federally insured credit unions' net worth.   Recoveries from this action will benefit

24   credit unions and their individual members by increasing net worth resulting in

25   more efficient and lower-cost lending practices.

26      16.     Defendant RBS Securities Inc. is a United States Securities and

27   Exchange Commission ("SEC") registered broker-dealer.   RBS Securities, Inc. is a

28   wholly-owned subsidiary of The Royal Bank of Scotland Group.   Prior to 2009,

EXHIBIT 13
18

1    RBS Securities, Inc. was known as "RBS Greenwich Capital Markets, Inc."   In

2    2000, The Royal Bank of Scotland acquired Greenwich Capital Markets, Inc.,

3    renaming it "RBS Greenwich Capital Markets, Inc."

4         17.    RBS acted as an underwriter of all the RMBS that are the subject of

5    this Complaint and that are listed in Tables 1 and 2 (supra).  RBS is a Delaware

6    corporation with its principal place of business in Connecticut.

7         18.    Greenwich Capital Acceptance, Inc. is the depositor and issuer of the

8    HarborView 2007-5, HarborView 2007-4, HarborView 2007-2, HarborView 2007-

9    1, HarborView 2006-14, HarborView 2006-12, HarborView 2006-11, HarborView

10   2006-10, HarborView 2006-9, and HarborView 2006-8 offerings.   Greenwich

11   Capital Acceptance, Inc. is a Delaware corporation with its principal place of

12   business in Maryland.

13        19.    American Home Mortgage Assets LLC is the depositor and issuer of

14   the American Home Mortgage Assets Trust 2007-3 offering.   American Home

15   Mortgage Assets LLC is a Delaware corporation with its principal place of business

16   in New York.

17        20.    IndyMac MBS, Inc. is the depositor and issuer of the IndyMac INDX

18   Mortgage Loan Trust 2006-AR35 offering.   IndyMac MBS, Inc. is a Delaware

19   corporation with its principal place of business in California.

20        21.    Lares Asset Securitization, Inc. is the depositor and issuer of the

21   Luminent Mortgage Trust 2007-1 offering.   Lares Asset Securitization, Inc. is a

22   Delaware corporation with its principal place of business in California.

23        22.    Nomura Asset Acceptance Corp. is the depositor and issuer of the

24   Alternative Loan Trust 2006-AR4 offering.  Nomura Asset Acceptance Corp. is a

25   Delaware corporation with its principal place of business in New York.

26        23.    Nomura Home Equity Loan, Inc. is the depositor and issuer of the

27   Nomura Home Equity Loan, Inc., Home Equity Loan Trust, Series 2007-1

28

EXHIBIT 13
19

1  ("Nomura HELT 2007-1") offering.   Nomura Home Equity Loan, Inc. is a

2  Delaware corporation with its principal place of business in New York.

3      24.   Wachovia Mortgage Loan Trust, LLC is the depositor and issuer of the

4  Wachovia Mortgage Loan Trust, Series 2006-ALT1 offering.   Wachovia Mortgage

5  Loan Trust, LLC is a Delaware corporation with its principal place of business in

6  North Carolina.

7  **III.   JURISDICTION AND VENUE**

8      25.   This Court has subject matter jurisdiction pursuant to:  (a) 12 U.S.C. §

9  1789(a)(2), which provides that "[a]ll suits of a civil nature at common law or in

10  equity to which the [NCUA Board] shall be a party shall be deemed to arise under

11  the laws of the United States, and the United States district courts shall have

12  original jurisdiction thereof, without regard to the amount in controversy"; and (b)

13  28 U.S.C. § 1345, which provides that "the district courts shall have original

14  jurisdiction of all civil actions, suits or proceedings commenced by the United

15  States, or by any agency or officer thereof expressly authorized to sue by Act of

16  Congress."

17      26.   Venue is proper in this District under Section 22 of the Securities Act,

18  15 U.S.C. § 77v(a), because the transactions at issue occurred in San Dimas,

19  California, the headquarters of WesCorp.  This Court has personal jurisdiction over

20  each Defendant because they offered/sold the RMBS at issue in this Complaint to

21  WesCorp in this District; prepared/disseminated the Offering Documents

22  containing untrue statements or omissions of material fact as alleged herein to

23  WesCorp in this District; and/or are residents of/conduct business in this District.

24  **IV.   MORTGAGE ORIGINATION AND THE SECURITIZATION**

25        **PROCESS**

26      27.   RMBS are asset-backed securities.   A pool or pools of residential

27  mortgages are the assets that back or collateralize the RMBS certificates purchased

28  by investors.

1616146v1/012661

9

EXHIBIT 13
20

28.   Because residential mortgages are the assets collateralizing RMBS, the origination of mortgages commences the process that leads to the creation of RMBS.  Originators decide whether to loan potential borrowers money to purchase residential real estate through a process called mortgage underwriting.   The originator applies its underwriting standards or guidelines to determine whether a particular borrower is qualified to receive a mortgage for a particular property.  The underwriting guidelines consist of a variety of metrics including:  the borrower's debt, income, savings, credit history, and credit score; whether the property will be owner-occupied; and the amount of the loan compared to the value of the property at issue (the "loan-to-value" or "LTV" ratio), among other things.   Underwriting guidelines are designed to ensure that:  (1) the borrower has the means to repay the loan, (2) the borrower will likely repay the loan, and (3) the loan is secured by sufficient collateral in the event of default.

29.   Historically, originators made mortgage loans to borrowers and held the loans.   Originators profited as they collected monthly principal and interest payments directly from the borrower.   Originators also retained the risk that the borrower would default on the loan.

30.   This changed in the 1970s when the Government National Mortgage Association ("Ginnie Mae"), the Federal National Mortgage Association ("Fannie Mae"), and the Federal Home Loan Mortgage Corporation ("Freddie Mac") began purchasing "conforming loans" (loans underwritten in accordance with Fannie Mae and Freddie Mac underwriting guidelines) from originators and "securitizing" them for resale to investors as RMBS.

31.   More recently, originators, usually working with investment banks, began securitizing "non-conforming" loans.   Non-conforming loans (loans not written in compliance with Fannie Mae or Freddie Mac guidelines) are also known as "nonprime" or "private label" loans and include "Alt-A" and "subprime" loans. Despite the non-conforming nature of the underlying mortgages, the securitizers of

1616146v1/012661

10

EXHIBIT 13
21

such RMBS were able to obtain triple-A credit ratings by using "credit enhancement" (explained *infra*) when they securitized the non-conforming loans.

32.    On information and belief, all of the loans collateralizing the RMBS at issue in this Complaint are non-conforming mortgage loans.

33.    The issuance of RMBS collateralized by non-conforming loans peaked in 2006.  The securitization process shifted the originators' focus from ensuring the ability of borrowers to repay their mortgages to ensuring that the originator could process (and obtain fees from) an ever-larger loan volume for distribution as RMBS.  This practice is known as "originate-to-distribute" ("OTD").

34.    Securitization begins with a "sponsor" that purchases loans in bulk from one or more originators.  The sponsor transfers title of the loans to an entity called the "depositor."

35.    The depositor transfers the loans to a trust called the "issuing entity."

36.    The issuing entity issues "notes" and/or "certificates" representing an ownership interest in the cash flow from the mortgage pool underlying the securities (*i.e.*, the principal and interest generated as borrowers make monthly payments on the mortgages in the pool).

37.    The depositor files required documents (such as registration statements and prospectuses) with the SEC so that the certificates can be offered to the public.

38.    One or more "underwriters"—like RBS—then sell the certificates to investors.

39.    A loan "servicer" collects payments from borrowers on individual mortgages as part of a pool of mortgages, and the issuing entity allocates and distributes the income stream generated from the mortgage loan payments to the RMBS investors.

40.    Figure 1 (*infra*) depicts a typical securitization process.

1616146v1/012661                                11

EXHIBIT 13
22

1

**Figure 1**



20    41.    Because securitization, as a practical matter, shifts the risk of default

21 on the mortgage loans from the originator of the loan to the RMBS investor, the

22 originator's adherence to mortgage underwriting guidelines as represented in the

23 offering documents with respect to the underlying mortgage loans is critical to the

24 investors' ability to evaluate the expected performance of the RMBS.

25    **V.    RMBS CREDIT RATINGS AND CREDIT ENHANCEMENT**

26    42.    RMBS offerings are generally divided into slices or "tranches," each

27 of which represents a different level of risk.    RMBS certificates denote the

28 particular tranches of the security purchased by the investor.

1616146v1/012661                              12

EXHIBIT 13
23

43.     The credit rating for an RMBS reflects an assessment of the creditworthiness of that RMBS and indicates the level of risk associated with that RMBS.    Standard & Poor's ("S&P") and Moody's Investors Service, Inc. ("Moody's") are the credit rating agencies that assigned credit ratings to the RMBS in this case.

44.     The credit rating agencies use letter-grade rating systems as shown in Table 3 (infra).

**Table 3**
*Credit Ratings*

| Moody's | S&P | Definitions | Grade Type |
|---|---|---|---|
| Aaa | AAA | Prime (Maximum Safety) | INVESTMENT GRADE |
| Aa1 Aa2 Aa3 | AA+ AA AA- | High Grade, High Quality | |
| A1 A2 A3 | A+ A A- | Upper Medium Grade | |
| Baa1 Baa2 Baa3 | BBB+ BBB BBB- | Medium Grade | |
| Ba2 Ba3 | BB BB- | Non-Investment Grade, or Speculative | SPECULATIVE GRADE |
| B1 B2 B3 | B+ B B- | Highly Speculative, or Substantial Risk | |
| Caa2 Caa3 | CCC+ | In Poor Standing | |
| Ca | CCC CCC- | Extremely Speculative | |
| C | - | May be in Default | |
| - | D | Default | |

45.     Moody's purportedly awards the coveted "Aaa" rating to structured finance products that are "of the highest quality, with minimal credit risk." Moody's Investors Service, *Moody's Rating Symbols & Definitions* at 6 (August 2003), *available at* http://www.rbcpa.com/Moody's_ratings_and_definitions.pdf. Likewise, S&P rates a product "AAA" when the "obligor's capacity to meet its

EXHIBIT 13
24

1   financial commitment on the obligation is extremely strong."  Standard & Poor's,

2   *Ratings Definitions, available at*  http://www.standardandpoors.com/ratings/

3   articles/en/us/ ?assetID=1245303711350.

4       46.    In fact, RMBS could not be sold unless they received one of the

5   highest "investment grade" ratings on most tranches from one or more credit rating

6   agencies, because the primary market for RMBS is institutional investors, such as

7   WesCorp, that are generally limited to buying only securities with the highest credit

8   ratings.  *See, e.g.*, NCUA Credit Risk Management Rule, 12 C.F.R. § 704.6(d)(2)

9   (2010) (prohibiting corporate credit unions from investing in securities rated below

10  AA-); *but see, e.g.*, Removing References to Credit Ratings in Regulations;

11  Proposing Alternatives to the Use of Credit Ratings, 76 Fed. Reg. 11,164 (proposed

12  Mar. 1, 2011) (to be codified at 12 C.F.R. pts. 703, 704, 709, and 742) (NCUA's

13  proposed rule eliminating the use of credit ratings for guidance in investment

14  decisions by credit unions).

15      47.    While the pool of mortgages underlying the RMBS may not have been

16  sufficient to warrant a triple-A credit rating, various forms of "credit enhancement"

17  were used to obtain a triple-A rating on the higher tranches of RMBS.

18      48.    One form of credit enhancement is "structural subordination."  The

19  tranches, and their risk characteristics relative to each other, are often analogized to

20  a waterfall.  Investors in the higher or "senior" tranches are the first to be paid as

21  income is generated when borrowers make their monthly payments.  After investors

22  in the most senior tranche are paid, investors in the next subordinate or "junior"

23  tranche are paid, and so on down to the most subordinate or lowest tranche.

24      49.    In the event mortgages in the pool default, the resulting loss is

25  absorbed by the subordinate tranches first.

26      50.    Accordingly, senior tranches are deemed less risky than subordinate

27  tranches and therefore receive higher credit ratings.

28

1616146v1/012661

14

EXHIBIT 13
25

51. Another form of credit enhancement is overcollateralization. Overcollateralization is the inclusion of a higher dollar amount of mortgages in the pool than the par value of the security. The spread between the value of the pool and the par value of the security acts as a cushion in the event of a shortfall in expected cash flow.

52. Other forms of credit enhancement include "excess spread," monoline insurance, obtaining a letter of credit, and "cross-collateralization." "Excess spread" involves increasing the interest rate paid to the purchasers of the RMBS relative to the interest rate received on the cash flow from the underlying mortgages. Monoline insurance, also known as "wrapping" the deal, involves purchasing insurance to cover losses from any defaults. Letters of credit can also be purchased to cover defaults. Finally, some RMBS are "cross-collateralized," *i.e.*, when a tranche in an RMBS experiences rapid prepayments or disproportionately high realized losses, principal and interest collected from another tranche is applied to pay principal or interest, or both, to the senior certificates in the loan group experiencing rapid prepayment or disproportionate losses.

## VI. WESCORP'S PURCHASES

53. WesCorp purchased only the highest-rated tranches of RMBS. All but two were rated triple-A at the time of issuance. These securities have since been downgraded below investment grade just a few years after they were sold (*see infra* Table 4).

**Table 4**

| CREDIT RATINGS OF RMBS PURCHASES ORIGINAL/RECENT | | | | | | |
|---|---|---|---|---|---|---|
| CUSIP | ISSUER NAME | BUYER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
| 65538DAB1 | Alternative Loan Trust 2006-AR4 | WesCorp | AAA 12/4/2006 | Aaa 11/30/2006 | D 8/19/2009 | C 9/2/2010 |

EXHIBIT 13
26

| CREDIT RATINGS OF RMBS PURCHASES ORIGINAL/RECENT | | | | | | |
|---|---|---|---|---|---|---|
| CUSIP | ISSUER NAME | BUYER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
| 026935AD8 | American Home Mortgage Assets Trust 2007-3 | WesCorp | AAA 6/14/2007 | Aaa 6/14/2007 | D 2/24/2010 | C 2/2/2009 |
| 32027NXE6 | First Franklin Mortgage Loan Trust 2005-FFH4 | WesCorp | AA 12/28/2005 | Aa2 12/22/2005 | B- 8/4/2009 | C 4/6/2010 |
| 41162CAD3 | HarborView 2006-10 | WesCorp | AAA 11/22/2006 | Aaa 11/21/2006 | CC 5/11/2011 | C 12/5/2010 |
| 41162GAB8 | HarborView 2006-11 | WesCorp | AAA 12/22/2006 | Aaa 12/20/2006 | CC 2/16/2010 | C 11/19/2010 |
| 41162DAG4 | HarborView 2006-12 | WesCorp | AAA 12/19/2006 | Aaa 12/13/2006 | CCC 7/24/2009 | C 12/5/2010 |
| 41162DAH2 | HarborView 2006-12 | WesCorp | AAA 12/19/2006 | Aaa 12/13/2006 | AA+ 11/8/2010 | Aa3 11/23/2008 |
| 41162NAD9 | HarborView 2006-14 | WesCorp | AAA 12/27/2006 | Aaa 12/22/2006 | CCC 8/14/2009 | C 11/19/2010 |
| 41162NAH0 | HarborView 2006-14 | WesCorp | AAA 12/27/2006 | Aaa 12/22/2006 | D 6/23/2010 | C 11/19/2010 |
| 41161GAE3 | HarborView 2006-8 | WesCorp | AAA 9/5/2006 | Aaa 8/4/2006 | D 9/24/2010 | C 12/5/2010 |
| 41161XAM8 | HarborView 2006-9 | WesCorp | AAA 10/18/2006 | Aaa 10/4/2006 | CCC 4/15/2009 | C 12/5/2010 |
| 41161XAN6 | HarborView 2006-9 | WesCorp | AAA 10/18/2006 | Aaa 10/4/2006 | CCC 8/14/2009 | C 12/5/2010 |
| 41164MAF4 | HarborView 2007-1 | WesCorp | NR | Aaa 2/26/2007 | NR | C 2/20/2009 |
| 41164MAP2 | HarborView 2007-1 | WesCorp | AAA 3/22/2007 | Aaa 3/9/2007 | CCC 8/14/2009 | C 12/5/2010 |
| 41164LAC3 | HarborView 2007-2 | WesCorp | AAA 4/3/2007 | Aaa 3/30/2007 | CCC 8/14/2009 | C 12/5/2010 |
| 41164YAD3 | HarborView 2007-4 | WesCorp | NR | Aaa 6/14/2007 | NR | C 12/5/2010 |
| 41165AAC6 | HarborView 2007-5 | WesCorp | AAA 7/26/2007 | Aaa 7/12/2007 | CCC 7/24/2009 | C 12/5/2010 |
| 41165AAD4 | HarborView 2007-5 | WesCorp | AAA 7/26/2007 | Aaa 7/12/2007 | D 5/25/2010 | C 12/5/2010 |
| 45667SAN7 | IndyMac INDX Mortgage Loan Trust 2006-AR35 | WesCorp | AAA 12/1/2006 | Aaa 11/29/2006 | D 3/18/2011 | Caa3 1/29/2009 |
| 45667SAP2 | IndyMac INDX Mortgage Loan Trust 2006-AR35 | WesCorp | AAA 12/1/2006 | Aaa 11/29/2006 | D 12/24/2009 | C 10/12/2010 |
| 55028CAA3 | Luminent Mortgage Trust 2007-1 | WesCorp | AAA 2/1/2007 | Aaa 1/25/2007 | CCC 7/24/2009 | Caa3 12/14/2010 |
| 55028CAB1 | Luminent Mortgage Trust 2007-1 | WesCorp | AAA 2/1/2007 | Aaa 1/25/2007 | CC 2/16/2010 | C 12/14/2010 |

EXHIBIT 13
27

| CREDIT RATINGS OF RMBS PURCHASES ORIGINAL/RECENT | | | | | | |
|---|---|---|---|---|---|---|
| CUSIP | ISSUER NAME | BUYER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
| 55028CAE5 | Luminent Mortgage Trust 2007-1 | WesCorp | AAA 2/1/2007 | Aaa 1/25/2007 | D 6/23/2010 | C 12/5/2010 |
| 61915RCL8 | MortgageIT Mortgage Loan Trust 2006-1 | WesCorp | AAA 3/2/2006 | Aaa 2/22/2006 | D 2/24/2010 | C 12/9/2010 |
| 65537KAB6 | Nomura Home Equity Loan, Inc., Home Equity Loan Trust, Series 2007-1 | WesCorp | AAA 2/2/2007 | Aaa 1/31/2007 | D 11/25/2009 | Ca 9/2/2010 |
| 65537KAC4 | Nomura Home Equity Loan, Inc., Home Equity Loan Trust, Series 2007-1 | WesCorp | AAA 2/2/2007 | Aaa 1/31/2007 | D 6/25/2009 | C 9/2/2010 |
| 83611MJM1 | Soundview Home Loan Trust 2005-OPT4 | WesCorp | AA 12/1/2005 | NR | CCC 8/4/2009 | NR |
| 92978GAC3 | Wachovia Mortgage Loan Trust, Series 2006-ALT1 | WesCorp | AAA 1/3/2007 | Aaa 12/27/2006 | B- 2/2/2010 | Caa2 1/14/2010 |

54. At the time of purchase, WesCorp was not aware of the untrue statements or omissions of material facts in the Offering Documents of the RMBS. If WesCorp had known about the Originators' pervasive disregard of underwriting standards—contrary to the representations in the Offering Documents—WesCorp would not have purchased the certificates.

55. The securities' substantial loss of market value has injured WesCorp and the NCUA Board.

## VII. THE ORIGINATORS SYSTEMATICALLY DISREGARDED THE UNDERWRITING GUIDELINES STATED IN THE OFFERING DOCUMENTS

56. The performance and value of RMBS are largely contingent upon borrowers repaying their mortgages. The loan underwriting guidelines ensure that the borrower has the means to repay the mortgage and that the RMBS is secured by

EXHIBIT 13
28

1   sufficient collateral in the event of reasonably anticipated defaults on underlying

2   mortgage loans.

3       57.    With respect to RMBS collateralized by loans written by originators

4   that systematically disregarded their stated underwriting standards, the following

5   pattern is present:

6           (a)    a surge in borrower delinquencies and defaults on the mortgages

7                 in the pools (*see infra* Section VII.A and Table 5);

8           (b)    actual losses to the underlying mortgage pools within the first 12

9                 months after the offerings vastly exceeded expected losses (*see*

10                 *infra* Section VII.B and Figure 2); and,

11           (c)    a high percentage of the underlying mortgage loans were

12                 originated for distribution, as explained below (*see infra* Table 6

13                 and accompanying allegations).

14       58.    These factors support a finding that the Originators failed to originate

15   the mortgages in accordance with the underwriting standards stated in the Offering

16   Documents.

17       59.    This conclusion is further corroborated by reports that the Originators

18   that contributed mortgage loans to the RMBS at issue in this Complaint abandoned

19   the underwriting standards described in the RMBS Offering Documents. *See infra*

20   Section VII.D.

21       **A.**    **The Surge in Mortgage Delinquency and Defaults Shortly After**

22             **the Offerings and the High OTD Practices of the Originators**

23             **Demonstrate Systematic Disregard of Underwriting Standards**

24       60.    Residential mortgages are generally considered delinquent if no

25   payment has been received for more than 30 days after payment is due. Residential

26   mortgages where no payment has been received for more than 90 days (or three

27   payment cycles) are generally considered to be in default.

28

1616146v1/012661                    18

EXHIBIT 13
29

61.     The surge in delinquencies and defaults following the offerings evidences the systematic flaws in the Originators' underwriting process (*see infra* Table 5).

62.     The Offering Documents reported zero or near zero delinquencies and defaults at the time of the offerings (*see infra* Table 5).

63.     The pools of mortgages collateralizing the RMBS experienced delinquency and default rates as high as 9.63% after only three months, up to 23.04% at six months, and reaching 43.78% at one year (*see infra* Table 5).

64.     As of May 2011, nearly half (45.09%) of the mortgage collateral across all of the RMBS that WesCorp purchased was in delinquency, bankruptcy, foreclosure, or was real estate owned ("REO"), which means that a bank or lending institution owns the property after a failed sale at a foreclosure auction (*see infra* Table 5).

65.     Table 5 (*infra*) reflects the delinquency, foreclosure, bankruptcy, and REO rates on the RMBS as to which claims are asserted in this Complaint. The data presented in the last five columns are from the trustee reports (dates and page references as indicated in the parentheticals). The shadowed rows reflect the group of mortgages in the pool underlying the specific tranches purchased by WesCorp; however, some trustee reports include only the aggregate data. For the RMBS with multiple groups, aggregate information on all the groups is included because the tranches are cross-collateralized.

**Table 5**

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 65538DAB1 | Alternative Loan Trust 2006-AR4 Aggregate (P.S. dated November 30, 2006) | Zero. (S-34) | .27% (Dec., p.9) | 2.69% (Feb., p.9) | 7.32% (May, p.9) | 17.63% (Nov., p.9) | 42.39% (May 2011, p.9) |

EXHIBIT 13
30

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | American Home Mortgage Assets Trust 2007-3 Aggregate (June 5, 2007) | Zero. (S-40) | 0% (June, p.10) | 4.99% (Aug., p.10) | 13.90% (Nov., p.10) | 27.47% (May, p.10) | 46.49% (May 2011, p.11) |
| | American Home Mortgage Assets Trust 2007-3: Group I-1 | Zero. (S-40) | 0% (June, p.12) | 2.62% (Aug., p.12) | 8.63% (Nov., p.12) | 23.58% (May, p.12) | 52.52% (May 2011, p.12) |
| 026935AD8 | American Home Mortgage Assets Trust 2007-3: Group I-2 *Class I-2A-2 in Group I-2. (S-12) | Zero. (S-40) | 0% (June, p.12) | 9.63% (Aug., p.12) | 23.04% (Nov., p.12) | 43.78% (May, p.12) | 62.39% (May 2011, p.12) |
| | American Home Mortgage Assets Trust 2007-3: Group II-1 | Zero. (S-40) | 0% (June, p.13) | 2.04% (Aug., p.13) | 5.74% (Nov., p.13) | 15.73% (May, p.13) | 42.32% (May 2011, p.13) |
| | American Home Mortgage Assets Trust 2007-3: Group II-2 | Zero. (S-40) | 0% (June, p.13) | 3.72% (Aug., p.13) | 12.44% (Nov., p.13) | 25.55% (May, p.13) | 42.85% (May 2011, p.13) |
| | American Home Mortgage Assets Trust 2007-3: Group III | Zero. (S-40) | 0% (June, p.14) | 5.16% (Aug., p.14) | 16.35% (Nov., p.14) | 18.05% (May, p.14) | 13.85% (May 2011, p.14) |
| | First Franklin Mortgage Loan Trust 2005-FFH4 Aggregate (P.S. dated November 30, 2005) | | .80% (Dec., p.12) | 2.16% (Feb., p.12) | 3.83% (May, p.12) | 9.64% (Nov., p.12) | 49.43% (May 2011, p.13) |
| 32027NXE6 | First Franklin Mortgage Loan Trust 2005-FFH4 Group 1 *Class M-2 in Groups 1 and 2. (S-72) | | .73% (Dec., p.13) | 1.38% (Feb., p.13) | 2.58% (May, p.13) | 8.66% (Nov., p.13) | 46.37% (May 2011, p.14) |
| 32027NXE6 | First Franklin Mortgage Loan Trust 2005-FFH4 Group 2 *Class M-2 in Groups 1 and 2. (S-72) | | .88% (Dec., p.14) | 3.09% (Feb., p.14) | 5.39% (May, p.14) | 10.92% (Nov., p.14) | 54.40% (May 2011, p.15) |

EXHIBIT 13
31

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | HarborView 2006-10 Aggregate (P.S. dated November 10, 2006) | .15% of the mortgage loans were 30-59 days delinquent. (S-27) | .14% (Nov., p.10) | .67% (Jan., p.10) | 1.12% (Apr., p.10) | 5.47% (Apr., p.10) | 28.99% (May 2011, p.10) |
| | HarborView 2006-10 Group 1 | .15% of the mortgage loans were 30-59 days delinquent. (S-27) | .07% (Nov., p.11) | .55% (Jan., p.11) | .56% (Apr., p.11) | 5.38% (Apr., p.11) | 32.57% (May 2011, p.11) |
| 41162CAD3 | HarborView 2006-10 Group 2 *Class 2A-1B and 2A-1C in Group 2 (S-6) | .15% of the mortgage loans were 30-59 days delinquent. (S-27) | .19% (Nov., p.11) | .74% (Jan., p.11) | 1.44% (Apr., p.11) | 5.52% (Apr., p.11) | 26.97% (May 2011, p.11) |
| 41162GAB8 | HarborView 2006-11 (P.S. dated November 10, 2006) | Zero. (S-20) | .38% (Nov., p.9) | 1.46% (Jan., p.9) | 2.44% (Apr., p.9) | 9.07% (Apr., p.9) | 50.38% (May 2011, p.9) |
| | HarborView 2006-12 Aggregate (P.S. dated December 11, 2006) | Zero. (S-28) | 0% (Dec., p.11) | .57% (Feb., p.11) | 1.41% (May, p.10) | 7.37% (Nov., p.10) | 61.77% (May 2011, p.11) |
| | HarborView 2006-12 Group 1 | Zero. (S-28) | 0% (Dec., p.12) | .46% (Feb., p.13) | 1.01% (May, p.11) | 6.88% (Nov., p.11) | 63.08% (May 2011, p.12) |
| 41162DAG4 41162DAH2 | HarborView 2006-12 Group 2 *Class 2A-1B, 2A-2B and 2A-2C in Group 2. (S-7) | Zero. (S-28) | 0% (Dec., p.12) | .61% (Feb., p.13) | 1.53% (May, p.11) | 7.55% (Nov., p.11) | 61.27% (May 2011, p.12) |
| | HarborView 2006-14 Aggregate (December 20, 2006) | Zero. (S-26) | .17% (Jan., p.11) | .78% (Mar., p.10) | 1.97% (June, p.10) | 8.61% (Dec., p.10) | 36.66% (May 2011, p.11) |
| | HarborView 2006-14 Group 1 | Zero. (S-26) | .20% (Jan., p.13) | .39% (Mar., p.12) | .74% (June, p.12) | 6.45% (Dec., p.12) | 37.01% (May 2011, p.12) |
| 41162NAD9 41162NAH0 | HarborView 2006-14 Group 2 *Class 2A-1B and 2A-2C in Group 2. (S-7) | Zero. (S-26) | .16% (Jan., p.13) | .90% (Mar., p.12) | 2.36% (June, p.12) | 9.29% (Dec., p.12) | 36.54% (May 2011, p.12) |

EXHIBIT 13

32

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | HarborView 2006-8 Aggregate (P.S. dated August 28, 2006) | 2.78% of the mortgage loans were 30-59 days delinquent in payment, and 0.48% were 60-89 days delinquent in payment. (S-24) | 5.59% (Sept., p.11) | 5.68% (Nov., p.11) | 5.48% (Feb., p.10) | 9.16% (Aug., p.10) | 46.43% (May 2011, p.10) |
| | HarborView 2006-8 Group 1 | 2.78% of the mortgage loans were 30-59 days delinquent in payment, and 0.48% were 60-89 days delinquent in payment. (S-24) | 3.78% (Sept., p.13) | 4.12% (Nov., p.13) | 3.40% (Feb., p.12) | 8.11% (Aug., p.12) | 45.29% (May 2011, p.11) |
| 41161GAE3 | HarborView 2006-8 Group 2 *Class 2A-1C in Group 2. (S-7) | 2.78% of the mortgage loans were 30-59 days delinquent in payment, and 0.48% were 60-89 days delinquent in payment. (S-24) | 6.51% (Sept., p.13) | 6.50% (Nov., p.13) | 6.54% (Feb., p.12) | 9.75% (Aug., p.12) | 47.13% (May 2011, p.11) |
| | HarborView 2006-9 Aggregate (P.S. dated October 3, 2006) | Zero. (S-26) | 0% (Oct., p.10) | .31% (Dec., p.10) | .99% (Mar., p.10) | 5.32% (Sept., p.10) | 61.34% (May 2011, p.10) |
| | HarborView 2006-9 Group 1 | Zero. (S-26) | 0% (Oct., p.11) | .31% (Dec., p.11) | .67% (Mar., p.11) | 4.96% (Sept., p.11) | 58.93% (May 2011, p.15) |
| 41161XAM8 41161XAN6 | HarborView 2006-9 Group 2 *Class 2A-1C1 and 2A-1B2 in Group 2. (S-7) | Zero. (S-26) | 0% (Oct., p.12) | .31% (Dec., p.12) | 1.14% (Mar., p.12) | 5.50% (Sept., p.12) | 62.52% (May 2011, p.19) |

EXHIBIT 13
33

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | HarborView 2007-1 Aggregate (P.S. dated March 7, 2007) | 0.04% of the mortgage loans were at least 30 days but less than 60 days delinquent in payment, and 0.03% were 60 days or more delinquent in payment. (S-24) | .32% (Mar., p.10) | 1.08% (May, p.10) | 2.88% (Aug., p.10) | 12.86% (Feb., p.10) | 62.01% (May 2011, p.10) |
| 41164MAF4 | HarborView 2007-1 Group 1 *Class B-1 in both loan groups. (S-6) | 0.04% of the mortgage loans were at least 30 days but less than 60 days delinquent in payment, and 0.03% were 60 days or more delinquent in payment. (S-24) | .25% (Mar., p.11) | 1.05% (May, p.11) | 2.32% (Aug., p.11) | 10.83% (Feb., p.11) | 57.52% (May 2011, p.11) |
| 41164MAP2 41164MAF4 | HarborView 2007-1 Group 2 *Class 2A-1C2 in Group 2 and Class B-1 in both groups. (S-6) | 0.04% of the mortgage loans were at least 30 days but less than 60 days delinquent in payment, and 0.03% were 60 days or more delinquent in payment. (S-24) | .37% (Mar., p.11) | 1.10% (May, p.11) | 3.29% (Aug., p.11) | 14.29% (Feb., p.11) | 65.17% (May 2011, p.11) |
| | HarborView 2007-2 Aggregate (P.S. dated March 29, 2007) | .64% of the mortgage loans were 30 days or more delinquent. (S-25) | 1.40% (Apr., p.10) | 2.84% (June, p.10) | 6.45% (Sept., p.10) | 16.00% (Mar., p.10) | 39.27% (May 2011, p.10) |
| | HarborView 2007-2 Group 1 | .64% of the mortgage loans were 30 days or more delinquent. (S-25) | .84% (Apr., p.11) | 1.18% (June, p.11) | 3.15% (Sept., p.11) | 10.64% (Mar., p.11) | 37.72% (May 2011, p.11) |

EXHIBIT 13
34

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 41164LAC3 | HarborView 2007-2 Group 2 *Class 2A-1B in Group 2. (S-7) | .64% of the mortgage loans were 30 days or more delinquent. (S-25) | 1.63% (Apr., p.11) | 3.45% (June, p.11) | 7.66% (Sept., p.11) | 17.93% (Mar., p.11) | 39.94% (May 2011, p.11) |
| | HarborView 2007-4 Aggregate (P.S. dated June 13, 2007) | .26% of the mortgage loans were 30 days or more delinquent. (S-26) | .69% (June, p.11) | 2.62% (Aug., p.10) | 5.90% (Nov., p.10) | 14.04% (May, p.10) | 29.24% (May 2011, p.10) |
| | HarborView 2007-4 Group 1 | .26% of the mortgage loans were 30 days or more delinquent. (S-26) | .44% (June, p.12) | .77% (Aug., p.11) | 1.73% (Nov., p.11) | 4.88% (May, p.11) | 24.24% (May 2011, p.11) |
| 41164YAD3 | HarborView 2007-4 Group 2 *Class 2A-3 in Group 2 (S-7) | .26% of the mortgage loans were 30 days or more delinquent. (S-26) | .78% (June, p.12) | 3.31% (Aug., p.11) | 7.45% (Nov., p.11) | 17.40% (May, p.11) | 31.52% (May 2011, p.11) |
| 41165AAC6 41165AAD4 | HarborView 2007-5 Aggregate *Classes A-1B and A-1C (P.S. dated July 11, 2007) | Zero. (S-23) | 0% (July, p.10) | .55% (Sept., p.10) | 1.88% (Dec., p.9) | 7.42% (June, p.9) | 35.23% (May 2011, p.9) |
| | HarborView 2007-5 Group 1 | Zero. (S-23) | 0% (July, p.11) | 0.00% (Sept., p.11) | .32% (Dec., p.10) | 3.31% (June, p.10) | 30.32% (May 2011, p.10) |
| | HarborView 2007-5 Group 2 | Zero. (S-23) | 0% (July, p.11) | .60% (Sept., p.11) | 2.01% (Dec., p.10) | 7.75% (June, p.10) | 35.71% (May 2011, p.10) |
| | IndyMac INDX Mortgage Loan Trust 2006-AR35 Aggregate (P.S. dated November 29, 2006) | Zero. (S-36) | 2.42% (Dec., p.10) | 3.76% (Feb., p.10) | 6.42% (May, p.10) | 16.16% (Nov., p.10) | 43.06% (May 2011, p.10) |
| | IndyMac INDX Mortgage Loan Trust 2006-AR35 Group 1 | Zero. (S-36) | 1.67% (Dec., p.11) | 2.99% (Feb., p.11) | 6.16% (May, p.11) | 15.58% (Nov., p.11) | 44.60% (May 2011, p.15) |

1616146v1/012661

24

EXHIBIT 13
35

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 45667SAN7 45667SAP2 | IndyMac INDX Mortgage Loan Trust 2006-AR35 Group 2 *Classes 2-A-1A, 2-A-3A and 2-A-3B in Group 2. (S-11) | Zero. (S-36) | 2.89% (Dec., p.12) | 4.25% (Feb., p.12) | 6.58% (May, p.12) | 16.54% (Nov., p.12) | 41.99% (May 2011, p.20) |
| | Luminent Mortgage Trust 2007-1 Aggregate (P.S. dated January 24, 2007) | Zero. (S-24) | 1.24% (Feb., p.11) | 2.56% (Apr., p.11) | 4.82% (July, p.11) | 11.32% (Jan., p.11) | 45.39% (May 2011, p.11) |
| 55028CAA3 55028CAB1 | Luminent Mortgage Trust 2007-1 Group 1 *Classes I-A-1 and I-A-2 in Group 1. (S-7) | Zero. (S-24) | 1.14% (Feb., p.13) | 2.54% (Apr., p.13) | 4.32% (July, p.13) | 9.95% (Jan., p.13) | 43.19% (May 2011, p.12) |
| 55028CAE5 | Luminent Mortgage Trust 2007-1 Group 2 *Class II-A-3 in Group 2. (S-7) | Zero. (S-24) | 1.40% (Feb., p.13) | 2.59% (Apr., p.13) | 5.55% (July, p.13) | 13.40% (Jan., p.13) | 49.11% (May 2011, p.12) |
| | MortgageIT Mortgage Loan Trust 2006-1 Aggregate (P.S. dated February 17, 2006) | | .17% (Mar., p.13) | 1.89% (May, p.13) | 3.03% (Aug., p.13) | 5.75% (Feb., p.13) | 24.42% (May 2011, p.13) |
| | MortgageIT Mortgage Loan Trust 2006-1 Group 1-A1 | .27% of the mortgage loans were 30 days or more delinquent. (S-31) | 0% (Mar., p.14) | 1.37% (May, p.14) | 1.33% (Aug., p.14) | 2.18% (Feb., p.14) | 18.12% (May 2011, p.15) |
| | MortgageIT Mortgage Loan Trust 2006-1 Group 1-A2 | .26% of the mortgage loans were 30 days or more delinquent. (S-47) | .27% (Mar., p.14) | 2.74% (May, p.14) | 4.35% (Aug., p.14) | 8.05% (Feb., p.14) | 23.14% (May 2011, p.15) |

1616146v1/012661

25

EXHIBIT 13
36

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 61915RCL8 | MortgageIT Mortgage Loan Trust 2006-1 Group 2 *Class 2-A-1C in Group 2. (S-8) | .34% of the mortgage loans were 30 days or more delinquent. (S-54) | .18% (Mar., p.15) | 1.30% (May, p.15) | 2.80% (Aug., p.15) | 5.91% (Feb., p.15) | 31.62% (May 2011, p.14) |
| | Nomura Home Equity Loan, Inc., Home Equity Loan Trust, Series 2007-1 Aggregate (P.S. dated January 29, 2007) | Zero. (S-57) | .16% (Feb., p.13) | 5.05% (Apr., p.13) | 11.90% (July, p.13) | 24.01% (Jan., p.13) | 46.39% (May 2011, p.13) |
| 65537KAB6 65537KAC4 | Nomura Home Equity Loan, Inc., Home Equity Loan Trust, Series 2007-1 Group 2 *Classes 2-A-1A and 2-A-1B in Group 2. (S-i) | Zero. (S-57) | .19% (Feb., p.14) | 7.00% (Apr., p.15) | 14.26% (July, p.15) | 27.54% (Jan., p.15) | 47.53% (May 2011, p.14) |
| | Soundview Home Loan Trust 2005-OPT4 Aggregate (P.S. dated November 22, 2005) | Zero. (37) | .12% (Dec., p.12) | 1.87% (Feb., p.12) | .04% (May, p.11) | 8.51% (Nov., p.11) | 36.08% (May 2011, p.12) |
| 83611MJM1 | Soundview Home Loan Trust 2005-OPT4 Group 1 *Classes M-1 and M-2 in Groups 1 and 2. (S-68) | Zero. (37) | .05% (Dec., p.13) | 2.13% (Feb., p.13) | 3.34% (May, p.12) | 9.3% (Nov., p.12) | 34.35% (May 2011, p.13) |
| 83611MJM1 | Soundview Home Loan Trust 2005-OPT4 Group 2 *Classes M-1 and M-2 in Groups 1 and 2. (S-68) | Zero. (37) | .2% (Dec., p.14) | 1.6% (Feb., p.14) | 2.72% (May, p.13) | 7.71% (Nov., p.13) | 37.66% (May 2011, p.14) |
| 92978GAC3 | Wachovia Mortgage Loan Trust, Series 2006-ALT1 (P.S. dated December 19, 2006) | Zero. (S-32) | .94% (Jan., p.14) | 2.13% (Mar., p.14) | 4.14% (June, p.14) | 10.84% (Dec., p.14) | 31.95% (May 2011, p.12) |

EXHIBIT 13
37

66.   This early spike in delinquencies and defaults, which occurred almost immediately after these RMBS were purchased by WesCorp, was later discovered to be indicative of the Originators' systematic disregard of their stated underwriting guidelines.

67.   The phenomenon of borrower default shortly after origination of the loans is known as "Early Payment Default."  Early Payment Default evidences borrower misrepresentations and other misinformation in the origination process resulting from the systematic failure of the Originators to apply the underwriting guidelines described in the Offering Documents.

68.   A November 2008 Federal Reserve Board study attributed the rise in defaults, in part, to "[d]eteriorating lending standards," and posited that "the surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to investors."  Christopher J. Mayer et al., *The Rise in Mortgage Defaults* 15-16 (Fed. Reserve Bd. Fin. & Econ. Discussion Series, Paper No. 2008-59).

69.   In January 2011, the Financial Stability Oversight Council ("FSOC"), chaired by United States Treasury Secretary Timothy Geithner, issued a report analyzing the effects of risk retention requirements in mortgage lending on the broader economy.   *See*   FIN. STABILITY OVERSIGHT COUNCIL, MACROECONOMIC EFFECTS OF RISK RETENTION REQUIREMENTS (2011) ("FSOC Risk Retention Report").   The FSOC Risk Retention Report focused on stabilizing the mortgage lending industry through larger risk retention requirements in the industry that can "incent better lending decisions" and "help to mitigate some of the pro-cyclical effects securitization may have on the economy." *Id.* at 2.

70.   The FSOC Risk Retention Report observed that the securitization process often incentivizes poor underwriting by shifting the risk of default from the

EXHIBIT 13
38

1    originators to the investors, while obscuring critical information concerning the

2    actual nature of the risk.  The FSOC Risk Retention Report stated:

3   The securitization process involves multiple parties with varying

4   incentives and information, thereby breaking down the traditional

5   direct relationship between borrower and lender.  The party setting

6   underwriting standards and making lending decisions (the originator)

7   and the party making structuring decisions (the securitizer) are often

8   exposed to minimal or no credit risk.  By contrast, the party that is

9   most exposed to credit risk (the investor) often has less influence over

10   underwriting standards and may have less information about the

11   borrower.  As a result, originators and securitizers that do not retain

12   risk can, at least in the short run, maximize their own returns by

13   lowering loan underwriting standards in ways that investors may have

14   difficulty detecting.   The originate-to-distribute model, as it was

15   conducted, exacerbated this weakness by compensating originators and

16   securitizers based on volume, rather than on quality.

17    *Id.* at 3.

18  71.    Indeed, originators that wrote a high percentage of their loans for

19    distribution were more likely to disregard underwriting standards, resulting in

20    poorly performing mortgages, in contrast to originators that originated and then

21    held most of their loans.

22  72.    High OTD originators profited from mortgage origination fees without

23    bearing the risks of borrower default or insufficient collateral in the event of a

24    default.  Divorced from these risks, high OTD originators were incentivized to push

25    loan quantity over quality.

26  73.    Table 6 (*infra*) shows the percentage of loans originated for

27    distribution relative to all the loans made by the Originator for the years 2005,

28    2006, and 2007, for those Originators in this Complaint with high OTD

1616146v1/012661     28

EXHIBIT 13
39

percentages.   The data was obtained from the Home Mortgage Disclosure Act database.

Table 6

| Originator | OTD % 2005 | OTD % 2006 | OTD % 2007 |
|---|---|---|---|
| American Home Mortgage Corp. | 91.9 | 62.4 | |
| American Home Mortgage Investment Corp. | 100 | 100 | 100 |
| Countrywide Home Loans, Inc. | 98.5 | 96.5 | 98.4 |
| First Federal Bank of California | 0 | 20.6 | 54.3 |
| First National Bank of Nevada | 88.0 | 79.8 | 89.4 |
| IndyMac Bank, F.S.B. | 81.1 | 87.7 | 82.8 |
| Kay-Co Investment Inc. dba Pro30 Funding | | 99.4 | |
| Metrocities Mortgage, LLC | 99.96 | 100 | 100 |
| MortgageIT, Inc. | 55.5 | 98.8 | 100 |
| Option One Mortgage Corporation | 92.2 | 72.7 | 58.2 |
| Paul Financial, LLC | 85.2 | 83.4 | 99.1 |
| Residential Mortgage Capital | 99.9 | 100 | 100 |

**B.      The Surge in Actual Versus Expected Cumulative Losses Is Evidence of the Originators' Systematic Disregard of Underwriting Standards**

74.    The actual losses to the mortgage pools underlying the RMBS WesCorp purchased have exceeded expected losses so quickly and by so wide a margin (*see infra* Figure 2) that a significant portion of the mortgages could not have been underwritten as represented in the Offering Documents.

75.    "Loss" is different than and should be distinguished from default and delinquency rates.   Loss either attempts to predict ("expected loss") or reflects ("actual loss") losses to the collateral pool by reason of borrower default, less any amounts recovered by the mortgage holder on a defaulted loan by sale of the subject property after foreclosure (which amounts may be less than 100% of the

EXHIBIT 13
40

1   balance of the outstanding mortgage if the property is sold for less than the
2   balance).

3       76.    While the short term price of a security may be influenced by broader
4   market or liquidity forces, actual versus expected loss is a gauge of the health or the
5   performance of an RMBS based on factors particular to that security.

6       77.    Expected loss is a statistical estimate of the total cumulative shortfall
7   in principal payments on a mortgage pool over its 30-year life, expressed as a
8   percentage of the original principal balance of the pool.  Expected loss is based on
9   historical data for similar mortgage pools.

10      78.    The amount of expected loss is used to determine the amount of credit
11  enhancement needed to achieve a desired credit rating.  Each credit rating has a
12  "rating factor," which can be expressed in multiples of the amount of credit
13  enhancement over expected loss (in equation form: $CE/EL = RF$).  Thus, the rating
14  factor expresses how many times the expected loss is covered by credit
15  enhancement.  A triple-A rated security would have a rating factor of "5," so it
16  would require credit enhancement of five times the amount of the expected loss.  A
17  "double-A rating" would have a rating factor of "4," and thus would require credit
18  enhancement equaling four times the expected loss.  A "single-A" rating would
19  have a rating factor of "3" and would require credit enhancement of three times the
20  expected loss.  A "Baa" rating would require credit enhancement of 2—1.5 times
21  expected loss, and a "Ba" rating or lower requires some amount of credit
22  enhancement less than 1.5 times expected loss.

23      79.    Again, credit enhancement over expected loss equals the rating factor.
24  So, by way of example, if cumulative expected losses on an asset pool are
25  calculated to be $1 million and the desired rating is triple-A (rating factor 5), the
26  amount of credit enhancement provided will have to equal $5 million, or $1 million
27  multiplied by five.

28

EXHIBIT 13
41

80.     Accordingly, if the analysis of expected loss is flawed, so too is the calculation of the amount of credit enhancement.  For instance, on a triple-A rated security, if actual cumulative losses exceed five times expected losses, the credit enhancement will be insufficient, and the principal of the senior tranche will be impaired.     This  is  because,  again,  the  amount  of  credit  enhancement  was determined based on the assumed amount of expected loss.

81.     The  following  hypothetical  illustrates  how,  working  backwards, expected loss can be inferred in an already-issued offering.  Assume there is a $100 million offering backed by $100 million of assets, with a triple-A rated senior tranche  with  a  principal  balance  of  $75  million.     This  means  the  non-senior (subordinate) tranches, in aggregate, have a principal balance of $25 million.  The $25 million amount of the non-senior or subordinated tranches in this hypothetical offering serves as the credit enhancement for the senior tranche.  Therefore, on our hypothetical $100 million offering, the expected loss would be $5 million, or the amount  of  the  credit  enhancement  on  the  triple-A  rated  senior  tranche—$25 million—divided  by  the  rating  factor  for  triple-A  rated  securities—5.     The following equation illustrates:  $25,000,000/5 = $5,000,000.

82.     "Actual losses" are the economic losses that were, in fact, suffered by the mortgage pools due to defaults and resulting foreclosures and any related inability of the mortgage holder or servicer to recoup the full principal amount of the mortgages.  The actual loss data in Figure 2 (*infra*) is from ABSNET, a provider of asset-backed securities related data.

83.     The  path  of  cumulative  losses  can  be  plotted  on  a  line  graph representing loss (either expected or actual) from origination to maturity, as shown in Figure 2 (*infra*).

84.     For the RMBS WesCorp purchased, Figure 2 (*infra*) depicts a series of graphs illustrating the losses the RMBS actually experienced in the first 12 months after issuance in comparison to the losses the RMBS were expected to experience

EXHIBIT 13
42

during the same time period. As the graphs show, the actual losses (the "Series 1" or solid line) far exceeded the expected losses (the "Series 2" or dotted line) for the period analyzed.

**Figure 2**

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Alternative Loan Trust 2006-AR4 | 39723 | 1 | $ - | $ 881,637 |
| Alternative Loan Trust 2006-AR4 | 39723 | 2 | $ - | $ 962,968 |
| Alternative Loan Trust 2006-AR4 | 39723 | 3 | $ 1,901,772 | $ 1,051,631 |
| Alternative Loan Trust 2006-AR4 | 39723 | 4 | $ 7,464,605 | $ 1,148,255 |
| Alternative Loan Trust 2006-AR4 | 39723 | 5 | $ 7,310,855 | $ 1,253,515 |
| Alternative Loan Trust 2006-AR4 | 39723 | 6 | $ 7,310,855 | $ 1,368,137 |
| Alternative Loan Trust 2006-AR4 | 39723 | 7 | $ 11,290,671 | $ 1,492,899 |
| Alternative Loan Trust 2006-AR4 | 39723 | 8 | $ 24,181,875 | $ 1,628,633 |
| Alternative Loan Trust 2006-AR4 | 39723 | 9 | $ 28,385,840 | $ 1,776,228 |
| Alternative Loan Trust 2006-AR4 | 39723 | 10 | $ 45,560,714 | $ 1,936,629 |
| Alternative Loan Trust 2006-AR4 | 39723 | 11 | $ 47,163,113 | $ 2,110,842 |
| Alternative Loan Trust 2006-AR4 | 39723 | 12 | $ 50,115,861 | $ 2,299,928 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| American Home Mortgage Assets Trust 2007-3 | 41708 | 1 | $ - | $ 2,232,609 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 2 | $ 20,399,980 | $ 2,438,567 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 3 | $ 49,464,549 | $ 2,663,093 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 4 | $ 76,378,883 | $ 2,907,778 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 5 | $ 103,617,642 | $ 3,174,333 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 6 | $ 130,873,934 | $ 3,464,595 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 7 | $ 140,742,932 | $ 3,780,536 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 8 | $ 163,847,101 | $ 4,124,262 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 9 | $ 187,001,069 | $ 4,498,024 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 10 | $ 185,965,334 | $ 4,904,215 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 11 | $ 206,785,530 | $ 5,345,381 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 12 | $ 226,605,691 | $ 5,824,213 |

EXHIBIT 13
43



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 1 | $ 4,157,138 | $ 5,089,278 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 2 | $ 6,017,078 | $ 5,558,764 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 3 | $ 9,357,150 | $ 6,070,576 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 4 | $ 10,723,986 | $ 6,628,339 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 5 | $ 11,705,031 | $ 7,235,956 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 6 | $ 17,425,209 | $ 7,897,616 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 7 | $ 20,756,714 | $ 8,617,809 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 8 | $ 27,245,055 | $ 9,401,340 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 9 | $ 31,707,712 | $ 10,253,337 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 10 | $ 35,498,901 | $ 11,179,259 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 11 | $ 38,255,707 | $ 12,184,906 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 12 | $ 44,937,612 | $ 13,276,413 |

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2006-8 | 38787 | 1 | $ - | $ 2,969,076 |
| HarborView 2006-8 | 38787 | 2 | $ 844,510 | $ 3,242,974 |
| HarborView 2006-8 | 38787 | 3 | $ 2,248,223 | $ 3,541,564 |
| HarborView 2006-8 | 38787 | 4 | $ 3,195,493 | $ 3,866,962 |
| HarborView 2006-8 | 38787 | 5 | $ 5,503,145 | $ 4,221,445 |
| HarborView 2006-8 | 38787 | 6 | $ 7,929,141 | $ 4,607,456 |
| HarborView 2006-8 | 38787 | 7 | $ 6,810,649 | $ 5,027,615 |
| HarborView 2006-8 | 38787 | 8 | $ 8,830,028 | $ 5,484,726 |
| HarborView 2006-8 | 38787 | 9 | $ 9,472,044 | $ 5,981,780 |
| HarborView 2006-8 | 38787 | 10 | $ 10,903,395 | $ 6,521,962 |
| HarborView 2006-8 | 38787 | 11 | $ 12,058,271 | $ 7,108,654 |
| HarborView 2006-8 | 38787 | 12 | $ 15,824,121 | $ 7,745,437 |

EXHIBIT 13
44

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView  2006-9 | 39173 | 1 | $                      - | $          6,428,529 |
| HarborView  2006-9 | 39173 | 2 | $                      - | $          7,021,561 |
| HarborView  2006-9 | 39173 | 3 | $                      - | $          7,668,057 |
| HarborView  2006-9 | 39173 | 4 | $          2,570,574 | $          8,372,597 |
| HarborView  2006-9 | 39173 | 5 | $          6,353,042 | $          9,140,109 |
| HarborView  2006-9 | 39173 | 6 | $          6,758,658 | $          9,975,885 |
| HarborView  2006-9 | 39173 | 7 | $        11,655,574 | $        10,885,598 |
| HarborView  2006-9 | 39173 | 8 | $        13,825,145 | $        11,875,316 |
| HarborView  2006-9 | 39173 | 9 | $        17,538,934 | $        12,951,517 |
| HarborView  2006-9 | 39173 | 10 | $        29,668,715 | $        14,121,098 |
| HarborView  2006-9 | 39173 | 11 | $        39,916,025 | $        15,391,381 |
| HarborView  2006-9 | 39173 | 12 | $        54,441,864 | $        16,770,120 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView  2006-10 | 39466 | 1 | $                      - | $          4,146,641 |
| HarborView  2006-10 | 39466 | 2 | $                      - | $          4,529,169 |
| HarborView  2006-10 | 39466 | 3 | $                      - | $          4,946,182 |
| HarborView  2006-10 | 39466 | 4 | $                      - | $          5,400,637 |
| HarborView  2006-10 | 39466 | 5 | $                      - | $          5,895,711 |
| HarborView  2006-10 | 39466 | 6 | $                      - | $          6,434,818 |
| HarborView  2006-10 | 39466 | 7 | $          8,680,070 | $          7,021,616 |
| HarborView  2006-10 | 39466 | 8 | $        11,141,881 | $          7,660,021 |
| HarborView  2006-10 | 39466 | 9 | $        14,725,771 | $          8,354,211 |
| HarborView  2006-10 | 39466 | 10 | $        20,454,135 | $          9,108,634 |
| HarborView  2006-10 | 39466 | 11 | $        24,280,421 | $          9,928,015 |
| HarborView  2006-10 | 39466 | 12 | $        32,908,115 | $        10,817,352 |

EXHIBIT 13
45



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2006-11 | 39604 | 1 | $            - | $         620,128 |
| HarborView 2006-11 | 39604 | 2 | $            - | $         677,335 |
| HarborView 2006-11 | 39604 | 3 | $     1,541,596 | $         739,700 |
| HarborView 2006-11 | 39604 | 4 | $     2,586,325 | $         807,663 |
| HarborView 2006-11 | 39604 | 5 | $     1,614,729 | $         881,701 |
| HarborView 2006-11 | 39604 | 6 | $     2,697,387 | $         962,324 |
| HarborView 2006-11 | 39604 | 7 | $     5,548,956 | $       1,050,080 |
| HarborView 2006-11 | 39604 | 8 | $     8,395,221 | $       1,145,553 |
| HarborView 2006-11 | 39604 | 9 | $    10,039,321 | $       1,249,369 |
| HarborView 2006-11 | 39604 | 10 | $    10,546,521 | $       1,362,193 |
| HarborView 2006-11 | 39604 | 11 | $    12,059,557 | $       1,484,731 |
| HarborView 2006-11 | 39604 | 12 | $    11,489,433 | $       1,617,731 |

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2006-12 | 39654 | 1 | $            - | $       6,998,409 |
| HarborView 2006-12 | 39654 | 2 | $            - | $       7,644,013 |
| HarborView 2006-12 | 39654 | 3 | $            - | $       8,347,820 |
| HarborView 2006-12 | 39654 | 4 | $     4,084,060 | $       9,114,816 |
| HarborView 2006-12 | 39654 | 5 | $    11,094,460 | $       9,950,367 |
| HarborView 2006-12 | 39654 | 6 | $    19,896,280 | $      10,860,234 |
| HarborView 2006-12 | 39654 | 7 | $    31,022,567 | $      11,850,591 |
| HarborView 2006-12 | 39654 | 8 | $    40,963,688 | $      12,928,047 |
| HarborView 2006-12 | 39654 | 9 | $    60,192,493 | $      14,099,652 |
| HarborView 2006-12 | 39654 | 10 | $    88,526,405 | $      15,372,914 |
| HarborView 2006-12 | 39654 | 11 | $    96,055,571 | $      16,755,807 |
| HarborView 2006-12 | 39654 | 12 | $    96,131,151 | $      18,256,769 |

EXHIBIT 13
46





| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2006-14 | 39668 | 1 | $ - | $ 3,574,654 |
| HarborView 2006-14 | 39668 | 2 | $ - | $ 3,904,416 |
| HarborView 2006-14 | 39668 | 3 | $ 368,396 | $ 4,263,907 |
| HarborView 2006-14 | 39668 | 4 | $ 6,858,408 | $ 4,655,674 |
| HarborView 2006-14 | 39668 | 5 | $ 13,473,277 | $ 5,082,458 |
| HarborView 2006-14 | 39668 | 6 | $ 16,771,582 | $ 5,547,200 |
| HarborView 2006-14 | 39668 | 7 | $ 21,587,406 | $ 6,053,056 |
| HarborView 2006-14 | 39668 | 8 | $ 28,030,117 | $ 6,603,399 |
| HarborView 2006-14 | 39668 | 9 | $ 39,750,069 | $ 7,201,833 |
| HarborView 2006-14 | 39668 | 10 | $ 44,347,316 | $ 7,852,191 |
| HarborView 2006-14 | 39668 | 11 | $ 59,770,494 | $ 8,558,546 |
| HarborView 2006-14 | 39668 | 12 | $ 74,945,944 | $ 9,325,209 |

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2007-1 | 40906 | 1 | $ 470,016 | $ 4,486,867 |
| HarborView 2007-1 | 40906 | 2 | $ - | $ 4,900,781 |
| HarborView 2007-1 | 40906 | 3 | $ 740,974 | $ 5,352,010 |
| HarborView 2007-1 | 40906 | 4 | $ 3,422,669 | $ 5,843,752 |
| HarborView 2007-1 | 40906 | 5 | $ 11,572,487 | $ 6,379,446 |
| HarborView 2007-1 | 40906 | 6 | $ 17,645,257 | $ 6,962,786 |
| HarborView 2007-1 | 40906 | 7 | $ 27,455,285 | $ 7,597,731 |
| HarborView 2007-1 | 40906 | 8 | $ 33,429,089 | $ 8,288,517 |
| HarborView 2007-1 | 40906 | 9 | $ 37,706,844 | $ 9,039,664 |
| HarborView 2007-1 | 40906 | 10 | $ 37,339,557 | $ 9,855,987 |
| HarborView 2007-1 | 40906 | 11 | $ 48,483,984 | $ 10,742,596 |
| HarborView 2007-1 | 40906 | 12 | $ 47,750,914 | $ 11,704,903 |

EXHIBIT 13
47



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2007-2 | 40907 | 1 | $ 647,551 | $ 1,785,903 |
| HarborView 2007-2 | 40907 | 2 | $ 1,783,440 | $ 1,950,652 |
| HarborView 2007-2 | 40907 | 3 | $ 1,699,532 | $ 2,130,255 |
| HarborView 2007-2 | 40907 | 4 | $ 11,140,763 | $ 2,325,982 |
| HarborView 2007-2 | 40907 | 5 | $ 12,498,521 | $ 2,539,204 |
| HarborView 2007-2 | 40907 | 6 | $ 33,584,483 | $ 2,771,390 |
| HarborView 2007-2 | 40907 | 7 | $ 46,188,913 | $ 3,024,116 |
| HarborView 2007-2 | 40907 | 8 | $ 55,536,048 | $ 3,299,069 |
| HarborView 2007-2 | 40907 | 9 | $ 61,318,518 | $ 3,598,047 |
| HarborView 2007-2 | 40907 | 10 | $ 69,284,016 | $ 3,922,967 |
| HarborView 2007-2 | 40907 | 11 | $ 69,215,449 | $ 4,275,863 |
| HarborView 2007-2 | 40907 | 12 | $ 83,515,196 | $ 4,658,889 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2007-4 | 41472 | 1 | $ - | $ 1,484,815 |
| HarborView 2007-4 | 41472 | 2 | $ 1,475,896 | $ 1,621,790 |
| HarborView 2007-4 | 41472 | 3 | $ 4,503,163 | $ 1,771,113 |
| HarborView 2007-4 | 41472 | 4 | $ 12,670,740 | $ 1,933,842 |
| HarborView 2007-4 | 41472 | 5 | $ 18,897,311 | $ 2,111,117 |
| HarborView 2007-4 | 41472 | 6 | $ 26,420,698 | $ 2,304,158 |
| HarborView 2007-4 | 41472 | 7 | $ 33,546,631 | $ 2,514,277 |
| HarborView 2007-4 | 41472 | 8 | $ 40,719,514 | $ 2,742,875 |
| HarborView 2007-4 | 41472 | 9 | $ 52,660,914 | $ 2,991,449 |
| HarborView 2007-4 | 41472 | 10 | $ 58,084,757 | $ 3,261,590 |
| HarborView 2007-4 | 41472 | 11 | $ 63,355,076 | $ 3,554,991 |
| HarborView 2007-4 | 41472 | 12 | $ 73,274,190 | $ 3,873,442 |

EXHIBIT 13

48



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|-----------|---------------|-------|--------------------|-----------------------|
| HarborView 2007-5 | 41776 | 1 | $          - | $   1,359,786 |
| HarborView 2007-5 | 41776 | 2 | $          - | $   1,485,226 |
| HarborView 2007-5 | 41776 | 3 | $      751,500 | $   1,621,975 |
| HarborView 2007-5 | 41776 | 4 | $    2,920,614 | $   1,771,002 |
| HarborView 2007-5 | 41776 | 5 | $    7,632,190 | $   1,933,349 |
| HarborView 2007-5 | 41776 | 6 | $   12,511,060 | $   2,110,135 |
| HarborView 2007-5 | 41776 | 7 | $   15,835,944 | $   2,302,561 |
| HarborView 2007-5 | 41776 | 8 | $   21,143,592 | $   2,511,910 |
| HarborView 2007-5 | 41776 | 9 | $   24,750,664 | $   2,739,552 |
| HarborView 2007-5 | 41776 | 10 | $   20,932,966 | $   2,986,945 |
| HarborView 2007-5 | 41776 | 11 | $   29,635,152 | $   3,255,640 |
| HarborView 2007-5 | 41776 | 12 | $   34,563,869 | $   3,547,276 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|-----------|---------------|-------|--------------------|-----------------------|
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 1 | $          - | $   1,734,368 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 2 | $          - | $   1,894,364 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 3 | $          - | $   2,068,783 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 4 | $          - | $   2,258,863 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 5 | $    1,848,000 | $   2,465,932 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 6 | $    3,866,023 | $   2,691,418 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 7 | $   13,740,659 | $   2,936,851 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 8 | $   21,838,012 | $   3,203,870 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 9 | $   27,603,649 | $   3,494,221 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 10 | $   31,428,103 | $   3,809,765 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 11 | $   34,423,595 | $   4,152,477 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 12 | $   43,899,521 | $   4,524,450 |

EXHIBIT 13
49





| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Luminent Mortgage Trust 2007-1 | 40299 | 1 | $ - | $ 837,607 |
| Luminent Mortgage Trust 2007-1 | 40299 | 2 | $ - | $ 914,876 |
| Luminent Mortgage Trust 2007-1 | 40299 | 3 | $ - | $ 999,112 |
| Luminent Mortgage Trust 2007-1 | 40299 | 4 | $ 1,982,522 | $ 1,090,910 |
| Luminent Mortgage Trust 2007-1 | 40299 | 5 | $ 3,098,851 | $ 1,190,913 |
| Luminent Mortgage Trust 2007-1 | 40299 | 6 | $ 7,535,538 | $ 1,299,811 |
| Luminent Mortgage Trust 2007-1 | 40299 | 7 | $ 8,877,706 | $ 1,418,342 |
| Luminent Mortgage Trust 2007-1 | 40299 | 8 | $ 7,269,659 | $ 1,547,298 |
| Luminent Mortgage Trust 2007-1 | 40299 | 9 | $ 7,809,257 | $ 1,687,522 |
| Luminent Mortgage Trust 2007-1 | 40299 | 10 | $ 6,135,975 | $ 1,839,912 |
| Luminent Mortgage Trust 2007-1 | 40299 | 11 | $ 11,639,877 | $ 2,005,424 |
| Luminent Mortgage Trust 2007-1 | 40299 | 12 | $ 13,374,400 | $ 2,185,068 |

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 1 | $ - | $ 676,065.76 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 2 | $ - | $ 738,432.90 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 3 | $ - | $ 806,422.58 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 4 | $ 560,000.00 | $ 880,516.57 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 5 | $ 1,254,257.17 | $ 961,233.11 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 6 | $ 2,470,257.89 | $ 1,049,128.74 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 7 | $ 2,628,457.17 | $ 1,144,800.05 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 8 | $ 4,055,807.17 | $ 1,248,885.24 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 9 | $ 3,738,676.18 | $ 1,362,065.53 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 10 | $ 4,116,310.48 | $ 1,485,066.24 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 11 | $ 5,153,808.11 | $ 1,618,657.50 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 12 | $ 7,103,777.17 | $ 1,763,654.58 |

EXHIBIT 13

50



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 1 | $ 159,200 | $ 1,737,954 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 2 | $ 619,200 | $ 1,898,280 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 3 | $ 23,542,962 | $ 2,073,060 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 4 | $ 42,794,130 | $ 2,263,533 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 5 | $ 36,287,162 | $ 2,471,030 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 6 | $ 37,717,522 | $ 2,696,982 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 7 | $ 69,224,811 | $ 2,942,923 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 8 | $ 86,609,785 | $ 3,210,493 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 9 | $ 90,655,311 | $ 3,501,444 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 10 | $ 112,784,673 | $ 3,817,641 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 11 | $ 96,635,919 | $ 4,161,062 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 12 | $ 105,724,469 | $ 4,533,804 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 1 | $ 1,212,442 | $ 6,716,668 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 2 | $ 1,512,469 | $ 7,336,281 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 3 | $ 3,073,678 | $ 8,011,754 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 4 | $ 5,331,109 | $ 8,747,873 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 5 | $ 5,676,196 | $ 9,549,786 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 6 | $ 12,008,162 | $ 10,423,024 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 7 | $ 19,248,543 | $ 11,373,512 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 8 | $ 23,426,005 | $ 12,407,591 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 9 | $ 30,776,311 | $ 13,532,030 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 10 | $ 35,034,668 | $ 14,754,033 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 11 | $ 44,624,482 | $ 16,081,254 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 12 | $ 52,570,998 | $ 17,521,790 |

EXHIBIT 13



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 1 | $ - | $ 571,225 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 2 | $ 907,000 | $ 623,920 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 3 | $ 3,477,778 | $ 681,366 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 4 | $ 3,865,958 | $ 743,970 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 5 | $ 4,775,290 | $ 812,169 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 6 | $ 8,398,870 | $ 886,435 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 7 | $ 8,047,724 | $ 967,270 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 8 | $ 8,645,036 | $ 1,055,214 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 9 | $ 11,762,701 | $ 1,150,843 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 10 | $ 17,071,099 | $ 1,254,769 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 11 | $ 21,346,144 | $ 1,367,643 |
| Wachovia Mortgage Loan Trust Series 2006-ALT1 | 40065 | 12 | $ 23,684,214 | $ 1,490,155 |



85.    As clearly shown in Figure 2 (*supra*), actual losses spiked almost immediately after issuance of the RMBS.  Borrowers defaulted on the underlying mortgages soon after loan origination, rapidly eliminating the RMBS's credit enhancement.  For example, in the American Home Mortgage Assets Trust 2007-3 offering (shown in Figure 2), actual losses at month 12 exceeded $226 million, nearly 39 times the expected losses of $5.8 million.

EXHIBIT 13
52

86.   This immediate increase in actual losses—at a rate far greater than expected losses—is strong evidence that the Originators systematically disregarded the underwriting standards in the Offering Documents.

87.   Because credit enhancement is designed to ensure triple-A performance of triple-A-rated RMBS, the evidence that credit enhancement failed (*i.e.*, actual losses swiftly surged past expected losses shortly after the offering) substantiates that a critical number of mortgages in the pool were not written in accordance with the underwriting guidelines stated in the Offering Documents.

**C.    The Collapse of the Certificates' Credit Ratings Is Evidence of Systematic Disregard of Underwriting Guidelines**

88.   Virtually all of the RMBS WesCorp purchased were rated triple-A at issuance.

89.   Moody's and S&P have since downgraded the RMBS WesCorp purchased to well below investment grade (*see supra* Table 4).

90.   A rating downgrade is material.  The total collapse in the credit ratings of the RMBS WesCorp purchased, typically from triple-A to non-investment speculative grade, is evidence of the Originators' systematic disregard of underwriting guidelines, amplifying that these securities were impaired from the outset.

**D.    Revelations Subsequent to the Offerings Show That the Originators Systematically Disregarded Underwriting Standards**

91.   Public disclosures subsequent to the issuance of the RMBS reinforce the allegation that the Originators systematically abandoned their stated underwriting guidelines.

**1.    The Systematic Disregard of Underwriting Standards Was Pervasive as Revealed After the Collapse**

92.   Mortgage originators experienced unprecedented success during the mortgage boom.  Yet their success was illusory.  As the loans they originated began

EXHIBIT 13
53

1    to significantly underperform, the demand for their products subsided. It became

2    evident that originators had systematically disregarded their underwriting standards.

3          93.     The Office of the Comptroller of the Currency (the "OCC"), an office

4    within the United States Department of the Treasury, published a report in

5    November 2008 listing the "Worst Ten" metropolitan areas with the highest rates of

6    foreclosures and the "Worst Ten" originators with the largest numbers of

7    foreclosures in those areas ("2008 'Worst Ten in the Worst Ten' Report"). In this

8    report, the OCC emphasized the importance of adherence to underwriting standards

9    in mortgage loan origination

10         The quality of the underwriting process—that is, determining through

11         analysis of the borrower and market conditions that a borrower is

12         highly likely to be able to repay the loan as promised—is a major

13         determinant of subsequent loan performance. The quality of

14         underwriting varies across lenders, a factor that is evident through

15         comparisons of rates of delinquency, foreclosure, or other loan

16         performance measures across loan originators.

17          94.     Recently, government reports and investigations and newspaper

18    reports have uncovered the extent of the pervasive abandonment of underwriting

19    standards. The Permanent Subcommittee on Investigations in the United States

20    Senate ("PSI") recently released its report detailing the causes of the financial

21    crisis. Using Washington Mutual Bank ("WaMu") as a case study, the PSI

22    concluded through its investigation:

23         Washington Mutual was far from the only lender that sold poor quality

24         mortgages and mortgage backed securities that undermined U.S.

25         financial markets. The Subcommittee investigation indicates that

26         Washington Mutual was emblematic of a host of financial institutions

27         that knowingly originated, sold, and securitized billions of dollars in

28         high risk, poor quality home loans. These lenders were not the victims

EXHIBIT 13
54

1    of the financial crisis; the high risk loans they issued became the fuel

2    that ignited the financial crisis.

3    STAFF OF S. PERMANENT SUBCOMM. ON INVESTIGATIONS, 112TH CONG.,

4    WALL STREET AND THE FINANCIAL CRISIS: ANATOMY OF A FINANCIAL

5    COLLAPSE 50 (Subcomm. Print 2011) ("PSI Wall Street Report").

6    95.    Indeed, the Financial Crisis Inquiry Commission ("FCIC") issued its

7    final report in January 2011 that detailed, among other things, the collapse of

8    mortgage underwriting standards and subsequent collapse of the mortgage market

9    and wider economy. *See* FIN CRISIS INQUIRY COMM'N, FINAL REPORT OF

10    THE NATIONAL COMMISSION ON THE CAUSES OF THE FINANCIAL AND

11    ECONOMIC CRISIS IN THE UNITED STATES (2011) ("FCIC Report").

12    96.    The FCIC Report concluded that there was a "systemic breakdown in

13    accountability and ethics" during the housing and financial crisis.

14    "Unfortunately—as has been the case in past speculative booms and busts—we

15    witnessed an erosion of standards of responsibility and ethics that exacerbated the

16    financial crisis." *Id.* at xxii. The FCIC found that the current economic crisis had

17    its genesis in the housing boom:

18        [I]t was the collapse of the housing bubble—fueled by low interest

19        rates, easy and available credit, scant regulation, and toxic

20        mortgages—that was the spark that ignited a string of events, which

21        led to a full-blown crises in the fall of 2008. Trillions of dollars in

22        risky mortgages had become embedded throughout the financial

23        system, as mortgage-related securities were packaged, repackaged, and

24        sold to investors around the world.

25    *Id.* at xvi.

26    97.    During the housing boom, mortgage lenders focused on quantity rather

27    than quality, originating loans for borrowers who had no realistic capacity to repay

28    the loan. The FCIC Report found "that the percentage of borrowers who defaulted

EXHIBIT 13

55

on their mortgages within just a matter of months after taking a loan nearly doubled from the summer of 2006 to late 2007." *Id.* at xxii. Early Payment Default is a significant indicator of pervasive disregard for underwriting standards. The FCIC Report noted that mortgage fraud "flourished in an environment of collapsing lending standards. . . ." *Id.*

98.  In this lax lending environment, mortgage lenders went unchecked, originating mortgages for borrowers in spite of underwriting standards:

> Lenders made loans that they knew borrowers could not afford and that could cause massive losses to investors in mortgage securities. As early as September 2004, Countrywide executives recognized that many of the loans they were originating could result in "catastrophic consequences." Less than a year later, they noted that certain high-risk loans they were making could result not only in foreclosures but also in "financial and reputational catastrophe" for the firm. But they did not stop.

*Id.*

99.  Lenders and borrowers took advantage of this climate, with borrowers willing to take on loans and lenders anxious to get those borrowers into the loans, ignoring even loosened underwriting standards. The FCIC Report observed: "Many mortgage lenders set the bar so low that lenders simply took eager borrowers' qualifications on faith, often with a willful disregard for a borrower's ability to pay." *Id.* at xxiii.

100.  In an interview with the FCIC, Alphonso Jackson, the Secretary of the Department of Housing and Urban Affairs ("HUD") from 2004 to 2008, related that HUD had heard about mortgage lenders "running wild, taking applications over the Internet, not verifying people's income or their ability to have a job." *Id.* at 12-13 (internal quotation marks omitted).

1616146v1/012661

45

EXHIBIT 13
56

1    101.   Chairman of the Federal Reserve Board, Benjamin Bernanke, spoke to

2    the decline of underwriting standards in his speech before the World Affairs

3    Council of Greater Richmond on April 10, 2008:

4         First, at the point of origination, underwriting standards became

5         increasingly compromised.  The best-known and most serious case is

6         that of subprime mortgages, mortgages extended to borrowers with

7         weaker credit histories.  To a degree that increased over time, these

8         mortgages were often poorly documented and extended with

9         insufficient attention to the borrower's ability to repay.  In retrospect,

10        the breakdown in underwriting can be linked to the incentives that the

11        originate-to-distribute model, as implemented in this case, created for

12        the originators.  Notably, the incentive structures sometimes often tied

13        originator revenue to loan volume, rather than to the quality of the

14        loans being passed up the chain.  Investors normally have the right to

15        put loans that default quickly back to the originator, which should tend

16        to apply some discipline to the underwriting process.  However, in the

17        recent episode, some originators had little capital at stake, reducing

18        their exposure to the risk that the loans would perform poorly.

19   Benjamin Bernanke, Chairman, Federal Reserve Board, Speech to the World

20   Affairs Council of Greater Richmond, *Addressing Weaknesses in the Global*

21   *Financial Markets: The Report of the President's Working Group on Financial*

22   *Markets*, Apr. 10, 2008.

23        102.   Investment banks securitized loans that were not originated in

24   accordance with underwriting guidelines and failed to disclose this fact in RMBS

25   offering documents.  As the FCIC Report noted:

26        The Commission concludes that firms securitizing mortgages failed to

27        perform adequate due diligence on the mortgages they purchased and

28        at times knowingly waived compliance with underwriting standards.

1616146v1/012661                          46

EXHIBIT 13
57

Potential investors were not fully informed or were misled about the poor quality of the mortgages contained in some mortgage-related securities. These problems appear to have been significant.

FCIC Report at 187.

103.   The lack of disclosure regarding the true underwriting practices of the Originators in the Offering Documents at issue in this Complaint put WesCorp at a severe disadvantage.   The FSOC explained that the origination and securitization process contains inherent "information asymmetries" that put investors at a disadvantage regarding critical information concerning the quality and performance of RMBS.    The FSOC Risk Retention Report described the information disadvantage for investors of RMBS:

One important informational friction highlighted during the recent financial crisis has aspects of a "lemons" problem that exists between the issuer and investor.  An originator has more information about the ability of a borrower to repay than an investor, because the originator is the party making the loan.  Because the investor is several steps removed from the borrower, the investor may receive less robust loan performance information.  Additionally, the large number of assets and the disclosures provided to investors may not include sufficient information on the quality of the underlying financial assets for investors to undertake full due diligence on each asset that backs the security.

FSOC Risk Retention Report at 9 (footnote omitted).

104.   Because investors had limited or no access to information concerning the actual quality of loans underlying the RMBS, the "originate-to-distribute" model created a situation where the origination of low quality mortgages through poor underwriting thrived.  The FSOC found:

EXHIBIT 13
58

In the originate-to-distribute model, originators receive significant compensation upfront without retaining a material ongoing economic interest in the performance of the loan. This reduces the economic incentive of originators and securitizers to evaluate the credit quality of the underlying loans carefully. Some research indicates that securitization was associated with lower quality loans in the financial crisis. For instance, one study found that subprime borrowers with credit scores just above a threshold commonly used by securitizers to determine which loans to purchase defaulted at significantly higher rates than those with credit scores below the threshold. By lower underwriting standards, securitization may have increased the amount of credit extended, resulting in riskier and unsustainable loans that otherwise may not have been originated.

Id. at 11 (footnote omitted).

105. The FSOC reported that, as the "originate-to-distribute" model became more pervasive in the mortgage industry, underwriting practices weakened across the industry. The FSOC Risk Retention Report found "[t]his deterioration was particularly prevalent with respect to the verification of the borrower's income, assets, and employment for residential real estate loans. . . ." *Id.*

106. In sum, the disregard of underwriting standards was pervasive across originators. The failure to adhere to underwriting standards directly contributed to the sharp decline in the quality of mortgages that became part of mortgage pools collateralizing RMBS. The lack of adherence to underwriting standards for the loans underlying RMBS was not disclosed to investors in the offering materials. The nature of the securitization process, with the investor several steps removed from the origination of the mortgages underlying the RMBS, made it difficult for investors to ascertain how the RMBS would perform.

1616146v1/012661                                    48

EXHIBIT 13
59

107.   As discussed below, facts have recently come to light that show many of the Originators that contributed to the loan pools underlying the RMBS at issue in this Complaint engaged in these underwriting practices.

### 2.   American Home's Systematic Disregard of Underwriting Standards

108.   American Home Mortgage Investment Corp. was a real estate investment trust that invested in RMBS consisting of loans originated and serviced by its subsidiaries.  It was the parent of American Home Mortgage Holdings, Inc., which in turn was the parent of American Home Mortgage Corp., a retail lender of mortgage loans.   Collectively, these entities are referred to herein as "American Home."  American Home originated or contributed a critical number of loans to the mortgage pools underlying the American Home Mortgage Assets Trust 2007-3, HarborView 2007-5, HarborView 2007-2, and HarborView 2006-14 offerings.

109.   Edmund Andrews, an economics reporter for the New York Times, recounted his own experience using American Home as a lender.   According to Andrews, he was looking to purchase a home in 2004, and his real estate agent referred him to a loan officer at American Home.  The American Home loan officer began the ordeal by asking Andrews how large of a loan he needed.  Andrews, who had a monthly take home pay of $2,777, advised the loan officer that he had hefty child support and alimony payments to an ex-wife.  Andrews would be relying on his then-unemployed fiancée to earn enough money to meet his monthly obligations—including the mortgage.  Andrews reported:

> As I quickly found out, American Home Mortgage had become one of the fastest-growing mortgage lenders in the country.   One of its specialties was serving people just like me:  borrowers with good credit scores who wanted to stretch their finances far beyond what our incomes could justify.  In industry jargon, we were "Alt-A" customers,

EXHIBIT 13
60

and we usually paid slightly higher rates for the privilege of concealing our financial weaknesses.

I thought I knew a lot about go-go mortgages.  I had already written several articles about the explosive growth of liar's loans, no-money-down loans, interest-only loans and other even more exotic mortgages.  I had interviewed people with very modest incomes who had taken out big loans.  Yet for all that, I was stunned at how much money people were willing to throw at me.

[The American Home loan officer] called back the next morning.  "Your credit scores are almost perfect," he said happily.  "Based on your income, you can qualify for a mortgage of about $500,000."

What about my alimony and child-support obligations?  No need to mention them.   What would happen when they saw the automatic withholdings in my paycheck? No need to show them.  If I wanted to buy a house, [the American Home loan officer] figured, it was my job to decide whether I could afford it.  His job was to make it happen.

"I am here to enable dreams," he explained to me long afterward.  [The American Home loan officer]'s view was that if I'd been unemployed for seven years and didn't have a dime to my name but I wanted a house, he wouldn't question my prudence.  "Who am I to tell you that you shouldn't do what you want to do?  I am here to sell money and to help you do what you want to do.  At the end of the day, it's your signature on the mortgage—not mine."

EXHIBIT 13
61

1   Edmund L. Andrews, *My Personal Credit Crisis*, N.Y. TIMES, May 17, 2009, at

2   MM46.

3       110.   The American Home loan officer steered Andrews to a stated-income

4   loan so that he would not have to produce paychecks or tax returns that would

5   reveal his alimony and child support obligations.   The loan officer wanted to limit

6   disclosure of Andrews's alimony and child support payments when an existing

7   mortgage showed up under Andrews's name.   Although his ex-wife was solely

8   responsible for that mortgage under the terms of the couple's separation agreement,

9   the only way Andrews could explain that fact would be to produce the agreement,

10  which would also reveal his alimony and child support obligations.   According to

11  Andrews:

12       [The American Home loan officer] didn't get flustered.   If Plan A

13       didn't work, he would simply move down another step on the ladder of

14       credibility.   Instead of "stating" my income without documenting it, I

15       would take out a "no ratio" mortgage and not state my income at all.

16       For the price of a slightly higher interest rate, American Home would

17       verify my assets, but that was it.   Because I wasn't stating my income,

18       I couldn't have a debt-to-income ratio, and therefore, I couldn't have

19       too much debt.   I could have had four other mortgages, and it wouldn't

20       have mattered.   American Home was practically begging me to take

21       the money.

22  *Id.*

23       111.   American Home ultimately approved Andrews's application.   Not

24  surprisingly, Andrews was unable to afford his monthly mortgage payments.

25       112.   American Home's lack of adherence to underwriting guidelines was

26  set forth in detail in a 165-page amended class action complaint filed June 4, 2008,

27  in *In re American Home Mortgage Sec Litig*, No. 07-md-1898 (TCP) (E.D.N.Y.).

28  Investors in American Home common/preferred stock alleged that the company

EXHIBIT 13
62

misrepresented itself as a conservative lender, when, based on statements from more than 33 confidential witnesses and internal company documents, American Home in reality was a high risk lender, promoting quantity of loans over quality by targeting borrowers with poor credit, violating company underwriting guidelines, and providing incentives for employees to sell risky loans, regardless of the borrowers' creditworthiness. *See* Am. Class Action Compl., *In re American Home Mortgage Sec. Litig.*, No. 07-md-1898 (E.D.N.Y. filed June 4, 2008) ("American Home ACC").

113. According to the American Home ACC, former American Home employees recounted that underwriters were consistently bullied by sales staff when underwriters challenged questionable loans, while exceptions to American Home's underwriting guidelines were routinely applied. *See id.* at 43.

114. The American Home ACC cited to witnesses who were former American Home employees. These witnesses reported that American Home management told underwriters not to decline a loan, regardless of whether the loan application included fraud. *See id.*

115. Another former American Home employee stated that American Home routinely made exceptions to its underwriting guidelines to be able to close loans. When American Home mortgage underwriters raised concerns to the sales department about the pervasive use of exceptions to American Home's mortgage underwriting practices, the sales department contacted American Home headquarters to get approval for the use of exceptions. Indeed, it was commonplace to overrule mortgage underwriters' objections to approving a loan to facilitate loan approval. *See id.* at 44.

116. A former American Home auditor confirmed this account that American Home mortgage underwriters were regularly overruled when they objected to loan originations. *See id.*

EXHIBIT 13
63

117.   The parties settled the litigation on January 14, 2010, for $37.25 million.

118.   American Home's lax lending practices landed it in the 2008 "Worst Ten in the Worst Ten" Report.  American Home came in 8th in Las Vegas, Nevada, and 9th in both Detroit, Michigan, and Miami, Florida.  *See* 2008 "Worst Ten in the Worst Ten" Report.  When the OCC issued the 2009 "Worst Ten in the Worst Ten" Report, American Home again featured prominently, appearing in the top ten in six of the ten worst metropolitan areas (4th in both Fort Pierce-Port St. Lucie, Florida, and Fort Myers-Cape Coral, Florida; 7th in Vallejo-Fairfield-Napa, California; 8th in Las Vegas, Nevada; 9th in Stockton-Lodi, California; and 10th in Bakersfield, California).  *See* 2009 "Worst Ten in the Worst Ten" Report.

### 3.   **Countrywide Home Loans, Inc.'s Systematic Disregard of Underwriting Standards**

119.   Countrywide Home Loans, Inc. ("Countrywide") was among the largest originators of residential mortgages in the United States during the period at issue in this Complaint.  Countrywide originated or contributed a critical portion of the loans in the mortgage pools underlying the HarborView 2007-1, HarborView 2006-12, HarborView 2006-11, and HarborView 2006-9 offerings.

120.   In October 2009, the House Committee on Oversight and Government Reform launched an investigation into the entire subprime mortgage industry, including Countrywide, focusing on "whether mortgage companies employed deceptive and predatory lending practices, or improper tactics to thwart regulation, and the impact of those activities on the current crisis."  Press Release, Comm. on Oversight & Government Reform, Statement of Chairman Towns on Committee Investigation Into Mortgage Crisis at 1 (Oct. 23, 2009) (internal quotation marks omitted).

121.   On May 9, 2008, the New York Times noted that minimal documentation and stated income loans—Countrywide's No Income/No Assets

EXHIBIT 13
64

Program and Stated Income/Stated Assets Program—have "bec[o]me known [within the mortgage industry] as 'liars' loans' because many [of the] borrowers falsified their income."   Floyd Norris, *A Little Pity, Please, for Lenders*, N.Y. TIMES, May 9, 2008, at C1.

122.   In a television special titled, "If You Had a Pulse, We Gave You a Loan," Dateline NBC reported on March 27, 2009:

> To highlight just how simple it could be to borrow money, Countrywide marketed one of its stated-income products as the "Fast and Easy loan."
>
> As manager of Countrywide's office in Alaska, Kourosh Partow pushed Fast and Easy loans and became one of the company's top producers.
>
> He said the loans were "an invitation to lie" because there was so little scrutiny of lenders.  "We told them the income that you are giving us will not be verified.  The asset that you are stating will not be verified."
>
> He said they joked about it:  "If you had a pulse, we gave you a loan. If you fog the mirror, give you a loan."
>
> But it turned out to be no laughing matter for Partow.  Countrywide fired him for processing so-called "liar loans" and federal prosecutors charged him with crimes.  On April 20, 2007, he pleaded guilty to two counts of wire fraud involving loans to a real estate speculator; he spent 18 months in prison.

EXHIBIT 13
65

In an interview shortly after he completed his sentence, Partow said that the practice of pushing through loans with false information was common and was known by top company officials. "It's impossible they didn't know."

. . .

During the criminal proceedings in federal court, Countrywide executives portrayed Partow as a rogue who violated company standards.

But former senior account executive Bob Feinberg, who was with the company for 12 years, said the problem was not isolated. "I don't buy the rogue. I think it was infested."

He lamented the decline of what he saw as a great place to work, suggesting a push to be number one in the business led Countrywide astray. He blamed Angelo Mozilo, a man he long admired, for taking the company down the wrong path. It was not just the matter of stated income loans, said Feinberg. Countrywide also became a purveyor of loans that many consumer experts contend were a bad deal for borrowers, with low introductory interest rates that later could skyrocket.

In many instances, Feinberg said, that meant borrowers were getting loans that were "guaranteed to fail."

123. On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide executives, alleging securities fraud. Specifically, the SEC alleged that Mozilo and the others misled investors about the credit risks that Countrywide created with its

1616146v1/012661                                55

EXHIBIT 13
66

mortgage origination business, telling investors that Countrywide was primarily involved in prime mortgage lending, when it was actually heavily involved in risky sub-prime loans with expanded underwriting guidelines. *See* Compl. for Violations of the Federal Securities Laws, *SEC v. Mozilo*, No. CV 09-3994-JFW (C.D. Cal. filed June 4, 2009). Mozilo and the other executives settled the charges with the SEC for $73 million on October 15, 2010. *See* Walter Hamilton & E. Scott Reckard, *Angelo Mozilo, Other Former Countrywide Execs Settle Fraud Charges*, L.A. Times, Oct. 16, 2010, at A1.

124. Internal Countrywide e-mails the SEC released in connection with its lawsuit show the extent to which Countrywide systematically deviated from its underwriting guidelines. For instance, in an April 13, 2006 e-mail from Mozilo to other top Countrywide executives, Mozilo stated that Countrywide was originating home mortgage loans with "serious disregard for process, compliance with guidelines and irresponsible behavior relative to meeting timelines." E-mail from Angelo Mozilo to Eric Sieracki and other Countrywide Executives (Apr. 13, 2006 7:42 PM PDT). Mozilo also wrote that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]." *Id.* (internal quotation marks omitted).

125. Indeed, in September 2004, Mozilo had voiced his concern over the "clear deterioration in the credit quality of loans being originated," observing that "the trend is getting worse" because of competition in the non-conforming loans market. With this in mind, Mozilo argued that Countrywide should "seriously consider securitizing and selling ([Net Interest Margin Securities]) a substantial portion of [Countrywide's] current and future sub prime [sic] residuals." E-mail from Angelo Mozilo to Stan Kurland & Keith McLaughlin, Managing Directors, Countrywide (Sept. 1, 2004 8:17 PM PDT).

EXHIBIT 13
67

126.   To protect themselves against poorly underwritten loans, parties that purchase loans from an originator frequently require the originator to repurchase any loans that suffer Early Payment Default.

127.   In the first quarter of 2006, HSBC Holdings plc ("HSBC"), a purchaser of Countrywide's 80/20 subprime loans, began to force Countrywide to repurchase certain loans that HSBC contended were defective under the parties' contract.   In an e-mail sent on April 17, 2006, Mozilo asked, "[w]here were the breakdowns in our system that caused the HSBC debacle including the creation of the contract all the way through the massive disregard for guidelines set forth by both the contract and corporate."   E-mail from Angelo Mozilo to Dave Sambol, former Executive Managing Director and Chief of Mortgage Banking and Capital Markets, Countrywide Financial (Apr. 17, 2006 5:55 PM PST).  Mozilo continued:

> In all my years in the business I have never seen a more toxic prduct.
> [sic]  It's not only subordinated to the first, but the first is subprime.  In
> addition, the [FICOs] are below 600, below 500 and some below 400.
> . . . With real estate values coming down . . . the product will become
> increasingly worse.   There has [sic] to be major changes in this
> program, including substantial increases in the minimum [FICO].

*Id.*

128.   Countrywide sold a product called the "Pay Option ARM."  This loan was a 30-year adjustable rate mortgage that allowed the borrower to choose between various monthly payment options, including a set minimum payment.  In a June 1, 2006 e-mail, Mozilo noted that most of Countrywide's Pay Option ARMs were based on stated income and admitted that "[t]here is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records."  E-mail from Angelo Mozilo to Carlos Garcia, former

1616146v1/012661                                           57

EXHIBIT 13
68

1   CFO of Countrywide Financial, and Jim Furash, former President of Countrywide

2   Bank (June 1, 2006 10:38 PM PST).

3       129.   An internal quality control report e-mailed on June 2, 2006, showed

4   that, for stated income loans, 50.3% of loans indicated a variance of 10% or more

5   from the stated income in the loan application.  *See* E-mail from Clifford Rossi,

6   Chief Risk Officer, Countrywide, to Jim Furash, Executive, CEO, Countrywide

7   Bank, N.A., among others (June 2, 2006 12:28 PM PDT).

8       130.   Countrywide, apparently, was "flying blind" on how one of its popular

9   loan products, the Pay Option ARM loan, would perform, and, admittedly, had "no

10  way, with any reasonable certainty, to assess the real risk of holding these loans on

11  [its] balance sheet."   E-mail from Angelo Mozilo to Dave Sambol, Managing

12  Director Countrywide (Sept. 26, 2006 10:15 AM PDT).   Yet such loans were

13  securitized and passed on to unsuspecting investors such as WesCorp.

14      131.   With growing concern over the performance of Pay Option ARM

15  loans in the waning months of 2007, Mozilo advised that he "d[id]n't want any

16  more Pay Options originated for the Bank."  E-mail from Angelo Mozilo to Carlos

17  Garcia, former Managing Director, Countrywide (Nov. 3, 2007 5:33 PM PST).   In

18  other words, if Countrywide was to continue to originate Pay Option ARM loans, it

19  was not to hold onto the loans.  Mozilo's concerns about Pay Option ARM loans

20  were rooted in "[Countrywide's] inability to underwrite [Pay Option ARM loans]

21  combined with the fact that these loans [we]re inherently unsound unless they are

22  full doc, no more than 75% LTV and no piggys."  *Id.*

23      132.   In a March 27, 2006 e-mail, Mozilo reaffirmed the need to "oversee all

24  of the corrective processes that will be put into effect to permanently avoid the

25  errors of both judgement [sic] and protocol that have led to the issues that we face

26  today" and that "the people responsible for the origination process understand the

27  necessity for adhering to the guidelines for 100% LTV sub-prime product.  This is

28  the most dangerous product in existence and there can be nothing more toxic and

1616146v1/012661                         58

EXHIBIT 13
69

1  therefore requires that no deviation from guidelines be permitted irrespective of the

2  circumstances." E-mail from Angelo Mozilo to the former Countrywide Managing

3  Directors (Mar. 27, 2006 8:53 PM PST).

4          133.  Yet Countrywide routinely found exceptions to its underwriting

5  guidelines without sufficient compensating factors.  In an April 14, 2005 e-mail,

6  Frank Aguilera, a Countrywide managing director, explained that the "spirit" of

7  Countrywide's exception policy was not being followed.  He noted a "significant

8  concentration of similar exceptions" that "denote[d] a divisional or branch

9  exception policy that is out side [sic] the spirit of the policy."  E-mail from Frank

10 Aguilera, Managing Director, Countrywide to John McMurray, Managing Director,

11 Countrywide (Apr. 14, 2005 12:14 PM PDT).  Aguilera continued:  "The continued

12 concentration in these same categories indicates either a) inadequate controls in

13 place to mange [sic] rogue production units or b) general disregard for corporate

14 program policies and guidelines."  *Id.*  Aguilera observed that pervasive use of the

15 exceptions policy was an industry-wide practice:

16         It appears that [Countrywide Home Loans]' loan exception policy is

17         more loosely interpreted at [Specialty Lending Group] than at the other

18         divisions.  I understand that [Correspondent Lending Division] has

19         decided to proceed with a similar strategy to appease their complaint

20         customers. . . .  [Specialty Lending Group] has clearly made a market

21         in this unauthorized product by employing a strategy that Blackwell

22         has suggested is prevalent in the industry. . . .

23 *Id.*

24         134.  Internal reports months after an initial push to rein in the excessive use

25 of exceptions with a "zero tolerance" policy showed the use of exceptions remained

26 excessive.  E-mail from Frank Aguilera, Managing Director, Countrywide, to Brian

27 Kuelbs, Managing Director, Countrywide, among others (June 12, 2006 10:13 AM

28 PDT).

EXHIBIT 13
70

135.   In February 2007, nearly a year after pressing for a reduction in the overuse of exceptions and as Countrywide claimed to be tightening lending standards, Countrywide executives found that exceptions continued to be used at an unacceptably high rate.   Frank Aguilera stated that any "[g]uideline tightening should be considered purely optics with little change in overall execution unless these exceptions can be contained."   E-mail from Frank Aguilera, Managing Director, Countrywide, to Mark Elbuam, Managing Director, Countrywide, among others (Feb. 21, 2007 4:58 PM PST).

136.   John McMurray, a former Countrywide managing director, expressed his opinion in a September 2007 e-mail that "the exception process has never worked properly."   E-mail from John McMurray, Managing Director, Countrywide, to Jess Lederman, Managing Director, Countrywide (Sept. 7, 2007 10:12 AM PDT).

137.   Countrywide conceded that the poor performance of loans it originated was, in many cases, due to poor underwriting.   In April 2007, Countrywide noticed that its high combined loan-to-value ratio ("CLTV") stated income loans were performing worse than those of its competitors.   After reviewing many of the loans that went bad, a Countrywide executive stated that "in most cases [poor performance was] due to poor underwriting related to reserves and verification of assets to support reasonable income."   E-mail from Russ Smith, Countrywide, to Andrew Gissinger, Managing Director, Countrywide (Apr. 11, 2007 7:58 AM PDT).

138.   On October 6, 2008, 39 states announced that Countrywide agreed to pay up to $8 billion in relief to homeowners nationwide to settle lawsuits and investigations regarding Countrywide's deceptive lending practices.

139.   On July 1, 2008, NBC Nightly News aired the story of a former Countrywide regional Vice President, Mark Zachary, who sued Countrywide after

EXHIBIT 13
71

1    he was fired for questioning his supervisors about Countrywide's poor underwriting

2    practices.

3       140.   According to Zachary, Countrywide pressured employees to approve

4    unqualified borrowers.  Countrywide's mentality, he said, was "what do we do to

5    get one more deal done.  It doesn't matter how you get there [*i.e.*, how the

6    employee closes the deal]. . . ."  NBC Nightly News, Countrywide Whistleblower

7    Reports "Liar Loans" (July 1, 2008) ("July 1, 2008 NBC Nightly News").  Zachary

8    also stated that the practices were not the work of a few bad apples, but rather:  "It

9    comes down, I think from the very top that you get a loan done at any cost."  *Id.*

10      141.   Zachary also told of a pattern of:  (1) inflating home appraisals so

11   buyers could borrow enough to cover closing costs, but leaving the borrower owing

12   more than the house was truly worth; (2) employees steering borrowers who did not

13   qualify for a conventional loan into riskier mortgages requiring little or no

14   documentation, knowing they could not afford it; and (3) employees coaching

15   borrowers to overstate their income in order to qualify for loans.

16      142.   NBC News interviewed six other former Countrywide employees from

17   different parts of the country, who confirmed Zachary's description of

18   Countrywide's corrupt culture and practices.   Some said that Countrywide

19   employees falsified documents intended to verify borrowers' debt and income to

20   clear loans.  NBC News quoted a former loan officer:  "'I've seen supervisors stand

21   over employees' shoulders and watch them . . . change incomes and things like that

22   to make the loan work.'"  July 1, 2008 NBC Nightly News.

23      143.   Not surprisingly, Countrywide's default rates reflected its approach to

24   underwriting.  *See* 2008 "Worst Ten in the Worst Ten" Report.  Countrywide

25   appeared on the top ten list in six of the ten markets:  4th in Las Vegas, Nevada; 8th

26   in Sacramento, California; 9th in Stockton, California, and Riverside, California;

27   and 10th in Bakersfield, California, and Miami, Florida.  When the OCC issued its

28   updated 2009 "Worst Ten in the Worst Ten" Report, Countrywide appeared on the

EXHIBIT 13
72

top ten list in every market, holding 1st place in Las Vegas, Nevada; 2nd in Reno, Nevada; 3rd in Merced, California; 6th in Fort Myers-Cape Coral, Florida, Modesto, California, and Stockton-Lodi, California; 7th in Riverside-San Bernardino, California, and Fort Pierce-Port St. Lucie, Florida; 8th in Vallejo-Fairfield-Napa, California; and 9th in Bakersfield, California. *See* 2009 "Worst Ten in the Worst Ten" Report.

### 4. First National Bank of Nevada's Systematic Disregard of Underwriting Standards

144. First National Bank of Nevada ("FNBN") originated or contributed a critical portion of loans in the mortgage pool underlying the Nomura HELT 2007-1 offering. The Federal Deposit Insurance Corporation ("FDIC") wound down FNBN's operations in July 2008—among the largest bank failures of that year.

145. FNBN faces a class action lawsuit that alleges FNBN systematically disregarded its underwriting guidelines when originating mortgages that were subsequently securitized into RMBS. *See* Consolidated Amended Class Action Compl., *Plumber's Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, No. 08-cv-10446 (D. Mass. filed Jan. 20, 2009) ("Plumber's Union ACC").

146. According to the Plumber's Union ACC, one of FNBN's underwriters approached her Underwriting Supervisor about a loan application where the borrower—a hotel housekeeper—stated a monthly income of $5,000.

147. The mortgage underwriter informed her supervisor of her intention to deny the loan on the grounds that the unverified income of the borrower appeared to be inflated. The Underwriting Supervisor pushed back on the underwriter's decision, assuring her that the loan could be worked out. The underwriter told the Underwriting Supervisor that it was "absolutely impossible" for the application information to be true, but the Underwriting Supervisor refused to "back-down." The underwriter refused to close the loan, but the Underwriting Supervisor eventually signed the necessary forms and the loan was closed. *See id.* ¶ 92.

EXHIBIT 13
73

148.   The complaint described FNBN's use of "loan scrubbing" when originating loans. *See id.* ¶ 87.

149.   According to the complaint, the Warm Springs office in Las Vegas, Nevada, employed eight or nine Loan Coordinators whose primary job was to "scrub" the loan applications received from a broker.  This consisted of removing any and all information for the loan application that would disqualify the borrower from FNBN's loan programs. FNBN Loan Coordinators were often fired for failing to alter the loan package information to eliminate disqualifying information. *See id.* ¶ 87.

150.   FNBN originated a large number of Alt-A loans, many of which were made to borrowers who were "obviously unqualified to be able to repay them," although FNBN would make the loans pass by "creating the numbers to make things work." *See id.* ¶ 88.

### 5.   IndyMac Bank's Systematic Disregard of Underwriting Standards

151.   IndyMac Bank ("IndyMac") was a principal originator of the loans underlying the IndyMac INDX Mortgage Loan Trust 2006-AR35 and HarborView 2006-14 offerings.

152.   On July 11, 2008, just four months after IndyMac filed its 2007 Annual Report, federal regulators seized IndyMac in what was among one of the largest bank failures in U.S. history.  IndyMac filed for bankruptcy on July 31, 2008.

153.   On March 4, 2009, the Office of the Inspector General of the United States Department of the Treasury ("Treasury OIG") issued Audit Report No. OIG-09-032, titled "Safety and Soundness:  Material Loss Review of IndyMac Bank, FSB" (the "IndyMac OIG Report"), reporting the results of the Treasury OIG's review of the failure of IndyMac.  The IndyMac OIG Report portrays IndyMac as a company determined to originate as many loans as possible, as quickly as possible,

EXHIBIT 13
74

1   without regard for the quality of the loans, the creditworthiness of the borrowers, or
2   the value of the underlying collateral.

3       154.   According to the IndyMac OIG Report, "[t]he primary causes of
4   IndyMac's failure were . . . associated with its" "aggressive growth strategy" of
5   "originating and securitizing Alt-A loans on a large scale." IndyMac OIG Report at
6   2.   The report found, "IndyMac often made loans without verification of the
7   borrower's income or assets, and to borrowers with poor credit histories.
8   Appraisals obtained by IndyMac on underlying collateral were often questionable
9   as well." *Id.*

10      155.   IndyMac "encouraged the use of nontraditional loans," engaged in
11  "unsound underwriting practices," and "did not perform adequate underwriting," in
12  an effort to "produce as many loans as possible and sell them in the secondary
13  market." *Id.* at 11, 21.   The IndyMac OIG Report reviewed a sampling of loans in
14  default and found "little, if any, review of borrower qualifications, including
15  income, assets, and employment." *Id.* at 11.

16      156.   IndyMac was not concerned by the poor quality of the loans or the fact
17  that borrowers simply "could not afford to make their payments" because, "as long
18  as it was able to sell those loans in the secondary mortgage market," IndyMac could
19  remain profitable. *Id.* at 2-3.

20      157.   IndyMac's "risk from its loan products . . . was not sufficiently offset
21  by other underwriting parameters, primarily higher FICO scores and lower LTV
22  ratios." *Id.* at 31.

23      158.   Unprepared for the downturn in the mortgage market and the sharp
24  decrease in demand for poorly underwritten loans, IndyMac found itself "hold[ing]
25  $10.7 billion of loans it could not sell in the secondary market." *Id.* at 3.   This
26  proved to be a weight it could not bear, and IndyMac ultimately failed. *See id.*

27      159.   In June 2008, the Center for Responsible Lending ("CRL") published a
28  report titled *IndyMac: What Went Wrong? How an 'Alt-A' Leader Fueled its*

EXHIBIT 13
75

1   *Growth with Unsound and Abusive Mortgage Lending* (June 30, 2008) ("CRL
2   Report"), *available at* http://www.responsiblelending.org/mortgage-
3   lending/research-analysis/indymac_what_went_ wrong.pdf.   The CRL Report
4   detailed the results of the CRL's investigation into IndyMac's lending practices.
5   CRL based its report on interviews with former IndyMac employees and reviewed
6   numerous lawsuits filed against IndyMac.  The CRL Report summarized the results
7   of its investigation as follows:

8       IndyMac's story offers a body of evidence that discredits the notion
9       that the mortgage crisis was caused by rogue brokers or by borrowers
10      who lied to bankroll the purchase of bigger homes or investment
11      properties.  CRL's investigation indicates many of the problems at
12      IndyMac were spawned by top-down pressures that valued short-term
13      growth over protecting borrowers and shareholders' interests over the
14      long haul.

15  CRL Report at 1.

16      160.  CRL reported that its investigation "uncovered substantial evidence
17  that [IndyMac] engaged in unsound and abusive lending during the mortgage boom,
18  routinely making loans without regard to borrowers' ability to repay [the mortgage
19  loans]." *Id.* at 2.

20      161.  The CRL Report stated that "IndyMac pushed through loans with
21  fudged or falsified information or simply lowered standards so dramatically that
22  shaky loans were easy to approve." *Id.*

23      162.  The CRL Report noted that, "[a]s IndyMac lowered standards and
24  pushed for more volume," "the quality of [IndyMac's] loans became a running joke
25  among its employees." *Id.* at 3.

26      163.  Former IndyMac mortgage underwriters explained that "loans that
27  required no documentation of the borrowers' wages" were "[a] big problem"
28  because "these loans allowed outside mortgage brokers and in-house sales staffers

EXHIBIT 13
76

to inflate applicants' [financial information] . . . and make them look like better credit risks." *Id.* at 8. These "shoddily documented loans were known inside the company as 'Disneyland loans'—in honor of a mortgage issued to a Disneyland cashier whose loan application claimed an income of $90,000 a year." *Id.* at 3.

164. The CRL also found evidence that:   (1) managers pressured underwriters to approve shaky loans in disregard of IndyMac's underwriting guidelines; and (2) managers overruled underwriters' decisions to deny loans that were based upon falsified paperwork and inflated appraisals. For instance, Wesley E. Miller, who worked as a mortgage underwriter for IndyMac in California from 2005 to 2007, told the CRL:

> [W]hen he rejected a loan, sales managers screamed at him and then went up the line to a senior vice president and got it okayed.  "There's a lot of pressure when you're doing a deal and you know it's wrong from the get-go—that the guy can't afford it," Miller told CRL.  "And then they pressure you to approve it."
>
> The refrain from managers, Miller recalls, was simple:  "Find a way to make this work."

*Id.* at 9 (footnote omitted).

165.   Likewise, Audrey Streater, a former IndyMac mortgage underwriting team leader, stated:  "I would reject a loan and the insanity would begin.  It would go to upper management and the next thing you know it's going to closing." *Id.* at 1, 3.  Streater also said the "prevailing attitude" at IndyMac was that underwriting was "window dressing—a procedural annoyance that was tolerated because loans needed an underwriter's stamp of approval if they were going to be sold to investors." *Id.* at 8.

166.   Scott Montilla, who was an IndyMac mortgage loan underwriter in Arizona during the same time period, told the CRL that IndyMac management

EXHIBIT 13
77

1  would override his decision to reject loans about 50% of the time. *See id.* at 9.

2  According to Montilla:

3      "I would tell them: 'If you want to approve this, let another

4      underwriter do it, I won't touch it—I'm not putting my name on it,'"

5      Montilla says. "There were some loans that were just blatantly

6      overstated. . . . Some of these loans are very questionable. They're

7      not going to perform."

8  *Id.* at 10.

9      167.   Montilla and another IndyMac mortgage underwriter told the CRL that

10 borrowers did not know their stated incomes were being inflated as part of the

11 application process. *See id.* at 14.

12     168.   On July 2, 2010, the FDIC sued certain former officers of IndyMac's

13 Homebuilder Division ("HBD"), alleging that IndyMac disregarded its

14 underwriting practices, among other things, and approved loans to borrowers who

15 were not creditworthy or for projects with insufficient collateral. *See Compl.* ¶ 6,

16 *FDIC v. Van Dellen*, No. 2:10-cv-04915-DSF (C.D. Cal. filed July 2, 2010). That

17 case is set for trial in September 2012.

18     169.   IndyMac currently faces a class action lawsuit alleging disregard of

19 underwriting standards that adversely affected the value of the purchased RMBS.

20 *See* Class Action Compl., *In re IndyMac Mortgage-Backed Sec. Litig.*, No. 09-4583

21 (S.D.N.Y. filed May 14, 2009). On June 21, 2010, the class action suit survived a

22 motion to dismiss.

23     170.   Like loan purchasers, insurers of RMBS also typically require the

24 insured party to repurchase loans suffering Early Payment Default in order to

25 protect themselves against fraud and poor underwriting.

26     171.   MBIA Insurance Corporation, an RMBS insurer, filed a breach of

27 contract claim against IndyMac (with the FDIC representing IndyMac as

28 conservator and receiver) in May 2009, claiming that IndyMac made contractual

EXHIBIT 13
78

1  misrepresentations concerning its adherence to its underwriting standards in

2  processing mortgage loan applications. *See* Compl., *MBIA Ins. Corp. v. IndyMac*

3  *Bank, FSB*, No. 1:09-cv-01011-CKK (D.D.C. filed May 29, 2009).  A motion to

4  dismiss is pending.

5       172.  IndyMac's failure to abide by its underwriting standards left investors

6  holding severely downgraded junk securities.  As a result of IndyMac's systematic

7  disregard of its underwriting standards, the OCC included IndyMac in the OCC's

8  2008 "Worst Ten in the Worst Ten" Report.  IndyMac ranked 10th in Las Vegas,

9  Nevada, in both 2008 and 2009, while coming in at 10th in Merced, California,

10  Riverside-San Bernardino, California, and Modesto, California, in 2009. *See* 2008

11  "Worst Ten in the Worst Ten" Report; 2009 "Worst Ten in the Worst Ten" Report.

12       **6.**     **Option One Mortgage Corporation's Systematic Disregard**

13               **of Underwriting Standards**

14       173.  Option One Mortgage Corporation ("Option One") was a California

15  corporation headquartered in Irvine, California.  Option One originated, serviced,

16  acquired, and sold non-prime residential mortgages.  The company was founded in

17  1992 and, from June 1997 until April 2008, was a subsidiary of Block Financial

18  Corporation.  In April 2008, Option One's assets were sold to American Home

19  Mortgage Servicing, Inc.  Option One originated or contributed loans in the

20  mortgage pool underlying the Soundview Home Loan Trust 2005-OPT4 offering.

21       174.  The Massachusetts Attorney General sued Option One, alleging,

22  among other things, that Option One failed to follow its own underwriting

23  standards in processing mortgage loan applications. *See Massachusetts v. H&R*

24  *Block, Inc.*, No. 08-2474-BLS (Mass. Super. Ct. filed June 3, 2008); *see also* Tim

25  McLaughlin, *Caturano Being Acquired by RSM McGladrey*, BOSTON BUS. J., June

26  24, 2010.  Trial is set for June 2011.

27       175.  Option One faces a lawsuit that alleges it systematically disregarded its

28  underwriting guidelines when originating mortgages that were subsequently

EXHIBIT 13
79

securitized into RMBS. *See* Complaint, *Federal Home Loan Bank of Chicago v. Banc of Am.*, No. 10-ch-45003 (Ill. Cir. Ct.) ("FHLB Chicago Complaint").

176. Statements from confidential witnesses in the FHLB Chicago Complaint represented that Option One originated mortgage loans in violation of its stated underwriting standards.

177. According to one confidential witness in the complaint, Option One "watered down" the appraisal process, allowing loans with inflated appraisals to be approved. *See id.* ¶ 298.

178. The same confidential witness explained how Option One told its employees to "be more aggressive"; it was made clear that the main objective of the company was to generate loans—"[a]s long as they could sell it, that's what mattered." *See id.* ¶ 296.

179. Another confidential witness stated that one particular broker who worked with Option One "was given preferential treatment and his loans were always pushed through" because he provided the company with "lots and lots of loans"; loans that this confidential witness said were often absent the necessary documentation. *See id.* ¶ 297.

### 7. Silver State Mortgage Company's Systematic Disregard of Underwriting Standards

180. Silver State Mortgage Company ("Silver State") was a national wholesale and residential mortgage lender headquartered in Las Vegas, Nevada. Silver State ceased operations in February 2007 amid the turmoil of the subprime mortgage crisis. The details of Silver State's mortgage lending practices slowly emerged after it ceased operations. Silver State originated or contributed a critical portion of loans in the mortgage pool underlying the Alternative Loan Trust 2006-AR4 and Nomura HELT 2007-1 offerings.

181. A former Silver State employee recounted his experiences as a loan officer with Silver State in a May 9, 2008 This American Life story on NPR

1616146v1/012661                                   69

EXHIBIT 13
80

1   entitled "The Giant Pool of Money."   Mike Garner, the former Silver State

2   employee, related how Silver State did not adequately assess whether the income of

3   borrowers under Silver State's "stated income" product was reasonable compared

4   to the borrowers' line of work:

5       Garner:  The next guideline lower is just stated income, stated assets.

6       Then you state what you make and state what's in your bank account.

7       They call and make sure you work where you say you work.  Then an

8       accountant has to say for your field it is possible to make what you

9       said you make.  But they don't say what you make, they just say it's

10      possible that they could make that.

11  Alex Blumberg & Adam Davidson, *The Giant Pool of Money* (National Public

12  Radio      broadcast      May      9,      2008),      *transcript      available      at*

13  http://www.thisamericanlife.org/sites/default/files/355_transcript.pdf.

14      182.   Alex Blumberg, one of the NPR interviewers, commented on how easy

15  it could have been to simply provide a W-2.  Garner responded by describing the

16  means by which loan officers would determine whether the income was reasonable

17  for the occupation:

18      Blumberg:  It's just so funny that instead of just asking people to prove

19      what they make, there's this theater in place of you have to find an

20      accountant sitting right in front of me who could very easily provide a

21      W2, but we're not asking for a W2 form, but we do want this

22      accountant to say yeah, what they're saying is plausible in some

23      universe.

24

25      Garner:  Yeah, and loan officers would have an accountant they could

26      call up and say "Can you write a statement saying a truck driver can

27      make this much money?" Then the next one, came along, and it was no

28      income, verified assets.  So you don't have to tell the people what you

EXHIBIT 13

81

1      do for a living.  You don't have to tell the people what you do for

2      work.  All you have to do is state you have a certain amount of money

3      in your bank account.  And then, the next one, is just no income, no

4      asset.  You don't have to state anything.  Just have to have a credit

5      score and a pulse.

6  *Id.*

7      183.   Garner recounted how his boss at Silver State despised these types of

8  loan products that permitted such wanton disregard of underwriting standards.

9  Garner concluded:

10     Garner:  Yeah.  And my boss was in the business for 25 years.  He

11     hated those loans.  He hated them and used to rant and say, "It makes

12     me sick to my stomach the kind of loans that we do."  He fought the

13     owners and sales force tooth and neck about these guidelines.  He got

14     [the] same answer.  Nope, other people are offering it.  We're going to

15     offer them too.  We're going to get more market share this way.

16     House prices are booming, everything's gonna [sic] be good.  And . . .

17     the company was just rolling in the cash.  The owners and the

18     production staff were just raking it in.

19 *Id.*

20     184.   Instead, Silver State, like many other originators, focused on keeping

21 up with the competition, sacrificing adherence to underwriting guidelines.  This

22 quixotic quest for higher profits and more market share ultimately failed as Silver

23 State ceased operations in 2007, no longer maintaining any share of the mortgage

24 market.

25         **8.   WaMu's Systematic Disregard of Underwriting Standards**

26     185.   WaMu contributed a substantial portion of loans to the Luminent

27 Mortgage Trust 2007-1 offering.

28

EXHIBIT 13
82

186.   WaMu was a Seattle-based thrift that rapidly grew from a regional to a national mortgage lender from 1991 to 2006.   At over \$300 billion in total assets, WaMu was at one time the largest institution regulated by the Office of Thrift Supervision ("OTS").   On September 25, 2008, however, federal regulators closed WaMu when loan losses, borrowing capacity limitations, a plummeting stock price, and rumors of WaMu's problems led to a run on the thrift by depositors.   Federal regulators facilitated the sale of WaMu to J.P. Morgan Chase & Co., in September 2008.

187.   In April 2010, the Treasury OIG, issued a report entitled, "Evaluation of Federal Regulatory Oversight of Washington Mutual Bank," Report No. EVAL-10-002 (the "WaMu OIG Report"), discussing the reasons for WaMu's meteoric rise and consequent collapse.   The WaMu OIG Report found, "WaMu failed primarily because of management's pursuit of a high-risk lending strategy that included liberal underwriting standards and inadequate risk controls."   WaMu OIG Report at 2.   The report elaborated on how WaMu adopted this new strategy to compete with Countrywide and maximize profits:

> In 2005, WaMu management made a decision to shift its business strategy away from originating traditional fixed-rate and conforming single family residential loans, towards riskier nontraditional loan products and subprime loans.   WaMu pursued the new strategy in anticipation of increased earnings and to compete with Countrywide. . . .
>
> . . . WaMu estimated in 2006 that its internal profit margin from subprime loans could be more than 10 times the amount for a government-backed loan product and more than 7 times the amount for a fixed-rate loan product.

*Id.* at 8 (footnote omitted).

EXHIBIT 13
83

188.   As previously noted in this Complaint, the PSI issued its report on the causes of the economic crisis.  The PSI Wall Street Report used WaMu as its case study into lending practices of the mortgage industry during the housing bubble. Citing internal e-mails and correspondence the PSI obtained as part of its investigation, the PSI made the following factual findings:

(1) High Risk Lending Strategy.  [WaMu] executives embarked upon a High Risk Lending Strategy and increased sales of high risk home loans to Wall Street, because they projected that high risk home loans, which generally charged higher rates of interest, would be more profitable for the bank than low risk home loans.

(2) Shoddy Lending Practices.  WaMu and its affiliate, [Long Beach], used shoddy lending practices riddled with credit, compliance, and operational deficiencies to make tens of thousands of high risk home loans that too often contained excessive risk, fraudulent information, or errors.

(3) Steering Borrowers to High Risk Loans.  WaMu and Long Beach too often steered borrowers into home loans they could not afford, allowing and encouraging them to make low initial payments that would be followed by much higher payments, and presumed that rising home prices would enable those borrowers to refinance their loans or sell their homes before the payments shot up.

(4) Polluting the Financial System.   WaMu and Long Beach securitized over $77 billion in subprime home loans and billions more in other high risk home loans, used Wall Street firms to sell the securities to investors worldwide, and polluted the financial system

EXHIBIT 13
84

with mortgage backed securities which later incurred high rates of delinquency and loss.

(5) Securitizing Delinquency-Prone and Fraudulent Loans.  At times, WaMu selected and securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors who bought the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered.

(6) Destructive Compensation.   WaMu's compensation system rewarded loan officers and loan processors for originating large volumes of high risk loans, paid extra to loan officers who overcharged borrowers or added stiff prepayment penalties, and gave executives millions of dollars even when their High Risk Lending Strategy placed the bank in financial jeopardy.

PSI Wall Street Report at 50-51.

189.  In particular, the PSI Wall Street Report noted that WaMu had engaged in internal reviews of its lending practices and the lending practices of its subsidiary, Long Beach.  WaMu's Chief Risk Officer, Ron Cathcart commissioned a study to look into the quality of loans originated by Long Beach.  The review found that the "top five priority issues" were as follows:

"Appraisal deficiencies that could impact value and were not addressed[;]

Material misrepresentations relating to credit evaluation were confirmed[;]

Legal documents were missing or contained errors or discrepancies[;]

Credit evaluation or loan decision errors[; and]

1616146v1/012661

74

EXHIBIT 13
85

1  Required credit documentation was insufficient or missing from the

2  file."

3  *Id.* at 82 (quoting e-mail from Ron Cathcart, Chief Risk Officer, WaMu, to Cory

4  Gunderson (Dec. 11, 2006 9:21 AM PST)).

5  190. Pushing "Option ARMs" was a major part of WaMu's new "high risk"

6  lending strategy. In a bipartisan memorandum from Senators Carl Levin and Tom

7  Coburn to the Members of the PSI, dated April 13, 2010, Option ARMS were

8  labeled WaMu's "flagship" product. *Wall Street and the Financial Crisis: The*

9  *Role of High Risk Home Loans, Hearing Before S. Permanent Subcomm. on*

10  *Investigations*, 112th Cong. (2010) ("PSI High Risk Home Loans Hearing"), Senate

11  Ex. 1.a, at 3. The WaMu OIG Report describes the inherently dangerous nature of

12  WaMu's Option ARMs:

13  WaMu's Option ARMs provided borrowers with the choice to pay

14  their monthly mortgages in amounts equal to monthly principal and

15  interest, interest-only, or a minimum monthly payment. Borrowers

16  selected the minimum monthly payment option for 56 percent of the

17  Option ARM portfolio in 2005.

18

19  The minimum monthly payment was based on an introductory rate,

20  also known as a teaser rate, which was significantly below the market

21  interest rate and was usually in place for only 1 month. After the

22  introductory rate expired, the minimum monthly payment feature

23  introduced two significant risks to WaMu's portfolio: payment shock

24  and negative amortization. WaMu projected that, on average, payment

25  shock increased monthly mortgage amounts by 60 percent. At the end

26  of 2007, 84 percent of the total value of Option ARMs on WaMu's

27  financial statements was negatively amortizing.

WaMu OIG Report at 9.

28

EXHIBIT 13
86

191. The WaMu OIG Report notes that "Option ARMs represented as much as half of all loan originations from 2003 to 2007 and approximately $59 billion, or 47 percent, of the home loans on WaMu's balance sheet at the end of 2007." *Id.*

192. The OIG also notes that WaMu's "new strategy included underwriting subprime loans, home equity loans, and home equity lines of credit to high-risk borrowers. In line with that strategy, WaMu purchased and originated subprime loans, which represented approximately $16 billion, or 13 percent, of WaMu's 2007 home loan portfolio." *Id.* at 10.

193. WaMu's careless underwriting practices rendered these already high risk loan products even more risky. *See id.* The WaMu OIG Report stated that the OTS and the FDIC repeatedly "identified concerns with WaMu's high-risk lending strategy" and loan underwriting, weaknesses in management, and "inadequate internal controls." *Id.* at 3-4. Those concerns included "questions about the reasonableness of stated incomes contained in loan documents, numerous underwriting exceptions, miscalculations of loan-to-value ratios, and missing or inadequate documentation." *Hearing on Wall Street & the Fin. Crisis: The Role of Bank Regulators Before the United States S. Homeland Security and Governmental Affairs Comm., Permanent Subcomm. on Investigations*, 111th Cong. 9 (Apr. 16, 2010) (statement of the Hon. Eric M. Thorson, Inspector General, Dep't of the Treasury) ("Thorson Statement").

194. WaMu management began to notice the pattern of "first payment default" ("FPD") for loans its Long Beach subsidiary originated. In June 2007, WaMu closed Long Beach as a separate entity and placed its subprime lending operations in a new division called "Wholesale Specialty Lending."

195. In late 2007, WaMu performed an internal review to determine whether its plans to address its poor underwriting practices were effective. The review focused on 187 loans that experienced FPD, originated from November 2006 to March 2007. As an initial matter, the review found:

1616146v1/012661                              76

EXHIBIT 13
87

The overall system of credit risk management activities and process has major weaknesses resulting in unacceptable level of credit risk. Exposure is considerable and immediate corrective action is essential in order to limit or avoid considerable losses, reputation damage, or financial statement errors.

PSI High Risk Home Loans Hearing, Senate Ex. 21, "WaMu Corporate Credit Review: Wholesale Specialty Lending-FPD" at 2 (Sept. 28, 2007).

196. Specifically, the WaMu internal review reported the following findings regarding the 187 FPD loans:

- (High) Ineffectiveness of fraud detection tools – 132 of the 187 (71%) files were reviewed by Risk Mitigation for fraud. Risk Mitigation confirmed fraud on 115 files and could not confirm on 17 of the files, but listed them as "highly suspect." This issue is a repeat finding with CCR.

- (High) Weak credit risk infrastructure impacting credit quality. Credit weakness and underwriting deficiencies is a repeat finding with CCR. It was also identified as a repeat finding and Criticism in the OTS Asset Quality memo 3 issued May 17, 2007. Internal Audit in their August 20, 2007 Loan Origination & Underwriting report identified it as a repeat issue. Findings from the CCR FPD review in relation to credit quality:

  o 132 of the 187 loans sampled were identified with red flags that were not addressed by the business unit

  o 80 of the 112 (71%) stated income loans were identified for lack of reasonableness of income

  o 87 files (47%) exceeded program parameters in place at the time of approval

  o 133 (71%) had credit evaluation or loan decision errors present

1616146v1/012661                          77

EXHIBIT 13
88

1        o      25 (13%) had the title report issues that were not addressed

2        o      28 (14%) had income calculation errors and 35 (19%) had

3                income documentation errors

4        o      58 (31%) had appraisal discrepancies that raised concerns that

5                the value was not supported

6  *Id.* at 3.

7     197.  An OTS memorandum on Loan Fraud Investigation, dated June 19, 2008, noted the systematic nature of the problem:  "[T]he review defines an origination culture focused more heavily on production volume rather than quality. An example of this was a finding that production personnel were allowed to participate in aspects of the income, employment, or asset verification process, a clear conflict of interest. . . .  Prior OTS examinations have raised similar issues including the need to implement incentive compensation programs to place greater emphasis on loan quality."  PSI High Risk Home Loans Hearing, Senate Ex. 25, Memorandum from D. Schneider, President Home Loans, to A. Hedger, OTS Examiner and B. Franklin, OTS EIC at 1 (June 19, 2008).

17     198.  A WaMu Significant Incident Notification, Date Incident Reported – 04/01/2008, Loss Type – Mortgage Loan, stated:

19        One Sales Associate admitted that during that crunch time some of the

20        Associates would "manufacture" assets statements from previous loan

21        docs and submit them to the Loan Fulfillment Center ("LFC").  She

22        said the pressure was tremendous from the LFC to get them the docs

23        since the loan had already been funded and there was pressure from

24        the Loan Consultants to get the loans funded.

25  PSI High Risk Home Loans Hearing, Senate Ex. 30, "Significant Incident Notification (SIN)" at 1 (Apr. 1, 2008).

27     199.  A New York Times article described WaMu's underwriting practices as follows:  "On a financial landscape littered with wreckage, WaMu, a Seattle-

EXHIBIT 13
89

based bank that opened branches at a clip worthy of a fast-food chain, stands out as a singularly brazen case of lax lending." Peter S. Goodman & Gretchen Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans*, N.Y. TIMES, Dec. 27, 2008, at A1.

200.   Sherri Zaback, a former underwriter at a WaMu branch in San Diego, California, stated that "[m]ost of the loans she . . . handled merely required borrowers to provide an address and Social Security number, and to state their income and assets." *Id.* On one occasion, Zaback asked a loan officer for verification of a potential borrower's assets. The officer sent her a letter from a bank showing a balance of approximately $150,000 in the borrower's account. Zaback called the bank to confirm and was told the balance was only $5,000. The loan officer yelled at her, Ms. Zaback recalled. "She said, 'We don't call the bank to verify.'" *Id.*

201.   Zaback also recalled that the sheer volume of loans precluded WaMu employees from adhering to underwriting standards. According to Zaback, she would typically spend a maximum of 35 minutes per file: "'Just spit it out and get it done. That's what they wanted us to do. Garbage in, and garbage out.'" *Id.* Another WaMu agent in Irvine, California told the New York Times that she "coached brokers to leave parts of applications blank to avoid prompting verification if the borrower's job or income was sketchy." *Id.*

202.   WaMu's underwriting critically failed with respect to appraisals as well. An accurate appraisal of a property's market value is as crucial to the underwriting process as the property provides collateral for the loan in case of default.

> WaMu's review of appraisals establishing the value of single family homes did not always follow standard residential appraisal methods because WaMu allowed a homeowner's estimate of the value of the

EXHIBIT 13
90

1  home to be included on the form sent from WaMu to third-party

2  appraisers, thereby biasing the appraiser's evaluation.

3  WaMu OIG Report at 11.

4  203. The New York Times reported, "WaMu pressured appraisers to

5  provide inflated property values that made loans appear less risky, enabling Wall

6  Street to bundle them more easily for sale to investors." Goodman & Morgenson,

7  *Saying Yes, WaMu Built Empire on Shaky Loans* at A1. The article quoted the

8  founder of one appraisal company that did business with WaMu until 2007 as

9  saying, "'It was the Wild West.' . . . 'If you were alive, they would give you a

10 loan. Actually, I think if you were dead, they would still give you a loan.'" *Id.*

11 (quoting Steven Knoble, founder Mitchell, Maxwell & Jackson).

12 204. Nor did WaMu adequately monitor non-employee third-party brokers

13 who originated most of WaMu's loans. As Eric Thorson explained before the PSI:

14  In addition to originating retail loans with its own employees, WaMu

15  began originating and purchasing wholesale loans through a network

16  of brokers and correspondents. From 2003 to 2007, wholesale loan

17  channels represented 48 to 70 percent of WaMu's total single family

18  residential loan production. WaMu saw the financial incentive to use

19  wholesale loan channels for production as significant. According to an

20  April 2006 internal presentation to the WaMu Board, it cost WaMu

21  about 66 percent less to close a wholesale loan ($1,809 per loan) than

22  it did to close a retail loan ($5,273). So while WaMu profitability

23  increased through the use of third-party originators, it had far less

24  oversight and control over the quality of the originations.

25 Thorson Statement at 5. According to the WaMu OIG Report, WaMu had only 14

26 employees monitoring the actions of 34,000 third-party brokers. *See* WaMu OIG

27 Report at 11. This lack of oversight led to WaMu "identif[ying] fraud losses

28 attributable to third-party brokers of $51 million for subprime loans and $27 million

1616146v1/012661                              80

EXHIBIT 13
91

for prime loans" in 2007. *Id.*

205.   Federal regulators also noted that "WaMu acquired 11 institutions and merged with 2 affiliates" from 1991 to 2006, yet failed to "fully integrate . . . information technology systems, risk controls, and policies and procedures" from its acquisitions and institute "a single enterprise-wide risk management system." Thorson Statement at 5.   An integrated risk management system was critically important in light of WaMu's high-risk lending strategy. *See id.*

206.   Based on interviews with two dozen former employees, mortgage brokers, real estate agents and appraisers, Goodman and Morgenson of the New York Times noted the "relentless pressure to churn out loans" while "disregarding borrowers' incomes and assets" came from WaMu's top executives.   Goodman & Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans* at A1.   According to Dana Zweibel, a former financial representative at a WaMu branch in Tampa, Florida, even if she doubted whether a borrower could repay the loan, she was told by WaMu management that it was not her concern:  her concern was "'just to write the loan.'"   *Id.*   Said Zweibel, "'It was a disgrace'. . . .  'We were giving loans to people that never should have had loans.'"   *Id.*

207.   In November 2008 the New York Times, quoting Keysha Cooper, a Senior Mortgage Underwriter at WaMu from 2003 to 2007, recounted "'[a]t WaMu it wasn't about the quality of the loans; it was about the numbers'. . . .  'They didn't care if we were giving loans to people that didn't qualify.  Instead, it was how many loans did you guys close and fund?'"   Gretchen Morgenson, *Was There a Loan It Didn't Like?*, N.Y. Times, Nov. 1, 2008.   According to the article, "[i]n February 2007 . . . the pressure became intense.  WaMu executives told employees they were not making enough loans and had to get their numbers up. . . ."   Cooper concluded, "'I swear 60 percent of the loans I approved I was made to' . . . 'If I could get everyone's name, I would write them apology letters.'"   *Id.*

1616146v1/012661                          81

EXHIBIT 13
92

208.   WaMu blatantly inflated salaries of baby sitters and mariachi singers to the six-figure range.   Indeed, the only verification of the mariachi singer's income was a photograph of the mariachi singer in his outfit included in the loan application file.  The New York Times reported:

> As a supervisor at a Washington Mutual mortgage processing center, John D. Parsons was accustomed to seeing baby sitters claiming salaries worthy of college presidents, and schoolteachers with incomes rivaling stockbrokers'.   He rarely questioned them.   A real estate frenzy was under way and WaMu, as his bank was known, was all about saying yes.
>
> Yet even by WaMu's relaxed standards, one mortgage four years ago raised eyebrows.  The borrower was claiming a six-figure income and an unusual profession:  mariachi singer.
>
> Mr. Parsons could not verify the singer's income, so he had him photographed in front of his home dressed in his mariachi outfit.  The photo went into a WaMu file.  Approved.
>
> "I'd lie if I said every piece of documentation was properly signed and dated," said Mr. Parsons.
>
> . . .
>
> At WaMu, getting the job done meant lending money to nearly anyone who asked for it — the force behind the bank's meteoric rise and its precipitous collapse this year in the biggest bank failure in American history.
>
> . . .

EXHIBIT 13
93

1   Interviews with two dozen former employees, mortgage brokers, real

2   estate agents and appraisers reveal the relentless pressure to churn out

3   loans that produced such results.

4   Goodman & Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans* at A1.

5   **VIII.  THE OFFERING DOCUMENTS CONTAINED UNTRUE**

6   **STATEMENTS OF MATERIAL FACT**

7   209.  The Offering Documents included material untrue statements or

8   omitted facts necessary to make the statements made, in light of the circumstances

9   under which they were made, not misleading.

10   210.  For purposes of Section 11 liability, the prospectus supplements are

11   part of and included in the registration statements of the offerings pursuant to 17

12   C.F.R. §§ 230.158, 230.430B (2008); *see also* Securities Offering Reform, 70 Fed.

13   Reg. 44,722-01, 44,768-69 (Aug. 3, 2005).

14   211.  Statements in the Offering Documents concerning the following

15   subjects were material and untrue at the time they were made:  (1) the Originators'

16   evaluation of the borrower's likelihood and capacity to repay the loan through

17   application of the stated underwriting standards, including the calculation and use

18   of an accurate "debt-to-income" ratio and the frequency and use of exceptions to

19   those standards;  (2) adherence to stated underwriting standards for reduced

20   documentation programs;  (3) the accurate calculation of the "loan-to-value" ratio

21   for the mortgaged property and the accuracy of appraisals; and (4) the existence of

22   credit enhancement to minimize the risk of loss.

23   212.  FNBN and Silver State were the primary originators in the Alternative

24   Loan Trust 2006-AR4 and Nomura HELT 2007-1 offerings.  *See* Nomura HELT

25   2007-1 Prospectus Supplement, Jan. 29, 2007, at S-3; Alternative Loan Trust 2006-

26   AR4 Prospectus Supplement, Nov. 29, 2006, at S-2.  FNBN's and Silver State's

27   systematic disregard of their underwriting standards is detailed in Sections VII.D.4

28   and VII.D.7 (*supra*).

1616146v1/012661                                   83

EXHIBIT 13
94

213.  American Home was the sole originator of loans in the American Home Mortgage Assets Trust 2007-3 offering.  *See* American Home Mortgage Assets Trust 2007-3 Prospectus Supplement, June 5, 2007, at S-5.  American Home also originated all of the loans in the HarborView 2007-5 offering.  *See* HarborView 2007-5 Prospectus Supplement, July 11, 2007, at S-22.  American Home's systematic disregard of its underwriting standards is detailed in Section VII.D.2 (*supra*).

214.  First Franklin Mortgage was the primary originator of mortgages collateralizing the First Franklin Mortgage Loan Trust 2005-FFH4 offering.  *See* First Franklin Mortgage Loan Trust 2005-FFH4 Prospectus Supplement, Nov. 30, 2005, at S-5.

215.  Paul Financial, Plaza Home Mortgage, and First Federal Bank of California originated a large portion of the loans in the mortgage pool underlying the HarborView 2007-4 offering.  No other originators contributed more than 10% of the loans to the offering.  *See* HarborView 2007-4 Prospectus Supplement, June 13, 2007, at S-25.

216.  American Home, Paul Financial, Kay-Co Investment d/b/a Pro 30 Funding, and Residential Funding Co., originated a large portion of loans for the HarborView 2007-2 offering.  No other originators contributed more than 10% of the loans to the offering.  *See* HarborView 2007-2 Prospectus Supplement, Mar. 29, 2007, at S-24.  American Home's systematic disregard of its underwriting standards is detailed in Section VII.D.2 (*supra*).

217.  Countrywide originated all of the loans in the HarborView 2007-1, HarborView 2006-12, HarborView 2006-11, and HarborView 2006-9 offerings.  *See* HarborView 2007-1 Prospectus Supplement, Mar. 7, 2007, at S-23; HarborView 2006-12 Prospectus Supplement, Dec. 11, 2006, at S-25; HarborView 2006-11 Prospectus Supplement, Nov. 10, 2006, at S-33; and HarborView 2006-9

EXHIBIT 13
95

Prospectus Supplement, Oct. 3, 2006, at S-23. Countrywide's systematic disregard of its underwriting standards is detailed in Section VII.D.3 (*supra*).

218. IndyMac, BankUnited FSB, and American Home originated a substantial majority of the loans in the HarborView 2006-14 offering. No other originators contributed more than 10% of the loans to the offering. *See* HarborView 2006-14 Prospectus Supplement, Dec. 20, 2006, at S-25. American Home's and IndyMac's systematic disregard of their underwriting standards is detailed in Sections VII.D.2 and VII.D.5 (*supra*).

219. BankUnited, Paul Financial, and Residential Mortgage Capital originated a substantial portion of the loans in the HarborView 2006-10 offering. *See* HarborView 2006-10 Prospectus Supplement, Nov. 10, 2006, at S-24.

220. BankUnited, First Federal Bank of California, and Paul Financial originated a substantial portion of the loans underlying the HarborView 2006-8 offering. *See* HarborView 2006-8 Prospectus Supplement, Aug. 28, 2006, at S-21.

221. IndyMac originated all of the loans in the IndyMac INDX Mortgage Loan Trust 2006-AR35 offering. *See* IndyMac INDX Mortgage Loan Trust 2006-AR35 Prospectus Supplement, Nov. 29, 2006, at S-66. IndyMac's systematic disregard of its underwriting standards is recounted in Section VII.D.5 (*supra*).

222. WaMu purchased all of the loans that made up the Group 1 pool of loans backing the certificate in the CUSIP 55028CAB1 purchased by WesCorp in the Luminent Mortgage Trust 2007-1 offering. *See* Luminent Mortgage Trust 2007-1 Prospectus Supplement, Jan. 24, 2007, at S-31. IndyMac Bank FSB originated all of the loans in Group 2 backing the certificate that WesCorp purchased in the CUSIP 55028CAE5 of the Luminent Mortgage Trust 2007-1 offering. *See id.* WaMu's systematic disregard of its underwriting standards is detailed in Section VII.D.8 (*supra*). IndyMac's systematic disregard of its underwriting standards is detailed in Section VII.D.5 (*supra*).

EXHIBIT 13
96

223.   MortgageIT, Inc. was the sole originator of loans in the MortgageIT Mortgage Loan Trust 2006-1 offering.   *See* MortgageIT Mortgage Loan Trust 2006-1 Prospectus Supplement, Feb. 17, 2006, at S-64.

224.   Option One originated or acquired all of the loans underlying the Soundview Home Loan Trust 2005-OPT4 offering.   *See* Soundview Home Loan Trust 2005-OPT4 Prospectus Supplement, Nov. 22, 2005, at S-5.   Option One's systematic disregard of its underwriting standards is detailed in Section VII.D.6 (*supra*).

225.   National City Mortgage, Accredited Home Lenders, Inc., and Wachovia Mortgage Corp., were the primary originators of the loans underlying the Wachovia Mortgage Loan Trust, Series 2006-ALT1 offering.   *See* Wachovia Mortgage Loan Trust, Series 2006-ALT1 Prospectus Supplement, Dec. 19, 2006, at S-3.

226.   Examples of material untrue statements and/or omissions of fact from the RMBS listed above follow.

A.   **Untrue Statements Concerning Evaluation of the Borrower's Capacity and Likelihood To Repay the Mortgage Loan**

227.   The Nomura HELT 2007-1 Prospectus Supplement represented:

FNBN's underwriting guidelines are applied in a standard procedure that is intended to comply with applicable federal and state laws and regulations.   However, the application of FNBN's underwriting guidelines does not imply that each specific criterion was satisfied individually.   FNBN will have considered a mortgage loan to be originated in accordance with a given set of underwriting guidelines if, based on an overall qualitative evaluation, in FNBN's discretion such mortgage loan is in substantial compliance with such underwriting guidelines or if the borrower can document compensating factors.   A mortgage loan may be considered to comply with a set of underwriting

1616146v1/012661                              86

EXHIBIT 13
97

1       guidelines, even if one or more specific criteria included in such
2       underwriting guidelines were not satisfied, if other factors
3       compensated for the criteria that were not satisfied or the mortgage
4       loan is considered to be in substantial compliance with the
5       underwriting guidelines.

6 Nomura HELT 2007-1 Prospectus Supplement at S-105-106; Alternative Loan
7 Trust 2006-AR4 Prospectus Supplement at S-49-50; *see* Alternative Loan Trust
8 2006-AR4 Free Writing Prospectus, Nov. 17, 2006, at the "Underwriting Standards
9 of FNBN" section.

10       228. The Nomura HELT 2007-1 Prospectus Supplement represented:
11       All of the Mortgage Loans have been purchased by the sponsor from
12       various banks, savings and loan associations, mortgage bankers and
13       other mortgage loan originators and purchasers of mortgage loans in
14       the secondary market, and were originated generally in accordance
15       with the underwriting criteria described in this section.

16 Nomura HELT 2007-1 Prospectus Supplement at S-108; Alternative Loan Trust
17 2006-AR4 Free Writing Prospectus, Nov. 17, 2006, at the "Underwriting Standards
18 of the Sponsor" section.

19       229. The Nomura HELT 2007-1 Prospectus Supplement represented:
20       In addition, FNBN may make certain exceptions to the underwriting
21       guidelines described herein if, in FNBN's discretion, compensating
22       factors are demonstrated by a prospective borrower.

23 Nomura HELT 2007-1 Prospectus Supplement at S-104; Alternative Loan Trust
24 2006-AR4 Prospectus Supplement at S-48.

25       230. The Nomura HELT 2007-1 Prospectus Supplement represented the
26 sponsor, Nomura Credit & Capital, Inc.'s underwriting standards as follows:

27

28

EXHIBIT 13
98

1          In addition, certain exceptions to the underwriting standards described

2          in this prospectus supplement are made in the event that compensating

3          factors are demonstrated by a prospective borrower.

4    Nomura HELT 2007-1 Prospectus Supplement at S-109.

5          231.  The Nomura HELT 2007-1 Prospectus Supplement represented:

6          FNBN's underwriting guidelines are primarily intended to evaluate the

7          prospective borrower's credit standing and ability to repay the loan, as

8          well as the value and adequacy of the proposed Mortgaged Property as

9          collateral.  A prospective borrower applying for a mortgage loan is

10         required to complete an application, which elicits pertinent information

11         about the prospective borrower including, depending upon the loan

12         program, the prospective borrower's financial condition (assets,

13         liabilities, income and expenses), the property being financed and the

14         type of loan desired.

15    Nomura HELT 2007-1 Prospectus Supplement at S-105; Alternative Loan Trust

16    2006-AR4 Prospectus Supplement at S-49; Alternative Loan Trust 2006-AR4 Free

17    Writing Prospectus, Nov. 17, 2006, at the "Underwriting Standards of FNBN"

18    section.

19          232.  The Nomura HELT 2007-1 Prospectus Supplement represented:

20          Based on the data provided in the application and certain verifications

21          (if required), a determination will have been made that the borrower's

22          monthly income (if required to be stated or verified) should be

23          sufficient to enable the borrower to meet its monthly obligations on the

24          mortgage loan and other expenses related to the Mortgaged Property

25          (such as property taxes, standard hazard insurance and other fixed

26          obligations other than housing expenses).  Generally, scheduled

27          payments on a mortgage loan during the first year of its term plus taxes

28          and insurance and other fixed obligations equal no more than a

EXHIBIT 13
99

specified percentage of the prospective borrower's gross income. The percentage applied varies on a case-by-case basis depending on a number of underwriting criteria including, but not limited to, the loan-to-value ratio of the mortgage loan or the amount of liquid assets available to the borrower after origination.

Nomura HELT 2007-1 Prospectus Supplement at S-105; Alternative Loan Trust 2006-AR4 Prospectus Supplement at S-49.

233.   The Nomura HELT 2007-1 Prospectus Supplement stated:

Silver State Mortgage's underwriting guidelines are primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan, as well as the value and adequacy of the proposed Mortgaged Property as collateral.   A prospective borrower applying for a mortgage loan is required to complete an application which elicits pertinent information about the prospective borrower including, depending upon the loan program, the prospective borrower's financial condition (assets, liabilities, income and expenses), the property being financed and the type of loan desired.

Nomura HELT 2007-1 Prospectus Supplement at S-107.

234.   The Nomura HELT 2007-1 Prospectus Supplement represented:

Based on the data provided in the application and certain verifications (if required), a determination will have been made that the borrower's monthly income (if required to be stated or verified) should be sufficient to enable the borrower to meet its monthly obligations on the mortgage loan and other expenses related to the Mortgaged Property (such as property taxes, standard hazard insurance and other fixed obligations other than housing expenses).

Nomura HELT 2007-1 Prospectus Supplement at S-108.

235.   The Nomura HELT 2007-1 Prospectus Supplement represented:

EXHIBIT 13
100

1   Generally, each borrower will have been required to complete an
2   application designed to provide to the original lender pertinent credit
3   information concerning the borrower.  As part of the description of the
4   borrower's financial condition, the borrower generally will have
5   furnished certain information with respect to its assets, liabilities,
6   income (except as described below), credit history, employment
7   history and personal information, and furnished an authorization to
8   apply for a credit report which summarizes the borrower's credit
9   history with local merchants and lenders and any record of bankruptcy.
10  The borrower may also have been required to authorize verifications of
11  deposits at financial institutions where the borrower had demand or
12  savings accounts.

13  Nomura HELT 2007-1 Prospectus Supplement at S-109.

14  236.  The American Home Mortgage Assets Trust 2007-3 Prospectus
15  Supplement represented:

16  The Originator's underwriting philosophy is to weigh all risk factors
17  inherent in the loan file, giving consideration to the individual
18  transaction, borrower profile, the level of documentation provided and
19  the property used to collateralize the debt.  Because each loan is
20  different, the Originator expects and encourages underwriters to use
21  professional judgment based on their experience in making a lending
22  decision.

23  American Home Mortgage Assets Trust 2007-3 Prospectus Supplement at S-51-52.

24  237.  The American Home Mortgage Assets Trust 2007-3 Prospectus
25  Supplement represented:

26  The Originator realizes that there may be some acceptable quality
27  loans that fall outside published guidelines and encourages "common
28  sense" underwriting.  Because a multitude of factors are involved in a

1616146v1/012661                    90

EXHIBIT 13
101

loan transaction, no set of guidelines can contemplate every potential situation. Therefore, each case is weighed individually on its own merits and exceptions to the Originator's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.

American Home Mortgage Assets Trust 2007-3 Prospectus Supplement at S-53.

238. The American Home Mortgage Assets Trust 2007-3 Prospectus Supplement represented:

In order to determine if a borrower qualifies for a non-conforming loan, the loans have been either approved by Fannie Mae's Desktop Underwriter or Freddie Mac's Loan Prospector automated underwriting systems or they have been manually underwritten by the Originator underwriters. The Originator's Alt-A loan products have been approved manually by contract underwriters provided by certain mortgage insurance companies. American Home Solutions products must receive an approval from the Assetwise automated underwriting system. For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis. Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period. In addition to the monthly expense the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower their total obligations should receive favorable

EXHIBIT 13
102

consideration and borrowers with a history of heavy usage and a
pattern of slow or late payments should receive less flexibility.

American Home Mortgage Assets Trust 2007-3 Prospectus Supplement at S-52-53.

239. The American Home Mortgage Assets Trust 2007-3 Prospectus
Supplement represented:

The Originator obtains a credit report that summarizes each borrower's
credit history. The credit report contains information from the three
major credit repositories, Equifax, Experian and TransUnion. These
companies have developed scoring models to identify the comparative
risk of delinquency among applicants based on characteristics within
the applicant's credit report. A borrower's credit score represents a
comprehensive view of the borrower's credit history risk factors and is
indicative of whether a borrower is likely to default on a loan. Some
of the factors used to calculate credit scores are a borrower's incidents
of previous delinquency, the number of credit accounts a borrower has,
the amount of available credit that a borrower has utilized, the source
of a borrower's existing credit, and recent attempts by a borrower to
obtain additional credit. Applicants who have higher credit scores
will, as a group, have fewer defaults than those who have lower credit
scores. The minimum credit score allowed by the Originator non-
conforming loan guidelines for these loans is 620 and the average is
typically over 700. For American Home Alt-A products, the minimum
credit score is generally 580. If the borrowers do not have a credit
score they must have an alternative credit history showing at least
three trade lines with no payments over 60 days past due in the last 12
months.

EXHIBIT 13
103

1  In addition to reviewing the borrower's credit history and credit score,
2  the Originator underwriters closely review the borrower's housing
3  payment history. In general, for non-conforming loans the borrower
4  should not have made any mortgage payments over thirty days after
5  the due date for the most recent twelve months. In general, for Alt-A
6  loans the borrower may have no more than one payment that was made
7  over thirty days after the due date for the most recent twelve months.

8  American Home Mortgage Assets Trust 2007-3 Prospectus Supplement at S-52.

9  240. The American Home Mortgage Assets Trust 2007-3 Prospectus
10  Supplement represented:

11  The Originator underwrites a borrower's creditworthiness based solely
12  on information that the Originator believes is indicative of the
13  applicant's willingness and ability to pay the debt they would be
14  incurring.

15  American Home Mortgage Assets Trust 2007-3 Prospectus Supplement at S-52.

16  241. The First Franklin Mortgage Loan Trust Series 2005-FFH4 Prospectus
17  Supplement represented:

18  All of the Mortgage Loans were originated or acquired by the
19  Originator, generally in accordance with the underwriting criteria
20  described herein.

21  . . .

22  The Originator's underwriting standards are primarily intended to
23  assess the ability and willingness of the borrower to repay the debt and
24  to evaluate the adequacy of the mortgaged property as collateral for the
25  mortgage loan. . . . The Originator considers, among other things, a
26  mortgagor's credit history, repayment ability and debt service-to-
27  income ratio ("Debt Ratio"), as well as the value, type and use of the
28  mortgage property.

1616146v1/012661

93

EXHIBIT 13
104

First Franklin Mortgage Loan Trust Series 2005-FFH4 Prospectus Supplement at S-54.

242.   The First Franklin Mortgage Loan Trust 2005-FFH4 Prospectus Supplement represented:

> All of the Mortgage Loans were underwritten by the Originator's underwriters having the appropriate signature authority.   Each underwriter is granted a level of authority commensurate with their proven judgment, maturity and credit skills. On a case by case basis, the Originator may determine that, based upon compensating factors, a prospective mortgagor not strictly qualifying under the underwriting risk category guidelines described below warrants an underwriting exception.   Compensating factors may include, but are not limited to, low loan-to-value ratio, low Debt Ratio, substantial liquid assets, good credit history, stable employment and time in residence at the applicant's current address.   It is expected that a substantial portion of the Mortgage Loans may represent such underwriting exceptions.

First Franklin Mortgage Loan Trust 2005-FFH4 Prospectus Supplement at S-56.

243.   The HarborView 2007-5 Prospectus Supplement represented:

> The mortgage loans have been purchased or originated, underwritten and documented in accordance with the guidelines of Fannie Mae, Freddie Mac, the Federal Housing Administration (FHA), the U.S. Department of Veterans Affairs (VA), the U.S. Department of Agriculture Guaranteed Rural Housing Program (GRH), Ginnie Mae, the underwriting guidelines of specific private investors, and the non-conforming or Alt-A underwriting guidelines established by American Home.

HarborView 2007-5 Prospectus Supplement at S-29; HarborView 2007-2 Prospectus Supplement at S-33.

EXHIBIT 13
105

244.   The HarborView 2007-5 Prospectus Supplement represented:

American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt.  These standards are applied in accordance with applicable federal and state laws and regulations.  Exceptions to the underwriting standards may be permitted where compensating factors are present. . . .  Because each loan is different, American Home expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.

HarborView 2007-5 Prospectus Supplement at S-29-30; HarborView 2007-2 Prospectus Supplement at S-33.

245.   The HarborView 2007-5 Prospectus Supplement represented:

American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

HarborView 2007-5 Prospectus Supplement at S-30; HarborView 2007-2 Prospectus Supplement at S-33.

246.   The HarborView 2007-4 Prospectus Supplement represented the following with respect to originator Paul Financial:

An applicant's creditworthiness is determined based on the borrower's ability and willingness to repay the loan.  The loan decision is based upon the applicant's financial information, employment and income stability, credit history and collateral value.

HarborView 2007-4 Prospectus Supplement at S-34; HarborView 2007-2 Prospectus Supplement at S-35.

EXHIBIT 13
106

1       247.  The HarborView 2007-5 Prospectus Supplement represented:

2           American Home realizes that there may be some acceptable quality

3           loans that fall outside published guidelines and encourages "common

4           sense" underwriting.  Because a multitude of factors are involved in a

5           loan transaction, no set of guidelines can contemplate every potential

6           situation.   Therefore, each case is weighed individually on its own

7           merits and exceptions to American Home's underwriting guidelines

8           are allowed if sufficient compensating factors exist to offset any

9           additional risk due to the exception.

10  HarborView 2007-5 Prospectus Supplement at S-31; HarborView 2007-2

11  Prospectus Supplement at S-35.

12      248.  The HarborView 2007-4 Prospectus Supplement stated:

13         Paul Financial's underwriting guidelines are applied to evaluate the

14         applicant, the property and the applicant's income, employment and

15         credit history in the context of the loan program and documentation

16         requirements.  These are guidelines only and each loan is evaluated

17         based upon its own merits.   Exceptions to the guidelines may be

18         acceptable if there are compensating factors.

19  HarborView 2007-4 Prospectus Supplement at S-34; HarborView 2007-2

20  Prospectus Supplement at S-35.

21      249.  The HarborView 2007-4 Prospectus Supplement represented:

22         Paul Financial's underwriting standards are applied by or on behalf of

23         Paul Financial to evaluate the prospective borrower's credit standing

24         and repayment ability and the value and adequacy of the mortgaged

25         property as collateral.   Except under the No Income programs, a

26         prospective borrower must generally demonstrate that the ratio of the

27         borrower's monthly housing expenses (including interest on the

28         proposed mortgage loan and, as applicable, the related monthly portion

EXHIBIT 13
107

1    of property taxes, hazard insurance and mortgage insurance) to the
2    borrower's monthly gross income and the ratio of total monthly debt to
3    the monthly gross income (the "debt-to-income" ratios) are within
4    acceptable limits.

5    HarborView 2007-4 Prospectus Supplement at S-35; HarborView 2007-2
6    Prospectus Supplement at S-36.

7    250.   The HarborView 2007-1 Prospectus Supplement represented:
8        Under its Standard Underwriting Guidelines, Countrywide Home
9        Loans generally permits a debt-to-income ratio based on the
10       borrower's monthly housing expenses of up to 33% and a debt-to-
11       income ratio based on the borrower's total monthly debt of up to 38%.

12   HarborView 2007-1 Prospectus Supplement at S-32; HarborView 2006-12
13   Prospectus Supplement at S-70; HarborView 2006-11 Prospectus Supplement at S-
14   36; HarborView 2006-9 Prospectus Supplement at S-65.

15   251.   The HarborView 2007-1 Prospectus Supplement represented:
16       As part of its evaluation of potential borrowers, Countrywide Home
17       Loans generally requires a description of income.  If required by its
18       underwriting guidelines, Countrywide Home Loans obtains
19       employment verification providing current and historical income
20       information and/or a telephonic employment confirmation.  Such
21       employment verification may be obtained, either through analysis of
22       the prospective borrower's recent pay stub and/or W-2 forms for the
23       most recent two years, relevant portions of the most recent two years'
24       tax returns, or from the prospective borrower's employer, wherein the
25       employer reports the length of employment and current salary with
26       that organization.  Self-employed prospective borrowers generally are
27       required to submit relevant portions of their federal tax returns for the
28       past two years.

1616146v1/012661                          97

EXHIBIT 13
108

HarborView 2007-1 Prospectus Supplement at S-29-30; HarborView 2006-12 Prospectus Supplement at S-68; HarborView 2006-11 Prospectus Supplement at S-34; HarborView 2006-9 Prospectus Supplement at S-63.

252. The HarborView 2006-10 Prospectus Supplement represented:

In determining whether a prospective borrower has sufficient monthly income available to meet the monthly housing expenses and other financial obligations on the proposed mortgage loan, BankUnited generally considers, when required by the applicable documentation type, the ratio of such amounts to the proposed borrower's acceptable stable monthly gross income. Such ratio varies depending on a number of underwriting criteria, including loan-to-value ratios, and is determined on a loan-by-loan basis. Under its One Month MTA Guidelines, BankUnited generally permits a debt-to-income ratio based on the borrower's total monthly debt of 42%. Higher debt-to-income ratios may also be acceptable with evidence of specific compensating factors.

HarborView 2006-10 Prospectus Supplement at S-64; HarborView 2006-14 Prospectus Supplement at S-66.

253. The HarborView 2006-10 Prospectus Supplement represented: "Such underwriting standards are applied to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral. Exceptions to the underwriting standards are permitted where compensating factors are present." HarborView 2006-10 Prospectus Supplement at S-63 (representing BankUnited's underwriting guidelines); HarborView 2006-14 Prospectus Supplement at S-65.

254. The HarborView 2006-8 Prospectus Supplement stated: "BankUnited has represented to the depositor that the mortgage loans were originated generally

EXHIBIT 13
109

1  in accordance with such [underwriting] policies." HarborView 2006-8 Prospectus

2  Supplement at S-60.

3     255.   The HarborView 2006-8 Prospectus Supplement represented:

4     Such underwriting standards are applied to evaluate the prospective

5     borrower's credit standing and repayment ability and the value and

6     adequacy of the mortgaged property as collateral.  Exceptions to the

7     underwriting standards are permitted where compensating factors are

8     present.

9

10     Generally, each borrower will have been required to complete an

11     application designed to provide pertinent credit information

12     concerning the borrower.  The borrower will have given information

13     with respect to its assets, liabilities, income (except as described

14     below), credit history, employment history and personal information,

15     and will have furnished the lender with authorization to obtain a credit

16     report that summarizes the borrower's credit history.

17  HarborView 2006-8 Prospectus Supplement at S-60.

18     256.   The HarborView 2006-8 Prospectus Supplement represented:

19     In determining whether a prospective borrower has sufficient monthly

20     income available (i) to meet the borrower's monthly obligation on

21     their proposed mortgage loan and (ii) to meet the monthly housing

22     expenses and other financial obligations on the proposed mortgage

23     loan, BankUnited generally considers, when required by the applicable

24     documentation type, the ratio of such amounts to the proposed

25     borrower's acceptable stable monthly gross income.  Such ratios vary

26     depending on a number underwriting criteria, including loan-to-value

27     ratios, and are determined on a loan-by-loan basis.

28  HarborView 2006-8 Prospectus Supplement at S-60-61.

EXHIBIT 13
110

257. The IndyMac INDX Mortgage Loan Trust 2006-AR35 Prospectus Supplement represented:

> Mortgage loans that are acquired by IndyMac Bank are underwritten by IndyMac Bank according to IndyMac Bank's underwriting guidelines, which also accept mortgage loans meeting Fannie Mae or Freddie Mac guidelines regardless of whether such mortgage loans would otherwise meet IndyMac Bank's guidelines, or pursuant to an exception to those guidelines based on IndyMac Bank's procedures for approving such exceptions.  Conventional mortgage loans are loans that are not insured by the FHA or partially guaranteed by the VA. Conforming mortgage loans are loans that qualify for sale to Fannie Mae and Freddie Mac, whereas non-conforming mortgage loans are loans that do not so qualify.  Non-conforming mortgage loans originated or purchased by IndyMac Bank pursuant to its underwriting programs typically differ from conforming loans primarily with respect to loan-to-value ratios, borrower income, required documentation, interest rates, borrower occupancy of the mortgaged property and/or property types.  To the extent that these programs reflect underwriting standards different from those of Fannie Mae and Freddie Mac, the performance of loans made pursuant to these different underwriting standards may reflect higher delinquency rates and/or credit losses.

IndyMac INDX Mortgage Loan Trust 2006-AR35 Prospectus Supplement at S-67; *see* IndyMac INDX Mortgage Loan Trust 2006-AR35 Registration Statement, Feb. 24, 2006, at S-28.

258. The IndyMac INDX Mortgage Loan Trust 2006-AR35 Prospectus Supplement represented:

1616146v1/012661                                    100

EXHIBIT 13
111

1    IndyMac Bank has two principal underwriting methods designed to be
2    responsive to the needs of its mortgage loan customers:   traditional
3    underwriting and e-MITS (Electronic Mortgage Information and
4    Transaction System) underwriting.   E-MITS is an automated, internet-
5    based underwriting and risk-based pricing system.   IndyMac Bank
6    believes that e-MITS generally enables it to estimate expected credit
7    loss, interest rate risk and prepayment risk more objectively than
8    traditional underwriting and also provides consistent underwriting
9    decisions.   IndyMac Bank has procedures to override an e-MITS
10   decision to allow for compensating factors.

11   IndyMac INDX Mortgage Loan Trust 2006-AR35 Prospectus Supplement at S-67;
12   *see* IndyMac INDX Mortgage Loan Trust 2006-AR35 Registration Statement, Feb.
13   24, 2006, at S-28.

14   259.   The IndyMac INDX Mortgage Loan Trust 2006-AR35 Prospectus
15   Supplement represented:

16   Underwriting procedures vary by channel of origination.   Generally,
17   mortgage loans originated through the mortgage professional channel
18   will be submitted to e-MITS for assessment and subjected to a full
19   credit review and analysis.   Mortgage loans that do not meet IndyMac
20   Bank's guidelines may be manually re-underwritten and approved
21   under an exception to those underwriting guidelines.   Mortgage loans
22   originated through the consumer direct channel are subjected to
23   essentially the same procedures, modified as necessary to reflect the
24   fact that no third-party contributes to the preparation of the credit file.

25   IndyMac INDX Mortgage Loan Trust 2006-AR35 Prospectus Supplement at S-69;
26   *see* IndyMac INDX Mortgage Loan Trust 2006-AR35 Registration Statement, Feb.
27   24, 2006, at S-30.

28

1616146v1/012661                        101

EXHIBIT 13
112

260. The IndyMac INDX Mortgage Loan Trust 2006-AR35 Prospectus Supplement represented:

> Exceptions to underwriting standards are permitted in situations in which compensating factors exist. Examples of these factors are significant financial reserves, a low loan-to-value ratio, significant decrease in the borrower's monthly payment and long-term employment with the same employer.

IndyMac INDX Mortgage Loan Trust 2006-AR35 Prospectus Supplement at S-69; IndyMac INDX Mortgage Loan Trust 2006-AR35 Registration Statement, Feb. 24, 2006, at S-31.

261. The IndyMac INDX Mortgage Loan Trust 2006-AR35 Prospectus Supplement represented:

> Additionally, maximum total monthly debt payments-to-income ratios and cash-out limits may be applied. Other factors may be considered in determining loan eligibility such as a borrower's residency and immigration status, whether a non-occupying borrower will be included for qualification purposes, sales or financing concessions included in any purchase contract, the acquisition cost of the property in the case of a refinance transaction, the number of properties owned by the borrower, the type and amount of any subordinate mortgage, the amount of any increase in the borrower's monthly mortgage payment compared to previous mortgage or rent payments and the amount of disposable monthly income after payment of all monthly expenses.

IndyMac INDX Mortgage Loan Trust 2006-AR35 Prospectus Supplement at S-68; IndyMac INDX Mortgage Loan Trust 2006-AR35 Registration Statement, Feb. 24, 2006, at S-30.

262. The IndyMac INDX Mortgage Loan Trust 2006-AR35 Prospectus Supplement stated:

1616146v1/012661

102

EXHIBIT 13
113

1   IndyMac Bank's underwriting criteria for traditionally underwritten
2   mortgage loans includes an analysis of the borrower's credit history,
3   ability to repay the mortgage loan and the adequacy of the mortgaged
4   property as collateral.  Traditional underwriting decisions are made by
5   individuals authorized to consider compensating factors that would
6   allow mortgage loans not otherwise meeting IndyMac Bank's
7   guidelines.

8   IndyMac INDX Mortgage Loan Trust 2006-AR35 Prospectus Supplement at S-67;
9   *see* IndyMac INDX Mortgage Loan Trust 2006-AR35 Registration Statement, Feb.
10  24, 2006, at S-28.

11       263.   The   Luminent   Mortgage   Trust   2007-1   Prospectus   Supplement
12  represented:

13       The mortgage loans have been originated generally in accordance with
14       the following underwriting standards established by WMMSC or
15       underwriting guidelines established by WaMu.

16  Luminent Mortgage Trust 2007-1 Prospectus Supplement at S-32.

17       264.   The   Luminent   Mortgage   Trust   2007-1   Prospectus   Supplement
18  represented:

19       Each mortgage loan has been underwritten under one of the following
20       documentation programs.    Under a full/alternative documentation
21       program, a borrower's employment and income are verified.    The
22       employment and income as stated in the prospective borrower's loan
23       application are verified either directly with the borrower's stated
24       employer(s) or through receipt of alternative documentation such as
25       the borrower's recent pay stub(s) and/or W-2 form(s) reflecting a
26       minimum of 12 months of employment and income or, in the case of
27       self-employed borrowers or borrowers who derive a substantial portion
28       of their income from commissions, receipt of the borrower's personal

EXHIBIT 13
114

1    (and, if applicable, business) tax returns.    For self-employed

2    borrowers, profit and loss statements may also be required.  Generally,

3    under a full/alternative documentation program, the borrower's stated

4    assets are also verified either directly with the stated financial

5    institution holding the stated asset or through receipt of alternative

6    documentation such as the borrower's recent bank and/or brokerage

7    statement(s). In addition, the borrower's employment may be verified

8    with the employer by telephone or by other independent means.

9    Luminent Mortgage Trust 2007-1 Prospectus Supplement at S-33-34.

10    265.  The Luminent Mortgage Trust 2007-1 Prospectus Supplement

11    represented: "Mortgage loans that are acquired by IndyMac Bank are underwritten

12    by IndyMac Bank according to IndyMac Bank's underwriting guidelines…"

13    Luminent Mortgage Trust 2007-1 Prospectus Supplement at S-36.

14    266.  The Luminent Mortgage Trust 2007-1 Prospectus Supplement

15    represented:

16    Exceptions to underwriting standards described above may be made on

17    a case-by-case basis if compensating factors are present.   In those

18    cases, the basis for the exception is documented.   Compensating

19    factors may include, but are not limited to, low loan-to-value ratio, low

20    debt-to-income ratio, good credit standing, the availability of other

21    liquid assets, stable employment and time in residence at the

22    prospective borrower's current address.

23    Luminent Mortgage Trust 2007-1 Prospectus Supplement at S-34.

24    267.  The Luminent Mortgage Trust 2007-1 Prospectus Supplement

25    represented:

26    Exceptions to underwriting standards are permitted in situations in

27    which compensating factors exist.   Examples of these factors are

28    significant financial reserves, a low loan-to-value ratio, significant

1616146v1/012661                                104

EXHIBIT 13

115

1   decrease in the borrower's monthly payment and long-term
2   employment with the same employer.

3   Luminent Mortgage Trust 2007-1 Prospectus Supplement at S-39.

4   268. The Luminent Mortgage Trust 2007-1 Prospectus Supplement
5   represented:

6   Under all documentation programs other than the no ratio programs
7   and the no documentation programs, in evaluating a prospective
8   borrower's ability to repay a mortgage loan, the loan underwriter
9   considers the ratio of the borrower's mortgage payments, real property
10   taxes and other monthly housing expenses to the borrower's gross
11   income (referred to as the "housing-to-income ratio" or "front end
12   ratio"), and the ratio of the borrower's total monthly debt (including
13   certain non-housing expenses) to the borrower's gross income
14   (referred to as the "debt-to-income ratio" or "back end ratio"). The
15   maximum acceptable ratios may vary depending on other loan factors,
16   such as loan amount and loan purpose, loan-to-value ratio, credit score
17   and the availability of other liquid assets. Exceptions to the ratio
18   guidelines may be made when compensating factors are present.

19   Luminent Mortgage Trust 2007-1 Prospectus Supplement at S-33.

20   269. The Luminent Mortgage Trust 2007-1 Prospectus Supplement
21   represented:

22   Additionally, maximum total monthly debt payments-to-income ratios
23   and cash-out limits may be applied. Other factors may be considered
24   in determining loan eligibility such as a borrower's residency and
25   immigration status, whether a non-occupying borrower will be
26   included for qualification purposes, sales or financing concessions
27   included in any purchase contract, the acquisition cost of the property
28   in the case of a refinance transaction, the number of properties owned

EXHIBIT 13
116

1      by the borrower, the type and amount of any subordinate mortgage the

2      amount of any increase in the borrower's monthly mortgage payment

3      compared to previous mortgage or rent payments and the amount of

4      disposable monthly income after payment of all monthly expenses.

5  Luminent Mortgage Trust 2007-1 Prospectus Supplement at S-38.

6      270.   The   Luminent   Mortgage   Trust   2007-1   Prospectus   Supplement

7  represented:

8      Such underwriting standards or guidelines generally are intended to

9      evaluate the prospective borrower's credit standing and repayment

10     ability and the value and adequacy of the mortgaged property as

11     collateral.  Some mortgage loans are manually underwritten, in which

12     case an underwriter reviews a loan application and supporting

13     documentation, if required, and a credit report of the borrower, and

14     based on that review determines whether to originate a loan in the

15     amount and with the terms stated in the loan application.   Some

16     mortgage loans may be underwritten through an automated

17     underwriting system, including WaMu's automated underwriting

18     system, described below.

19  Luminent Mortgage Trust 2007-1 Prospectus Supplement at S-32.

20     271.   The   Luminent   Mortgage   Trust   2007-1   Prospectus   Supplement

21  represented:

22     IndyMac Bank's underwriting criteria for traditionally underwritten

23     mortgage loans includes an analysis of the borrower's credit history,

24     ability to repay the mortgage loan and the adequacy of the mortgaged

25     property as collateral.  Traditional underwriting decisions are made by

26     individuals authorized to consider compensating factors that would

27     allow mortgage loans not otherwise meeting IndyMac Bank's

28     guidelines.

EXHIBIT 13
117

1    Luminent Mortgage Trust 2007-1 Prospectus Supplement at S-36.

2            272.   The MortgageIT Mortgage Loan Trust 2006-1 Prospectus Supplement

3    represented:

4            MortgageIT's underwriting philosophy is to weigh all risk factors

5            inherent in the loan file, giving consideration to the individual

6            transaction, borrower profile, the level of documentation provided and

7            the property used to collateralize the debt.  Because each loan is

8            different, MortgageIT expects and encourages underwriters to use

9            professional judgment based on their experience in making a lending

10           decision.

11   MortgageIT Mortgage Loan Trust 2006-1 Prospectus Supplement at S-64.

12           273.   The MortgageIT Mortgage Loan Trust 2006-1 Prospectus Supplement

13   represented:

14           MortgageIT realizes that there may be some acceptable quality loans

15           that fall outside published guidelines and encourages "common sense"

16           underwriting.  Because a multitude of factors are involved in a loan

17           transaction, no set of guidelines can contemplate every potential

18           situation.  Therefore, exceptions to these underwriting guidelines are

19           considered, so long as the borrower has other reasonable compensating

20           factors, on a case-by-case basis.

21   MortgageIT Mortgage Loan Trust 2006-1 Prospectus Supplement at S-66.

22           274.   The MortgageIT Mortgage Loan Trust 2006-1 Prospectus Supplement

23   represented:

24           In order to determine if a borrower qualifies for a Pay Option ARM or

25           Alt-A loan, MortgageIT underwriting staff or contract underwriters

26           provided by certain mortgage insurance companies have manually

27           underwritten and approved such loans.  For manually underwritten

28           loans, the underwriter must ensure that the borrower's income will

1616146v1/012661                               107

EXHIBIT 13
118

support the total housing expense on an ongoing basis.  Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period.  In addition to the monthly housing expense the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense.  When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan.  For example, borrowers who lower their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility.

MortgageIT Mortgage Loan Trust 2006-1 Prospectus Supplement at S-65-66.

275.   The MortgageIT Mortgage Loan Trust 2006-1 Prospectus Supplement represented:

MortgageIT underwrites a borrower's creditworthiness based solely on information that MortgageIT believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

MortgageIT Mortgage Loan Trust 2006-1 Prospectus Supplement at S-64.

276.   The MortgageIT Mortgage Loan Trust 2006-1 Prospectus Supplement represented:

In addition to reviewing the borrower's credit history and credit score, MortgageIT underwriters closely review the borrower's housing payment history.  In general, for non-conforming loans the borrower should not have made any mortgage payments over 30 days after the due date for the most recent 24 months.  In general, for Pay Option ARM and Alt-A loans the borrower may have no more than one

EXHIBIT 13
119

1    payment that was made over 30 days after the due date for the most

2    recent 24 months.

3  MortgageIT Mortgage Loan Trust 2006-1 Prospectus Supplement at S-65.

4        277.   The Soundview Home Loan Trust 2005-OPT4 Prospectus Supplement

5  represented:   The Mortgage Loans will have been originated generally in

6  accordance with Option One's Guidelines (the 'Option One Underwriting

7  Guidelines')."  Soundview Home Loan Trust 2005-OPT4 Prospectus Supplement at

8  S-54.

9        278.   The Soundview Home Loan Trust 2005-OPT4 Prospectus Supplement

10  represented:  "On a case-by-case basis, exceptions to the Option One Underwriting

11  Guidelines are made where compensating factors exist."  Soundview Home Loan

12  Trust 2005-OPT4 Prospectus Supplement at S-54.

13        279.   The Soundview Home Loan Trust 2005-OPT4 Prospectus Supplement

14  represented:

15        Option   One   Underwriting   Guidelines   require   a   reasonable

16        determination of an applicant's ability to repay the loan.   Such

17        determination is based on a review of the applicant's source of income,

18        calculation of a debt service-to-income ratio based on the amount of

19        income from sources indicated on the loan application or similar

20        documentation, a review of the applicant's credit history and the type

21        and intended use of the property being financed.

22  Soundview Home Loan Trust 2005-OPT4 Prospectus Supplement at S-55.

23        280.   The Soundview Home Loan Trust 2005-OPT4 Prospectus Supplement

24  represented:

25        The Option One Underwriting Guidelines are primarily intended to

26        assess the value of the mortgaged property, to evaluate the adequacy of

27        such property as collateral for the mortgage loan and to assess the

28        applicant's ability to repay the mortgage loan.

EXHIBIT 13
120

1    Soundview Home Loan Trust 2005-OPT4 Prospectus Supplement at S-54.

2        281.  The Wachovia Mortgage Loan Trust, Series 2006-ALT1 Prospectus

3    Supplement represented:

> National City Mortgage's underwriting standards are applied to
> evaluate the prospective borrower's credit standing and repayment
> ability and the value and adequacy of the mortgaged property as
> collateral.  These standards are applied in accordance with the
> applicable federal and state laws and regulations.  Exceptions to the
> underwriting standards are permitted where compensating factors are
> present.

Wachovia Mortgage Loan Trust, Series 2006-ALT1 Prospectus Supplement at S-34.

        282.  The Wachovia Mortgage Loan Trust, Series 2006-ALT1 Prospectus Supplement represented:

> In determining whether a prospective borrower has sufficient monthly
> income available (i) to meet the borrower's monthly obligation on
> their proposed mortgage loan and (ii) to meet the monthly housing
> expenses and other financial obligation on the proposed mortgage
> loan, the originator generally considers, when required by the
> applicable documentation program, the ratio of such amounts to the
> proposed borrower's acceptable stable monthly gross income.  Such
> ratios vary depending on a number of underwriting criteria, including
> loan-to-value ratios, and are determined on a loan-by-loan basis.

Wachovia Mortgage Loan Trust, Series 2006-ALT1 Prospectus Supplement at S-35.

        283.  UNTRUE STATEMENTS AND OMITTED INFORMATION:  The preceding statements were material at the time they were made, because the quality of the loans in the mortgage pool directly affects the riskiness of the RMBS

EXHIBIT 13
121

1    investment, and the quality of the loans is dependent upon the underwriting process

2    employed.   The preceding statements were untrue at the time they were made

3    because, as alleged herein, the Originators did not adhere to the stated underwriting

4    guidelines, did not effectively evaluate the borrowers' ability or likelihood to repay

5    the loans, did not properly evaluate whether the borrower's debt-to-income ratio

6    supported a conclusion that the borrower had the means to meet his/her monthly

7    obligations, and did not ensure that adequate compensating factors justified the

8    granting of exceptions to guidelines.   Rather, as alleged herein, the Originators

9    systematically disregarded the stated underwriting guidelines in order to increase

10   the volume of mortgages originated (*see supra* Section VII.D).   Further evidence of

11   this fact is found in, among other things, the surge in delinquencies and defaults

12   shortly after the offerings (*see supra* Table 5), the rate at which actual losses

13   outpaced expected losses within the first year after the offerings (*see supra* Figure

14   2), the collapse of the credit ratings (*see supra* Table 4), and the fact that the

15   Originators were engaged in high OTD lending (*see supra* Table 6).

16          **B.    Untrue Statements Concerning Reduced Documentation Programs**

17          284.   The Nomura HELT 2007-1 Prospectus Supplement represented

18   FNBN's reduced documentation underwriting guidelines as the following:

19          Under the stated income documentation and the no ratio programs,

20          more emphasis is placed on a prospective borrower's credit score and

21          on the value and adequacy of the Mortgaged Property as collateral and

22          other assets of the prospective borrower rather than on income

23          underwriting.   The stated income documentation program requires

24          prospective borrowers to provide information regarding their assets

25          and income.  Information regarding assets is verified through written

26          communications or bank statements.  Information regarding income is

27          not verified.  The no ratio program requires prospective borrowers to

28          provide information regarding their assets, which is then verified

EXHIBIT 13
122

through written communications or bank statements. The no ratio program does not require prospective borrowers to provide information regarding their income. In both the stated income and no ratio programs, the employment history is verified through written or telephonic communication.

Nomura HELT 2007-1 Prospectus Supplement at S-106; Alternative Loan Trust 2006-AR4 Prospectus Supplement at S-50.

285. The American Home Mortgage Assets Trust 2007-3 Prospectus Supplement represented:

Certain non-conforming stated income or stated asset products allow for less verification documentation than Fannie Mae or Freddie Mac require. Certain non-conforming Alt-A products also allow for less verification documentation than Fannie Mae or Freddie Mac require. For these Alt-A products the borrower may not be required to verify employment income, assets required to close or both. For some other Alt-A products the borrower is not required to provide any information regarding employment income, assets required to close or both. Alt-A products with less verification documentation generally have other compensating factors such as higher credit score or lower loan-to-value requirements.

American Home Mortgage Assets Trust 2007-3 Prospectus Supplement at S-52; HarborView 2007-5 Prospectus Supplement at S-30; HarborView 2007-2 Prospectus Supplement at S-33.

286. The HarborView 2006-8 Prospectus Supplement represented:

Under the Stated Income Verified Asset Documentation type, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the assets are consistent with the borrower's income.

1616146v1/012661                                112

EXHIBIT 13
123

HarborView 2006-8 Prospectus Supplement at S-61.

287.   The HarborView 2006-14 Prospectus Supplement represented:

Under the Stated Income Verified Asset Documentation type, the mortgage loan application is reviewed to determine that the stated income is reasonable for the borrower's employment and that the assets are consistent with the borrower's income.  BankUnited obtains from a prospective borrower either a verification of deposit or bank statements for the two-month period immediately before the date of the mortgage loan application or verbal verification of employment.

HarborView 2006-14 Prospectus Supplement at S-66; HarborView 2006-10 Prospectus Supplement at S-64.

288.   The HarborView 2006-14 Prospectus Supplement represented:

Under the Stated Income Documentation Program and the No Ratio Program, more emphasis is placed on the prospective borrower's credit score and on the value and adequacy of the mortgaged property as collateral and other assets of the prospective borrower than on income underwriting.  The Stated Income Documentation Program requires prospective borrowers to provide information regarding their assets and income.  Information regarding assets is verified through written communications.  Information regarding income is not verified.  The No Ratio Program requires prospective borrowers to provide information regarding their assets, which is then verified through written communications.  The No Ratio Program does not require prospective borrowers to provide information regarding their income. Employment is orally verified under both programs.

HarborView 2006-14 Prospectus Supplement at S-70.

289.   The HarborView 2007-1 Prospectus Supplement represented:

EXHIBIT 13
124

1   Under the Reduced Documentation Program, some underwriting
2   documentation concerning income, employment and asset verification
3   is waived. Countrywide Home Loans obtains from a prospective
4   borrower either a verification of deposit or bank statements for the
5   two-month period immediately before the date of the mortgage loan
6   application or verbal verification of employment.  Since information
7   relating to a prospective borrower's income and employment is not
8   verified, the borrower's debt-to-income ratios are calculated based on
9   the information provided by the borrower in the mortgage loan
10  application.  The maximum Loan-to-Value Ratio ranges up to 95%.

11  HarborView 2007-1 Prospectus Supplement at S-32; HarborView 2006-12
12  Prospectus Supplement at S-70; HarborView 2006-11 Prospectus Supplement at S-
13  37; HarborView 2006-9 Prospectus Supplement at S-66.

14      290.   The HarborView 2007-4 Prospectus Supplement represented:

15  Under the Reduced Documentation program, the mortgage loan
16  application is reviewed to determine that the stated income is
17  reasonable for the borrower's employment.  Generally, employment is
18  verified by verbal verification.   Paul Financial obtains from a
19  prospective borrower either a verification of deposit or bank
20  statements for a two-month period within 120 days of the date of the
21  mortgage loan application or verbal verification of employment.  Since
22  information relating to a prospective borrower's income is not verified,
23  the borrower's debt-to-income ratios are calculated based on the
24  information provided by the borrower in the mortgage loan
25  application.

26  HarborView 2007-4 Prospectus Supplement at S-36.

27      291.   The IndyMac INDX Mortgage Loan Trust 2006-AR35 Prospectus
28  Supplement represented:

EXHIBIT 13
125

1       The Stated Income Documentation Program requires prospective

2      borrowers to provide information regarding their assets and income.

3      Information regarding a borrower's assets, if applicable, is verified

4      through written communications.  Information regarding income is not

5      verified and employment verification may not be written.

6  IndyMac INDX Mortgage Loan Trust 2006-AR35 Prospectus Supplement at S-68;

7  *see* IndyMac INDX Mortgage Loan Trust 2006-AR35 Registration Statement, Feb.

8  24, 2006, at S-29.

9     292.   The MortgageIT Mortgage Loan Trust 2006-1 Prospectus Supplement

10  represented:

11      Generally, under a "stated income/verified assets" program, no

12      verification of a mortgagor's income is undertaken by the origination;

13      however, verification of the mortgagor's assets is obtained.

14  MortgageIT Mortgage Loan Trust Prospectus Supplement at S-65.

15     293.   The MortgageIT Mortgage Loan Trust 2006-1 Prospectus Supplement

16  represented:

17      Generally, under both "full/alternative" documentation programs, at

18      least one month of income documentation is provided.  This

19      documentation is also required to include year-to-date income or prior

20      year income in case the former is not sufficient to establish consistent

21      income.

22  MortgageIT Mortgage Loan Trust 2006-1 Prospectus Supplement at S-65.

23     294.   The MortgageIT Mortgage Loan Trust 2006-1 Prospectus Supplement

24  represented:

25      The Pay Option ARM and Alt-A mortgage loans are generally

26      documented to the requirements of Fannie Mae and Freddie Mac in

27      that the borrower provides the same information on the loan

28      application along with documentation to verify the accuracy of the

EXHIBIT 13
126

1        information on the application such as income, assets, other liabilities,

2        etc.   Certain non-conforming stated income or stated asset products

3        allow for less verification documentation than Fannie Mae or Freddie

4        Mac require.   Certain Pay Option ARM and Alt-A products also allow

5        for less verification documentation than Fannie Mae or Freddie Mac

6        requires.   For these Pay Option ARM and Alt-A products, the

7        borrower may not be required to verify employment income, assets

8        required to close or both.  For some other Pay Option ARM and Alt-A

9        products the borrower is not required to provide any information

10       regarding employment income, assets required to close or both.  Pay

11       Option ARM and Alt-A products with less verification documentation

12       generally have other compensating factors such as higher credit score

13       or lower loan-to-value requirements.

14  MortgageIT Mortgage Loan Trust 2006-1 Prospectus Supplement at S-65.

15        295.   The Wachovia Mortgage Loan Trust, Series 2006-ALT1 Prospectus

16  Supplement represented:

17        *Stated Documentation.*   Under a stated income documentation

18        program, more emphasis is placed on the value and adequacy of the

19        mortgaged property as collateral, credit history and other assets of the

20        borrower than on a verified income of the borrower.  Although the

21        income is not verified, the originators obtain a telephonic verification

22        of the borrower's employment without reference to income.

23        Employment stability is a critical component in evaluating the

24        borrower's continuing ability to meet obligations.  Borrower's assets

25        may or may not be verified.

26  Wachovia Mortgage Loan Trust, Series 2006-ALT1 Prospectus Supplement at S-

27  36.

28

EXHIBIT 13
127

296. UNTRUE STATEMENTS AND OMITTED INFORMATION: The preceding statements were material at the time they were made, because the quality of the loans in the mortgage pool directly affects the riskiness of the RMBS investment, and the quality of the loans is dependent upon the underwriting process employed. The preceding statements were untrue at the time they were made, because regardless of the documentation program purportedly employed, the Originators systematically disregarded their underwriting guidelines in order to increase the volume of mortgages originated, emphasizing quantity of loans rather than the quality of those loans (*see supra* Section VII.D). Further evidence of this fact is found in, among other things, the surge in delinquencies and defaults shortly after the offerings (*see supra* Table 5), the huge discrepancy between expected and actual losses (*see supra* Figure 2), the collapse of the credit ratings (*see supra* Table 4), and the fact that the Originators were engaged in high OTD lending (*see supra* Table 6).

**C.** **Untrue Statements Concerning Loan-to-Value Ratios**

297. The American Home Mortgage Assets Trust 2007-3 Prospectus Supplement represented:

> The Originator sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan. In general, the Originator requires lower loan-to-value ratios for those loans that are perceived to have a higher risk, such as high loan amounts, loans in which additional cash is being taken out on a refinance transaction or loans on second homes. A lower loan-to-value ratio requires a borrower to have more equity in the property which is a significant additional incentive to the borrower to avoid default on the loan.

American Home Mortgage Assets Trust 2007-3 Prospectus Supplement at S-53.

1616146v1/012661                                            117

EXHIBIT 13
128

298. The IndyMac INDX Mortgage Loan Trust 2006-AR35 Prospectus Supplement represented: "Maximum loan-to-value and combined loan-to-value ratios and loan amounts are established according to the occupancy type, loan purpose, property type, FICO Credit Score, number of previous late mortgage payments and the age of any bankruptcy or foreclosure actions." IndyMac INDX Mortgage Loan Trust 2006-AR35 Prospectus Supplement at S-68; *see* IndyMac INDX Mortgage Loan Trust 2006-AR35 Registration Statement, Feb. 24, 2006, at S-30.

299. The Luminent Mortgage Trust 2007-1 Prospectus Supplement represented: "Maximum loan-to-value and combined loan-to-value ratios and loan amounts are established according to the occupancy type, loan purpose, property type, FICO Credit Score, number of previous late mortgage payments and the age of any bankruptcy or foreclosure actions." Luminent Mortgage Trust 2007-1 Prospectus Supplement at S-38.

300. The MortgageIT Mortgage Loan Trust 2006-1 Prospectus Supplement represented:

> The appraiser's value conclusion is used to calculate the ratio (loan-to-value) of the loan amount to the value of the property. For loans made to purchase a property this ratio is based on the lower of the sales price of the property and the appraised value. MortgageIT sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan. In general, MortgageIT requires lower loan-to-value ratios for those loans that are perceived to have a higher risk, such as high loan amounts, loans in which additional cash is being taken out on a refinance transaction or loans on second homes. A lower loan-to-value ratio requires a borrower to have more equity in the property, which is a significant additional incentive to the borrower to avoid default on

EXHIBIT 13
129

1  the loan.  In addition, for all conventional loans in which the loan-to-

2  value ratio exceeds 80%, MortgageIT requires that a private mortgage

3  insurance company that is approved by Fannie Mae and Freddie Mac

4  insure the loan.  Higher loan-to-value ratios require higher coverage

5  levels.

6  MortgageIT Mortgage Loan Trust 2006-1 Prospectus Supplement at S-64-65.

7  301.  The Soundview Home Loan Trust 2005-OPT4 Prospectus Supplement

8  represented:

9  Option One recognizes that an appraised value is an opinion and thus,

10  allows for variances to the appraisal based on a review of such

11  appraisal, the loan-to-value ratio ("LTV") and other risk factors.  The

12  maximum variance between the appraisal and a review of the appraisal

13  is limited to (i) 10% for LTVs that are less than or equal to 85%, (ii)

14  5% for LTVs between 85.01% and 95%, and (iii) 3% for LTVs over

15  95%.

16  Soundview Home Loan Trust 2005-OPT4 Prospectus Supplement at S-55.

17  302.  UNTRUE STATEMENTS AND OMITTED INFORMATION:  The

18  preceding statements were material at the time they were made because the

19  riskiness of the RMBS investment is directly dependent on the quality of the

20  underwriting process and adequate assessment and limits on loan-to-value ratios (in

21  addition to accurate appraisals) is key to that process.  The preceding statements

22  were untrue at the time they were made because the Originators did not adhere to

23  the maximum loan-to-value ratios as represented in the offering document,

24  encouraged inflated appraisals and frequently granted loans with high loan-to-value

25  ratios with no meaningful assessment of the borrower's ability to repay the loan

26  based on the borrower's credit profile (*see supra* Section VII.D).  Further evidence

27  of this fact is found in, among other things, the surge in delinquencies and defaults

28  shortly after the offerings (*see supra* Table 5), the huge discrepancy between

1616146v1/012661                                                    119

EXHIBIT 13
130

expected and actual losses (*see supra* Figure 2), the collapse of the credit ratings (*see supra* Table 4), and the fact that the Originators were engaged in high OTD lending (*see supra* Table 6).

### D.   Untrue Statements Concerning Credit Enhancement

303.   With regard to credit enhancement, the Nomura HELT 2007-1 Prospectus Supplement represented:

> The credit enhancement features described in this prospectus supplement are intended to enhance the likelihood that holders of the Group I Senior Certificates and Group II Senior Certificates will receive regular distributions of interest and principal from amounts received or advanced on the related Mortgage Loans. However, we cannot assure you that the applicable credit enhancement will adequately cover any shortfalls in cash available to distribute to your certificates as a result of delinquencies or defaults on the related Mortgage Loans. If delinquencies or defaults occur on the related Mortgage Loans, neither the servicers nor any other entity will advance scheduled monthly payments of interest and principal on delinquent or defaulted Mortgage Loans if such advances are not likely to be recovered.

Nomura HELT 2007-1 Prospectus Supplement at S-38.

304.   The American Home Mortgage Assets Trust 2007-3 Prospectus Supplement represented:  "Any decrease in the value of the mortgage properties related to the mortgage loans may result in the allocation of losses which are not covered by credit enhancement to the offered certificates." American Home Mortgage Assets Trust 2007-3 Prospectus Supplement at S-24; *see* American Home Mortgage Assets Trust 2007-3 Registration Statement, Feb. 6, 2007, at S-16.

305.   The First Franklin Mortgage Loan Trust 2005-FFH4 Prospectus Supplement represented:

1616146v1/012661                                    120

EXHIBIT 13
131

1       The credit enhancement features described in the summary of this

2   prospectus supplement are intended to enhance the likelihood that

3   holders of the Class A Certificates, and to a limited extent, the holders

4   of the Mezzanine Certificates and the Class B Certificates, will receive

5   regular distributions of interest and principal.

6   First Franklin Mortgage Loan Trust 2005-FFH4 Prospectus Supplement at S-16.

7       306.  The HarborView 2006-8 Prospectus Supplement represented:

8       Subordination is designed to provide the holders of certificates with a

9   higher payment priority with protection against losses realized when

10  the remaining unpaid principal balance on a mortgage loan exceeds the

11  amount of proceeds recovered upon the liquidation of that mortgage

12  loan.

13  HarborView 2006-8 Prospectus Supplement at S-10; HarborView 2006-9

14  Prospectus Supplement at S-10; HarborView 2006-10 Prospectus Supplement at S-

15  10; HarborView 2006-11 Prospectus Supplement at S-8; HarborView 2006-12

16  Prospectus Supplement at S-10-11; HarborView 2006-14 Prospectus Supplement at

17  S-11; HarborView 2007-1 Prospectus Supplement at S-9; HarborView 2007-2

18  Prospectus Supplement at S-11; HarborView 2007-4 Prospectus Supplement at S-

19  11; HarborView 2007-5 Prospectus Supplement at S-9.

20      307.  The IndyMac INDX Mortgage Loan Trust 2006-AR35 Prospectus

21  Supplement represented:   "The subordination features of the issuing entity are

22  intended to enhance the likelihood that senior certificate holders will receive regular

23  payments of interest and principal, as applicable."   IndyMac INDX Mortgage Loan

24  Trust 2006-AR35 Prospectus Supplement at S-25; *see* IndyMac INDX Mortgage

25  Loan Trust 2006-AR35 Registration Statement, Feb. 24, 2006 at S-18.

26      308.  The Luminent Mortgage Trust 2007-1 Prospectus Supplement

27  represented:

28

1616146v1/012661

121

EXHIBIT 13
132

1     Credit enhancement is intended to reduce the loss caused to holders of

2     the certificates as a result of shortfalls in payments received and losses

3     realized on the mortgage loans. The credit enhancement for each of the

4     Class I and Class II offered certificates includes subordination, excess

5     interest, overcollateralization and realized loss allocation with respect

6     to the related group of mortgage loans.  In addition, substantially all of

7     the mortgage loans with loan-to-value ratios equal to or greater than

8     75% are covered by one or more primary mortgage insurance policies

9     that, subject to compliance with the terms of the policy, would cover a

10     portion of any losses on a covered loan.

11 Luminent Mortgage Trust 2007-1 Prospectus Supplement at S-6.

12     309.   The Soundview Home Loan Trust 2005-OPT4 Prospectus Supplement

13 represented:

14     The credit enhancement features described in this prospectus

15     supplement are intended to enhance the likelihood that holders of the

16     Class A Certificates and the Mezzanine Certificates, will receive

17     regular distributions of interest and principal. However, we cannot

18     assure you that the applicable credit enhancement will adequately

19     cover any shortfalls in cash available to pay your certificates as a result

20     of delinquencies or defaults on the Mortgage Loans. If delinquencies

21     or defaults occur on the Mortgage Loans, neither the Servicer nor any

22     other entity will advance scheduled monthly payments of interest and

23     principal on delinquent or defaulted Mortgage Loans if such advances

24     are not likely to be recovered.

25 Soundview Home Loan Trust 2005-OPT4 Prospectus Supplement at S-14.

26     310.   UNTRUE STATEMENTS AND OMITTED INFORMATION:   The

27 preceding  statements were material at the time they were made, because WesCorp

28 nearly always purchased the highest rated tranches of the RMBS, and those highly

EXHIBIT 13

133

rated tranches relied on the credit enhancement, which purportedly afforded protection against financial loss. The preceding statements were untrue at the time they were made, because, due to the Originators' systematic disregard of underwriting standards, the mortgages in the pools were fatally impaired at the outset and destined to fail (*see supra* Section VII.D). This rendered the protection allegedly afforded by the credit enhancement in the highest tranches illusory. Further evidence of the Originators' pervasive disregard of underwriting standards is found in the surge in delinquencies and defaults shortly after the offerings (*see supra* Table 5); the huge discrepancy between expected and actual losses (*see supra* Figure 2); the collapse of the credit ratings (*see supra* Table 4); and the Originators' high OTD lending (*see supra* Table 6).

## IX.    THE CLAIMS ARE TIMELY

311.   For actions brought by the NCUA Board as Liquidating Agent, the FCU Act extends the statute of limitations for at least three years from the date of the appointment of the NCUA Board as Conservator or Liquidating Agent. *See* 12 U.S.C. § 1787(b)(14)(B)(i).

312.   The NCUA Board placed WesCorp into conservatorship and appointed itself as conservator on March 20, 2009.  On October 1, 2010, the NCUA Board placed WesCorp in liquidation and appointed itself Liquidating Agent.

313.   Actions brought under Sections 11 and 12(a)(2) of the Securities Act must be:

> brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence. . . .  In no event shall any such action be brought to enforce a liability created under section 77k or 77*l*(a)(1) of this title more than three years after the security was bona fide offered to the public, or under section 77*l*(a)(2) of this title more than three years after the sale.

EXHIBIT 13
134

1   15 U.S.C. § 77m.

2      314.  Actions brought under section 25501 of the California Corporate Securities Law must be brought within "five years after the act or transaction constituting the violation or the expiration of two years after the discovery by the plaintiff of the facts constituting the violation, whichever shall first expire." Cal. Corp. Code § 25506(b).

3      315.  As the Federal Reserve Board noted in November 2008, the "deteriorating lending standards" and "the surge in early payment defaults suggests that underwriting . . . deteriorated on dimensions that were less readily apparent to investors." Christopher Mayer *et al.*, *The Rise in Mortgage Defaults* at 15-16; *see also* FSOC Risk Retention Report at 9.

      316.  Accordingly, WesCorp did not discover and could not have discovered the material untrue statements and/or misleading omissions in the Offering Documents more than one year prior to March 20, 2009, the date on which the NCUA Board placed WesCorp into conservatorship.

      317.  In addition, WesCorp and/or the NCUA Board, as Liquidating Agent of WesCorp, is or was a member of putative classes in the cases listed below. Therefore, the NCUA Board's claims are subject to legal tolling of the statute of limitations and statute of repose under the doctrine announced in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) ("American Pipe"), and its progeny.

Table 7

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | American Pipe Tolling Commencement Date | American Pipe Tolling Most Recent Update |
|---|---|---|---|---|---|
| 41162CAD3 | HarborView 2006-10 | WesCorp | 10/18/06 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland*, No. 08-cv-5093 (S.D.N.Y.) Consolidated First Amended Class Action Complaint **Filed:  May 19, 2009** | New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland, No. 08-cv-5093 (S.D.N.Y.)<br><br>Opinion & Order Granting in Part Motion To Dismiss **Filed: May 19, 2011** |

EXHIBIT 13
135

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | American Pipe Tolling Commencement Date | American Pipe Tolling Most Recent Update |
|---|---|---|---|---|---|
| 41162GAB8 | HarborView 2006-11 | WesCorp | 10/27/06 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland*, No. 08-cv-5093 (S.D.N.Y.) Consolidated First Amended Class Action Complaint **Filed: May 19, 2009** | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland*, No. 08-cv-5093 (S.D.N.Y.) Opinion & Order Granting in Part Motion To Dismiss **Filed: May 19, 2011** |
| 41162DAG4 | HarborView 2006-12 | WesCorp | 10/19/06 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland*, No. 08-cv-5093 (S.D.N.Y.) Consolidated First Amended Class Action Complaint **Filed: May 19, 2009** | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland*, No. 08-cv-5093 (S.D.N.Y.) Opinion & Order Granting in Part Motion To Dismiss **Filed: May 19, 2011** |
| 41162DAH2 | HarborView 2006-12 | WesCorp | 11/29/06 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland*, No. 08-cv-5093 (S.D.N.Y.) Consolidated First Amended Class Action Complaint **Filed: May 19, 2009** | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland*, No. 08-cv-5093 (S.D.N.Y.) Opinion & Order Granting in Part Motion To Dismiss **Filed: May 19, 2011** |
| 41162NAD9 | HarborView 2006-14 | WesCorp | 12/506 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland*, No. 08-cv-5093 (S.D.N.Y.) Consolidated First Amended Class Action Complaint **Filed: May 19, 2009** | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland*, No. 08-cv-5093 (S.D.N.Y.) Opinion & Order Granting in Part Motion To Dismiss **Filed: May 19, 2011** |
| 41162NAH0 | HarborView 2006-14 | WesCorp | 12/5/06 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland*, No. 08-cv-5093 (S.D.N.Y.) Consolidated First Amended Class Action Complaint **Filed: May 19, 2009** | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland*, No. 08-cv-5093 (S.D.N.Y.) Opinion & Order Granting in Part Motion To Dismiss **Filed: May 19, 2011** |

EXHIBIT 13

136

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | American Pipe Tolling Commencement Date | American Pipe Tolling Most Recent Update |
|---|---|---|---|---|---|
| 41161XAM8 | HarborView 2006-9 | WesCorp | 8/18/06 | *New Jersey Carpenters Vacation Fund v. Harborview Mortgage Loan,* No. 08-601451 (N.Y. Sup. Ct. Trial Div.) **Filed: May 14, 2008** (Removed to No. 08-5093 (S.D.N.Y.)) | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland,* No. 08-cv-5093 (S.D.N.Y.) Opinion & Order Granting in Part Motion To Dismiss **Filed: May 19, 2011** |
| 41161XAN6 | HarborView 2006-9 | WesCorp | 3/8/07 | *New Jersey Carpenters Vacation Fund v. Harborview Mortgage Loan,* No. 08-601451 (N.Y. Sup. Ct. Trial Div.) **Filed: May 14, 2008** (Removed to No. 08-5093 (S.D.N.Y.)) | New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland, No. 08-cv-5093 (S.D.N.Y.) Opinion & Order Granting in Part Motion To Dismiss **Filed: May 19, 2011** |
| 45667SAN7 | IndyMac INDX Mortgage Loan Trust 2006-AR35 | WesCorp | 11/28/06 | *Police and Fire Retirement System of Detroit v. Indymac,* No. 09-cv-4583 (S.D.N.Y.) Complaint **Filed: May 14, 2009;** *Wyoming State Treasurer v. Olinski,* No. 09-cv-5933 (S.D.N.Y.) Complaint **Filed: June 29, 2009** (Consolidated with No. 09-4583 (S.D.N.Y.)) | *In re Indymac Mortgage-Backed Sec. Litig.,* No. 09-cv-4583 (S.D.N.Y.) Motion for Class Certification **PENDING: December 10, 2010** |
| 45667SAP2 | IndyMac INDX Mortgage Loan Trust 2006-AR35 | WesCorp | 11/28/06 | *Police and Fire Retirement System of Detroit v. Indymac,* No. 09-cv-4583 (S.D.N.Y.) Complaint **Filed: May 14, 2009;** *Wyoming State Treasurer v. Olinski,* No. 09-cv-5933 (S.D.N.Y.) Complaint **Filed: June 29, 2009** (Consolidated with No. 09-4583 (S.D.N.Y.)) | *In re Indymac Mortgage-Backed Sec. Litig.,* No. 09-cv-4583 (S.D.N.Y.) Motion for Class Certification **PENDING: December 10, 2010** |

318. With respect to those RMBS purchases for which the NCUA Board asserts claims under Section 11 of the Securities Act (Claims 1-7), the earliest date

EXHIBIT 13
137

1  they were bona fide offered to the public was August 28, 2006, or not more than

2  three years prior to March 20, 2009. Accordingly, the NCUA Board's Section 11

3  claims are not time-barred.

4      319. With respect to those RMBS purchases for which the NCUA Board

5  asserts claims under Section 12(a)(2) (Claim 8), the earliest sale was August 1,

6  2006, or not more than three years prior to March 20, 2009. Accordingly, the

7  NCUA Board's Section 12(a)(2) claims are not time-barred.

8      320. With respect to those RMBS purchases for which the NCUA Board

9  asserts claims under state law (Claim 9), the earliest purchase date or offering date

10  with respect to those claims was November 22, 2005, or not more than five years

11  prior to March 20, 2009. Accordingly, the NCUA Board's state law claims are not

12  time-barred.

13  **X.    CLAIMS FOR RELIEF**

14               **FIRST CLAIM FOR RELIEF**

15               **Section 11 of the Securities Act**

16               **(Alternative Loan Trust 2006-AR4)**

17      321. The NCUA Board realleges paragraphs 1 through 320 of this

18  Complaint, as though fully set forth here, except those paragraphs specific to the

19  Issuer Defendants other than Nomura Asset Acceptance Corp., or specific to

20  offerings other than the Alternative Loan Trust 2006-AR4 offering. The NCUA

21  Board brings this cause of action pursuant to Section 11 of the Securities Act, with

22  respect to WesCorp's purchase of the Alternative Loan Trust 2006-AR4 certificate

23  against Defendant RBS, as underwriter, and against Defendant Nomura Asset

24  Acceptance Corp., as issuer.

25      322. The NCUA Board expressly disclaims and disavows any allegation

26  that could be construed as alleging fraud.

27      323. At the time the registration statement became effective, it (including

28  the prospectus and any prospectus supplements) contained untrue statements and

EXHIBIT 13
138

1  omitted facts that were necessary to make the statements made not misleading, as
2  alleged above.

3      324.  The untrue statements and omitted facts were material because a
4  reasonably prudent investor deciding whether to purchase the certificate would
5  have viewed them as important and as substantially altering the total mix of
6  information available, as alleged above.

7      325.  WesCorp purchased the certificate pursuant to and traceable to the
8  defective registration statement, as alleged above.

9      326.  At the time WesCorp purchased the certificate, it did not know of the
10  untrue statements and omissions contained in the registration statement.

11      327.  RBS's and Nomura Asset Acceptance Corp's conduct as alleged above
12  violated Section 11.

13      328.  WesCorp and the NCUA Board sustained damages as a result of
14  Defendant RBS's and Defendant Nomura Asset Acceptance Corp.'s violations of
15  Section 11.

16      329.  WHEREFORE, the NCUA Board requests the Court to enter judgment
17  in its favor against Defendant RBS and Defendant Nomura Asset Acceptance
18  Corp., jointly and severally, awarding all damages, in an amount to be proven at
19  trial, costs, and such other relief as the Court deems appropriate and just.

20                    **SECOND CLAIM FOR RELIEF**
21                    **Section 11 of the Securities Act**
22          **(American Home Mortgage Assets Trust 2007-3)**

23      330.  The NCUA Board realleges paragraphs 1 through 320 of this
24  Complaint, as though fully set forth here, except those paragraphs specific to the
25  Issuer Defendants other than American Home Mortgage Assets LLC, or specific to
26  offerings other than the American Home Mortgage Assets Trust 2007-3 offering.

27      331.  The NCUA Board brings this cause of action pursuant to Section 11 of
28  the Securities Act, with respect to WesCorp's purchase of the American Home

1616146v1/012661                          128

EXHIBIT 13
139

1  Mortgage Assets Trust 2007-3 certificate against Defendant RBS, as underwriter,
2  and against Defendant American Home Mortgage Assets LLC, as the issuer.

3      332.  The NCUA Board expressly disclaims and disavows any allegation
4  that could be construed as alleging fraud.

5      333.  At the time the registration statement became effective, it (including
6  the prospectus and any prospectus supplements) contained untrue statements and
7  omitted facts that were necessary to make the statements made not misleading, as
8  alleged above.

9      334.  The untrue statements and omitted facts were material because a
10  reasonably prudent investor deciding whether to purchase the certificate would
11  have viewed them as important and as substantially altering the total mix of
12  information available, as alleged above.

13      335.  WesCorp purchased the certificate pursuant to and traceable to the
14  defective registration statement, as alleged above.

15      336.  At the time WesCorp purchased the certificate, it did not know of the
16  untrue statements and omissions contained in the registration statement.

17      337.  RBS's and American Home Mortgage Assets LLC's conduct as
18  alleged above violated Section 11.

19      338.  WesCorp and the NCUA Board sustained damages as a result of
20  Defendant RBS's and Defendant American Home Mortgage Assets LLC's
21  violations of Section 11.

22      339.  WHEREFORE, the NCUA Board requests the Court to enter judgment
23  in its favor against Defendant RBS and Defendant American Home Mortgage
24  Assets LLC, jointly and severally awarding all damages, in an amount to be proven
25  at trial, costs, and such other relief as the Court deems appropriate and just.

26

27

28

EXHIBIT 13
140

**THIRD CLAIM FOR RELIEF**

**Section 11 of the Securities Act**

**(HarborView 2007-5, HarborView 2007-4, HarborView 2007-2, HarborView 2007-1, HarborView 2006-14, HarborView 2006-12, HarborView 2006-11, HarborView 2006-10, HarborView 2006-9, and HarborView 2006-8)**

340.   The NCUA Board realleges paragraphs 1 through 320 of this Complaint as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than Greenwich Capital Acceptance, Inc., or specific to offerings other than the HarborView 2007-5, HarborView 2007-4, HarborView 2007-2, HarborView 2007-1, HarborView 2006-14, HarborView 2006-12, HarborView 2006-11, HarborView 2006-10, HarborView 2006-9, and HarborView 2006-8 offerings.

341.   The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to WesCorp's purchases of the HarborView 2007-5, HarborView 2007-4, HarborView 2007-2, HarborView 2007-1, HarborView 2006-14, HarborView 2006-12, HarborView 2006-11, HarborView 2006-10, HarborView 2006-9, and HarborView 2006-8 certificates against Defendant RBS, as underwriter, and against Defendant Greenwich Capital Acceptance, Inc., as the issuer.

342.   The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

343.   At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

344.   The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificates would

EXHIBIT 13
141

1  have viewed them as important and as substantially altering the total mix of
2  information available, as alleged above.

3      345.  WesCorp purchased the certificates pursuant to and traceable to a
4  defective registration statement, as alleged above.

5      346.  At the time WesCorp purchased the certificates, it did not know of the
6  untrue statements and omissions contained in the registration statement.

7      347.  RBS's and Greenwich Capital Acceptance, Inc.'s conduct as alleged
8  above violated Section 11.

9      348.  WesCorp and the NCUA Board sustained damages as a result of
10  Defendant RBS's and Defendant Greenwich Capital Acceptance, Inc.'s violations
11  of Section 11.

12      349.  WHEREFORE, the NCUA Board requests the Court to enter judgment
13  in its favor against Defendant RBS and Defendant Greenwich Capital Acceptance,
14  Inc., jointly and severally, awarding all damages, in an amount to be proven at trial,
15  costs, and such other relief as the Court deems appropriate and just.

16  **FOURTH CLAIM FOR RELIEF**

17  **Section 11 of the Securities Act**

18  **(IndyMac INDX Mortgage Loan Trust 2006-AR35)**

19      350.  The NCUA Board realleges paragraphs 1 through 320 of this
20  Complaint, as though fully set forth here, except those paragraphs specific to the
21  Issuer Defendants other than IndyMac MBS, Inc., or specific to offerings other than
22  the IndyMac INDX Mortgage Loan Trust 2006-AR35 offering.

23      351.  The NCUA Board brings this cause of action pursuant to Section 11 of
24  the Securities Act, with respect to WesCorp's purchase of the IndyMac INDX
25  Mortgage Loan Trust 2006-AR35 certificate against Defendant RBS, as
26  underwriter, and against Defendant IndyMac MBS, Inc., as the issuer.

27      352.  The NCUA Board expressly disclaims and disavows any allegation
28  that could be construed as alleging fraud.

1616146v1/012661
131

EXHIBIT 13
142

353.   At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

354.   The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificate would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

355.   WesCorp purchased the certificate pursuant to and traceable to the defective registration statement, as alleged above.

356.   At the time WesCorp purchased the certificate, it did not know of the untrue statements and omissions contained in the registration statement.

357.   RBS's and IndyMac MBS, Inc.'s conduct as alleged above violated Section 11.

358.   WesCorp and the NCUA Board sustained damages as a result of Defendant RBS's and Defendant IndyMac MBS, Inc.'s violations of Section 11.

359.   WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant RBS and Defendant IndyMac MBS, Inc., jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

### FIFTH CLAIM FOR RELIEF

### Section 11 of the Securities Act

### (Luminent Mortgage Trust 2007-1)

360.   The NCUA Board realleges paragraphs 1 through 320 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than Lares Asset Securitization, Inc., or specific to offerings other than the Luminent Mortgage Trust 2007-1 offering.

EXHIBIT 13

143

361. The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to WesCorp's purchase of the Luminent Mortgage Trust 2007-1 certificate against Defendant RBS, as underwriter, and against Defendant Lares Asset Securitization, Inc., as the issuer.

362. The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

363. At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

364. The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificate would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

365. WesCorp purchased the certificate pursuant to and traceable to the defective registration statement, as alleged above.

366. At the time WesCorp purchased the certificate, it did not know of the untrue statements and omissions contained in the registration statement.

367. RBS's and Lares Asset Securitization, Inc.'s conduct as alleged above violated Section 11.

368. WesCorp and the NCUA Board sustained damages as a result of Defendant RBS's and Defendant Lares Asset Securitization, Inc.'s violations of Section 11.

369. WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant RBS and Defendant Lares Asset Securitization, Inc., jointly and severally, awarding all damages, in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

EXHIBIT 13
144

# SIXTH CLAIM FOR RELIEF

## Section 11 of the Securities Act

## (Nomura HELT 2007-1)

370. The NCUA Board realleges paragraphs 1 through 320 of this Complaint, as though fully set forth here, except those paragraphs specific to the Issuer Defendants other than Nomura Home Equity Loan, Inc., or specific to offerings other than the Nomura HELT 2007-1 offering.

371. The NCUA Board brings this cause of action pursuant to Section 11 of the Securities Act, with respect to WesCorp's purchase of the Nomura HELT 2007-1 certificate against Defendant RBS, as underwriter, and against Defendant Nomura Home Equity Loan, Inc., as the issuer.

372. The NCUA Board expressly disclaims and disavows any allegation that could be construed as alleging fraud.

373. At the time the registration statement became effective, it (including the prospectus and any prospectus supplements) contained untrue statements and omitted facts that were necessary to make the statements made not misleading, as alleged above.

374. The untrue statements and omitted facts were material because a reasonably prudent investor deciding whether to purchase the certificate would have viewed them as important and as substantially altering the total mix of information available, as alleged above.

375. WesCorp purchased the certificate pursuant to and traceable to the defective registration statement, as alleged above.

376. At the time WesCorp purchased the certificate, it did not know of the untrue statements and omissions contained in the registration statement.

377. RBS's and Nomura Home Equity Loan, Inc.'s conduct as alleged above violated Section 11.

1616146v1/012661                           134

EXHIBIT 13
145

1    378.   WesCorp and the NCUA Board sustained damages as a result of

2    Defendant RBS's and Defendant Nomura Home Equity Loan, Inc.'s violations of

3    Section 11.

4    379.   WHEREFORE, the NCUA Board requests the Court to enter judgment

5    in its favor against Defendant RBS and Defendant Nomura Home Equity Loan,

6    Inc., jointly and severally, awarding all damages, in an amount to be proven at trial,

7    costs, and such other relief as the Court deems appropriate and just.

8    **SEVENTH CLAIM FOR RELIEF**

9    **Section 11 of the Securities Act**

10    **(Wachovia Mortgage Loan Trust, Series 2006-ALT1)**

11    380.   The NCUA Board realleges paragraphs 1 through 320 of this

12    Complaint, as though fully set forth here, except those paragraphs specific to the

13    Issuer Defendants other than Wachovia Mortgage Loan Trust, LLC, or specific to

14    offerings other than the Wachovia Mortgage Loan Trust, Series 2006-ALT1

15    offering.

16    381.   The NCUA Board brings this cause of action pursuant to Section 11 of

17    the Securities Act, with respect to WesCorp's purchase of the Wachovia Mortgage

18    Loan Trust, Series 2006-ALT1 certificate against Defendant RBS, as the

19    underwriter, and against Defendant Wachovia Mortgage Loan Trust, LLC, as the

20    issuer.

21    382.   The NCUA Board expressly disclaims and disavows any allegation

22    that could be construed as alleging fraud.

23    383.   At the time the registration statement became effective, it (including

24    the prospectus and any prospectus supplements) contained untrue statements and

25    omitted facts that were necessary to make the statements made not misleading, as

26    alleged above.

27    384.   The untrue statements and omitted facts were material because a

28    reasonably prudent investor deciding whether to purchase the certificate would

EXHIBIT 13

146

1    have viewed them as important and as substantially altering the total mix of

2    information available, as alleged above.

3          385. WesCorp purchased the certificate pursuant to and traceable to the

4    defective registration statement, as alleged above.

5          386. At the time WesCorp purchased the certificate, it did not know of the

6    untrue statements and omissions contained in the registration statement.

7          387. RBS's and Wachovia Mortgage Loan Trust, LLC's conduct as alleged

8    above violated Section 11.

9          388. WesCorp and the NCUA Board sustained damages as a result of

10    Defendant RBS's and Defendant Wachovia Mortgage Loan Trust, LLC's violations

11    of Section 11.

12          389. WHEREFORE, the NCUA Board requests the Court to enter judgment

13    in its favor against Defendant RBS and Defendant Wachovia Mortgage Loan Trust,

14    LLC, jointly and severally, awarding all damages, in an amount to be proven at

15    trial, costs, and such other relief as the Court deems appropriate and just.

16    **EIGHTH CLAIM FOR RELIEF**

17    **Section 12(a)(2) of the Securities Act**

18    **(Alternative Loan Trust 2006-AR4, American Home Mortgage Assets Trust**

19    **2007-3, HarborView 2007-5, HarborView 2007-4, HarborView 2007-2,**

20    **HarborView 2007-1, HarborView 2006-14, HarborView 2006-12, HarborView**

21    **2006-11, HarborView 2006-10, HarborView 2006-9, HarborView 2006-8,**

22    **IndyMac INDX Mortgage Loan Trust 2006-AR35, Luminent Mortgage Trust**

23    **2007-1, Nomura HELT 2007-1)**

24          390. The NCUA Board realleges paragraphs 1 through 320 of this

25    Complaint, as though fully set forth here, except those paragraphs specific to the

26    offerings other than Alternative Loan Trust 2006-AR4, American Home Mortgage

27    Assets Trust 2007-3, HarborView 2007-5, HarborView 2007-4, HarborView 2007-

28    2, HarborView 2007-1, HarborView 2006-14, HarborView 2006-12, HarborView

EXHIBIT 13
147

1   2006-11, HarborView 2006-10, HarborView 2006-9, HarborView 2006-8,
2   IndyMac INDX Mortgage Loan Trust 2006-AR35, Luminent Mortgage Trust 2007-
3   1, and Nomura HELT 2007-1offerings.

4   391. The NCUA Board brings this cause of action pursuant to Section
5   12(a)(2) of the Securities Act, with respect to WesCorp's purchases of the
6   Alternative Loan Trust 2006-AR4, American Home Mortgage Assets Trust 2007-3,
7   HarborView 2007-5, HarborView 2007-4, HarborView 2007-2, HarborView 2007-
8   1, HarborView 2006-14, HarborView 2006-12, HarborView 2006-11, HarborView
9   2006-10, HarborView 2006-9, HarborView 2006-8, IndyMac INDX Mortgage
10  Loan Trust 2006-AR35, Luminent Mortgage Trust 2007-1, Nomura HELT 2007-
11  1certificates against Defendant RBS, as the underwriter and seller of those
12  certificates.

13  392. The NCUA Board expressly disclaims and disavows any allegation
14  that could be construed as alleging fraud.

15  393. Defendant RBS offered to sell and sold the securities to WesCorp
16  through one or more instrumentalities of interstate commerce (*i.e.*, telephone, faxes,
17  mails, e-mail, or other means of electronic communication).

18  394. Defendant RBS offered to sell and sold the securities, for its own
19  financial gain, to WesCorp by means of the prospectus and/or prospectus
20  supplements, as alleged above, and/or oral communications related to the
21  prospectuses and/or prospectus supplements.

22  395. The prospectuses and/or prospectus supplements contained untrue
23  statements of material fact and omitted facts that were necessary to make the
24  statements made not misleading, as alleged above.

25  396. The untrue statements of material fact and omitted facts were material
26  because a reasonably prudent investor deciding whether to purchase the certificates
27  would have viewed them as important and as substantially altering the total mix of
28  information available, as alleged above.

1616146v1/012661                                137

EXHIBIT 13
148

397.   WesCorp purchased the certificates on the initial offering pursuant to the prospectus and/or prospectus supplements.

398.   At the time WesCorp purchased the certificates, it did not know of the untrue statements and omissions contained in the prospectuses and/or prospectus supplements.

399.   Defendant RBS's conduct as alleged above violated Section 12(a)(2).

400.   WesCorp and the NCUA Board sustained damages as a result of Defendant RBS's violations of Section 12(a)(2).

401.   WHEREFORE, the NCUA Board requests the Court to enter judgment in its favor against Defendant RBS awarding damages in an amount to be proven at trial, costs, and such other relief as the Court deems appropriate and just.

EXHIBIT 13
149

## NINTH CLAIM FOR RELIEF

### Violation of the California Corporate Securities Law of 1968

### Cal. Corp. Code §§ 25401 and 25501

### (Alternative Loan Trust 2006-AR4, American Home Mortgage Assets Trust 2007-3, First Franklin Mortgage Loan Trust 2005-FFH4, HarborView 2007-5, HarborView 2007-4, HarborView 2007-2, HarborView 2007-1, HarborView 2006-14, HarborView 2006-12, HarborView 2006-11, HarborView 2006-10, HarborView 2006-9, HarborView 2006-8, IndyMac INDX Mortgage Loan Trust 2006-AR35, Luminent Mortgage Trust 2007-1, MortgageIT Mortgage Loan Trust 2006-1, Nomura HELT 2007-1, Soundview Home Loan Trust 2005-OPT4)

402. The NCUA Board realleges paragraphs 1 through 320 of this Complaint, as though fully set forth here, except those paragraphs specific to offerings other than the Alternative Loan Trust 2006-AR4, American Home Mortgage Assets Trust 2007-3, First Franklin Mortgage Loan Trust 2005-FFH4, HarborView 2007-5, HarborView 2007-4, HarborView 2007-2, HarborView 2007-1, HarborView 2006-14, HarborView 2006-12, HarborView 2006-11, HarborView 2006-10, HarborView 2006-9, HarborView 2006-8, IndyMac INDX Mortgage Loan Trust 2006-AR35, Luminent Mortgage Trust 2007-1, MortgageIT Mortgage Loan Trust 2006-1, Nomura HELT 2007-1, and Soundview Home Loan Trust 2005-OPT4 offerings.

403. The NCUA Board brings this cause of action pursuant to Sections 25401 and 25501 of the California Corporations Code, with respect to WesCorp's purchases of the Alternative Loan Trust 2006-AR4, American Home Mortgage Assets Trust 2007-3, First Franklin Mortgage Loan Trust 2005-FFH4, HarborView 2007-5, HarborView 2007-4, HarborView 2007-2, HarborView 2007-1, HarborView 2006-14, HarborView 2006-12, HarborView 2006-11, HarborView 2006-10, HarborView 2006-9, HarborView 2006-8, IndyMac INDX Mortgage

EXHIBIT 13
150

1    Loan Trust 2006-AR35, Luminent Mortgage Trust 2007-1, MortgageIT Mortgage

2    Loan Trust 2006-1, Nomura HELT 2007-1, and Soundview Home Loan Trust

3    2005-OPT4 certificates against Defendant RBS, as the seller of those certificates.

4        404.    Defendant RBS offered to sell for its own financial gain and sold the

5    certificates to WesCorp by means of written and/or oral communications which

6    included untrue statements of material fact and omissions of material facts that

7    were necessary to make the statements made not misleading, as alleged above.

8        405.    The untrue statements and omitted facts were material because a

9    reasonably prudent investor deciding whether to purchase the certificates would

10   have viewed them as important and as substantially altering the total mix of

11   information available, as alleged above.

12       406.    Defendant RBS sold the certificates to WesCorp in California.

13       407.    Defendant RBS's sales of the certificates violated Cal. Corp. Code

14   § 25401.

15       408.    WesCorp and the NCUA Board sustained damages as a result of

16   Defendant RBS's violations of Cal. Corp. Code § 25401, and WesCorp and the

17   NCUA Board are entitled to the remedies provided by Cal. Corp. Code § 25501.

18

19       WHEREFORE, the NCUA Board requests the Court to enter judgment in its

20   favor against Defendant RBS awarding damages in an amount to be proven at trial,

21   costs, and such other relief as the Court deems appropriate and just.

22

23                              **PRAYER FOR RELIEF**

24       WHEREFORE, plaintiff prays for judgment as follows:

25       A.    For judgment against the defendants in accordance with the prayers for

26   relief set forth in each of the foregoing Claims for Relief;

27       B.    For plaintiff's costs of suit; and

28       C.    For any other relief the Court deems just and proper.

1616146v1/012661                          140

EXHIBIT 13

151

1

Dated:  July 18, 2011

2
    MARC M. SELTZER
    BRYAN J.E. CAFORIO
3
    SUSMAN GODFREY L.L.P.

4
    GEORGE A. ZELCS
    KOREIN TILLERY LLC
5

6
    STEPHEN M. TILLERY
    DOUGLAS R. SPRING
7
    PETER H. RACHMAN
    ROBERT L. KING
8
    DIANE MOORE HEITMAN
    KOREIN TILLERY LLC
9
    505 North Seventh Street, Suite 3600
    St. Louis, Missouri  63101-1625
10
    Tel:  (314) 241-4844
    Fax:  (314) 241-3525

11
    MARK C. HANSEN
12
    DAVID C. FREDERICK
    dfrederick@khhte.com
13
    WAN J. KIM
    JOSEPH S. HALL
14
    KELLOGG, HUBER, HANSEN, TODD,
     EVANS & FIGEL, P.L.L.C.
15
    Sumner Square
    1615 M Street, N.W., Suite 400
16
    Washington, D.C.  20036
    Telephone:  (202) 326-7900
17
    Fax:  (202) 326-7999

18
    ROBERT M. FENNER
    General Counsel
19
    bobf@ncua.gov
    JOHN K. IANNO
20
    Associate General Counsel
    johni@ncua.gov
21
    NATIONAL CREDIT UNION
    ADMINISTRATION
22
    1775 Duke Street
    Alexandria, Virginia  22314-3428
23
    Tel:  (703) 518-6540

24

25
    By:  Marc M. Seltzer
        Marc M. Seltzer
26
    Attorneys for Plaintiff
    National Credit Union Administration
27
    Board

28

EXHIBIT 13
152

1

## JURY DEMAND

2          Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all of

3    the claims asserted in this Complaint so triable.

4    Dated:  July 18, 2011                    MARC M. SELTZER
                                              BRYAN J.E. CAFORIO
5                                             SUSMAN GODFREY L.L.P.

6                                             GEORGE A. ZELCS
                                              KOREIN TILLERY LLC
7
                                              STEPHEN M. TILLERY
8                                             DOUGLAS R. SPRING
                                              PETER H. RACHMAN
9                                             ROBERT L. KING
                                              DIANE MOORE HEITMAN
10                                            KOREIN TILLERY LLC
                                              505 North Seventh Street, Suite 3600
11                                            St. Louis, Missouri  63101-1625
                                              Tel: (314) 241-4844
12                                            Fax: (314) 241-3525

13                                            MARK C. HANSEN
                                              DAVID C. FREDERICK
14                                            dfrederick@khhte.com
                                              WAN J. KIM
15                                            JOSEPH S. HALL
                                              KELLOGG, HUBER, HANSEN, TODD,
16                                              EVANS & FIGEL, P.L.L.C.
                                              Sumner Square
17                                            1615 M Street, N.W., Suite 400
                                              Washington, D.C.  20036
18                                            Telephone: (202) 326-7900
                                              Fax: (202) 326-7999
19
                                              ROBERT M. FENNER
20                                            General Counsel
                                              bobf@ncua.gov
21                                            JOHN K. IANNO
                                              Associate General Counsel
22                                            johni@ncua.gov
                                              NATIONAL CREDIT UNION
23                                            ADMINISTRATION
                                              1775 Duke Street
24                                            Alexandria, Virginia  22314-3428
                                              Tel: (703) 518-6540
25
                                              By:  _Marc M. Seltzer_
26                                                   Marc M. Seltzer
                                              Attorneys for Plaintiff
27                                            National Credit Union Administration
                                              Board
28

1616146v1/012661                              142

EXHIBIT 13
153

# Appendix A

# Table 1

| CUSIP | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 65538DAB1 | Alternative Loan Trust 2006-AR4 | Nomura Asset Acceptance Corporation | WesCorp | 11/17/06 | $12,778,000 |
| 026935AD8 | American Home Mortgage Assets Trust 2007-3 | American Home Mortgage Assets LLC | WesCorp | 6/1/07 | $30,339,000 |
| 32027NXE6 | First Franklin Mortgage Loan Trust 2005-FFH4 | Financial Asset Securities Corp. | WesCorp | 11/30/05 | $10,000,000 |
| 41162CAD3 | HarborView 2006-10 | Greenwich Capital Acceptance, Inc. | WesCorp | 10/18/06 | $90,000,000 |
| 41162GAB8 | HarborView 2006-11 | Greenwich Capital Acceptance, Inc. | WesCorp | 10/27/06 | $18,934,000 |
| 41162DAG4 | HarborView 2006-12 | Greenwich Capital Acceptance, Inc. | WesCorp | 10/19/06 | $80,000,000 |
| 41162DAH2 | HarborView 2006-12 | Greenwich Capital Acceptance, Inc. | WesCorp | 11/29/06 | $120,000,000 |
| 41162NAD9 | HarborView 2006-14 | Greenwich Capital Acceptance, Inc. | WesCorp | 12/5/06 | $60,000,000 |
| 41162NAH0 | HarborView 2006-14 | Greenwich Capital Acceptance, Inc. | WesCorp | 12/5/06 | $99,827,000 |
| 41161GAE3 | HarborView 2006-8 | Greenwich Capital Acceptance, Inc. | WesCorp | 8/1/06 | $105,693,000 |
| 41161XAM8 | HarborView 2006-9 | Greenwich Capital Acceptance, Inc. | WesCorp | 8/18/06 | $100,000,000 |
| 41164MAF4 | HarborView 2007-1 | Greenwich Capital Acceptance, Inc. | WesCorp | 2/14/07 | $48,602,000 |
| 41164MAP2 | HarborView 2007-1 | Greenwich Capital Acceptance, Inc. | WesCorp | 2/16/07 | $56,000,000 |
| 41164LAC3 | HarborView 2007-2 | Greenwich Capital Acceptance, Inc. | WesCorp | 3/1/07 | $55,000,000 |
| 41164YAD3 | HarborView 2007-4 | Greenwich Capital Acceptance, Inc. | WesCorp | 5/30/07 | $98,667,000 |
| 41165AAC6 | HarborView 2007-5 | Greenwich Capital Acceptance, Inc. | WesCorp | 6/26/07 | $55,000,000 |
| 41165AAD4 | HarborView 2007-5 | Greenwich Capital Acceptance, Inc. | WesCorp | 6/26/07 | $71,000,000 |
| 45667SAN7 | IndyMac INDX Mortgage Loan Trust 2006-AR35 | IndyMac MBS, Inc. | WesCorp | 11/28/06 | $180,000,000 |
| 45667SAP2 | IndyMac INDX Mortgage Loan Trust 2006-AR35 | IndyMac MBS, Inc. | WesCorp | 11/28/06 | $20,000,000 |
| 55028CAA3 | Luminent Mortgage Trust 2007-1 | Lares Asset Securitization, Inc. | WesCorp | 1/23/07 | $35,000,000 |
| 55028CAB1 | Luminent Mortgage Trust 2007-1 | Lares Asset Securitization, Inc. | WesCorp | 1/23/07 | $20,400,000 |

EXHIBIT 13
154

| 61915RCL8 | MortgageIT Mortgage Loan Trust 2006-1 | Greenwich Capital Acceptance, Inc. | WesCorp | 2/17/06 | $35,710,500 |
| 65537KAB6 | Nomura Home Equity Loan, Inc., Home Equity Loan Trust, Series 2007-1 | Nomura Home Equity Loan, Inc. | WesCorp | 1/23/07 | $40,000,000 |
| 65537KAC4 | Nomura Home Equity Loan, Inc., Home Equity Loan Trust, Series 2007-1 | Nomura Home Equity Loan, Inc. | WesCorp | 1/23/07 | $30,000,000 |
| 83611MJM1 | Soundview Home Loan Trust 2005-OPT4 | Financial Asset Securities Corp. | WesCorp | 11/22/05 | $18,037,000 |

## Table 2

| CUSIP | ISSUING ENTITY | DEPOSITOR | BUYER | TRADE DATE | PRICE PAID |
|---|---|---|---|---|---|
| 41161XAN6 | HarborView 2006-9 | Greenwich Capital Acceptance, Inc. | WesCorp | 3/8/07 | $22,810,706 |
| 41164MAP2 | HarborView 2007-1 | Greenwich Capital Acceptance, Inc. | WesCorp | 3/12/07 | $6,921,395 |
| 55028CAE5 | Luminent Mortgage Trust 2007-1 | Lares Asset Securitization, Inc. | WesCorp | 3/1/07 | $25,074,560 |
| 92978GAC3 | Wachovia Mortgage Loan Trust, Series 2006-ALT1 | Wachovia Mortgage Loan Trust, LLC | WesCorp | 11/30/06 | $44,376,000 |

EXHIBIT 13
155

## Table 3

### *Credit Ratings*

| Moody's | S&P | Definitions | Grade Type |
|---------|-----|-------------|------------|
| Aaa | AAA | Prime (Maximum Safety) | INVESTMENT GRADE |
| Aa1<br>Aa2<br>Aa3 | AA+<br>AA<br>AA- | High Grade, High Quality | |
| A1<br>A2<br>A3 | A+<br>A<br>A- | Upper Medium Grade | |
| Baa1<br>Baa2<br>Baa3 | BBB+<br>BBB<br>BBB- | Medium Grade | |
| Ba2<br>Ba3 | BB<br>BB- | Non-Investment Grade, or Speculative | SPECULATIVE GRADE |
| B1<br>B2<br>B3 | B+<br>B<br>B- | Highly Speculative, or Substantial Risk | |
| Caa2<br>Caa3 | CCC+ | In Poor Standing | |
| Ca | CCC<br>CCC- | Extremely Speculative | |
| C | - | May be in Default | |
| - | D | Default | |

EXHIBIT 13
156

# Table 4

| CREDIT RATINGS OF RMBS PURCHASES ORIGINAL/RECENT | | | | | | |
|---|---|---|---|---|---|---|
| CUSIP | ISSUER NAME | BUYER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
| 65538DAB1 | Alternative Loan Trust 2006-AR4 | WesCorp | AAA 12/4/2006 | Aaa 11/30/2006 | D 8/19/2009 | C 9/2/2010 |
| 026935AD8 | American Home Mortgage Assets Trust 2007-3 | WesCorp | AAA 6/14/2007 | Aaa 6/14/2007 | D 2/24/2010 | C 2/2/2009 |
| 32027NXE6 | First Franklin Mortgage Loan Trust 2005-FFH4 | WesCorp | AA 12/28/2005 | Aa2 12/22/2005 | B- 8/4/2009 | C 4/6/2010 |
| 41162CAD3 | HarborView 2006-10 | WesCorp | AAA 11/22/2006 | Aaa 11/21/2006 | CC 5/11/2011 | C 12/5/2010 |
| 41162GAB8 | HarborView 2006-11 | WesCorp | AAA 12/22/2006 | Aaa 12/20/2006 | CC 2/16/2010 | C 11/19/2010 |
| 41162DAG4 | HarborView 2006-12 | WesCorp | AAA 12/19/2006 | Aaa 12/13/2006 | CCC 7/24/2009 | C 12/5/2010 |
| 41162DAH2 | HarborView 2006-12 | WesCorp | AAA 12/19/2006 | Aaa 12/13/2006 | AA+ 11/8/2010 | Aa3 11/23/2008 |
| 41162NAD9 | HarborView 2006-14 | WesCorp | AAA 12/27/2006 | Aaa 12/22/2006 | CCC 8/14/2009 | C 11/19/2010 |
| 41162NAH0 | HarborView 2006-14 | WesCorp | AAA 12/27/2006 | Aaa 12/22/2006 | D 6/23/2010 | C 11/19/2010 |
| 41161GAE3 | HarborView 2006-8 | WesCorp | AAA 9/5/2006 | Aaa 8/4/2006 | D 9/24/2010 | C 12/5/2010 |
| 41161XAM8 | HarborView 2006-9 | WesCorp | AAA 10/18/2006 | Aaa 10/4/2006 | CCC 4/15/2009 | C 12/5/2010 |
| 41161XAN6 | HarborView 2006-9 | WesCorp | AAA 10/18/2006 | Aaa 10/4/2006 | CCC 8/14/2009 | C 12/5/2010 |
| 41164MAF4 | HarborView 2007-1 | WesCorp | NR | Aaa 2/26/2007 | NR | C 2/20/2009 |
| 41164MAP2 | HarborView 2007-1 | WesCorp | AAA 3/22/2007 | Aaa 3/9/2007 | CCC 8/14/2009 | C 12/5/2010 |
| 41164LAC3 | HarborView 2007-2 | WesCorp | AAA 4/3/2007 | Aaa 3/30/2007 | CCC 8/14/2009 | C 12/5/2010 |
| 41164YAD3 | HarborView 2007-4 | WesCorp | NR | Aaa 6/14/2007 | NR | C 12/5/2010 |
| 41165AAC6 | HarborView 2007-5 | WesCorp | AAA 7/26/2007 | Aaa 7/12/2007 | CCC 7/24/2009 | C 12/5/2010 |
| 41165AAD4 | HarborView 2007-5 | WesCorp | AAA 7/26/2007 | Aaa 7/12/2007 | D 5/25/2010 | C 12/5/2010 |
| 45667SAN7 | IndyMac INDX Mortgage Loan Trust 2006-AR35 | WesCorp | AAA 12/1/2006 | Aaa 11/29/2006 | D 3/18/2011 | Caa3 1/29/2009 |
| 45667SAP2 | IndyMac INDX Mortgage Loan Trust 2006-AR35 | WesCorp | AAA 12/1/2006 | Aaa 11/29/2006 | D 12/24/2009 | C 10/12/2010 |

EXHIBIT 13
157

| CUSIP | ISSUER NAME | BUYER | ORIGINAL RATING S&P | ORIGINAL RATING MOODY'S | RECENT RATING S&P | RECENT RATING MOODY'S |
|---|---|---|---|---|---|---|
| CREDIT RATINGS OF RMBS PURCHASES ORIGINAL/RECENT |||||||
| 55028CAA3 | Luminent Mortgage Trust 2007-1 | WesCorp | AAA 2/1/2007 | Aaa 1/25/2007 | CCC 7/24/2009 | Caa3 12/14/2010 |
| 55028CAB1 | Luminent Mortgage Trust 2007-1 | WesCorp | AAA 2/1/2007 | Aaa 1/25/2007 | CC 2/16/2010 | C 12/14/2010 |
| 55028CAE5 | Luminent Mortgage Trust 2007-1 | WesCorp | AAA 2/1/2007 | Aaa 1/25/2007 | D 6/23/2010 | C 12/5/2010 |
| 61915RCL8 | MortgageIT Mortgage Loan Trust 2006-1 | WesCorp | AAA 3/2/2006 | Aaa 2/22/2006 | D 2/24/2010 | C 12/9/2010 |
| 65537KAB6 | Nomura Home Equity Loan, Inc., Home Equity Loan Trust, Series 2007-1 | WesCorp | AAA 2/2/2007 | Aaa 1/31/2007 | D 11/25/2009 | Ca 9/2/2010 |
| 65537KAC4 | Nomura Home Equity Loan, Inc., Home Equity Loan Trust, Series 2007-1 | WesCorp | AAA 2/2/2007 | Aaa 1/31/2007 | D 6/25/2009 | C 9/2/2010 |
| 83611MJM1 | Soundview Home Loan Trust 2005-OPT4 | WesCorp | AA 12/1/2005 | NR | CCC 8/4/2009 | NR |
| 92978GAC3 | Wachovia Mortgage Loan Trust, Series 2006-ALT1 | WesCorp | AAA 1/3/2007 | Aaa 12/27/2006 | B- 2/2/2010 | Caa2 1/14/2010 |

EXHIBIT 13

158

## Table 5

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 65538DAB1 | Alternative Loan Trust 2006-AR4 Aggregate (P.S. dated November 30, 2006) | Zero. (S-34) | .27% (Dec., p.9) | 2.69% (Feb., p.9) | 7.32% (May, p.9) | 17.63% (Nov., p.9) | 42.39% (May 2011, p.9) |
| | American Home Mortgage Assets Trust 2007-3 Aggregate (June 5, 2007) | Zero. (S-40) | 0% (June, p.10) | 4.99% (Aug., p.10) | 13.90% (Nov., p.10) | 27.47% (May, p.10) | 46.49% (May 2011, p.11) |
| | American Home Mortgage Assets Trust 2007-3: Group I-1 | Zero. (S-40) | 0% (June, p.12) | 2.62% (Aug., p.12) | 8.63% (Nov., p.12) | 23.58% (May, p.12) | 52.52% (May 2011, p.12) |
| 026935AD8 | American Home Mortgage Assets Trust 2007-3: Group I-2 *Class I-2A-2 in Group I-2. (S-12) | Zero. (S-40) | 0% (June, p.12) | 9.63% (Aug., p.12) | 23.04% (Nov., p.12) | 43.78% (May, p.12) | 62.39% (May 2011, p.12) |
| | American Home Mortgage Assets Trust 2007-3: Group II-1 | Zero. (S-40) | 0% (June, p.13) | 2.04% (Aug., p.13) | 5.74% (Nov., p.13) | 15.73% (May, p.13) | 42.32% (May 2011, p.13) |
| | American Home Mortgage Assets Trust 2007-3: Group II-2 | Zero. (S-40) | 0% (June, p.13) | 3.72% (Aug., p.13) | 12.44% (Nov., p.13) | 25.55% (May, p.13) | 42.85% (May 2011, p.13) |
| | American Home Mortgage Assets Trust 2007-3: Group III | Zero. (S-40) | 0% (June, p.14) | 5.16% (Aug., p.14) | 16.35% (Nov., p.14) | 18.05% (May, p.14) | 13.85% (May 2011, p.14) |
| | First Franklin Mortgage Loan Trust 2005-FFH4 Aggregate (P.S. dated November 30, 2005) | | .80% (Dec., p.12) | 2.16% (Feb., p.12) | 3.83% (May, p.12) | 9.64% (Nov., p.12) | 49.43% (May 2011, p.13) |

EXHIBIT 13
159

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| 32027NXE6 | First Franklin Mortgage Loan Trust 2005-FFH4 Group 1 *Class M-2 in Groups 1 and 2. (S-72) | | .73% (Dec., p.13) | 1.38% (Feb., p.13) | 2.58% (May, p.13) | 8.66% (Nov., p.13) | 46.37% (May 2011, p.14) |
| 32027NXE6 | First Franklin Mortgage Loan Trust 2005-FFH4 Group 2 *Class M-2 in Groups 1 and 2. (S-72) | | .88% (Dec., p.14) | 3.09% (Feb., p.14) | 5.39% (May, p.14) | 10.92% (Nov., p.14) | 54.40% (May 2011, p.15) |
| | HarborView 2006-10 Aggregate (P.S. dated November 10, 2006) | .15% of the mortgage loans were 30-59 days delinquent. (S-27) | .14% (Nov., p.10) | .67% (Jan., p.10) | 1.12% (Apr., p.10) | 5.47% (Apr., p.10) | 28.99% (May 2011, p.10) |
| | HarborView 2006-10 Group 1 | .15% of the mortgage loans were 30-59 days delinquent. (S-27) | .07% (Nov., p.11) | .55% (Jan., p.11) | .56% (Apr., p.11) | 5.38% (Apr., p.11) | 32.57% (May 2011, p.11) |
| 41162CAD3 | HarborView 2006-10 Group 2 *Class 2A-1B and 2A-1C in Group 2 (S-6) | .15% of the mortgage loans were 30-59 days delinquent. (S-27) | .19% (Nov., p.11) | .74% (Jan., p.11) | 1.44% (Apr., p.11) | 5.52% (Apr., p.11) | 26.97% (May 2011, p.11) |
| 41162GAB8 | HarborView 2006-11 (P.S. dated November 10, 2006) | Zero. (S-20) | .38% (Nov., p.9) | 1.46% (Jan., p.9) | 2.44% (Apr., p.9) | 9.07% (Apr., p.9) | 50.38% (May 2011, p.9) |
| | HarborView 2006-12 Aggregate (P.S. dated December 11, 2006) | Zero. (S-28) | 0% (Dec., p.11) | .57% (Feb., p.11) | 1.41% (May, p.10) | 7.37% (Nov., p.10) | 61.77% (May 2011, p.11) |
| | HarborView 2006-12 Group 1 | Zero. (S-28) | 0% (Dec., p.12) | .46% (Feb., p.13) | 1.01% (May, p.11) | 6.88% (Nov., p.11) | 63.08% (May 2011, p.12) |
| 41162DAG4 41162DAH2 | HarborView 2006-12 Group 2 *Class 2A-1B, 2A-2B and 2A-2C in Group 2. (S-7) | Zero. (S-28) | 0% (Dec., p.12) | .61% (Feb., p.13) | 1.53% (May, p.11) | 7.55% (Nov., p.11) | 61.27% (May 2011, p.12) |

EXHIBIT 13
160

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | HarborView 2006-14 Aggregate (December 20, 2006) | Zero. (S-26) | .17% (Jan., p.11) | .78% (Mar., p.10) | 1.97% (June, p.10) | 8.61% (Dec., p.10) | 36.66% (May 2011, p.11) |
| | HarborView 2006-14 Group 1 | Zero. (S-26) | .20% (Jan., p.13) | .39% (Mar., p.12) | .74% (June, p.12) | 6.45% (Dec., p.12) | 37.01% (May 2011, p.12) |
| 41162NAD9 41162NAH0 | HarborView 2006-14 Group 2 *Class 2A-1B and 2A-2C in Group 2. (S-7) | Zero. (S-26) | .16% (Jan., p.13) | .90% (Mar., p.12) | 2.36% (June, p.12) | 9.29% (Dec., p.12) | 36.54% (May 2011, p.12) |
| | HarborView 2006-8 Aggregate (P.S. dated August 28, 2006) | 2.78% of the mortgage loans were 30-59 days delinquent in payment, and 0.48% were 60-89 days delinquent in payment. (S-24) | 5.59% (Sept., p.11) | 5.68% (Nov., p.11) | 5.48% (Feb., p.10) | 9.16% (Aug., p.10) | 46.43% (May 2011, p.10) |
| | HarborView 2006-8 Group 1 | 2.78% of the mortgage loans were 30-59 days delinquent in payment, and 0.48% were 60-89 days delinquent in payment. (S-24) | 3.78% (Sept., p.13) | 4.12% (Nov., p.13) | 3.40% (Feb., p.12) | 8.11% (Aug., p.12) | 45.29% (May 2011, p.11) |
| 41161GAE3 | HarborView 2006-8 Group 2 *Class 2A-1C in Group 2. (S-7) | 2.78% of the mortgage loans were 30-59 days delinquent in payment, and 0.48% were 60-89 days delinquent in payment. (S-24) | 6.51% (Sept., p.13) | 6.50% (Nov., p.13) | 6.54% (Feb., p.12) | 9.75% (Aug., p.12) | 47.13% (May 2011, p.11) |
| | HarborView 2006-9 Aggregate (P.S. dated October 3, 2006) | Zero. (S-26) | 0% (Oct., p.10) | .31% (Dec., p.10) | .99% (Mar., p.10) | 5.32% (Sept., p.10) | 61.34% (May 2011, p.10) |
| | HarborView 2006-9 Group 1 | Zero. (S-26) | 0% (Oct., p.11) | .31% (Dec., p.11) | .67% (Mar., p.11) | 4.96% (Sept., p.11) | 58.93% (May 2011, p.15) |
| 41161XAM8 41161XAN6 | HarborView 2006-9 Group 2 *Class 2A-1C1 and 2A-1B2 in Group 2. (S-7) | Zero. (S-26) | 0% (Oct., p.12) | .31% (Dec., p.12) | 1.14% (Mar., p.12) | 5.50% (Sept., p.12) | 62.52% (May 2011, p.19) |

EXHIBIT 13
161

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | HarborView 2007-1 Aggregate (P.S. dated March 7, 2007) | 0.04% of the mortgage loans were at least 30 days but less than 60 days delinquent in payment, and 0.03% were 60 days or more delinquent in payment. (S-24) | .32% (Mar., p.10) | 1.08% (May, p.10) | 2.88% (Aug., p.10) | 12.86% (Feb., p.10) | 62.01% (May 2011, p.10) |
| 41164MAF4 | HarborView 2007-1 Group 1 *Class B-1 in both loan groups. (S-6) | 0.04% of the mortgage loans were at least 30 days but less than 60 days delinquent in payment, and 0.03% were 60 days or more delinquent in payment. (S-24) | .25% (Mar., p.11) | 1.05% (May, p.11) | 2.32% (Aug., p.11) | 10.83% (Feb., p.11) | 57.52% (May 2011, p.11) |
| 41164MAP2 41164MAF4 | HarborView 2007-1 Group 2 *Class 2A-1C2 in Group 2 and Class B-1 in both groups. (S-6) | 0.04% of the mortgage loans were at least 30 days but less than 60 days delinquent in payment, and 0.03% were 60 days or more delinquent in payment. (S-24) | .37% (Mar., p.11) | 1.10% (May, p.11) | 3.29% (Aug., p.11) | 14.29% (Feb., p.11) | 65.17% (May 2011, p.11) |
| | HarborView 2007-2 Aggregate (P.S. dated March 29, 2007) | .64% of the mortgage loans were 30 days or more delinquent. (S-25) | 1.40% (Apr., p.10) | 2.84% (June, p.10) | 6.45% (Sept., p.10) | 16.00% (Mar., p.10) | 39.27% (May 2011, p.10) |
| | HarborView 2007-2 Group 1 | .64% of the mortgage loans were 30 days or more delinquent. (S-25) | .84% (Apr., p.11) | 1.18% (June, p.11) | 3.15% (Sept., p.11) | 10.64% (Mar., p.11) | 37.72% (May 2011, p.11) |
| 41164LAC3 | HarborView 2007-2 Group 2 *Class 2A-1B in Group 2. (S-7) | .64% of the mortgage loans were 30 days or more delinquent. (S-25) | 1.63% (Apr., p.11) | 3.45% (June, p.11) | 7.66% (Sept., p.11) | 17.93% (Mar., p.11) | 39.94% (May 2011, p.11) |

EXHIBIT 13
162

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | HarborView 2007-4 Aggregate (P.S. dated June 13, 2007) | .26% of the mortgage loans were 30 days or more delinquent. (S-26) | .69% (June, p.11) | 2.62% (Aug., p.10) | 5.90% (Nov., p.10) | 14.04% (May, p.10) | 29.24% (May 2011, p.10) |
| | HarborView 2007-4 Group 1 | .26% of the mortgage loans were 30 days or more delinquent. (S-26) | .44% (June, p.12) | .77% (Aug., p.11) | 1.73% (Nov., p.11) | 4.88% (May, p.11) | 24.24% (May 2011, p.11) |
| 41164YAD3 | HarborView 2007-4 Group 2 *Class 2A-3 in Group 2 (S-7) | .26% of the mortgage loans were 30 days or more delinquent. (S-26) | .78% (June, p.12) | 3.31% (Aug., p.11) | 7.45% (Nov., p.11) | 17.40% (May, p.11) | 31.52% (May 2011, p.11) |
| 41165AAC6 41165AAD4 | HarborView 2007-5 Aggregate *Classes A-1B and A-1C (P.S. dated July 11, 2007) | Zero. (S-23) | 0% (July, p.10) | .55% (Sept., p.10) | 1.88% (Dec., p.9) | 7.42% (June, p.9) | 35.23% (May 2011, p.9) |
| | HarborView 2007-5 Group 1 | Zero. (S-23) | 0% (July, p.11) | 0.00% (Sept., p.11) | .32% (Dec., p.10) | 3.31% (June, p.10) | 30.32% (May 2011, p.10) |
| | HarborView 2007-5 Group 2 | Zero. (S-23) | 0% (July, p.11) | .60% (Sept., p.11) | 2.01% (Dec., p.10) | 7.75% (June, p.10) | 35.71% (May 2011, p.10) |
| | IndyMac INDX Mortgage Loan Trust 2006-AR35 Aggregate (P.S. dated November 29, 2006) | Zero. (S-36) | 2.42% (Dec., p.10) | 3.76% (Feb., p.10) | 6.42% (May, p.10) | 16.16% (Nov., p.10) | 43.06% (May 2011, p.10) |
| | IndyMac INDX Mortgage Loan Trust 2006-AR35 Group 1 | Zero. (S-36) | 1.67% (Dec., p.11) | 2.99% (Feb., p.11) | 6.16% (May, p.11) | 15.58% (Nov., p.11) | 44.60% (May 2011, p.15) |
| 45667SAN7 45667SAP2 | IndyMac INDX Mortgage Loan Trust 2006-AR35 Group 2 *Classes 2-A-1A, 2-A-3A and 2-A-3B in Group 2. (S-11) | Zero. (S-36) | 2.89% (Dec., p.12) | 4.25% (Feb., p.12) | 6.58% (May, p.12) | 16.54% (Nov., p.12) | 41.99% (May 2011, p.20) |

EXHIBIT 13
163

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | Luminent Mortgage Trust 2007-1 Aggregate (P.S. dated January 24, 2007) | Zero. (S-24) | 1.24% (Feb., p.11) | 2.56% (Apr., p.11) | 4.82% (July, p.11) | 11.32% (Jan., p.11) | 45.39% (May 2011, p.11) |
| 55028CAA3 55028CAB1 | Luminent Mortgage Trust 2007-1 Group 1 *Classes I-A-1 and I-A-2 in Group 1. (S-7) | Zero. (S-24) | 1.14% (Feb., p.13) | 2.54% (Apr., p.13) | 4.32% (July, p.13) | 9.95% (Jan., p.13) | 43.19% (May 2011, p.12) |
| 55028CAE5 | Luminent Mortgage Trust 2007-1 Group 2 *Class II-A-3 in Group 2. (S-7) | Zero. (S-24) | 1.40% (Feb., p.13) | 2.59% (Apr., p.13) | 5.55% (July, p.13) | 13.40% (Jan., p.13) | 49.11% (May 2011, p.12) |
| | MortgageIT Mortgage Loan Trust 2006-1 Aggregate (P.S. dated February 17, 2006) | | .17% (Mar., p.13) | 1.89% (May, p.13) | 3.03% (Aug., p.13) | 5.75% (Feb., p.13) | 24.42% (May 2011, p.13) |
| | MortgageIT Mortgage Loan Trust 2006-1 Group 1-A1 | .27% of the mortgage loans were 30 days or more delinquent. (S-31) | 0% (Mar., p.14) | 1.37% (May, p.14) | 1.33% (Aug., p.14) | 2.18% (Feb., p.14) | 18.12% (May 2011, p.15) |
| | MortgageIT Mortgage Loan Trust 2006-1 Group 1-A2 | .26% of the mortgage loans were 30 days or more delinquent. (S-47) | .27% (Mar., p.14) | 2.74% (May, p.14) | 4.35% (Aug., p.14) | 8.05% (Feb., p.14) | 23.14% (May 2011, p.15) |
| 61915RCL8 | MortgageIT Mortgage Loan Trust 2006-1 Group 2 *Class 2-A-1C in Group 2. (S-8) | .34% of the mortgage loans were 30 days or more delinquent. (S-54) | .18% (Mar., p.15) | 1.30% (May, p.15) | 2.80% (Aug., p.15) | 5.91% (Feb., p.15) | 31.62% (May 2011, p.14) |

EXHIBIT 13

164

| CUSIP | OFFERING | RATE AT CUT-OFF DATE FOR OFFERING | 1 MO. | 3 MOS. | 6 MOS. | 12 MOS. | RECENT |
|---|---|---|---|---|---|---|---|
| | Nomura Home Equity Loan, Inc., Home Equity Loan Trust, Series 2007-1 Aggregate (P.S. dated January 29, 2007) | Zero. (S-57) | .16% (Feb., p.13) | 5.05% (Apr., p.13) | 11.90% (July, p.13) | 24.01% (Jan., p.13) | 46.39% (May 2011, p.13) |
| 65537KAB6 65537KAC4 | Nomura Home Equity Loan, Inc., Home Equity Loan Trust, Series 2007-1 Group 2 *Classes 2-A-1A and 2-A-1B in Group 2. (S-i) | Zero. (S-57) | .19% (Feb., p.14) | 7.00% (Apr., p.15) | 14.26% (July, p.15) | 27.54% (Jan., p.15) | 47.53% (May 2011, p.14) |
| | Soundview Home Loan Trust 2005-OPT4 Aggregate (P.S. dated November 22, 2005) | Zero. (37) | .12% (Dec., p.12) | 1.87% (Feb., p.12) | .04% (May, p.11) | 8.51% (Nov., p.11) | 36.08% (May 2011, p.12) |
| 83611MJM1 | Soundview Home Loan Trust 2005-OPT4 Group 1 *Classes M-1 and M-2 in Groups 1 and 2. (S-68) | Zero. (37) | .05% (Dec., p.13) | 2.13% (Feb., p.13) | 3.34% (May, p.12) | 9.3% (Nov., p.12) | 34.35% (May 2011, p.13) |
| 83611MJM1 | Soundview Home Loan Trust 2005-OPT4 Group 2 *Classes M-1 and M-2 in Groups 1 and 2. (S-68) | Zero. (37) | .2% (Dec., p.14) | 1.6% (Feb., p.14) | 2.72% (May, p.13) | 7.71% (Nov., p.13) | 37.66% (May 2011, p.14) |
| 92978GAC3 | Wachovia Mortgage Loan Trust, Series 2006-ALT1 (P.S. dated December 19, 2006) | Zero. (S-32) | .94% (Jan., p.14) | 2.13% (Mar., p.14) | 4.14% (June, p.14) | 10.84% (Dec., p.14) | 31.95% (May 2011, p.12) |

EXHIBIT 13
165

## Table 6

| Originator Name | OTD % 2005 | OTD% 2006 | OTD % 2007 |
|---|---|---|---|
| American Home Mortgage Corp. | 91.9 | 62.4 | |
| American Home Mortgage Investment Corp. | 100 | 100 | 100 |
| Countrywide Home Loans, Inc. | 98.5 | 96.5 | 98.4 |
| First Federal Bank of California | 0 | 20.6 | 54.3 |
| First National Bank of Nevada | 88.0 | 79.8 | 89.4 |
| IndyMac Bank, F.S.B. | 81.1 | 87.7 | 82.8 |
| Kay-Co Investment Inc. dba Pro30 Funding | | 99.4 | |
| Metrocities Mortgage, LLC | 99.96 | 100 | 100 |
| MortgageIT, Inc. | 55.5 | 98.8 | 100 |
| Option One Mortgage Corporation | 92.2 | 72.7 | 58.2 |
| Paul Financial, LLC | 85.2 | 83.4 | 99.1 |
| Residential Mortgage Capital | 99.9 | 100 | 100 |

EXHIBIT 13
166

## Table 7

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | American Pipe Tolling Commencement Date | American Pipe Tolling Latest Update |
|---|---|---|---|---|---|
| 41162CAD3 | HarborView 2006-10 | WesCorp | 10/18/06 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland,* No. 08-cv-5093 (S.D.N.Y.) Consolidated First Amended Class Action Complaint **Filed: May 19, 2009** | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland,* No. 08-cv-5093 (S.D.N.Y.) Opinion & Order Granting in Part Motion To Dismiss **Filed: May 19, 2011** |
| 41162GAB8 | HarborView 2006-11 | WesCorp | 10/27/06 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland,* No. 08-cv-5093 (S.D.N.Y.) Consolidated First Amended Class Action Complaint **Filed: May 19, 2009** | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland,* No. 08-cv-5093 (S.D.N.Y.) Opinion & Order Granting in Part Motion To Dismiss **Filed: May 19, 2011** |
| 41162DAG4 | HarborView 2006-12 | WesCorp | 10/19/06 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland,* No. 08-cv-5093 (S.D.N.Y.) Consolidated First Amended Class Action Complaint **Filed: May 19, 2009** | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland,* No. 08-cv-5093 (S.D.N.Y.) Opinion & Order Granting in Part Motion To Dismiss **Filed: May 19, 2011** |
| 41162DAH2 | HarborView 2006-12 | WesCorp | 11/29/06 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland,* No. 08-cv-5093 (S.D.N.Y.) Consolidated First Amended Class Action Complaint **Filed: May 19, 2009** | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland,* No. 08-cv-5093 (S.D.N.Y.) Opinion & Order Granting in Part Motion To Dismiss **Filed: May 19, 2011** |
| 41162NAD9 | HarborView 2006-14 | WesCorp | 12/506 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland,* No. 08-cv-5093 (S.D.N.Y.) Consolidated First Amended Class Action Complaint **Filed: May 19, 2009** | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland,* No. 08-cv-5093 (S.D.N.Y.) Opinion & Order Granting in Part Motion To Dismiss **Filed: May 19, 2011** |
| 41162NAH0 | HarborView 2006-14 | WesCorp | 12/5/06 | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland,* No. 08-cv-5093 (S.D.N.Y.) Consolidated First Amended Class Action Complaint **Filed: May 19, 2009** | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland,* No. 08-cv-5093 (S.D.N.Y.) Opinion & Order Granting in Part Motion To Dismiss **Filed: May 19, 2011** |

EXHIBIT 13
167

| CUSIP | ISSUING ENTITY | BUYER | TRADE DATE | American Pipe Tolling Commencement Date | American Pipe Tolling Latest Update |
|-------|---------------|-------|-----------|----------------------------------------|-------------------------------------|
| 41161XAM8 | HarborView 2006-9 | WesCorp | 8/18/06 | *New Jersey Carpenters Vacation Fund v. Harborview Mortgage Loan,* No. 08-601451 (N.Y. Sup. Ct. Trial Div.) **Filed: May 14, 2008** (Removed to No. 08-5093 (S.D.N.Y.)) | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland,* No. 08-cv-5093 (S.D.N.Y.) Opinion & Order Granting in Part Motion To Dismiss **Filed: May 19, 2011** |
| 41161XAN6 | HarborView 2006-9 | WesCorp | 3/8/07 | *New Jersey Carpenters Vacation Fund v. Harborview Mortgage Loan,* No. 08-601451 (N.Y. Sup. Ct. Trial Div.) **Filed: May 14, 2008** (Removed to No. 08-5093 (S.D.N.Y.)) | *New Jersey Carpenters Vacation Fund v. The Royal Bank of Scotland,* No. 08-cv-5093 (S.D.N.Y.) Opinion & Order Granting in Part Motion To Dismiss **Filed: May 19, 2011** |
| 45667SAN7 | IndyMac INDX Mortgage Loan Trust 2006-AR35 | WesCorp | 11/28/06 | *Police and Fire Retirement System of Detroit v. Indymac,* No. 09-cv-4583 (S.D.N.Y.) Complaint **Filed: May 14, 2009** *Wyoming State Treasurer v. Olinski,* No. 09-cv-5933 (S.D.N.Y.) Complaint **Filed: June 29, 2009** (Consolidated with No. 09-4583 (S.D.N.Y.)) | *In re Indymac Mortgage-Backed Sec. Litig.,* No. 09-cv-4583 (S.D.N.Y.) Motion for Class Certification **PENDING: December 10, 2010** |
| 45667SAP2 | IndyMac INDX Mortgage Loan Trust 2006-AR35 | WesCorp | 11/28/06 | *Police and Fire Retirement System of Detroit v. Indymac,* No. 09-cv-4583 (S.D.N.Y.) Complaint **Filed: May 14, 2009** *Wyoming State Treasurer v. Olinski,* No. 09-cv-5933 (S.D.N.Y.) Complaint **Filed: June 29, 2009** (Consolidated with No. 09-4583 (S.D.N.Y.)) | *In re Indymac Mortgage-Backed Sec. Litig.,* No. 09-cv-4583 (S.D.N.Y.) Motion for Class Certification **PENDING: December 10, 2010** |

EXHIBIT 13
168

1

## Appendix B

2

## Figure 1



EXHIBIT 13
169

## Figure 2

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Alternative Loan Trust 2006-AR4 | 39723 | 1 | $ - | $ 881,637 |
| Alternative Loan Trust 2006-AR4 | 39723 | 2 | $ - | $ 962,968 |
| Alternative Loan Trust 2006-AR4 | 39723 | 3 | $ 1,901,772 | $ 1,051,631 |
| Alternative Loan Trust 2006-AR4 | 39723 | 4 | $ 7,464,605 | $ 1,148,255 |
| Alternative Loan Trust 2006-AR4 | 39723 | 5 | $ 7,310,855 | $ 1,253,515 |
| Alternative Loan Trust 2006-AR4 | 39723 | 6 | $ 7,310,855 | $ 1,368,137 |
| Alternative Loan Trust 2006-AR4 | 39723 | 7 | $ 11,290,671 | $ 1,492,899 |
| Alternative Loan Trust 2006-AR4 | 39723 | 8 | $ 24,181,875 | $ 1,628,633 |
| Alternative Loan Trust 2006-AR4 | 39723 | 9 | $ 28,385,840 | $ 1,776,228 |
| Alternative Loan Trust 2006-AR4 | 39723 | 10 | $ 45,560,714 | $ 1,936,629 |
| Alternative Loan Trust 2006-AR4 | 39723 | 11 | $ 47,163,113 | $ 2,110,842 |
| Alternative Loan Trust 2006-AR4 | 39723 | 12 | $ 50,115,861 | $ 2,299,928 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| American Home Mortgage Assets Trust 2007-3 | 41708 | 1 | $ - | $ 2,232,609 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 2 | $ 20,399,980 | $ 2,438,567 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 3 | $ 49,464,549 | $ 2,663,093 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 4 | $ 76,378,883 | $ 2,907,778 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 5 | $ 103,617,642 | $ 3,174,333 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 6 | $ 130,873,934 | $ 3,464,595 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 7 | $ 140,742,932 | $ 3,780,536 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 8 | $ 163,847,101 | $ 4,124,262 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 9 | $ 187,001,069 | $ 4,498,024 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 10 | $ 185,965,334 | $ 4,904,215 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 11 | $ 206,785,530 | $ 5,345,381 |
| American Home Mortgage Assets Trust 2007-3 | 41708 | 12 | $ 226,605,691 | $ 5,824,213 |



EXHIBIT 13
170

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 1 | $ 4,157,138 | $ 5,089,278 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 2 | $ 6,017,078 | $ 5,558,764 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 3 | $ 9,357,150 | $ 6,070,576 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 4 | $ 10,723,986 | $ 6,628,339 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 5 | $ 11,705,031 | $ 7,235,956 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 6 | $ 17,425,209 | $ 7,897,616 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 7 | $ 20,756,714 | $ 8,617,809 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 8 | $ 27,245,055 | $ 9,401,340 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 9 | $ 31,707,712 | $ 10,253,337 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 10 | $ 35,498,901 | $ 11,179,259 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 11 | $ 38,255,707 | $ 12,184,906 |
| First Franklin Mortgage Loan Trust 2005-FFH4 | 36028 | 12 | $ 44,937,612 | $ 13,276,413 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2006-8 | 38787 | 1 | $ - | $ 2,969,076 |
| HarborView 2006-8 | 38787 | 2 | $ 844,510 | $ 3,242,974 |
| HarborView 2006-8 | 38787 | 3 | $ 2,248,223 | $ 3,541,564 |
| HarborView 2006-8 | 38787 | 4 | $ 3,195,493 | $ 3,866,962 |
| HarborView 2006-8 | 38787 | 5 | $ 5,503,145 | $ 4,221,445 |
| HarborView 2006-8 | 38787 | 6 | $ 7,929,141 | $ 4,607,456 |
| HarborView 2006-8 | 38787 | 7 | $ 6,810,649 | $ 5,027,615 |
| HarborView 2006-8 | 38787 | 8 | $ 8,830,028 | $ 5,484,726 |
| HarborView 2006-8 | 38787 | 9 | $ 9,472,044 | $ 5,981,780 |
| HarborView 2006-8 | 38787 | 10 | $ 10,903,395 | $ 6,521,962 |
| HarborView 2006-8 | 38787 | 11 | $ 12,058,271 | $ 7,108,654 |
| HarborView 2006-8 | 38787 | 12 | $ 15,824,121 | $ 7,745,437 |

EXHIBIT 13
171

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2006-9 | 39173 | 1 | $ - | $ 6,428,529 |
| HarborView 2006-9 | 39173 | 2 | $ - | $ 7,021,561 |
| HarborView 2006-9 | 39173 | 3 | $ - | $ 7,668,057 |
| HarborView 2006-9 | 39173 | 4 | $ 2,570,574 | $ 8,372,597 |
| HarborView 2006-9 | 39173 | 5 | $ 6,353,042 | $ 9,140,109 |
| HarborView 2006-9 | 39173 | 6 | $ 6,758,658 | $ 9,975,885 |
| HarborView 2006-9 | 39173 | 7 | $ 11,655,574 | $ 10,885,598 |
| HarborView 2006-9 | 39173 | 8 | $ 13,825,145 | $ 11,875,316 |
| HarborView 2006-9 | 39173 | 9 | $ 17,538,934 | $ 12,951,517 |
| HarborView 2006-9 | 39173 | 10 | $ 29,668,715 | $ 14,121,098 |
| HarborView 2006-9 | 39173 | 11 | $ 39,916,025 | $ 15,391,381 |
| HarborView 2006-9 | 39173 | 12 | $ 54,441,864 | $ 16,770,120 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2006-10 | 39466 | 1 | $ - | $ 4,146,641 |
| HarborView 2006-10 | 39466 | 2 | $ - | $ 4,529,169 |
| HarborView 2006-10 | 39466 | 3 | $ - | $ 4,946,182 |
| HarborView 2006-10 | 39466 | 4 | $ - | $ 5,400,637 |
| HarborView 2006-10 | 39466 | 5 | $ - | $ 5,895,711 |
| HarborView 2006-10 | 39466 | 6 | $ - | $ 6,434,818 |
| HarborView 2006-10 | 39466 | 7 | $ 8,680,070 | $ 7,021,616 |
| HarborView 2006-10 | 39466 | 8 | $ 11,141,881 | $ 7,660,021 |
| HarborView 2006-10 | 39466 | 9 | $ 14,725,771 | $ 8,354,211 |
| HarborView 2006-10 | 39466 | 10 | $ 20,454,135 | $ 9,108,634 |
| HarborView 2006-10 | 39466 | 11 | $ 24,280,421 | $ 9,928,015 |
| HarborView 2006-10 | 39466 | 12 | $ 32,908,115 | $ 10,817,352 |

EXHIBIT 13
172

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2006-11 | 39604 | 1 | $ - | $ 620,128 |
| HarborView 2006-11 | 39604 | 2 | $ - | $ 677,335 |
| HarborView 2006-11 | 39604 | 3 | $ 1,541,596 | $ 739,700 |
| HarborView 2006-11 | 39604 | 4 | $ 2,586,325 | $ 807,663 |
| HarborView 2006-11 | 39604 | 5 | $ 1,614,729 | $ 881,701 |
| HarborView 2006-11 | 39604 | 6 | $ 2,697,387 | $ 962,324 |
| HarborView 2006-11 | 39604 | 7 | $ 5,548,956 | $ 1,050,080 |
| HarborView 2006-11 | 39604 | 8 | $ 8,395,221 | $ 1,145,553 |
| HarborView 2006-11 | 39604 | 9 | $ 10,039,321 | $ 1,249,369 |
| HarborView 2006-11 | 39604 | 10 | $ 10,546,521 | $ 1,362,193 |
| HarborView 2006-11 | 39604 | 11 | $ 12,059,557 | $ 1,484,731 |
| HarborView 2006-11 | 39604 | 12 | $ 11,489,433 | $ 1,617,731 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2006-12 | 39654 | 1 | $ - | $ 6,998,409 |
| HarborView 2006-12 | 39654 | 2 | $ - | $ 7,644,013 |
| HarborView 2006-12 | 39654 | 3 | $ - | $ 8,347,820 |
| HarborView 2006-12 | 39654 | 4 | $ 4,084,060 | $ 9,114,816 |
| HarborView 2006-12 | 39654 | 5 | $ 11,094,460 | $ 9,950,367 |
| HarborView 2006-12 | 39654 | 6 | $ 19,896,280 | $ 10,860,234 |
| HarborView 2006-12 | 39654 | 7 | $ 31,022,567 | $ 11,850,591 |
| HarborView 2006-12 | 39654 | 8 | $ 40,963,688 | $ 12,928,047 |
| HarborView 2006-12 | 39654 | 9 | $ 60,192,493 | $ 14,099,652 |
| HarborView 2006-12 | 39654 | 10 | $ 88,526,405 | $ 15,372,914 |
| HarborView 2006-12 | 39654 | 11 | $ 96,055,571 | $ 16,755,807 |
| HarborView 2006-12 | 39654 | 12 | $ 96,131,151 | $ 18,256,769 |

EXHIBIT 13
173

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2006-14 | 39668 | 1 | $ - | $ 3,574,654 |
| HarborView 2006-14 | 39668 | 2 | $ - | $ 3,904,416 |
| HarborView 2006-14 | 39668 | 3 | $ 368,396 | $ 4,263,907 |
| HarborView 2006-14 | 39668 | 4 | $ 6,858,408 | $ 4,655,674 |
| HarborView 2006-14 | 39668 | 5 | $ 13,473,277 | $ 5,082,458 |
| HarborView 2006-14 | 39668 | 6 | $ 16,771,582 | $ 5,547,200 |
| HarborView 2006-14 | 39668 | 7 | $ 21,587,406 | $ 6,053,056 |
| HarborView 2006-14 | 39668 | 8 | $ 28,030,117 | $ 6,603,399 |
| HarborView 2006-14 | 39668 | 9 | $ 39,750,069 | $ 7,201,833 |
| HarborView 2006-14 | 39668 | 10 | $ 44,347,316 | $ 7,852,191 |
| HarborView 2006-14 | 39668 | 11 | $ 59,770,494 | $ 8,558,546 |
| HarborView 2006-14 | 39668 | 12 | $ 74,945,944 | $ 9,325,209 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2007-1 | 40906 | 1 | $ 470,016 | $ 4,486,867 |
| HarborView 2007-1 | 40906 | 2 | $ - | $ 4,900,781 |
| HarborView 2007-1 | 40906 | 3 | $ 740,974 | $ 5,352,010 |
| HarborView 2007-1 | 40906 | 4 | $ 3,422,669 | $ 5,843,752 |
| HarborView 2007-1 | 40906 | 5 | $ 11,572,487 | $ 6,379,446 |
| HarborView 2007-1 | 40906 | 6 | $ 17,645,257 | $ 6,962,786 |
| HarborView 2007-1 | 40906 | 7 | $ 27,455,285 | $ 7,597,731 |
| HarborView 2007-1 | 40906 | 8 | $ 33,429,089 | $ 8,288,517 |
| HarborView 2007-1 | 40906 | 9 | $ 37,706,844 | $ 9,039,664 |
| HarborView 2007-1 | 40906 | 10 | $ 37,339,557 | $ 9,855,987 |
| HarborView 2007-1 | 40906 | 11 | $ 48,483,984 | $ 10,742,596 |
| HarborView 2007-1 | 40906 | 12 | $ 47,750,914 | $ 11,704,903 |

EXHIBIT 13
174

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2007-2 | 40907 | 1 | $ 647,551 | $ 1,785,903 |
| HarborView 2007-2 | 40907 | 2 | $ 1,783,440 | $ 1,950,652 |
| HarborView 2007-2 | 40907 | 3 | $ 1,699,532 | $ 2,130,255 |
| HarborView 2007-2 | 40907 | 4 | $ 11,140,763 | $ 2,325,982 |
| HarborView 2007-2 | 40907 | 5 | $ 12,498,521 | $ 2,539,204 |
| HarborView 2007-2 | 40907 | 6 | $ 33,584,483 | $ 2,771,390 |
| HarborView 2007-2 | 40907 | 7 | $ 46,188,913 | $ 3,024,116 |
| HarborView 2007-2 | 40907 | 8 | $ 55,536,048 | $ 3,299,069 |
| HarborView 2007-2 | 40907 | 9 | $ 61,318,518 | $ 3,598,047 |
| HarborView 2007-2 | 40907 | 10 | $ 69,284,016 | $ 3,922,967 |
| HarborView 2007-2 | 40907 | 11 | $ 69,215,449 | $ 4,275,863 |
| HarborView 2007-2 | 40907 | 12 | $ 83,515,196 | $ 4,658,889 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2007-4 | 41472 | 1 | $ - | $ 1,484,815 |
| HarborView 2007-4 | 41472 | 2 | $ 1,475,896 | $ 1,621,790 |
| HarborView 2007-4 | 41472 | 3 | $ 4,503,163 | $ 1,771,113 |
| HarborView 2007-4 | 41472 | 4 | $ 12,670,740 | $ 1,933,842 |
| HarborView 2007-4 | 41472 | 5 | $ 18,897,311 | $ 2,111,117 |
| HarborView 2007-4 | 41472 | 6 | $ 26,420,698 | $ 2,304,158 |
| HarborView 2007-4 | 41472 | 7 | $ 33,546,631 | $ 2,514,277 |
| HarborView 2007-4 | 41472 | 8 | $ 40,719,514 | $ 2,742,875 |
| HarborView 2007-4 | 41472 | 9 | $ 52,660,914 | $ 2,991,449 |
| HarborView 2007-4 | 41472 | 10 | $ 58,084,757 | $ 3,261,590 |
| HarborView 2007-4 | 41472 | 11 | $ 63,355,076 | $ 3,554,991 |
| HarborView 2007-4 | 41472 | 12 | $ 73,274,190 | $ 3,873,442 |

EXHIBIT 13
175

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| HarborView 2007-5 | 41776 | 1 | $ - | $ 1,359,786 |
| HarborView 2007-5 | 41776 | 2 | $ - | $ 1,485,226 |
| HarborView 2007-5 | 41776 | 3 | $ 751,500 | $ 1,621,975 |
| HarborView 2007-5 | 41776 | 4 | $ 2,920,614 | $ 1,771,002 |
| HarborView 2007-5 | 41776 | 5 | $ 7,632,190 | $ 1,933,349 |
| HarborView 2007-5 | 41776 | 6 | $ 12,511,060 | $ 2,110,135 |
| HarborView 2007-5 | 41776 | 7 | $ 15,835,944 | $ 2,302,561 |
| HarborView 2007-5 | 41776 | 8 | $ 21,143,592 | $ 2,511,910 |
| HarborView 2007-5 | 41776 | 9 | $ 24,750,664 | $ 2,739,552 |
| HarborView 2007-5 | 41776 | 10 | $ 20,932,966 | $ 2,986,945 |
| HarborView 2007-5 | 41776 | 11 | $ 29,635,152 | $ 3,255,640 |
| HarborView 2007-5 | 41776 | 12 | $ 34,563,869 | $ 3,547,276 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 1 | $ - | $ 1,734,368 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 2 | $ - | $ 1,894,364 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 3 | $ - | $ 2,068,783 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 4 | $ - | $ 2,258,863 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 5 | $ 1,848,000 | $ 2,465,932 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 6 | $ 3,866,023 | $ 2,691,418 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 7 | $ 13,740,659 | $ 2,936,851 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 8 | $ 21,838,012 | $ 3,203,870 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 9 | $ 27,603,649 | $ 3,494,221 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 10 | $ 31,428,103 | $ 3,809,765 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 11 | $ 34,423,595 | $ 4,152,477 |
| IndyMac INDX Mortgage Loan Trust 2006-AR35 | 40677 | 12 | $ 43,899,521 | $ 4,524,450 |

EXHIBIT 13
176

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Luminent Mortgage  Trust 2007-1 | 40299 | 1 | $ - | $ 837,607 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 2 | $ - | $ 914,876 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 3 | $ - | $ 999,112 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 4 | $ 1,982,522 | $ 1,090,910 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 5 | $ 3,098,851 | $ 1,190,913 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 6 | $ 7,535,538 | $ 1,299,811 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 7 | $ 8,877,706 | $ 1,418,342 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 8 | $ 7,269,659 | $ 1,547,298 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 9 | $ 7,809,257 | $ 1,687,522 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 10 | $ 6,135,975 | $ 1,839,912 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 11 | $ 11,639,877 | $ 2,005,424 |
| Luminent Mortgage  Trust 2007-1 | 40299 | 12 | $ 13,374,400 | $ 2,185,068 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 1 | $ - | $ 676,065.76 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 2 | $ - | $ 738,432.90 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 3 | $ - | $ 806,422.58 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 4 | $ 560,000.00 | $ 880,516.57 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 5 | $ 1,254,257.17 | $ 961,233.11 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 6 | $ 2,470,257.89 | $ 1,049,128.74 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 7 | $ 2,628,457.17 | $ 1,144,800.05 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 8 | $ 4,055,807.17 | $ 1,248,885.24 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 9 | $ 3,738,676.18 | $ 1,362,065.53 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 10 | $ 4,116,310.48 | $ 1,485,066.24 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 11 | $ 5,153,808.11 | $ 1,618,657.50 |
| MortgageIT Mortgage Loan Trust 2006-1 | 36837 | 12 | $ 7,103,777.17 | $ 1,763,654.58 |

EXHIBIT 13
177

| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 1 | $ 159,200 | $ 1,737,954 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 2 | $ 619,200 | $ 1,898,280 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 3 | $ 23,542,962 | $ 2,073,060 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 4 | $ 42,794,130 | $ 2,263,533 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 5 | $ 36,287,162 | $ 2,471,030 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 6 | $ 37,717,522 | $ 2,696,982 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 7 | $ 69,224,811 | $ 2,942,923 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 8 | $ 86,609,785 | $ 3,210,493 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 9 | $ 90,655,311 | $ 3,501,444 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 10 | $ 112,784,673 | $ 3,817,641 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 11 | $ 96,635,919 | $ 4,161,062 |
| Nomura Home Equity Loan Trust Series 2007-1 | 40291 | 12 | $ 105,724,469 | $ 4,533,804 |



| Deal Name | ABSNet Deal Id | Month | Actual Gross Losses | Expected Gross Losses |
|---|---|---|---|---|
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 1 | $ 1,212,442 | $ 6,716,668 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 2 | $ 1,512,469 | $ 7,336,281 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 3 | $ 3,073,678 | $ 8,011,754 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 4 | $ 5,331,109 | $ 8,747,873 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 5 | $ 5,676,196 | $ 9,549,786 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 6 | $ 12,008,162 | $ 10,423,024 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 7 | $ 19,248,543 | $ 11,373,512 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 8 | $ 23,426,005 | $ 12,407,591 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 9 | $ 30,776,311 | $ 13,532,030 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 10 | $ 35,034,668 | $ 14,754,033 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 11 | $ 44,624,482 | $ 16,081,254 |
| Soundview Home Equity Loan Trust 2005-OPT4 | 36025 | 12 | $ 52,570,998 | $ 17,521,790 |

EXHIBIT 13
178

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



EXHIBIT 13
179

# EXHIBIT 14

EXHIBIT 14
180



National Credit Union Administration
1775 Duke Street
Alexandria, Va. 22314
www.ncua.gov

Office of Public &
Congressional Affairs
(703) 518-6336
dsmall@ncua.gov

*NCUA Media Release*

# NCUA Files Third Suit in String Against Securities Firms to Recover Billions

*Recoveries Will Benefit All Federally Insured Credit Unions*

**ALEXANDRIA, Va. (July 18, 2011)** – The National Credit Union Administration filed another suit today in California against RBS Securities, Inc. alleging violations of federal and state securities laws and misrepresentations in the sale of securities to the failed Western Corporate Federal Credit Union (WesCorp).

This law suit follows two similar legal proceedings filed in the Federal District Court of Kansas June 20 against J.P. Morgan Securities, LLC, and RBS. Anticipating a total of five to10 actions, additional lawsuits may follow in order to recover losses from the purchase of securities that caused the failures of five, large wholesale credit unions.

As liquidating agent for WesCorp, NCUA has a statutory duty to seek recoveries from responsible parties to minimize cost to its insurance funds and the credit union industry.

"NCUA continues to carry out our responsibility to do everything reasonable in our power to seek maximum recoveries," said NCUA Board Chairman Debbie Matz. "By these actions we intend to hold responsible parties accountable. We expect to file additional actions, seeking damages in the billions of dollars. Those who caused the problems in the wholesale credit unions should pay for the losses now being paid by retail credit unions."

This action seeks damages in excess of $629 million, totaling more than $1.5 billion when added to the damages sought in the previous filings.

NCUA's new suit against RBS claims the sellers and underwriters of the questionable securities made numerous material misrepresentations in the offering documents. These misrepresentations caused WesCorp to believe the risk of loss associated with the investment was minimal, when in fact the risk was substantial. The mortgage-backed securities experienced dramatic, unprecedented declines in value, effectively rendering WesCorp insolvent. The combined suits are the culmination of lengthy investigations into the circumstances surrounding the purchases of these securities.

Any recoveries from these legal actions would reduce the total losses resulting from the failure of the five corporate credit unions. The five wholesale credit unions placed into NCUA conservatorship and now liquidated are: U.S. Central, WesCorp, Southwest Corporate, Members United Corporate, and Constitution Corporate.

**- MORE -**

*"Protecting credit unions and the consumers who own them through effective regulation"*

EXHIBIT 14
181

**Page 2**
**NCUA Media Release – Continued**
**Lawsuits**



Corporate credit unions are wholesale credit unions that provide various services to retail credit unions, which in turn serve consumers, or "natural persons." Natural person credit unions rely on corporate credit unions to provide them such services as check clearing, electronic payments and investments.

"While the credit union industry generally fared better than the rest of the financial world over the last few years, the corporate credit union collapse remains the largest crisis ever faced by credit unions," said Matz. "Fortunately, given the liquidity in the system, the average consumer is insulated from these past losses. However, it remains our statutory duty to replenish the insurance fund that protects consumer deposits by seeking recoveries."

You may view a copy of the complaint here.

*NCUA is the independent federal agency created by the U.S. Congress to regulate, charter and supervise federal credit unions. With the backing of the full faith and credit of the U.S. Government, NCUA operates and manages the National Credit Union Share Insurance Fund, insuring the deposits of more than 90 million account holders in all federal credit unions and the overwhelming majority of state-chartered credit unions.*

**- NCUA -**

*"Protecting credit unions and the consumers who own them through effective regulation"*

EXHIBIT 14
182